# EXHIBIT 1

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
07/08/2025
CT Log Number 549545433

## Service of Process Transmittal Summary

**TO:**     Amy Welsh, Associate Counsel
Coventry
7111 Valley Green Rd
Fort Washington, PA 19034-2207

**RE:**     **Process Served in Florida**

**FOR:**    Coventry First LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ABACUS GLOBAL MANAGEMENT, INC., a corporation vs. COVENTRY FIRST LLC |
| **CASE #:** | 2025CA006191O |
| **NATURE OF ACTION:** | Insurance Litigation |
| **PROCESS SERVED ON:** | C T Corporation System, Plantation, FL |
| **DATE/METHOD OF SERVICE:** | By Electronic Receipt on 07/08/2025 at 00:00 |
| **JURISDICTION SERVED:** | Florida |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Liz Hauser  ehauser@coventry.com |
| | Email Notification,  Richard Cooper  rcooper@coventry.com |
| | Email Notification,  Amy Welsh  awelsh@coventry.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>1200 South Pine Island Road<br>Plantation, FL 33324<br>866-401-8252<br>LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

*25-000171999*

ABACUS GLOBAL MANAGEMENT, INC.

PLAINTIFF(S)

VS.

COVENTRY FIRST LLC, ET AL

DEFENDANT(S)

_____/

SUMMONS, COMPLAINT, CIVIL COVER SHEET

**CASE #:**     **2025-CA-006191-O**
**COURT:**    **9TH JUDICIAL CIRCUIT**
**COUNTY:**   **ORANGE**
**DFS-SOP #:** 25-000171999

# NOTICE OF SERVICE OF PROCESS

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the of the State of Florida. Said process was received in my office by ELECTRONIC DELIVERY on Thursday, July 3, 2025 and a copy was forwarded by ELECTRONIC DELIVERY on Tuesday, July 8, 2025 to the designated agent for the named entity as shown below.

COVENTRY FIRST LLC
DONNA MOCH
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324

**\*Our office will only serve the initial process (Summons and Complaint) or Subpoena and is not responsible for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court pursuant to Florida Rules of Civil Procedure, Rule 1.080.**

JASON STERNBERG
ATTORNEY
QUINN EMANUEL TRIAL LAWYERS
2601 SOUTH BAYSHORE DRIVE
1550
MIAMI, FL 33133

KS1

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT,
IN AND FOR ORANGE COUNTY, FLORIDA

Case No.: 2025-CA-006191-O

Division: 43

ABACUS GLOBAL MANAGEMENT, INC., a corporation,

Petitioner,

and

COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,

Respondent.

# SUMMONS:
# ORDEN DE COMPARECENCIA:
# CITATION:

TO/PARA/A: (name of party to be served), COVENTRY FIRST LLC ,
{address (including city and state)/location for service} CHIEF FINANCIAL OFFICER 200 E. GAINES ST. TALLAHASSEE, FL 32399 ,

# IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint/petition with the clerk of this circuit court.
A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.
If you do not file your written response on time, you may lose the case, and your wages, money, and property may be taken thereafter without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).
If you choose to file a written response yourself, at the same time you file your written response to the Court, you must also serve a copy of your written response on the party serving this summons at:
 Quinn Emanuel Urquhart & Sullivan, LLP / Jason Sternberg, Esq. / 2601 S. Bayshore Drive Suite 1550, Miami, FL 33133

If the party serving summons has designated email address(es) for service or is represented by an attorney, you may designate email address(es) for service by or on you. Service must be in accordance with Florida Rule of Judicial Administration 2.516.
Copies of all court documents in this case, including orders, are available at the Clerk of the Circuit

Court's office. You may review these documents, upon request.
You must keep the Clerk of the Circuit Court's office notified of your current address. (You may file Designation of Current Mailing and Email Address).

# IMPORTANTE

Usted ha sido demandado legalmente, Tiene veinte (20) dias, contados a Partir del recibo de esta notificacion, para contestar la demanda adjunto, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo  rotegera; si usted desea que el tribunal considere su defensa, debe
presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales, Si lo desea, puede usted consultar a un abogado immediatament. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparencen en la guia telefonica. Si desa responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante al tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demanadante).

Quinn Emanuel Urquhart & Sullivan, LLP / Jason Sternberg, Esq.
2601 S. Bayshore Drive Suite 1550
Miami, FL 33133

# IMPORTANT

Des poursuites judiciaries ont ete enterprises contre ous. Vous avez 20 jours consecutifts a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal. Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre response ecrite, avec mentin du numero de dossier ci-dessus et du nom des paties nommees isi, si vous souhaitez que le Tribunal entende votre cause. Si vous ne deposez pas votre response ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur de Tribunal. Il y a d'autres obligations juridiques et vous pouvez reqerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).
Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

Quinn Emanuel Urquhart & Sullivan, LLP / Jason Sternberg, Esq.
2601 S. Bayshore Drive Suite 1550
Miami, FL 33133

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE: You are commanded to serve this summons and a copy of the complaint in this lawsuit on the above-named person.

TIFFANY M. RUSSELL
CLERK OF THE CIRCUIT COURT

07/02/2025

By: _Naline S. Bahadur_
Deputy Clerk

Filing # 226352675 E-Filed 06/30/2025 11:45:57 PM

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA**

ABACUS GLOBAL MANAGEMENT,
INC., a corporation,

     Plaintiff,

v.                                                                          Case No.:

COVENTRY FIRST LLC, a limited liability
company; ALAN BUERGER, an individual,

     Defendants.

_____

**<u>COMPLAINT</u>**

Plaintiff Abacus Global Management, Inc. ("Abacus" or the "Company"), by and through its undersigned counsel, brings this Complaint against Coventry First LLC ("Coventry") and its Co-Founder and Chairman Alan Buerger ("Buerger") (collectively, "Defendants") and pleads as follows:

**<u>NATURE OF THE ACTION</u>**

1.     Founded two decades ago, Abacus entered the life settlements market with a distinctive business model predicated on transparency and fair pricing. Unlike its competitors who operate through opaque valuation processes, Abacus built its reputation—and its status as the industry's only publicly traded company—by providing policyholders with unprecedented access to policy valuations through its proprietary Life Settlement Calculator. This tool enables policyholders to understand the net present value ("NPV") of their policies, fundamentally altering the traditional information asymmetry that has long characterized this market. The result is that Abacus consistently pays higher prices as a percentage of each policy's face value than its competitors—a premium that reflects both its commitment to transparency and the competitive advantage such transparency creates.

2.      This transparency has proven commercially successful:  After steadily growing for years, the Company's quarterly revenues have quadrupled since 2023.  Today, Abacus acquires 25% of all life insurance policies sold in first-time life settlement transactions, and its market share continues to increase.

3.      Coventry is a direct competitor of Abacus in the life settlements space.  It has gone on a very different journey over the last twenty years—acting as the poster child for an otherwise beleaguered industry whose reputation Abacus is fervently trying to change. Coventry's pattern of misconduct is extensive and well-documented.  Coventry faced bid-rigging charges from the Office of the New York Attorney General, and it settled a multi-billion-dollar fraud case brought by insurance giant AIG.  A federal Court of Appeals characterized Coventry's policy origination practices as "*illegal*."   Unlike Abacus, Coventry operates without pricing transparency, concealing its valuation methodology from policyholders while simultaneously representing to investors that it achieves profit margins of 40-60% or more on individual policies—a spread made possible only by systematically undervaluing policyholder assets. Coventry can afford to operate this way because it is not a publicly traded company like Abacus, and thus faces less regulatory scrutiny and fewer disclosure obligations.  And despite generating profits by acquiring policies substantially below what Abacus deems to be a fair representation of NPV, Coventry is losing market share to Abacus every year.

4.      Unable to match Abacus's transparent pricing model or market performance, Buerger devised a scheme to undermine Abacus through false and misleading statements: convince the market that Abacus pays policyholders *too much* for their policies—and that this alleged "overvaluation" (which amounts to paying a policyholder too large of a lump sum payment for their life insurance policies) is fraudulently reflected in Abacus's *audited* financial

statements, thus artificially inflating the Company's stock price. In other words, according to Coventry, the very business model that Abacus uses to deliver greater value and higher monetary payments to policyholders is actually a massive fraud against its shareholders—a baseless and defamatory narrative. In spreading these falsehoods, Coventry deliberately ignores Abacus's consistent and legally mandated disclosures that policies on its balance sheet are valued "under the fair value method"—that is, market price, which is fundamentally distinct from the NPV used in the Life Settlement Calculator for policyholder transactions.

5. Since the beginning of 2024, Coventry has routinely disseminated false and misleading statements about Abacus, including targeting the Company's relationship with Lapetus Solutions, Inc. ("Lapetus"), which serves as one component of Abacus's comprehensive and multi-faceted valuation process. Lapetus provides one of six life expectancy estimates Abacus uses to price policies using the Life Settlement Calculator. None of Abacus's valuations of the policies it already owns, the policies it sells to third parties, or the bespoke investment opportunities it crafts for institutional investors depend on Lapetus's life expectancy estimates. Abacus's market-based valuation methodology consistently values the policies on its book within Abacus's stated margin of error of 2%. Defendants are committed to distorting, misrepresenting, and concealing this reality.

6. Coventry, and in particular Buerger, have intentionally made false and misleading statements about Abacus and its use of Lapetus. They did this through self-proclaimed independent but paid studies that purport to show that Lapetus underestimates life expectancy, causing Abacus to overpay policyholders, and then overvalue the policies on its book. From May 2024 to June 2025, Coventry spread these false claims across a wide range of audiences, each deliberately chosen to inflict maximum harm on Abacus. Coventry presented its lies to

3

Abacus's auditor, Grant Thornton ("GT"); market analysts that track Abacus's stock, TD Securities; and the Securities and Exchange Commission ("SEC").  Coventry then filed a meritless lawsuit, for which it has no standing, against the Florida Office of Insurance Regulation ("OIR"), seeking Lapetus's audit records.  Coventry's OIR filing included even more false and malicious claims about the relationship between Lapetus life expectancy estimates and Abacus's stock price.

7.      Despite Coventry's defamatory campaign, Abacus's financial performance has continued to demonstrate the falsity of Coventry's claims.  In the first quarter of 2025, Abacus reported a 105% increase in year-over-year revenue; a 111% increase in year-over-year adjusted EBITDA; and a 157% increase in adjusted year-over-year net income.  This explosive growth is inconsistent with Coventry's claim that Abacus is *overpaying* for its core assets in economically inefficient transactions—because Coventry's claim is false.

8.      Coventry needed to do more to stop Abacus's forward momentum.  So Buerger took these insinuations to the next level in an interview with a financial expert network on May 22, 2025.  In a barely five-page transcript, Buerger accused Abacus of "manufactur[ing] earnings," said that its "stockholders . . . will be subordinated to the asset-backed debt, which is to say they will all be wiped out when this thing goes upside down," repeated that Abacus was "us[ing] Lapetus . . . primarily," and predicted, "it's just a matter of time before [Abacus] implode[s]."

9.      Buerger claimed to speak with authority about Abacus, calling the Company his "*pet project*."  Claiming to "know every public document" Abacus has filed, Buerger apparently ignored that Abacus clearly and repeatedly disclosed:  (i) Abacus's financial statements and internal controls over financial reporting have been found in compliance with Generally

4

Accepted Accounting Principles ("GAAP") by a respected public company auditor, GT, in every annual audit since the Company's inception; (ii) Abacus has zero "asset-backed debt"; and (iii) Abacus has **never said that it uses Lapetus to value the assets on its balance sheet, nor has it ever done so**.

10.     These false statements were made with full knowledge of their inaccuracy in light of Buerger's claim that he has read each and every one of Abacus's SEC filings.  On June 4, 2025—the same morning that Buerger's interview was published to subscribers, including some of Abacus's largest stockholders—the other shoe dropped.

11.     For over a year, Defendants have been soliciting multiple short sellers to write a hit piece on Abacus, regurgitating the same false claims about Lapetus and Abacus's valuation. At least one prominent short seller turned them down because the narrative that senior citizens are making **too much money** from selling their insurance policies is not a compelling story.  But, eventually, short seller Morpheus Research ("Morpheus") agreed to participate in Coventry's smear campaign.  The same morning the interview with Buerger was released to investors, Morpheus released a report (the "Short Report") citing Coventry's "research" on Lapetus and quoting some of Buerger's most inflammatory accusations, under the title:  "Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die." Within minutes, Abacus stock (NASDAQ: ABL) dropped over 21%, erasing more than $157 million in market capitalization in a single day, and roughly $287,400,000 over the next four weeks.

12.     Coventry's relentless campaign against Abacus has caused substantial harm to the Company and its stockholders.  Coventry's false narrative attempts to project its own financial

5

vulnerabilities onto Abacus, but the facts demonstrate otherwise. The market analysts who came to Abacus's defense after the Short Report recognize the truth: Abacus's transparent approach is a ray of sunshine in an otherwise beleaguered industry, and that explains its rapid rise.

13. In the wake of Buerger's interview and the Short Report, Abacus is now fielding questions from investors parroting the points Coventry has been shilling for over a year. That is in part because ***Buerger is communicating directly with Abacus investors, and disseminating Coventry's misleading "studies" of Lapetus***. Of course, Buerger's communications omit that Lapetus has thoroughly rebutted Coventry's one-sided studies with its own independent report, which has caused market analysts to conclude that "there is no evidence that [Lapetus] under-estimates [life expectancy]."

14. To be clear, this case is not about legitimate competitive practices or good faith criticism of a competitor's business model. Competition through superior products, services, or pricing benefits consumers and strengthens markets. Defendants' conduct, however, crosses the line from lawful competition into tortious interference and defamation. Rather than competing on the merits by offering policyholders better terms or more transparent pricing, Coventry has chosen to attack Abacus through a systematic campaign of false and misleading statements designed to damage Abacus's reputation, confuse its customers, and undermine investor confidence. This calculated campaign to harm a competitor through deception and falsehoods rather than through a legitimate business strategy has no place in a properly functioning marketplace.

15. Abacus therefore brings this action to put an end to Defendants' unjust and anticompetitive scheme of spreading false and misleading statements about Abacus's business, and to restore its reputation. Abacus seeks compensation for the substantial economic and

reputational harm Coventry's falsehoods have caused.

## PARTIES AND JURISDICTION

16. Abacus is a corporation organized under the laws of the state of Delaware with its principal place of business in Orlando, Florida.

17. Coventry is a limited liability company organized under the laws of Delaware, with its principal place of business in Fort Washington, Pennsylvania. Coventry is registered and licensed to do business in Florida.

18. Alan Buerger, the Co-Founder and Chairman of Coventry, is a citizen of the state of Pennsylvania, and resides at 8850 Montgomery Ave., Glenside, Pennsylvania 19038-8310.

19. This Court has personal jurisdiction over Defendants, pursuant to section 48.193(2), Florida Statutes, because Defendants engage in substantial and not isolated activity within this state. This Court also has personal jurisdiction over Defendants, pursuant to section 48.193(1)(a), because the causes of action in this Complaint arise from Defendants "[c]ommitting a tortious act within this state"; "[c]ausing injury to persons or property within this state" while "engaged in solicitation or service activities within this state"; and/or "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state."

20. Jurisdiction is proper in this Court, pursuant to section 26.012(2)(a), because the amount in controversy exceeds $50,000, exclusive of interest, costs, and attorneys' fees.

21. This case is subject to mandatory assignment to the Business Court because it is an action relating to securities, AO2019-08-02 § I.B.4, and because it is a complex dispute of a commercial nature with complex factual and legal issues and an amount in controversy of at least $388,500,000, *id.* § I.A.10. Specifically, as explained in further detail below, Defendants' bad

7

acts and inflammatory statements caused Abacus to lose roughly $287,400,000 in market capitalization, lose the ability to collect management fees on a $100 million private fund deal, and lose an approximately $1.1 million consulting agreement.

22.    Venue is proper in Orange County, Florida, pursuant to section 47.051, as this cause of action accrued in Orange County, Florida.

## FACTUAL BACKGROUND

### I.    ABACUS AND COVENTRY COMPETE IN A GROWING MARKET

#### A.    A New Asset Class For An Uncertain Time

23.    While life insurance often provides the policyholder and their family with peace of mind, in most cases it fails to deliver a financial benefit.

24.    Of the approximately $13 trillion in potential benefits currently underwritten in the United States, insurance industry forecasts predict that over 90% will never pay out, due to the policyholder's inability to pay the remaining premiums necessary to fully fund the policy.

25.    As a result, many policyholders end up wasting the value built up in their policies, even though life insurance is considered valuable and transferable personal property.  *See Grigsby v. Russell*, 222 U.S. 149 (1911).

26.    The life settlements industry helps solve this problem by allowing policyholders the opportunity to monetize their policies.  A "life settlement" transaction allows the original policyholder to sell their life insurance policy to a licensed third party at the policy's then-NPV, where NPV equals the face value of the policy upon maturity and any future premium payments discounted to the present, with the total forecasted discounting period being based on the policyholder's life expectancy at the time of the settlement.

27.    In a typical life settlement transaction, the original policyholder receives a lump-sum cash payment, which can be quite meaningful because life insurance is often a senior

citizen's largest asset (including their home).  On average, life settlements companies pay sellers nearly eight times more than the current cash surrender value the seller could get from their insurance carrier.  Sellers are freed from paying premiums, and are able to use the proceeds to support their retirement, transfer wealth, and pay medical bills.

28.     In exchange, the purchaser in a life settlement transaction receives the right to collect the face value of the policy at maturity, provided that the purchaser maintains the premiums as required under the original insurance contract.

29.     For the same reasons that life insurance offers peace of mind to the original policyholder, life settlements are a very stable investment.  The payouts under life insurance policies are cash reserved by highly-rated insurance companies and not correlated to market trends.

30.     Abacus estimates that the scale of the life settlements market opportunity is $233 billion each year, yet only 2% of those policies are captured in life settlement transactions, which means this market offers significant growth opportunities.

**B.      The Life Settlements Markets**

31.     After the initial issuance of a life insurance policy, life insurance policies are sometimes bought and sold in two distinct markets.  Transactions in which the policy passes from the policyholder to a licensed life settlements provider occur in what is known as the "secondary market."  Transactions in which the policy passes from a licensed provider to an investor interested in this new alternative investment opportunity occur in the "tertiary market."

**1.      The Secondary Market**

32.     Transactions in the secondary life settlements market are necessarily individualized.  While the policy is still held by an insured, its NPV depends on the age, gender and health of the insured, life expectancy, future premium projections, and the face value of the

9

underlying life insurance policy.

33.    The value of a secondary transaction takes into account the value of the policy to the original policyholder, meaning that it assumes the only alternative is holding the face value of the policy to maturity (which would entail making the premium payments), or allowing the policy to lapse.

34.    Because the secondary market discounts NPV based on the time to maturity, the policyholder's remaining life expectancy, calculated by a life expectancy provider ("LE" or collectively, "LEs") is a hugely important variable in pricing secondary transactions.  All else equal, an insured will fetch a higher price for their policy the shorter their remaining life expectancy.  It is therefore common practice in the industry to require a medical underwriting to confirm life expectancy before offering a price in a secondary transaction.  Therefore, the price of a secondary transaction depends directly on the life expectancy valuation model.

### 2.    The Tertiary Market

35.    Tertiary transactions bear a closer resemblance to markets for other fixed-income assets that trade over-the-counter, such as mortgages or collateralized loan obligations.  The buyers in the tertiary market are not licensed intermediaries, do not interact with the insured, and frequently do not have the level of information and access necessary to do a ground-up medical re-underwriting of the insured.  The buyers in the tertiary market are investors, and the discount rate they apply to policies they buy is primarily driven by the investor's costs of capital, and the current supply and demand of policies; thus, individual life expectancy estimates are far less important.

36.    Buyers in the tertiary market, frequently large institutional investors seeking exposure to the uncorrelated yield of life settlements, typically do not buy policies one at a time. Rather, tertiary market buyers normally buy groups of policies in pools, assessing the risk and

10

appropriate discount rate on a pool-wide basis.

37.     The buyers in the tertiary markets have their own internal models, life expectancy assumptions, and diligence processes to derive the ideal price for their investments in life settlements.  It is not uncommon for buyers in tertiary markets to rely primarily on a single life expectancy provider to ensure consistent pricing across their array of policy acquisitions.

## II.     ABACUS AND COVENTRY HAVE VERY DIFFERENT WAYS OF DOING BUSINESS

38.     On a surface level, Coventry and Abacus both fill the intermediary role of buying policies on the secondary market and selling on the tertiary market.  But each company's practices shed light on the current state of the life settlements space and expose Coventry's motives for attacking Abacus.

### A.     Coventry's Checkered History

39.     Coventry claims on its website to have coined the term "life settlement" in 1998. It has also garnered more than its fair share of negative attention for how it has sourced the life insurance policies it purchases.

40.     Coventry first began buying life insurance policies on the secondary market in 2000.  Upon information and belief, Coventry generates profits well above industry standards by paying policyholders less than a fair NPV for their policies.  Coventry has bragged to investors it can realize 40–60% profits on a given policy, up to three times the average Abacus realizes.

41.     Over the next two decades, these high profit margins lifted Coventry to the top of the life settlements business in terms of total policies purchased and total revenue.  Coventry grew to dominate the secondary market—in 2022, Coventry and its wholly-owned affiliate Life Equity LLC bought 52.1% of the life insurance policies sold by policyholders in the United States.

11

42.     This growth did not come without criticism, or, indeed, legal exposure.  In 2006, the Office of the New York Attorney General accused Coventry of bid-rigging and aiding and abetting breaches of fiduciary duty perpetrated by insurance brokers against their clients.  *See* Complaint, *New York v. Coventry First LLC, et al.*, Index No. 0404620/2006, 2006 NY S. Ct. Pleadings LEXIS 35.

43.     The next year, OIR opened an investigation into Coventry for similar practices, which resulted in a consent order requiring Coventry to adopt a remedial business plan.  *In re Coventry First LLC*, No. 88270-06-CO (Fla. OIR Sept. 28, 2007).[1]

44.     Coventry has also been a leading player in the so-called "stranger-originated life insurance" ("STOLI") space, which refers to the practice of a lender providing up-front financing of life insurance policies for seniors who could not otherwise afford to obtain them, in exchange for the lender taking control of the policy after a reasonable interval.  STOLI policies have been highly controversial.

45.     As discussed in a 2010 report from the SEC's Life Settlements Task Force, STOLI policies are "inconsistent with the historical social policy of insurance, which is to protect families and businesses from potential economic hardship caused by untimely death of the insured," "may encourage insurance fraud," and "could make life insurance more expensive."[2]

46.     Moreover, several courts across the country have expressly held that STOLI policies, and in particular **Coventry's STOLI policies**, are "***illegal***" insofar as they allow a third party to take out an insurance contract for a life in which they do not have an insurable interest.

---

[1]  *Available at* https://floir.com/docs-sf/default-source/life-and-health/coventryfirst88270-06-co.pdf?sfvrsn=214bcecb.

[2]  LIFE SETTLEMENTS TASK FORCE, STAFF REP. TO U.S. SEC. & EXCH. COMM'N 12–13 (2010).

In *Estate of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186 (11th Cir. 2021), the Eleventh Circuit explicitly upheld a lower court ruling invalidating an insurance policy, the circumstances of which "[did] not show [the insured], [the broker], and Coventry intended to purchase the Policy for lawful insurance purposes. . . . Rather, the arrangement appears to . . . create an illegal wagering contract by which Coventry gambled on [the insured's] life and from which Coventry and [the broker] profited." *Id.* at 1196–97.

### B.     Abacus Empowers Its Clients And Its Investors

47.     Abacus has built its business on a fundamentally different model than Coventry's. Rather than buying low from seniors and selling high to investors, Abacus is developing a comprehensive suite of products and solutions around the life settlement asset to serve a variety of stakeholders.  As the only publicly-traded life settlements company, Abacus functions as both an originator and market maker of this asset.

48.     Abacus has purchased $10 billion in face value of policies since 2004.  Abacus Global Management, Inc., Annual Report (Form 10-K), at 2 (Mar. 28, 2025).  In 2023, the Company went public through a de-SPAC transaction with East Resource Acquisition Company. The next year, Abacus purchased 22% of the face value of policies sold on the secondary market.

49.     Abacus is committed to expanding the underlying premise of life settlements— that one's lifespan can be treated as a monetizable asset—into newly profitable investment strategies beyond the ultimate maturity of the underlying policies.  Abacus has expanded its reach and built its reputation in large part through the "Abacus Pays" portal, a free online policy value calculator that informs policyholders of the approximate NPV of their policy based on basic demographic characteristics, policy type, and face value.  This transparency, in marked contrast to Coventry's practices, has resulted in Abacus making larger life settlement payments to policyholders, measured as a percentage of policy face value, than its competitors.

13

50. Today, four divisions of the public entity, Abacus Global Management, Inc., are driving its growth:

a. **Abacus Life Solutions** buys policies in individual secondary life settlement transactions, and specializes in raising awareness among consumers of the life settlement path, including through direct marketing and by outreach to financial advisors and their client networks.

b. **Abacus Asset Group** serves "institutional investors alongside select private clients, providing excess returns across the risk-reward spectrum" through a suite of public and private fund offerings.

c. **Abacus Wealth Advisors** is a registered investment adviser leveraging more than two decades of proprietary data and algorithms that helps financial advisors create customized plans based on clients' health, longevity, and overall financial wellbeing.

d. **ABL Technologies** creates technology products that are revolutionizing the life planning industry by processing and analyzing an ever-expanding universe of mortality data, not only improving the precision of pricing that the Life Solutions division can offer to policyholders, but also delivering valuable data resources to pension funds, government agencies, and insurance-related businesses that may struggle to track members and beneficiaries without cutting-edge tools. The division has developed platforms that conduct real-time mortality verification, locate missing participants, and service the secondary life insurance market with unprecedented speed and accuracy.

51. In addition, on October 16, 2024, a newly-organized Abacus affiliate, ABL Longevity Growth and Income Fund (the "Fund"), filed a preliminary prospectus with the SEC, seeking approval to launch an interval fund—a specialized type of investment company that continually offers shares for purchase, but only permits repurchase or sale of shares on a quarterly basis. ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (Oct. 16, 2024).[3]

52. The Fund is a vehicle for extending the opportunities that institutional investors realize through the Abacus Asset Group to a broader class of retail investors.

---

[3] The Fund recently filed an update N-2 on June 17, 2025. *See* ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (June 17, 2025).

53. The Fund is purpose-built to act as a buyer on the tertiary market. Unlike Abacus Life Solutions, the Fund does not participate in secondary market purchases, and will not reach out to policyholders directly, nor will the Fund buy any policies from any Abacus affiliate (which is expressly prohibited by the Investment Company Act of 1940).

## III. ABACUS AND ITS AFFILIATES MAKE CLEAR AND CONSISTENT DISCLOSURES REGARDING THEIR VALUATION METHODOLOGIES

### A. Abacus Uses A Fair Value Approach

54. Beginning in October 2024, Coventry launched a campaign falsely claiming that Abacus misrepresents the value of policies on its balance sheet. Coventry's central accusation—that Abacus uses Lapetus life expectancy estimates to inflate the value of policies on Abacus's books—is demonstrably false, as Abacus's public disclosures make clear.

55. ***As it has repeatedly disclosed, Abacus does not use a life expectancy valuation model to value the policies on its balance sheet*** **(instead, it uses market-based fair value accounting pursuant to GAAP)**. The former approach is appropriate for secondary market transactions because those are individualized for the policyholder in question. Secondary market prices thus depend on the individual insured life and rely heavily on medical underwriting and the particular life expectancy at issue.

56. That model, however, does not reflect the value Abacus could reasonably expect to capture in a subsequent transaction, and therefore is inappropriate to value policies held on its balance sheet. Once the secondary transaction is complete, the policy can only be traded in a tertiary transaction if a willing investor exists on the other end. Accordingly, Abacus values the life insurance policies on its balance sheet in accordance with ASC 325-30, *Investments in Insurance Contracts*. As explained in the Company's most recent annual report, dated March 28, 2025:

15

> For all policies purchased after June 30, 2023, the Company accounts for these under the fair value method. For policies purchased before June 30, 2023, the Company elected to use either the fair value method or the investment method (cost, plus premiums paid). The valuation method is chosen upon contract acquisition and is irrevocable.

Abacus Global Management, Inc., Annual Report (Form 10-K), at 80 (Mar. 28, 2025).

57. As of 2025, over 99% of the policies on the Company's balance sheet were valued using the fair value method, which dictates "fair value as ***an exit price*** representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date." *Id.* (emphasis added). The annual report reminds investors (and competitors, should they be reviewing each and every filing, as Buerger claims he does) that "fair value is a market-based measurement," which "reflect[s] assumptions about what factors market participants would use in pricing life settlement policies." *Id.*

58. These disclosures indicate that Abacus values over 99% of the policies on its balance sheet based on assumptions about the value of tertiary market transactions—the kinds of transactions that are not priced on a policy-by-policy basis, do not involve thorough medical underwriting, and which do not always assume holding the policy to maturity.

59. Since Abacus became a public company, GT, a reputable public accounting firm, has audited the Company's consolidated financial statements and has issued unqualified opinions, including this valuation approach.

**B.    The Fund Uses A Fair Value Approach**

60. The Fund is a separate investment product, which has not yet been approved, and the value of which will be based on assets other than those Abacus holds on its balance sheet. As part of the registration process, which is still ongoing, the Fund also discloses its valuation

16

methodology.  In the most recent Form N-2 filed with the SEC before Buerger's most recent inflammatory statements, *see infra* ¶¶ 100-108, the Fund disclosed that it relies on "[t]he Valuation Methodology developed by ABL Technologies that is leveraged by the Manager, enabl[ing] the Manager to deploy a dual criterion evaluation system."  ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2), at 3 (Apr. 14, 2025).  The two criteria are as follows:

    a.  "The first criterion focuses on the valuation of Mortality Contracts using a defined risk-adjusted market discount rate, coupled with a projected life expectancy.  ***The market discount rate is derived from ABL Technologies' proprietary database of historical transactions completed by the Sponsor and its affiliates that span the prior rolling five-year period***, which are then adjusted for policy specific risks (including factors such as life expectancy, maturity date, and premiums)."

    b.  "The second criterion derives its valuation from the cost basis of the Mortality Contract and is adjusted based upon our risk-adjusted historical trade spread. This inclusion allows the Fund to consider the dynamics of ***historical trading of over 1,000 realized Mortality Contract trades spread on average***, evenly over the prior five-year period."

*Id.* (emphasis added).

61.    In other words, the ABL Technologies formula for valuing the life insurance polices that the Fund will purchase—which it values as a pool making up the assets of the Fund—depends upon historical transactions in the tertiary market.  Or, as the Fund disclosed in the same Form N-2:  "[f]or purposes of calculating [net asset value], portfolio investments are valued using fair value."  *Id.* at 45.  Meanwhile, the Fund manager has no particular interest in those fair value marks; management fees are charged ***the lower of*** the fair value mark or the purchase price of the asset, so that the manager has no incentive to inflate the marks of Fund assets in the fair value analysis.  *Id.* at 44.

62.    Separately, the Fund discloses that "[t]he value of an ***individual*** Mortality Contract is determined through the development of probabilistic survivability curves based on

the medical underwritings . . . such as those provided by ITM 21st, Fasano & Associates, Predictive Analytics, Lapetus Solutions, Polaris, and LSI Longevity Solutions Inc." *Id.* at 45–46 (emphasis added). Those six firms provide life expectancy estimates.

63. The Fund has been clear in its disclosures to the SEC throughout the registration process: it is set up to act as a tertiary market participant, which, as a matter of practice, rely on a single LE for all of their policies in order to ensure consistent day-to-day marking. Accordingly, while the Fund reviews all available LEs for a particular policy, the Fund discloses that "[c]onsistent with standard practice in the life settlement market, the Manager will typically engage a single life expectancy provider with respect to any given Mortality Contract. Generally, the Fund expects to rely on Lapetus Solutions as its primary life expectancy provider." *Id.* at 46. The Fund's disclosures explain that Lapetus's "data set is significantly larger than other life expectancy providers" and Lapetus (unlike other providers) engages in medical underwriting. *Id.*[4]

64. The Fund is an interval fund that, if registered, will distribute investor risk across hundreds of policies. ***Once the Fund is registered, no investor in the Fund will ever buy or sell units based a valuation derived solely from a Lapetus life expectancy estimate***; rather, units will be exchanged according to the net asset value ("NAV") calculation generated by the ABL Technologies algorithm, which is based on "fair value," in particular "historical trading" on the tertiary market. *Id.* at 45–46.

---

[4] Indeed, many participants in the space besides Abacus, including major insurance companies, use the Lapetus LEs as a data point. And Abacus is not even the only party to this action that has used data from Lapetus. On more than one occasion in 2024, Coventry has offered for sale policies priced using a Lapetus LE. One of these offers came directly from Coventry CEO Reid Buerger.

18

IV.    **WITH ABACUS GAINING MARKET SHARE, REVENUE, AND RESPECT IN THE MARKET, COVENTRY SEEKS TO DISCREDIT LAPETUS AND DESTROY ABACUS'S REPUTATION**

65.    The Fund first disclosed its selection of Lapetus as its preferred life expectancy provider for single policy purchases in February of 2024.  Since that time, Coventry has pursued an array of media strategies to convince the market of three lies clearly refuted by Abacus in its public disclosures:

    a.  Lapetus underestimates life expectancies;

    b.  Abacus values policies on its balance sheet using Lapetus; and

    c.  Abacus is overvalued because of its reliance on Lapetus, and its recent growth is the product of fraud.

66.    As set forth below, Coventry's efforts to discredit Lapetus, and associate Lapetus with the value of Abacus—even though no such association exists—have been brazen, persistent, and defamatory.

    A.    **As Soon As The Fund Mentions Lapetus, Coventry Sets Out To Discredit Lapetus, Including By Interfering With Abacus's Public Auditor, Grant Thornton, And Running To The SEC**

67.    Coventry has been planning to defame and slow Abacus for well over a year.  For example, in February 2024, after the Fund filed its first N-2, Coventry wrote a letter to the SEC highlighting what it purported to be actionable conflicts of interest and accounting misstatements.  The SEC took no action on the February 2024 letter.

68.    In May 2024, a few months after the Fund first disclosed its selection of Lapetus, Coventry published an "internal review" of Lapetus's life expectancy estimates purporting to show that Lapetus's estimates were "consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies and investor losses."  Coventry then concluded that its "results cast doubt on the accuracy of

19

asset valuations based primarily on Lapetus life expectancies."[5]  Then, in July 2024, Coventry commissioned two professors to produce a report published on their website to "confirm[] the results of [Coventry's] internal analysis."  Coventry's core claim is that Lapetus LEs are shorter for 85% of underwritten cases, and that the average difference is 31 months.  Coventry went on to opine "valuations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses."[6]

69.     On October 25, 2024, Buerger spoke at the Life Insurance Settlement Association ("LISA") Life Settlement Conference, a public event, in Miami.  In a video of the presentation available on YouTube, Buerger doubles down on the claims in Coventry's "internal review," stating, among other things, that Lapetus systematically underestimates life expectancy.  Buerger repeatedly challenged Lapetus's work, but when asked by Lapetus's CEO to review the underlying data together, refused that offer.

70.     When asked about Abacus, Buerger stated that its "fair market value [suggested by Lapetus] is grossly overstated," and that the "$250 million dollars out there that investors have put up" with Abacus "is debt."

71.     He continued, "and I worry that it's going to be $300, $400, $600, and $1 billion. With Mutual Benefits, it was $800 million. . . .  It's going to be awful for us."[7]  By referring to the Mutual Benefits Corporation, Buerger implied Abacus was similar to a company that conducted one of the largest ponzi schemes in Florida's history, and whose CEO has been

---

[5]   *Coventry Study Finds Lapetus Life Expectancies are Shorter than Competitors in 85% of Cases Reviewed*, Coventry (May 5, 2024), https://www.coventry.com/coventry-study-finds-lapetus-life-expectancies-are-shorter-than-competitors-in-85-of-cases-reviewed/.

[6]   *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, Coventry (July 22, 2024), https://www.coventry.com/coventry-releases-peer-review-of-lapetus-life-expectancy-study/.

[7]   *See* Jon Mains, *October 25, 2024* [Statement at 30th Annual LISA Life Settlement Conference] (YouTube, Oct. 25, 2024), https://youtu.be/-xwCWTM33VY?feature=shared&t=4482.

sentenced too 20 years in prison.

72. Unsatisfied with its campaign to bring down Abacus by way of Lapetus, Coventry took its defamation campaign a step further. On information and belief, a week after Abacus's Lapetus disclosure in the Fund's N-2, Coventry approached a partner at Abacus's auditor, GT. Coventry tried to influence GT's audit of Abacus's audited financials by disseminating the same lies that were disseminated to other third parties, including the false and misleading statements contained in Coventry's own study of Lapetus's life expectancy estimates and that Abacus uses Lapetus in its valuation process.

**B.      Coventry Runs To The SEC About The Fund's Disclosure With Respect To Lapetus**

73. On November 1, 2024, nine months after the Fund first mentioned Lapetus in its registration statement, but within days of the letter to GT and Buerger's public comments, the SEC curiously and suddenly issued a Comment Letter on Abacus's Form S-1/S-3 filing, asking the Fund to "provide a detailed explanation of any relationship and disclose the extent to which you have relied upon Lapetus or any of its co-owned entities for valuation of life insurance policies."[8]

74. On information and belief, the SEC issued the November 1 comment letter because Coventry contacted the SEC in October of 2024 and urged the SEC to inquire further into Abacus's disclosures about Lapetus.

75. In the SEC's subsequent Comment Letter, it asked pointed questions about (1) whether Abacus or its officers and directors had an interest or relationship in Lapetus and (2) "[i]f Lapetus is a related party," what limitations that placed on Abacus's ability "to value life

---

[8]  *See* Abacus's Resp. to SEC Nov. 1, 2024 Comment Letter (Nov. 4, 2024),
https://www.sec.gov/Archives/edgar/data/1814287/000162828024044861/filename1.htm.

insurance policies under any relevant state laws."[9]  These questions from the SEC largely mirror the accusations contained in the letter from Coventry to Abacus's auditor as well as the biased conclusions contained in the Coventry Study.  *See infra* ¶¶ 78-82.

76.    In any event, Abacus disclosed the truth to the SEC, investors, and the public that Abacus and Lapetus are not related parties, and that Abacus complied "with all relevant state laws."  Abacus also disclosed that with respect to Abacus's valuation process, "Lapetus's role involves generating life expectancy reports, which [Abacus] incorporates as one of multiple inputs into its valuation process."  Indeed, Abacus further disclosed that "it does not rely solely . . . on Lapetus's life expectancy reports."  And critically, "Lapetus does not engage in the valuation of policies" thus, Abacus's "use of Lapetus as an input" is "limited and immaterial to [Abacus's] overall valuation process."[10]

77.    After reviewing these fulsome disclosures, the SEC did not raise any concerns about the valuation methodology or the relationship between Lapetus and Abacus again.

### C.    Coventry Commissions A Hit Job On Lapetus With The Goal Of Harming Abacus

78.    Having failed to gain traction through its direct attacks on Abacus's auditor, analysts, and regulators, Coventry escalated its campaign.

79.    To add a veneer of legitimacy to its attacks on Lapetus and Abacus, in December 2024, Coventry commissioned an "independent study" purporting to show that Lapetus's Life Expectancy estimates were far shorter than other providers (the "Coventry Study").[11]  What Coventry failed to disclose about this purportedly objective analysis is that *Coventry paid* the

---

[9]  *Id.*

[10]   *Id.*

[11]   Daniel Bauer and Nan Zhu, *Lapetus Actual-to-Expected Deaths Study* (Dec. 2024), https://www.slideshare.net/secret/9fjnG9zXIx1jM8?ref=morpheus-research.com.

two "leading professors" to validate the conclusions in Coventry's predetermined narrative, which Coventry had already set out in its May 2024 "independent review" and paid the two professors to "confirm[]" in July 2024.[12]  Moreover, Coventry failed to disclose that these "leading professors" did not perform an independent study, rather Coventry provided them with data that Coventry cherry-picked, and the professors' role was limited to verifying the math supporting *Coventry's pre-existing thesis* that Lapetus's LEs are far lower than its peers.

80.    Lapetus refuted the Coventry Study with its own independent analysis.  Lapetus's auditor examined Lapetus data "with matched medical records" for the same lives in Coventry's analysis and concluded that "Lapetus has proved to produce more accurate estimates" than its competitors, and that "[there] is no direct evidence at this stage to suggest that the life estimates produced by other LE providers will prove to be more accurate for such lives."[13]

81.    Coventry published a press release stating only the high-level "conclusions" of its "independent study," but did not make the details of the study public, nor did it respond to the Lapetus rebuttal.[14]  Coventry hides the details underlying its attacks on Lapetus behind a click-through agreement that requires anyone who wants to see the Coventry Study to agree that they

---

[12]  *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, Coventry (July 22, 2024), https://www.coventry.com/coventry-releases-peer-review-of-lapetus-life-expectancy-study/.

[13]  Daniel G. Ryan, *Independent assessment of Lapetus methodology for estimating individual lifespans* (June 4, 2025), https://lapetussolutions.com/wp-content/uploads/2025/06/Independent-assessment-of-Lapetus-methodology-for-estimating-individual-lifespan-20250604.pdf.  To be sure, Lapetus maintains a license to operate in Florida, which has one of the nation's most stringent regulatory frameworks.  Among other things, Lapetus must (i) file routine audits by "a nationally recognized actuarial firm," of all life expectancy calculations, including "actual-to-expected ratio[s] of life expectancies" across seven time categories; (ii) maintain detailed "policies and procedures covering all life expectancy determination criteria and protocols"; and (iii) provide OIR "[a] description of the training, including continuing training, of the individuals who determine life expectancies."  § 626.99175, Fla. Stat.

[14]  *Flaws in Lapetus Life Expectancy Estimates Exposed in New Study Following Olshansky-Buerger Debate at LISA Conference*, Coventry (Feb. 10, 2025), https://www.coventry.com/flaws-in-lapetus-life-expectancy-estimates-exposed-in-new-study-following-olshansky-buerger-debate-at-lisa-conference/#:~:text=The%20analysis%20covered%20a%20total,31%25%20A%2FE%20Ratio.

23

will only access it "for informational purposes."[15]  And even if one fills out the form, it is only to "Submit [a] Request," which in turn requires the interested party to provide its name, email address, phone number, company / publication, and which document the party is interested in.[16] There is no guarantee that, once the user forfeits the information, they will actually gain access to the Coventry Study.

82.    The Coventry Study serves not as genuine research but as a manufactured credential—allowing Coventry to cite purportedly independent academic findings while ensuring the underlying methodology remains hidden from scrutiny.  This approach enables Coventry to disseminate its false claims about Lapetus and Abacus across multiple platforms while avoiding accountability for the study's flawed foundations.

**D.    Coventry Tells Market Analysts At TD Securities To Downgrade Abacus Based On The Coventry Study**

83.    Coventry was trying, and largely not succeeding, in convincing the market that Lapetus was wrong, and thus Abacus was misvaluing the insurance policies it owned.  Yet sophisticated institutional investors and market analysts disagreed, likely because Abacus repeatedly disclosed that its asset valuation was based on market transactions and "reflect[ed] . . . assumptions about what factors market participants would use in pricing life settlement policies," and not on the output of a single life expectancy provider.  Abacus Global Management, Inc., Annual Report (Form 10-K), at 80 (Mar. 28, 2025).

84.    On March 9, 2025, Coventry contacted TD Securities, one of the analysis firms that frequently comments on the strength and value proposition represented by Abacus's common stock.  Later that day, an analyst at TD Securities emailed Abacus Chairman Jay

---

[15]  *Request Lapetus Life Expectancy Study Information*, Coventry, https://www.coventry.com/research/ (last visited June 30, 2025).

[16]  *Id.*

Jackson and Abacus Chief Financial Officer Bill McCauley, stating that an "Abacus competitor informed us of some recent" news about Lapetus which required Abacus's feedback. The TD Securities analyst specifically referenced the statistics Coventry had put out about Lapetus in 2024.

85.    Mr. Jackson later learned that the "Abacus competitor" was none other than Coventry. The analyst regurgitated the same biased conclusions and flaws in the Coventry Study, including that Lapetus has shorter life expectancies than other providers. Mr. Jackson made clear that Lapetus's estimates reported to the state of Florida are in line with other life expectancy providers. In addition, the analyst addressed the specter of concern raised by Coventry around Abacus's and Mr. Jackson's relationship with and to Lapetus which, according to Coventry, violates Florida regulations.

86.    Abacus's communications with TD Securities continued with Abacus having to correct the myriad of false and misleading statements advanced by Coventry. For example, on March 21, 2025, the TD Securities analyst asked Mr. Jackson "[w]hat percentage of the life settlement policies on your books are based on Lapetus LEs to set the fair value?"—apparently buying the line from Coventry that the fair value calculations depended on Lapetus life expectancies, when in fact, the Lapetus LEs are not used *at all* in the fair value analysis.

87.    A few weeks later, in an April 2025 phone call between Mr. Jackson and the TD Securities analyst, Mr. Jackson learned not only that Buerger was the "industry source" sowing doubt to TD Securities, but that Buerger reached out to TD Securities directly to inform the analyst that Abacus's balance sheet was overvalued due to Abacus's use of Lapetus's life expectancy estimates. The goal? Buerger suggested to the analyst that TD Securities ***drop its coverage*** of Abacus's stock.

25

88.    TD Securities did not follow that invitation, convinced that Coventry's Co-Founder and Chairman's smear campaign was simply not true.

**E.    Despite Claiming That Lapetus's Data Is Incorrect And Misleading, Coventry Sues OIR For The Information, While Simultaneously Smearing Abacus For Using The Data**

89.    At the same time, Coventry made defamatory statements about Abacus directly to regulators as part of a pleading seeking disclosure of information Lapetus provided to Florida OIR.  *See* Petition for Writ of Mandamus and Expedited Hearing for Violations of Florida's Public Records Act, *Coventry First LLC v. Fla. Office of Ins. Regul. & Lapetus Sols., Inc.*, Case No. 2025 CA 000463 (Fla. 2d Cir. Ct. Mar. 21, 2025) ("Coventry Writ" or the "Writ").

90.    A few weeks after the initial email exchange between Mr. Jackson and the TD Securities analyst in which Mr. Jackson informed the analyst of the life expectancy data reported to Florida regulators, Coventry filed a petition to gain access to Lapetus's Florida audit reports. *Id.*  The Coventry Writ alleged that the OIR violated Florida's Public Records Act because OIR did not satisfy Coventry's request for life expectancy audit reports that Lapetus is required to submit to OIR.  *Id.* ¶¶ 3–4, 16.  Coventry claimed that Lapetus's "issuance of chronically short Life Expectancies has skewed the entire life settlement market." *Id.* ¶ 18.

91.    Regardless of the "merits" of Coventry's claim, Coventry's true motivation for its Writ is laid bare in paragraph 18 of the Writ—yet another public vehicle to attack Abacus by way of attacking Lapetus.

92.    Although wholly irrelevant to Coventry's claimed right to the information held by OIR, the Writ alleged that Lapetus's "Life Expectancies have substantial influence on the market through . . . [its] *unique relationship* with Abacus Global, *a group of life settlement companies which use LAPETUS as their preferred Life Expectancy provider*." *Id.* (emphasis added). Abacus has never made any such claim.

93.     The support Coventry cites to underscore this "unique relationship"?  A *prior unpaid* nominal board position held by Mr. Jackson in which Mr. Jackson was in an advisory position, he did not have authority or capacity to act on Lapetus's behalf, and he was only minimally involved with Lapetus's operations.[17]  And Abacus purportedly "invest[ed] heavily in Lapetus."  The heavy investment?  A $1 million convertible note, that may result in at most 5% ownership upon conversion, which "would not grant [Abacus] any influence or control over Lapetus."[18]

94.     Coventry falsely asserts that Mr. Jackson's prior Lapetus board position and the minor convertible note Abacus maintains in Lapetus "may violate the Life Expectancy reform law passed by the [L]egislature in the wake of the Mutual Benefits collapse," and goes on to falsely compare Abacus to Mutual Benefits: "Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their relationships, the [L]egislature now requires independence between settlement providers and Life Expectancy providers. . . . The relationship between Lapetus and Abacus is so close that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the market, bizarrely asserted that 'Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions.'"  Coventry Writ ¶ 18 n.4.

95.     The Coventry Writ also contains the clearest statement of Coventry's Big Lie: "One of the Abacus companies, **Abacus Life Inc.[19]—the main asset of which is life policies purchased by Abacus—is a publicly traded company whose shareholders' investments are**

---

[17]   *See* Abacus's Resp. to SEC Nov. 1, 2024 Comment Letter (Nov. 4, 2024), https://www.sec.gov/Archives/edgar/data/1814287/000162828024044861/filename1.htm.

[18]   *See id.*

[19]   Abacus Global Management, Inc. was previously named Abacus Life Inc.

**dependent on the accuracy of the Life Expectancy estimates used to value policies**." *Id.* ¶ 20 (emphasis added).

96.     This is not even a little bit true, about *any* securities issued by any Abacus entity. The stock of the publicly traded company is valued according to "an exit price representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date."  Abacus Global Management, Inc., Annual Report (Form 10-K), at 80 (Mar. 28, 2025).

97.     The units of the Fund—which *has no investors because it has not yet been approved*—will depend upon "ABL Technologies' proprietary database of historical transactions" and its "risk-adjusted historical trade spread."  ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2), at 4 (Apr. 14, 2025).

98.     Neither metric depends upon a specific life expectancy calculation, let alone Lapetus.  Rather, Lapetus is one of six Life Expectancy Providers that Abacus may consider for initial policy pricing and Abacus relies on market transactions to value the policies it holds on its balance sheet.[20]

99.     Once again, Coventry's assertions—both express and/or implied—are false. Abacus does not use Lapetus as its "preferred" Life Expectancy Provider, Coventry Writ ¶ 18, nor does Abacus use Lapetus as part of its valuation.

---

[20]   Coventry's false statements about Abacus's compliance with Florida laws is particularly ironic where, as here, Coventry has long resisted any attempts by the OIR to regulate life settlement providers.  For example, in 2010, Coventry attempted to block OIR's full review of company records in order to determine which files were subject to Florida laws.  A federal appeals court affirmed OIR's right to inspect non-Florida records.  And in 2023, Coventry filed to block an OIR request to examine almost six years of records from life settlement providers after the OIR launched the investigation into Coventry because it had received complaints about Coventry First and its subsidiary Life Equity in 2022.

28

**F.    Coventry Broadcasts Its View Of Abacus To A Wider Audience, Telling Market Analysts And Institutional Investors That Flaws In The Lapetus LE Indicate That Abacus "Will Implode" "Soon"**

100.    Following Coventry's bogus Writ filed in Leon County, Coventry continued its defamatory campaign when, on May 22, 2025, Buerger conducted an interview with Tegus, a subsidiary of AlphaSense.  Tegus is a business intelligence and expert network firm that provides one-on-one interviews with industry experts to investors and subscribers.[21]

101.    Tegus subscribers pay $20,000 or more annually to get access to interviews held with "industry experts" on various topics of interest.  Tegus's subscribers include Fortune 500 companies, world-renowned private equity firms, hedge funds, and other institutional investors. The client that requests the specific interview gets priority on the expert information, but then these interviews are transcribed and the transcripts are emailed to all of Tegus's subscriber network after a waiting period.

102.    Therefore, experts and industry insiders that sit down with Tegus or a Tegus client for an interview know that their words will be transmitted to market-movers, including the blue-chip financial institutions that have played a part in Abacus's success over the past 20 years.

103.    In a May 22 interview with Tegus (the "Tegus Interview"), Buerger spoke almost exclusively about Abacus.  After bragging that he had made Abacus his "***pet project***" and "know[s] every public document" Abacus has filed, Buerger doubled-down on his and Coventry's defamatory remarks about Abacus, Abacus's use of Lapetus, Abacus's valuation process, and even the financial health of Abacus as a company.  Indeed, Buerger's false and misleading statements in the Tegus Interview include:

      a.   "***If you're a public company***, you're trying to generate steady progress in your quarterly earnings like any public company.  ***The temptation that creates is to manufacture earnings***, which with a Level three asset is an easy temptation to

---

[21]    *See* Tegus, https://www.tegus.com/expert-calls (last visited June 30, 2025).

fulfill. Specifically . . . Abacus uses Lapetus as their so-called independent medical underwriting company, ***not exclusively but primarily***.” Buerger's meaning is unmistakable, and unmistakably false—these statements cannot be read to mean anything other than that Abacus uses Lapetus as its primary life expectancy provider. No public document says that, as Buerger is aware from his self-proclaimed close study of those filings. And Abacus does not use Lapetus to value the policies on its balance sheet. *See* Abacus Global Management, Inc., Annual Report (Form 10-K), at 80 (Mar. 28, 2025); *see supra* ¶¶ 54–64.

b. “The problem with that is the stockholders, the baby bondholders, and even the [Sagard] loan ***will be subordinated to the asset-backed debt***, which is to say they will all be wiped out when this thing goes upside down.” The implication—that stockholders' equity is subordinated to debt backed by investments in assets, *i.e.* life insurance policies—is not only false, but is a dog whistle for anyone familiar with life settlements. “Asset-backed debt”—which Abacus carries none of—has been linked to other failed life settlement companies.

c. “[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore.” This contradicts the fact that Coventry itself, including Buerger's son, Reid, was trying to sell policies purchased on the secondary market with the Lapetus LE, less than a year ago.

d. “[Y]ou have to choose which accounting method you'll use for that policy and you can never change it.” The implication is, contrary to GT's conclusion, that Abacus has changed its accounting method for policies it has already purchased. But that is not the case: Abacus clearly discloses which policies it values by which method, and it has not switched the valuation of a policy once purchased.

e. “As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q.” Buerger's suggestion is that Abacus is engaged in dishonest accounting, and that it ***only*** generates revenue through unrealized gains. Buerger fails to mention that Abacus is routinely audited and that Abacus sells hundreds of policies per quarter which results in realized gains.

f. “[R]ight now they've been trying to get the stock price up through their stock repurchase plan.” This statement—made without any awareness of Abacus's internal decision making—suggests Abacus was somehow manipulating the market by implementing a routine stock repurchase.

g. “There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements. There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and all of them have gone bankrupt.” Buerger is clearly implying that Abacus, the only publicly-traded life settlements company, will go bankrupt, notwithstanding the Company's record financial success in the year leading up to

30

his interview.

h. "I should tell you also that Abacus has a $1 million investment in Lapetus Solutions, which was disclosed in correspondences with the SEC. The CEO of Abacus was on the board of Lapetus. In industry publications, there are articles about this and once those articles came out, the CEO of Abacus immediately resigned from the Lapetus board." Read in context, Buerger made this statement to suggest Abacus unlawfully controlled Lapetus's independent, audited life expectancy calculations. This is patently false.

i. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "[n]otwithstanding that they do say that, it is just not accurate." His implication was that Abacus lied in its 2024 Annual Report, where it discussed the ongoing growth of its "hold" portfolio made possible by increased access to capital. Abacus Global Management, Inc., Annual Report (Form 10-K), at 7–8 (Mar. 28, 2025).

104. And perhaps one of Buerger's most brazen lies and statements to sow doubt about Abacus: "it's just a matter of time before [Abacus] implode[s]."

105. Buerger and Coventry knew these assertions were wrong, or at the very least, recklessly failed to apprise themselves of the truth. Indeed, Buerger even conceded that the fair value approach Abacus actually uses to value its policies is the correct one: "[W]e"—referring to Coventry—"do a fair value calculation because *I want to know what my policies are worth.*" The implication that Abacus does anything else is patently false, as anyone familiar with Abacus's disclosures would know.

106. While it is not yet known why Buerger was selected as a so-called industry "expert" on Abacus, it is clear that Buerger's sole purpose in giving the interview was to sow doubt about Abacus to industry leaders, experts, and investors, including Abacus's own investors. Indeed, Buerger knew or should have known the content of his interview with Tegus would be published and broadcasted to all of Tegus's subscribers.

107. On June 4, 2025, at 8:00 a.m. ET, 90 minutes before the market opened, the May 22 interview transcript was circulated to all of Tegus's subscribers. Indeed, on the evening of

31

June 4, Mr. Jackson received an unsolicited email from a third party attaching the May 22 transcript and informing Mr. Jackson that Buerger's interview about Abacus was "getting circulated" amongst key investors, including investors with large stakes in Abacus.

108. In addition, according to this third party, the May 22 interview being circulated on June 4 appeared to be "very coordinated" with another hit piece published on June 4 that focused on amplifying Coventry's false and misleading statements about Abacus.

## V. MORPHEUS PUTS OUT THE SHORT REPORT BASED ON COVENTRY'S LIES

### A. Coventry Finds A Megaphone For Its Defamatory Statements, Causes Morpheus Research To Issue A Short-Seller Report

109. Three hours after institutional investors, including some with large positions in Abacus stock, received the Tegus Interview in their inboxes, Morpheus, a "research" group that appears to be a spin-off of the now-defunct Hindenburg Research group led by Nathan Anderson,[22] published the Short Report, a false, scathing and lengthy exposé purporting to reveal Abacus's accounting fraud and "fake revenue" by undervaluing life expectancy estimates.[23]

110. While purporting to base the Short Report on "extensive research," the reality is that Buerger has been working on this dossier for over a year. Indeed, as early as January 2024, Buerger had previously shopped a hit piece to Morpheus's predecessor, Hindenburg Research, but Hindenburg passed.

111. Over the course of 2024, Buerger said he was reaching out to a number of other short sellers, seeking a seemingly "independent" outlet to publish his defamatory statements.

112. In any event, it is clear that the Short Report parrots the same or similar false and

---

[22] *See* Nate Anderson (@NateHindenburg), X, Anderson posting "[t]his is a great team that I have known for a long time and includes some Hindenburg alumni." (Mar. 14, 2025, at 1:13 P.M. ET), https://tinyurl.com/dravzjzv.

[23] *See Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die*, Morpheus Research (June 4, 2025), https://www.morpheus-research.com/abacus/.

misleading statements that Coventry had previously peddled.  As Morpheus acknowledges, one of its "sources" for the Short Report includes "Abacus competitors," a.k.a. Coventry.

113.    Morpheus timed the report perfectly to coincide with the release of the Tegus Interview.  Although Morpheus uploaded supporting documents to a document sharing website on June 2, the report was not released for another two days, when it would have maximum impact.  Upon information and belief, Buerger informed Morpheus of his defamatory comments in the Tegus Interview, and Morpheus waited to publish its report until Buerger's Tegus Interview had been shared with Tegus subscribers.

114.    Like Coventry and Buerger, the Short Report attacks Abacus's purported relationship with and to Lapetus; falsely claims that Abacus uses Lapetus to value its balance sheet; and falsely claims that Abacus is overvalued.  Specifically, the Short Report falsely claims the following, playing all of Coventry's hits:

    a.   **The Short Report criticizes and aggrandizes Abacus's "relationship" with Lapetus**, saying the LE provider is an "intimately-linked" Abacus vendor;

    b.   **The Short Report implies Abacus is in violation of Florida Laws and Regulations:**  "Abacus' initial hesitancy to fully disclose the Lapetus investment may have been due to Florida's prohibition against direct or indirect ownership of a life expectancy provider by a life settlements provider, due to the inherent conflict of interest it presents."

    c.   **The Short Report reprises Coventry's claims about Lapetus LE**, freely admitting that the claims that Lapetus has shorter life expectancy estimates come directly from the biased and flawed studies commissioned by Coventry.

    d.   **The Short Report falsely implies that Abacus uses Lapetus to value its balance sheet**.  Morpheus directly quoted Buerger's public statement that Abacus's use of Lapetus means that "fair market value is grossly overstated." And by Morpheus's own words, Buerger's words "appear[] to have been aimed squarely at Abacus, which he seems to have likened to Mutual Benefits Corporation, an infamous life settlements fraud that claimed $250 million of investor capital in the early 2000s."

    e.   **The Short Report repeats Coventry's Claim that Abacus is overvalued due to counterfactual reliance on Lapetus:**  Morpheus writes, "Abacus' Reliance On

33

Lapetus Presents A Material Risk To The 'Unrealized Gains' Generated From Valuation Mark-Ups On Its Held Portfolio – Presenting An Estimated Writedown Risk Of At Least 35 - 50%." Morpheus also writes, "Abacus' reliance on Lapetus LE data to value its portfolio presents a material risk to its 'held' portfolio, which could be turned 'upside down' if the policies take longer to mature than anticipated." These statements similarly flow from Coventry. As highlighted above, Coventry has publicly stated and privately told Abacus's stock valuator and auditor about Coventry's belief that Abacus is overvalued.[24]

115. Notably, none of the market analysts familiar with Abacus, and whom Coventry was unable to persuade, bought the falsehoods in the Short Report. In an extraordinary series of third-party rebuttals, Bernstein Research called the Morpheus claims "misleading"; TD Securities stated that "ABL's model . . . would seem to argue against overvaluation of policies"; and Piper Sandler called the reaction to the Short Report "overdone."[25] These rapid reactions— *i.e.*, the truth—help explain why Coventry has had to be so underhanded in its effort to slow Abacus's rise in the life settlements world.

116. Nonetheless, investors and traders less familiar with Abacus reacted negatively to the false and misleading statements contained in the Short Report, as well as Buerger's comments in the Tegus Interview, released on the same day to Tegus subscribers. Abacus's stock dropped over 21% on June 4, 2025, causing the company to lose more than $157 million in market capitalization in a single trading session. By June 27, Abacus's market capitalization had fallen some $287,400,000, for a total loss of roughly 39%.

117. Abacus has also lost client relationships as a result of the Short Report. For instance, one of its service providers, a consultancy that furnishes data on the populations from whom Abacus buys insurance policies, broke off an agreement in principle with Abacus after

---

[24] The Short Report included several other mischaracterizations, exaggerations and falsehoods regarding the prior associations and private lives of Abacus executives, each of whom continues to weigh appropriate legal action against Morpheus, Coventry, and any other potentially responsible party.

[25] *Abacus Refutes Misleading Balance Sheet Claims With Independent Third-Party Actuarial Valuation*, Abacus Global Management, Inc. (June 10, 2025), https://ir.abacusgm.com/news-releases/news-release-details/abacus-refutes-misleading-balance-sheet-claims-independent-third.

34

seeing Coventry's falsehoods reprinted in the Short Report.

118.    To make matters worse, and increasing the costs to Abacus, hours after the publication of the Short Report, various shareholder plaintiffs' attorneys began investigating Abacus over the claims in the report.  This has led to shareholder inquiries, policyholders reconsidering selling their policies, and asset investors concerned about any potential litigation and headline risk.  The harm is ongoing, because Buerger's campaign to ruin Abacus is ongoing.

## VI.    COVENTRY AND MORPHEUS CAUSE ABACUS REPUTATIONAL HARM, AND COVENTRY CONTINUES TO PUSH ITS BIG LIE DIRECTLY TO ABACUS INVESTORS

119.    After half a dozen attempts to find an effective attack on Abacus, it appears Coventry has finally dealt Abacus substantial reputational harm through the Tegus Interview and the Short Report.

120.    For example, the day before the Short Report issued, Abacus was in discussions with an intermediary representing a multi-trillion-dollar investment company to form a fund-of-one to be managed by Abacus Asset Group.  The fund would have had a minimum investment size of $100 million.  The day after the Short Report issued, the investment company broke off the talks.

121.    Life settlements offer the promise of uncorrelated yield—a "safe" investment in an uncertain world.  In particular, family offices and pension funds are interested in stable, long-term investments in funds managed by Abacus Asset Group.  The Short Report has been widely discussed at recent investor conferences, and Abacus is losing leads as a result.

122.     But mere ripple effects are not enough for Coventry.  Since the Short Report was published, ***Buerger has been directly contacting Abacus prospective and current investors that hold large positions***, recirculating the same misleading Coventry Study, and instructing them what questions to ask Abacus to challenge Abacus's valuation practices.

123.    Specifically, on June 17, 2025, Buerger sent the Coventry Study to the chief financial officer of a major credit union, which is already invested with Abacus and is interested in increasing its investments in Abacus life settlements, stating that the Coventry Study—which pertains to one of six LE providers Abacus uses, and which does not include any information about how Abacus values policies for investors—"will be . . . helpful with your diligence."

124.    Again, Coventry's aim is to suggest that Abacus's use of an LE in the secondary market—which puts more money in the pocket of seniors selling their life insurance policies—is actually evidence of a widespread fraud.

125.    The credit union officer did not buy it.  Having read the Short Report, and seen the limited detail underlying the studies, he was not convinced that Buerger's or Morpheus's claims were accurate.

126.    Likewise, in the days leading to the filing of this Complaint, Abacus has received increased inquiries from investors, specifically about Lapetus, and specifically based on the premises that (i) Abacus and its affiliates use Lapetus to value insurance policies; and (ii) valuations based on Lapetus LEs should be discounted.

127.    One sovereign wealth fund, with a $100 million position in a private life settlement fund managed by an Abacus affiliate, asked "[i]f policies valued using Lapetus and acquired from Abacus were marked down by 30%, what would be the impact on aggregate NAV?"

128.    Abacus and its affiliates would not be facing this harmful scrutiny but for Coventry's relentless campaign of misinformation.  Upon information and belief, Coventry is providing these inquisitive investors with a script to maximize the impact of the investor unrest it has conjured over the last year.

36

129. Coventry's false and defamatory statements caused significant damages to Abacus's reputation and stock price and caused it to suffer financial harm by being forced to incur expenses to respond to the statements, including professional fees such as legal and accounting costs.

130. Abacus now seeks compensation for the great harm done to its reputation and the specific damages it has suffered as a result of Coventry's campaign of falsehoods.

131. Abacus has retained the law firms of Quinn, Emanuel, Urquhart & Sullivan, LLP and Gunster, Yoakley & Stewart, P.A., agreeing to pay reasonable attorneys' fees for their services.

## COUNT I
### (Defamation against all Defendants)

132. Abacus realleges and incorporates Paragraphs 1 through 131 as if fully set forth herein.

133. Abacus is not a public figure or a limited public figure.

134. Coventry and Buerger are non-media defendants.

135. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

136. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

137. Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

138. Coventry's and Buerger's statements about Abacus are false, including but not limited to:

37

a. "*If you're a public company*, you're trying to generate steady progress in your quarterly earnings like any public company. *The temptation that creates is to manufacture earnings*, which with a Level three asset is an easy temptation to fulfill. Specifically . . . Abacus uses Lapetus as their so-called independent medical underwriting company, *not exclusively but primarily*."

b. "The problem with that is the stockholders, the baby bondholders, and even the [Sagard] loan *will be subordinated to the asset-backed debt*, which is to say they will all be wiped out when this thing goes upside down."

c. "[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore."

d. "[Y]ou have to choose which accounting method you'll use for that policy and you can never change it."

e. "[I]t's just a matter of time before [Abacus] implode[s]."

f. Abacus's "fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up" with Abacus "is dead."

g. Lapetus's life expectancy estimates are "consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies and investor losses."

h. Coventry's own "internal review" "results cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies."

i. "[V]aluations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses."

j. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "*[n]otwithstanding that they do say that, it is just not accurate*."

139. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization of at least $287,400,000;

b. Abacus lost out on management fees in connection with a $100 million private fund deal;

38

    c.   Abacus has lost several prospective customers;

    d.   Abacus has lost several current customers; and

    e.   Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million.

140.    Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

141.    Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

142.    Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

143.    Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

144.    Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation.

145.    As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

## COUNT II
### (Defamation by Implication against all Defendants)

146.    Abacus realleges and incorporates Paragraphs 1 through 145 as if fully set forth herein.

147.    Abacus is not a public figure or a limited public figure.

148.    Coventry and Buerger are non-media defendants.

39

149.    Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

150.    Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

151.    Coventry and Buerger created a defamatory implication about Abacus by falsely comparing Abacus to past life settlements companies that failed, implying Abacus violated various state and federal laws, and suggesting Abacus improperly inflated its enterprise valuation.  Coventry and Buerger did so by juxtaposing and/or omitting facts with the intention of creating a defamatory implication.

152.    Coventry and Buerger created a defamatory implication about Abacus using intentionally misleading statements, including but are not limited to:

   a. "[Abacus's] fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up . . . is debt. . . .  I worry that it's going to be $300, $400, $600, and $1 billion.  With Mutual Benefits, it was $800 million. . . . It's going to be awful for us."

   b. "The unique relationship includes Abacus having held a seat on LAPETUS' board of directors through Abacus CEO Jay Jackson, and Abacus affiliates investing heavily in LAPETUS. . . .  Both of these relationships may violate the Life Expectancy reform law passed by the [L]egislature in the wake of the Mutual Benefits collapse.  *Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their relationships*, the [L]egislature now requires independence between settlement providers and Life Expectancy providers. . . .  *The relationship between Lapetus and Abacus is so close* that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the market, bizarrely asserted that 'Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions.'"

   c. "There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements.  There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and *all of them have gone bankrupt*."

   d. "[W]e"—referring to Coventry—"do a fair value calculation because I want to know what my policies are worth."

40

e. "As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q."

f. "[R]ight now they've been trying to get the stock price up through their stock repurchase plan."

153. Coventry's and Buerger's defamatory implications exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization of at least $287,400,000;

b. Abacus lost out on management fees in connection with a $100 million private fund deal;

c. Abacus has lost several prospective customers;

d. Abacus has lost several current customers; and

e. Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million.

154. Coventry and Buerger published these defamatory implications about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

155. Coventry and Buerger knew the false and implications statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

156. Coventry's and Buerger's false and defamatory implications do not enjoy any absolute or qualified privilege.

157. Coventry and Buerger published these false and defamatory implications about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

41

158. Coventry's and Buerger's false and defamatory implications have adversely affected Abacus's otherwise good business reputation.

159. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

## COUNT III
### (Defamation *Per Se* against all Defendants)

160. Abacus realleges and incorporates Paragraphs 1 through 159 as if fully set forth herein.

161. Abacus is not a public figure or a limited public figure.

162. Coventry and Buerger are non-media defendants.

163. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

164. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

165. Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

166. Coventry's and Buerger's statements about Abacus are false, including but not limited to the statements listed in Paragraphs 138 and 152.

167. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation.

168. Coventry's and Buerger's false statements are defamatory *per se* because, when considered alone without innuendo, these statements subject Abacus to distrust, contempt, or

42

disgrace and/or injure Abacus in its trade or profession by accusing Abacus of securities law violations as well improperly inflating its enterprise valuation.

169. Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

170. Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

171. Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

172. Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

173. Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation.

174. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

### COUNT IV
**(Deceptive and Unfair Trade Practices, § 501.204, Fla. Stat., against all Defendants)**

175. Abacus realleges and incorporates Paragraphs 1 through 174 as if fully set forth herein.

176. At all relevant times, Coventry and Buerger were engaged in trade or commerce as defined in section 501.203(8), Florida Statutes.

177. Coventry and Buerger violated the Florida Deceptive and Unfair Trade Practices

Act ("FDUTPA") by engaging in a deceptive and unfair smear campaign to damage Abacus's share price, reputation in the marketplace, and business relationships, as set forth above, for Coventry's and Buerger's perceived gain.

178.    Coventry's and Buerger's deceptive and unfair trade practices have caused Abacus actual harm, including but not limited to by causing Abacus's share price to drop, causing Abacus to lose revenue and profits, and causing Abacus to suffer other commercial injuries.    Coventry's and Buerger's deceptive and unfair trade practices have also harmed consumers by misleading investors and artificially consolidating market share in Coventry.

## COUNT V
**(Tortious Interference with Business Relations against Buerger)**

179.    Abacus realleges and incorporates Paragraphs 1 through 178 as if fully set forth herein.

180.    Abacus has business relationships with several large investors, including the large credit union referenced in Paragraph 123.

181.    Buerger spoke to the CFO of the credit union specifically because Buerger was aware the credit union was invested with Abacus.

182.    Buerger intentionally and unjustifiably encouraged the credit union CFO to question and distrust Abacus's valuation marks through his use of the Coventry Study.

183.    Buerger's activities, and those like it with other customers, have caused Abacus reputational harm.

## RELIEF

WHEREFORE, Abacus demands judgment against Defendants and requests relief as follows:

    a.    Compensatory damages in an amount to be proven at trial, including but not

44

limited to for redress of reputational harms;

b. A judicial declaration that the statements listed in Paragraphs 138 and 152 are defamatory;

c. Attorneys' fees and costs;

d. Pre- and post-judgment interest; and

e. Any and all other legal or equitable relief to which Abacus is entitled.

## DEMAND FOR JURY TRIAL

Abacus demands trial by jury on all counts so triable, and intends to amend its complaint

to seek punitive damages as appropriate given the egregiousness of Defendants' misconduct.

45

DATED: June 30, 2025

/s/ Alex Zuckerman

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Alex Zuckerman (*pro hac vice* forthcoming)
alexzuckerman@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000

Jason D. Sternberg (Fla. Bar No. 72887)
jasonsternberg@quinnemanuel.com
David M. Walsh (Fla. Bar No. 1048823)
davidwalsh@quinnemanuel.com
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
(305) 402-4880

Kathleen S. Messinger (*pro hac vice* forthcoming)
kathleenmessinger@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

/s/ Jason W. Johnson

**GUNSTER, YOAKLEY & STEWART P.A.**
Jason W. Johnson (Fla. Bar No. 186538)
Primary Email: JJohnson@Gunster.com
Secondary Email: DMowery@Gunster.com
200 South Orange Avenue, Suite 1400
Orlando, Florida 32801
(407) 406-5255

*Attorneys for Plaintiff Abacus Global Management, Inc.*

46

Filing # 226445527 E-Filed 07/01/2025 06:34:56 PM

Corrected

## FORM 1.997.        CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replaces nor supplement the filing and service of pleadings or other documents as required by law. This form shall be filed by the plaintiff or petitioner with the Clerk of Court for purpose of reporting uniform data pursuant to section 25.075, Florida Statute. (See instructions for completion.)

### 1.  CASE STYLE

In the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida

ABACUS GLOBAL MANAGEMENT,
Inc., a corporation

Plaintiff(s)

Case Number:_____

Division:        _____

v. COVENTRY FIRST LLC, a limited liability com-
    pany; ALAN BUERGER, an individual

Defendant(s)

### 2.  AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purposes.

- ☐ $8,000 or less         _____
- ☐ $8,001 - $30,000       _____
- ☐ $30,001 - $50,000      _____
- ☐ $50,001 - $75,000      _____
- ☐ $75,001 - $100,000     _____
- ☒ over $100,000.00       _____

### 3.  TYPE OF CASE (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an X in both the main category and subcategory boxes.

#### CIRCUIT CIVIL

- ☐ Condominium
- ☐ Contracts and indebtedness
- ☐ Eminent domain
- ☐ Auto negligence
- ☐ Negligence – other
  - ☐ Business governance
  - ☐ Business torts
  - ☐ Environmental/Toxic tort
  - ☐ Third party indemnification
  - ☐ Construction defect

- ☐ Homestead residential foreclosure $50,001 - $249,999
- ☐ Homestead residential foreclosure $250,000 or more
- ☐ Non-homestead residential Foreclosure $0 - $50,000
- ☐ Non-homestead residential Foreclosure $50,001-$249,999
- ☐ Non-homestead residential Foreclosure $250,000 or more
- ☐ Other
  - ☐ Antitrust / trade regulation
  - ☐ Business transactions
  - ☐ Constitutional challenge – statute or ordinance
  - ☐ Constitutional challenge – proposed amendment

☐ Mass tort                                  ☐ Corporate trusts
☐ Negligent security                   ☐ Discrimination – employment or other
☐ Nursing home negligence        ☐ Insurance claims
☐ Premises liability – commercial    ☐ Intellectual property

☐ Premises liability – residential      ☒ Libel / Slander
☐ Products liability                    ☐ Shareholder derivative action
☐ Real property / Mortgage foreclosure    ☒ Securities litigation
     ☐ Commercial foreclosure $0 - $50,000      ☐ Trade secrets
     ☐ Commercial foreclosure $50,001 - $249,999      ☐ Trust litigation
     ☐ Commercial foreclosure $250,000 or more
     ☐ Homestead residential foreclosure $0 - $50,000

☒ PLEASE CHECK THIS BOX IF THIS CASE IS APPROPRIATE FOR ASSIGNMENT TO THE COMPLEX BUSINESS LITIGATION DIVISION. PLEASE SEE ATTACHED COMPLEX BUSINESS LITIGATION DIVISION ADDENDUM FORM.

**COUNTY CIVIL**

☐ Small Claims
☐ Civil
☐ Real property/Mortgage foreclosure
☐ Replevins
☐ Evictions
     ☐ Residential Evictions
     ☐ Non-Residential Evictions
☐ Other civil (non-monetary)

4. **REMEDIES SOUGHT** (Check all that apply):
     ☒ Monetary;
     ☒ Non-monetary declaratory or injunctive relief;
     ☒ Punitive

5. **NUMBER OF CAUSES OF ACTION:** _____5_____

     (Specify)  Defamation; Defamation by Implication; Defamation *Per Se;* Deceptive and Unfair Trade Practices, § 501.204, Fla. Stat.; Tortious Interference with Business Relations

6. **IS THIS CASE A CLASS ACTION LAWSUIT?**
     ☐ Yes
     ☒ No

7. **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
     ☒ No
     ☐ Yes. If "Yes", list all related cases by name, case number and court. _____

_____

_____

**8.  IS JURY TRIAL DEMANDED IN COMPLAINT?**

☒ Yes

☐ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature _____

Attorney or Party

_____
Jason Sternberg

Type or Print Name

FL Bar Number _____72887_____

(Bar Number if attorney)

_____
July 1, 2025

Date

Form 1.997 (Revised 08/14/2020)

Page 3 of 5

## CIVIL COVER SHEET BUSINESS COURT ADDENDUM
## PARTY OR ATTORNEY FILING ACTION MUST SELECT WHICH APPLIES

Cases Subject to Business Court. The principles set out below shall guide the parties and the Court in the assignment of cases to Business Court. All jury, non-jury, injunction and class action cases shall be assigned to Business Court if they are among the following types of actions:

A.      Any of the following where the amount in controversy is **$500,000.00 or more**:

\_\_\_    1.    Claims arising from U.C.C. related transactions;

\_\_\_    2.    Claims arising from the purchases and sales of business or the assets of a business including contract disputes and business torts;

\_\_\_    3.    Claims involving the sale of goods or services by or to business enterprises;

\_\_\_    4.    Claims involving non-consumer bank or brokerage accounts, including loan, deposit, cash management, and investment accounts;

\_\_\_    5.    Claims arising from the purchase, sale, lease of real or personal property or security interests therein, excluding commercial landlord tenant claims;

\_\_\_    6.    Claims related to surety bonds;

\_\_\_    7.    Franchisee/franchisor relationships and liabilities;

\_\_\_    8.    Malpractice claims of non-medical professionals in connection with rendering services to a business enterprise;

\_\_\_    9.    Insurance coverage disputes, bad faith suits, and third party indemnity actions against insurers arising under policies issued to businesses, such as those claims arising under a commercial general liability policy or commercial property policy; and

\_X\_    10.    Other complex disputes of a commercial nature, excluding those listed in Section II of Administrative Order Number 2019-08-02  Cases eligible under this category will normally have four or more parties, multiple claims and defenses, third party, cross or counterclaims, complex factual or legal issues, or other unusual features warranting assignment to Business Court.

B.    Any of the following without regard to the amount in controversy:

____ 1.    Actions relating to the internal affairs or governance, dissolution or liquidation rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises;

____ 2.    Actions relating to trade secrets and non-compete agreements;

____ 3.    Intellectual property claims;

_X_ 4.    Actions relating to securities or relating to or arising under the state securities laws or antitrust statutes;

____ 5.    Shareholder derivative suits and class actions involving claims that are subject to Business Court, pursuant to Administrative Order Number 2019-08-02; and

____ 6.    Actions relating to corporate trust affairs or director and officer liability.

*NOTE*: A copy of the Civil Cover Sheet and this Addendum must be served with the Complaint for all Business Court cases. See Administrative Order Number 2019-08- 02 for further Business Court requirements.

Page 5 of 5