# EXHIBIT 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**
# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2024**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 001-39403**

# Abacus Global Management, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **85-1210472** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2101 Park Center Drive, Suite 200**<br>**Orlando Florida** | **32835** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(800) 561-4148**
Registrant's telephone number, including area code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 per share | ABL | The NASDAQ Stock Market LLC |
| Warrants, each whole warrant exercisable for one share of common stock at an exercise price of $11.50 per share | ABLLW | The NASDAQ Stock Market LLC |
| 9.875% Fixed Rate Senior Notes due 2028 | ABLLL | The NASDAQ Stock Market LLC |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of “large accelerated filer”, “accelerated filer”, “smaller reporting company”, and "emerging growth company" in Rule 12b-2 of the Exchange Act.:

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

APPLICABLE ONLY TO REGISTRANTS INVOLVED IN BANKRUPTCY

PROCEEDINGS DURING THE PRECEDING FIVE YEARS:

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. ☐ Yes ☐ No

APPLICABLE ONLY TO CORPORATE ISSUERS:

The aggregate market value of shares of common stock held by non-affiliates at June 30, 2024, was $108,967,000.

The registrant had 96,853,039 shares of common stock, $0.0001 par value per share, outstanding as of March 26, 2025.

Documents Incorporated by Reference: Certain portions of the Definitive Proxy Statement for the 2025 Annual Meeting of Shareholders are incorporated by reference into Part III of this Form 10-K.

# ABACUS GLOBAL MANAGEMENT, INC.

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | PART I | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 34 |
| Item 1C. | Cybersecurity | 34 |
| Item 2. | Properties | 35 |
| Item 3. | Legal Proceedings | 35 |
| Item 4. | Mine Safety Disclosures | 35 |
| | PART II | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 35 |
| Item 6. | [Reserved] | 36 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 65 |
| Item 8. | Financial Statements and Supplementary Data | 66 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 132 |
| Item 9A. | Controls and Procedures | 132 |
| Item 9B. | Other Information | 132 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 133 |
| | PART III | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 133 |
| Item 11. | Executive Compensation | 133 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 133 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 133 |
| Item 14. | Principal Accountant Fees and Services | 133 |
| | PART IV | |
| Item 15. | Exhibit and Financial Statement Schedules | 134 |
| Item 16. | Form 10-K Summary | 137 |
| Signatures | | 138 |

## Part I

## Item 1. Business

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

The statements contained in this Annual Report on Form 10-K that are not purely historical are forward-looking statements within the meaning of Section27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements regarding our expectations, hopes, intentions or strategies regarding the future. In addition to historical financial analysis, this discussion and analysis contains forward-looking statements based upon current expectations that involve risks, uncertainties, and assumptions. These statements may be preceded by, followed by or include the words "believe(s)," "estimate(s)," "expect(s)," "predict(s)," "project(s)," "forecast(s)," "may," "might," "will," "could," "should," "would," "seek(s)," "plan(s)," "scheduled," "possible," "continue," "potential," "anticipate(s)" or "intend(s)" or similar expressions; provided that the absence of these does not means that a statement is not forward-looking.

All forward-looking statements included in this document are based on information available to us on the date hereof, and we assume no obligation to update any such forward-looking statements. Actual results and timing of selected events may differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to: the potential impact of our business relationships, including with our employees, customers and competitors; changes in general economic, business and political conditions, including changes in the financial markets; weakness or adverse changes in the level of activity in our sector or the sectors of our affiliated companies, which may be caused by, among other things, high or increasing interest rates, or a weak U.S. economy; significant competition that our operating subsidiaries face; compliance with extensive government regulation; and other risks detailed in the those set forth under "Risk Factors" or elsewhere in this document and in our other public filings with the United States Securities and Exchange Commission (the "SEC").

### Business Combination

On June 30, 2023, (the "Merger Closing Date"), ERES, LMA and Abacus consummated the combining of the companies as contemplated by a merger agreement ("Merger"). In connection with the closing of the Merger, ERES was renamed Abacus Life, Inc. (the foregoing transaction is referred to as the "Business Combination") and subsequently renamed to Abacus Global Management, Inc. in February 2025.

On December 2, 2024 ("Acquisition Closing Date"), we completed the previously announced acquisitions of Carlisle Management Company S.C.A., a corporate partnership limited by shares established under the laws of Luxembourg ("CMC"), Carlisle Investment Group S.A.R.L., a private limited liability company incorporated under the laws of Luxembourg ("CIG," and together with CMC, "Carlisle"), a leading Luxembourg-based investment manager in the life settlement space ("Carlisle Acquisition") and of FCF Advisors, LLC ("FCF Advisors" or "FCF"), a New York based asset manager and index provider specializing in free cash flow-focused investment strategies ("FCF Acquisition"). Refer to Note 3 Business Combinations of the consolidated financial statements in Part II, Item 8 Financial Statements and Supplementary Data for additional information.

We operate through four principle subsidiaries:

- Abacus Settlements, LLC ("Abacus Settlements"), which was formed as a New York limited liability company in 2004. In 2016, Abacus Settlements was licensed in Florida as a life settlement broker and became a Florida limited liability company. We are not an insurance company, are not licensed or regulated as an insurance company, and therefore do not underwrite insurable risks for our own account.
- Longevity Market Assets, LLC ("LMA"), which was formed in 2017 as a Florida limited liability company

- Carlisle incorporated in 2008 in Luxembourg
- FCF incorporated in 2016 in New York

**Our Mission**

Abacus Global Management Inc.'s ("Abacus Global Management" or "Abacus" or the "Company") mission is to revolutionize financial services through expert asset management and data-driven lifespan insights, leveraging advanced technology to deliver personalized solutions that optimize financial well-being across every stage of life.

**Strategic Vision**

"Abacus envisions a future where financial decisions are transformed by the powerful intersection of technology, longevity data, and expert asset management. Through our four integrated verticals—Life Solutions, Asset Management, Private Wealth Management, and Health and Longevity Technology—we strive to be the premier financial partner that helps institutional investors, financial advisors, and clients harness untapped value in lifespan metrics, creating investment strategies that stand the test of time."

- Jay Jackson, Chairman and Chief Executive Officer of Abacus Global Management, Inc.

**Abacus Overview**

Abacus Global Management (NASDAQ: ABL) is a leading financial services company specializing in alternative asset management, data-driven wealth solutions, technology innovations, and institutional services. With a focus on longevity-based assets and personalized financial planning, Abacus leverages proprietary data analytics and decades of industry expertise to deliver innovative solutions that optimize financial outcomes for individuals and institutions worldwide.

The company's expanded business model now operates through four distinct yet complementary divisions:

**Abacus Life Solutions—**Since 2004, Abacus has purchased over $10 billion in face value of life insurance policies, helping thousands of clients maximize the value of their life insurance assets. The Life Solutions division specializes in helping consumers achieve financial security through retirement products while serving as a solutions provider to institutions. The institutional business assists insurance carriers and reinsurers in optimizing legacy liabilities and creating innovative consumer-facing products through data-based solutions.

**Abacus Asset Group—**The asset management division serves primarily institutional investors alongside select private clients, providing excess returns across the risk-reward spectrum. Abacus Asset Group specializes in uncorrelated and longevity-based assets, fixed-income replacement strategies, and free-cash flow based investment solutions. This division leverages proprietary analytics and market insights to identify unique opportunities through distinct investment strategies that deliver consistent performance through various market cycles while maintaining a disciplined approach to risk management.

**ABL Tech—**Building on decades of experience and proprietary health and longevity data sets, ABL Tech creates technology products that are revolutionizing the life planning industry. These innovations deliver tremendous benefits for pension funds, government agencies, and insurance-related businesses. The division has developed platforms that conduct real-time mortality verification, locate missing participants, and service the secondary life insurance market with unprecedented speed and accuracy.

**ABL Wealth—**Leveraging more than two decades of proprietary data and algorithms, ABL Wealth is redefining wealth management through a transparent, cutting edge, data-driven approach. The division helps financial advisors create customized plans based on clients' health, longevity, and overall financial wellbeing, moving beyond one-size-fits-all planning to develop financial strategies tailored to each individual.

*Policy Origination | Abacus Life Solutions*

As one of the leading buyers of life insurance policies in the United States for over 20 years, we sit at the heart of the life settlements industry. We leverage our strong market position, highly efficient origination platform and proprietary technology to drive our revenue and profitability. The Company and its executive team have deep experience in the life settlement industry. The Company's guidelines are designed to allow the Company to target the life insurance policies that it believes have the most upside potential to generate attractive risk-adjusted returns to the Company through either its hold or trade portfolio. Currently, the Company principally invests in non-variable universal life insurance policies and retains the discretion to invest in whole life or convertible term life insurance policies.

*Underwriting*

Abacus' origination guidelines focus on the age, gender and health of the insured, the duration, mortality risk and face value of the underlying life insurance policy, the projected internal rate of return of the investment in the underlying life insurance policy after taking into account the cost of making continued premium payments, and the ultimate amount and timing of the death benefit. These guidelines are designed to allow the Company to target the life insurance policies that it believes will generate attractive risk-adjusted returns. The Company invests primarily in non-variable universal life insurance policies.

*Origination*

Our proven policy origination process, known as "origination services" first locates policies and screens them for eligibility for a life settlement. This process includes verifying that the policy is in force, obtaining consent forms, and making disclosures to, policy owners, and obtaining or generating life expectancy estimates.

We generate fees on the policies we originate, which are sourced from three channels: (i) a network of approximately 30,000 financial advisors and agents, (ii) direct-to-consumer and (iii) a number of traditional life settlements intermediaries that submit policies to us on behalf of a financial advisor, agent or other client.

*Portfolio Management*

Once identified, we utilize our proprietary "heat-map" technology platform to determine the initial risk and viability of policies. Thereafter, a purchased policy is "actively managed," whereby we consistently monitor the policy risk to optimize revenue by choosing to either (x) trade the policy to a third-party institutional investor (i.e., receive a trade spread) or (y) hold the policy over time (i.e., pay premiums and receive payout). Additionally, we service policies on behalf of third parties for which we receive fee-based revenue based on a percentage of policy value. Our multi-faceted and dynamic revenue model is made possible by the fact that we sit at the heart of the entire life settlements industry.

Our revenue generation platform and economic model is best summarized below:

1. Origination (fees based on a percentage of the face value or net death benefit of the acquired policies)

2. Active Management (spreads for traded policies and realized returns for held policies)

3. Third Party Portfolio Servicing (fees based on a percentage of the total asset value serviced)

*Asset Management*

During December 2024, we added two asset management companies in connection with two business acquisitions described above. Starting in December 2024, we manage alternative investment funds and exchange-traded funds ("ETF"). The alternative investment funds primarily invest in insurance policy settlement contracts that cater to investors seeking risk-adjusted returns with low correlation to other asset classes. The ETFs primarily invest in equity securities using a suite of core and thematic free cash flow equity strategies and offers over 50 customizable free cash flow index strategies covering eight global equities allocation categories available in separately managed accounts. Asset Management fees are based on a

percentage of total asset value under management. We also realize performance fees based on a percentage of returns over certain hurdle rates for the managed alternative investment funds.

*Technology Services*

Starting in February 2024, we utilize proprietary technology based on health and longevity data sets to provide solutions to pension funds, government agencies, insurance-related businesses, as well as other entities that benefit from real-time mortality verification, missing participant verification, and other services specific to the life insurance market. Technology Services fees are based on fixed annual contracts. During the fourth quarter of 2024 we began recognizing Technology Service revenue generated by ABL Tech.

**The Life Settlement Industry**

*Large Addressable Market with Meaningful Growth Potential*

We operate within a large, growing and currently under-penetrated market. The face value of all in force U.S. life insurance industry policies is approximately $13 trillion. Historically, more than 90% of life insurance policies in force did not pay a claim. Based on industry forecasts, approximately 75% of policyholders over the age of 65 will either cancel their policies or allow their coverage to lapse, forfeiting the right to ever receive a full payout. The life settlements industry helps solve this problem by allowing policyholders the opportunity to monetize their policies.

We are currently a leader in the life settlements industry. The Company has approximately a 26% market share based on our 2023 capital invested/total industry capital invested and data compiled in a 2024 report by The Deal and Life Settlements Report, a U.S. life settlements industry news source. Data for the report was aggregated from each state based on 2023 annual reporting. We have a proven track record of growth and strong asset returns. Furthermore, we are currently operational in 49 states, which is a key differentiator in an industry with high barriers to entry due to significant regulatory requirements. Our business is supported by over 125 employees and an innovative leadership team, with an average of over 20 years of experience in the industry.

The combination of the large U.S. life insurance market and the high percentage of policies that never pay a claim creates a considerable opportunity for Abacus and the broader life settlements industry. Specifically, the scale of the life settlements market opportunity is $233 billion each year. However, in 2021, the life settlements industry only captured $4 billion, or approximately 2% of the annual market of lapsed life insurance policies. We believe there is a significant opportunity to increase this market penetration, primarily by driving awareness and education regarding the ability to monetize life insurance policies by utilizing our services.

Life insurance is often a senior citizen's largest asset and one that can be used to alleviate retirement challenges, but it is rarely treated in this way. This can be partially attributed to the fact that almost half of all financial advisors are not aware that selling a life insurance policy is an option for their clients. We help financial advisors and their clients understand that a life insurance policy is personal property and selling it for a fair market value is a legitimate, safe and viable choice that creates more investment options for the client. While less than 1% of financial advisors and agents transact in the life settlements market, based on research conducted by the Life Insurance Settlement Association, the primary industry trade association for the U.S. life settlements industry, we believe approximately 90% of senior citizens who let their life insurance policies lapse or surrendered their policies, would have considered this alternative if they had been made aware of it before lapsing or surrendering their policies. The reference to this study can be found at the Life Insurance Settlement Association—https://www.lisa.org/life-settlements-industry-will-grow-as-more-seniors-are-informed-of-their-options-say-experts-at-lisa-conference/.

Selling a life insurance policy is a valuable transaction and for those consumers who transact, the benefits can be substantial. On average, life settlements companies pay sellers nearly eight times more than the current cash value of a policy. Selling a life insurance policy not only alleviates the requirement for a policyholder to pay premiums but creates a meaningful and immediate monetization event. Sellers use these proceeds in a variety of ways, including to support their retirement, transfer wealth and pay medical bills.

*Generally Uncorrelated Alternative Asset Class with Institutional Investment Grade Counterparts*

While selling life insurance policies at a fair market value can have significantly positive impacts on a person's life, it is a mutually beneficial transaction. The underlying life insurance policy is a highly attractive asset that has minimal payout risk and generally uncorrelated returns. The counterparties to these transactions are generally high-quality investment grade insurance companies. In fact, greater than 90% of our carriers have an "A Rating" or better. Additionally, these life insurance policies are cash backed by the carriers, which means they are required to pay policy claims ahead of any other contractual obligation, including senior debt.

In addition to counterparty quality, this is a largely acyclical asset class. A life insurance policy is sometimes described as a "mortality-driven zero-coupon bond" because its underlying value will appreciate over time as it approaches maturity (i.e., as the policyholder ages). This is best demonstrated when comparing our historical risk-adjusted returns relative to other benchmark asset classes.

**We are at the Heart of the Life Settlements Industry**

**Abacus' Origination Model**

Our "Origination Process" is core to our entire business and drives our economics. We're paid a percentage of face value in origination fees on policies and have spent the last 20 years developing three high quality origination channels (financial advisors or agents, direct to consumer and life settlements brokers).

An example of our target market includes policyholders over 75 years old whose insurance need for life insurance is outweighed by the benefit of immediate cash. We then focus our origination process on these targeted individuals, developing processes and procedures for identifying and screening policies that have attractive potential returns.

We have three distinct origination channels to reach this target market.

**1.** ***Financial Advisor or Agent***—Our largest origination channel involves working directly with financial advisors to facilitate the sale of client policies. Since our founding, we have been at the forefront of developing this market and are now ingrained in a network of over 30,000 financial advisors. We are currently on multiple national financial advisory platforms, we present at conferences, and we develop marketing tools to help advisors efficiently present the benefits of life insurance settlements to their clients. As we highlighted earlier, just under half of financial advisors are unaware this financial option exists and less than 1% have completed a life settlement transaction. This origination channel has driven our significant growth over the last five years, and we believe it will continue to be a priority for our future growth.

**2.** ***Direct to Consumer***—We have been building this channel for several years and have focused heavily on increasing broad consumer awareness and education regarding life insurance settlements. We have been active in a variety of common direct-to-consumer advertisement channels, including radio and television advertisements in particular. In addition, we have created a unique online "Policy Value Calculator" so that individuals can receive an instant valuation on their life insurance policies. The direct-to-consumer channel has historically driven origination on smaller face value policies than through our financial advisor or agent channel, thereby expanding the scope of policies we are able to value and acquire.

**3.** ***Traditional Life Settlements Intermediaries***—Within this channel, we engage with life settlements intermediaries or "brokers" who submit policies to us on behalf of an advisor or client, for which the life settlement intermediary earns a commission. We intend to slowly reduce our reliance on these intermediaries over time and focus our efforts on building out the technology required to educate and gain access to both the financial advisor and direct-to-consumer channels.

We intend to continue to fuel origination growth by expanding our team and outreach. In order to drive awareness across all origination channels, we plan to expand our marketing and launch national television advertising campaigns.

**Abacus' Policy Acquisition Process**

A life settlement transaction is the process by which a third-party intermediary acquires an existing life insurance policy for an amount greater than its current cash surrender value. Upon closing of the life settlement transaction, the insured receives an immediate cash payment, and the third-party intermediary receives ownership of the policy. Thus, the third-party intermediary becomes the beneficiary of the insured's claim payout but is now solely responsible for all future premium payments. Our company functions as this third-party intermediary.

The process of acquiring a policy is highly regulated and policyholder friendly. Unique licenses are mandatory to operate and significant disclosures are required to be made available to consumers. We originate these policies through three distinct channels (i.e., financial advisors / agents, direct-to-consumer and traditional life settlements intermediaries). We first screen each policy to ensure it is eligible for a life settlement, including verifying the policy is in force, obtaining appropriate consents, providing disclosures, and submitting cases for medical underwriting and life expectancy estimates. In connection with this process, we use our proprietary analytics and risk-rating systems to determine an estimated market value for each individual policy.

The Company has established policies and guidelines with respect to its purchase of life insurance policies. These guidelines focus on the age of the insured, the sex of the insured, the duration of the underlying life insurance policy, the expected mortality risk of the underlying life insurance policy, the projected internal rate of return of the investment in the underlying life insurance policy and the amount of the death benefit of the underlying life insurance policy. The Company excludes making investments in life insurance policies based on certain types of the primary health impairment associated with the underlying insured to ensure that all policies are purchased in accordance with established industry standards and state law requirements.

Following the origination, underwriting and valuation processes, we formally present our proposed purchase price to the policyholder or advisor. If agreed upon, the settlement closing process begins. Appropriate closing documents are reviewed by our in-house counsel, and we send funds to an independent escrow agent. Simultaneously, change of ownership and beneficiary documentation is sent to the underlying insurance carrier. Once the changes are confirmed by the carrier, the escrow agent sends the proceeds to the appropriate party, and we become responsible for the underlying insurance policy (i.e., paying premiums and receiving claim). The proceeds from the escrow agent will also include the commission(s) we owe to the broker and / or agent as well as our fee for completing the origination services.

While the transaction is deemed closed, it is important to note that the policy owner may generally rescind the life settlement contract within 30 days from execution of the agreement or 15 days from the receipt of cash proceeds by the owner. As such, revenue is not recorded until this rescission period is over.

Once the transaction is closed, the policy enters our active portfolio management whereby we determine whether a policy should be sold to a third-party institutional investor or held on our balance sheet. In certain cases, we identify a purchaser prior to the close of a transaction, in which case the policy is transferred directly to the purchaser at closing.

**Proprietary Technology Platforms Support Our Business**

We have and continue to develop a comprehensive suite of technology products that helps drive origination, underwriting and trading. Specifically, we have created:

**1. *Risk Rating Heat Map***—Using the large amount of data we have gathered over time, we have developed a proprietary risk-rating platform that measures the risk of life insurance contracts on a range from 1–5 (low–high risk, respectively). This risk score is calculated on a wide range of factors, including (i) duration and extension risk, (ii) policy face value and purchase type, (iii) policy type, (iv) carrier rating, (v) life expectancy ("LE") and LE extension ratios, (vi) age and age on LE date and (vii) survival probability. We believe this platform is a key differentiating factor relative to our competitors as it gives us a meaningful advantage when valuing and purchasing life insurance policies.

**2. *Policy Value Creator***—Our "Policy Value Calculator" drives origination by using proprietary data to instantly value policies for both individuals and financial advisors. This easy-to-use online tool only requires four pieces of information: (i) gender, (ii) age, (iii) face value and (iv) policy type. These data points then generate a valuation range that advisors and individuals can use to quickly assess the current value of their policy.

**3. Innovations in "InsurTech"**—More recently, we have begun developing "Abacusmarketplace.com", which is a blockchain tertiary trading, servicing and valuation platform. Given we will be able to see a large suite of data gathered by this website, we believe it will help us maintain our leading market position and keep us at the heart of the life settlements industry. We added the ability for investors to directly purchase policies in the third quarter of 2023. Abacusmarketplace.com is still in the early stages of development and we do not currently expect that Abacusmarketplace.com will have a material impact on the Company's future financial results.

**Active Portfolio Management Strategy**

With meaningful support from our proprietary risk rating heat map, we consistently evaluate policies (at origination and throughout the lifecycle) to generate essentially uncorrelated risk adjusted returns. Upon acquiring a policy, we have the option to either (i) trade that policy to a third-party institutional investor (i.e., generating a spread on each trade) or (ii) hold that policy on our balance sheet until maturity (i.e., paying the premiums over time and receiving the final claim / payout). This process is predicated on driving the best economics for Abacus.

**1. *Traded Portfolio***—Our traded portfolio returns are driven by (i) the spread we generate by selling policies to third-party institutional investors and (ii) our ability to quickly recycle capital. Our trade spreads average above cost basis depending on the contract and we recycle our capital annually. These two metrics are driven by our ability to effectively originate new policies (supply) and the underlying market interest for the policies (demand).

**2. *Hold Portfolio***—Relative to our traded portfolio, our hold portfolio has the potential to generate a higher estimated annual return than our traded portfolio but requires approximately a 3 to 4 times greater capital investment, which is driven by the need to hold policies, rather than recycle the policies in trading, and to fund premium payments during the holding period for a policy. To the extent that we are not able to commit the required capital, we then focus efforts more on our traded portfolio. Our origination platform and proprietary risk rating heat map has allowed us to hold only what we determine to be the highest quality policies which have our lowest risk ratings.

**Policy Servicing**

In addition to generating economics on the policies we directly originate and actively manage, we have a dynamic platform to service bundles of policies for a variety of third-party institutions. We generate revenue by charging a base servicing fee of approximately 0.5% of the total asset value of the portfolio. We have experience servicing a large number of policies for highly sophisticated institutions, including policies for large asset managers. Beyond our fees, servicing policies at scale supports our data analytics and keeps us at the heart of the life settlements industry. We have a sophisticated team of professionals solely focused on servicing these policies.

**Prospects for Future Growth**

*Continued Maturation of the Life Settlements Industry*

As described above, there is approximately $200 billion in policy value that lapses on an annual basis. However, the life settlements industry captured only approximately 2% of the potential market in 2021, which leaves significant runway for future growth for industry participants. The total face value of life insurance policies is expected to grow from approximately $6 billion in 2022 to approximately $8 billion in 2028, which is a 5% compounded annual growth rate. Given our position at the heart of the life settlements industry, we believe that we are well positioned to capitalize on this anticipated market growth.

*Focus on Growing the Origination Process*

Our ability to originate policies is essential to scale our business over time. In order to support this expected growth, we continue to invest in our technology and marketing infrastructure. In general, we expect our efforts will continue to focus on driving education and awareness of life settlements. In order to meet this growing demand, we have increased our total employee headcount.

*Continued Innovation in Technology*

Using technology to improve our analytics, market liquidity and velocity of capital use is a key priority. Certain key technology elements are:

**1. *Analytics (Abacus Analytics)***—the standard pricing and valuation platform for policy valuation and portfolio assessment that we believe will allow us to obtain visibility into every transaction in the industry.

**2. *Liquidity (Abacusmarketplace.com)***—tertiary trading, servicing and valuation platform (added direct purchase in 2023). Abacusmarketplace.com is a proprietary technology platform that has been designed in order to facilitate tertiary trading, servicing and valuation for the life settlement industry. This platform is intended to increase the trading volume for the entire industry by removing intermediaries and improving the efficiency and security of the transactions. The Company expects to realize future revenue through licensing agreements with Abacusmarketplace.com. However, Abacusmarketplace.com is still in the early stages of development, and we do not currently expect that Abacusmarketplace.com will have a material impact on the Company's future financial results.

*Access to Capital Markets Provides More Attractive Financing*

We believe that as a publicly traded company, we will have access to a lower cost of capital, which will optimize our per policy revenue and allow us to fund additional investment in infrastructure. Additionally, as discussed in more detail below, access to additional capital will enable us to increase our balance sheet hold portfolio, which we believe may drive higher long-term returns.

*Transitioning Our Business Model as Our Capital Base Scales*

As our capital base scales, we have the ability to increase the proportion of policies that we hold on our balance sheet. One of the most obvious benefits to a larger hold portfolio is that it may increase the predictability of returns (i.e., held policies typically increase in value over time, largely independent of trading market conditions). Additionally, with a larger hold portfolio, there is a unique opportunity to begin securitizing policies. In the long-term, we believe securitized portfolios can drive an even lower cost of capital and can be sold in scale to third parties at a significant multiple.

*Proven Ability to Deploy Capital and Scale*

Over the past few years, we managed a $150 million capital base via a joint venture with a large alternative asset manager. This joint venture was terminated on June 30,2023, in connection with the Company's merger with East Resources Acquisition Company ("ERES"), a blank check company incorporated in Delaware on May 22, 2020. Under GAAP the financial results of the entire joint venture are not included in our financial statements as the joint venture is not under common control and neither Abacus Settlements nor LMA have a direct ownership interest or investment in the joint venture. The financial impacts of the joint venture recognized in the financial statements solely relate to the services provided by Abacus Settlements and LMA to the joint venture and are discussed in the respective related party transaction notes in the financial statements.

**Competition**

We compete with numerous life insurance settlement originators, servicers, and investors, alternative asset managers, wealth advisors as well as mortality verification companies. Our primary competitors in each of our business lines differ significantly from those in our other business lines principally because few companies

compete against us in all business segments in which we operate. Competition is high in all our business lines, in particular life insurance settlement origination where competitors have invested significantly in marketing and acquisitions.

The risks associated with our competitors are further discussed in Part I, Item 1A Risk Factors.

**Our Employees**

As of December 31, 2024, we had 157 employees, none of whom are subject to any collective bargaining agreement or represented by a labor union. 25 of our employees are based outside of the United States. To date, we have not experienced any work stoppages and we consider our employee relations to be good. We believe that our employees are critical to our long-term success.

**Intellectual Property**

Our business depends, in part, on our ability to develop and maintain the proprietary aspects of its core technology. We rely on trademarks to protect our intellectual property.

We have been issued a federal registration for our “Abacus Settlements” and “Abacus Life” trademarks. We also hold various domain names for websites that we use in our business. Additionally, we have developed and maintain proprietary software for our internal use to aid in pricing, valuation and risk analysis of life settlement policies.

**Regulatory Overview**

We are subject to various laws, regulations and licensing requirements in the United States which may expose us to liability, increase costs or have other adverse effects that could harm our business. These laws and regulations include, but are not limited to, data privacy and data localization, healthcare, insurance, copyright or similar laws, anti-spam, consumer protection, employment and taxation. Compliance with such laws can require changes to our business practices and significant management time and effort. Additionally, as we continue to develop and improve consumer-facing products and services, and as those offerings grow in popularity, the risk that additional laws and regulations will impact our business will continue to increase. We believe that we are in material compliance with all such laws, regulations and licensing requirements.

*Data Privacy Laws and Regulations*

Because we receive, use, transmit, disclose and store personal data, we are subject to numerous state and federal laws and regulations that address privacy, data protection and the collection, storing, sharing, use, transfer, disclosure and protection of certain types of data. We are subject to the Telephone Consumer Protection Act (“TCPA”) which restricts the making of telemarketing calls and the use of automatic telephone dialing systems. Violators of the TCPA face regulatory enforcement action, substantial civil penalties, injunctions, and in some states, private lawsuits for damages.

Privacy and data security regulation in the U.S. is rapidly evolving. For example, California enacted the California Consumer Privacy Act (“CCPA”), which came into force in 2020. The CCPA and related regulations give California residents expanded rights to access and request deletion of their personal information, opt out of certain personal information sharing and receive detailed information about how their personal information is used and shared. The CCPA allows for the California Attorney General to impose civil penalties for violations, as well as providing a private right of action for certain data breaches. California voters also recently passed the California Privacy Rights Act (“CPRA”), which will take effect on January 1, 2023. The CPRA significantly modifies the CCPA, including by imposing additional obligations on covered companies and expanding California consumers’ rights with respect to certain personal information. The CCPA’s restrictions on “sales” of personal information may restrict our use of cookies and similar technologies for advertising purposes, as well as increasing our compliance costs and potential liability. The CCPA excludes information covered by the Gramm-Leach-Bliley Act, the Driver’s Privacy Protection Act, the Fair Credit Reporting Act and the California

Financial Information Privacy Act from the CCPA's scope, but the CCPA's definition of "personal information" is broad and may encompass other information that we maintain.

The passage of the CCPA likely marked the beginning of a trend toward more stringent privacy legislation in the U.S., and multiple states have enacted or proposed similar laws. For example, in 2020, Nevada enacted SB 220 which restricts the "selling" of personal information and, in 2021, Virginia passed the Consumer Data Protection Act which is set to take effect on January 1, 2023 and creates new privacy rights for Virginia residents. There is also discussion in Congress of new comprehensive federal data protection and privacy law to which we likely would be subject if it is enacted.

Various regulators are interpreting existing state consumer protection laws to impose evolving standards for the online collection, use, dissemination and security of other personal data. Courts may also adopt the standards for fair information practices which concern consumer notice, choice, security and access. Consumer protection laws require us to publish statements that describe how we handle personal information and choices individuals may have about the way we handle their personal data.

Our failure to comply with these privacy laws or regulations could expose us to significant fines and penalties imposed by regulators and has in the past and could in the future expose us to legal claims by buyers, or other relevant stakeholders. Some of these laws, such as the CCPA, permit individual or class action claims for certain alleged violations, increasing the likelihood of such legal claims. Similarly, many of these laws require us to maintain an online privacy policy, terms of service and other informational pages that disclose our practices regarding the collection, processing and disclosure of personal information. If these disclosures contain any information that a court or regulator finds to be inaccurate, we could also be exposed to legal or regulatory liability. Any such proceedings or violations could force us to spend money in defense or settlement of these proceedings, result in the imposition of monetary liability or demanding injunctive relief, divert management's time and attention, increase our costs of doing business and materially adversely affect our reputation.

**Insurance Laws and Regulations**

We operate as a life settlement producer in forty-nine (49) states. We have a strong track record with each state in which we are licensed and have not had any reportable incidents. Our in-house counsel and compliance staff reviews every life insurance policy we consider acquiring for compliance with applicable state regulations. We file an annual report with each state in which it operates and each state has the ability to request an audit at its discretion. Currently, 42 states have regulations that support the sale of life insurance policies to a third party, like our Company. Each state also has its own policyholder-facing disclosure requirements that we comply with in the ordinary course of its business.

We focus on acquiring and trading non-variable, non-fractionalized life insurance policies. These life insurance policies are deemed to be personal property of the owner based upon the Supreme Court decision Grigsby v. Russell in 1911. Furthermore, non-variable, non-fractionalized life insurance policies are not deemed to be securities under the federal securities laws, and so the Company is not required to register as an investment adviser or an investment company under the Investment Advisers Act of 1940, as amended or the Investment Company Act, respectively.

The Company may, in the future, purchase some amount of variable life insurance policies or interests in the death benefit of underlying life insurance policies. The Company has recently acquired a limited purpose broker dealer, which the Company intends to license to engage in transactions for variable and fractionalized life insurance policies. Abacus expects that any transactions in variable or fractionalized life insurance policies will represent less than 20% of the life insurance policies acquired by the Company at any time. The Company does not, and does not in the future intend to, engage in any life insurance securitization.

**Regulated Entities Outside of the U.S.**

Carlisle and the funds it manages are licensed and have authorizations to operate in Luxembourg. These licenses and authorizations relate to providing investment management, administration of funds, marketing of the funds, and other regulated activities. Failure to comply with the laws and regulations could expose us to liability and/or damage our reputation.

The risks associated with our regulated entities outside of the U.S. are further discussed in Part I, Item 1A Risk Factors.

**Available Information**

Our investor relations website address is https://ir.abacuslife.com/. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, proxy statements, and any and all amendments thereto are available free of charge through our investor relations website as soon as reasonably practicable after they are filed or furnished to the Securities and Exchange Commission (the "SEC"). These materials are also accessible on the SEC's website at www.sec.gov.

**Item 1A. Risk Factors**

The following discussion of "Risk Factors" identifies factors that may adversely affect our business, operations, financial condition or future performance. This information should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Result of Operations" and the consolidated financial statements and related notes. The following discussion of risks is not all-inclusive but is designed to highlight what we believe are the material factors to consider when evaluating our business and expectations. These factors could cause our future results to differ materially from our historical results and from expectations reflected in forward-looking statements.

**Risk Factors Summary**

**Risks Related to the Business and Regulatory Matters**

- The Company's valuation of life insurance policies is uncertain as many life insurance policies' values are tied to their actual maturity date and any erroneous valuations could have a material adverse impact on the Company's business.

- The Company could fail to accurately forecast life expectancies. There may also be changes to life expectancies generally, resulting in people living longer in the future, which could result in a lower return on the Company's life settlement policies.

- The Company's policy acquisitions are limited by the market availability of life insurance policies that meet the Company's eligibility criteria and purchase parameters, and failure to secure a sufficient number of quality life insurance policies could have a material adverse effect on the Company's business.

- The Company may experience increased competition from originating life insurance companies, life insurance brokers, and investment funds which could have a material adverse effect on the Company's business.

- Historically, there has been a negative public perception of the life settlement industry that could affect the value and/or liquidity of the Company's investments and the life settlement industry faces political

opposition from life insurance companies which could have a material adverse effect on the Company's business.

- The Company or third parties the Company relies upon could fail to accurately evaluate, acquire, maintain, track, or collect on life settlement policies, which could have a material adverse impact on the Company's revenues.
- There is a risk of fraud in the origination of the original life insurance policy or in subsequent sales of the life insurance policy that could adversely affect the Company's returns which could have a material adverse impact on the Company's business.
- The Company may become subject to claims by life insurance companies, individuals and their families, or regulatory authorities which could have a material adverse impact on the Company's business.
- Life settlements in which we invest are not currently regulated under the federal securities laws, but if deemed to be securities would require further compliance with federal and state securities laws, which could result in significant additional regulatory burdens on the Company, and limit the Company's investments, which could have an adverse impact on the Company's business and results of operations.
- Life settlements in which we invest are not currently regulated under the federal securities laws, but if deemed to be securities would require further compliance with federal and state securities laws, which could result in significant additional regulatory burdens on the Company, and limit the Company's investments, which could have an adverse impact on the Company's business and results of operations.
- The Company could in the future be required to register as an investment company under the Investment Company Act or could have to substantively change its business model in order to fit within an applicable exemption from such registration requirement.
- The Company faces privacy and cyber security risks related to its maintenance of proprietary information, including information regarding life settlement policies and the related insureds, and any adverse impact related to such risks could have a material adverse impact on the Company's business.
- The Company is subject to U.S. privacy laws and regulations. Failure to comply with such obligations could lead to regulatory investigations or actions; litigation; fines and penalties; disruptions of operations; reputational harm; loss of revenue or profits; and other adverse business consequences.
- The Company's business may be subject to additional or different government regulation in the future, which could have a material adverse impact on the Company's business.
- There is currently no direct legal authority regarding the proper federal tax treatment of life settlements and potential future rulings from the IRS may have significant tax consequences on the Company.
- There have been lawsuits in various states questioning whether a purchaser of a life insurance policy has the requisite "insurable interest" in the policy which would permit the purchaser to collect the insurance benefits and an adverse finding in any of these lawsuits could have a material adverse effect on the Company's business.
- The failure of the Company to accurately and timely track and pay premium payments on the life insurance policies it holds could result in the lapse of such policies which would have a material adverse impact on the Company's business.
- The originating life insurance company may increase the cost of insurance premiums, which would adversely affect the Company's returns.

- The Company may not be able to liquidate its life insurance policies which could have a material adverse effect on the Company's business.
- The Company assumes the credit risk associated with life insurance companies and may not be able to realize the full value of insurance company payouts which could have a material adverse effect on the Company's profits.
- The Company's success is dependent upon the services of its experienced management and talented employees. If the Company is unable to retain management and/or key employees, its ability to compete could be harmed.
- The Company's intellectual property rights may not adequately protect the Company's business.
- The Company may become subject to intellectual property disputes, which are costly and may subject the Company to significant liability and increased costs of doing business.
- Pandemics, along with rising interest rates and inflation, may disrupt the ability of the Company and its providers to originate life settlement policies which could have a material adverse impact on the Company's financial position.
- Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses and lead to errors in our financial reporting, which could adversely affect our business as a public company.
- Our ability to timely raise capital in the future may be limited, or may be unavailable on acceptable terms, if at all. Our failure to raise capital when needed could harm our business, operating results and financial condition. Debt issued to raise additional capital may reduce the cash flow available to make required payments with respect to the notes and affect our ability to execute our investment strategy or impact the value of our investments.
- Because a portion of our business is conducted in currency other than U.S. dollar, we have significant foreign currency risk.
- We are an "emerging growth company." The reduced public company reporting requirements applicable to emerging growth companies may make our securities less attractive to investors.
- Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses and lead to errors in our financial reporting, which could adversely affect our business as a public company.
- Changes in tax regulations or their interpretation could negatively impact our cash flows and results of operations.
- Our use of different estimates and assumptions in the application of our accounting policies could result in material changes to our reported financial condition and results of operations, and changes in accounting standards or their interpretation could significantly impact our reported results of operations.

**Risks Related to our Recent Acquisitions**

- The Company may not realize the anticipated benefits of the Carlisle Acquisition and the FCF Acquisition, which may adversely affect the Company's business results and negatively impact the value of the Company's Common Stock.
- Our international operations pose additional risks that may adversely impact our financial results and operations.

- Any disruption to Carlisle Management's distribution channels may cause the Company's AUM, revenue and earnings to decline.
- Because a portion of our business is conducted in currency other than U.S. dollar, we have significant foreign currency risk.
- Litigation and other claims and liabilities have arisen and may arise with respect to the acquisitions that we consummate or the businesses acquired, including our recently completed acquisitions, and could have a material adverse effect on our business and financial results.

**Risks Related to our Common Stock**

- Our stock repurchase program may not enhance long-term stockholder value and could increase the volatility of the market price of our common stock and diminish our cash.
- Upon the expiration of the lockup agreements entered into by the Carlisle sellers, the Company, our directors, executive officers and holders of 5% or more of our Common Stock, as applicable, a substantial number of shares of Common Stock will be eligible for resale into the public market, a portion of which shares are being offered in this prospectus.
- Our Board has broad discretion to issue additional securities, and in order to raise sufficient funds to expand our operations, we may have to issue securities at prices which may result in substantial dilution to our stockholders.
- If we issue additional debt securities, our operations may be restricted, we will be exposed to additional risk and the market price of our Common Stock could be adversely affected.
- If securities or industry analysts do not publish research or reports about our business, if they adversely change their recommendations regarding our Common Stock or if our operating results do not meet their expectations, our stock price could decline.
- The trading price of our Common Stock has been, and is likely to continue to be, volatile and could be subject to wide fluctuations in response to various factors, some of which are beyond our control.
- Future sales of our Common Stock, or the perception that such future sales may occur, may cause our stock price to decline.
- We have not paid cash dividends in the past and do not expect to pay cash dividends in the foreseeable future. Any return on your investment may be limited to increases in the market price of our Common Stock.
- Investing in our Common Stock may involve a significant degree of risk.

**Risks Related to our Debt**

- Our outstanding and any future indebtedness could adversely affect our financial and operational flexibility.

**Risks Related to the Business and Regulatory Matters**

***The Company's valuation of life insurance policies is uncertain as many life insurance policies' values are tied to their actual maturity date and any erroneous valuations could have a material adverse impact on the Company's business.***

The valuation of life insurance policies involves inherent uncertainty (including, without limitation, the life expectancies of insureds and future increases in premium costs to keep the policies in force). The Company utilizes a multitude of inputs to determine the fair value of the policies it holds, which may include life

expectancy reports generated by a company in which the Company holds a minority ownership interest. The Company uses its own underwriting practices, origination protocols, and proprietary technology. There is no guarantee that the value determined with respect to a particular life settlement policy by the Company will represent the value that will be realized by the Company on the eventual disposition of the related investment or that would, in fact, be realized upon an immediate disposition of the investment. In addition, there can be no guarantee that such valuation accurately reflects the current present value of such life insurance policy at its actual maturity. Uncertainties as to the valuation of life insurance policies held by the Company could require adjustments to reported net asset values and could have a material adverse impact on the Company's business. Uncertainties as to the valuation may also result in the Company being less competitive in the market for originating new life settlement policies and could adversely affect the profits the Company realizes on life settlements purchased and sold.

***The Company could fail to accurately forecast life expectancies. There may also be changes to life expectancies generally, resulting in people living longer in the future, which could result in a lower return on the Company's life settlement policies.***

Prices for life insurance policies and annuities that may be obtained by the Company depend, in large measure, upon the life expectancy of the underlying insureds. The returns of the Company's hold portfolio is almost entirely dependent upon how accurate the actual longevity of an insured is as compared to the Company's expectation for that insured. Life expectancies are estimates of the expected longevity or mortality of an insured. In determining the life expectancy of an insured, the Company relies on medical underwriting conducted by various medical underwriting firms. The medical underwriting process underlying life expectancy estimates is highly subjective, and mortality and longevity estimates are inherently uncertain. In addition, there can be no assurance that the applicable medical underwriting firm received accurate or complete information regarding the health of an insured under a life insurance policy, or that such insured's health has not changed since the information was received. Different medical underwriting firms use different methods and may arrive at materially different mortality estimates for the same individual based on the same information, thus causing a life insurance policy's value to vary. Moreover, as methods of calculating mortality estimates change over time, a mortality estimate prepared by any medical underwriting firm in connection with the acquisition of a life insurance policy may be different from a mortality estimate prepared by the same person at a later time. The valuation of the life insurance policies will vary depending on the dates of the related mortality estimates and the medical underwriting firms that provide the supporting information.

Other factors, including, but not limited to, better access to health care, better adherence to treatment plans, improved nutritional habits, improved lifestyle, an improved economic environment and a higher standard of living could also lead to increases in the longevity of the insureds under the life insurance policies. In addition to other factors affecting the accuracy of life expectancy estimates, improvements in medicine, disease treatment, pharmaceuticals and other medical and health services may enable insureds to live longer.

The actual longevity of an insured may be materially different than the predicted mortality estimate. If the actual maturity date of life insurance policies are longer than projected, it would delay when the Company could expect to receive a return on its investment and the Company may be unable to meet its investment objectives and goals. For example, a term life insurance policy in which the Company may invest have a stated expiration date on the date at which the underlying insured reaches a certain attained age and, beyond such date, the issuing insurance company may not be obligated to pay the face value, but rather only the cash surrender value which is usually maintained at a low value by investors, if any, in accordance with the terms of such life insurance policy. Therefore, if the underlying insured survives to the stated maturity date set forth in the terms of the life insurance policy, the issuing insurance company may only be obligated to pay an amount substantially less than the face value, which could have an adverse effect on the performance of the Company.

The medical underwriting and other firms that provide information for the Company's forecasts of life expectancies are generally not regulated by the U.S. federal or state governments, with the exception of the states of Florida and Texas, which require life expectancy providers to register with their respective offices of insurance regulation. There can be no assurance that this business will not become more broadly regulated and,

if so, that any such regulation would not have a material adverse effect on the ability of the Company to establish appropriate life expectancies in connection with the purchase or sale of policies.

***The Company's policy acquisitions are limited by the market availability of life insurance policies that meet the Company's eligibility criteria and purchase parameters, and failure to secure a sufficient number of quality life insurance policies could have a material adverse effect on the Company's business.***

The life insurance policy secondary market has grown substantially in the past several years, however, as to whether and how it will continue to develop is uncertain. There are only a limited number of life insurance policies available in the market from time to time. There can be no assurance that the Company will be able to source life insurance policies on terms acceptable to the Company. As more investment funds flow into the market for life insurance policies, margins may be squeezed and the value of the collateral may become comparatively more expensive to purchase or subject to greater competition on the purchase side. There can be no assurance that secondary market life insurance policies will be available to the Company on satisfactory or competitive terms.

The supply of life insurance policies available in the market may be reduced by, among other things: (i) improvement in the economy, resulting in higher investment returns to insureds and other owners of life insurance policies from their investment portfolios; (ii) improvements in health insurance coverage, limiting the need of insureds to obtain funds to pay the cost of their medical treatment by selling their life insurance policies; (iii) the entry into the market of less reputable third-party brokers who submit inaccurate or false life insurance policy information to the Company; (iv) the establishment of new licensing requirements for market participants and a delay in complying or an inability to comply with such new requirements; or (v) refusal of the carrier that issued a life insurance policy to consent to its transfer. A change in the availability of life insurance policies could adversely affect the Company's ability to execute its strategy and meet its objectives.

***The Company may experience increased competition from originating life insurance companies, life insurance brokers, and investment funds which could have a material adverse effect on the Company's business.***

Life insurance companies have begun offering to repurchase their own in-force life insurance policies from their current policyholders by offering "enhanced cash surrender value payments" above the amount of the net cash surrender value provided under the life insurance contracts' terms and thus compete directly with the Company and other life settlement providers. The life settlements industry has challenged the legal validity of the life insurance companies' actions, and some state insurance regulators have declared that these repurchase offers are unlawful while other state insurance regulators have approved them. To the extent that life insurance companies can seek to repurchase their own in-force life insurance policies, they present competition to the Company in acquiring policies.

In addition, the Company is subject to significant competition from other life settlement brokers and investment funds for the purchase of life settlement policies. Increased competition for life settlement policies may result in the Company being unable to access the number of life settlement policies that it desires for its business at prices that it deems acceptable.

***Historically, there has been a negative public perception of the life settlement industry that could affect the value and/or liquidity of the Company's investments and the life settlement industry faces political opposition from life insurance companies which could have a material adverse effect on the Company's business.***

Many regulators, lawmakers and other governmental authorities, as well as many insurance companies and insurance industry organizations, are hostile to or otherwise concerned about certain aspects of the longevity-contingent asset markets. The life settlement industry and some of its participants have also been, and may continue to be, portrayed negatively in a number of widely read publications and other forms of media. These opponents regularly contend that life settlement transactions are contrary to public policy by promoting financial speculation on human life and often involve elements of fraud and other wrongdoing. Continued public opposition to the life settlement industry, as well as actual or alleged wrongdoing by participants in the

industry, could have a material adverse effect on the Company and its investors, including on the value and/or liquidity of the Company's investments.

In March 2010, the American Council of Life Insurers, an insurance carrier trade association, issued a press release calling for a complete ban on life settlement securitization. While that effort was not successful, any such federal or state legislation, if passed, could have the effect of severely limiting or potentially prohibiting the continued operation of the Company's life settlement purchasing operations. All of the foregoing could adversely affect the Company's ability to execute its investment strategy and meet its investment objectives.

***The Company or third parties the Company relies upon could fail to accurately evaluate, acquire, maintain, track, or collect on life settlement policies, which could have a material adverse impact on the Company's revenues.***

The Company relies on third party data for tracking and servicing its life settlement policies. This includes the origination and servicing of life settlement policies by the servicing and tracking agent, market counterparties and other service providers, and the Company may not be in a position to verify the risks or reliability of such third-party data and systems. Failures in the systems employed by the Company and other service providers, counterparties, and other parties could result in mistakes made in the evaluation, acquisition, maintenance, tracking and collection of life settlement policies and other longevity-linked investments. This could result in the Company overpaying for life settlement policies it acquires or underpricing life settlement policies it sells. In addition, disruptions in the Company's operations as a result of a failure in a third party system may cause the Company to suffer, among other things, financial loss, the disruption of its business, liability to third-parties, regulatory intervention or reputational damage. Any of the foregoing failures or disruptions could have a material adverse effect on the Company.

***There is a risk of fraud in the origination of the original life insurance policy or in subsequent sales of the life insurance policy that could adversely affect the Company's returns which could have a material adverse impact on the Company's business.***

The Company faces the risk that an original owner of a life insurance policy, the related insured, the insurance agent involved in the issuance of such life insurance policy, or other party may have committed fraud, or misstated or failed to provide material information in connection with the origination or subsequent sale of that life insurance policy. While most life insurance policies may not be challenged for fraud after the end of the two-year contestability period, there may be situations where such fraud in connection with the issuance of a life insurance policy may survive the contestability period. If an issuing insurance company successfully challenges a life insurance policy acquired by the Company on the grounds of fraud, the Company may lose its entire investment in that life insurance policy. Furthermore, if the age of an insured was misstated, the Company may receive lower death benefits than expected. In addition, there may be information directly relevant to the value of a life insurance policy, including, but not limited to, information relating to the insured's medical or financial condition, to which the Company will not have access. It is not possible to verify the accuracy or completeness of each piece of information or the completeness of the overall information supplied by such parties. Any such misstatement or omission could cause the Company to rely on assumptions which turn out to be inaccurate. Additionally, there can be no assurance that the seller of a life insurance policy in the tertiary market properly acquired that policy from the former owner, or that a former beneficiary or other interested party will not attempt to challenge the validity of the transfer. The occurrence of any one or more of these factors could adversely affect the Company's performance and returns.

***The Company may become subject to claims by life insurance companies, individuals and their families, or regulatory authorities which could have a material adverse impact on the Company's business.***

The secondary market for life insurance policies has been subjected to allegations of fraud and misconduct as reflected in certain litigated cases. Some of these cases, some of which have been brought by regulatory authorities, involve allegations of fraud, breaches of fiduciary duty, bid rigging, non-disclosure of material facts and associated misconduct in life settlement transactions. Cases have also been brought by the life insurance

companies that challenge the legality of the original issuance of the life insurance policies based on lack of insurable interest, fraud and misrepresentation grounds.

Further, both federal and U.S. state statutes safeguard an insured's private health information. In addition, insureds frequently have an expectation of confidentiality even if they are not legally entitled to it. Even if the Company properly obtains and uses otherwise private health information, but fails to maintain the confidentiality of such information, the Company may be the subject of complaints from the affected individuals, their families and relatives and, potentially, interested regulatory authorities. Because of the uncertainty of applicable laws, it is not possible to predict the outcome of those disputes. It is also possible that, due to a misunderstanding regarding the scope of consents that a transaction party possesses, the Company may request and receive from health care providers, information that it in fact did not have a right to request or receive. If the Company finds itself to be the recipient of complaints for these acts, it is not possible to predict what the results will be. This uncertainty also increases the likelihood that a transaction party may sell, or cause to be sold, life insurance policies in violation of applicable law, which could potentially result in additional costs related to defending claims or enduring regulatory inquiries, rescinding such transactions, possible legal damages and penalties and probable reduced market value of the affected life insurance policies. Each of the foregoing factors may delay or reduce the return on the policies and adversely affect the Company's business and results of operations.

***Life settlements in which we invest are not currently regulated under the federal securities laws, but if deemed to be securities would require further compliance with federal and state securities laws, which could result in significant additional regulatory burdens on the Company, and limit the Company's investments, which could have an adverse impact on the Company's business and results of operations.***

The origination and trading in whole, non-variable life insurance policies has historically been understood to not involve transactions in securities. However, on February 22, 2019, the United States Court of Appeals for the Fifth Circuit in a case captioned In the Matter of Living Benefits Asset Management, LLC, vs. Kestrel Aircraft Company, Incorporated, case No. 18-10510, concluded that whole, non-variable life insurance policies, when offered for sale to an investor, were securities for purposes of the Investment Company Act. If this same conclusion were to be reached in other circuits or at the Supreme Court and extended to the Securities Act, there would be significant changes to our industry and it would materially impact the Company's ability to conduct its business.

In 2002, the Eleventh Circuit Court of Appeals reached a similar conclusion with respect to fractionalized death benefits payable under non-variable policies in SEC v. Mutual Benefits Corp., but the District of Columbia Circuit Court of Appeals reached a contrary result with respect to fractionalized death benefits in SEC v. Life Partners which was decided in 1996. The Company does not presently transact in fractionalized death benefits, i.e. buying or selling a part of, but not all of, a life settlement policy, nor does it currently plan to transact in fractionalized death benefits.

On July 22, 2010, the SEC released a staff report that recommended that Congress clearly define life settlements to be securities, so that the investors in life settlements transactions would be protected under the U.S. federal securities laws. To date, the SEC has not made another such recommendation to Congress nor has Congress acted on the SEC staff's report. If the statutory definitions of "security" were to be amended to encompass life settlements involving non-variable life insurance policies, or if the Supreme Court or other Circuit Courts were to conclude that non-variable life insurance policies are securities for purposes of the Securities Act, the Company could become subject to additional extensive regulatory requirements under the federal securities laws. Those regulatory requirements would include the obligation to register the Company's sales and offerings of life settlements with the SEC as public offerings under the Securities Act. Also, if the resale of non-variable life insurance policies were to be considered securities, the Company's ownership of those policies as a percentage of its assets or source of income could be limited as it would likely manage its business to avoid being required to register as an "investment company" pursuant to the Investment Company Act. Those limitations could have an adverse effect on the Company's business and results of operations. Any legislation or court or regulatory interpretations leading to that regulatory change or a change in the transactions that are

characterized as life settlement transactions could lead to significantly increased compliance costs and increased liability risk to the Company, and could adversely affect the Company's ability to acquire or sell life insurance policies in the future. This could materially and adversely affect the Company's business, financial condition and results of operations, which in turn could materially and adversely affect the performance of the Company.

The Company cannot assure you as to the ultimate content, timing, or effect of changes, nor is it possible at this time to estimate the impact of any such potential change in administration or new legislation on the Company's business, financial condition, or results of operations and consequently, any potential material and adverse effect on the performance of the Company.

***The Company may be subject to certain U.S. state securities laws, and failure to comply with applicable requirements may result in fines, sanctions and rescission of purchase or sale transactions.***

Certain U.S. state laws specifically characterize life settlements as securities transactions. Thus, in some U.S. states, purchases and sales of life insurance policies by the Company may be subject to applicable U.S. state blue sky laws or other U.S. state securities laws. The Company intends to comply with all applicable federal and state securities laws. However, this will not necessarily exempt the Company from compliance with U.S. federal or state broker-dealer laws. The failure to comply with applicable securities laws in connection with the purchase or sale of life settlement policies could result in the Company being subject to fines, administrative and civil sanctions and rescission of life settlement policy purchase or sales transactions. Each of the foregoing factors could materially and adversely affect the performance of the Company.

***The Company could in the future be required to register as an investment company under the Investment Company Act or could have to substantively change its business model in order to fit within an applicable exemption from such registration requirement.***

The Company's sales of life insurance policies and investment and financing programs of which the purchase or sale of a life insurance policy is a part are subject to an evolving regulatory landscape. Depending on the facts and circumstances attending such sales or programs, U.S. state and federal securities laws, including the Investment Company Act could be implicated, and it is possible that the Company could in the future be required to register as an investment company under the Investment Company Act. The Company would not be able to continue to operate its business as it does today if required to register as an investment company. In such event, the Company would have to substantively change its business model to avoid registration as an investment company under the Investment Company Act. If the Company were required to change its business model in order to fit within an exemption from registration, it would have a material adverse effect on the performance of the Company.

***The Company faces privacy and cyber security risks related to its maintenance of proprietary information, including information regarding life settlement policies and the related insureds, and any adverse impact related to such risks could have a material adverse impact on the Company's business.***

The Company relies on data processing systems to price and close transactions, to evaluate investments, to monitor its portfolio and capital, and to generate risk management and other reports that are critical to oversight of the Company's activities. Further, the Company relies on information systems to store sensitive information about the Company, its affiliates, and its investments, including life settlement policies and information about the related insured individuals and others. While the Company is not aware of security breaches or proceedings related to the processing of information, the loss or improper access, use or disclosure of the Company's proprietary information could adversely impact the Company. For example, the Company could suffer, among other things, financial loss, the disruption of its business, liability to third parties, regulatory intervention or reputational damage. Any of the foregoing events could have a material adverse effect on the Company.

Additionally, the Company collects information related to life insurance, including nonpublic personal information ("NPI") and protected health information ("PHI"), and information from its website, such as contact information and high-level policy information. The Company also collects information from its employees, such as standard HR information, and business contact information from third party employees. The

Company shares information with its service providers, and has entered into non-disclosure and business association agreements, where appropriate. Although the Company has, and believes that each service provider has, procedures and systems in place that it believes are reasonably designed to protect such information and prevent data loss and security breaches, such measures cannot guarantee absolute security.

Furthermore, the techniques used to obtain unauthorized access to data, disable or degrade service, or sabotage systems change frequently with increasing sophistication and may be difficult to detect for long periods of time. For example, hardware or software acquired from third parties may contain defects in design or other problems that could unexpectedly compromise information security. Network connected services provided by third parties to the Company may be susceptible to compromise, leading to a breach of the Company's network and/or business interruptions. The Company's systems or facilities may be susceptible to employee error or malfeasance, government surveillance, or other security threats.

***The Company is subject to U.S. privacy laws and regulations. Failure to comply with such obligations could lead to regulatory investigations or actions; litigation; fines and penalties; disruptions of operations; reputational harm; loss of revenue or profits; and other adverse business consequences.***

Due to the type of information the Company collects, including personal, medical, and financial information on the underlying insureds, and the nature of its services, the Company is subject to privacy laws. In the United States, federal, state and local governments have enacted numerous data privacy and security laws to address privacy, data protection and collection, and the processing and disclosure of certain types of information. Obligations related to these laws are quickly changing, becoming increasingly stringent and creating regulatory uncertainty. In addition, these obligations may be subject to differing applications and interpretations, which can result in inconsistency or conflict among jurisdictions. Among these laws, the Company is likely subject to the Telephone Consumer Protection Act ("TCPA"), the Gramm-Leach Bliley Act ("GLBA"), and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

The Company may be considered a financial institution under the GLBA, and is subject to the GLBA through the NPI it collects. The GLBA regulates, among other things, the use of certain information about individuals (NPI) in the context of the provision of financial services. The GLBA includes both a "Privacy Rule," which imposes obligations on financial institutions relating to the use or disclosure of NPI, and a "Safeguards Rule," which imposes obligations on financial institutions, and indirectly, their service providers, to implement and maintain physical, administrative and technological measures to protect the security of NPI.

The Company has certain business components that are subject to HIPAA. HIPAA imposes privacy, security and breach notification obligations on "covered entities" and "business associates." Furthermore, HIPAA requires "covered entities" and "business associates" to develop and maintain policies with respect to the protection of PHI. If in violation of HIPAA, the Company may be subject to significant civil, criminal and administrative fines and penalties and/or additional reporting and oversight obligations. HIPAA also authorizes state Attorneys Generals to file suit on behalf of their residents. Courts may award damages, costs and attorneys' fees related to violations of HIPAA in such cases. While HIPAA does not create a private right of action allowing individuals to sue the Company in civil court for violations of HIPAA, its standards have been used as the basis for duty of care in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI.

Because of the complexity of the various data privacy laws the Company may be subject to, compliance can be costly. The Company has taken general steps to comply with data privacy and security laws. For example, the Company has implemented a number of policies, including policies regarding access controls, customer data privacy, secure data disposal, and incident response and risk assessments. Despite these efforts, the Company may at times fail in its efforts due to the complexity and evolving nature of these laws. Failure to comply with relevant data privacy laws could negatively impact the Company's operations, including subject the Company to possible government enforcement actions which could result in investigations, fines, penalties, audits, inspection, litigation, additional reporting requirements and/or oversight.

***The Company's business may be subject to additional or different government regulation in the future, which could have a material adverse impact on the Company's business.***

The Company is currently licensed and operating in 49 states. Increased regulation (whether promulgated under insurance laws or any other applicable law) and regulatory oversight of and changes in law applicable to life settlements may restrict the ability of the Company to carry on its business as currently conducted. This could also impose additional administrative burdens on the Company, including responding to examinations and other regulatory inquiries and implementing policies and procedures. Regulatory inquiries often are confidential in nature, may involve a review of an individual's or a firm's activities or may involve studies of the industry or industry practices, as well as the practices of a particular institution.

***There is currently no direct legal authority regarding the proper federal tax treatment of life settlements and potential future rulings from the IRS may have significant tax consequences on the Company.***

There is no direct legal authority regarding the proper U.S. federal income tax treatment of life settlements, and the Company does not plan to request a ruling from the IRS. Consequently, significant aspects of the tax treatment of the Company's assets are uncertain, and the IRS or a court might not agree with the Company's treatment of life settlements as prepaid financial contracts that are not debt. If the IRS were successful in asserting an alternative treatment, the tax consequences of ownership and disposition of life settlements could be materially and adversely affected. In addition, in 2007, the U.S. Treasury Department and the IRS released a notice requesting public comments on various issues regarding the U.S. federal income tax treatment of "prepaid forward contracts" and similar instruments. Any Treasury regulations or other guidance promulgated after consideration of these issues could materially and adversely affect the tax consequences of an investment in life settlements, possibly with retroactive effect.

***There have been lawsuits in various states questioning whether a purchaser of a life insurance policy has the requisite "insurable interest" in the policy which would permit the purchaser to collect the insurance benefits and an adverse finding in any of these lawsuits could have a material adverse effect on the Company's business.***

All states require that the initial purchaser of a new life insurance policy insuring the life of another individual have an insurable interest in that individual's life at the time of the original issuance of the policy. An "insurable interest" is an economic stake in an event for which a person or entity purchases an insurance policy. An insurance policy may only be initially purchased by a person or entity who has an insurable interest in the insured. For example, if a spouse purchases an insurance policy on his or her spouse or a company purchases an insurance policy on an employee. In addition, some states may require that the Company have an insurable interest in the insured. Whether an insurable interest exists in the context of the purchase of a life insurance policy is critical because in the absence of a valid insurable interest, life insurance policies are unenforceable under the laws of most states. Where a life insurance policy has been issued to a policy holder without an insurable interest in the life of the insured, the life insurance company may not be required to pay the face value under the policy and may also be entitled to retain the premiums paid. Generally, there are two forms of insurable interest in the life of an individual, familial and financial. Additionally, an individual is deemed to have an insurable interest in his or her own life. Insurable interest is determined at the inception of the policy. The definition of exactly what constitutes "insurable interest" tends to vary by state. Some cases have also been initiated by life insurance companies, challenging the legality of the original issuance of policies on insurable interest grounds and asserting that such policies constitute "Stranger-Originated Life Insurance" or "STOLI," which is defined as a practice or plan to initiate a life insurance policy for a third-party investor who, at the time of policy origination, has no insurable interest in the insured. Some states (such as Utah and New York) permit the heirs and beneficiaries of an insured to recover the face value under such STOLI policies rather than the policy owner which lacked insurable interest.

While the Company does not believe it has invested in any STOLI polices, and has policies and procedures in place to identify potential STOLI policies, there can be no guarantee that the Company will identify all STOLI policies. As such, the Company may acquire certain life insurance policies that may be deemed by an issuing

insurance company to be STOLI policies, whether purposefully, if the Company deems such life insurance policy to be an attractive investment even after taking into account the insurable interest risk, or inadvertently, where the true nature of such life insurance policy is not discovered prior to its acquisition by the Company. Should an issuing insurance company successfully challenge the validity of a life insurance policy acquired by the Company, the Company will lose its investment in such life insurance policy. Furthermore, the Company will also suffer losses if a family member of an insured is successful in asserting a claim that he or she, and not the Company, is entitled to the face value payable under a life insurance policy.

***The failure of the Company to accurately and timely track and pay premium payments on the life insurance policies it holds could result in the lapse of such policies which would have a material adverse impact on the Company's business.***

In order to realize gains on its investment in life insurance policies, the Company must ensure that the life insurance policies remain in force until they mature or are sold by the Company. Failure by the Company to pay premiums on the life insurance policies when due will result in termination or "lapse" of the life insurance policies and will result in the loss of the Company's investment in such life insurance policies.

***The originating life insurance company may increase the cost of insurance premiums, which would adversely affect the Company's returns.***

For any life insurance policies that may be obtained by the Company, the Company will be responsible for maintaining the policies, including paying insurance premiums. If a life insurance company increases the cost of insurance charged for any of the life insurance policies held by the Company, the amounts required to be paid for insurance premiums due for these life insurance policies may increase, requiring the Company to incur additional costs for the life insurance policies which may reduce the value of such life insurance policies and consequently affect the returns available on such policies.

Life insurance companies have in the past materially increased the cost of insurance charges. There can be no assurance that life insurance policies acquired by the Company will not be subject to cost of insurance increases. If any such life insurance policies are affected by a cost of insurance increase, the value of such life insurance policy may be materially reduced and the Company may decide or may be forced to allow such life insurance policy to lapse, resulting in a loss to the Company.

In the event an insurance company experiences significantly higher than anticipated expenses associated with operation and/or policy administration, or, in some instances, lower investment returns, the insurance company may have the right to increase the charges to each of its policy owners, but not beyond guaranteed maximums. While the insurance companies did not specify the reason for the increases, it is generally believed that the low interest rate environment was a significant contributing factor in the decision to raise the cost of insurance.

***The Company may not be able to liquidate its life insurance policies which could have a material adverse effect on the Company's business.***

In the ordinary course of its business, the Company engages in the purchase and sale of life insurance policies. The liquidation value of these life insurance policies is important where, for example, it becomes necessary to sell life insurance policies from the Company's hold portfolio in order to meet the Company's cash flow needs, including the payment of future premiums.

In many cases liquidations may not be a viable option to meet the Company's liquidity because of, among other things: (1) the lack of a market for such life insurance policies at the time; (2) the uncertainties surrounding the liquidation value of an individual life insurance policy; (3) the extensive amount of time and effort it might take to sell a life insurance policy; (4) the effect excessive sales of life insurance policies may have on transactions and future cash flows; and (5) the tax consequences.

***The Company assumes the credit risk associated with life insurance companies and may not be able to realize the full value of insurance company payouts which could have a material adverse effect on the Company's profits.***

The Company will assume the credit risk associated with life insurance policies issued by various life insurance companies. The failure or bankruptcy of any such life insurance company could have a material adverse impact on the Company's ability to achieve its investment objectives. A life insurance company's business tends to track general economic and market conditions that are beyond its control, including extended economic recessions, interest rate changes, the subprime lending market crisis or changes in investor perceptions regarding the strength of insurers generally and the life insurance policies or annuities they offer. Adverse economic factors and volatility in the financial markets may have a material adverse effect on a life insurance company's business obligation to pay the face value of policies.

The insolvency of any insurance company or a downgrade in the ratings of an insurance company could have a material adverse impact on the value of the related life insurance policies, the collectability of the related face value, cash surrender value or other amounts agreed to be paid by such insurance company. In the event that a life insurance carrier becomes insolvent or is placed into receivership, most state guaranty associations place a $300,000 or lower cap on face value for policies per insured. In addition to the limitations on the amount of coverage, which vary by state, there are limitations on who may make claims under such coverage and the Company may not be eligible to make claims under U.S. state guarantee funds as most U.S. state guarantee fund laws were enacted with the stated goal of assisting policyholders residing in such states. Even if available to the Company, guarantee fund coverage limits are typically smaller than the face values of some of the life insurance policies that the Company will acquire. There can be no assurance that as more life settlement transactions are undertaken, legislators will not adopt additional restrictions on the availability of U.S. state guaranty funds.

***The Company's success is dependent upon the services of its experienced management and talented employees. If the Company is unable to retain management and/or key employees, its ability to compete could be harmed.***

The success of the Company is dependent upon the talents and efforts of highly skilled individuals employed by the Company and the Company's ability to identify and willingness to provide acceptable compensation to attract, retain and motivate experienced management, talented investment professionals and other employees. Most of the shares registered for sale by the Registration Statement of which this Prospectus is a part are owned by our founders who are also key members of management of the Company.

There can be no assurance that the Company's management and professionals will continue to be associated with the Company, and the failure to attract or retain such professionals could have a material adverse effect on the Company's ability to execute on its business plan. Competition in the financial services industry for qualified management and employees is intense and there is no guarantee that, if lost, the talents of the Company's professionals could be replaced.

***The Company's intellectual property rights may not adequately protect the Company's business.***

To be successful, the Company must protect its technology, know-how and brand through means, such as trademarks, trade secrets, patents, copyrights, service marks, contractual restrictions, and other intellectual property rights and confidentiality procedures in the U.S. and outside of the U.S. Despite the Company's efforts to implement these protections, they may not adequately protect its business for a variety of reasons, including:

- inability to successfully register or obtain patents and other intellectual property rights for important innovations that sufficiently protect the full scope of such innovations;
- inability to maintain appropriate confidentiality and other protective measures to establish and maintain the Company's trade secrets;

- uncertainty in, and evolution of, legal standards relating to the validity, enforceability and scope of protection of intellectual property rights;
- potential invalidation of the Company's intellectual property rights through administrative processes or litigation; and
- other practical, resource, or business limitations on the Company's ability to detect and prevent infringement or misappropriation of our rights and to enforce our rights.

Litigation may be necessary to enforce the Company's intellectual property or proprietary rights, protect the Company's trade secrets, or determine the validity and scope of proprietary rights claimed by others. Any litigation, whether or not resolved in the Company's favor, could result in significant expense to the Company, and divert the time and efforts of the Company's technical and management personnel. If the Company is unable to prevent third parties from infringing upon, violating or misappropriating the Company's intellectual property or is required to incur substantial expenses defending the Company's intellectual property rights, the Company's business, financial condition and results of operations may be materially adversely affected.

***The Company may become subject to intellectual property disputes, which are costly and may subject the Company to significant liability and increased costs of doing business.***

The Company may in the future become subject to intellectual property disputes. The Company's success depends, in part, on the Company's ability to operate without infringing, misappropriating or otherwise violating the intellectual property rights of third parties. However, the Company may not be aware that its practices are infringing, misappropriating or otherwise violating third-party intellectual property rights, and such third parties may bring claims against the Company or its business partners alleging such infringement, misappropriation or violation.

Any claims of intellectual property infringement, even those without merit, may be time-consuming and expensive to resolve, divert management's time and attention, cause the Company to cease using or incorporating the asserted challenged intellectual property rights expose it to other legal liabilities, or require it to enter into licensing agreements to obtain the right to use a third party's intellectual property. Although the Company carries general liability insurance, it may not cover potential claims of this type or may not be adequate to indemnify the Company for all liability that may be imposed. The Company cannot predict the outcome of lawsuits and cannot ensure that the results of any such actions will not have an adverse effect on the Company's business, financial condition, or results of operations.

Even if the claims do not result in litigation or are resolved in the Company's favor, these claims, and the time and resources necessary to resolve them, could divert the resources of the Company's management and harm the Company's business and results of operations.

***Pandemics, along with rising interest rates and inflation, may disrupt the ability of the Company and its providers to originate life settlement policies which could have a material adverse impact on the Company's financial position.***

Pandemics, particularly in the United States, could have a material and adverse effect on our business operations. These could include disruptions or restrictions on our ability to source life settlement policies, as well as temporary closures of our facilities and the facilities of our third-party service providers. Any disruption or delay of our third-party service providers would likely impact our operating results. In addition, a significant outbreak of contagious diseases in the human population could result in a widespread health crisis that could adversely affect the economies and financial markets of the United States and throughout the world, resulting in an economic downturn that could affect demand for the life insurance policies and significantly impact the Company's operating results. Adverse changes in the perceived or actual economic climate, including higher

unemployment rates, declines in income levels, inflation, and recession may shift the timing and volume of transactions, or the number of customers using our services for a prolonged period.

***Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses and lead to errors in our financial reporting, which could adversely affect our business as a public company.***

As a public company, we are required to maintain internal control over financial reporting and to report any material weaknesses in such internal controls. Section 404 of Sarbanes-Oxley requires that we evaluate and determine the effectiveness of our internal control over financial reporting.Maintaining effective internal control over financial reporting is necessary for us to produce reliable financial reports and is important in helping to prevent financial fraud.

Our current controls and any new controls that we develop may become inadequate because of poor design and changes in our business, including increased complexity resulting from any expansion. Any failure to implement and maintain effective internal control over financial reporting could adversely affect the results of assessments by our independent registered public accounting firm and their attestation reports.

If we are unable to certify the effectiveness of our internal controls, or if our internal controls have a material weakness, we may not detect errors in a timely fashion, our consolidated financial statements could be misstated, we could be subject to regulatory scrutiny and a loss of confidence by stakeholders, which could harm our business and adversely affect the market price of our common stock. Failure to comply with Section 404 of Sarbanes-Oxley could potentially subject us to sanctions or investigations by the SEC, FINRA or other regulatory authorities, as well as increase the risk of liability arising from litigation based on securities law.

***Our ability to timely raise capital in the future may be limited, or may be unavailable on acceptable terms, if at all. Our failure to raise capital when needed could harm our business, operating results and financial condition. Debt issued to raise additional capital may reduce the cash flow available to make required payments with respect to the notes and affect our ability to execute our investment strategy or impact the value of our investments.***

We have funded our operations since inception primarily through our origination, active management and holding of life settlement policies. We cannot be certain when or if our operations will generate sufficient cash to fund our ongoing operations or the growth of our business.

We intend to continue to make investments to support our business and may require additional funds. Additional financing may not be available on favorable terms, if at all. If adequate funds are not available on acceptable terms, we may be unable to invest in future growth opportunities, which could harm our business, operating results and financial condition. If we incur debt, the debt holders could have rights senior to holders of the notes to make claims on our assets.

The Company has a series of warrants outstanding (collectively the "Warrants"), which include: (i) warrants (the "Private Placement Warrants") originally issued in connection the Company's initial public offering (the "Company IPO") to purchase up to 7,120,000 shares of the Company's common stock, par value $0.0001 per share (the "Common Stock"), issuable upon the exercise, at an exercise price of $11.50 per share; (ii) warrants issued in connection with the Closing of the Business Combination to purchase up to 1,780,000 shares of our Common Stock issuable upon the exercise, at an exercise price of $11.50 per share; (iii) warrants (the "Public Warrants") issued in connection with the Company IPO to purchase up to 17,250,000 shares of Common Stock, at an exercise price of $11.50 per share, of the public warrants. We receive no capital until the Warrants are exercised, which do not expire until 2028. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

***We are an "emerging growth company." The reduced public company reporting requirements applicable to emerging growth companies may make our securities less attractive to investors.***

We qualify as an "emerging growth company," as defined in the JOBS Act. While we remain an emerging growth company, we are permitted and plan to rely on exemptions from certain disclosure requirements that are applicable to other public companies that are not emerging growth companies. These provisions include: (1) an

exemption from compliance with the auditor attestation requirement in the assessment of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act, (2) not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements, (3) reduced disclosure obligations regarding executive compensation arrangements in our periodic reports, registration statements and proxy statements and (4) exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, the information we provide will be different than the information that is available with respect to other public companies that are not emerging growth companies. In addition, Section 107 of the JOBS Act provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as we are an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. We have elected to irrevocably opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we will adopt the new or revised standard at the time public companies adopt the new or revised standard. This may make comparison of our financial statements with another emerging growth company that has not opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

We cannot predict whether investors will find our securities less attractive if we rely on these exemptions. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities. The market price of our securities may be more volatile.

***Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses and lead to errors in our financial reporting, which could adversely affect our business as a public company.***

As a public company, we are required to maintain internal control over financial reporting and to report any material weaknesses in such internal controls. Section 404 of Sarbanes-Oxley requires that we evaluate and determine the effectiveness of our internal control over financial reporting.Maintaining effective internal control over financial reporting is necessary for us to produce reliable financial reports and is important in helping to prevent financial fraud.

Our current controls and any new controls that we develop may become inadequate because of poor design and changes in our business, including increased complexity resulting from any expansion. Any failure to implement and maintain effective internal control over financial reporting could adversely affect the results of assessments by our independent registered public accounting firm and their attestation reports.

If we are unable to certify the effectiveness of our internal controls, or if our internal controls have a material weakness, we may not detect errors in a timely fashion, our consolidated financial statements could be misstated, we could be subject to regulatory scrutiny and a loss of confidence by stakeholders, which could harm our business and adversely affect the market price of our common stock. Failure to comply with Section 404 of Sarbanes-Oxley could potentially subject us to sanctions or investigations by the SEC, FINRA or other regulatory authorities, as well as increase the risk of liability arising from litigation based on securities law.

***Changes in tax regulations or their interpretation could negatively impact our cash flows and results of operations.***

Changes in tax and other revenue raising laws, regulations and policies in the jurisdictions where we do business could impose new restrictions, costs or prohibitions on our practices and negatively impact our results of operations. In addition, interpretation of tax regulations requires us to exercise our judgment and taxing authorities or our independent registered public accounting firm may reach conclusions about the application of

such regulations that differ from our conclusions. Changes to US tax laws, regulations, or interpretations could impact the tax treatment of our earnings and adversely affect our cash flows and financial results.

We are subject to audit in various jurisdictions, and these jurisdictions may assess additional taxes against us. Developments in an audit, litigation, or laws, regulations, administrative practices, principles, and interpretations could have a material effect on our operating results or cash flows. The final outcome of tax audits, investigations, and any related litigation could be materially different from our historical tax provisions and accruals.

***Our use of different estimates and assumptions in the application of our accounting policies could result in material changes to our reported financial condition and results of operations, and changes in accounting standards or their interpretation could significantly impact our reported results of operations.***

Our accounting policies are critical to the manner in which we present our results of operations and financial condition. Many of these policies, including policies relating to the recognition of revenue, are highly complex and involve many assumptions, estimates and judgments. We are required to review these assumptions, estimates and judgments regularly and revise them when necessary. Our actual results of operations vary from period to period based on revisions to these estimates. See the "Critical Accounting Estimates" section of Part II, Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations for further information. In addition, the regulatory bodies that establish accounting and reporting standards, including the SEC and the Financial Accounting Standards Board, periodically revise or issue new financial accounting and reporting standards that govern the preparation of our consolidated financial statements. Changes to these standards or their interpretation could significantly impact our reported results in future periods.

**Risks Related to our Recent Acquisitions**

***The Company may not realize the anticipated benefits of the Carlisle Acquisition and the FCF Acquisition, which may adversely affect the Company's business results and negatively impact the value of the Company's Common Stock.***

An inability to realize the full extent of the anticipated benefits of the Carlisle Acquisition and the FCF Acquisition, as well as any future delays encountered in the integration process, could have an adverse effect upon the revenues, level of expenses and operating results of the Company, which may adversely affect the value of the Company's Common Stock. Our ability to realize the anticipated benefits of the Carlisle Acquisition and the FCF Acquisition will depend, to a large extent, on our ability to integrate our business with Carlisle's business and with FCF Advisors' business in a manner that facilitates growth opportunities and achieves the anticipated benefits. In addition, some of the anticipated synergies are not expected to occur for a significant time period following the completion of the acquisitions and will require substantial capital expenditures to achieve. There can be no guarantee we will achieve any of these benefits on the anticipated timeframe or at all.

It is possible that the integration process could ultimately result in the loss of key employees, the loss of customers, the disruption of any of the companies' or all of the companies' ongoing businesses, inconsistencies in standards, controls (including internal controls over financial reporting), procedures and policies, unexpected integration issues, higher than expected integration costs and an overall post-completion integration process that takes longer than originally anticipated. We expect to face numerous challenges as we integrate the operations of the Company, Carlisle, and FCF Advisors in order to realize the anticipated benefits of the acquisitions, including:

- combining the business of the Company, Carlisle and FCF Advisors and meeting the capital requirements, in a manner that permits the combined company to achieve any cost savings or other synergies, the failure of which would result in the anticipated benefits of the Carlisle Acquisition and the FCF Acquisition not being realized in the time frame currently anticipated or at all;
- integrating and unifying the offerings and services available to customers;

- adopting mechanisms to address and comply with new regulatory and legal requirements associated with new business lines of the Company in a highly regulated industry;
- identifying and eliminating redundant and underperforming functions and assets;
- maintaining existing agreements with customers, suppliers, distributors and vendors, avoiding delays in entering into new agreements with prospective customers, suppliers, distributors and vendors, and leveraging relationships with such third parties for the benefit of the combined company;
- consolidating the companies' information technology infrastructure;
- difficulties in managing the expanded operations of a larger and more complex company; and
- potential unknown liabilities, adverse consequences and unforeseen increased expenses associated with the integration of Carlisle and FCF Advisors into our business.

In addition, at times the attention of certain members of the Company's management and respective resources may in the future be focused on the integration of the businesses and diverted from day-to-day business operations or other opportunities that may have been beneficial to such Company, which may disrupt the business of the Company.

Many of these factors are outside of our control and any of them could result in lower revenues and higher costs, which could materially impact our business, financial condition and results of operations. In addition, even if the operations of the companies are integrated successfully, the full benefits of the Carlisle Acquisition and the FCF Acquisition may not be realized, including, among others, the synergies, cost savings or sales or growth opportunities that are expected. As a result, it cannot be assured that the Carlisle Acquisition and the FCF Acquisition will result in the realization of the full benefits expected within the anticipated time frames, or at all.

***Our international operations pose additional risks that may adversely impact our financial results and operations.***

Following the Carlisle Acquisition, we derive a portion of our revenues from sources located outside of the U.S. We are subject to a number of risks due to our international operations, including:

- difficulties in staffing and managing foreign operations;
- coordinating our information and data processing systems, communications, policies and logistics across geographic distances, multiple time zones and in different languages;
- changes in tax regulations or practice, and rates in both U.S. and foreign countries;
- lost business or financial harm due to protectionism in the United States and in countries around the world, including adverse trade policies, price controls or economic sanctions,
- government actions affecting the flow of goods, services and currency,
- governmental restrictions on the transfer of funds to us and from our operations outside the United States;
- changes in the geopolitical environment, wars, conflicts, or trade barriers or blockades in Luxembourg and/or in the EU, which may adversely affect business activity and economic conditions globally and could contribute to instability in global financial and foreign exchange markets, as well as disrupt the free movement of goods, services, and people between countries;
- cash balances held in foreign banks and institutions where governments have not specifically enacted formal guarantee programs;

- differences in the availability and terms of financing;
- Luxembourg and EU regulatory reforms exposing the Company to increasing regulatory scrutiny as well as regulatory uncertainty; and
- epidemics or pandemics on a regional or global level.

We must comply with differing labor practices and foreign laws, including data privacy requirements, licensing regulations, anti-money laundering, counter terrorist-financing, and anti-corruption rules and laws and regulations applicable to U.S. business operations abroad, any or all of which will impose administrative burdens on the Company. Violations of these laws and regulations could result in fines and penalties, criminal sanctions, tariffs or duties, restrictions on our business conduct and on our ability to offer our services in one or more countries, and could also materially adversely affect our reputation, our ability to attract and retain employees, our international operations, our business and our operating results.

The EU General Data Protection Regulation (the "GDPR") is a comprehensive regulation applying across all EU member states. All our business units (regardless of whether they are located in the EU) may be subject to the GDPR when personal data is processed in relation to the offer of goods and services to individuals within the EU. The GDPR is complex and compliance may be costly. Our failure to comply with GDPR and other countries' privacy or data security-related laws, rules or regulations could result in significant penalties imposed by regulators which could have an adverse effect on our business financial condition and results of operations.

Carlisle is regulated by the Luxembourg supervisory authority (*Commission de Surveillance du Secteur Financier* or "CSSF") and is subject to the *Luxembourg's and the European Union's Alternative Investment Fund Managers* ("AIFM") Directive which regulates investment advisors domiciled in Luxembourg and in the European Union and investment advisors that manage investment funds domiciled or marketed in Luxembourg and in the European Union. The AIFM Directive imposes certain requirements and restrictions on such investment advisors, which differ based on the domicile of the applicable investment advisor and investment fund and the circumstances under which an investment fund is marketed in Luxembourg and in the European Union. Such requirements and restrictions may include disclosure and transparency obligations, capital adequacy, valuation and depositary requirements, leverage and investment restrictions, other conduct of business requirements and tax requirements. As a result of the AIFM Directive, an investment advisor may be restricted from marketing investment funds in Luxembourg and in the European Union, may incur potentially significant increased operating costs, may be unable to engage in certain activities that it otherwise would have and/or may be subject to other adverse consequences. Any of the foregoing could adversely affect the performance of the Company.

The Company's business and operating activities are subject to increasing regulatory oversight outside the U.S. and Carlisle may be affected by several proposed or implemented reform initiatives in Luxembourg and in the EU as well as volatility associated with international regulatory uncertainty. International regulatory reforms could require the Company to alter its future business or operating activities, which could be time-consuming and costly, increase regulatory compliance costs, result in litigation, impede the Company's growth, and cause its assets under management ("AUM"), revenue and earnings to decline. Regulatory reform may also impact the Company's clients, which could cause them to change their investment strategies or allocations in manners that may be adverse to the Company. Any of the foregoing could adversely affect the performance of the Company.

***Any disruption to Carlisle Management's distribution channels may cause the Company's AUM, revenue and earnings to decline.***

Carlisle relies on a number of third parties to provide distribution and business introduction servicing for certain of its investment management products through its various distribution channels. Carlisle's ability to maintain strong relationships with its distributors may impact the Company's future performance, and its relationships with distributors are subject to periodic renegotiation that may result in increased distribution costs and/or reductions in the number of products and services being marketed or distributed. Moreover, new fiduciary regulations could lead to significant shifts in distributors' business models and more limited product offerings, potentially resulting in reduced distribution and/or marketing of certain of the Carlisle's products. If Carlisle is

unable to distribute its products successfully or if it is unable to replace or renew existing distribution arrangements, the Company's AUM, revenue and earnings may decline. In addition, improper activities, as well as inadequate and improper execution of controls in the context of anti-money laundering and counter terrorist financing, could create additionally reputational and regulatory harm to Carlisle. In the context of the management of its products, Carlisle's obligations include having a proper due diligence process on its delegates to ensure that third-party distributors conduct ongoing checks on its contracting parties.

***Because a portion of our business is conducted in currency other than U.S. dollar, we have significant foreign currency risk.***

Our results of operations and financial condition are affected by fluctuations in exchange rates between the Euro and the U.S. dollar. The exchange rates between the Euro against the U.S. dollar have fluctuated significantly in recent years and may fluctuate significantly in the future. In the future we may hedge a portion of our foreign currency exposure with the purchase of forward exchange contracts or through other hedging techniques. Hedge contracts only mitigate the impact of changes in foreign currency exchange rates that occur during the term of the related contract period and carry risks of counterparty failure. There can be no assurance that we will enter into such hedges or that our hedges will have their intended effects.

***Litigation and other claims and liabilities have arisen and may arise with respect to the acquisitions that we consummate or the businesses acquired, including our recently completed acquisitions, and could have a material adverse effect on our business and financial results.***

We may face litigation or other claims as a result of the terms and conditions of our acquisition agreements, stock purchase agreements, tender offers and other agreements to purchase equity interests in target companies, such as earnout payments or closing net asset adjustments. Shareholder litigation may arise as a result of proposed acquisitions. Acquired businesses may have liabilities, pre-existing compliance issues or deficiencies, or be subject to claims, litigation, or investigations that we did not anticipate or which exceed our estimates at the time of the acquisition. These liabilities and claims will increase expenses, may cause a delay in completing an acquisition, and may disrupt our operations, which could have a material adverse effect on our business and financial results.

Businesses we have recently acquired, including Carlisle, have included litigation and claims by investors such as those relating to asset valuations, distributions and other matters. Such litigation and claims and any similar future claims may result in a loss of investors, reduced management fees, increased costs, damage to our reputation, and diversion of management's time, and could have a material adverse effect on our business and financial results.

**Risks Related to our Common Stock**

***Our stock repurchase program may not enhance long-term stockholder value and could increase the volatility of the market price of our common stock and diminish our cash.***

Our stock repurchase program does not obligate us to repurchase any shares of our Common Stock. The timing and amount of any repurchases depend upon several factors, including market conditions, business conditions, statutory and contractual restrictions, the trading price of our Common Stock and the nature of other investment opportunities available to us. In addition, repurchases of our Common Stock could affect our stock price and increase its volatility. The existence of a stock repurchase program could cause our stock price to be higher than it would be absent the program and could reduce market liquidity for our stock. Use of our funds to repurchase stock could diminish our cash reserves, which may impact our ability to finance growth, pursue strategic opportunities, and discharge liabilities. Our stock repurchases may not enhance stockholder value because the market price of our Common Stock may decline below the prices at which we repurchased stock and short-term stock price fluctuations could reduce the program's effectiveness.

***Upon the expiration of the lockup agreements entered into by the Carlisle sellers, the Company, our directors, executive officers and holders of 5% or more of our Common Stock, as applicable, a substantial***

***number of shares of Common Stock will be eligible for resale into the public market, a portion of which shares are being offered in this prospectus.***

Each of the selling securityholders (other than Manorhaven) have executed a share lockup and standstill agreement providing that each selling securityholder will not (subject to certain customary exceptions) transfer such selling securityholders' shares through July 3, 2025, and that each selling securityholder will not transfer more than 15% of the Shares held on the Acquisition Closing Date, December 2, 2024, within any 30-day period. In addition, each selling securityholder agreed, for 12 months following the Acquisition Closing Date, not to initiate or participate in any acquisition of the Company's securities that would result in (i) such selling securityholder and its affiliates and associates beneficially owning 10% or more of the Company's voting securities or (ii) any group beneficially owning 20% or more of the Company's voting securities.

We have also entered into lock-up agreements in connection with the Business Combination, pursuant to which certain directors, executive officers, holders of 5% or more of our Common Stock have agreed with the Company, subject to certain exceptions, not to dispose of or hedge any of our or their shares of Common Stock from the date of such agreements until the agreed-upon date of termination of the lock-up. On November 21, 2024, the Company released certain restricted shares of Common Stock held by Jay Jackson, our chief executive officer, from the transfer and other restrictions applicable to such shares. Upon the expiration or early termination or waiver of the lock-up agreements, those shares will be eligible for resale unless such shares are subject to certain transfer restrictions. The resale of these shares in the public market, or the perception that such sales could occur, could harm the prevailing market price of shares of our Common Stock. These sales, or the possibility that these sales may occur, also may make it more difficult for us to sell equity securities in the future at a time and at a price we or the Selling Securityholders deem appropriate.

In addition, we have entered into registration rights agreements with certain stockholders of the Company, including East Sponsor, LLC, Thomas W. Corbett, Jr., Jay Jackson, Scott Kirby, Sean McNealy, and Matthew Ganovsky as well as with the Selling Securityholders, providing the parties thereto with certain registration rights relating to the shares of our Common Stock which they beneficially own, including certain demand and piggyback registration rights, in each case, subject to certain requirements and customary conditions. The registration rights agreements set forth customary registration procedures, including an agreement by us to make appropriate officers available to participate in roadshow presentations and cooperate as reasonably requested in connection with any underwritten offerings. These registration rights would facilitate the resale of such securities into the public market, and any such resale would increase the number of shares of our Common Stock available for public trading.

***Our Board has broad discretion to issue additional securities, and in order to raise sufficient funds to expand our operations, we may have to issue securities at prices which may result in substantial dilution to our stockholders.***

We are entitled under the Second Amended and Restated Certificate of Incorporation of the Company (the "Charter") to issue up to 200,000,000 shares of Common Stock and 1,000,000 shares of preferred stock, par value $0.0001 ("Preferred Stock"), although these amounts may change in the future subject to stockholder approval. Shares of our Preferred Stock provide our board of directors broad authority to determine voting, dividend, conversion and other rights. Any additional stock issuances could be made at a price that reflects a discount or premium to the then-current market price of our Common Stock. In addition, in order to raise capital, we may need to issue securities that are convertible into or exchangeable for a significant amount of our Common Stock. Our board of directors may generally issue those shares of Common Stock and Preferred Stock, or convertible securities to purchase those shares, without further approval by our stockholders. Any Preferred Stock we may issue could have such rights, preferences, privileges and restrictions as may be designated from time to time by our board of directors, including preferential dividend rights, voting rights, conversion rights, redemption rights and liquidation provisions. We may also issue additional securities to our directors, officers, employees and consultants as compensatory grants in connection with their services, both in the form of stand-alone grants or under our stock incentive plans. Additionally, we have a series of warrants outstanding (collectively, the "Warrants") which include: (i) warrants issued in connection with the initial public offering of

East Resources Acquisition Company (the "ERES IPO") to purchase up to 7,120,000 shares of our Common Stock issuable upon the exercise, at an exercise price of $11.50 per share; (ii) warrants issued in connection with the closing of the Business Combination to purchase up to 1,780,000 shares of our Common Stock issuable upon the exercise, at an exercise price of $11.50 per share; and (iii) warrants issued in connection with the ERES IPO to purchase up to 17,250,000 shares of Common Stock, at an exercise price of $11.50 per share (16,654,140 of which were outstanding as of January 6, 2025). The exercise of such Warrants and the issuance of additional securities may cause substantial dilution to our stockholders.

***If we issue additional debt securities, our operations may be restricted, we will be exposed to additional risk and the market price of our Common Stock could be adversely affected.***

If we decide to issue debt securities in the future, it is likely that such securities will be governed by an indenture or other instrument containing covenants that may restrict our operating flexibility. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges more favorable than those of our Common Stock. Holders of debt securities may also be granted specific rights, including, but not limited to, the right to hold a perfected security interest in certain of our assets, the right to accelerate payments due under the indenture, rights to restrict dividend payments and rights to approve the sale of assets. Upon liquidation, holders of our debt securities and shares of Preferred Stock and lenders with respect to other borrowings will receive a distribution of our available assets prior to the holders of our Common Stock.

***If securities or industry analysts do not publish research or reports about our business, if they adversely change their recommendations regarding our Common Stock or if our operating results do not meet their expectations, our stock price could decline.***

The trading market for our Common Stock will be influenced by the research and reports that industry or securities analysts publish about us or our business. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline. Moreover, if one or more of the analysts who cover our Company downgrades our Common Stock or if our operating results do not meet their expectations, our stock price could decline.

***The trading price of our Common Stock has been, and is likely to continue to be, volatile and could be subject to wide fluctuations in response to various factors, some of which are beyond our control.***

The market price of our Common Stock may be volatile because of numerous factors, including:

- our operating and financial performance and prospects;
- quarterly variations in operating results;
- changes in financial estimates by us or securities analysts who may cover our stock or by our failure to meet the estimates made by securities analysts;
- conditions that impact demand for products and/or services;
- future announcements concerning our business, our clients' businesses or our competitors' businesses;market and industry perception of our success, or lack thereof, in pursuing our growth strategy;
- changes in market valuations of other similar companies;
- changes in laws or regulations applicable to our business;
- additions or departures of key personnel;
- changes in our capital structure, such as future issuances of debt, equity and equity-linked securities, including secured lending arrangements and securitizations;

- short sales, hedging and other derivative transactions involving our capital stock;
- our limited public float and the relatively thin trading market for our Common Stock;
- transactions in our Common Stock, by directors, officers, affiliates and other major investors;
- strategic actions by us or our competitors, such as acquisitions or restructurings;
- changes in laws or regulations which adversely affect our industry or us;
- adverse resolution of new or pending litigation against us; and
- changes in general market, economic and political conditions in the United States and global economies or financial markets, including those resulting from inflation, natural disasters, terrorist attacks, acts of war and responses to such events.

Furthermore, from time to time, the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. These fluctuations often have been unrelated or disproportionate to the operating performance of those companies.

These broad market and industry fluctuations, as well as general economic, political and market conditions, such as recessions or interest rate changes, may negatively impact the market price of our Common Stock. In the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. Any future securities litigation against us could result in substantial costs and divert our management's attention and resources, and harm our business, financial condition, and results of operations.

***Future sales of our Common Stock, or the perception that such future sales may occur, may cause our stock price to decline.***

Sales of substantial amounts of our Common Stock, including Common Stock issuable upon the exercise of our outstanding Warrants, in the public market, or the perception that these sales may occur, could cause the market price of our Common Stock to decline. In addition, the sale of such shares, or the perception that such sales may occur, could impair our ability to raise capital through the sale of additional Common Stock or Preferred Stock. Except for any shares purchased by our affiliates, all of the shares of Common Stock sold in this offering will be freely tradable.

***We have not paid cash dividends in the past and do not expect to pay cash dividends in the foreseeable future. Any return on your investment may be limited to increases in the market price of our Common Stock.***

We have not paid any cash dividends on our Common Stock to date. We may retain future earnings, if any, for future operations, expansion and debt repayment and have no current plans to pay cash dividends for the foreseeable future. Any decision to declare and pay dividends in the future will be made at the discretion of the board of directors and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions and other factors that the board may deem relevant. In addition, our ability to pay dividends may be limited by covenants of any existing and future indebtedness we or our subsidiaries incur.

***Investing in our Common Stock may involve a significant degree of risk.***

The investments we make in accordance with our investment objectives may result in a higher amount of risk when compared to alternative investment options and volatility or loss of principal. Our investments may be highly speculative and aggressive, and therefore an investment in our Common Stock may not be suitable for someone with lower risk tolerance and investors in our Common Stock may experience losses and volatility.

**Risks Related to our Debt**

***Our outstanding and any future indebtedness could adversely affect our financial and operational flexibility.***

As of December 31, 2024, we had indebtedness outstanding of approximately $381 million, including $100 million of borrowings under our Senior Secured Credit Facility and excluding approximately $143 million of indebtedness of consolidated variable interest entities. In addition, we have an additional committed Delayed Draw Facility with up to $50 million available to be drawn subject to certain conditions. We expect to incur additional indebtedness in the future. The terms of the indenture under which the Notes are issued do not prohibit us or our subsidiaries from incurring additional indebtedness. Our debt service obligations will require us to use a portion of our cash flow to pay interest and principal on debt instead of for other corporate purposes, including funding future expansion. If our cash flow and capital resources are insufficient to service our debt obligations, we may be forced to seek extraordinary dividends from our subsidiaries, sell assets, seek additional equity or debt capital or restructure our debt. However, these measures might be unsuccessful or inadequate in permitting us to meet scheduled debt service obligations.

Our Credit Agreement subjects us to restrictive covenants that could affect our financial and operational flexibility. Our breach or failure to comply with any of these covenants could result in a default under our credit agreement. In addition, our Senior Secured Credit Facility matures in 2030. We may not be able to refinance this debt on favorable terms or at all at maturity.

**Item 1B. Unresolved Staff Comments**

None.

**Item 1C. Cybersecurity**

Management is responsible for mitigating the Company's risks, including cybersecurity. The Board of Directors has the oversight responsibility for the Company's risk management and has delegated its responsibility over cybersecurity to the Audit Committee.

The Audit Committee periodically reviews the Company's cybersecurity policy and programs established by management to mitigate cybersecurity and data risks. The periodic reviews take place on a quarterly basis and include reports from the Company's cybersecurity team led by the Company's Chief Information Security Officer ("CISO") who has over 10 years of data security experience. The quarterly report provides an overview of cybersecurity threats, key measures in place to mitigate cybersecurity threats and vulnerabilities, provides a status of ongoing security projects to strengthen the Company's cybersecurity posture, as well as plans and resource needs for addressing possible future cybersecurity threats and vulnerabilities. The Company's cybersecurity policy is centered on mitigating risks related to cybersecurity, privacy, physical security, and information security risk management.

The Company's cybersecurity risk management approach is reviewed for alignment with the Company's overall risk tolerance. The Company has a dedicated cybersecurity team led by the CISO who is responsible for executing the risk strategy and policies developed in coordination with the Company's Chief Executive Officer, Chief Financial Officer, General Counsel, Presidents, and the Vice Presidents of Finance and Capital Markets.

The Company's cybersecurity policy outlines every level of protection put in place to safeguard sensitive data as well as company technology assets, including threats and vulnerabilities posed from our interactions with suppliers and third-party service providers. These layers of protection include physical, local, and network layers as prescribed by standard information technology guidelines. The cybersecurity policy also contains procedures for responding to incidents that may threaten the security of Company systems and/or network, which include multiple layers of protections using current security measures and applications. The effectiveness of our security policy and procedures are tested frequently with periodic effectiveness reports shared with senior management and the Audit Committee to facilitate their risk oversight responsibilities.

No risks from cybersecurity threats or previous cybersecurity incidents have materially affected our business strategy, results of operations, or financial condition. However, there can be no assurance that our controls and

procedures in place to monitor and mitigate the risks of cyber threats, including the remediation of critical information security and software vulnerabilities, will be sufficient and/or timely and that we will not suffer material losses or consequences in the future. Additionally, while we have in place insurance coverage designed to address certain aspects of cyber risks, such insurance coverage may be insufficient to cover all insured losses or all types of claims that may arise.

**Item 2. Properties**

Our corporate headquarters is located in Orlando, Florida. The office lease for our headquarters consists of approximately 19 thousand square feet of office space expiring in December 2029. We also lease office space in Luxembourg for our Asset Management business consisting of approximately 2 thousand square feet pursuant expiring in July 2033. We believe our facilities are adequate and suitable for our current needs and that, should it be needed, suitable additional or alternative space will be available to accommodate our operations.

## Item 3. Legal Proceedings

From time to time, the Company is involved in various civil actions as part of its normal course of business. In view of the inherent difficulty of predicting the outcome of such matters, the Company cannot state what the eventual outcome of these matters will be. However, the Company believes, based on current knowledge and after consultation with counsel, that the Company is not a party to any litigation that is material to ongoing operations as defined in Item 103 of Regulation S-K as of the end of the period to which this Report relates.

## Item 4. Mine Safety Disclosures

Not applicable.

**Part II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock, warrants, and fixed rate senior notes are currently listed on The NASDAQ Stock Market under the ticker symbol “ABL”, “ABLLW”, and “ABLLL”, respectively.

**Holders**

On March 20, 2025, there were 29 holders of record of our common stock. The actual number of holders of common stock is greater than these numbers of record holders and includes stockholders who are beneficial owners, but whose shares are held by brokers and nominees. The number of holders of record also does not include stockholders whose shares may be held in trust by other entities.

**Dividends**

We have not declared or paid dividends on our common stock to date. Any future determination to declare cash dividends on our common stock will be made at the discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, general business conditions, Delaware law, and other factors that our board of directors may deem relevant. In addition, our senior secured credit facility contains restrictions on our ability to pay dividends. We do not anticipate paying cash dividends on our common stock for the foreseeable future.

**Unregistered Sales of Equity Securities**

On December 2, 2024, the Company closed on an acquisition of FCF Advisors, LLC in which we issued approximately 578,000 shares of our common stock valued at $7.92 per share. The issuance of the common

stock to the sellers was completed in reliance on the exemption from the registration requirements of the Securities Act provided by Section 4(a)(2) thereof as a transaction by an issuer not involving any public offering.

**Purchases of equity securities by the issuer**

Refer to Note 15 Shareholders' Equity to the consolidated financial statements for further discussion of our stock repurchase program.

**Item 6. [Reserved]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**ABACUS GLOBAL MANAGEMENT, INC. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion provides an analysis of the Company's financial condition, cash flows and results of operations from management's perspective and should be read in conjunction with the consolidated financial statements and notes thereto included in Part II, Item 8 of this Annual Report on Form 10-K. Our objective is to provide discussion of events and uncertainties known to management that are reasonably likely to cause the reported financial information not to be indicative of future operating results or of future financial condition and to also offer information that provides an understanding of our financial condition, cash flows and results of operations. This section of this Form 10-K generally discusses 2024 and 2023 items and year-to-year comparisons between 2024 and 2023.*

*The statements contained in this Annual Report on Form 10-K that are not purely historical are forward-looking statements within the meaning of Section27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements regarding our expectations, hopes, intentions or strategies regarding the future. In addition to historical financial analysis, this discussion and analysis contains forward-looking statements based upon current expectations that involve risks, uncertainties, and assumptions, as described under the heading "Cautionary Note Regarding Forward-Looking Statements." All forward-looking statements included in this document are based on information available to us on the date hereof, and we assume no obligation to update any such forward-looking statements. Actual results and timing of selected events may differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to: the potential impact of our business relationships, including with our employees, customers and competitors; changes in general economic, business and political conditions, including changes in the financial markets; weakness or adverse changes in the level of activity in our sector or the sectors of our affiliated companies, which may be caused by, among other things, high or increasing interest rates, or a weak U.S. economy; significant competition that our operating subsidiaries face; compliance with extensive government regulation; and other risks detailed in the those set forth under "Risk Factors" or elsewhere in this quarterly statement. Unless the context otherwise requires, references in this "Abacus Global Management, Inc. Management's Discussion and Analysis of Financial Condition and Results of Operations" to "we," "us," "our," and "Company" are intended to mean the business and operations of Abacus Global Management, Inc.*

**Business Overview**

The Company is a leading vertically integrated alternative asset manager and market maker, specializing in longevity and actuarial technology. The Company operates in five reportable segments.

The Company, through its Longevity Market Assets, LLC ("LMA") subsidiary, directly acquires life insurance policies in a mutual beneficial transaction for both us and the underlying insured. With meaningful support from our proprietary risk rating heat map, we consistently evaluate policies (at origination and throughout the lifecycle) to generate essentially uncorrelated risk adjusted returns. Additionally, we provide a range of services for owners of life settlement assets.

Upon acquiring a policy, we have the option to either (i) trade that policy to a third-party institutional investor (i.e., generating a spread on each trade) or (ii) hold that policy on our balance sheet until maturity (i.e., paying the premiums over time and receiving the final claim / payout). This process is predicated on driving the best economics for the Company and we categorize this revenue as "Trading" or "Active management revenue" in our "Active Management" reportable segment.

Additionally, the Company, through its LMA subsidiary, provides a wide range of services to owners and purchasers of life settlements assets (i.e., acquired policies). More specifically, the Company provides consulting, valuation, actuarial services, and perform administrative work involved in keeping a policy in force and at the premium level most advantageous to the owner. We have experience servicing a large number of policies for highly sophisticated institutions, including policies for large institutional life settlement funds. We generate revenue on these services by charging a base servicing fee of approximately 0.5% of total asset value of the portfolio or flat rate

per policy. We categorize this revenue as "Servicing" or "Portfolio servicing revenue" in our "Portfolio Servicing" reportable segment.

The Company, through its Abacus Settlements, LLC ("Abacus Settlements") subsidiary, originates life insurance policy settlement contracts as a licensed life settlement provider on behalf of third-party institutional investors ("Financing Entities") and for the Company to invest in the life settlement asset class. Specifically, the Company originates policies through three primary origination channels (Agents, Brokers, and Direct-to-Consumers ("Client Direct")) and Third-Party Intermediaries, screens them for eligibility by verifying that the policy is in force, obtaining consents and disclosures, and submitting cases for life expectancy estimates. This process is characterized as our origination services, which averages a fee of approximately 2% of the life insurance policy's face value. We categorize this revenue "Origination Revenue" in our "Originations" reportable segment.

Starting in December 2024, the Company's acquired asset managers manage alternative investment funds and exchange-traded funds ("ETF"). The alternative investment funds primarily invest in insurance policy settlement contracts that cater to investors seeking risk-adjusted returns with low correlation to other asset classes. The ETFs primarily invest in equity securities using a suite of core and thematic free cash flow equity strategies and offers over 50 customizable free cash flow index strategies covering eight global equities allocation categories available in separately managed accounts. Asset Management fees are based on a percentage of total asset value under management. We also realize performance fees based on a percentage of returns over certain hurdle rates for the managed alternative investment funds. We categorize this revenue "Asset Management Fees" in our "Asset Management" reportable segment.

Starting in February 2024 with revenue beginning in December 2024, the Company, through its ABL Technologies, LLC ("ABL Tech") subsidiary, using its proprietary technology based on health and longevity data sets provides services to pension funds, government agencies, insurance-related businesses, as well as other entities that benefit from real-time mortality verification, missing participant verification, and other services specific to the life insurance market. Technology Services fees are based on fixed annual contracts. We categorize this revenue "Technology Services revenue" in our "Technology Services" reportable segment.

**Results of Operations**

The following tables set forth our results of operations for the periods presented. The period-to-period comparison of financial results is not indicative of future results:

| | Years Ended December 31, | |
|---|---|---|
| | **2024** | **2023** |
| REVENUES: | | |
| Asset management fees | $ 2,841,481 | $ — |
| Active management | 102,819,361 | 61,195,377 |
| Origination fees | 5,457,147 | 4,203,900 |
| Portfolio servicing fees | 772,169 | 1,002,174 |
| Technology services | 33,628 | — |
| Total revenues | 111,923,786 | 66,401,451 |
| COST OF REVENUES (excluding depreciation and amortization stated below): | | |
| Cost of revenue (including stock-based compensation) | 11,371,733 | 6,490,377 |
| Gross Profit | 100,552,053 | 59,911,074 |
| OPERATING EXPENSES: | | |
| Sales and marketing | 9,063,384 | 4,905,747 |
| General and administrative (including stock-based compensation) | 81,734,518 | 26,482,571 |
| Loss on change in fair value of debt | 4,835,351 | 2,356,058 |
| Unrealized loss (gain) on investments | 238,012 | (1,369,112) |
| Realized gain on investments | (2,341,066) | — |

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Depreciation and amortization expense | 7,910,158 | 3,409,928 |
| Total operating expenses | 101,440,357 | 35,785,192 |
| Operating (loss) income | (888,304) | 24,125,882 |
| OTHER INCOME (EXPENSE): | | |
| Loss on change in fair value of warrant liability | (2,702,040) | (4,204,360) |
| Interest (expense) | (18,279,686) | (9,866,821) |
| Interest income | 2,398,691 | 594,764 |
| Other income (expense) | 38,040 | (146,443) |
| Total other expense | (18,544,995) | (13,622,860) |
| Net (loss) income before provision for income taxes | (19,433,299) | 10,503,022 |
| Income tax expense | 5,484,738 | 1,468,535 |
| NET (LOSS) INCOME | (24,918,037) | 9,034,487 |
| LESS: NET LOSS ATTRIBUTABLE TO NONCONTROLLING INTEREST | (956,987) | (482,139) |
| NET (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ (23,961,050) | $ 9,516,626 |

**Revenue**

***Asset management revenue***

Management fees are recognized over time during the periods in which services are performed in accordance with relevant contractual terms. Management fees are generally based on net asset value (“NAV”) of the funds provided in the respective agreements. Performance fees are earned when the performance of the individual shares classes of the managed funds exceeds contractual thresholds.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Asset management fees | $ 2,841,481 | $ — | $ 2,841,481 | NM |

Asset management revenue is new in 2024 and contributed $2,841,481 in revenue for the year ended December 31, 2024. The increase in asset management revenue is primarily due to the acquisition of two asset management companies at the beginning of December 2024.

***Active management revenue***

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Realized and unrealized gains from life insurance policies held using the fair value method | $ 85,048,829 | $ 43,214,390 | $ 41,834,439 | 96.8 % |
| Fee-based services | 13,881,208 | — | 13,881,208 | NM |
| Related party realized gains from life insurance policies held using the fair value method | 3,312,202 | — | 3,312,202 | NM |

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Investment income from life insurance policies held using the investment method | 577,122 | 17,980,987 | (17,403,865) | (96.8)% |
| Total active management revenue | $ 102,819,361 | $ 61,195,377 | $ 41,623,984 | 68.0 % |

Total active management revenue increased by $41,623,984, or 68.0%, for the year ended December 31, 2024 compared to the year ended December 31, 2023. The increase in active management revenue was primarily attributable to an increase of $25,897,723 in unrealized gains on held policies accounted under the fair value method due to increase in held policies, $13,881,208 in fee-based revenue, $31,237,924 increase in total realized gains, and offset by $11,989,006 increase in premiums paid, and a decrease of $17,403,865 in trading activity related to policies accounted for under the investment method due to a shift to fair value method election for the year ended December 31, 2024, compared to the year ended December 31, 2023.

The aggregate face value of policies accounted for using the investment method is $2,225,000 as of December 31, 2024, with a corresponding carrying value of $1,083,977. Additional information regarding policies accounted for under the investment method is as follows:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Investment method: | | |
| Policies bought | — | 165 |
| Policies sold | 3 | 164 |
| Policies matured | 1 | 2 |
| Average realized gain (loss) on policies sold | 16% | 19% |
| Number of external counter parties that purchased policies | 2 | 15 |
| Realized gains | $297,378 | $13,980,987 |
| Revenue from maturities | $500,000 | $4,000,000 |

Aggregate face value of policies held at fair value is $1,295,788,355 as of December 31, 2024, with a corresponding fair value of $370,398,447. Additional information regarding policies accounted for under the fair value method is as follows:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Fair value method: | | |
| Policies bought | 914 | 382 |
| Policies sold | 466 | 196 |
| Policies matured | 21 | 3 |
| Average realized gain (loss) on policies sold | 24% | 17% |
| Number of external counter parties that purchased policies | 26 | 10 |
| Realized gains, net of premiums paid on sold policies | $45,253,308 | $18,446,897 |
| Revenue from maturities | $21,089,421 | $828,226 |

***Origination Revenue***

Through the origination segment, the Company originates life insurance policy settlement contracts as a licensed life settlement provider on behalf of third-party institutional investors interested in investing in the life settlement asset class. Specifically, the Company originates policies through three primary origination channels (agents/financial advisors, direct-to-consumers, life settlement brokers and third-party intermediaries), screens them for

eligibility by verifying that the policy is in force, obtaining consents and disclosures, and submitting cases for life expectancy estimates. The pricing for origination fees based on a percentage of the net death benefit of the policy serviced.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Origination fees | $ 5,457,147 | $ 4,203,900 | $ 1,253,247 | 29.8 % |

Origination Revenue increased by $1,253,247 or 29.8% from $4,203,900, for the year ended December 31, 2024 compared to the year ended December 31, 2023. Origination Revenue increased due to having a full year worth of revenue in 2024 compared to 2023.

***Portfolio servicing revenue***

We enter into service agreements with the owners of life settlement contracts and are responsible for maintaining the policies, managing processing of claims in the event of death of the insured and ensuring timely payment of optimized premiums computed to derive maximum return on maturity of the policy. We neither assume the ownership of the contracts nor undertake the responsibility to make the associated premium payments. The duties that we perform under these arrangements are considered a single performance obligation that is satisfied over time and revenue is recognized for services provided for the corresponding time period. We earn servicing revenue related to policy and administrative services on behalf of the life settlement policy owners as a percent of the net death benefit value.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Portfolio servicing fees | $ 772,169 | $ 1,002,174 | $ (230,005) | (23.0)% |

Portfolio servicing revenue decreased by $230,005 or 23.0%, for the year ended December 31, 2024 compared to the year ended December 31, 2023. The decrease in portfolio servicing revenue is primarily due to a decrease in policies serviced.

***Technology services revenue***

We enter into service agreements with pension funds, government agencies, insurance-related businesses, as well as other entities to provide real-time mortality verification, missing participant verification, and other services specific to the life insurance markets. The duties that we perform under these arrangements are considered a single performance obligation that is satisfied over time and revenue is recognized for services provided for the corresponding time period.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Technology services | $ 33,628 | $ — | $ 33,628 | NM |

Technology services revenue is new in 2024 and contributed $33,628 in revenue for the year ended December 31, 2024.

***Cost of Revenues (Including Stock-Based Compensation) and Gross Profit***

Cost of revenues (excluding depreciation and amortization) primarily consists of servicing fees, commissions expense, escrow fees, servicing and active management payroll costs, stock-based compensation for active

management and servicing employees, life expectancy fees, lead generation expenses, and active management consulting expenses.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Cost of revenue (including stock-based compensation) | $ 11,371,733 | $ 6,490,377 | $ 4,881,356 | 75.2 % |

Cost of revenues (including stock-based compensation) increased by $4,881,356 or 75.2%, for the year ended December 31, 2024 compared to the year ended December 31, 2023. The increase in cost of revenues is primarily due to an increase of payroll expenses related to increased headcount, stock-based compensation expense, and increase of commissions for origination activity related to the increase in insurance policy purchase and trading activity.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Gross Profit | $ 100,552,053 | $ 59,911,074 | $ 40,640,979 | 67.8 % |

Gross profit increased by $40,640,979, or 67.8%, for the year ended December 31, 2024 compared to the year ended December 31, 2023. The increase in gross profit is primarily due to an increase in active management revenues, offset by an increase in cost of revenues.

***Operating Expenses***

*Sales and Marketing Expenses*

Sales and marketing expenses primarily consist of advertising and marketing related expenses as well as payroll related expenses.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Sales and marketing | $ 9,063,384 | $ 4,905,747 | $ 4,157,637 | 84.8 % |

Sales and marketing expenses increased by $4,157,637, or 84.8%, for the year ended December 31, 2024, compared to the year ended December 31, 2023. The increase in sales and marketing expense was attributable to an increase in television advertising costs related to the increase in life policy purchase activity and increase in related payroll expenses.

*General and Administrative (Including Stock-Based Compensation), and Other*

General, administrative, and other primarily consists of payroll and stock-based compensation and benefits related costs associated with our finance, legal, human resources, information technology, and administrative functions. General, administrative and other costs also consist of third-party professional service fees for external legal, accounting and other consulting services, rent and lease charges, insurance costs, and software expense.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| General and administrative (including stock-based compensation) | $ 81,734,518 | $ 26,482,571 | $ 55,251,947 | 208.6 % |

General, administrative, and other increased by $55,251,947, or 208.6%, for the year ended December 31, 2024, compared to the year ended December 31, 2023. The increase in general, administrative, and other expenses is primarily related to stock-based compensation of $31,404,419 mainly due to early vesting of the CEO's restricted stock, payroll expense of $11,958,834, accounting and auditing fees of $2,966,488, legal and professional fees of $6,351,601, and an increase in other general and administrative expenses of $2,570,605 due to the increase in active management activity and business acquisitions.

*Depreciation and amortization expense*

Depreciation and amortization expense consists primarily of depreciation on property and equipment purchased and leasehold improvements and amortization of intangible assets. The property at the Company currently consists of furniture, fixtures and leasehold improvements for the office and are not directly used to support the servicing or trading of life settlement policies. The intangible assets at the Company consist of customer relationships, internally developed and used technology, and non-compete agreements.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2024** | **2023** | **$ Change** | **% Change** |
| Depreciation and amortization expense | $ 7,910,158 | $ 3,409,928 | $ 4,500,230 | 132.0 % |

The increase of $4,500,230, or 132.0%, in depreciation and amortization expense is primarily related to amortization of intangible assets.

*Unrealized and Realized Loss (Gain) on Investments*

Unrealized and realized investment activity is related to investments for the market-indexed notes and is presented as operating expenses as it is related to the change in value of the market indexed notes. Gains in investments represents a reduction to operating expenses and appears as a negative. Refer to Note 13 Fair Value Measurements and Note 14 Long-Term Debt for additional information.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2024** | **2023** | **$ Change** | **% Change** |
| Unrealized loss (gain) on investments | $ 238,012 | $ (1,369,112) | $ 1,607,124 | (117.4)% |
| Realized gain on investments | $ (2,341,066) | $ — | $ (2,341,066) | NM |

Unrealized loss (gain) on investments decreased by $1,607,124 or 117.4% for the year ended December 31, 2024, compared to the year ended December 31, 2023. During the first and third quarters of 2023, the Company, purchased S&P 500 call options through a broker as an economic hedge related to the market-indexed notes described below. The primary cause of this decrease pertains to the change in fair value of those options and the sale of these options during 2024 and is classified as an unrealized loss or gain on investments within the results of operations. During 2024 the Company sold its S&P 500 call options to pay off its market-indexed notes and realized the cumulative change in the value of the options representing an increase of $2,341,066 in realized gain on investment.

*Loss on Change in Fair Value of Debt*

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Loss on change in fair value of debt | $ 4,835,351 | $ 2,356,058 | $ 2,479,293 | 105.2 % |

The loss in the fair value of debt increased by $2,479,293, or 105.2% for the year ended December 31, 2024, compared to the year ended December 31, 2023. The increase is primarily attributable to changes in the risk-free fair value of LMATT Series 2024, Inc. market-indexed notes.

*Other Income (Expense)*

Other income (expense) consists mainly of interest expenses, interest income, and change in the value of the warrant liability.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Interest (expense) | $ (18,279,686) | $ (9,866,821) | $ (8,412,865) | 85.3 % |
| Interest income | 2,398,691 | 594,764 | 1,803,927 | 303.3 % |
| Loss on change in fair value of warrant liability | (2,702,040) | (4,204,360) | 1,502,320 | (35.7)% |
| Other income (expense) | $ 38,040 | $ (146,443) | $ 184,483 | (126.0)% |
| Total other expense | $ (18,544,995) | $ (13,622,860) | $ (4,922,135) | 36.1 % |

Interest expense was $18,279,686 for the year ended December 31, 2024, compared to $9,866,821 for the year ended December 31, 2023. The increase in interest expense is primarily related to additional debt incurred during the year.

Interest income was $2,398,691, for the year ended December 31, 2024, compared to $594,764 the year ended December 31, 2023. The increase in interest income is primarily due to money market sweeps during the year.

Loss on change in fair value of warrant liability was $2,702,040, for the year ended December 31, 2024, compared to $4,204,360 for the year ended December 31, 2023. The loss is primarily attributable to the increase in the price for the public warrants, which is a determining factor for measuring the fair value of the private warrants.

Other income (expense) increased by $184,483, or 126.0%, for the year ended December 31, 2024, compared to the year ended December 31, 2023. The decrease is primarily related to financial assistance provided to the Providers. Refer to Note 2 Summary of Significant Accounting Policies and Note 12 Commitments and Contingencies for additional information.

*Income Tax Expense*

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Income tax expense | $ 5,484,738 | $ 1,468,535 | $ 4,016,203 | 273.5 % |

Income tax expense increased by $4,016,203, or 273.5% for the year ended December 31, 2024 compared to the year ended December 31, 2023. Our effective income tax rate for the years ended December 31, 2024 and 2023, was (28.2)% and 14%, respectively. The income tax expense for the year ended December 31, 2024 differed from the statutory rate of 21% mainly due to restricted stock award deductions limited by IRC 162(m) as well as limitations in permanent differences related to non-deductible business acquisition transaction costs.

**Results of Operations—Segment Results**

The Company organizes its business into five reportable segments (1) Asset Management, (2) Active Management, (3) Originations, (4) Portfolio Servicing, and (5) Technology Services, which all generate revenue and incur expenses in different manners. Refer to Note 11 Segment Reporting for additional information.

The following tables provides supplemental information of revenue and profitability by operating segment:

***Asset Management***

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Total revenue | $ 2,841,481 | $ — | $ 2,841,481 | NM |
| Total cost of revenue | 288,599 | — | 288,599 | NM |
| Total gross profit | $ 2,552,882 | $ — | $ 2,552,882 | NM |

The change in revenue is explained above under Revenue. The composition of cost of revenue is described in Note 2, Summary of Significant Accounting Policies. Cost of revenue for the asset management segment is new in 2024 and contributed $288,599 to total cost of revenue.

***Active Management***

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Total revenue | $ 102,819,361 | $ 61,195,377 | $ 41,623,984 | 68.0 % |
| Total cost of revenue | 3,869,415 | 2,174,386 | 1,695,029 | 78.0 % |
| Total gross profit | $ 98,949,946 | $ 59,020,991 | $ 39,928,955 | 67.7 % |

The change in revenue is explained above under Revenue. The composition of cost of revenue is described in Note 2, Summary of Significant Accounting Policies. The increase of $1,695,029 or 78.0% in cost of revenue is mainly due to a increase in trading activity and compensation related expenses. Cost of revenue as a percent of revenue remained mostly flat for the years ended December 31, 2024, and 2023 at 3.8% and 3.6%, respectively.

***Originations***

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Revenue (including intersegment) | $ 24,823,130 | $ 19,247,972 | $ 5,575,158 | 29.0 % |
| Intersegment elimination | (19,365,983) | (15,044,072) | (4,321,911) | 28.7 % |
| Total revenue | 5,457,147 | 4,203,900 | 1,253,247 | 29.8 % |
| Cost of revenue (including intersegment) | 16,950,640 | 11,303,244 | 5,647,396 | 50.0 % |
| Intersegment elimination | (11,578,133) | (7,711,312) | (3,866,821) | 50.1 % |
| Total cost of revenue | 5,372,507 | 3,591,932 | 1,780,575 | 49.6 % |
| Gross profit (including intersegment) | 7,872,490 | 7,944,728 | (72,238) | (0.9)% |
| Intersegment elimination | (7,787,850) | (7,332,760) | (455,090) | 6.2 % |
| Total gross profit | $ 84,640 | $ 611,968 | $ (527,328) | (86.2)% |

The change in revenue is explained above under Revenue. The composition of cost of revenue is described in Note 2, Summary of Significant Accounting Policies. The increase of $1,780,575 or 49.6% in cost of revenue is mainly due to a increase in origination activity and compensation related expenses. The majority of the activity is related to the eliminated intersegment origination activity related to life policies purchased by the Company. No originations revenue was recorded prior the June 30, 2023 Business Combination.

***Portfolio Servicing***

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Total revenue | $ 772,169 | $ 1,002,174 | $ (230,005) | (23.0)% |
| Total cost of revenue | 1,608,220 | 724,059 | 884,161 | 122.1 % |
| Total gross profit | $ (836,051) | $ 278,115 | $ (1,114,166) | (400.6)% |

The change in revenue is explained above under Revenue. The composition of cost of revenue is described in Note 2, Summary of Significant Accounting Policies. The increase of $884,161 or 122.1% in cost of revenue is mainly due to a increase in compensation related expenses to service the increase in life policies held by the Company.

***Technology Services***

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Total revenue | $ 33,628 | $ — | $ 33,628 | NM |
| Total cost of revenue | 232,992 | — | 232,992 | NM |
| Total gross profit | $ (199,364) | $ — | $ (199,364) | NM |

The change in revenue is explained above under Revenue. The composition of cost of revenue is described in Note 2, Summary of Significant Accounting Policies. Cost of revenue for the technology services segment is new in 2024 and contributed $232,992 to total cost of revenue.

**Key Business Metrics and Non-GAAP Financial Measures**

The consolidated financial statements of the Company have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission and are prepared in accordance with U.S. GAAP. We monitor key business metrics and non-GAAP financial measures that assist us in evaluating our business, measuring our performance, identifying trends and making strategic decisions. We have presented the following non-GAAP measures, their most directly comparable GAAP measure, and key business metrics:

| Non-GAAP Measure | Comparable GAAP Measure |
|---|---|
| Adjusted Net Income, Adjusted EPS | Net (Loss) Income attributable to Common Stockholders, EPS |
| Adjusted EBITDA | Net (Loss) Income |

Adjusted Net Income, Adjusted EPS, Adjusted EBITDA, and Adjusted EBITDA Margin, are not measures of financial performance under GAAP and should not be considered substitutes for GAAP measures, Net (Loss) Income (for Adjusted EBITDA and Adjusted EBITDA Margin), Net (Loss) Income Attributable to Common Stockholders (for Adjusted Net Income) or Earnings per Share (for Adjusted EPS), which are considered to be the most directly comparable GAAP measures. These non-GAAP financial measures have limitations as analytical tools, and when assessing Company's operating performance, these non-GAAP financial measures should not be considered in isolation or as substitutes for Net (Loss) Income Attributable to Common Stockholders, (Loss) Earnings per Share or other consolidated statements of operations and comprehensive (loss) income data prepared in accordance with GAAP.

Adjusted Net Income is presented for the purpose of calculating Adjusted EPS. The Company defines Adjusted Net Income as Net (Loss) Income Attributable to Common Stockholders adjusted for non-controlling interest income, amortization, change in fair value of warrants, business acquisition costs, and non-cash stock-based compensation and the related tax effect. Management believes that Adjusted Net Income is an appropriate measure of operating performance because it eliminates the impact of non-cash expenses or expenses that do not relate to business performance.

Adjusted EPS measures our per share earnings and is calculated as Adjusted Net Income divided by adjusted weighted-average shares outstanding. We believe Adjusted EPS is useful to investors because it enables them to better evaluate per share operating performance across reporting periods and management believes that Adjusted EPS is an appropriate measure of operating performance because it eliminates the impact of non-cash expenses or expenses that do not relate to business performance.

**Adjusted Net Income and Adjusted EPS**

The following table presents a reconciliation of Adjusted Net Income to the most comparable GAAP financial measure, net income (loss) attributable to Common Stockholders and Adjusted EPS to the most comparable GAAP financial measure, earnings per share, on a historical basis for the periods indicated below:

| | Years Ended December 31, | |
|---|---|---|
| | **2024** | **2023** |
| NET (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ (23,961,050) | $ 9,516,626 |
| Net income attributable to non-controlling interests | (956,987) | (482,139) |
| Amortization expense | 7,748,269 | 3,364,167 |
| Stock based compensation | 43,435,215 | 10,768,024 |
| Business acquisition costs | 8,403,065 | — |
| Loss on change in fair value of warrant liability | 2,702,040 | 4,204,360 |
| Tax impact [1] | 9,151,161 | 2,069,993 |
| Adjusted Net Income | $ 46,521,713 | $ 29,441,031 |
| ADJUSTED EARNINGS PER SHARE: | | |
| Weighted-average shares of Class A common stock outstanding - basic [2] | 70,761,830 | 56,951,414 |
| Weighted-average shares of Class A common stock outstanding - diluted [2] | 70,761,830 | 57,767,898 |
| Proforma Adjusted EPS - basic | $ 0.66 | $ 0.52 |
| Proforma Adjusted EPS - diluted | $ 0.66 | $ 0.51 |

[1] Tax impact represents the permanent difference in tax expense related to the restricted stock awards granted to the CEO due to IRC 162(m) limitations.

[2] The number of shares outstanding have been retrospectively recast for prior period presented to reflect the outstanding stock of Abacus Global Management, Inc. as a result of the Business Combination.

Adjusted Net Income for the year ended December 31, 2024 was $46,521,713 compared to $29,441,031 for the year ended December 31, 2023. The increase of $17,080,682 or 58.0% in Adjusted Net Income is primarily due to increases non-cash stock based compensation and related tax effect, business acquisition costs, and acquired intangible asset amortizations. Adjusted basic EPS for the year ended December 31, 2024 was $0.66 compared to $0.52 for the year ended December 31, 2023.

**Adjusted EBITDA and Adjusted EBITDA Margin**

Adjusted EBITDA is net income adjusted for depreciation expense, amortization, interest expense, income tax, business acquisition costs, non-cash expenses, and certain other items that in our judgement significantly impact the period-over-period assessment of performance and operating results that do not directly relate to business performance within the Company's control. These items may include payments made as part of the Company's expense support commitment, (gain) loss on change in fair value of debt, loss on change in fair value of warrant liability, S&P 500 options that were entered into as an economic hedge related to the debt (described as the realized and unrealized loss on investments), non-cash stock based compensation, and other items. Adjusted EBITDA should not be determined as substitution for net (loss) income, cash flows (used in) provided by operating, investing, and financing activities, operating (loss) income, or other metrics prepared in accordance with U.S. GAAP.

Management believes the use of Adjusted EBITDA assists investors in understanding the ongoing operating performance by presenting comparable financial results between periods. We believe that by removing the impact of depreciation and amortization and excluding certain non-cash charges, amounts spent on interest and taxes and certain other charges that are variable from year to year, Adjusted EBITDA provides our investors with performance measures that reflect the impact to operations from trends in changes in revenue, policy values and

operating expenses, providing a perspective not immediately apparent from net (loss) income and operating (loss) income. The adjustments we make to derive the non-GAAP measure of Adjusted EBITDA exclude items which may cause short-term fluctuations in net income and operating income and which we do not consider to be the fundamental attributes or primary drivers of our business.

The following table presents a reconciliation of Adjusted EBITDA and Adjusted EBITDA margin to the most comparable GAAP financial measure, net income (loss), on a historical basis:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| NET (LOSS) INCOME | $ (24,918,037) | $ 9,034,487 |
| Depreciation and amortization expense | 7,910,158 | 3,409,928 |
| Income Tax | 5,484,738 | 1,468,535 |
| Interest (Expense) | 18,279,686 | 9,866,821 |
| Other Income (Expenses) | (38,040) | 146,443 |
| Interest Income | (2,398,691) | (594,764) |
| Loss on change in fair value of warrant liability | 2,702,040 | 4,204,360 |
| Business acquisition costs | 8,403,065 | — |
| Stock based compensation | 43,435,215 | 10,768,024 |
| Unrealized loss (gain) on investments | 238,012 | (1,369,112) |
| Realized gain on investments | (2,341,066) | — |
| Loss on change in fair value of debt | 4,835,351 | 2,356,058 |
| Adjusted EBITDA | $ 61,592,431 | $ 39,290,780 |
| Total revenues | 111,923,786 | 66,401,451 |
| Adjusted EBITDA Margin | 55.0% | 59.2% |
| Net Income Margin | (22.3)% | 13.6% |

Adjusted EBITDA for the year ended December 31, 2024 was $61,592,431 compared to $39,290,780 for the year ended December 31, 2023. The increase of $22,301,651, or 57%, in adjusted EBITDA is primarily due primarily due to increases non-cash stock based compensation, business acquisition costs, interest expense, income tax and acquired intangible asset amortizations, partially offset by increases in operating expenses.

We monitor the following key business metrics for asset management revenue: (i) assets under management also referred to as net asset value of funds ("AUM" or "NAV"). AUM drives management fees and performance fees generated by the Company.

We monitor the following key business metrics for active management revenue: (i) policies sold and purchased, (ii) realized gains on sold and matured policies, (iii) unrealized gains on held policies, and (iv) face value of policies held. The number of policies sold and purchased helps us measure the level of active management activity for the period that leads to realized and unrealized gains, respectively. Realized gains on sold and matured policies is used to measure the level of profit optimization. Unrealized gains on held policies is used to measure our policy optimization. The face value or net death benefit of policies represents the maximum potential revenue realization on policies held. Refer to the Results from Operations section above for a summary of active management key business metrics for investment and fair value method policies.

We monitor the following key business metrics for servicing revenue: (i) number of policies serviced, (ii) value of policies serviced, and (iii) total invested dollars. Servicing revenue involves the provision of services to one affiliate by common ownership and third parties which own life insurance policies. The number of policies and the value of policies serviced represents the volume and dollar value of policies over which the above services are performed. Total invested dollars represent the acquisition cost plus premiums paid by the policy. We use the aforementioned

metrics to assess business operations and provide concrete benchmarks that provide a clear snapshot of growth between the periods under consideration.

We monitor the following key business metric for origination revenue: the number of policies originated year-over-year in measuring our performance. Origination revenues represent fees negotiated for each purchase and sale of a policy to an investor. The number of policy originations represents the volume of policies over which the above origination services are performed. The number of policy originations directly correlates with origination revenues allowing management to evaluate fees earned upon each transaction. There are no estimates, assumptions, or limitations specific to the number of policy originations.

Our key business metrics are summarized below for asset management, portfolio servicing, and origination revenue (active management key business metrics are summarized above):

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | $ Change | % Change |
| Key business metric | | | | |
| Assets under management | $ 2,594,080,293 | $ — | $ 2,594,080,293 | NM |
| Number of policies serviced [1] | 2,105 | 722 | 1,383 | 191.6% |
| Face value of policies serviced ($) [1] | $ 5,474,356,066 | $ 1,143,584,088 | $ 4,330,771,978 | 378.7% |
| Total invested dollars ($) [1] | $ 2,263,013,213 | $ 257,129,186 | $ 2,005,884,027 | 780.1% |
| Number of policy originations to external parties | 124 | 67 | 57 | 85.1% |
| Number of policy originations to related parties | — | 7 | (7) | (100.0)% |
| Number of policy originations to subsidiaries eliminated in consolidation | 513 | 321 | 192 | 59.8% |

[1] For the year ended December 31, 2024, LMA and LMA subsidiaries comprised 692 of the policies serviced, $1,256,687,123 face value of the policies serviced, and $301,311,031 of the total invested dollars. For the year ended December 31, 2023, LMA and LMA subsidiaries comprised 288 of the policies serviced, $520,656,936 face value of the policies serviced, and $100,996,409 of the total invested dollars. All servicing revenues related to LMA or LMA subsidiaries are eliminated in consolidation.

| Non-GAAP Measure | Comparable GAAP Measure |
|---|---|
| Proforma Adjusted Net Income, Proforma Adjusted EPS | Net (Loss) Income Attributable to Common Stockholders, EPS |
| Proforma Adjusted EBITDA | Net (Loss) Income for Common Stockholders |

**Proforma adjusted Net Income and Proforma Adjusted EPS**

Proforma Adjusted Net Income, Proforma Adjusted EPS, Proforma Adjusted EBITDA and Proforma Adjusted EBITDA Margin, are not measures of financial performance under GAAP and should not be considered substitutes for GAAP measures, Net (Loss) Income for Common Stockholders and Carlisle (for Proforma Adjusted EBITDA and Proforma Adjusted EBITDA Margin), Net (Loss) Income Attributable to Common Stockholders and Net Income for Carlisle and Abacus Settlements (for Proforma Adjusted Net Income) or earnings (loss) per share (for Proforma Adjusted EPS), which are considered to be the most directly comparable GAAP measures. These non-GAAP financial measures have limitations as analytical tools, and when assessing Company's operating performance, these non-GAAP financial measures should not be considered in isolation or as substitutes for net income (loss) for Common Stockholders, Carlisle, and Abacus Settlements, Net (Loss) Income Attributable to Common Stockholders, Carlisle, and Abacus Settlements, earnings per share or other consolidated statements of operations and comprehensive income data prepared in accordance with GAAP.

Proforma Adjusted Net Income is presented for the purpose of calculating Proforma Adjusted EPS. The Company defines Proforma Adjusted Net Income as Net (Loss) Income Attributable to Common Stockholders plus historical net income for Carlisle and Abacus Settlements prior to the business combinations excluding related business combination costs and intangible asset amortizations, adjusted for non-controlling interest, amortization, stock based compensation and related tax effect, and change in fair value of warrants. Management believes that Proforma Adjusted Net Income is an appropriate measure of operating performance because it represents the combined results for the legacy operating companies year-over-year as if the business combination had occurred at the beginning of the years shown and eliminates the impact of non-cash expenses or expenses that do not relate to business performance.

The following table presents a reconciliation of Proforma Adjusted Net Income to the most comparable GAAP financial measure, Net (Loss) Income Attributable to Common Stockholders and Net (Loss) Income for Common Stockholders and Proforma Adjusted EPS to the most comparable GAAP financial measure, (Loss) Earnings per Share, on a historical basis for the periods indicated below:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| NET (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ (15,303,922) | $ 9,516,626 |
| Net income for Carlisle [1] | 3,996,229 | 5,196,037 |
| Net loss for Abacus Settlements [2] | — | (974,901) |
| Proforma net (loss) income available to common stockholders | (11,307,693) | 13,737,762 |
| Net income attributable to non-controlling interests | (956,987) | (482,139) |
| Amortization expense | 8,738,141 | 3,724,016 |
| Stock compensation expense | 43,435,215 | 10,768,024 |
| Business acquisition costs | 342,628 | — |
| Loss on change in fair value of warrant liability | 2,702,040 | 4,204,360 |
| Tax impact [3] | 9,151,161 | 2,069,993 |
| Proforma Adjusted Net Income | $ 52,104,505 | $ 34,022,016 |
| Weighted-average shares of Class A common stock outstanding - basic | 70,761,830 | 56,951,414 |
| Weighted-average shares of Class A common stock outstanding - diluted | 70,761,830 | 57,767,898 |
| Proforma Adjusted EPS - basic | $ 0.74 | $ 0.60 |
| Proforma Adjusted EPS - diluted | $ 0.74 | $ 0.59 |

[1] Net income attributable to Carlisle, includes all 2024 and 2023 activity.

[2] Net loss attributable to Abacus Settlements, LLC, includes all of 2023 activity.

[3] Tax impact represents the permanent difference in tax expense related to the restricted stock awards granted to certain executives due to IRC 162(m) limitations.

Proforma Adjusted Net Income for the year ended December 31, 2024 was $52,104,505 compared to $34,022,016 for the year ended December 31, 2023. The increase of $18,082,489, or 53.1%, in Proforma adjusted Net Income is primarily due to the increase in proforma revenues partially offset by general and administrative expenses. Proforma Adjusted basic EPS for the year ended December 31, 2024 was $0.74 compared to $0.60 for the year ended December 31, 2023.

**Proforma Adjusted EBITDA**

Proforma Adjusted EBITDA is net income for Common Stockholders plus historical net income for Carlisle and Abacus Settlements prior to the business combinations excluding related business combination costs and intangible asset amortizations, and adjusted for depreciation expense, amortization expense, interest expense, income tax and

other non-cash and other items that in our judgement significantly impact the period-over-period assessment of performance and operating results that do not directly relate to business performance within the Company's control. These items may include payments made as part of the Company's expense support commitment, (gain) loss on change in fair value of debt, loss on change in fair value of warrant liability, change in the fair value of S&P 500 options that were entered into as an economic hedge related to the debt (described as the realized or unrealized loss on investments), non-cash stock based compensation, and other items. Proforma Adjusted EBITDA should not be determined as substitution for net income (loss), cash flows provided (used in) operating, investing, and financing activities, operating income (loss), or other metrics prepared in accordance with U.S. GAAP.

Management believes the use of Proforma Adjusted EBITDA assists investors in understanding the ongoing operating performance by presenting comparable financial results between periods and represents the combined results for the legacy operating companies year-over-year as if the business combinations had occurred at the beginning of the years shown. We believe that after removing the impact of depreciation and amortization and excluding certain non-cash charges, amounts spent on interest and taxes and certain other charges that are variable from year to year, Proforma Adjusted EBITDA provides our investors with performance measures that reflect the impact to operations from trends in changes in revenue, policy values and operating expenses, providing a perspective not immediately apparent from net income and operating income. The adjustments we make to derive the non-GAAP measure of Proforma Adjusted EBITDA exclude items which may cause short-term fluctuations in net income (loss) and operating income (loss) and which we do not consider to be the fundamental attributes or primary drivers of our business.

The following table presents a reconciliation of Proforma Adjusted EBITDA and Proforma Adjusted EBITDA Margin to the most comparable GAAP financial measure, net income (loss) for Common Stockholders and net income (loss) for Carlisle and Abacus Settlements on a historical basis for the periods indicated below:

| | Years Ended December 31, | |
|---|---|---|
| | **2024** | **2023** |
| NET (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ (15,303,922) | $ 9,516,626 |
| Net income for Carlisle [1] | 3,996,229 | 5,196,037 |
| Net loss for Abacus Settlements [2] | — | (974,901) |
| Proforma net (loss) income available to common stockholders | (11,307,693) | 13,737,762 |
| Depreciation and amortization expense | 8,900,030 | 3,841,023 |
| Interest expense | 21,531,033 | 15,610,754 |
| Interest income | (2,704,240) | (656,895) |
| Income Tax | 6,354,321 | 2,784,849 |
| Stock compensation | 43,435,215 | 10,768,024 |
| Other (Income) / Expenses | (855,383) | 250,531 |
| Loss on change in fair value of warrant liability | 2,702,040 | 4,204,360 |
| Business acquisition costs | 342,628 | — |
| Loss on change in fair value of debt | 4,835,351 | 2,356,058 |
| Realized gain on investments | (2,989,479) | — |
| Unrealized loss (gain) on investments | (122,021) | (1,668,137) |
| Proforma Adjusted EBITDA | $ 70,121,802 | $ 51,228,329 |
| Proforma Revenue | $ 137,226,971 | $ 111,356,730 |
| Proforma Adjusted EBITDA Margin | 51.10% | 46.00% |
| Proforma Net Income Margin | (8.2)% | 12.34% |

[1] Net income attributable to Carlisle, includes all of 2024 and 2023 activity.

[2] Net income attributable to Abacus Settlements, LLC, includes all of 2023 activity.

Proforma Adjusted EBITDA for the year ended December 31, 2024 was $70,121,802 compared to $51,228,329 for the year ended December 31, 2023. The increase of $18,893,473 or 36.9%, in proforma adjusted EBITDA is primarily due to the increase in proforma revenue, stock-based compensation, and interest expense, partially offset by increases in operating expenses. While operating expenses also increased, many of these increases in expenses are being reflected as adjustments shown herein as a result of the business combinations.

**Proforma Segment Revenue**

Proforma Segment Revenue is not a measure of financial performance under GAAP and should not be considered substitutes for GAAP measures, segment revenue for the Company, Carlisle, and Abacus Settlements, which are considered to be the most directly comparable GAAP measures. This non-GAAP financial measure has limitations as analytical tools, and when assessing Company's operating performance, this non-GAAP financial measures should not be considered in isolation or as substitutes for segment revenue for the Company, Carlisle, and Abacus Settlements, or other consolidated statements of operations and comprehensive income data prepared in accordance with GAAP.

The Company defines Proforma Segment Revenue as segment revenue for the Company plus historical revenue for Carlisle, and Abacus Settlements prior to the business combination adjusted for intersegment activity for policies that Abacus Settlements has originated on behalf of the Company's subsidiaries. Management believes that Proforma Segment Revenue is an appropriate measure of operating performance because it represents the combined results for the legacy operating companies year-over-year as if the business combinations had occurred at the beginning of the years shown and eliminates intersegment revenue.

| | Years Ended December 31, | |
|---|---|---|
| | **2024** | **2023** |
| Asset Management | $ 28,144,666 | $ 31,767,997 |
| Active Management | 102,819,361 | 61,195,377 |
| Originations | 24,823,130 | 32,435,254 |
| Portfolio Servicing | 772,169 | 1,002,174 |
| Technology Services | 33,628 | — |
| Total Proforma Revenue (including intersegment) | 156,592,954 | 126,400,802 |
| Intersegment elimination | (19,365,983) | (15,044,072) |
| Total Proforma Revenue | $ 137,226,971 | $ 111,356,730 |

**Liquidity and Capital Resources**

The Company finances its operations primarily through cash generated from operations and net proceeds from debt or equity financing. The Company has sufficient sources of funds to meet ongoing operating and investing requirements over the next 12 months and beyond. The Company actively manages its working capital and the associated cash requirements when servicing policies while also effectively utilizing cash and other sources of liquidity to purchase additional policies. As of December 31, 2024, our principal source of liquidity was cash totaling $131,944,282.

On December 10, 2024 ("Closing Date") the Company entered into a Credit Agreement (the "SSCF") and borrowed $100,000,000 under the initial term loan. The Company is able to draw additional $50,000,000 under the optional delayed draw within 180 days after the Closing Date. Refer to Note 14 Long-Term Debt for additional information.

The Company is obligated to provide financial support to the Providers as described in Note 2 Summary of Significant Accounting Policies and Note 12 Commitments and Contingencies of the Company's financial statements. For the year ended December 31, 2024 and 2023, the Company incurred expense of $172,136 and $144,721, respectively, to fund the Providers' deficits. For the year ended December 31, 2024, the Providers were

considered to be VIEs, but were not consolidated in our consolidated financial statements due to a lack of the power criterion or the losses/benefits criterion.

Our future capital requirements will depend on many factors, including our revenue growth rate and the expansion of our active management and portfolio activities. The Company may, in the future, enter into arrangements to acquire or invest in complementary businesses, products and technologies.

Refer to Note 5 Life Insurance Settlement Policies, Note 14 Long-Term Debt, and Note 20 Leases, for further discussion on rights and obligations that impact liquidity.

***Cash Flows from our operations***

The following table summarizes our cash flows for the periods presented:

| | Years Ended December 31, | |
|---|---|---|
| | **2024** | **2023** |
| Net cash provided/(used) in operating activities | $ (208,810,444) | $ (64,044,384) |
| Net cash provided/(used) in investing activities | (4,955,290) | 2,241,502 |
| Net cash provided by financing activities | 320,121,348 | 57,338,727 |

*Operating Activities*

During the year ended December 31, 2024, our operating activities used $208,810,444 of net cash as compared to $64,044,384 of net cash used from operating activities during the year ended December 31, 2023. The increase of $144,766,060 in net cash used from operating activities during the year ended December 31, 2024 compared to the year ended December 31, 2023 was primarily due to $107,294,956 net cash used to purchase life settlement policies accounted for at fair value, $14,112,786 change in operating assets and liabilities, and $25,897,723 increase in unrealized gain on policies at fair value, partially offset by $32,667,191 increase in non-cash stock-based compensation and $5,532,995 increase in deferred taxes.

*Investing Activities*

During the year ended December 31, 2024, investing activities used $4,955,290 of net cash as compared to 2,241,502 net cash provided during the year ended December 31, 2023. The increase in net cash used of $7,196,792 in investing activities during the year ended December 31, 2024 compared to the year ended December 31, 2023 was related to $3,300,710 repayment to affiliates, $2,430,620 net cash paid for business acquisitions, and $1,000,000 purchase of a convertible note investment.

*Financing Activities*

During the year ended December 31, 2024, financing activities generated $320,121,348 of net cash compared to 57,338,727 of net cash generated during the year ended December 31, 2023. The increase of $262,782,621 in net cash generated in financing activities during the year ended December 31, 2024 compared to December 31, 2023 was mainly related to net proceeds of $66,373,569 for the issuance of debt net of issuance costs and debt repayments and $166,889,779 for common stock sales net of related issuance costs.

Refer to Note 13 Fair Value Measurements, Note 14 Long-Term Debt, and Note 15 Stockholders' Equity for additional information related to our financing sources.

***Contractual Obligations and Commitments***

Refer to the following notes in our Financial Statements for a list of contractual obligations and commitments:

- Note 12, Commitments and Contingencies, for a list of commitments and contingencies.
- Note 14, Long-Term Debt, for a list of outstanding debt, related interest rates, and maturity dates.

- Note 20, Leases, for our outstanding lease obligations.

**Recent Accounting Pronouncements**

Refer to Note 2 Summary of Significant Accounting Policies to our consolidated financial statements for a discussion of recently issued accounting pronouncements, including information about new accounting standards and the future adoption of such standards.

**Critical Accounting Policies and Estimates**

The Company prepared its consolidated financial statements in accordance with GAAP. Our preparation of these financial statements requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities and related disclosures at the date of the financial statements, as well as revenue and expense recorded during the reporting periods. The Company evaluates our estimates and judgments on an ongoing basis. The Company bases its estimates on historical experience and or other relevant assumptions that the Company believes to be reasonable under the circumstances. Actual results may differ materially from management's estimates.

Refer to Note 2 Summary of Significant Accounting Policies to our consolidated financial statements for further information related to our critical accounting policies and estimates, which are as follows:

***Valuation of Life Insurance Policies*—**including how the Company accounts for its holdings of life insurance settlement policies at fair value in accordance with ASC 325-30, *Investments in Insurance Contracts* and ASC 820, *Fair Value Measurements and Disclosures*. The Company's valuation of life settlements are considered Level 3, as there is currently no active market where the Company is able to observe quoted prices for identical assets. The Company's valuation model incorporates significant inputs that are not observable. Refer to Note 5 Life Insurance Settlement Policies, and Note 13 Fair Value Measurements to the consolidated financial statements for further discussion.

*Valuation of Goodwill and Other Intangible Assets*—including how the Company determines the fair value of goodwill and other intangible assets and reporting units, and how the Company determines when an impairment loss should be recorded. During the fourth quarter of 2024, we conducted our annual goodwill impairment test and did not record any impairment charges. The estimated fair values of our reporting units exceeded their carrying amounts at the date of their most recent estimated fair value determination. During 2024, we evaluated our other intangible assets for impairment and did not record any impairment charges. Refer to Note 1 Description of Business, Note 3 Business Combination, and Note 7 Goodwill and Other Intangible Assets to the consolidated financial statements for further discussion.

**Stock Repurchase Program**

On December 11, 2023, our Board of Directors authorized a stock repurchase program under which the Company may purchase shares of our common stock for an aggregate purchase price not to exceed $15 million over a period of up to 18 months. Refer to Note 15 Stockholders' Equity to the consolidated financial statements for further discussion of our stock repurchase program.

*****

**ABACUS SETTLEMENTS, LLC MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis provide information that management believes is relevant to an assessment and understanding of Abacus Settlements, LLC's financial condition and results of operations. This discussion should be read in conjunction with Abacus Settlements, LLC's financial statements and related notes thereto that appear elsewhere in this Annual Report on Form 10-K.*

*In addition to historical financial analysis, this discussion and analysis contains forward-looking statements based upon current expectations that involve risks, uncertainties and assumptions, as described under the heading "Cautionary Note Regarding Forward-Looking Statements." Actual results and timing of selected events may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" or elsewhere in this quarterly statement. Unless the context otherwise requires, references in this "Abacus Settlements, LLC Management's Discussion and Analysis of Financial Condition and Results of Operations" to "we," "us," "our," and "Abacus Settlements" are intended to mean the business and operations of Abacus Settlements, LLC.*

**Overview**

Abacus Settlements originates life insurance policy settlement contracts as a licensed life settlement provider on behalf of third-party institutional investors ("Financing Entities") interested in investing in the life settlement asset class. Specifically, Abacus Settlements originates policies through three primary origination channels (Agents/Financial Advisors, Direct-to-Consumers, Life Settlement Brokers) and Third-Party Intermediaries. Abacus Settlements screens them for eligibility by verifying that the policy is in force, obtaining consents and disclosures, and submitting cases for life expectancy estimates. This process is characterized as our origination services, which averages a fee of approximately 2% of face value ("Origination Revenue").

**Our Business Model**

As a life settlement provider, Abacus Settlements serves as a purchaser of outstanding life insurance policies. When serving as a purchaser, Abacus Settlements' primary purpose in the transaction is to connect buyers and sellers through an origination process. The origination process is core to Abacus Settlements' business and drives its economics. Abacus Settlements averages approximately 2% of face value in origination fees on policies and has developed three high quality origination channels which include agents and Financial Advisors, direct to consumer and Life Settlements Brokers. Abacus Settlements also originates policies with Third-Party Intermediaries. Generally, diversification across multiple origination channels lowers average policy acquisition costs and increases estimated returns. Abacus Settlements finds sellers through its origination channels using strategic marketing practices in its core markets, with the purpose of finding policy owners who want to capitalize on their investments prior to death by extracting value from their policies through the sale of such policies to Financing Entities.

**Key Factors Affecting Our Performance**

Our operations and financial performance are impacted by economic factors affecting the industry, including:

***Opportunities in the Life Settlements Industry***

Within the life settlements industry, there is significant policy value that lapses on an annual basis. Currently, the life settlements industry only captures a narrow portion of the potential market leaving significant runway for future growth for industry participants. With the anticipation of growth in total face value of life insurance policies, we believe we are well positioned to capitalize on the overall market growth. Abacus Settlements is currently conducting business in 49 states and the District of Columbia. The company holds viatical settlement and or life settlement provider licenses in forty-three (43) of those jurisdictions. Abacus Settlements also conducts business in seven (7) jurisdictions which do not currently have life and or viatical settlement provider licensing requirements. Abacus Settlements conducts business where is it legally allowed to across the United States. The only state Abacus Settlements is not currently conducting business in is Alaska and there are no current plans to procure a license.

Our ability to originate policies is essential to scale our business over time. In order to support this expected growth, we continue to invest in our technology and marketing infrastructure. In general, we expect our efforts will continue to focus on driving education and awareness of life settlements.

***Macroeconomic Changes***

Global macroeconomic factors, including regulatory policies, unemployment, changes in retirement savings, the cost of healthcare, inflation, and tax rate changes impact demand for our origination services. These factors evolve over time and while these changes have not currently had any significant impact on performance, these trends may shift the timing and volume of transactions, or the number of customers using our origination services.

**Components of Results of Operations**

**Results of Operations**

The following tables set forth our results of operations for each of the periods indicated, and we presented and expressed the relationship of certain line items as a percentage of revenue for those periods. The period-to-period comparison of financial results is not necessarily indicative of future results.

The following tables set forth our historical results for the periods indicated, and the changes between periods:

| | | Six Months Ended June 30, 2023 |
|---|---|---|
| Origination revenue | $ | 3,252,738 |
| Related-party revenue | | 9,931,938 |
| Total revenue | | 13,184,676 |
| Cost of revenue | | 2,734,949 |
| Related party cost of revenue | | 6,558,354 |
| Gross profit | | 3,891,373 |
| Operating expenses | | |
| General and administrative expenses | | 4,848,580 |
| Depreciation expense | | 5,597 |
| Total operating expenses | | 4,854,177 |
| Income (loss) from operations | | (962,804) |
| Other income (expense) | | |
| Interest income | | 1,917 |
| Interest (expense) | | (11,725) |
| Other income | | — |
| Total other (expense) | | (9,808) |
| Income (loss) before income taxes | | (972,612) |
| Provision for income taxes | | 2,289 |
| Net income (loss) and comprehensive income | $ | (974,901) |

***Origination Revenue***

Abacus Settlements recognizes revenue from origination activities by acting as a provider of life settlements and viatical settlements by representing investors that are interested in purchasing life settlements on the secondary or tertiary market. Revenue from origination services consists of fees negotiated for each purchase and sale of a policy to an investor, which also include any agent and broker commissions received and the reimbursement of transaction costs.

| | | Six Months Ended June 30, 2023 |
|---|---|---|
| Origination revenue | $ | 3,252,738 |

Revenue for the six months ended June 30, 2023 was $3,252,738 and is comprised of revenue in broker channel based on face values on the policies originated with consistent third party customers, origination fees, services revenue, and transaction fees reimbursements.

***Related Party Revenue***

Abacus Settlements has a related party relationship with Nova Trading (US), LLC ("Nova Trading"), a Delaware limited liability company and Nova Holding (US) LP, a Delaware limited partnership ("Nova Holding" and, collectively with Nova Trading, the "Nova Funds") as the owners of Abacus Settlements jointly own 11% of the Nova Funds. The pricing for origination fees is governed by origination contracts that have been negotiated by both parties and are considered to be arms-length and consistent with origination fees charged to third party customers. For its origination services to the Nova Funds, Abacus Settlements earns origination fees equal to the lesser of (i) 2% of the net death benefit for the policy or (ii) $20,000.

| | | Six Months Ended June 30, 2023 |
|---|---|---|
| Related Party Revenue | $ | 9,931,938 |

Related party revenue for the six months ended June 30, 2023 was $9,931,938. For six months ended June 30, 2023, Abacus Settlements had originated 72 policies for the Nova Funds with a total value of $96,674,080, and is comprised of origination services and transaction fees reimbursed by the related party. Further, for the six months ended June 30, 2023, Abacus Settlements had originated 103 policies, for LMA with a total value of $192,685,578.

***Cost of Revenue, Related Party Cost of Revenue, and Gross Margin***

Cost of revenue is primarily comprised of third-party commissions, which includes third-party sales and marketing commission fees, as well as transaction costs that are reimbursed as part of the origination activity and depreciation and amortization expense. Abacus Settlements receives an origination fee plus any commission to be paid from the purchaser for its part in arranging the life settlement transactions. Out of that fee income, Abacus Settlements pays commissions to the licensed representative of the seller, if one is required. Commission expense is recorded at the same time revenue is recognized and is included within cost of revenue. Depreciation expense consists of depreciation of property and equipment assets, which are computer equipment. Amortization expense consists primarily of amortization of capitalized costs incurred for the development of internal use software. The costs incurred exclusively consist of fees incurred from an external consulting firm during the development stage of the project and is amortized on the straight-line basis over an estimated useful life of three years.

| | | Six Months Ended June 30, 2023 |
|---|---|---|
| Cost of revenue | $ | 2,734,949 |
| Related party cost of revenue | | 6,558,354 |
| Gross Profit | $ | 3,891,373 |
| Gross Margin | | 30 % |

Cost of revenue for the six months ended June 30, 2023 was $2,734,949 and is primarily comprised of commissions expense, life expectancy fees, and lead generation expenses.

Related party cost of revenue for the six months ended June 30, 2023 was $6,558,354 is comprised of agent commission expenses, originations of policies sold to the Nova Funds, and transaction fees reimbursements.

Gross profit for the six months ended June 30, 2023 was $3,891,373. Gross margin for the six months ended June 30, 2023 was 30%.

***Operating Expenses***

Operating expenses are comprised of general and administrative expenses as well as depreciation expense.

General and administrative expenses include compensation, payroll, advertising, marketing, rent, insurance, recruitment, trade shows, telephone & internet, licenses, and other professional fees.

Depreciation expense consists of depreciation of property and equipment assets, which are computer equipment, office furniture and lease improvement.

| | Six Months Ended June 30, 2023 |
|---|---|

| | | |
|---|---|---|
| General and administrative expenses | $ | 4,848,580 |
| Depreciation expense | | 5,597 |

General and administrative expenses for the six months ended June 30, 2023 was $4,848,580, and is comprised of payroll expenses for administration support, sales department, marketing expenses, sponsorships, rent and office expenses.

Depreciation expense for the six months ended June 30, 2023 was $5,597. The depreciation expense for both the periods were computed on property and equipment (i.e., computer equipment, office furniture, and leasehold improvements).

***Other income (expense)***

Other income (expense) includes interest income, consulting income, and other income. Interest income represents the interest earned on Abacus Settlements' certificates of deposits. Consulting income represents income earned on various origination consulting services performed. Other income comprises of income from credit card cash rewards.

| | Six Months Ended June 30, 2023 | |
|---|---|---|
| Interest income | $ | 1,917 |
| Interest (expense) | | (11,725) |
| Other income | | — |

Interest income for the six months ended June 30, 2023 was $1,917. The interest income for the period represents interest earned on Abacus Settlements certificate of deposit.

Interest expense for the six months ended June 30, 2023 was $11,725, and is comprised of amortization of deferred financing fees.

***Provision for Income Taxes***

| | Six Months Ended June 30 | |
|---|---|---|
| Provision for income taxes | $ | 2,289 |

Provision for income taxes for the six months ended June 30, 2023 was $2,289. The amounts for both the periods are primarily annual report filing fees with various states.

**Business Segments**

Operating as a centrally led life insurance policy intermediary, Abacus Settlements' Chief Executive Officer is the Chief Operating Decision Maker (CODM) who allocates resources and assesses financial performance. As a result of this management approach, Abacus Settlements is organized as a single operating segment. The CODM reviews performance and allocates resources based on the total originations, total corresponding revenue generated for the period, gross profit, and adjusted EBITDA.

**Key Business Metrics and Non-GAAP Financial Measures**

Management uses non-GAAP financial measures, in conjunction with GAAP financial measures, as an integral part of managing our business and to, among other things: (i) monitor and evaluate the performance of our business operations and financial performance; (ii) facilitate internal comparisons of the historical operating performance of our business operations; (iii) review and assess the operating performance of our management team; (iv) analyze and evaluate financial and strategic planning decisions

regarding future operating investments; and (v) plan for and prepare future annual operating budgets and determine appropriate levels of operating investments.

We monitor the following key business metrics and non-GAAP financial measures that assist us in evaluating our business, measuring our performance, identifying trends and making strategic decisions. As such, we have presented the following non-GAAP measure, their most directly comparable U.S. GAAP measure, and key business metrics:

| **Non-GAAP Measure** | **Comparable U.S. GAAP Measure** |
|---|---|
| Adjusted EBITDA | Net (Loss) Income |

Adjusted EBITDA is net income adjusted for depreciation expense, provision for income taxes, interest income, and other items that in our judgement significantly impact the period-over-period assessment of performance and operating results. Adjusted EBITDA should not be construed as an indicator of our operating performance, liquidity, or cash flows provided by or used in operating, investing, and financing activities, as there may be significant factors or trends that it fails to address. We caution investors that non-GAAP financial information departs from traditional accounting conventions. Therefore, its use can make it difficult to compare current results with results from other reporting periods and with the results of other companies.

Management believes the use of Adjusted EBITDA measures assists investors in understanding the ongoing operating performance by presenting comparable financial results between periods. We believe that after removing the impact of depreciation and amortization, amounts spent on interest and taxes and other income and charges that are variable from year to year, Adjusted EBITDA provides our investors with performance measures that reflect the impact to operations from trends in changes in revenue and operating expenses, providing a perspective not immediately apparent from net income and operating income. The adjustments we make to derive the non-GAAP measure of Adjusted EBITDA exclude items which may cause short-term fluctuations in net income and operating income and which we do not consider to be the fundamental attributes or primary drivers of our business.

The following table illustrates the reconciliations from net income to adjusted EBITDA:

| | **Six Months Ended June 30, 2023** |
|---|---|
| NET LOSS AND COMPREHENSIVE LOSS | $ (974,901) |
| Depreciation expense | 5,597 |
| Provision for income taxes | 2,289 |
| Interest income | (1,917) |
| Interest expense | 11,725 |
| Adjusted EBITDA | $ (957,207) |

Adjusted EBITDA for the six months ended June 30, 2023, was $(957,207).

We monitor the following key business metrics such as the number of policies originated year-over-year in measuring our performance. Origination revenues represent fees negotiated for each purchase and sale of a policy to an investor. The number of policy originations represents the volume of policies over which the above origination services are performed. The number of policy originations directly correlates with origination revenues allowing management to evaluate fees earned upon each transaction. There are no estimates, assumptions, or limitations specific to the number of policy originations.

| | **Six Months Ended June 30, 2023** |
|---|---|
| Number of Policy Originations | 253 |

**Liquidity and Capital Resources**

We have financed operations since our inception primarily through customer payments and net proceeds from equity financing in the form of capital contributions from our members. Our principal uses of cash and cash equivalents in recent periods have been funding our operations. As of June 30, 2023, our principal sources of liquidity were cash and cash equivalents of $808,226 and retained earnings of $509,953. During the six months ended June 30, 2023, we had a net loss of $(974,901) and net cash used by operations of $(24,292). We believe our existing cash and cash equivalents as well as proceeds from equity financing will be sufficient to fund anticipated cash requirements for the next twelve months.

Our future capital requirements will depend on many factors, including our revenue growth rate, the expansion of our sales and marketing activities, the timing and extent of spending to support product development efforts. We may, in the future, enter into arrangements to acquire or invest in complementary businesses, products and technologies. We may be required to seek additional equity or debt financing. The additional debt financing would result in debt service obligations, and any future instruments governing such debt could provide for operating and financing covenants that could restrict our operations.

***Cash Flows***

The following table summarizes our cash flows:

| | Six Months Ended June 30, 2023 | |
|---|---|---|
| Net cash used in operating activities | $ | (24,292) |
| Net cash used in investing activities | | (182,528) |
| Net cash used in financing activities | | (443,694) |

***Operating Activities***

During the six months ended June 30, 2023, our operating activities used $24,292 in operating activities.

***Investing Activities***

During the six months ended June 30, 2023, our investing activities used $182,528.

***Financing Activities***

During the six months ended June 30, 2023, our financial activities used $443,694.

***Contractual Obligations and Commitments***

Our contractual obligations as of June 30, 2023, which are included as liabilities on our balance sheet, include operating lease obligations of $190,521 with $177,873 due in less than one year and $12,648 due within one to three years, which are comprised of the minimum commitments for our office space.

**Critical Accounting Policies and Estimates**

We have prepared our financial statements in accordance with GAAP. Our significant accounting policies are described in more detail in Note 2, Summary of Significant Accounting Policies, to our financial statements included in this annual filing statement. While our preparation of these financial statements requires us to make estimates, assumptions and judgments from time to time that may affect the reported amounts of assets, liabilities and related disclosures, as of the date of these financial statements, we have not identified any estimates made in accordance with generally accepted accounting principles that involve a significant level of estimation uncertainty which have had or are reasonably likely to have a material impact on the financial condition or results of operations.

***Related Party Receivables***

Related party receivables include fees to be reimbursed to Abacus Settlements from life expectancy reports, assisted physician services and escrow services incurred on policies that related party financing entities purchase as part of the origination agreement with Abacus Settlements. Related party receivables are stated at their net realizable value. All of the outstanding receivables of $5,710 as of June 30, 2023 were collected in July, 2023. Abacus Settlements provides an allowance for doubtful accounts equal to the estimated collection losses that will be incurred in collection of all receivables. The estimated losses are based upon historical collection experience coupled with a review of the current status of all existing receivables. Account balances are charged off against the allowance for doubtful accounts after all means of collection have been exhausted and the potential for recovery is remote. There is no allowance for doubtful accounts as of June 30, 2023.

***Intangible Assets***

Intangible assets are stated at cost, less accumulated amortization, and consist of capitalized costs incurred for the development of internal use software. The costs incurred exclusively consist of fees incurred from an external consulting firm during the development stage of the project and are subject to capitalization under ASC 350-40, Internal-Use Software. The software is amortized on the straight-line basis over an estimated useful life of 3 years. Abacus Settlements reviews definite-lived intangible assets and other long-lived assets for impairment at least annually or whenever an event occurs that indicates the carrying amount of an asset may not be recoverable. No impairment was recorded for the six months ended June 30, 2023.

***Revenue Recognition***

Abacus Settlements recognizes revenue from origination activities by acting as a provider of life settlements and viatical settlements representing investors that are interested in purchasing life settlements on the secondary or tertiary market. Revenue from origination services consists of fees negotiated for each purchase and sale of a policy to an investor, which also include any agent and broker commissions received and the reimbursement of transaction costs.

Abacus Settlements' revenue-generating arrangements are within the scope of Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers. Abacus Settlements originates life settlements policies with third parties that include settlement brokers, life insurance agents, and direct consumers or policyholders. Abacus Settlements then provides the administration services needed to initiate the transfer of the life settlement policies to investors in exchange for an origination fee. Such transactions are entirely performed through an escrow agent. In these arrangements, the customer is the investor, and Abacus Settlements has a single performance obligation to originate a life settlement policy for the investor. The consideration transferred upon each policy is negotiated directly with the investor by Abacus Settlements and is dependent upon the policy death benefits held by each life settlement policy. The revenue is recognized when the performance obligation under the terms of the contracts with customers are satisfied. Abacus Settlements recognizes revenue from life settlement transactions when the closing has occurred and any right of rescission under applicable state law has expired (i.e., the customer obtains control over the policy and has the right to use and obtain the benefits from the policy). While rescission periods may vary by state, most states grant the owner the right to rescind the contract before the earlier of 30 calendar days after the execution date of the contract or 15 calendar days after life settlement proceeds have been sent to the owner. Purchase and sale of the policies generally occurs simultaneously, and only the fees received, including any agent and broker commissions and transaction costs reimbursed, are recorded as gross revenue.

For agent and broker commissions received and transaction costs reimbursed, Abacus Settlements has determined that they are acting as the principal in the relationship as they maintain control of the services being performed as part of performance obligation prior to facilitating the transfer of the life settlement policy to the investor.

While the origination fees are fixed amounts based on the face value of the policy death benefit, there is variable consideration present due to the owner's rescission right. When variable consideration is present in a contract, Abacus Settlements estimates the amount of variable consideration to which it expects to be entitled at contract inception and again at each reporting period until the amount is known. Abacus Settlements applies the variable consideration constraint so that variable consideration is included in the transaction price only to the extent it is probable that a subsequent change in estimate will not result in a significant revenue reversal. While origination fees are variable due to the rescission periods, given the that the rescission periods are relatively short in nature, Abacus Settlements has concluded that such fees are fully constrained until the rescission period lapses and thus records revenue at a fixed amount based on the face value of the policy death benefit after the rescission period is over.

***New Accounting Pronouncements***

Refer to Note 2 Summary of Significant Accounting Policies to our consolidated financial statements.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Not required for smaller reporting companies.

**JOBS Act Election**

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that an emerging growth company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable.

The Company has irrevocably elected to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies,

the Company, as an emerging growth company, will adopt the new or revised standard at the time public companies adopt the new or revised standard. As a result, following the consummation of the Business Combination, the Company complies with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies.

**Item 8. Financial Statements and Supplementary Data**

Financial Statements

Report of Independent Registered Public Accounting Firm (PCAOB ID #248)

Financial Statements of Abacus Global Management, Inc.

Consolidated Balance Sheets

Consolidated Statements of Operations and Comprehensive (Loss) Income

Consolidated Statements of Changes in Stockholders' Equity

Consolidated Statements of Cash Flows

Notes to Consolidated Financial Statements

Predecessor Report of Independent Registered Public Accounting Firm (PCAOB ID #248)

Financial Statements of Abacus Settlements LLC (as predecessor)

Statement of Operations and Comprehensive Loss

Statement of Members' Equity

Statement of Cash Flows

Notes to Financial Statements

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
Abacus Global Management, Inc.

**Opinion on the financial statements**
We have audited the accompanying consolidated balance sheets of Abacus Global Management, Inc. (a Delaware corporation) (the "Company") as of December 31, 2024 and 2023, the related consolidated statements of operations and comprehensive (loss) income, changes in stockholders' equity, and cash flows for each of the two years in the period ended December 31, 2024, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2024 and 2023, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2024, in conformity with accounting principles generally accepted in the United States of America.

**Basis for opinion**
These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2022.

Philadelphia, Pennsylvania
March 28, 2025

**ABACUS GLOBAL MANAGEMENT, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31,**

| | 2024 | 2023 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 131,944,282 | $ 25,588,668 |
| Equity securities, at fair value | — | 2,252,891 |
| Accounts receivable | 15,785,531 | 2,149,111 |
| Accounts receivable, related party | 7,113,369 | 79,509 |
| Due from affiliates | 1,527,062 | 1,007,528 |
| Income taxes receivable | 2,099,673 | — |
| Prepaid expenses and other current assets | 1,094,729 | 699,127 |
| Total current assets | 159,564,646 | 31,776,834 |
| Property and equipment, net | 1,025,066 | 400,720 |
| Intangible assets, net | 79,786,793 | 29,623,130 |
| Goodwill | 238,296,200 | 140,287,000 |
| Operating right-of-use assets | 4,722,573 | 1,893,659 |
| Life settlement policies, at cost | 1,083,977 | 1,697,178 |
| Life settlement policies, at fair value | 370,398,447 | 122,296,559 |
| Management and performance fee receivable, related party | 13,379,301 | — |
| Available-for-sale securities, at fair value | 2,205,904 | 1,105,935 |
| Other investments, at cost | 1,850,000 | 1,650,000 |
| Other assets | 1,851,845 | 998,945 |
| Equity securities, at fair value | — | 96,107 |
| TOTAL ASSETS | $ 874,164,752 | $ 331,826,067 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| Current portion of long-term debt, at fair value | $ 37,430,336 | $ 13,029,632 |
| Current portion of long-term debt | 1,000,000 | — |
| Accrued expenses | 6,139,472 | 4,354,225 |
| Operating lease liabilities | 515,597 | 118,058 |
| Due to affiliates | — | 5,236 |
| Due to former members | — | 1,159,712 |

**ABACUS GLOBAL MANAGEMENT INC.**

**CONSOLIDATED BALANCE SHEETS (CONT.)**
**AS OF DECEMBER 31,**

| | 2024 | 2023 |
|---|---|---|
| Contract liabilities, deposits on pending settlements | 2,473,543 | 507,000 |
| Accrued transaction costs | 483,206 | — |
| Other current liabilities | 14,423,925 | 3,400,734 |
| Income taxes payable | — | 751,734 |
| Total current liabilities | 62,466,079 | 23,326,331 |
| | | |
| Long-term debt, net | 224,742,029 | 33,818,090 |
| Long-term debt, at fair value, net | 105,120,100 | 55,318,923 |
| Long-term debt, related party | 12,525,635 | 37,653,869 |
| Retrocession fees payable | 5,312,214 | — |
| Operating lease liabilities | 4,580,158 | 1,796,727 |
| Deferred tax liability | 26,778,865 | 9,199,091 |
| Warrant liability | 9,345,000 | 6,642,960 |
| TOTAL LIABILITIES | 450,870,080 | 167,755,991 |
| COMMITMENTS AND CONTINGENCIES (Note 12) | | |
| Preferred stock, $0.0001 par value; 1,000,000 authorized shares authorized; none issued or outstanding | — | — |
| Class A common stock, $0.0001 par value; 200,000,000 authorized shares; 96,731,194 and 63,388,823 shares issued, respectively | 10,133 | 6,339 |
| Treasury stock - at cost; 1,048,226 and 146,650 shares, respectively | (12,025,137) | (1,283,062) |
| Additional paid-in capital | 494,064,113 | 199,826,278 |
| Accumulated deficit | (57,896,606) | (34,726,135) |
| Accumulated other comprehensive income | — | 108,373 |
| Non-controlling interest | (857,831) | 138,283 |
| Total stockholders' equity | 423,294,672 | 164,070,076 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 874,164,752 | $ 331,826,067 |

The accompanying notes are an integral part of these consolidated financial statements.

**ABACUS GLOBAL MANAGEMENT, INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE (LOSS) INCOME FOR THE YEARS ENDED DECEMBER 31,**

| | 2024 | 2023 |
|---|---|---|
| REVENUES: | | |
| Asset management fees | $ 2,841,481 | $ — |
| Active management | 102,819,361 | 61,195,377 |
| Origination fees | 5,457,147 | 4,203,900 |
| Portfolio servicing fees | 772,169 | 1,002,174 |
| Technology services | 33,628 | — |
| Total revenues | 111,923,786 | 66,401,451 |
| COST OF REVENUES (excluding depreciation and amortization stated below): | | |
| Cost of revenue (including stock-based compensation) | 11,371,733 | 6,490,377 |
| Gross Profit | 100,552,053 | 59,911,074 |
| OPERATING EXPENSES: | | |
| Sales and marketing | 9,063,384 | 4,905,747 |
| General and administrative (including stock-based compensation) | 81,734,518 | 26,482,571 |
| Loss on change in fair value of debt | 4,835,351 | 2,356,058 |
| Unrealized loss (gain) on investments | 238,012 | (1,369,112) |
| Realized gain on investments | (2,341,066) | - |
| Depreciation and amortization expense | 7,910,158 | 3,409,928 |
| Total operating expenses | 101,440,357 | 35,785,192 |
| Operating (loss) income | (888,304) | 24,125,882 |
| OTHER INCOME (EXPENSE): | | |
| Loss on change in fair value of warrant liability | (2,702,040) | (4,204,360) |
| Interest (expense) | (18,279,686) | (9,866,821) |
| Interest income | 2,398,691 | 594,764 |
| Other income (expense) | 38,040 | (146,443) |
| Total other expense | (18,544,995) | (13,622,860) |
| Net (loss) income before provision for income taxes | (19,433,299) | 10,503,022 |
| Income tax expense | 5,484,738 | 1,468,535 |
| NET (LOSS) INCOME | (24,918,037) | 9,034,487 |
| LESS: NET LOSS ATTRIBUTABLE TO NONCONTROLLING INTEREST | (956,987) | (482,139) |
| NET (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ (23,961,050) | $ 9,516,626 |
| (LOSS) EARNINGS PER SHARE: | | |
| (Loss) earnings per share—basic | $ (0.34) | $ 0.17 |
| (Loss) earnings per share—diluted | $ (0.34) | $ 0.16 |
| Weighted-average stock outstanding—basic [1] | 70,761,830 | 56,951,414 |
| Weighted-average stock outstanding—diluted [1] | 70,761,830 | 57,767,898 |
| | | |
| NET (LOSS) INCOME | $ (24,918,037) | $ 9,034,487 |
| Other comprehensive (loss) income, net of tax: | | |
| Change in fair value of debt (risk adjusted) | (158,579) | (1,248,330) |

**ABACUS GLOBAL MANAGEMENT, INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE (LOSS) INCOME (CONT.)**
**FOR THE YEARS ENDED DECEMBER 31,**

| | 2024 | 2023 |
|---|---|---|
| Reclassification of change in fair value of debt (risk adjusted) upon related debt payoff | 11,079 | — |
| Comprehensive (loss) income before non-controlling interests | (25,065,537) | 7,786,157 |
| Net and comprehensive loss attributable to non-controlling interests | (996,114) | (800,311) |
| COMPREHENSIVE (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ (24,069,423) | $ 8,586,468 |

[1] Both the number of shares outstanding and their par value have been retrospectively recast for all prior periods presented to reflect the par value of the outstanding stock of Abacus Global Management, Inc. as a result of the Business Combination.

The accompanying notes are an integral part of these consolidated financial statements.

**ABACUS GLOBAL MANAGEMENT, INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Class A Common Stock | | Treasury Stock | | Additional Paid-In Capital | Retained Earnings (Accumulated Deficits) | Accumulated Other Comprehensive Income | Non-Controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| BALANCE AS OF DECEMBER 31, 2022[1] | 50,369,350 | $ 5,037 | — | $ — | $ 704,963 | $ 25,487,323 | $ 1,052,836 | $ 899,538 | $ 28,149,697 |
| Distributions | — | — | — | — | | (34,451,607) | — | — | (34,451,607) |
| Deferred transaction costs | — | — | — | — | (555,851) | (10,841,551) | — | — | (11,397,402) |
| Public warrants | — | — | — | — | 4,726,500 | (3,765,600) | — | — | 960,900 |
| Merger with East Resources Acquisition Company | 12,980,473 | 1,298 | — | — | 17,849,052 | (20,646,575) | — | — | (2,796,225) |
| Acquisition of Abacus Settlements, LLC | — | — | — | — | 165,361,332 | — | — | — | 165,361,332 |
| Proceeds received from SPAC trust | — | — | — | — | 972,262 | — | — | — | 972,262 |
| Repurchase of common stock | — | — | (146,650) | (1,283,062) | | — | — | — | (1,283,062) |
| Stock-based compensation | 39,000 | 4 | — | — | 10,768,020 | — | — | — | 10,768,024 |
| Transfer of non-controlling interest | — | — | — | — | — | (24,751) | — | 24,751 | — |
| Other comprehensive loss | — | — | — | — | — | — | (944,463) | (303,867) | (1,248,330) |
| Net income (loss) | — | — | — | — | — | 9,516,626 | | (482,139) | 9,034,487 |
| BALANCE AS OF DECEMBER 31, 2023[1] | 63,388,823 | $ 6,339 | (146,650) | $ (1,283,062) | $ 199,826,278 | $ (34,726,135) | $ 108,373 | $ 138,283 | $ 164,070,076 |
| Deferred transaction costs | — | — | — | — | (483,451) | 790,579 | — | — | 307,128 |
| Warrant conversions | 595,844 | 60 | — | — | 6,852,146 | — | — | — | 6,852,206 |
| Business acquisitions | 9,791,399 | 979 | — | — | 77,546,901 | — | — | — | 77,547,880 |
| Common stock sale | 22,712,800 | 2,271 | — | — | 181,700,129 | — | — | — | 181,702,400 |
| Common stock sale transaction costs | — | — | — | — | (14,812,621) | — | — | — | (14,812,621) |
| Repurchase of common stock | — | — | (901,576) | (10,742,075) | — | — | — | — | (10,742,075) |
| Stock-based compensation | 242,328 | 484 | — | — | 43,434,731 | — | — | — | 43,435,215 |
| Other comprehensive loss | — | — | — | — | — | — | (119,452) | (39,127) | (158,579) |
| Reclassification of change in fair value of debt (risk adjusted) upon related debt payoff | — | — | — | — | — | — | 11,079 | — | 11,079 |
| Net loss | — | — | — | — | — | (23,961,050) | | (956,987) | (24,918,037) |
| BALANCE AS OF DECEMBER 31, 2024 | 96,731,194 | $ 10,133 | (1,048,226) | $ (12,025,137) | $ 494,064,113 | $ (57,896,606) | $ — | $ (857,831) | $ 423,294,672 |

[1] Both the number of shares outstanding and their par value have been retrospectively recast for all prior periods presented to reflect the par value of the outstanding stock of Abacus Global Management, Inc. as a result of the successful Business Combination.

The accompanying notes are an integral part of these consolidated financial statements.

**ABACUS GLOBAL MANAGEMENT, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31,**

| | 2024 | 2023 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| NET (LOSS) INCOME | $ (24,918,037) | $ 9,034,487 |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | |
| Depreciation and amortization | 7,910,158 | 3,409,928 |
| Stock-based compensation | 43,435,215 | 10,768,024 |
| Amortization of debt issuance costs | 936,112 | 43,957 |
| Loss on extinguishment of debt | — | 2,086,303 |
| Loss on change in fair value of warrant liability | 2,702,040 | 4,204,360 |
| Unrealized (gain) loss on investments, at fair value | 238,012 | (1,369,112) |
| Unrealized gain on policies, at fair value | (53,786,829) | (27,889,106) |
| Non-cash gain on policy trades | (6,422,002) | — |
| Loss on change in fair value of debt | 4,835,351 | 2,356,058 |
| Deferred income taxes | 5,999,572 | 466,577 |
| Non-cash interest expense, related party | 3,061,172 | 2,182,221 |
| Non-cash interest expense | 470,464 | 478,765 |
| Non-cash lease expense | 352,056 | 17,901 |
| Non-cash interest income | (99,969) | (105,935) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (13,202,882) | (2,117,411) |
| Accounts receivable, related party | 266,030 | 124,565 |
| Equity securities, at fair value | 2,203,367 | (89,057) |
| Prepaid expenses and other current assets | (361,872) | (62,994) |
| Management and performance fee receivable, related party | (466,649) | — |
| Other assets | (537,242) | (522,326) |
| Accounts payable | — | (40,014) |
| Accrued expenses | 802,510 | 3,829,825 |
| Accrued transaction costs | 483,206 | (908,256) |
| Contract liabilities, deposits on pending settlement | 1,966,543 | (474,217) |
| Other current liabilities | 3,858,345 | 3,358,507 |
| Income tax payable | (751,734) | 751,734 |
| Income tax receivable | (2,178,694) | — |
| Retrocession fees payable | 1,675,169 | — |
| Net change in life settlement policies, at fair value | (187,893,057) | (80,598,101) |

ABACUS GLOBAL MANAGEMENT, INC.

**CONSOLIDATED STATEMENTS OF CASH FLOWS (CONT.)**
**FOR THE YEARS ENDED DECEMBER 31,**

| | 2024 | 2023 |
|---|---|---|
| Net change in life settlement policies, at cost | 613,201 | 7,018,933 |
| Net cash used in operating activities | (208,810,444) | (64,044,384) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchase of property and equipment | (786,236) | (189,674) |
| Purchase of intangible assets | (18,900) | — |
| Acquisition of businesses, net of cash acquired | (2,430,620) | — |
| Purchase of other investments | (200,000) | (350,000) |
| Purchase of available for sale securities | (1,000,000) | — |
| Change in due from affiliates | (519,534) | 2,781,176 |
| Net cash (used) provided in investing activities | (4,955,290) | 2,241,502 |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Issuance of long term debt | 198,475,570 | 98,722,563 |
| Payment of discounts and financing costs | (7,475,569) | (5,547,943) |
| Repayment of debt | (4,040,758) | (26,250,000) |
| Issuance of long term debt, related party | — | 25,471,648 |
| Repayment of debt, related party | (28,189,406) | — |
| Common stock sale | 181,702,400 | — |
| Common stock sale transaction costs | (14,812,621) | — |
| Warrant conversions | 6,852,206 | — |
| Repurchase of common stock | (10,742,075) | (1,283,062) |
| Capital distribution to former members | — | (23,533,073) |
| Transaction costs | (483,451) | (11,397,402) |
| Proceeds received from SPAC trust | — | 972,262 |
| Due to former members | (1,159,712) | 442,283 |
| Due to affiliates | (5,236) | (258,549) |
| Net cash provided by financing activities | 320,121,348 | 57,338,727 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 106,355,614 | (4,464,155) |
| CASH AND CASH EQUIVALENTS AT THE BEGINNING OF THE PERIOD | 25,588,668 | 30,052,823 |
| CASH AND CASH EQUIVALENTS AT THE END OF THE PERIOD | $ 131,944,282 | $ 25,588,668 |
| SUPPLEMENTAL DISCLOSURES: | | |
| Life settlement policies receipt in lieu of cash in exchange for the SPV Purchased and Sale Note | $ — | $ 10,191,125 |
| Life settlement policies distributed to affiliate | — | 10,191,125 |
| Non-cash sale of life settlement policies, at fair value | 24,957,059 | — |
| Non-cash purchase of life settlement policies, at fair value | 24,957,059 | — |
| Non-cash issuance of debt in connection with business acquisition | 72,727,075 | — |
| Non-cash issuance of common stock in connection with business acquisition | 77,547,880 | — |

**ABACUS GLOBAL MANAGEMENT, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS (CONT.)**

**FOR THE YEARS ENDED DECEMBER 31,**

| | 2024 | 2023 |
|---|---|---|
| Distribution payable to former members | — | 717,429 |
| Interest paid | 11,615,613 | 4,035,526 |
| Income taxes paid, net of refunds | 2,146,846 | 150,000 |

The accompanying notes are an integral part of these consolidated financial statements.

# ABACUS GLOBAL MANAGEMENT, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1. DESCRIPTION OF BUSINESS

**Organization and Merger**

Abacus Global Management, Inc. (the "Company") was formerly known as Abacus Life, Inc. and East Resources Acquisition Company ("ERES"), a blank check company incorporated in Delaware on May 22, 2020. Prior to December 2, 2024, the Company conducted its business through its wholly-owned, consolidated subsidiaries, primarily Abacus Settlements, LLC ("Abacus Settlements") and Longevity Market Assets, LLC ("LMA"), which are Delaware limited liability companies (collectively, the "Companies"). On June 30, 2023, (the "Closing Date"), ERES, LMA and Abacus consummated the combining of the Companies as contemplated by the Merger Agreement dated as of August 30, 2022 (as amended on October 14, 2022 and April 20, 2023) with LMA Merger Sub, LLC, a wholly owned subsidiary of ERES ("LMA Merger Sub"), Abacus Merger Sub, LLC, a wholly owned subsidiary of ERES ("Abacus Merger Sub"), LMA and Abacus (together with LMA, the "Legacy Companies"). Pursuant to the Merger Agreement, on June 30, 2023, (i) LMA Merger Sub merged with and into LMA, with LMA surviving such merger (the "LMA Merger") and (ii) Abacus Merger Sub merged with and into Abacus, with Abacus surviving such merger (the "Abacus Settlements Merger" and, together with the LMA Merger, the "Mergers" and, along with the other transactions contemplated by the Merger Agreement, the "Business Combination") and the Legacy Companies became direct wholly owned subsidiaries of the Company. On the Closing Date, ERES changed its name to Abacus Life, Inc.

The consolidated assets, liabilities and statements of operations and comprehensive income prior to the Business Combination are those of legacy LMA. The shares of common stock and corresponding capital amounts and income per share, prior to the Business Combination, have been retroactively restated based on share reflecting the exchange ratio established in the Business Combination.

The equity structure has been recast in all comparative periods up to the Closing Date to reflect the number of shares of the Company's common stock, $0.0001 par value per share, issued to legacy LMA's stockholders in connection with the Business Combination. As such, the shares and corresponding capital amounts and income per share related to legacy LMA common stock prior to the Business Combination have been retroactively recast as shares reflecting the exchange ratio of 0.8 established in the Business Combination.

On December 2, 2024, the Company completed the acquisition of Carlisle Management Company S.C.A., a corporate partnership limited by shares established under the laws of Luxembourg ("CMC"), Carlisle Investment Group S.A.R.L., a private limited liability company incorporated under the laws of Luxembourg ("CIG," and together with CMC, "Carlisle"), a leading Luxembourg-based investment manager in the life settlement space ("Carlisle Acquisition"). On the same day, the Company also completed the acquisition of acquire 100% of FCF Advisors ("FCF"), a New York based asset manager and index provider specializing in free cash flow-focused investment strategies ("FCF Advisors Acquisition"). Refer to Note 3 Business Combinations for additional information.

**Business Activity**

Effective December 2, 2024, the Company has five reportable segments. Prior to December 2, 2024, the Company had three reportable segments.

The Company, through its LMA subsidiary, is a provider of services pertaining to life insurance settlements and offers policy servicing to owners and purchasers of life settlement assets, as well as consulting, valuation, and actuarial services ("Portfolio Servicing" segment). The Company is also

engaged in buying and selling of life settlement policies in which it uses its own capital, and purchases life settlement contracts with the intent to either hold to maturity to receive the associated death claim payout or to sell to another purchaser of life settlement contracts for a gain on the sale ("Active Management" segment).

The Company, through its Abacus Settlements subsidiary, also is an originator of outstanding life insurance policies as a licensed life settlement provider on behalf of investors ("Financing Entities"). Abacus Settlements locates and screens policies for eligibility as a commercially desirable life settlement, including verifying that the policy is in force, obtaining consents and disclosures, and submitting cases for life expectancy estimates, also known, collectively, as origination services. When the sale of a policy is completed, this is deemed "settled" and the policy is then referred to as either a "life settlement" in which the insured's life expectancy is greater than two years or "viatical settlement," in which the insured's life expectancy is less than two years. The Company is not an insurance company, and therefore the Company does not underwrite insurable risks for its own account ("Originations" segment).

Starting on December 2, 2024, the Company added Asset Management and Technology Services reportable segments.

The Asset Management segment coincided with the Company's acquisitions of two asset managers as described in Note 3, Business Combinations. The Technology Services reportable segment, while not significant to the overall operations in 2024, is expected to become a significant in subsequent years.

The acquired asset managers provide asset management services for a fee based on the net asset values ("NAV"), also referred to asset under management ("AUM"), of the funds it manages. One of the asset managers also generates performance fees when the funds it manages generates returns that exceed certain performance thresholds and after all contingencies are satisfied. The Company, through its ABL Wealth, LLC ("ABL Wealth") subsidiary, will generate asset management fees as new funds become operational ("Asset Management" segment).

The Company, through its ABL Tech, LLC ("ABL Tech") subsidiary and by utilizing proprietary technology based on health and longevity data sets provides solutions to pension funds, government agencies, insurance-related businesses, as well as other entities that benefit from real-time mortality verification, missing participant verification, and other services specific to the life insurance market. Technology Services fees are based on fixed annual contracts ("Technology Services" segment).

Refer to Note 2 Summary of Significant Accounting Policies, Note 4 Revenues, and Note 11 Segment Reporting for additional information.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**—The Consolidated Financial Statements include the accounts of the Company and its wholly owned subsidiaries and controlled affiliates. The Company was formed through a special purpose acquisition company ("SPAC"), between East Resources Acquisition Company ("ERES") and Longevity Market Assets ("LMA"). In connection with the Business Combination, the Merger is accounted for as a reverse recapitalization with ERES in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP"). Under U.S. GAAP, ERES has been treated as the "acquired" company for financial reporting purposes. This determination was primarily based on the LMA stockholders having a relative majority of the voting power of the Company, the LMA stockholders having the authority to appoint a majority of directors on the Board of Directors, and senior management of LMA comprising the majority of the senior management of the post-combination Company. LMA was then determined to be the "acquirer" for financial reporting purposes based on the relative size of LMA as compared to Abacus Settlements, represented by their revenue, equity, gross profit and net income. Accordingly, for accounting purposes, the financial statements of the combined entity represents a continuation of the financial statements of LMA with the LMA Merger treated as the equivalent of LMA issuing stock for the net assets of ERES, accompanied by a recapitalization. The net assets of ERES are stated at historical cost, with no goodwill or other intangible assets recorded.

The Abacus Settlements Merger has been accounted for using the acquisition method of accounting. Under the acquisition method of accounting, the assets and liabilities of Abacus Settlements were recorded at fair value as of the acquisition date. The excess of the purchase price over the estimated fair values of the net assets acquired was recognized as goodwill.

As a result of the Business Combination, the Company evaluated if ERES, Abacus Settlements, or LMA is the predecessor for accounting purposes.

In considering the foregoing principles of predecessor determination and in light of the Company's specific facts and circumstances, management determined that LMA and Abacus Settlements are dual predecessors for accounting purposes. The financial statement presentation for Abacus Global Management, Inc. includes the purchase accounting effects of the Abacus Settlements Merger as of the Closing Date with the financial statements of LMA as the comparative period. The predecessor financial statements for Abacus Settlements are included separately within this report.

The accompanying consolidated financial statements of the Company have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission and are prepared in accordance with U.S. GAAP.

**Consolidation of Variable Interest Entities**—For entities in which the Company has variable interests, the Company first evaluates whether the entity meets the definition of a variable interest entity ("VIE") or a voting interest entity ("VOE"). If the entity is a VIE, the Company focuses on identifying whether it has the power to direct the activities that most significantly impact the VIE's economic performance and whether it has the obligation to absorb losses or the right to receive benefits from the VIE. If the Company is the primary beneficiary of a VIE, the assets, liabilities, and results of operations of the VIE will be included in the Company's consolidated financial statements. The proportionate share not owned by the Company is recognized as noncontrolling interest and net income attributable to noncontrolling interest on the consolidated balance sheets and consolidated statements of operations and comprehensive income, respectively. If the entity is a VOE, the Company evaluates whether it has the power to control the VOE through a majority voting interest or through other arrangements.

Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 810, *Consolidations*, ("ASC 810") requires the Company to separately disclose on its consolidated balance sheets the assets of consolidated VIEs and liabilities of consolidated VIEs as to which there is no recourse against the Company. As of December 31, 2024, total assets and liabilities of consolidated VIEs were $169,322,167 and $143,200,287, respectively. As of December 31, 2023, total assets and liabilities of consolidated VIEs were $77,132,592 and $65,031,207, respectively.

On October 4, 2021, the Company entered into an operating agreement with LMX Series, LLC ("LMX") and three other unaffiliated investors to obtain a 70% ownership interest in LMX, which was newly formed in August 2021. LMX had no operating activity prior to the operating agreement being signed. LMX has a wholly owned subsidiary, LMATT Series 2024, Inc., a Delaware C corporation ("LMATTS 2024"). While the Company and three other investors each contributed $100 to LMX, the Company directs the most significant activities by managing the investment offerings, and sponsoring and creating structured investment grade insurance liabilities, and thus was provided a 70% ownership interest. LMX is a VIE and the Company is the primary beneficiary of LMX. The Company has included the results of LMX and its subsidiaries in its consolidated financial statements for the year ended December 31, 2024.

On November 30, 2022, LMA Series, LLC, a wholly owned subsidiary of the Company, signed an Operating Agreement to be the sole member of a newly created general partnership, LMA Income Series, GP, LLC. Subsequent to that, LMA Income Series, GP, LLC formed a limited partnership, LMA Income Series, LP and issued partnership interests to limited partners in a private placement offering ("LMAIS"). It was determined that LMA Series, LLC is the primary beneficiary of LMA Income Series, LP and thus has fully consolidated the limited partnership in its consolidated financial statements for the year ended December 31, 2024.

On January 31, 2023, LMA Series, LLC, a wholly owned subsidiary of the Company, signed an Operating Agreement to be the sole member of a newly created general partnership, LMA Income Series II, GP, LLC. Subsequent to that, LMA Income Series II, GP, LLC formed a limited partnership, LMA Income Series II, LP and issued partnership interests to limited partners in a private placement offering ("LMAIS II"). It was determined that LMA Series, LLC is the primary beneficiary of LMA Income Series II, LP and thus has fully consolidated the limited partnership in its consolidated financial statements for the year ended December 31, 2024.

**Non-Consolidation of Variable Interest Entities**—On January 1, 2021, the Company entered into an option agreement with two commonly owned full-service origination, servicing, and investment providers (the "Providers"), in which the Company agreed to fund certain capital needs with an option to purchase the outstanding equity ownership of the Providers (the "Option Agreement").

The Company accounted for its investment in the call options under the Option Agreement as an equity security, pursuant to ASC 321, *Investments—Equity Securities*. In arriving at this accounting conclusion, the Company first considered whether the call options met the definition of a derivative pursuant to ASC 815, *Derivatives and Hedging*, and concluded that the options do not provide for net settlement and accordingly are not a derivative. The Company also concluded that the call options do not provide the Company with a controlling financial interest in the legal entity pursuant to ASC 810. The call options include material contingencies prior to exercisability that the Company does not anticipate will be resolved; additionally, the call options are in a legal entity for which the stock price has no readily determinable fair value. The Company's basis in the call options, pursuant to ASC 321, is $— and accordingly the call options are not reflected in the statement of financial position.

The Company provided $172,136 of working capital funding for the year ended December 31, 2024 which is included in other income (expense) on the consolidated statements of operations and comprehensive (loss) income and $144,721 of funding for the year ended December 31, 2023. Refer to Note 12 Commitments and Contingencies for further details.

For the years ended December 31, 2024, and 2023, the Providers were considered to be VIEs, but were not consolidated in the Company's consolidated financial statements due to a lack of the power criterion or the losses/benefits criterion. As of December 31, 2024, the unaudited financial information for the unconsolidated VIEs are as follows: held assets of $615,648 and liabilities of $47,006. As of December 31, 2023, the unaudited financial information for the unconsolidated VIEs are as follows: held assets of $601,762 and liabilities of $2,900.

**Noncontrolling Interest**—Noncontrolling interest represents the share of consolidated entities owned by third parties. At the date of formation or upon acquisition, the Company recognizes noncontrolling interest on the consolidated balance sheets at an amount equal to the noncontrolling interest's proportionate share of the relative fair value of any assets and liabilities acquired. Noncontrolling interest is subsequently adjusted for the noncontrolling stockholder's additional contributions, distributions, and the stockholder's share of the net earnings or losses of each respective consolidated entity.

Net income of a consolidated entity is allocated to noncontrolling interests based on the noncontrolling stockholder's ownership interest during the period. The net income or loss that is not attributable to the Company is reflected in net income (loss) attributable to noncontrolling interests in the consolidated statements of operations and comprehensive income.

**Use of Estimates**—The preparation of U.S. GAAP financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and changes therein, disclosure of contingent assets and liabilities at the date of financial statements, and the reported amounts of revenue and expenses during the reporting periods. Company's estimates, judgments, and assumptions are continually evaluated based on available information and experience. Because of the use of estimates inherent in the financial reporting process, actual results could differ from the estimates. Estimates are used when accounting for purchase price allocation, the selection of useful lives of property and equipment,

valuation of receivables, valuation of life settlement policies, valuation of other investments and available-for-sale securities, valuation of long-term debt, impairment testing, income taxes, deferred taxes, lease balances, and legal reserves.

**Life Settlement Policies**—The Company accounts for its holdings of life insurance settlement policies in accordance with ASC 325-30, *Investments in Insurance Contracts*. For all policies purchased after June 30, 2023, the Company accounts for these under the fair value method. For policies purchased before June 30, 2023, the Company elected to use either the fair value method or the investment method (cost, plus premiums paid). The valuation method is chosen upon contract acquisition and is irrevocable.

The Company follows ASC 820, *Fair Value Measurements and Disclosures*, in estimating the fair value of its life insurance policies held at fair value. ASC 820 defines fair value as an exit price representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date. As such, fair value is a market-based measurement that should be determined based on assumptions that market participants would use in pricing an asset or liability. The Company's valuation of life settlements is considered to be Level 3. The Company's valuation model incorporates significant inputs that are not observable and reflect our assumptions about what factors market participants would use in pricing life settlement policies. We develop our inputs based on the best information available to us, including our own data. We believe that our model would be reasonably comparable to a model that an independent third-party would use. Refer to Note 13 Fair Value Measurements, for further details. For policies held at fair value, changes in fair value are reflected in the consolidated statement of operations and comprehensive income under active management revenue in the period the change is calculated.

For policies held under the investment method, the Company tests the impairment if we become aware of information indicating that the carrying value plus undiscounted future premiums of a policy may not be recoverable. This information is gathered initially through extensive underwriting procedures at purchase of the settlement contract, as well as through periodic underwriting review that includes medical reports and life expectancy evaluations. The policies held by the Company using the investment method are expected to be owned for a shorter term, and are actively marketed to potential buyers. The market feedback received through these interactions provides the Company with information related to a potential impairment. If a policy is determined to be impaired, the Company will adjust the carrying value to the fair value determined through the impairment analysis.

The Company accounts for cash proceeds from sale and maturity of life insurance settlement policies, as well as cash outflows for premium payments, as operating activities within the consolidated statements of cash flows. The Company may at times generate non-cash realized gains or losses when the consideration of a policy sale is another life settlement policy with different risk characteristics and risk profile.

**Going Concern**—Management evaluates at each annual and interim period whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Company's ability to continue as a going concern within one year after the date that the consolidated financial statements are issued. Management's evaluation is based on relevant conditions and events that are known and reasonably knowable at the date that the consolidated financial statements are issued. Management has concluded that there are no conditions or events, considered in the aggregate, that raise substantial doubt about Company's ability to continue as a going concern within one year after the date these consolidated financial statements were issued.

**Cash and Cash Equivalents**—Cash and cash equivalents consist of cash and short-term, highly liquid investments that have original maturities of three months or less. A portion of the Company's cash and cash equivalents are in the form of short-term investments and are not held in federally insured bank accounts.

**Fair Value Measurements**—The following fair value hierarchy is used in selecting inputs for those assets and liabilities measured at fair value that distinguishes between assumptions based on market data

(observable inputs) and the Company's assumptions (unobservable inputs). The Company evaluates these inputs and recognizes transfers between levels, if any, at the end of each reporting period. The hierarchy consists of three levels:

***Level 1***—Valuation based on quoted market prices in active markets for identical assets or liabilities that we have the ability to access at the measurement date.

***Level 2***—Valuation based on inputs other than Level 1 inputs that are observable for the assets or liabilities either directly or indirectly.

***Level 3***—Valuation based on inputs that reflect our assumptions about what factors market participants would use in pricing the asset or liability. The inputs are developed based on the best available information, including our own data.

The Company's financial instruments consist of cash, cash equivalents, accounts receivables, due to affiliates, equity investments in privately held companies, S&P options, life settlement policies, available for sale securities, market-indexed debt and secured borrowings. Cash, cash equivalents, accounts receivables, and due to affiliates are stated at their carrying value, which approximates fair value due to the short time to the expected receipt or payment date.

Equity investments in privately held companies without readily determinable fair values are recognized at fair value on a nonrecurring basis when observable price changes from orderly transactions for identical or similar investments become available.

Available-for-sale securities are measured at fair value using inputs that are not readily determinable. Unrealized holding gains and losses are excluded from earnings and reported in other comprehensive income until realized.

S&P options are recognized at fair value using quoted market prices in active markets, with changes in fair value included in net income. Market-indexed debt is measured on a quarterly basis, with qualifying changes in fair value recognized in net income, except for the portion of the total change in the fair value of the liability that results from a change in the instrument-specific credit risk, which is separately included in other comprehensive income in accordance with ASC 825-10-45-5. The measurement approach for life settlement policies is included above within the Life Settlement Policies disclosure.

**Accounts Receivable**—These receivables include amounts owed to the Company from investors acquiring policies or insurance carriers. Management regularly reviews customer accounts for collectability and will record an allowance for these accounts when deemed necessary. Management determines the allowance for credit losses based on a review of outstanding receivables, historical collection experience, current economic conditions, and reasonable and supportable forecasts. Accounts receivable are charged off against the allowance for credit losses when deemed uncollectible (after all means of collection have been exhausted and the potential for recovery is deemed remote). Recoveries of accounts receivable previously written off are recorded when received. Management deems all amounts due to be collectable. If the financial condition of the Company's customers or insurance carriers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required. The Company did not record allowance for credit losses as of December 31, 2024 and 2023, respectively.

**Accounts Receivable, Related Party**—Related party receivable are amounts owed to the Company by related party customers for services delivered. These receivables also include management and performance fee balances due from unconsolidated investment funds where management has significant influence or control over significant activities of the unconsolidated fund. Management regularly reviews customer accounts for collectability and will record an allowance for these accounts when deemed necessary. Management determines the allowance for credit losses based on a review of outstanding receivables, historical collection experience, current economic conditions, and reasonable and supportable forecasts. Related party receivables are charged off against the allowance for credit losses when deemed

uncollectible (after all means of collection have been exhausted and the potential for recovery is deemed remote). Recoveries of related party receivables previously written off are recorded when received. Due to the nature of operations, related party receivables are due primarily from parties which the Company serves. As a result, management deems all amounts due to be collectable. If the financial condition of the Company's related party customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required. The Company did not record allowance for credit losses as of December 31, 2024 and 2023, respectively.

**Other Investments**—Equity investments without readily determinable fair values include the Company's investments in privately-held companies in which the Company holds less than a 20% ownership interest and does not have the ability to exercise significant influence. The Company measures these investments at cost, and these investments are adjusted through net earnings when they are deemed to be impaired or when there is an adjustment from observable price changes (referred to as the "measurement alternative"). In addition, the Company monitors these investments to determine if impairment charges are required based primarily on the financial condition and near-term prospects of these companies

**Available-for-sale Securities, at Fair Value**—The Company has investments in securities that are classified as available-for-sale securities, and which are reflected on the consolidated balance sheets at fair value. These securities solely consist of a convertible promissory note in a private company that was entered into at arms-length. The Company determines the fair value using unobservable inputs by considering the initial investment value, next round financing, and the likelihood of conversion or settlement based on the contractual terms in the agreement. If any unrealized gains and losses on these investments are incurred, these would be included as a separate component of accumulated other comprehensive income, net of tax, on the consolidated balance sheets. The Company classifies its available-for-sale securities as short-term or long-term based on the nature of the investment, its maturity date and its availability for use in current operations. The Company monitors if the fair value of the securities falls below the amortized cost basis. Credit losses identified are reflected in the allowance for credit losses and any credit losses reversed are recognized in earnings. As of December 31, 2024 and 2023, the fair value of the securities were determined to materially approximate amortized cost basis, thus no unrealized gains or losses were recorded. The Company did not record any allowance for credit losses. The Company writes off uncollectible accrued interest receivable balances in a timely manner.

**Equity Securities, at Fair Value**—The equity securities, at fair value balance consists of S&P 500 call options that were purchased through a broker as an economic hedge related to the market-indexed instruments that are included in Long-Term Debt. The Company records these options at fair value and recognizes changes in fair value as part of net income.

**Property and Equipment, Net**—Property and equipment are stated at cost less accumulated depreciation and are depreciated on a straight-line basis over the following estimated useful lives:

Estimated Useful Life

- Computer equipment 5 years
- Furniture and fixtures 5 years
- Leasehold improvements Shorter of remaining lease term or estimated useful life

Costs incurred for maintenance and repairs that do not extend the useful lives of property and equipment are expensed as incurred. Upon retirement or sale of assets, the cost and related accumulated depreciation are written off and any resulting gain or loss is reflected in the accompanying consolidated statements of operations and comprehensive income.

Property and equipment are tested for recoverability whenever events or changes in circumstance indicate that their carrying amounts may not be recoverable. An impairment loss is recognized if the carrying

amount of property and equipment is not recoverable and exceeds its fair value. Recoverability is determined based on the undiscounted cash flows expected to result from the use and eventual disposition of the asset or asset group. There were no impairments recognized during the years ended December 31, 2024 and 2023, respectively. Property and equipment to be disposed of are reported at the lower of carrying amount or fair value less cost to sell.

**Goodwill and Intangible Assets, Net**—Goodwill and intangible assets are recorded as a result of the Business Combination. Goodwill represents the excess of the purchase price over the fair value of the assets acquired and liabilities assumed. The Company amortizes identifiable intangible assets with a finite useful life over the period that the intangible asset is expected to contribute directly or indirectly to its future cash flows; however, it does not amortize indefinite lived intangible assets. The Company evaluates goodwill and indefinite intangible assets for recoverability annually in the fourth quarter as of October 1 of each year or on an interim basis should events or changes in circumstances indicate that a carrying amount may not be recoverable.

To test for impairment, a qualitative assessment is performed to determine if it is more likely-than-not that the fair value of a reporting unit is less than its carrying value, including goodwill. This initial assessment includes, among other factors, consideration of: (i) past, current and projected future earnings and equity; (ii) recent trends and market conditions; and (iii) valuation metrics involving similar companies that are publicly traded and acquisitions of similar companies, if available. If the more likely-than-not threshold is met, a quantitative impairment test is performed by comparing the estimated fair value with the carrying value. If the carrying value of the net assets associated with the reporting unit exceeds the fair value of the reporting unit, goodwill is considered impaired and will be determined as the amount by which the reporting unit's carrying value exceeds its fair value, not to exceed the carrying amount of goodwill.

The Company's reporting units are at the operating segment level; each operating segment represents a business and discrete financial information is available and reviewed regularly by management. Determining the fair value of its reporting units is subjective in nature and involves the use of significant estimates and assumptions, including projected net cash flows, discount and long-term growth rates.

The Company determines the fair value of its reporting units based on an income approach and market approach, whereby the fair value of the reporting unit is derived from the present value of estimated future cash flows associated with the reporting unit. The assumptions about estimated cash flows include factors such as future premiums, loss and expenses, general and administrative expenses and industry trends. The Company considers historical rates and current market conditions when determining the discount and long-term growth rates to use in its analysis.

The Company considers other valuation methods if the facts and circumstances indicate these methods provide a more representative approximation of fair value. Changes in these estimates based on evolving economic conditions or business strategies could result in material impairment charges in future periods. The Company bases its fair value estimates on assumptions it believes to be reasonable. Actual results may differ from those estimates. As of December 31, 2024, there were no events or changes in circumstances that indicated that a carrying amount of goodwill or intangible assets may not be recoverable.

The company has insignificant internal-use software accounted under ASC 350-40, *Internal-Use Software*. The software is amortized on the straight-line basis over an estimated useful life of 3 years when its available for its intended use.

**Revenue Recognition**—The Company generally derives its revenue from life settlement servicing and consulting activities (Portfolio Servicing Revenue), life settlement trading activities (Active Management Revenue) and fees, commissions (Origination Services), management and performance fees (Asset Management Revenue), and real-time mortality and missing participant verification (Technology Services). We account for revenue in accordance with ASC Topic 606, "*Revenue from Contracts with Customers*" ("ASC 606"). Revenue is recognized for each distinct performance obligation identified in customer contracts when the performance obligation has been satisfied by transferring services to a

customer either over time or at the point in time when the customer obtains control of the service. Revenue is recognized in the amount of variable or fixed consideration allocated to the satisfied performance obligation that the Company expects to be entitled to in exchange for transferring services to a customer. Variable consideration is included in the transaction price only when it is probable that a significant reversal of such revenue will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

***Portfolio Servicing Revenue***—Portfolio servicing is comprised of servicing activities and consulting activities. The Company enters into service agreements with the owners of life settlement contracts and is responsible for maintaining the policy, manages processing of claims in the event of death of the insured and ensuring timely payment of optimized premiums computed to derive maximum return on maturity of the policy. The company neither assumes the ownership of the contracts nor undertakes the responsibility to make the premium payments, which remains with the owner of the policy. These service arrangements have contractual terms typically ranging from one-month to ten years and include fixed charges within its contracts as part of the total transaction price which are recognized on gross basis. To the extent that variable consideration is not constrained, the Company includes an estimate of the variable amount, as appropriate, within the total transaction price and updates its assumptions over the duration of the contract. Variable consideration has not been material. The duties performed by the Company under these arrangements are considered as a single performance obligation that is satisfied on a monthly basis as the customer simultaneously receives and consumes the benefit provided by the Company as the Company performs the service. As such, revenue is recognized for services provided for the corresponding month.

Under consulting engagements, the Company provides services typically for the owners of life settlement contracts who are often customers of the servicing business line, or customers of Abacus Settlements. These consulting engagements are comprised of valuation, actuarial services, and overall policy assessments related life settlement contracts and are short-term in nature. The performance obligations are typically identified as separate services with a specific deliverable or a group of deliverables to be provided in tandem, as agreed to in the engagement letter or contract. Each service provided under a contract is considered as a performance obligation and revenue is recognized at a point in time when the deliverable or group of deliverables is transferred to the customer.

***Active Management Revenue***—The Company also engages in buying and selling life settlement policies whereby each potential policy is independently researched to determine if it would be a profitable investment. Some of the policies are purchased with the intent to hold to maturity, while others are held for trading to be sold for a gain. The Company elects to account for each investment in life settlement contracts using either the investment method or the fair value method. Once the accounting method is elected for each policy, it cannot be changed. Under the investment method, investments in contracts are based on the initial investment at the purchase price plus all initial direct costs. Continuing costs (e.g., policy premiums, statutory interest and direct external costs, if any) to keep the policy in force are capitalized. Under the fair value method, the company will record the initial investment of the transaction price and remeasures the investment at fair value at each subsequent reporting period. Changes in fair value are reported on earnings when they occur. Upon sale of a life settlement contract, the company will record revenue (gain/loss) for the difference between the agreed-upon purchase price with the buyer, and the carrying value of the contract.

***Originations Revenue***—The Company through its Abacus Settlements subsidiary, recognizes revenue from origination activities by acting as a provider of life settlements and viatical settlements representing investors that are interested in purchasing life settlements on the secondary or tertiary market. Revenue from origination services consists of fees negotiated for each purchase and sale of a policy to an investor, which also include any agent and broker commissions received and the reimbursement of transaction costs. See below for revenue disaggregation based upon the source of the policy.

The Company originates life settlements policies with third parties that include settlement brokers (“Brokers”), life insurance agents (“Agents”), and direct consumers or policyholders (“Client Direct”). The

Company then provides the administration services needed to initiate the transfer of the life settlement policies to investors in exchange for an origination fee. Such transactions are entirely performed through an escrow agent. In these arrangements, the customer is the investor, and the Company has a single performance obligation to originate a life settlement policy for the investor. The consideration transferred upon each policy is negotiated directly with the investor by the Company and is dependent upon the policy death benefits held by each life settlement policy. The revenue is recognized when the performance obligation under the terms of the contracts with customers are satisfied. The Company recognizes revenue from life settlement transactions when the closing has occurred and any right of rescission under applicable state law has expired (i.e., the customer obtains control over the policy and has the right to use and obtain the benefits from the policy). While rescission periods may vary by state, most states grant the owner the right to rescind the contract before the earlier of 30 calendar days after the execution date of the contract or 15 calendar days after life settlement proceeds have been sent to the owner. Purchase and sale of the policies generally occurs simultaneously, and only the fees received, including any agent and broker commissions and transaction costs reimbursed, are recorded as gross revenue.

For agent and broker commissions received and transaction costs reimbursed, the Company has determined that it is acting as the principal in the relationship as it maintains control of the services being performed as part of performance obligation prior to facilitating the transfer of the life settlement policy to the investor.

While the origination fees are fixed amounts based on the face value of the policy death benefit, there is variable consideration present due to the rescission right of the owners. When variable consideration is present in a contract, the Company estimates the amount of variable consideration to which it expects to be entitled at contract inception and again at each reporting period until the amount is known. The entity applies the variable consideration constraint so that variable consideration is included in the transaction price only to the extent it is probable that a subsequent change in estimate will not result in a significant revenue reversal. While origination fees are variable due to the rescission periods, given that the rescission periods are relatively short in nature, the Company has concluded that such fees are fully constrained until the rescission period lapses and thus records revenue at a fixed amount based on the face value of the policy death benefit after the rescission period is over.

***Asset Management Revenue***—The Company through its Carlisle subsidiary, recognizes management fee and performance fees and through its ABL Wealth and FCF Advisors subsidiaries, recognizes management fees.

Management fees are recognized over time during the periods in which services are performed in accordance with relevant contractual terms. Management fees are generally based on net asset value (“NAV”), also referred to as assets under management (“AUM”), of the funds provided in the respective agreements.

Performance fees are earned when the performance of the individual shares classes of the managed funds exceeds contractual thresholds.

Asset management and performance fees receivable are accrued on a monthly and quarterly. The Company receives performance fees from the closed-end funds when they are actually paid, those that are not expected to received over the next year are recorded as noncurrent receivables. Receivables due over the next 12 months and after a year are recorded in accounts receivable, related party and management and performance fee receivable, related party in the consolidated balances sheets, respectively, except for FCF Advisors. FCF Advisors related management fee receivable are recorded in accounts receivable in the consolidated balances sheets.The Company did not record allowance for credit losses as of December 31, 2024.

The Company has entered into agreements with various parties to introduce new investors into the funds. The Company has contractually agreed to share a portion of its asset management and performance fees with these introducers for investments placed with the funds as retrocession fees and are paid out when

corresponding management and performance fees are received. Retrocession fees payable over the next 12 months and after a year are recorded in other current liabilities and retrocession fees payable in the consolidated balances sheets, respectively, except for FCF Advisors. FCF Advisors related retrocession fees are recorded in other current liabilities in the consolidated balances sheets.

Where the Company's management has significant influence or control over the significant activities of the unconsolidated managed investment funds through contract but does not have significant economic interest through equity or otherwise, fees charged to unconsolidated managed investment funds are considered related party activities. Refer to Note 4 Revenues and Note 19 Related Parties for additional information.

***Technology Services Revenue***—The Company through its ABL Tech subsidiary, recognizes fees by providing real-time mortality verification, missing participant verification, and other services specific to the life insurance market. Technology Services fees are based on fixed annual contracts. The performance obligations are typically identified as separate services with a specific deliverable or a group of deliverables to be provided in tandem, as agreed to in the engagement letter or contract. Each service provided under a contract is considered as a performance obligation and revenue is recognized at a point in time when the deliverable or group of deliverables is transferred to the customer.

***Other Consideration***— Payment terms and conditions vary by contract type, although terms generally require payment within 30 days of the invoice date. In certain arrangements, the Company receives payment from a customer either before or after the performance obligation has been satisfied; however, the Company's contracts do not contain a significant financing component.

***Cost to Obtain and Fulfill Contracts***— Costs to obtain contracts solely relate to commissions for brokers agents and employees who are directly involved in buying and selling policies as part of the active management revenue stream and include commissions for brokers or agents under specific agreements that would not be incurred without a contract being signed and executed under origination services revenue stream. The Company has elected to apply the ASC 606, *Revenue from Contracts with Customers*, 'practical expedient' which allows us to expense these costs as incurred if the amortization period related to the resulting asset would be one year or less. The Company has no significant instances of contracts that would be amortized for a period greater than a year, and therefore has no contract costs capitalized for these arrangements. These costs are included expensed as incurred and are included in cost of revenue on the consolidated statements of operations and and comprehensive (loss) income.

**Cost of Revenues (excluding Depreciation and Amortization)**—Cost of revenue represents the direct costs associated with fulfilling the Company's obligations to its customers, primarily policy servicing fees, commissions expense (refer to cost to obtain and fulfill contracts above), escrow fees, servicing and active management payroll costs, stock-based compensation for active management and servicing employees, life expectancy fees, lead generation expenses, and consulting expenses.

**Segments**— Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the chief operating decision maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's CODM is the President and Chief Executive Officer ("CEO"). The Company has determined that it operates in five operating segments and five reportable segments, portfolio servicing, active management originations, asset management and technology services, as the CODM reviews financial information presented for purposes of making operating decisions, allocating resources, and evaluating financial performance.

**Income Taxes**—The provision for income taxes is determined using the asset and liability approach of accounting for income taxes. Under this approach, the provision for income taxes represents income taxes paid or payable (or received or receivable) for the current year plus the change in deferred taxes during the year. Deferred taxes represent the future tax consequences expected to occur when the reported amounts of assets and liabilities are recovered or paid, and result from differences between the financial and tax bases of the Company's assets and liabilities and are adjusted for changes in tax rates and tax laws when enacted.

Valuation allowances are recorded to reduce deferred tax assets when it is more likely than not (greater than 50%) that a tax benefit will not be realized. In evaluating the need for a valuation allowance, management considers all potential sources of taxable income, including income available in carryback periods, future reversals of taxable temporary differences, projections of taxable income, and income from tax planning strategies, as well as all available positive and negative evidence. Positive evidence includes factors such as a history of profitable operations, projections of future profitability within the carryforward period, including from tax planning strategies, and the Company's experience with similar operations. Existing favorable contracts are additional positive evidence. Negative evidence includes items such as cumulative losses, projections of future losses, or carryforward periods that are not long enough to allow for the utilization of a deferred tax asset based on existing projections of income. Deferred tax assets for which no valuation allowance is recorded may not be realized upon changes in facts and circumstances, resulting in a future charge to establish a valuation allowance. Existing valuation allowances are re-examined under the same standards of positive and negative evidence. If it is determined that it is more likely than not that a deferred tax asset will be realized, the appropriate amount of the valuation allowance, if any, is released. Deferred tax assets and liabilities are also remeasured to reflect changes in underlying tax rates due to law changes and the granting and lapse of tax holidays.

Tax benefits related to uncertain tax positions taken or expected to be taken on a tax return are recorded when such benefits meet a more likely than not threshold. Otherwise, these tax benefits are recorded when a tax position has been effectively settled, which means that the statute of limitations has expired, or the appropriate taxing authority has completed their examination even though the statute of limitations remains open. Interest and penalties related to uncertain tax positions are recognized as part of the provision for income taxes and are accrued beginning in the period that such interest and penalties would be applicable under relevant tax law until such time that the related tax benefits are recognized.

For purposes of Global Intangible Low-Taxed Income ("GILTI"), we elected to use the period cost method and therefore have not recorded deferred taxes for basis differences expected to reverse in future periods.

**Concentrations**—Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, accounts receivable, and available-for-sale securities. The Company maintains its cash in bank deposit accounts with high-quality financial institutions, which, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts. The Company believes it is not exposed to any significant credit risk on its cash and cash equivalents. For accounts receivable, the Company is exposed to credit risk in the event of nonpayment by customers to the extent of the amounts recorded on the accompanying consolidated balance sheets. The Company extends different levels of credit to its customers and maintains allowance for doubtful accounts based upon the expected collectability of accounts receivable. The Company's procedures for determining this allowance includes evaluating individual customer receivables, considering a customer's financial condition, monitoring credit history and current economic conditions, using historical experience applied to an aging of accounts, as well as management's expectations of conditions in the future, as applicable.

Three related party customers accounted for 63%, 12%, and 10% of the total balance of related party receivables as of December 31, 2024, and two related party customers accounted for 59% and 33% of the total accounts receivable and related party receivables as of December 31, 2023, respectively. The largest receivables balances are from related parties where the exposed credit risk is estimated to be low. As such, there is no allowance for doubtful accounts as of December 31, 2024, and 2023.

The Company purchases life insurance policies from various funds, directly from policy holders, or from Brokers or Agents representing policy holders (collectively "Seller" or "Sellers"). The Company purchased life insurance policies from two Sellers that accounted for 15% (related party) and 14% (related party) of the total policies purchased for the year ended December 31, 2024. The Company did not purchase policies from any Seller that accounted for 10% or greater of the policies purchased for the year ended December 31, 2023.

Three customers accounted for 22%, 18%, and 16% of active management revenue for the year ended December 31, 2024, respectively. Three customers accounted for 36% (related party), 22% (related party), and 10% of the portfolio servicing revenue for the year ended December 31, 2024. Three customers accounted for 49%, 14%, and 12% of active management revenue for the year ended December 31, 2023. One related party customer accounted for 78% of the portfolio servicing revenue for the year ended December 31, 2023.

The Company's reliance on a few customers can pose significant dangers, making the company vulnerable to revenue loss if those key customers leave or reduce their business.

**Warrants**—The Company accounts for warrants as either equity-classified or liability-classified instruments based on an assessment of the warrant's specific terms and applicable authoritative guidance in ASC 480, *Distinguishing Liabilities from Equity*, and ASC 815. The assessment considers whether the warrants are freestanding financial instruments pursuant to ASC 480, whether they meet the definition of a liability pursuant to ASC 480, and whether the warrants meet all of the requirements for equity classification under ASC 815, including whether the warrants are indexed to the Company's own common stock and whether the warrant holders could potentially require "net cash settlement" in a circumstance outside of the Company's control, among other conditions for equity classification. This assessment, which requires the use of professional judgment, is conducted at the time of warrant issuance and as of each subsequent quarterly period end date while the warrants are outstanding.

For issued or modified warrants that meet all of the criteria for equity classification, the warrants are required to be recorded as a component of equity at the time of issuance. For issued or modified warrants that do not meet all the criteria for equity classification, the warrants are required to be recorded as liabilities at their initial fair value on the date of issuance, and each balance sheet date thereafter. Changes in the estimated fair value of the warrants are recognized as a non-cash gain or loss on the consolidated statements of operations and comprehensive income.

**Stock-Based Compensation**—The Company accounts for stock-based compensation in accordance with ASC 718, *Compensation - Stock Compensation*, which requires that we measure the expense of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award. Generally, stock-based awards granted to our employees vest ratably over a three-year period. For stock-based awards with service only vesting conditions, the Company records compensation expense on a straight-line basis over the requisite service period. The Company accounts for forfeitures when they occur. The fair value of stock-based awards, granted or modified, is determined on the grant date (or modification dates, if applicable) at fair value, using appropriate valuation techniques. For stock-based awards granted to non-employee directors, the Company recognizes compensation expense on the grant date based on the fair value of the awards as of that date.

**Stock Options**—The Company awards stock options ("options") to purchase the Company's common stock at the market price of the stock on the grant date. Options generally vest over a period of three years and expire no later than ten years from the grant date. Fair value is estimated using the Black-Scholes option-pricing model by applying certain assumptions. That fair value is reduced when options are forfeited. The fair value of options, net of forfeitures, is recognized in general and administrative expenses on a straight-line basis over the vesting period.

**Leases**—The Company accounts for its leases in accordance with ASC 842, *Leases*. A contract is or contains a lease if there is identified property, plant and equipment that is either explicitly or implicitly specified in the contract and the lessee has the right to control the use of the property, plant and equipment throughout the contract term, which is based on an evaluation of whether the lessee has the right to direct the use of the property, plant and equipment.

The Company has a lease for office space in Orlando, Florida ("Orlando Lease") and another lease related to office space leased by Carlisle in Luxembourg ("Luxembourg Lease") that are accounted for as operating leases. The Company is responsible for utilities, maintenance, taxes and insurance, which are

variable payments based on a reimbursement to the lessor of the lessor's costs incurred. The Company excludes variable lease payments from the measurement of lease liabilities and right-of-use ("ROU") assets recognized on the Company's consolidated balance sheets. Variable lease payments are recognized as a lease expense on the Company's consolidated statements of operations and comprehensive income in the period incurred. The Company has elected the practical expedient to account for lease components and non-lease components together as a single lease component for its real estate lease noted above.

The Company has elected the short-term lease exemption, which permits the Company to not recognize a lease liability and ROU asset for leases with an original term of one year or less. Currently the Company does not have any short-term leases. The Company's current lease includes a renewal option. The Company has determined that the renewal option is not reasonably certain of exercise based on an evaluation of contract, market and asset-based factors, and therefore does not include periods covered by renewal options in its lease term. The Company's leases generally do not include purchase options, residual value guarantees, or material restrictive covenants.

The Company determines its lease liability and ROU by calculating the present value of future lease payments. The present value of future lease payments is discounted using the Company's incremental borrowing rate. As the Company's leases generally do not have a readily determinable implicit rate, the Company uses its incremental borrowing rate based on market yields and comparable credit ratings, adjusted for lease term, to determine the present value of fixed lease payments based on information available at the lease commencement date.

The Company does not have any finance leases, nor is the Company a lessor (or sub-lessor).

**Earnings Per Share**—The Company has only one class of common stock. Basic net income per share is calculated by dividing net income by the weighted average number of shares outstanding during the applicable period. If the number of shares outstanding increases as a result of a stock dividend or stock split or decreases as a result of a reverse stock split, the computations of basic net income per share are adjusted retroactively for all periods presented to reflect that change in capital structure. If such changes occur after the close of the reporting period but before issuance of the financial statements, the per-share computations for that period and any prior-period financial statements presented are based on the new number of shares. Diluted earnings per share is computed in the same manner as basic earnings per share, except that the number of shares is increased to assume the issuance of potentially dilutive shares using the treasury stock method, unless the effect of such increase would be anti-dilutive. Diluted earnings or loss per share attributable to common stockholders is calculated to give effect to all potentially dilutive common shares that were outstanding during the reporting period. The dilutive effect of outstanding stock-based compensation awards is reflected in diluted earnings per share attributable to common stockholders by application of the treasury stock method. Any potentially dilutive shares are excluded from the calculation for periods when there is a net loss attributable to common stockholders to avoid anti-dilutive effects.

**Treasury Stock**—The Company presents treasury stock is reflected as a reduction of stockholders' equity at cost. The Company elected to use the first in first out ("FIFO") purchase price to determine the cost of treasury stock that is reissued, if any. The Company uses method 1 to account for the retirement of treasury stock, if any. Under method 1, the Company allocates the excess of the repurchase price over the par value of the stock between additional paid in capital ("APIC") recorded at the time of the repurchase with the remainder posted to retained earnings or accumulated deficit.

**Business Combinations**—The Company accounts for business combinations under the acquisition method of accounting, in accordance with ASC 805, Business Combinations, ("ASC 805"), which requires assets acquired and liabilities assumed to be recognized at their fair values as of the acquisition date. Any fair value of purchase consideration in excess of the fair value of the assets acquired less liabilities assumed is recorded as goodwill. The fair values of the assets acquired and liabilities assumed are determined based

upon the valuation of the acquired business and involve management making significant estimates and assumptions.

**Foreign Currency and Comprehensive (Loss) Income**—For the period ended December 31, 2024, the Company's reporting currency was the U.S. dollar while the functional currency of the Company's significant non-U.S. subsidiaries was the Euro. The financial statements of the Company's significant non-U.S. subsidiaries were translated into United States dollars in accordance with ASC 830, Foreign Currency Matters, using period-end rates of exchange for assets and liabilities, and average rates of exchange for the period for revenues, costs and expenses and historical rates for equity. There were no material impacts related to translation adjustments on net loss. Effective as of January 1, 2025, the Company's reporting currency will remain the U.S. dollar and the functional currency of the Company's significant non-U.S. subsidiaries' will be changed from the Euro to the U.S. dollar. Accordingly, the Company will not have to translate the financial statements of its significant non-U.S. subsidiaries in future years and is not expected to have a material impact on net loss or income.

**Reclassifications**—Certain prior period amounts have been reclassified to conform to current presentation.

**New Accounting Standards**—The Company's management reviews recent accounting standards to determine the impact to the Company's financial statements. Below we discuss the impact of new Accounting Standards Updates Issued, "ASU", issued by the FASB to the Company's Consolidated Financial Statements.

In November 2023, the FASB issued ASU No. 2023-07, "Segment Reporting (ASC 280): Improvements to Reportable Segment Disclosures" ("ASU 2023-07"), which is intended to improve reportable segment disclosure requirements, primarily through enhanced disclosures about significant segment expenses. The guidance is effective for fiscal years beginning after December 15, 2023, and interim periods within fiscal years beginning after December 15, 2024. Early adoption is permitted. The guidance is to be applied retrospectively to all prior periods presented in the financial statements. Upon transition, the segment expense categories and amounts disclosed in the prior periods should be based on the significant segment expense categories identified and disclosed in the period of adoption. The Company adopted ASU 2023-07 in March 2024. The Company is now disclosing significant segment expenses that are regularly provided to the CODM. The Company's CODM periodically reviews cost of revenues by segment and treats it as a significant segment expense. Refer to Note 11 Segment Reporting for additional information.

In December 2023, the FASB issued ASU No. 2023-09, "Income Taxes (ASC 740): Improvements to Income Tax Disclosures" ("ASU 2023-09"), which modifies the rules on income tax disclosures to require entities to disclose (1) specific categories in the rate reconciliation, (2) the income or loss from continuing operations before income tax expense or benefit (separated between domestic and foreign) and (3) income tax expense or benefit from continuing operations (separated by federal, state and foreign). ASU 2023-09 also requires entities to disclose their income tax payments to international, federal, state and local jurisdictions, among other changes. The guidance is effective for annual periods beginning after December 15, 2024. Early adoption is permitted for annual financial statements that have not yet been issued or made available for issuance. ASU 2023-09 should be applied on a prospective basis, but retrospective application is permitted. We are currently evaluating the potential impact of adopting this new guidance on our consolidated financial statements and related disclosures.

In March 2024, the FASB issued ASU No. 2024-01, "Compensation—Stock Compensation (Topic 718): Scope Application of Profits Interest and Similar Awards" ("ASU 2024-01"), to add an illustrative example to demonstrate how an entity should apply the scope guidance in paragraph 718-10-15-3 to determine whether profits interest and similar awards ("profits interest awards") should be accounted for in accordance with Topic 718, *Compensation—Stock Compensation*. The amendments in this ASU are effective for annual periods beginning after December 15, 2024, and interim periods within those annual periods. Although early adoption of this ASU is permitted. The amendments in this ASU should be applied either (1) retrospectively to all prior periods presented in the financial statements or (2) prospectively to

profits interest and similar awards granted or modified on or after the date at which the entity first applies the amendments. If the amendments are applied retrospectively, an entity is required to provide the disclosures in paragraphs 250-10-50-1 through 50-3 in the period of adoption. If the amendments are applied prospectively, an entity is required to disclose the nature of and reason for the change in accounting principle. This ASU is not expected to have a significant impact to the Company's consolidated financial statements when adopted. The Company's management chose to not early adopt this ASU.

In March 2024, the FASB issued ASU No. 2024-02, "Codification Improvements—Amendments to Remove References to the Concepts Statements" ("ASU 2024-02"), to remove references to various FASB Concepts Statements. The Board has a standing project on its agenda to address suggestions received from stakeholders on the Accounting Standards Codification and other incremental improvements to GAAP. This effort facilitates Codification updates for technical corrections such as conforming amendments, clarifications to guidance, simplifications to wording or the structure of guidance, and other minor improvements. The amendments in this ASU are effective for annual periods beginning after December 15, 2024. Although early adoption of this ASU is permitted for any fiscal year or interim period for which financial statements have not yet been issued (or made available for issuance). The amendments in this ASU should be applied either (1) retrospectively to all prior periods presented in the financial statements or (2) prospectively to all new transactions recognized on or after the date that the entity first applies the amendments. This ASU is not expected to have a significant impact to the Company's consolidated financial statements when adopted. The Company's management chose to not early adopt this ASU.

In November 2024, the FASB issued ASU No. 2024-03, "Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses" ("ASU 2024-03"), to improve the disclosures about a public business entity's expenses and address requests from investors for more detailed information about the types of expenses (including purchases of inventory, employee compensation, depreciation, amortization, and depletion) in commonly presented expense captions (such as cost of sales, SG&A, and research and development). The amendments in this ASU are effective for annual periods beginning after December 15, 2026, and interim periods within fiscal years beginning after December 15, 2027. Early adoption is permitted. The amendments in this ASU should be applied either (1) prospectively to financial statements issued for reporting periods after the effective date of this Update or (2) retrospectively to any or all prior periods presented in the financial statements. This ASU is not expected to have a significant impact to the Company's consolidated financial statements when adopted. The Company's management chose to not early adopt this ASU.

In November 2024, the FASB issued ASU No. 2024-04, "Debt—Debt with Conversion and Other Options (Subtopic 470-20): Induced Conversions of Convertible Debt Instrument" ("ASU 2024-04"), to improve the improve the relevance and consistency in application of the induced conversion guidance in Subtopic 470-20, Debt—Debt with Conversion and Other Options. The amendments in this ASU are effective for annual periods beginning after December 15, 2025, and interim reporting periods within those annual reporting periods. Early adoption is permitted for all entities that have adopted the amendments in ASU 2020-06. The Company's management chose to not early adopt this ASU. The amendments in this ASU should be applied either (1) prospectively to financial statements issued for reporting periods after the effective date of this Update or (2) retrospectively to any or all prior periods presented in the financial statements. This ASU is not expected to have an impact to the Company's consolidated financial statements when adopted. The Company's management chose to not early adopt this ASU.

In January 2025, the FASB issued ASU No. 2025-01, "Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Clarifying the Effective Date" ("ASU 2025-01"), to clarify the effective date of ASU 2024-03. The amendment in this ASU amends the effective date of ASU 2024-03 to clarify that all public business entities are required to adopt the guidance in annual reporting periods beginning after December 15, 2026, and interim periods within annual reporting periods beginning after December 15, 2027. Early adoption of ASU 2024-03 is permitted. The amendment in this ASU applies to all public business entities but only potentially affects non-calendar year-end entities. This

ASU is not expected to have a significant impact to the Company's consolidated financial statements when adopted. The Company's management chose to not early adopt this ASU.

## 3. BUSINESS COMBINATIONS

### Carlisle Acquisition

On July 18, 2024, the Company entered into a share purchase agreement to acquire 100% of Carlisle Management Company S.C.A., a corporate partnership limited by shares established under the laws of Luxembourg ("CMC"), Carlisle Investment Group S.A.R.L., a private limited liability company incorporated under the laws of Luxembourg ("CIG," and together with CMC, "Carlisle"), a leading Luxembourg-based investment manager in the life settlement space to incorporate into the Company's asset management strategy ("Carlisle Acquisition"). The transaction closed on December 2, 2024 ("Carlisle Acquisition Date"). The aggregate Company Fixed Rate Senior Unsecured Notes and Company common stock issued as consideration by the Company at close was approximately $72.7 million and $73.0 million (equivalent to approximately 9.2 million of Company shares issued), respectively. Cash acquired amounted to $3.3 million. No cash consideration was paid as part of the Carlisle acquisition. The Company recognized approximately $8.1 million of acquisition-related costs recorded within general and administrative expenses in the consolidated statements of operations and comprehensive (loss) income. The Company also recognized approximately $1.3 million and $2.0 million in costs associated with issuing and registering the bonds and shares issued as consideration in the business combination, which were recorded as deferred financings costs within long-term debt, net, and a deduction to additional paid-in capital in the consolidated balance sheets, respectively.

The Carlisle Acquisition was accounted for as a business combination in accordance with ASC 805, which requires the Company to record the assets acquired and liabilities assumed at fair value as of the acquisition date. The values attributed to intangible assets were based on valuations prepared using Level 3 inputs and assumptions in accordance with ASC Topic 820 "Fair Value Measurements" ("ASC 820").

Goodwill is calculated as total consideration transferred, net of cash acquired, less identified net assets acquired, and was assigned to the Asset Management reportable segment. It represents the value that we expect to obtain from growth opportunities from our combined operations and is deductible for U.S. tax purposes when electing Section 338(g) of the U.S. Internal Revenue Code ("IRC").

The Company finalized the valuations related to the acquired assets and liabilities of Carlisle, except for the valuation of certain intangible assets and related impact on deferred income taxes. Accordingly, these estimates are subject to change during the measurement period, which is up to one year from the Carlisle Acquisition Date, as permitted under GAAP. Any potential adjustments could be material in relation to the values presented in the table below.

The following table presents the fair value of the assets acquired and the liabilities assumed in connection with the business combination.

| **Net Assets Identified** | | **Fair Value** |
|---|---|---|
| Intangibles | $ | 51,700,000 |
| Current Assets | | 9,570,953 |
| Management and performance fee receivable, related party | | 13,914,055 |
| Non-Current Assets | | 4,080,820 |
| Deferred Tax Liabilities | | (12,893,980) |
| Accrued Expenses | | (6,325,921) |
| Other Liabilities | | (8,091,962) |
| Net assets acquired | $ | 51,953,965 |

| Net Assets Identified | | Fair Value |
|---|---|---|
| Goodwill | | 93,745,891 |
| **Total purchase price** | $ | 145,699,856 |

Intangible assets were comprised of the following:

| Asset Type | | Fair Value | Useful Life | Valuation Methodology |
|---|---|---|---|---|
| Management agreements | $ | 47,400,000 | 3 - 8 years | Multi-period excess earnings method |
| Trade Name | | 2,000,000 | 10 years | Relief from royalty method |
| Non-Compete Agreements | | 2,300,000 | 3 years | With and without method |
| **Total Fair Value** | $ | 51,700,000 | | |

The supplemental pro forma financial information in the table below summarizes the combined results of operations for the Business Combination as if the Companies were combined for both reporting periods. The unaudited supplemental pro forma financial information as presented below is for illustrative purposes and does not purport to represent what the results of operations would actually have been if the business combinations occurred as of the date indicated or what the results would be for any future periods. There were no acquisition-related costs or related intangible amortization included in the unaudited pro forma results below.

| | Unaudited Years Ended December 31, | | | |
|---|---|---|---|---|
| | | 2024 | | 2023 |
| Proforma revenue | $ | 137,226,971 | $ | 111,356,730 |
| Proforma net (loss) income | | (11,307,693) | | 13,737,762 |

**Abacus Settlements Acquisition**

On June 30, 2023, LMA acquired Abacus Settlements through the Abacus Settlements Merger, which was accounted for using the acquisition method of accounting based on a business enterprise value of approximately $165.4 million.

The preliminary purchase price was allocated among the identified net assets to be acquired. On June 30, 2023, the primary area of the acquisition accounting that was not yet finalized was our estimate of the impact of acquisition accounting on deferred income taxes. On June 30, 2024, we finalized our acquisition accounting related to deferred income taxes.

All valuation procedures were related to existing assets at the time of the acquisition as no new assets were identified as a result of procedures performed. Goodwill was recognized as a result of the acquisition, which represents the excess fair value of consideration over the fair value of the underlying net assets, largely arising from the extensive industry expertise that has been established by Abacus Settlements. This was considered appropriate based on the determination that the Abacus Settlements Merger would be accounted for as a business acquisition under ASC 805. The allocation of the purchase price for Abacus Settlements Merger was as follows as finalized on June 30, 2024:

| Net Assets Identified | Fair Value | Adjustments | Adjusted Fair Value (as finalized on June 30, 2024) |
|---|---|---|---|
| Intangibles | $ 32,900,000 | $ — | $ 32,900,000 |
| Current Assets | 1,280,100 | — | 1,280,100 |
| Non-Current Assets | 901,337 | — | 901,337 |
| Deferred Tax Liabilities | (8,310,966) | 356,810 | (7,954,156) |
| Accrued Expenses | (524,400) | — | (524,400) |
| Other Liabilities | (1,171,739) | — | (1,171,739) |
| Net assets acquired | 25,074,332 | 356,810 | 25,431,142 |
| Goodwill | 140,287,000 | (356,810) | 139,930,190 |
| **Total purchase price** | $ 165,361,332 | $ — | $ 165,361,332 |

Intangible assets were comprised of the following:

| Asset Type | Fair Value | Useful Life | Valuation Methodology |
|---|---|---|---|
| Customer Relationships-Agents | $ 12,600,000 | 5 years | Multi-period excess earnings method |
| Customer Relationships-Financing Entities | 11,000,000 | 8 years | Multi-period excess earnings method |
| Internally Developed and Used Technology-APA | 1,600,000 | 2 years | Relief from royalty method |
| Internally Developed and Used Technology-Marketplace | 100,000 | 3 years | Replacement cost method |
| Trade Name | 900,000 | Indefinite | Relief from royalty method |
| Non-Compete Agreements | 4,000,000 | 2 years | With and without method |
| State Insurance Licenses | 2,700,000 | Indefinite | Replacement cost method |
| **Total Fair Value** | $ 32,900,000 | | |

The supplemental pro forma financial information in the table below summarizes the combined results of operations for the Business Combination as if the Companies were combined for both reporting periods. The unaudited supplemental pro forma financial information as presented below is for illustrative purposes and does not purport to represent what the results of operations would actually have been if the business combinations occurred as of the date indicated or what the results would be for any future periods.

| | Unaudited Year Ended December 31, 2023 |
|---|---|
| Proforma revenue | $ 79,588,733 |
| Proforma net income available to to common stockholders | 8,541,727 |

**FCF Acquisition**

On August 7, 2024, the Company entered into a definitive agreement to acquire 100% of FCF Advisors, LLC (“FCF”), a New York based asset manager and index provider specializing in free cash flow-focused investment strategies to incorporate into the Company’s asset management strategy (“FCF Acquisition”). The transaction closed on December 2, 2024 (“FCF Acquisition Date”). The aggregate cash paid and Company common stock issued by the Company at close was approximately $10.3 million, net of cash acquired. The fair value of the shares issued as part of the business combination was $4.6 million (equivalent to approximately 0.6 million of Company shares issued).

The Company recognized approximately $0.3 million of acquisition-related costs recorded within general and administrative expenses in the consolidated statements of operations and comprehensive (loss) income.

The FCF Acquisition was accounted for as a business combination in accordance with ASC 805, which requires the Company to record the assets acquired and liabilities assumed at fair value as of the acquisition date. The values attributed to intangible assets were based on valuations prepared using Level 3 inputs and assumptions in accordance with ASC Topic 820 "Fair Value Measurements" ("ASC 820").

Goodwill is calculated as total consideration transferred, net of cash acquired, less identified net assets acquired, and was assigned to the Asset Management reportable segment. It represents the value that we expect to obtain from growth opportunities from our combined operations and is deductible for tax purposes.

The Company finalized the valuations related to the acquired assets and liabilities of FCF, except for the valuation of certain intangible assets and deferred income taxes. Accordingly, these estimates are subject to change during the measurement period, which is up to one year from the FCF Acquisition Date, as permitted under GAAP. Any potential adjustments could be material in relation to the values presented in the table below.

The following table presents the fair value of the assets acquired and the liabilities assumed in connection with the business combination.

| **Net Assets Identified** | | **Fair Value** |
|---|---|---|
| Intangibles | $ | 5,300,000 |
| Current Assets | | 575,212 |
| Deferred Tax Liabilities | | (116,313) |
| Accrued Expenses | | (225,515) |
| Net assets acquired | $ | 5,533,384 |
| Goodwill | | 4,620,119 |
| **Total purchase price** | $ | 10,153,503 |

Intangible assets were comprised of the following:

| **Asset Type** | | **Fair Value** | **Useful Life** | **Valuation Methodology** |
|---|---|---|---|---|
| Customer Relationships - Investment Advisory Agreements | $ | 3,800,000 | 3 years | Multi-period excess earnings method |
| Non-Compete Agreements | | 1,100,000 | 1 year | With and without method |
| Internally Developed and Used Technology | | 400,000 | 3 years | Relief from royalty method |
| **Total Fair Value** | $ | 5,300,000 | | |

## 4. REVENUES

**Disaggregated Revenue—**The disaggregation of the Company's revenue by major sources is as follows:

| | **For the Year Ended December 31,** | |
|---|---|---|
| | **2024** | **2023** |
| **Asset management:** | | |
| Related party asset management fees | 2,420,239 | — |

| | For the Year Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Asset management fees | 421,242 | — |
| Total asset management fees | 2,841,481 | — |
| **Active management:** | | |
| Realized and unrealized gains from life insurance policies held using the fair value method | $ 85,048,829 | $ 43,214,390 |
| Fee-based services | 13,881,208 | — |
| Related party realized gains from life insurance policies held using the fair value method | 3,312,202 | — |
| Investment income from life insurance policies held using the investment method | 577,122 | 17,980,987 |
| Total active management revenue | 102,819,361 | 61,195,377 |
| **Origination fees:** | | |
| Broker | 2,747,224 | 1,787,832 |
| Agent | 2,325,702 | 1,737,221 |
| Client direct | 384,221 | 183,875 |
| Total origination fees | 5,457,147 | 3,708,928 |
| Related party origination fees: | | |
| Broker | — | 203,034 |
| Client direct | — | 176,243 |
| Agent | — | 115,695 |
| Total related party origination fees | — | 494,972 |
| **Portfolio servicing:** | | |
| Related party portfolio serving fees | 471,094 | 778,678 |
| Portfolio servicing fees | 301,075 | 223,496 |
| Total portfolio servicing fees | 772,169 | 1,002,174 |
| **Technology services** | 33,628 | — |
| Total revenue | $ 111,923,786 | $ 66,401,451 |

**Asset Management Balances**—The Company has the following asset management related balances:

| Balance Sheet Account | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Management and Performance Fee Receivables:** | | |
| Accounts receivable, related party | $ 6,772,073 | $ — |
| Management and performance fee receivable, related party | 13,379,301 | — |
| Total management and performance fee receivables | $ 20,151,374 | $ — |
| **Retrocession Fee Payable:** | | |
| Other current liabilities | $ 3,216,639 | $ — |

| Balance Sheet Account | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Retrocession fees payable | 5,312,214 | — |
| Total retrocession fee payable | $ 8,528,853 | $ — |

**Originations Contract Balances**—We had no contract assets at December 31, 2024 and 2023. The balances of contract liabilities arising from originated contracts with customers were as follows:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Contract liabilities, deposits on pending settlements | $ 2,473,543 | $ 507,000 |
| Total contract liabilities | $ 2,473,543 | $ 507,000 |

Revenue recognized during the first quarter of 2024 that was included in our contract liabilities balance at December 31, 2023 was $507,000, less $347,000 intercompany revenue that was eliminated in consolidation.

5. **LIFE SETTLEMENT POLICIES**

As of December 31, 2024, the Company holds 719 life settlement policies, of which 714 are accounted for under the fair value method and 5 are accounted for using the investment method (cost, plus premiums paid). Aggregate face value of policies held at fair value is $1,295,788,355 as of December 31, 2024, with a corresponding fair value of $370,398,447. The aggregate face value of policies accounted for using the investment method is $2,225,000 as of December 31, 2024, with a corresponding carrying value of $1,083,977. Differences between the face value and the net death benefit of certain policies is due to return of premium policies offset by loans on policies and retained death benefit by insureds.

As of December 31, 2023, the Company held 296 life settlement policies, of which 287 were accounted for under the fair value method and 9 were accounted for using the investment method (cost, plus premiums paid). Aggregate face value of policies held at fair value was $520,503,710 as of December 31, 2023, with a corresponding fair value of $122,296,559. The aggregate face value of policies accounted for using the investment method was $33,900,000 as of December 31, 2023, with a corresponding carrying value of $1,697,178.

At December 31, 2024, the Company did not have any contractual restrictions on its ability to sell policies, including those held as collateral for the issuance of long-term debt. Refer to Note 14 Long-Term Debt for further details.

Life expectancy reflects the probable number of years remaining in the life of a class of persons determined statistically, affected by such factors as heredity, physical condition, nutrition, and occupation. It is not an estimate or an indication of the actual expected maturity date or indication of the timing of expected cash flows from death benefits. The following tables summarize the Company's life insurance policies grouped by remaining life expectancy as of December 31, 2024:

**Policies Carried at Fair Value**—

| Remaining Life Expectancy (Years) | Policies | Face Value | Net Death Benefit | Fair Value |
|---|---|---|---|---|
| 0-1 | 8 | $ 8,200,000 | $ 8,200,000 | $ 6,415,589 |
| 1-2 | 21 | 24,726,449 | 24,728,852 | 16,167,043 |
| 2-3 | 58 | 89,623,722 | 84,066,291 | 50,294,452 |
| 3-4 | 81 | 151,798,792 | 149,547,429 | 70,654,605 |
| 4-5 | 68 | 124,251,322 | 124,954,767 | 49,505,201 |

| | | | | |
|---|---|---|---|---|
| Thereafter | 478 | 897,188,070 | 882,997,005 | 177,361,557 |
| | 714 | $ 1,295,788,355 | $ 1,274,494,344 | $ 370,398,447 |

**Policies accounted for using the investment method—**

| Remaining Life Expectancy (Years) | Policies | Face Value | Net Death Benefit | Carrying Value |
|---|---|---|---|---|
| 4-5 | 1 | $ 750,000 | $ 750,000 | $ 405,331 |
| Thereafter | 4 | 1,475,000 | 1,499,207 | 678,646 |
| | 5 | $ 2,225,000 | $ 2,249,207 | $ 1,083,977 |

Estimated premiums to be paid by the Company for its portfolio accounted for using the investment method during each of the five succeeding calendar years and thereafter as of December 31, 2024, are as follows:

| | |
|---|---|
| 2025 | $ 38,078 |
| 2026 | 55,123 |
| 2027 | 56,213 |
| 2028 | 29,756 |
| 2029 | 6,337 |
| Thereafter | 8,394 |
| Total | $ 193,901 |

The Company is required to pay premiums to keep its portion of life insurance policies in force. The estimated total future premium payments could increase or decrease significantly to the extent that actual mortalities of insureds differ from the estimated life expectancies.

For policies accounted for under the investment method, the Company has not been made aware of information causing a material change to assumptions relating to the timing of realization of life insurance settlement proceeds. The Company have also not been made aware of information indicating impairment to the carrying value of policies.

## 6. PROPERTY AND EQUIPMENT—NET

Property and equipment—net composed of the following:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Computer equipment | $ 1,127,188 | 356,939 |
| Furniture and fixtures | 91,125 | 91,125 |
| Leasehold improvements | 38,405 | 22,418 |
| Property and equipment—gross | 1,256,718 | 470,482 |
| Less: accumulated depreciation | (231,652) | (69,762) |
| Property and equipment—net | $ 1,025,066 | $ 400,720 |

Depreciation expense for the years ended December 31, 2024, and 2023, was $161,890 and $63,033, respectively.

## 7. GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill of $238,296,200 was recognized as a result of the Abacus Settlements, Carlisle, and FCF acquisitions, which represents the excess fair value of consideration over the fair value of the underlying net assets of the acquired businesses. The estimates of fair value are based upon preliminary valuation

assumptions believed to be reasonable, but which are inherently uncertain and unpredictable. Refer to Note 3 Business Combinations for further information.

The changes in the carrying amount of goodwill by reportable segments were as follows:

| Reportable Segment | December 31, 2023 | Additions | Adjustments | December 31, 2024 |
|---|---|---|---|---|
| Portfolio Servicing | $ — | $ — | $ — | $ — |
| Active Management | — | — | — | — |
| Originations | 140,287,000 | — | (356,810) | 139,930,190 |
| Asset Management | — | 98,366,010 | — | 98,366,010 |
| Technology Services | — | — | — | — |
| Total | $ 140,287,000 | $ 98,366,010 | $ (356,810) | $ 238,296,200 |

Intangible Assets Acquired comprised of the following:

| Asset Type | Fair Value | Useful Life | Valuation Methodology |
|---|---|---|---|
| Management agreements | $ 47,400,000 | 4 - 8 years | Multi-period excess-earnings method |
| Customer relationships | 27,400,000 | 3 - 8 years | Multi-period excess-earnings method |
| Non-compete agreements | 7,400,000 | 1 - 3 years | With or Without Method |
| Internally developed and used technology | 2,100,000 | 2 - 3 years | Replacement Cost Method |
| Trade Name | 2,000,000 | 10 years | Relief from Royalty Method |
| State Insurance Licenses | 2,700,000 | Indefinite | Replacement Cost Method |
| Trade Name | 900,000 | Indefinite | Relief from Royalty Method |
| | $ 89,900,000 | | |

Intangible assets and related accumulated amortization as of December 31, 2024 are as follows:

| | December 31, 2024 | | |
|---|---|---|---|
| | Gross Value | Accumulated Amortization | Net Book Value |
| **Definite Lived Intangible Assets:** | | | |
| Management agreements | $ 47,400,000 | $ 694,800 | $ 46,705,200 |
| Customer relationships | 27,400,000 | 5,948,056 | 21,451,944 |
| Non-compete agreements | 7,400,000 | 3,155,556 | 4,244,444 |
| Internally developed and used technology | 2,100,000 | 1,261,111 | 838,889 |
| Trade Name | 2,000,000 | 16,667 | 1,983,333 |
| | $ 86,300,000 | $ 11,076,190 | $ 75,223,810 |
| **Indefinite Lived Intangible Assets:** | | | |
| State Insurance Licenses | 2,700,000 | — | 2,700,000 |
| Trade Name | 900,000 | — | 900,000 |
| **Total** | $ 89,900,000 | $ 11,076,190 | $ 78,823,810 |

Substantially all intangible assets with finite useful lives were acquired as part of the Abacus Settlements, Carlisle, and FCF acquisitions and are amortized on a straight-line basis over their estimated useful lives. Amortization expense for definite lived intangible assets was $7,712,023 and $3,364,177 for the years ended December 31, 2024 and 2023, respectively. All indefinite-lived intangibles are related to our Originations reportable segment. The Company performed an annual impairment test of indefinite-lived intangible assets during the fourth quarters of 2024 and 2023, and impairment charges were recorded.

Estimated annual amortization of intangible assets for the next five years ending December 31 and thereafter is as follows:

| | | |
|---|---|---|
| 2025 | $ | 17,040,952 |
| 2026 | | 14,615,953 |
| 2027 | | 14,418,730 |
| 2028 | | 10,974,703 |
| 2029 | | 7,384,286 |

The Company also has other insignificant intangible assets of $962,983 as of December 31, 2024.

The Company performed the annual goodwill impairment test as of October 1, 2024, which was a qualitative evaluation, and no impairment charges were recorded. The estimated fair value of the Originations reporting unit exceeded its carrying value at the date of its most recent fair value estimate. On December 2, 2024, we acquired two asset management companies. See Note 3, Business Combinations for additional information. We performed a qualitative impairment assessment for the Asset Management reporting unit during December 2024. Our qualitative impairment assessment indicated that it was more likely than not that the fair value of our Asset Management reporting unit exceeded its carrying value and, therefore, did not result in an impairment.

## 8. AVAILABLE-FOR-SALE SECURITIES, AT FAIR VALUE

**Convertible Promissory Note**—The Company holds investments in convertible promissory notes in two separate unrelated entities, “Convertible Promissory Notes”. The value of the combined investment in these two entities was $2,205,904 and $1,105,935 as of December 31, 2024 and 2023, respectively. Each investment is worth $1,000,000 bearing an annual interest rate ranging between 5% and 8% maturing between September 30, 2025 and October 15, 2028. For one of the entities we have a commitment to invest an additional $2,000,000 during 2025.

The Company applies the available-for-sale method of accounting for its investments in the Convertible Promissory Notes, which are debt investments. The Convertible Promissory Notes do not qualify for either the held-to-maturity method due to the Convertible Promissory Note’s conversion rights or the trading securities method because the Company holds the Convertible Promissory Notes as long-term investments. The Convertible Promissory Notes are measured at fair value at each reporting period-end. Unrealized gains and losses are reported in other comprehensive income until realized. As of December 31, 2024 and 2023, the Company evaluated the fair value of its investments and determined that the fair value approximates the carrying value of $2,205,904 and $1,105,935, which included $205,904 and $105,935 of non-cash interest income, respectively. There was no unrealized gain or loss recorded. Non-cash interest income recognized for the for the years ended December 31, 2024 and 2023 was $99,969 and $105,935, respectively.

## 9. OTHER INVESTMENTS AND OTHER NONCURRENT ASSETS

**Other Investments:**

**Convertible Preferred Stock Ownership**—The Company owns convertible preferred stock in two unrelated entities. The value of the combined investment in these two entities was $1,850,000 and $1,650,000 as of December 31, 2024 and 2023, respectively.

The Company applies the measurement alternative for its investments in preferred stock because these investments are of an equity nature, and the Company does not have the ability to exercise significant influence over operating and financial policies of entities even in the event of conversion of the Seed Units or Preferred Stock. Under the measurement alternative, the Company records the investment based on original cost, less impairments, if any, plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the investee. The Company's share of income or loss of such companies is not included in the Company's consolidated statements of operations and comprehensive income. The Company tests its investments for impairment whenever circumstances indicate that the carrying value of the investment may not be recoverable. No impairment of investments occurred for the years ended December 31, 2024 and 2023.

**Other Assets**—The Company's other assets are mainly composed of cash deposits in compliance requirements in various states. As of December 31, 2024 and 2023, the balance of other assets was $1,851,845 and $998,945, respectively.

**Equity Securities,- at Fair Value:**

**S&P Options**—The Company invested in S&P 500 call options, which were purchased through a broker as an economic hedge related to the market-indexed debt instruments. The value is based on stock owned and quoted market prices in active markets. Changes in fair value are recorded in the unrealized gain on investments line item on the consolidated statements of operations and comprehensive (loss) income until they are sold. As of December 31, 2024, and 2023, the value of the S&P 500 options was $— and $2,348,998, respectively, recorded in the following accounts on the consolidated balance sheets:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Current assets: | | |
| Equity securities, at fair value | $ — | $ 2,252,891 |
| Non-current assets: | | |
| Equity securities, at fair value | — | 96,107 |
| Total equity securities, at fair value | $ — | $ 2,348,998 |

## 10. CONSOLIDATION OF VARIABLE INTEREST ENTITIES

The Company consolidates VIEs for which it is the primary beneficiary or VOEs for which it controls through a majority voting interest or other arrangement. Refer to Note 2 Summary of Significant Accounting Policies for more information on how the Company evaluates an entity for consolidation.

The Company evaluated any entity in which it had a variable interest upon formation to determine whether the entity should be consolidated. The Company also evaluated the consolidation conclusion during each reconsideration event, such as changes in the governing documents or additional equity contributions to the entity. During the year ended December 31, 2024, the Company's consolidated VIEs, LMA Income Series II LP, LMX Series LLC (LMATT Series 2024, Inc.), and LMA Income Series, LP, had total assets of $169,322,167 and liabilities of $143,200,287. For the year ended December 31, 2023, the Company's consolidated VIEs, LMA Income Series II LP, LMX Series LLC (LMATT Series 2024, Inc.), and LMA Income Series, LP, had total assets and liabilities of $77,132,592 and $65,031,207, respectively. The Company did not deconsolidate any entities during the years ended December 31, 2024, or 2023.

As of December 31, 2024, the Company held total assets of $615,648 and liabilities of $47,006 in unconsolidated VIEs. As of December 31, 2023, the Company held total assets of $601,762 and liabilities of $2,900 in unconsolidated VIEs.

## 11. SEGMENT REPORTING

**Segment Information**—The Company organizes its business into five reportable segments (1) Active Management, (2) Originations, (3) Asset Management, (4) Portfolio Servicing, and (5) Technology Services, which all generate revenue and incur expenses in different manners.

This segment structure reflects the financial information and reports used by the Company's management, specifically its chief operating decision maker (CODM), to make decisions regarding the Company's business, including resource allocations and performance assessments, as well as the current operating focus in compliance with ASC 280, *Segment Reporting*. The Company's CODM is the President and Chief Executive Officer. The Company's reportable segments are not aggregated.

The Active Management segment generates revenues by buying, selling, and trading policies and maintaining policies until receipt of death benefits.

The Originations segment generates revenue by originating life insurance policy settlements between investors or buyers, and the sellers, who is often the original policy owner. The policies are purchased from owners or other providers through advisors, brokers or directly through the owner.

The Asset Management segment generates revenues by providing asset management services to investors investing in alternative investment and equity portfolio funds based on fund investment agreements.

The Portfolio Servicing segment generates revenues by providing policy services to customers on a contract basis.

The Technology Services segment generates revenues by providing real-time mortality verification, missing participant verification, and other services specific to the life insurance market services to customers on a contract basis.

The Company's method for measuring profitability on a reportable segment basis is gross profit. The CODM does not review disaggregated assets by segment. The Company adopted ASU 2023-07 in March 2024. The most significant provision was for the Company to disclose significant segment expenses that are regularly provided to the CODM. The Company's CODM periodically reviews cost of revenues by segment and treats it as a significant segment expense.

Revenue related to the Company's reporting segments is as follows:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Asset management | $ 2,841,481 | $ — |
| Active management | 102,819,361 | 61,195,377 |
| Originations | 24,823,130 | 19,247,972 |
| Portfolio servicing | 772,169 | 1,002,174 |
| Technology services | 33,628 | — |
| Revenue (including intersegment) | 131,289,769 | 81,445,523 |
| Intersegment elimination | (19,365,983) | (15,044,072) |
| Total revenue | $ 111,923,786 | $ 66,401,451 |

Cost of revenue related to the Company's reportable segments is as follows:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Asset management | $ 288,599 | $ — |
| Active management | 3,869,415 | 2,174,386 |
| Originations | 16,950,640 | 11,303,244 |
| Portfolio servicing | 1,608,220 | 724,059 |
| Technology services | 232,992 | — |
| Cost of revenue (including intersegment) | 22,949,866 | 14,201,689 |
| Intersegment elimination | (11,578,133) | (7,711,312) |
| Total cost of revenue | $ 11,371,733 | $ 6,490,377 |

Gross profit related to the Company's reportable segments and the reconciliation of the total gross profit to net income (loss) attributable to common stockholders is as follows:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Asset management | $ 2,552,882 | $ — |
| Active management | 98,949,946 | 59,020,991 |
| Originations | 7,872,490 | 7,944,728 |
| Portfolio servicing | (836,051) | 278,115 |
| Technology services | (199,364) | — |
| Gross profit (including intersegment) | 108,339,903 | 67,243,834 |
| Intersegment elimination | (7,787,850) | (7,332,760) |
| Total gross profit | 100,552,053 | 59,911,074 |
| | | |
| Sales and marketing | (9,063,384) | (4,905,747) |
| General, administrative and other (including stock-based compensation) | (81,734,518) | (26,482,571) |
| Depreciation and amortization expense | (7,910,158) | (3,409,928) |
| Other (expense) income | 38,040 | (146,443) |
| Loss on change in fair value of warrant liability | (2,702,040) | (4,204,360) |
| Interest expense | (18,279,686) | (9,866,821) |
| Interest income | 2,398,691 | 594,764 |
| Loss on change in fair value of debt | (4,835,351) | (2,356,058) |
| Unrealized (loss) gain on investments | (238,012) | 1,369,112 |
| Realized gain on investments | 2,341,066 | — |
| Provision for income taxes | (5,484,738) | (1,468,535) |
| LESS: NET LOSS ATTRIBUTABLE TO NONCONTROLLING INTEREST | 956,987 | 482,139 |
| NET (LOSS) INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS | $ (23,961,050) | $ 9,516,626 |

Segment gross profit is defined as revenues less cost of revenue, excluding depreciation and amortization. Expenses below the gross profit line are not allocated across operating segments, as they relate primarily to the overall management of the consolidated entity.

As of December 31, 2024 and 2023, our operations are mostly confined to the United States.

## 12. COMMITMENTS AND CONTINGENCIES

**Legal Proceedings**—Occasionally, the Company may be subject to various proceedings such as lawsuits, disputes, or claims. The Company assesses these proceedings as they arise and accrues a liability when

losses are probable and reasonably estimable. Although legal proceedings are inherently unpredictable, the Company is currently not aware of any matters that, if determined adversely to the Company, would individually, or taken together, have a material adverse effect on the Company's business, financial position, results of operations, or cash flows.

**Available-For-Sale Securities, at Fair Value**—Please refer to Note 8 Available-For-Sale Securities, at Fair Value for an additional commitment to purchase $2,000,000 in convertible promissory notes from one investee.

**Commitment**—The Company has entered into a Strategic Services and Expenses Support Agreement ("SSES" or "Expense Support Agreement") with the Providers in exchange for an option to purchase the outstanding equity ownership of the Providers. Pursuant to the Expense Support Agreement, the Company provides financial support and advice for the expenses of the Providers incurred in connection with their life settlement transactions businesses and the Providers are required to hire a life settlement transactions operations employee of an affiliate of the Company. No later than December 1 of each calendar year, the Company obtains a budget for the Providers, in which the Company commits to extend financial support for all operating expenses up to the budgeted amount. "Operating Expenses" for purposes of the Expense Support Agreement means all annual operating expenses of the Providers incurred in the ordinary course of business, excluding the premiums paid for the Providers insurance coverages that are allocable to the insurance coverage provided to the Providers, which owns all the outstanding membership interests of the Providers if unrelated to the Providers settlement business.

For the years ended December 31, 2024, and 2023, the Company incurred $172,136, and $144,721 of expenses, related to the Expense Support Agreement respectively, which is included in the Other income (expense) line of the consolidated statements of operations and comprehensive income and have not been reimbursed by the Providers.

## 13. FAIR VALUE MEASUREMENTS

The Company determines fair value based on assumptions that market participants would use in pricing an asset or a liability in the principal or most advantageous market. When considering market participant assumptions in fair value measurements, the following fair value hierarchy distinguishes between observable and unobservable inputs.

- Level 1 inputs: Unadjusted quoted prices in active markets for identical assets or liabilities accessible to the reporting entity at the measurement date.

- Level 2 inputs: Other than quoted prices in Level 1 inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the asset or liability.

- Level 3 inputs: Unobservable inputs for the asset or liability used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date.

**Recurring Fair Value Measurements**—The assets and liabilities measured at estimated fair value on a recurring basis and their corresponding placement in the fair value hierarchy are presented in the tables below.

| | Fair Value Hierarchy | | | |
|---|---|---|---|---|
| **As of December 31, 2024** | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Assets: | | | | |
| Life settlement policies, at fair value | $ — | $ — | $ 370,398,447 | $ 370,398,447 |
| Available-for-sale securities, at fair value | — | — | 2,205,904 | 2,205,904 |
| Total assets held at fair value | $ - | $ — | $ 372,604,351 | $ 372,604,351 |
| Liabilities: | | | | |
| Current portion of long-term debt, at fair value | $ — | $ — | $ 37,430,336 | $ 37,430,336 |
| Long-term debt, at fair value, net | — | — | 105,120,100 | 105,120,100 |
| Private placement warrants | — | — | 9,345,000 | 9,345,000 |
| Total liabilities held at fair value: | $ — | $ — | $ 151,895,436 | $ 151,895,436 |

| | Fair Value Hierarchy | | | |
|---|---|---|---|---|
| **As of December 31, 2023** | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Assets: | | | | |
| Life settlement policies, at fair value | $ — | $ — | $ 122,296,559 | $ 122,296,559 |
| Available-for-sale securities, at fair value | — | — | 1,105,935 | 1,105,935 |
| Equity securities, at fair value | 2,348,998 | — | — | 2,348,998 |
| Total assets held at fair value | $ 2,348,998 | $ — | $ 123,402,494 | $ 125,751,492 |
| Liabilities: | | | | |
| Current portion of long-term debt, at fair value | $ — | $ — | $ 13,029,632 | $ 13,029,632 |
| Long-term debt, at fair value, net | $ — | $ — | $ 55,318,923 | $ 55,318,923 |
| Private placement warrants | $ — | $ — | $ 6,642,960 | $ 6,642,960 |
| Total liabilities held at fair value: | $ — | $ — | $ 74,991,515 | $ 74,991,515 |

**Life Settlement Policies—**For all policies purchased after June 30, 2023, the Company accounts for owned life settlement policies using the fair value method. Prior to June 30, 2023, the Company elected to use either the fair value method or the investment method (cost, plus premiums paid). The valuation method is chosen upon contract acquisition and is irrevocable.

For policies carried at fair value, the valuation based on Level 3 inputs that reflect our assumptions about what factors market participants would use in pricing the asset or liability, such as life expectancies and cash flow discount rates. The inputs are developed based on the best available information, including our own data. The valuation model is based on a discounted cash flow analysis and is sensitive to changes in the discount rate used. The Company utilized a blended average discount rate of 20% for policy valuations at December 31, 2024 and 21% for all policies at December 31, 2023, respectively, for policy valuation, which is based on economic and company-specific factors. The Company re-evaluates its discount rates at the end of every reporting period in order to reflect the estimated discount rates that could reasonably be used in a market transaction involving the Company's portfolio of life settlements.

For life settlement policies carried using the investment method, the Company measures these at the cost of the policy plus premiums paid. The policies accounted for using the investment method totaled $1,083,977 at December 31, 2024 and $1,697,178 at December 31, 2023.

**Discount Rate Sensitivity**—20% was determined to be the weighted average discount rate used to estimate the fair value of policies held by LMA and its investment funds. If the discount rate increased or

decreased by two percentage points and the other assumptions used to estimate fair value remained the same, the change in estimated fair value as of December 31, 2024, would be as follows:

| **As of December 31, 2024**<br>**Rate Adjustment** | **Fair Value** | **Change in Fair Value** |
|---|---|---|
| +2% | $ 346,386,888 | $ (24,011,559) |
| No change | 370,398,447 | |
| -2% | 397,932,381 | 27,533,934 |

**Credit Exposure to Insurance Companies**—The following table provides information about the life insurance issuer concentrations that exceed 10% of total face value or 10% of total fair value of the Company's life insurance policies as of December 31, 2024:

| **Carrier** | **Percentage of Face Value** | **Percentage of Fair Value** | **Carrier Rating** |
|---|---|---|---|
| John Hancock Life Insurance Company (U.S.A.) | 14.4% | 12.0% | A+ |
| Lincoln National Life Insurance Company | 12.5% | 11.6% | A |
| Transamerica | 9.7% | 13.4% | A |

The following table provides a roll forward of the fair value of life insurance policies for the year ended December 31, 2024:

| | |
|---|---|
| Fair value at December 31, 2023 | $ 122,296,559 |
| Policies purchased | 363,663,216 |
| Matured/sold policies | (169,348,157) |
| Realized gain on matured/sold policies | 50,844,818 |
| Premiums paid | (16,270,616) |
| Unrealized gain on held policies | 53,786,829 |
| Change in estimated fair value | 88,361,031 |
| Realized gain on matured/sold policies | (50,844,818) |
| Premiums paid | 16,270,616 |
| Fair value at December 31, 2024 | $ 370,398,447 |

The following table provides a roll forward of the fair value of life insurance policies for the year ended December 31, 2023:

| | |
|---|---|
| Fair value at December 31, 2022 | $ 13,809,352 |
| Policies purchased | 186,124,688 |
| Matured/sold policies | (105,526,587) |
| Realized gain on matured/sold policies | 19,606,894 |
| Premiums paid | (4,281,610) |
| Unrealized gain on held policies | 27,889,106 |
| Change in estimated fair value | 43,214,390 |
| Realized gain on matured/sold policies | (19,606,894) |
| Premiums paid | 4,281,610 |
| Fair value at December 31, 2023 | $ 122,296,559 |

**Long-Term Debt—**Refer to Note 14 Long-Term Debt for background information on the market-indexed debt. The Company has elected the fair value option in accounting for the instruments. Fair value is determined using Level 3 inputs. As of December 31, 2024, and 2023, the Company evaluated the fair value of its secured borrowing debt and determined that the fair value approximates the carrying value.

The valuation methodology for the market-indexed notes is based on the Black-Scholes-Merton option-pricing formula and a discounted cash flow analysis. Inputs to the Black-Scholes-Merton model include (i) the S&P 500 Index price, (ii) S&P 500 Index volatility, (iii) a risk-free rate based on data published by the US Treasury, and (iv) a term assumption based on the contractual term of the LMATT Series 2024, Inc., LMATTS Growth Series 2.2024, Inc., and LMATTS Growth and Income Series 1.2026, Inc. notes. The discounted cash flow analysis includes a discount rate that is based on the implied discount rate developed by calibrating a valuation model to the purchase price on the initial investment date. The implied discount rate is evaluated for reasonableness by benchmarking it to yields on actively traded comparable securities.

The total change in fair value of the debt resulted in a gain of $5,032,927. This gain is comprised of $108,373, net of tax, which is included within accumulated other comprehensive loss and $39,127 net of tax, which is included in equity of noncontrolling interests resulting from risk-adjusted valuation scenarios. The Company recognized a loss of $4,835,351 on the change in fair value of the debt resulting from risk-free valuation scenarios, which is included within loss on change in fair value of debt within the consolidated statement of operations and comprehensive (loss) income for the year ended December 31, 2024.

The following table provides a roll forward of the fair value of the issued notes for the year ended December 31, 2024:

| | | |
|---|---|---|
| Fair value at December 31, 2023 | $ | 68,348,556 |
| Debt issued to third parties | | 73,475,570 |
| Repayment of debt | | (4,040,758) |
| Unrealized loss on change in fair value (risk-free) | | 4,835,351 |
| Unrealized loss on change in fair value (credit-adjusted) included in OCI | | 145,166 |
| Unrealized loss on change in fair value (credit-adjusted) included in equity of NCI | | 52,410 |
| Change in estimated fair value of debt | | 5,032,927 |
| LMA Income Series, LP excess return accrual | | 470,463 |
| Deferred issuance costs and discounts | | (736,322) |
| Fair value at December 31, 2024 | $ | 142,550,436 |

**Private Placement Warrants**—Simultaneously with the closing of the Initial Public Offering, ERES consummated the sale of 8,900,000 warrants (the “Private Placement Warrants”) to East Sponsor, LLC (the “Sponsor”), which included the sale of an additional 900,000 Private Placement Warrants in connection with the full exercise by the underwriters of their over-allotment option on August 25, 2020, at a price of $1.00 per Private Placement Warrant, for an aggregate purchase price of $8,900,000. Each Private Placement Warrant is exercisable for one share of Class A common stock at a price of $11.50 per share, subject to adjustment.

Private Placement Warrants are identical to the Public Warrants underlying the Units sold in the Initial Public Offering, except that (x) the Private Placement Warrants and the shares of Class A common stock issuable upon the exercise of the Private Placement Warrants will not be transferable, assignable or salable until 30 days after the completion of a Business Combination, subject to certain limited exceptions, (y) the Private Placement Warrants will be exercisable on a cashless basis and be non-redeemable so long as they are held by the initial purchasers or their permitted transferees and (z) the Private Placement Warrants and the shares of Class A common stock issuable upon exercise of the Private Placement Warrants will be entitled to registration rights. If the Private Placement Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Placement Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

Private Placement Warrants were accounted for as liabilities in accordance with ASC 815-40. The warrant liabilities are measured at fair value at inception and on a recurring basis, with changes in fair value presented separately in the consolidated statements of operations and comprehensive income.

The Private Placement Warrants were considered a Level 3 fair value measurement using a binomial lattice model in a risk-neutral framework. The binomial lattice model's primary unobservable input utilized in determining the fair value of the Private Placement Warrants is the expected volatility of the common stock. The implied volatility as of the reporting date was derived from observable public warrant traded price provided by Bloomberg LP.

The following table presents the key assumptions in the analysis as of June 30, 2023:

| | Private Placement Warrants |
|---|---|
| Expected implied volatility | de minimis |
| Risk-free interest rate | 4.09% |
| Term to expiration | 5.0 years |
| Exercise price | $11.50 |
| Common Stock Price | $10.03 |
| Dividend Yield | —% |

The subsequent changes in the value of the private warrants is based on the changes in the value of the public warrants as of the relevant reporting date due to mostly identical terms between the Private Placement Warrants and the Public warrants, except as noted above. The noted exceptions were determined not to have a significant impact on the valuation of the Private Placement Warrants when using the change in the value of the Public Warrants.

**Equity Securities, at Fair Value: S&P 500 Options**—In February 2022, LMATT Series 2024, Inc. ("LMATTS 2024"), which the Company consolidates for financial reporting, purchased and sold S&P 500 call and put options through a broker. The Company purchased and sold additional S&P 500 call options through a broker in June 2022 through their 100% owned and fully consolidated subsidiaries LMATT Growth Series 2.2024 ("LMATTS 2.2024"), Inc. and LMATT Growth and Income Series 1.2026, Inc ("LMATTS 1.2026"). The options are exchange traded, and fair value is determined using Level 1 inputs of quoted market prices as of the consolidated balance sheets dates. Changes in fair value are classified as unrealized (gain)/loss on investments within the consolidated statements of operations and comprehensive income. In 2024, the Company sold the S&P 500 call options that were held by LMATTS 2.2024 and LMATTS 1.2026 with the proceeds used to extinguish the related market-indexed debt. On the last trading day of December 2024, the Company sold the S&P 500 call options that were held by LMATTS 2024 with the proceeds used to extinguish the related market-indexed debt during the first week of January 2025.

**Available-for-Sale Investment**—The Convertible Promissory Notes are classified as available-for-sale securities. Available-for-sale investments are subsequently measured at fair value. Unrealized holding gains and losses are excluded from earnings and reported in other comprehensive income until realized. The Company determines fair value of its available-for-sale investments using unobservable inputs by considering the initial investment value, next round financing, and the likelihood of conversion or settlement based on the contractual terms in the agreement. As of December 31, 2024 and 2023, the Company evaluated the fair value of its Promissory Note and determined that the fair value approximates the carrying value of $2,205,904 and $1,105,935, which included $205,904 and $105,935 of accrued interest, respectively.

**Other Investments**—The Company determines fair value using Level 3 inputs under the measurement alternative. These investments are recorded at cost, minus impairment, if any, plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer. Impairment is assessed qualitatively. As of December 31, 2024, and 2023, the Company did not identify any impairment indicators and determined that the carrying value of $1,850,000 and $1,650,000, respectively is the fair value for these equity investments in privately held companies, given that there have been no observable price changes.

**Other Financial Instruments Where Carrying Value Approximates Fair Value**—The carrying value of cash, cash equivalents, accounts receivables, due to affiliates, and income tax receivables approximates fair value due to the short-term nature of their maturities.

## 14. LONG-TERM DEBT

Outstanding principal balances of Long-term debt comprises of the following:

| | | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|---|
| | Maturity Date | Cost | Fair value | Cost | Fair value |
| **Market-indexed notes:** | | | | | |
| LMATTS 2024 | December 31, 2024 | $ 11,229,560 | $ 14,591,663 | $ 9,124,944 | $ 9,477,780 |
| LMATTS 2.2024 | July 31, 2024 | — | — | 2,981,480 | 3,551,852 |
| LMATTS 1.2026 | July 31, 2026 | — | — | 492,582 | 569,862 |
| **Secured borrowing:** | | | | | |
| SSCF | December 10, 2030 | 100,000,000 | 100,000,000 | — | — |
| LMAIS | December 31, 2025 | 22,838,673 | 22,838,673 | 22,368,209 | 22,368,209 |
| LMAIS II | March 31, 2026 | 105,856,422 | 105,856,422 | 32,380,852 | 32,380,852 |
| Unamortized debt costs | | (4,533,917) | (4,533,917) | - | - |
| **Unsecured borrowing:** | | | | | |
| FRSUN | November 15, 2028 | 133,377,075 | 133,377,075 | 35,650,000 | 35,650,000 |
| SPV Note | July 5, 2028 | — | — | 26,538,004 | 26,538,004 |
| Sponsor PIK Note | June 30, 2028 | 12,525,635 | 12,525,635 | 11,115,865 | 11,115,865 |
| Unamortized debt costs | | (3,837,451) | (3,837,451) | (1,831,910) | (1,831,910) |
| Total debt | | 377,455,997 | 380,818,100 | 138,820,026 | 139,820,514 |
| Less current portion of long-term debt | | (34,068,233) | (38,430,336) | (11,440,236) | (13,029,632) |
| Total long-term debt | | $ 343,387,764 | $ 342,387,764 | $ 127,379,790 | $ 126,790,882 |

**Fixed Rate Senior Unsecured Notes**

On November 10, 2023, the Company issued $35,650,000 in fixed rate senior unsecured notes ("FRSUN"). The net proceeds after related debt issue costs, were used by the Company to repay the Owl Rock Credit Facility, with the remaining to be used for general corporate purposes. The Fixed Unsecured Notes are based on a fixed interest rate of 9.875% to be paid in quarterly interest payments beginning on February 15, 2024 and mature on November 15, 2028. The Company has the option to redeem the Fixed Unsecured Notes in whole or in part at a price of 100% of the outstanding principal balance on or after November 15, 2027. The notes are senior unsecured obligations of the Company and will rank equal in right of payment to all of the Company's other senior unsecured indebtedness from time to time outstanding.

On February 15, 2024, the Company issued an additional $25,000,000 as part of the previously issued Fixed Unsecured Notes. The net proceeds, after related debt issue costs, were used by the Company for general corporate purposes.

On December 2, 2024, the Company issued an additional $72,727,075 as part of the previously issued Fixed Unsecured Notes as consideration for the Carlisle acquisition.

**Senior Secured Credit Facility**

On December 10, 2024 (the "Senior Secured Credit Facility ("SSCF") Closing Date"), the Company entered into a Credit Agreement (the "SSCF"), among the Company, as borrower, and affiliates of Sagard Senior Lending Partners Holdings II LP and Värde Partners, as lenders, and other persons from time to time party thereto (the "SSCF Lenders"), and GLAS USA LLC, as Administrative Agent and Collateral Agent for the SSCF Lenders thereunder. The SSCF provides credit extensions for (i) an initial term loan in an aggregate principal amount of $100,000,000 upon the closing of the SSCF and (ii) optional delayed draw term loans in an aggregate principal amount of up to $50,000,000 that are available for 180 days after the SSCF Closing Date ("DDTL Facility"), subject to the requirement that on each delayed draw date, the proceeds are used for operations, including the purchase of life settlement policies, to support its overall business strategy, for working capital purposes, and for general corporate purposes, which may include funding previously announced and future acquisitions and repayment and refinancing of its indebtedness. The SSCF and any drawn amounts under the DDTL Facility mature on December 10, 2030, with quarterly amortization payments of (i) 1% per annum of the aggregate principal amount of the initial facility outstanding as of the SSCF Closing Date and DDTL Facility to the extent borrowed and (ii) additional amortization payments based on the Company's Consolidated Adjusted EBITDA, in each case with the remaining outstanding principal amount due on the maturity date.

The interest rate is based an adjusted term Secured Overnight Financing Rate ("SOFR"), which was calculated as term SOFR plus a a fixed rate of 5.25% per annum with a stepdown to 5.00% if the Company achieves certain metrics related to Consolidated Adjusted EBITDA and Total Leverage Ratios. In addition, undrawn amounts committed under the Delayed Draw Facility bear a commitment fee until such commitments are drawn or cancelled. The loan may be prepaid at any time in amounts of $1.0 million or greater, subject to a premium equal to 1.00% of the amount prepaid if prepaid prior to the 12-month anniversary of funding.

The SSCF contains customary covenants for financings of this type including financial maintenance and restrictive covenants, such as the aggregate asset value held at the loan parties to the sum of the outstanding principal amounts of the loans. The SSCF restricts the payment of dividends and distributions and the ability of the Company to make certain investments, incur certain indebtedness and liens and sell assets, in each case subject to important exceptions. The SSCF also includes various financial covenants, each measured on a quarterly basis, including (A) a maximum Secured Leverage Ratio (as defined in the SSCF Credit Agreement), (B) a minimum Consolidated Fixed Charge Coverage Ratio (as defined in the SSCF Credit Agreement) and (C) a minimum Asset Coverage Ratio (as defined in the SSCF Credit Agreement). In addition, the SSCF Credit Agreement includes customary events of default, including failure to pay interest or principal in a timely manner, failure to comply with covenants, cross-defaults to other material indebtedness, certain bankruptcy related events and subject to certain threshold and notices requirements as set forth in the Credit Agreement.

In connection with the SSCF, certain wholly owned and material subsidiaries of the Company issued a guaranty with respect to the obligations of the Company under the SSCF Credit Agreement and related documents (the "SSCF Credit Facility Guaranty"). Additionally, the Company and the guarantors party to the SSCF Credit Facility Guaranty entered into a security agreement (the "SSCF Credit Facility Security Agreement") which secures the SSCF Credit Facility on primarily all assets of the Company and each guarantor on a first lien basis to the exclusion of certain Excluded Assets (as defined in the SSCF Credit Agreement), including the life insurance policies owned by the Company and each Guarantor.

**LMATT Series 2024, Inc. Market-Indexed Notes:**

On March 31, 2022, LMATT Series 2024, Inc., which the Company consolidates for financial reporting, issued $10,166,900 in market-indexed private placement notes. The note, titled the Longevity Market Assets Target-Term Series (LMATTS) 2024, is a market-indexed instrument designed to provide upside performance exposure of the S&P 500 Index, while limiting downward exposure. Upon maturity of the note in 2024, the principal, plus the return based upon the S&P 500 Index must be paid. The note has a feature to protect debt holders from market downturns, up to 40%. Any subsequent losses below the 40%

threshold will reduce the note on a one-to-one basis. As of December 31, 2024, $11,229,560 of the principal amount remained outstanding. Refer to Note 22 Subsequent Events for additional discussion.

The notes are held at fair value, which represents the exit price, or anticipated price to transfer the liability to a third party. As of December 31, 2024, the fair value of the LMATT Series 2024, Inc. notes was $14,591,663. Note that these were repaid in January of 2025.

The notes are secured by the assets of the issuing entities, which includes cash totaling $11,217,936 as of December 31, 2024. The notes' agreements do not restrict the trading of life settlement contracts prior to maturity of the note, as total assets of the issuing companies are considered as collateral. There are also no restrictive covenants associated with the notes with which the entities must comply.

**LMATT Growth Series 2.2024, Inc. Market-Indexed Notes:**

On September 16, 2022, LMATTS Growth Series 2.2024, Inc., a 100% owned subsidiary, which the Company consolidates for financial reporting, issued $2,333,391 in market-indexed private placement notes. The note, titled the Longevity Market Assets Target-Term Growth Series 2.2024, Inc. ("LMATTS™ Series 2.2024, Inc.") is a market-indexed instrument designed to provide upside performance exposure of the S&P 500 Index, while limiting downward exposure. Upon maturity of the note in 2024, the principal, plus the return based upon the S&P 500 Index must be paid. The note has a feature to provide upside performance participation that is capped at 120% of the performance of the S&P 500. A separate layer of the note had a feature to protect debt holders from market downturns by up to 20% if the index price experienced a loss during the investment period.

During 2024, the Company paid $3,480,758 to extinguish the notes early.

The notes are held at fair value, which represented the exit price, or anticipated price to transfer the liability to a third party. As of December 31, 2024 and 2023, the fair value of the LMATT Growth Series 2.2024 notes was $— and $3,551,852, respectively.

The notes were secured by the assets of the issuing entity, LMATTS™ Series 2.2024, Inc., which included cash, S&P 500 call options, and life settlement policies. The note agreements did not restrict the trading of life settlement contracts prior to maturity of the note, as total assets of LMATTS 2.2024 served as collateral. There were no restrictive covenants associated with the notes.

**LMATT Growth and Income Series 1.2026, Inc. Market-Indexed Notes:**

On September 16, 2022, LMATTS Growth and Income Series 1.2026, Inc., a 100% owned subsidiary, which the Company consolidates for financial reporting, issued $400,000 in market-indexed private placement notes. The note, titled the Longevity Market Assets Target-Term Growth and Income Series 1.2026, Inc. ("LMATTS 1.2026") is a market-indexed instrument designed to provide upside performance exposure of the S&P 500 Index, while limiting downward exposure. Upon maturity of the note in 2026, the principal, plus the return based upon the S&P 500 Index must be paid. The note has a feature to provide upside performance participation that is capped at 140% of the performance of the S&P 500. A separate layer of the note has a feature to protect debt holders from market downturns by up to 10% if the index price experiences a loss during the investment period. This note also included a 4% dividend feature that was paid annually.

During 2024, the Company paid $560,000 to extinguish the notes early.

The notes were held at fair value, which represented the exit price, or anticipated price to transfer the liability to a third party. As of December 31, 2024 and 2023, the fair value of the LMATTS 1.2026 notes was $— and $569,862, respectively.

The notes were secured by the assets of the issuing entity, LMATTS Growth and Income Series 1.2026, Inc. which included cash, S&P 500 call options, and life settlement policies. The note agreements did not

restrict the trading of life settlement contracts prior to maturity of the note, as total assets of LMATTS Growth and Income Series 1.2026 served as collateral. There were no restrictive covenants associated with the notes.

**LMA Income Series, LP and LMA Income Series, GP LLC Secured Borrowing**

On September 2, 2022, LMA Income Series, GP, LLC, wholly owned and controlled by that LMA Series, LLC, formed a limited partnership, LMA Income Series, LP and subsequently issued partnership interests to limited partners in a private placement offering. The initial term of the offering is three years which will end in December 2025 with the ability to extend for two additional one-year periods at the discretion of the general partner, LMA Income Series, GP, LLC. The limited partners will receive an annual dividend of 6.5% paid quarterly and 25% of returns in excess of a 6.5% internal rate of return capped at 9% which would require a 15% net internal rate of return. The General Partner will receive 75% of returns in excess of a 6.5% internal rate of return to limited partners then 100% in excess of a 15% net internal rate of return.

It was determined that LMA Series, LLC is the primary beneficiary of LMA Income Series, LP and thus has fully consolidated the limited partnership in its consolidated financial statements for the year ended December 31, 2024.

The private placement offerings proceeds are used to acquire and actively manage a large and diversified portfolio of financial assets. LMA, through its consolidated subsidiaries, serves as the portfolio manager for the financial asset portfolio, which includes investment sourcing and monitoring. In this role, LMA has the unilateral ability to acquire and dispose of any of the above investments. As the partnership does not represent a business in accordance with ASC 810 and is a consolidated subsidiary that only holds financial assets, this represents a transfer subject to ASC 860-10. As the financial assets are not transferred outside the consolidated group, the proceeds from the offering shall be classified as a liability unless it meets the definition of a participating interest and the derecognition criteria in ASC 860 are met. The transferred interest did not meet the definition of a participating interest as LMA possesses the unilateral ability to direct the sale of the financial assets (ASC 860-10-50-6A(d)). In accordance with ASC 860-30-25-2, as the transfer of the financial assets did not meet the definition of a participating interest, LMA shall recognize the proceeds received from the offering as a secured borrowing.

Dividends paid and accrued are included in interest expense. The excess dividend returns will not be paid by LMA Income Series, LP until termination, are considered non-cash interest expense, and are included in the principal balance outstanding. As of December 31, 2024 and 2023, $949,229 and $478,765 in non-cash interest expense was added to the outstanding principal balance, respectively.

LMA elected to account for the secured borrowing at fair value under the collateralized financing entity guidance within ASC 810-10-30. As of December 31, 2024 and 2023, the fair value of the secured borrowing was $22,838,673 and $22,368,209, respectively.

**LMA Income Series II, LP and LMA Income Series II, GP LLC Secured Borrowing**

On January 31, 2023, LMA Income Series II, GP, LLC, wholly owned and controlled by that LMA Series, LLC, formed a limited partnership, LMA Income Series II, LP and subsequently issued partnership interests to limited partners in a private placement offering ("LMAIS II"). The initial term of the offering is three years maturing on March 31, 2026 with the ability to extend for two additional one-year periods at the discretion of the general partner, LMA Income Series II, GP, LLC. During 2024, the LMAIS II offering was amended to be able to add additional limited partners, option to delay redemption date to June 30, 2027 and December 31, 2028, and an increase to the Preferred Return Amount by 50 basis points. Effective April 1, 2024, the limited partners will receive annual dividends equal to the Preferred Return Amounts as follows: Capital commitment less than $500,000, 8.00%; between $500,000 and $1,000,000, 8.25%; over $1,000,000, 8.50%. Thereafter, 100% of the excess to be paid to the General Partner.

It was determined that LMA Series, LLC is the primary beneficiary of LMA Income Series, LP and thus has fully consolidated the limited partnership in its consolidated financial statements for the year ended December 31, 2024.

The private placement offerings proceeds will be used to acquire and actively manage a large and diversified portfolio of financial assets. LMA, through its consolidated subsidiaries, serves as the portfolio manager for the financial asset portfolio, which includes investment sourcing and monitoring. In this role, LMA has the unilateral ability to acquire and dispose of any of the above investments. As the partnership does not represent a business in accordance with ASC 810 and is a consolidated subsidiary that only holds financial assets, this represents a transfer subject to ASC 860-10. As the financial assets are not transferred outside the consolidated group, the proceeds from the offering shall be classified as a liability unless it meets the definition of a participating interest and the derecognition criteria in ASC 860 are met. The transferred interest did not meet the definition of a participating interest as LMA possesses the unilateral ability to direct the sale of the financial assets (ASC 860-10-50-6A(d)). In accordance with ASC 860-30-25-2, as the transfer of the financial assets did not meet the definition of a participating interest, LMA shall recognize the proceeds received from the offering as a secured borrowing.

LMA elected to account for the secured borrowing at fair value under the collateralized financing entity guidance within ASC 810-10-30. As of December 31, 2024 and 2023, the fair value of the secured borrowing was $105,856,422 and $32,380,852, respectively.

**Sponsor PIK Note**

On June 30, 2023, in connection with the Merger Agreement, East Sponsor, LLC, a Delaware limited liability company (“Sponsor”), made an unsecured loan to the Company in the aggregate amount of $10,471,648 (the “Sponsor PIK Note”) with an interest rate of 12% per year compounding semi-annually. Accrued interest is payable in arrears quarterly starting on September 30, 2023 by adding it to the outstanding principal balance. As of December 31, 2024 and 2023, $1,409,770 and $644,217 in non-cash interest expense was added to the outstanding principal balance, respectively. The Sponsor PIK Note matures on June 30, 2028 (the “Maturity Date”) and may be prepaid at any time in accordance with its terms without any premium or penalty.

**SPV Purchase and Sale Note**

On July 5, 2023, the Company entered into an Asset Purchase Agreement (the “Policy APA”) to acquire certain insurance policies with an aggregate fair market value of $10,000,000 from Abacus Investment SPV, LLC, a Delaware limited liability company (“SPV”), in exchange for a payable obligation owed by the Company to SPV (such acquisition transaction under the Policy APA, the “SPV Purchase and Sale”). SPV is jointly owned by the Sponsor and former members of LMA and Abacus.

SPV extended an additional principal amount of $15,000,000 bringing the total SPV Purchase and Sale Note to $25,000,000. The Company was able to borrow additional funds from SPV. The interest accrued at a rate of 12% per year, accrued quarterly, all of which is to be paid in-kind by the Company by increasing the principal amount of the SPV Purchase and Sale Note on each interest payment date and is not required to be paid until maturity on July 5, 2026, three years after the closing of the SPV Purchase and Sale Note, subject to two automatic extensions of one-year each without any amendment of the relevant documentation.

During the first week of July 2024, the Company paid $28,189,406 to extinguish the SPV Purchase and Sale Note early. The total paid included $3,189,406 in accumulated non-cash interest incurred through the early extinguishment date. The total interest paid in connection with the payoff is part of interest paid in the consolidated statements of cash flows.

For the periods ended December 31, 2024 and 2023, $3,189,406 and $1,538,004 of non-cash interest expense was incurred.

Maturities of long-term debt (secured and unsecured) outstanding, including current maturities, excluding unamortized debt issuance costs, at December 31, 2024 are as follows:

| Years | | Amount |
|---|---|---|
| 2025 | $ | 38,430,336 |
| 2026 | | 106,856,422 |
| 2027 | | 1,000,000 |
| 2028 | | 146,902,710 |
| 2029 | | 1,000,000 |
| Thereafter | | 95,000,000 |
| Total | $ | 389,189,468 |

## 15. STOCKHOLDERS' EQUITY

The Company is authorized to issue up to 200,000,000 shares of common stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. No shares of preferred stock are issued or outstanding. Holders of the Company's common stock are entitled to one vote for each share. As of December 31, 2024, there were 96,731,194 shares of common stock issued, of which 95,682,968 are outstanding and 1,048,226 shares were held as treasury stock. Holders of shares were entitled to receive, in the event of a liquidation, dissolution or winding up, ratably the assets available for distribution to the stockholders after payment of all liabilities.

As of December 31, 2023, the Company had 63,388,823 shares of common stock issued, of which 63,242,173 were outstanding and 146,650 shares were held as treasury stock.

During 2024, the Company sold 22,712,800 of its common stock for $181,702,400 and incurred $14,812,621 in transaction costs of which $348,847 is recorded in accrued transaction costs as of December 31, 2024.

In connection with the Carlisle and FCF Advisors business acquisitions, the Company issued 9,791,399 of its common stock valued at $77,547,880 on the day of the acquisitions. Refer to Note 3 Business Combinations for additional information.

**Public Warrants**

As of December 31, 2024, the Company has 16,654,140 Public Warrants outstanding. Each redeemable whole Public Warrant entitles the holder thereof to purchase one share of common stock at a price of $11.50 per full share, subject to adjustment as described. The Public Warrants represent a freestanding financial instrument as it is traded on the Nasdaq under the symbol "ABLLW" and legally detachable and separately exercisable from the related underlying shares of the Company's common stock. Public Warrants may only be exercised for a whole number of shares. No fractional shares will be issued upon exercise of the Public Warrants. The Public Warrants will become exercisable on the later of (a) 30 days after the completion of a Business Combination and (b) 12 months from the closing of the Proposed Offering. The Public Warrants will expire five years from the completion of a Business Combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

Redemption of Warrants for Cash - Once the warrants become exercisable, the Company may redeem the outstanding Public Warrants for cash:

- in whole and not in part;
- at a price of $0.01 per Public Warrant;
- upon not less than 30 days' prior written notice of redemption to each warrant holder; and
- if, and only if, the last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for

any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

Redemption of Warrants for Shares of Class A Common Stock - The Company may redeem the outstanding warrants for shares of Class A common stock:

- in whole and not in part;
- at a price equal to a number of shares of Class A common stock to be determined by reference to the agreed table set forth in the warrant agreement based on the redemption date and the "fair market value" of the Class A common stock;
- upon not less than 30 days' prior written notice of redemption to each warrant holder; and
- if, and only if, the last sale price of the Class A common stock equals or exceeds $10.00 per share (as adjusted per stock splits, stock dividends, reorganizations, recapitalizations and the like) on the trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

If the Company elects to redeem all of the Public Warrants or the common stock is at the time of any exercise of a Public Warrant not listed on a national securities exchange, management has the option to require all holders that wish to exercise the Public Warrants to do so on a "cashless basis," as described in the warrant agreement. In such event, each holder would pay the exercise price by surrendering the whole warrants for that number of shares of common stock equal to the quotient obtained by dividing (x) the product of the number of shares of common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. However, in no instance can the warrant holder unilaterally decide to exercise its Public Warrant on a cashless basis.

The Company accounts for the Public Warrants as equity instruments. The Company estimated that the fair value of the warrants upon the Business Combination was approximately $4.73 million, or $0.274 per Public Warrant, using the binomial lattice model. The fair value of the warrants was estimated as of the date of grant using the following assumptions: (1) risk-free interest rate of 4.09%, (2) term to expiration of 5.00 years, (3) exercise price of $11.50 and (4) stock price of $10.03.The Company accounted for the warrant as an expense of the IPO resulting in a charge directly to stockholders' equity on June 30, 2023

During 2024, the Company's share price reached the warrant exercise price of $11.50. Certain public warrant holders redeemed their warrants for the Company's common stock. As of December 31, 2024, the Company received $6,852,206 from the exercise of 595,844 public warrants.

**Stock Repurchase Program**

On December 11, 2023, our board authorized a stock repurchase program under which the Company may purchase shares of our common stock for an aggregate purchase price not to exceed $15,000,000 over a period of up to 18 months. Stock repurchases may be made through open market transactions, block trades, accelerated stock repurchases, privately negotiated transactions, derivative transactions or otherwise, certain of which may be made pursuant to a trading plan meeting the requirements of Rule 10b5-1 under the Securities Exchange Act of 1934, as amended, in compliance with applicable state and federal securities laws. The timing, as well as the number and value of stock repurchased under the program, will be determined by the Company at its discretion and will depend on a variety of factors, including our assessment of the intrinsic value of the Company's common stock, the market price of the Company's common stock, general market and economic conditions, available liquidity, compliance with the Company's debt and other agreements, applicable legal requirements, the nature of other investment opportunities available to the Company, and other considerations. The Company is not obligated to purchase any stock under the repurchase program, and the program may be suspended, modified, or discontinued at any time without prior notice. The Company expects to fund the repurchases by using cash

on hand and expected free cash flow to be generated in the future. Acquired shares of our common stock are held as treasury stock carried at cost in our consolidated financial statements. In connection with the repurchase program, the Company is authorized to adopt one of more plans pursuant to the provisions of Rule 10b5-1 under the Securities Exchange Act of 1934, as amended.

As of December 31, 2024, $2,974,863 remained available for repurchase under the authorization approved by the Company's board of directors The authorization for the stock repurchase program may be suspended, terminated, increased or decreased by our board of directors at any time without prior notice.

The following table summarizes stock repurchase activity under our stock repurchase program:

| | Total Number of Shares Purchased | Cost of Shares Repurchased | Average Price Paid per Share |
|---|---|---|---|
| As of December 31, 2023 | 146,650 | $ 1,283,062 | $ 8.82 |
| January 1, 2024 to January 31, 2024 | 316,800 | 3,664,552 | 11.61 |
| February 1, 2024 to February 29, 2024 | 200,916 | $ 2,480,383 | 12.35 |
| March 1, 2024 to March 31, 2024 | 114,400 | $ 1,379,457 | 12.06 |
| April 1, 2024 to April 30, 2024 | 173,197 | $ 2,081,859 | 12.02 |
| May 1, 2024 to May 31, 2024 | 96,263 | $ 1,135,824 | 11.81 |
| As of December 31, 2024 | 1,048,226 | $ 12,025,137 | $ 11.61 |

## 16. STOCK-BASED COMPENSATION

***Long-term Incentive Plan:***

In October 2023, the Compensation Committee approved the issuance of 2,468,500 restricted stock units ("RSUs") to executives, employees and directors as part of the Company's 2023 Long-Term Equity Compensation Incentive Plan ("Long-term Incentive Plan"). This plan provides for equity-based awards, including restricted stock units, performance stock units ("PSU"), stock options and unrestricted shares of common stock, may be granted to officers, key employees and directors of the Company. The Company has granted RSUs that provide the right to receive, subject to service based vesting conditions, shares of common stock pursuant to the Equity Plan. The expense associated with these awards will be based on the fair value of the stock as of the grant date, where the Company will elect to straight line recognition over the vesting period, which is three years.

In February 2024, the Compensation Committee approved the issuance of 108,000 RSUs and 345,263 stock options ("Options") at an exercise price of $12.37 (closing price on February 12, 2024).

In April 2024, the Company's Board of Directors adopted a resolution to amend the Long-Term Incentive Plan to update certain terms and increase the RSUs available for future equity-based awards by 5,000,000 shares and provided for an additional 5,000,000 shares to be available for incentive stock options in the Company's common stock bringing the total authorized shares available for awards to 13,164,991. This resolution was approved by the Company's shareholders during the Company's annual shareholder meeting in June 2024.

Under the approved Long-term Incentive Plan, generally, each RSU entitles the unit holder to one share of common stock when the restriction expires. RSUs have service conditions associated with them that range from one to three years. In our plan, subject to continuous employment, employees that were part of the Company at the time of the Merger, the vesting periods are 9 months for the 10% and 33 months for the 90% of the Initial Annual Awards. After satisfying the above vesting conditions, the participants will be fully entitled to their shares of Class A common stock. Shares that are issued upon vesting are newly issued shares from the Long-term Incentive Plan and are not issued from treasury stock. Forfeitures are

recorded as they occur. Stock options generally expire after ten years and vest equally over three years from the grant date.

After the approved amendment to the Long-Term Incentive Plan, 10,215,756 shares of common stock remained available for issuance.

The following table shows a summary of the unvested restricted stock under the 2023 Long-Term Equity Compensation Incentive Plan as of December 31, 2023 as well as activity during the year:

| | Number of shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Restricted stock units, unvested, December 31, 2023 | 2,429,500 | $ 6.16 |
| Granted | 1,319,532 | 8.32 |
| Vested | (271,772) | 6.16 |
| Forfeited | (1,500) | 6.16 |
| Restricted stock units, unvested, December 31, 2024 | 3,475,760 | $ 6.98 |

Black-Scholes option-pricing model assumptions and the resulting fair value of options are presented in the following table:

| | Stock Options on Grant Date |
|---|---|
| Dividend yield | — % |
| Expected volatility | 23.00 % |
| Risk-free interest rate | 3.98 % |
| Expected option life | 5.81 years |
| Weighted average fair value of stock options | $ 3.91 |

The Company does not intend to pay dividends for the foreseeable future. The expected volatility reflects the Company's past daily common stock price volatility. The risk-free interest rate is derived using the term matched U.S. Treasury constant maturity yields. The expected stock option life is based on the average of the average time to vest and the remaining contractual term.

The following table shows the status of, and changes in, common stock options:

| | Number of Options | Weighted Average Exercise Price |
|---|---|---|
| Options outstanding, December 31, 2023 | — | $ — |
| Granted | 345,263 | 3.91 |
| Exercised | — | — |
| Expired or cancelled | — | — |
| Options exercisable, December 31, 2024 | 345,263 | $ 3.91 |

Compensation costs recognized for RSUs and Options were $6,766,160 and $1,600,760 for the years ended December 31, 2024 and 2023, respectively. $1,585,379 and $5,180,781 of the 2024 compensation costs is recorded in cost of revenue (including stock-based compensation) and in general and administrative expense (including stock-based compensation) in the consolidated statements of operations

and comprehensive (loss) income, respectively. As of December 31, 2024, there was approximately $19,152,022 of unrecognized compensation costs related to these restricted stock units which the Company expects to recognize over the next 2.0 years.

***CEO Restriction Agreement:***

As part of the Merger, the Chief Executive Officer ("CEO") entered into a Restriction Agreement with the Company that provides terms for the CEO's ownership interest grant that were assigned to him from the three original founders of Abacus Settlements. As of the Closing Date of the Merger on June 30, 2023, the CEO received 4,569,922 shares of Restricted Stock.

**Vesting Conditions.** The Company shall issue the shares of Restricted Stock either (a) in certificate form or (b) in book entry form, registered in the CEO's name, referring to the terms, conditions and restrictions applicable to the shares as outlined below. The CEO's Ownership Interest Grant ("Restricted Stock") shall vest as follows:

i. 50% of the shares on the 25th month following the Effective Date,

ii. 50% of the shares on the 30th month following the Effective Date,

iii. Additionally, the Restricted Stock will become fully vested upon the first to occur of one of the following events: (i) separation from service due to disability, (ii) death, (iii) separation from service without cause; or (iv) separation from service for good reason.

On November 21, 2024, the Company's board of directors accelerated the vesting of the CEO's 4,569,922 shares Restricted Stock held by Company's CEO, pursuant to that certain Restriction Agreement, dated as of June 30, 2023 (the "Restriction Agreement"), between the Company and the CEO.

CEO Stock-based compensation expense is recorded in general and administrative expense (including stock-based compensation) in the consolidated statements of operations and comprehensive (loss) income is summarized as follows:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Stock-based compensation expense | $ 22,918,159 | $ 9,167,264 |

Restricted Stock activity relative to the CEO for the year ended December 31, 2024 is summarized as follows:

| | Number of Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 31, 2023 | 4,569,922 | $ 10.03 |
| Granted | — | — |
| Vested | (4,569,922) | 10.03 |
| Forfeited | — | — |
| Outstanding at December 31, 2024 | — | $ — |

As of December 31, 2024 there was $— of unamortized stock-based compensation expense for unvested Restricted Stock relative to the CEO.

## 17. EMPLOYEE BENEFIT PLAN

The Company has a defined contribution plan in the U.S. intended to qualify under Section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan covers substantially all employees who meet

minimum age and service requirements and allows participants to defer up to 100% of their annual compensation on a pretax basis. The Company matches up to a maximum of 4% of eligible employee contributions and may choose to make additional discretionary contributions to the 401(k) Plan. For the years ended December 31, 2024 and 2023, the Company recognized expenses related to the 401(k) Plan amounting to $384,669 and $183,439, respectively. For the years ended December 31, 2024 and 2023, the Company did not make discretionary contributions.

## 18. INCOME TAXES

For the years ended December 31, 2024 and 2023, the Company recorded provision for income taxes of $5,484,738 and $1,468,535, respectively. The effective tax rate is (28.2)% for the year ended December 31, 2024 was due to permanent differences related to IRS Section 162(m) limitations and business acquisition transaction costs. The effective rate for the year ended December 31, 2023 was 14.0% was due to non-taxable flow-through entities within the Company as well as a change in tax status of certain entities upon the Business Combination caused the effective tax rate to vary from the statutory rate.

The components of the provision for income taxes are as follows:

| | For the Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Current provision: | | |
| Federal | $ (640,833) | $ 706,686 |
| State | (132,993) | 195,679 |
| Foreign | 258,995 | — |
| Total current tax | (514,831) | 902,365 |
| Deferred provision: | | |
| Federal | 5,582,741 | 469,109 |
| State | 1,155,096 | 97,061 |
| Foreign | (738,268) | — |
| Total deferred tax | 5,999,569 | 566,170 |
| Provision for income taxes | $ 5,484,738 | $ 1,468,535 |

The Company did not have any unrecognized tax benefits relating to uncertain tax positions as of December 31, 2024, and 2023, and did not recognize any interest or penalties related to uncertain tax positions as of December 31, 2024, and 2023.

The effective income tax rate differs from the federal statutory income tax rate applied to the profit loss before provision for income taxes due to the following:

| | For the Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Income tax benefit computed at federal statutory rate | $ (4,080,993) | $ 2,205,635 |
| Restricted stock award deductions limited by IRC 162(m) | 9,151,161 | 2,069,993 |
| Transaction costs | 1,444,257 | — |
| Change in tax rates | (544,894) | — |
| Change in tax status | — | 1,414,469 |
| Effect of pass through entities and noncontrolling interests | — | (3,812,977) |
| State income taxes, net of federal tax benefit | (844,377) | (332,567) |
| Other | 105,335 | (76,018) |
| Valuation allowance | 254,249 | — |
| Income tax at effective rate | $ 5,484,738 | $ 1,468,535 |

The effects of temporary differences that give rise to significant components of deferred tax assets and liabilities at December 31, are as follows:

| | 2024 | 2023 |
|---|---|---|
| Deferred tax assets: | | |
| Basis difference related to life insurance policy sales | $ 1,963,194 | $ 1,798,639 |
| Warrant liability | 2,368,490 | 1,683,658 |
| Interest expense carryforward | 935,149 | 740,657 |
| Stock-based compensation | 1,668,623 | 598,274 |
| Right of use liability | 590,345 | 455,380 |
| Change in fair value of debt | 834,653 | 405,804 |
| Deferred compensation | 1,077,061 | — |
| Capitalized transaction costs | 714,095 | — |
| Net operating loss carryforwards | 521,687 | 21,470 |
| | 10,673,297 | 5,703,882 |
| Less: valuation allowance | (254,249) | — |
| Deferred tax assets | 10,419,048 | 5,703,882 |
| Deferred tax liabilities: | | |
| Basis difference in intangible assets | (17,760,617) | (7,480,659) |
| Change in fair value of life insurance policies (policies held at fair value method) | (12,509,221) | (4,318,194) |
| Basis difference in investments | (6,426,108) | (2,398,987) |
| Other, net | (501,967) | (705,133) |
| Deferred tax liabilities | (37,197,913) | (14,902,973) |
| Net deferred tax liability | $ (26,778,865) | $ (9,199,091) |

Valuation allowances are provided when it is considered more likely than not that deferred tax assets will not be realized. In 2024 the Company established a valuation allowance of approximately $0.3 millions.

The Company has approximately $2.1 millions of Federal Net Operating Losses and approximately $2.1 millions State Net Operating Losses that can be carried forward indefinitely. The Federal Net Operating Losses may be used to offset 80% of taxable income in a given year.

The Company did not have any unrecognized tax benefits relating to uncertain tax positions at December 31, 2024 and 2023 and did not recognize any interest or penalties related to uncertain tax position at December 31, 2024 and 2023. The Company does not anticipate that changes in its unrecognized tax benefits will have a material impact on the consolidated statements of operations and comprehensive income during 2025.

The Company's tax returns are subject to examination by relevant taxing authorities. None of the Company's tax returns are under audit. As of December 31, 2024, tax years for 2023, 2022, and 2021, are subject to examination by the relevant tax authorities.

## 19. RELATED-PARTY TRANSACTIONS

As of December 31, 2024 and 2023, $— and $5,236, respectively, were due to affiliates. As of December 31, 2024 and 2023, $1,527,062 and $1,007,528, respectively, was due from affiliates, respectively. The majority of the due from affiliate amount as of December 31, 2024 and 2023 represents transaction costs incurred by the Company related to the formation of an investment fund being registered under the Investment Company Act of 1940 that will be reimbursed upon regulatory approval and effectiveness of the investment fund and subsequent sale of shares in the investment fund.

The SPV Purchase and Sale Note for $28,189,406 was paid off in early July 2024 and was a related party transaction given the transfer of cash and policies between the Company and the SPV, which is jointly owned by the Sponsor and former members of LMA and Abacus Settlements. The Sponsor PIK Note for $12,525,635 is also recorded as a related party transaction due to the relationship between the Sponsor and the Company. Refer to Note 14 Long-Term Debt for more information.

After the Company's acquisition of Carlisle on December 2, 2024, life policy sales to or purchases from the Carlisle Funds are considered related party activity. In addition, management and performance fee receivables from the Carlisle Funds are considered related party receivables. Refer to Note 2 Summary of Significant Accounting Policies and Note 3 Business Combinations for additional information. As of December 31, 2024, the Company had $6,772,072 and $13,379,301 current and noncurrent related party receivables due from the Carlisle Funds, respectively. For the year ended December 31, 2024, the Company recognized $3,312,202 in realized gains from life policy sales to the Carlisle Funds post acquisition. Post acquisition, the Company purchased $18,112,784 in life policies from the Carlisle Funds, of which $10,662,784 were acquired by exchanging life policies with different risk characteristics and risk profiles.

As of December 31, 2024, there was $337,840 owed from the Carlisle Funds for portfolio servicing related activities, which are included as related-party receivables in the accompanying consolidated balance sheets.

The Company has a related-party relationship with Nova Trading (US), LLC ("Nova Trading"), a Delaware limited liability company and Nova Holding (US) LP, a Delaware limited partnership ("Nova Holding" and collectively with Nova Trading, the "Nova Funds"). The Company also earns service revenue related to policy and administrative services on behalf of Nova Funds. The servicing fee is equal to 50 basis points (0.50%) times the monthly invested amount in policies held by Nova Funds divided by 12. The Company earned $471,094 and $778,678 in service revenue related to Nova Funds for the years ended December 31, 2024 and 2023, respectively. The Company may at times purchase policies it services for the Nova Funds for active management trading purposes. During 2024, the Company paid $98,400,029 to acquire policies from the Nova Funds.

As of December 31, 2024, and 2023, there were $— and $79,509, respectively owed from the Nova Funds, which are included as related-party receivables in the accompanying consolidated balance sheets.

In 2024, the Company no longer originates policies for the Nova Funds. For its origination services to the Nova Funds, the Company earned origination fees equal to the lesser of (i) 2% of the net death benefit for the policy or (ii) $20,000. In addition to the Nova Funds, the Company also has other affiliated investors that provide origination services. For the years ended December 31, 2024, and 2023, the Company earned origination revenue of $— and $494,972 and incurred related costs of $— and $99,456, respectively.

## 20. LEASES

During 2023, the Company amended the Orlando Lease with the lessor to swap office spaces, increase square footage, and extend the lease term from July 31, 2023 to December 31, 2029. The Company applied the lease modification guidance to account for the amendment to the lease. The commencement date for the amended lease was December 8, 2023, the date the lessor allowed the Company to take possession of the space. The amended lease provided for a leasehold improvement allowance, a monthly lease abatement

from August to December 2024, and an option terminate. The Company remeasured the ROU assets and the lease liabilities as of the commencement date.

The Company determined that the termination option is not reasonably certain of exercise based on an evaluation of the contract, the termination fee, market and asset-based factors, and therefore does not exclude periods covered by the termination option.

In February 2024, the Company added additional office space to the existing lease via an amendment. This amendment did not significantly change the overall terms of the amendment signed in 2023 and as a result was treated as a lease modification. The modification increased the Company's right of use asset and liability by $359,352.

On December 2, 2024, the Company recognized a lease right of use asset and liabilities related to office space leased by Carlisle in Luxembourg, as part of the business combination. Refer to Note 3 Business Combinations for additional information. The Carlisle Lease terminates at the end of July 2033. There is no substantive option to terminate the Luxembourg Lease before the end of its term. The Luxembourg Lease increased the Company's right of use asset and liability by $2,779,748.

The Company's right-of-use assets and lease liabilities for its operating lease consisted of the following amounts:

| | As of December 31, | |
|---|---|---|
| Assets: | 2024 | 2023 |
| Operating lease right-of-use assets | $ 4,722,573 | $ 1,893,659 |
| Liabilities: | | |
| Operating lease liability, current | 515,597 | 118,058 |
| Operating lease liability, non-current | 4,580,158 | 1,796,727 |
| Total lease liability | $ 5,095,755 | $ 1,914,785 |

The Company recognizes lease expense for its operating leases within general, administrative, and other expenses on the Company's consolidated statements of operations and comprehensive income. The Company's lease expense for the periods presented consisted of the following:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Operating lease cost | $ 547,570 | $ 207,508 |
| Variable lease cost | 20,885 | 16,103 |
| Total lease cost | $ 568,455 | $ 223,611 |

The following table shows supplemental cash flow information related to lease activities for the periods presented:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| **Cash paid for amounts included in the measurement of the lease liability** | | |
| Operating cash outflows for operating leases | $ 217,090 | $ 201,200 |
| ROU assets obtained in exchange for new lease liabilities | 3,139,100 | 1,782,726 |

The table below shows a weighted-average analysis for lease terms and discount rates for all operating leases for the periods presented:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Weighted-average remaining lease term (in years) | 6.95 | 6.01 |
| Weighted-average discount rate | 9.78 % | 9.67 % |

Future minimum noncancellable lease payments under the Company's operating leases on an undiscounted basis reconciled to the respective lease liability at December 31, 2024 are as follows:

| | Operating leases |
|---|---|
| 2025 | $ 981,275 |
| 2026 | 1,010,744 |
| 2027 | 1,041,041 |
| 2028 | 1,072,214 |
| 2029 | 1,024,286 |
| Thereafter | 1,927,110 |
| Total operating lease payments (undiscounted) | 7,056,670 |
| Less: Imputed interest | (1,960,915) |
| Lease liability as of December 31, 2024 | $ 5,095,755 |

## 21. (LOSS) EARNINGS PER SHARE

Basic (loss) or earnings per share represents net loss or income attributable to ordinary stockholders divided by the weighted average number of common stock outstanding during the reported period. Treasury stock is excluded from the weighted average number of shares of common stock outstanding. Diluted (loss) or earnings per common share attributable to common shareholders is calculated to give effect to all potentially dilutive common shares that were outstanding during the reporting period, except in periods when there is a loss because the inclusion of the potential common shares would have an anti-dilutive effect. The dilutive effect of outstanding equity-based compensation awards is reflected in diluted earnings or loss per common share applicable to common shareholders by application of the treasury stock method using average market prices during the period.

The shares issuable upon exercise of the Public Warrants, Private Placement Warrants, or stock options will not impact the total dilutive weighted average shares outstanding unless and until the price of our common stock exceeds the respective strike price. If and when the price of our common stock exceeds the respective strike price of any of the warrants or stock options, we will include the dilutive effect of the additional shares that may be issued upon exercise of the warrants in total dilutive weighted average shares outstanding, which we calculate using the treasury stock method.

The table below illustrates the reconciliation of the earnings or loss and number of shares used in our calculation of basic earnings or loss per share attributable to common stockholders:

| | Years Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Net (loss) income attributable to common stockholders (for basic and diluted (loss) earnings per share) | $ (23,961,050) | $ 9,516,626 |
| Weighted-average common shares outstanding for basic (loss) earnings per share | 70,761,830 | 56,951,414 |
| Restricted stock units | — | 816,484 |
| Weighted average common shares outstanding for diluted (loss) earnings per share | 70,761,830 | 57,767,898 |
| (Loss) earnings per share: | | |
| Basic (loss) earnings per share | $ (0.34) | $ 0.17 |
| Diluted (loss) earnings per share | (0.34) | 0.16 |

## 22. SUBSEQUENT EVENTS

The Company evaluated subsequent events and transactions from the consolidated balance sheet date through the date at which the consolidated financial statements were issued.

**Conversion of Public Warrants**—On February 24, 2025, the Company entered into warrant exchange agreements (each, an "Exchange Agreement") with certain holders (the "Holders") of its outstanding publicly traded warrants (the "Public Warrants") to purchase shares of the Company's common stock, par value $0.0001 per share. Pursuant to their respective Exchange Agreements, the Holders agreed to surrender an aggregate of 4,930,745 Public Warrants in exchange for an aggregate of 1,134,071 shares of newly issued Common Stock, representing a ratio of 0.23 shares per warrant.

**Issuance of Preferred Stock—**On March 18, 2025, the Company entered into an agreement pursuant to which the Company issued an aggregate of 5,000 shares of a newly created series of the Company's preferred stock, par value $0.0001 per share, designated as the "Series A Convertible Preferred Stock," in exchange for 400,000 Class A Interests of Dynasty Financial Holdings LLC.

**Repayment of long-term debt, at fair value**—The LMATTS 2024 note matured on December 31, 2024. In anticipation of the maturity date, the Company closed its S&P 500 option positions on the last trading day of December 2024. During the first week of January 2025, this debt of $11,229,560 was extinguished.

**LMA Income Series II, LP and LMA Income Series II, GP LLC Secured Borrowin**g—Subsequent to year end, LMA Income Series II, GP, LLC through the LMA Income Series II, LP admitted additional limited partners into the fund. The additional limited partnership interests amounted to $15,939,871 as of March 27, 2025.

*****

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Members
Abacus Settlements, LLC

**Opinion on the financial statements**
We have audited the statements of operations and comprehensive loss, changes in members' equity, and cash flows for the period from January 1, 2023 to June 30, 2023, and the related notes (collectively referred to as the "financial statements") of Abacus Settlements, LLC (Predecessor) (a Delaware Limited Liability Corporation) (the "Company"). In our opinion, the financial statements present fairly, in all material respects, the results of the Company's operations and its cash flows for the period from January 1, 2023 to June 30, 2023, in conformity with accounting principles generally accepted in the United States of America.

**Basis for opinion**
These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2022.

Philadelphia, Pennsylvania
May 30, 2024

**ABACUS SETTLEMENTS, LLC**

**STATEMENT OF OPERATIONS AND COMPREHENSIVE LOSS**

| | | Six Months Ended June 30, 2023 |
|---|---|---|
| REVENUES: | | |
| Origination revenue | $ | 3,252,738 |
| Related party origination revenue | | 9,931,938 |
| Total revenue | | 13,184,676 |
| Cost of revenue | | 2,734,949 |
| Related party cost of revenue | | 6,558,354 |
| Total cost of revenue | | 9,293,303 |
| Gross Profit | | 3,891,373 |
| OPERATING EXPENSES: | | |
| General and administrative expenses | | 4,848,580 |
| Depreciation expense | | 5,597 |
| Total operating expenses | | 4,854,177 |
| Loss from operations | | (962,804) |
| OTHER INCOME (EXPENSE): | | |
| Interest income | | 1,917 |
| Interest expense | | (11,725) |
| Other income | | — |
| Total other expense | | (9,808) |
| Loss before provision for income taxes | | (972,612) |
| Provision for income taxes | | 2,289 |
| NET LOSS AND COMPREHENSIVE LOSS | $ | (974,901) |
| WEIGHTED-AVERAGE UNITS USED IN COMPUTING NET LOSS PER UNIT: | | |
| Basic | | 400 |
| Diluted | | 400 |
| NET LOSS PER UNIT: | | |
| Basic loss per unit | $ | (2,437.25) |
| Diluted loss per unit | $ | (2,437.25) |

See accompanying notes to financial statements.

**ABACUS SETTLEMENTS, LLC**

**STATEMENT OF CHANGES IN MEMBERS' EQUITY**

| | Common Units | | Additional Paid-In Capital | Retained Earnings | Total |
|---|---|---|---|---|---|
| | Units | Amount | | | |
| BALANCE—December 31, 2022 | 400 | $ 4,000 | $ 80,000 | $ 1,927,137 | $ 2,011,137 |
| Net loss | — | — | — | (974,901) | (974,901) |
| Distributions | — | — | — | (442,283) | (442,283) |
| BALANCE—June 30, 2023 | 400 | $ 4,000 | $ 80,000 | $ 509,953 | $ 593,953 |

See accompanying notes to financial statements.

**ABACUS SETTLEMENTS, LLC**

**STATEMENT OF CASH FLOWS**

| | | Six Months Ended June 30, 2023 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ | (974,901) |
| Adjustments to reconcile net income to net cash used in operating activities: | | |
| Depreciation expense | | 19,157 |
| Amortization expense | | 40,278 |
| Amortization of deferred financing fees | | 11,725 |
| Non-cash lease expense | | 1,210 |
| Changes in operating assets and liabilities: | | |
| Related party receivables | | 397,039 |
| Other receivables | | 101,203 |
| Prepaid expenses | | (198,643) |
| Other current assets | | (26,211) |
| Other non-current assets | | |
| Certificate of deposit | | — |
| State security deposit | | |
| Accrued payroll and other expenses | | (17,466) |
| Contract liability—deposits on pending settlements | | 659,067 |
| Accounts payable | | (36,750) |
| Net cash used in operating activities | | (24,292) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Capital expenditures | | (108,394) |
| Purchase of intangible asset | | — |
| Due from members and affiliates | | (74,134) |
| Net cash used in investing activities | | (182,528) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Due to members | | (1,411) |
| Financing fees | | |
| Distributions | | (442,283) |
| Net cash used in financing activities | | (443,694) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | | (650,514) |
| Beginning of period | | 1,458,740 |
| End of period | $ | 808,226 |

See accompanying notes to financial statements.

## ABACUS SETTLEMENTS, LLC

### NOTES TO FINANCIAL STATEMENTS

### 1. DESCRIPTION OF THE BUSINESS

Abacus Settlements, LLC d/b/a Abacus Life (“Abacus Settlements”) was formed in 2004 in the state of New York. In 2016, the Company obtained its licensure in Florida and re-domesticated to that state. On June 13, 2023, the Company re-domesticated to Delaware.

Abacus Settlement acts as a purchaser of outstanding life insurance policies (“Provider”) on behalf of investors (“Financing Entities”) by locating policies and screening them for eligibility for a life settlement, including verifying that the policy is in force, obtaining consents and disclosures, and submitting cases for life expectancy estimates, also known as origination services. When the sale of a policy is completed, this is deemed “settled” and the policy is then referred to as either a “life settlement” in which the insured’s life expectancy is greater than two years or “viatical settlement,” in which the insured’s life expectancy is less than two years.

Abacus Settlements is not an insurance company, and therefore Abacus Settlements does not underwrite insurable risks for its own account. On August 30, 2022, Abacus Settlements entered into an Agreement and Plan of Merger (the “Merger Agreement”) with East Resources Acquisition Company (“ERES”), which was subsequently amended on October 14, 2022. As part of the Merger Agreement, the holders of Abacus Settlements’ common units together with the holders of Longevity Markets Assets, LLC (“LMA”), a commonly owned affiliate, will receive aggregate consideration of $531,750,000, payable in a number of newly issued shares of ERES Class A common stock, par value $0.0001 per share (“ERES Class A common stock”), with a value ascribed to each share of ERES Class A common stock of $10.00 and, to the extent the aggregate transaction proceeds exceed $200.0 million, at the election of Abacus Settlements’ and LMA’s members, up to $20.0 million of the aggregate consideration will be payable in cash to the Abacus Settlements’ and LMA’s members. The transaction closed on June 30, 2023 upon stockholder approval and customary closing conditions.

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**—The accompanying financial statements are presented in accordance with the rules and regulations of the Securities and Exchange Commission (“SEC”) and are prepared in accordance with generally accepted accounting principles in the United States of America (“US GAAP”).

**Use of Estimates**—The preparation of US GAAP financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and changes therein, and disclosure of contingent assets and liabilities at the date of financial statements and the reports amounts of revenue and expenses during the reporting periods. Abacus Settlements’ estimates, judgments, and assumptions are continually evaluated based on available information and experience. Because of the use of estimates inherent in the financial reporting process, actual results could differ from the estimates. Estimates are used when accounting for revenue recognition and related costs, the selection of useful lives of property and equipment, impairment testing, valuation of other receivables from clients, income taxes, and legal reserves.

**Going Concern**—Management evaluates at each annual and interim period whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company’s ability to continue as a going concern within one year after the date that the financial statements are issued. Management’s evaluation is based on relevant conditions and events that are known and reasonably knowable at the date that the financial statements are issued. Management has concluded that there are no conditions or events, considered in the aggregate, that raise substantial doubt about the Company’s

ability to continue as a going concern within one year after the date these financial statements were issued.

**Other receivables**—Other receivables include origination fees for policies in which the rescission period has ended, but the funds have not been received yet from financing entities. These fees were collected in the subsequent month.

Abacus Settlements provides an allowance for credit losses equal to the estimated collection losses that will be incurred in collection of all receivables. Management determines the allowance for credit losses based on a review of outstanding receivables, historical collection experience, current economic conditions, and reasonable and supportable forecasts. Account balances are charged off against the allowance for credit losses after all means of collection have been exhausted and the potential for recovery is deemed remote. Abacus Settlements does not have any material allowance for credit losses as of June 30, 2023.

If the financial condition of Abacus Settlements' customers were to deteriorate, resulting in an impairment of their ability to make payments, additional allowances may be required. Abacus Settlements did not record material allowance for credit losses as of June 30, 2023.

**Concentrations**—All of Abacus Settlements' revenues are derived from life settlement transactions in which Abacus Settlements represents Financing Entities that purchased existing life insurance policies. One financing entity, a company in which the Abacus Settlements' members own interests, represented 23% of Abacus Settlements' revenues in six months ended June 30, 2023. Abacus Settlements originates policies through three different channels: Direct to Consumer, Agent, and Broker. Two brokers represented the sellers for over 10% of Abacus Settlements' life settlement commission expense during the period six months ended June 30, 2023. Abacus Settlements maintains cash deposits with a major financial institution, which from time to time may exceed federally insured limits. Abacus Settlements periodically assesses the financial condition of the institution and believes that the risk of loss is minimal.

**Advertising**—All advertising expenditures incurred by Abacus Settlements are charged to expense in the period to which they relate and are included in general and administrative expenses on the accompanying statements of operations and comprehensive income/(loss). Advertising expense totaled $741,789 for six months ended June 30, 2023.

## 3. SEGMENT REPORTING

Operating as a centrally led life insurance policy intermediary, Abacus Settlements' president and chief executive officer is the chief operating decision maker who allocates resources and assesses financial performance based on financial information presented for Abacus Settlements as a whole. As a result of this management approach, Abacus Settlements is organized as a single operating segment.

## 4. REVENUE

**Disaggregated Revenue—**The following table presents a disaggregation of Abacus Settlements' revenue by major sources:

| | Six Months Ended June 30, 2023 |
|---|---|
| Agent | $ 7,143,016 |
| Broker | 4,675,973 |
| Client direct | 1,365,687 |
| Total | $ 13,184,676 |

## 5. INCOME TAXES

Since Abacus Settlements elected to file as an S corporation for federal and State income tax purposes, Abacus Settlements incurred no federal or state income taxes. Accordingly, provision for income taxes is attributable to minimum state tax payments that are due regardless of their S corporation status and income position.

For the six months ended June 30, 2023, Abacus Settlements recorded provision for income taxes of $2,289, which consist of state minimum taxes for state taxes that have been paid and settled during the period. The effective tax rate was approximately (0.24%) for the six months ended June 30, 2023.

Given Abacus Settlements' S Corporation status, temporary book and tax differences do not create a deferred tax asset or liability on the balance sheets. Accordingly, an assessment of realizability of any deferred tax asset balances is not relevant.

## 6. RETIREMENT PLAN

Abacus Settlements provides a defined contribution plan to its employees, Abacus Settlements LLC 401(k) Profit Sharing Plan & Trust (the "Plan"). All eligible employees are able to participate in voluntary salary reduction contributions to the Profit-Sharing Plan. All employees who have completed one year of service with Abacus Settlements are eligible to receive employer-matching contributions. Abacus Settlements may match contributions to the Plan, up to 4% of compensation. For the six months ended June 30, 2023, Abacus Settlements made no discretionary contribution to the Plan.

## 7. RELATED-PARTY TRANSACTIONS

Abacus Settlements has a related-party relationship with Nova Trading (US), LLC ("Nova Trading"), a Delaware limited liability company and Nova Holding (US) LP, a Delaware limited partnership ("Nova Holding" and collectively with Nova Trading, the "Nova Funds") as the owners of Abacus Settlements jointly own 11% of the Nova Funds. For the six months ended June 30, 2023, Abacus Settlements originated 72 policies for the Nova Funds with a total value of $96,674,080. For its origination services to the Nova Funds, Abacus Settlements earns origination fees equal to the lesser of (i) 2% of the net death benefit for the policy or (ii) $20,000. Revenue earned and contracts originated were as follows:

| | | Six Months Ended June 30, 2023 |
|---|---|---|
| Origination fee revenue | $ | 2,952,837 |
| Commissions and transaction reimbursement revenue | | 140,960 |
| Total | $ | 3,093,797 |
| | | |
| Cost | $ | 11,656,637 |
| Face value | $ | 96,674,080 |
| Total policies | | 72 |
| Average Age | | 75 |

In addition to the Nova Funds, Abacus Settlements also has another affiliated investor that they provide origination services for. Total revenue earned related to the other affiliated investor was $6,838,141, of which $6,794,641 related to LMA, for the six months ended June 30, 2023. Total cost of revenue related to the other affiliated investor was $5,020,603, of which $5,012,103 related to LMA for the six months ended June 30, 2023. In addition, there is a related party receivable due from LMA related to transaction expenses of $19,246 as of June 30, 2023, which is included as due from members and affiliates in the accompanying balance sheet.

**8. SUBSEQUENT EVENT**

On June 30, 2023, Abacus Settlements consummated the merger with LMA. Abacus Settlements has evaluated its subsequent events through May 30, 2024, the date that the financial statements were issued and determined that there were no events that occurred that required disclosure.

*****

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e)and 15d-15(e) under the Exchange Act, as of the end of the period covered by this Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of such date, our disclosure controls and procedures were effective.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the Company and have designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we assessed, as of December 31, 2024, the effectiveness of our internal control over financial reporting. This assessment was based on criteria established in accordance with the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2024. We completed the acquisitions of Carlisle and FCF on December 2, 2024. As permitted under SEC guidance, management's assessment as of December 31, 2024 did not include an assessment of the effectiveness of internal control over financial reporting of Carlisle or FCF. These two businesses collectively constituted approximately 4% of the Company's total assets and 3% of the Company's total revenue for the year ended December 31, 2024.

This Annual Report on Form 10-K does not include an attestation report of our independent registered public accounting firm due to our status as an emerging growth company under the JOBS Act.

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

**Part III**

Our Proxy Statement will be filed with the SEC in connection with our 2025 Annual Meeting of Stockholders no later than 120 days after December 31, 2024.

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this Item will be included in the Proxy Statement under the captions *Information Regarding the Board of Directors and Corporate Governance* and is incorporated by reference herein.

**Item 11. Executive Compensation**

The information required by this Item will be included in the Proxy Statement under the captions *Executive Compensation* and is incorporated by reference herein.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this Item will be included in the Proxy Statement under the caption *Security Ownership of Certain Beneficial Owners and Management* and is incorporated by reference herein.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this Item will be included in the Company's Proxy Statement under the caption *Certain Relationships and Related Party Transactions* and are incorporated by reference herein.

**Item 14. Principal Accountant Fees and Services**

The information required by this Item will be included in the Company's Proxy Statement under the caption *Ratification of the Selection of Independent Registered Public Accounting Firm* and is incorporated by reference herein.

**Part IV**

**Item 15. Exhibit and Financial Statement Schedules**

The following are filed as part of this Annual Report on Form 10-K.

(1) Financial Statements

We include this portion of Item 15 under Part II, Item 8 of this Annual Report on Form 10-K.

(2) Financial Statement Schedules

We include the financial statement schedules required by the applicable regulations of the SEC in the notes to our consolidated financial statements and incorporate that information in this Item 15 by reference.

(3) Exhibits

All of the following exhibits are filed as part of, or incorporated by reference into, this Annual Report on Form 10-K, unless otherwise noted.

| Exhibit Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of August 30, 2022, by and among East Resources Acquisition Company, LMA Merger Sub, LLC, Abacus Merger Sub, LLC, Longevity Market Assets, LLC and Abacus Settlements, LLC, incorporated by reference from the Company's Form 8-K filed August 30, 2022. |
| 2.2 | First Amendment to Agreement and Plan of Merger, dated as of October 14, 2022, by and among East Resources Acquisition Company, LMA Merger Sub, LLC, Abacus Merger Sub, LLC, Longevity Market Assets, LLC and Abacus Settlements, LLC, incorporated by reference from the Company's Form 8-K filed October 14, 2022. |
| 2.3 | Second Amendment to Agreement and Plan of Merger, dated as of April 20, 2023, by and among East Resources Acquisition Company, LMA Merger Sub, LLC, Abacus Merger Sub, LLC, Longevity Market Assets, LLC and Abacus Settlements, LLC (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K (File No. 001-39403) filed with the SEC on April 20, 2023), incorporated by reference from the Company's Form 8-K filed April 20, 2023. |
| 2.4 | Share Purchase Agreement, by and among Abacus Life, Inc., Carlisle Management Company S.C.A., Carlisle Investment Group S.A.R.L., the Sellers party thereto, Jose Eseteban Casares Garcia, Manorhaven Holdings, LLC, Pacific Current Group Limited, certain equityholders of CMC Vehicle, LLC and Pillo Portsmouth Holding Company, LLC, in its capacity as the Sellers' Representative thereunder, dated as of July 18, 2024, incorporated by reference from the Company's Form 8-K filed July 18, 2024. |
| 3.1 | Second Amended and Restated Certificate of Incorporation of Abacus Life, Inc., incorporated by reference from the Company's 8-K filed July 6, 2023. |
| 3.2 | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation of Abacus Life, Inc., dated February 27, 2025, incorporated by reference from the Company's Form 8-K filed March, 5, 2025. |
| 3.3* | Amended and Restated Bylaws of Abacus Global Management, Inc., dated February 27, 2025. |
| 4.1 | Specimen Common Stock Certificate, incorporated by reference from the Company's Form S-1 filed July 2, 2020. |
| 4.2 | Specimen Warrant Certificate, incorporated by reference from the Company's Form S-1 filed July 2, 2020. |
| 4.3 | Warrant Agreement, dated July 23, 2020 between East Resources Acquisition Company and Continental Stock Transfer & Trust Company, as warrant agent, incorporated by reference from the Company's Form 8-K filed July 27, 2020. |
| 4.4 | Unsecured Promissory Note, dated as of June 30, 2023, issued to Sponsor, incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 4.5 | Amended and Restated Unsecured Promissory Note, dated as of July 5, 2023, issued to East Asset Management, LLC, incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 4.6 | Base Indenture, incorporated by reference from the Company's Form 8-K filed November 13, 2023. |

| Exhibit Number | Description |
|---|---|
| 4.7 | Supplemental Indenture, incorporated by reference from the Company's Form 8-K filed November 13, 2023. |
| 4.8 | Form of 9.875% Fixed Rate Senior Notes due 2028, incorporated by reference from the Company's Form 8-K filed November 10, 2023. |
| 4.9 | Second Supplemental Indenture, dated as of December 2, 2024, between the Company and U.S. Bank Trust Company, National Association, as Trustee, including the form of the notes, incorporated by reference from the Company's Form 8-K filed December 2, 2024. |
| 4.10 | Certificate of Designations of Abacus Global Management, Inc., designating the Company's Series A Convertible Preferred Stock, par value $0.0001 per share, , incorporated by reference from the Company's Form 8-K filed March 24, 2025. |
| 4.11* | Description of registrant's securities. |
| 10.1 | Warrant Forfeiture Agreement, dated as of June 30, 2023, by and among East Resources Acquisition Company and Sponsor incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 10.2 | Amended and Restated Registration Rights Agreement, dated as of June 30, 2023, by and among the Company, Sponsor, certain equityholders of East Resources Acquisition Company named therein and certain equityholders of the LMA and Legacy Abacus named therein, incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 10.3 | Letter Agreement, dated as of July 23, 2020, among the Company, its officers and directors and the Sponsor, incorporated by reference from the Company's Form 8-K filed July 27, 2020. |
| 10.4 | Form of Indemnification Agreement, incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 10.5 | Abacus Life, Inc. Amended and Restated 2024 Long—Term Equity Compensation Incentive Plan, incorporated by reference from Appendix A to the Company's Proxy Statement filed on April 29, 2024. |
| 10.6 | Form of Restricted Stock Unit Award granted under the Abacus Life, Inc. Amended and Restated 2024 Long-Term Equity Compensation Incentive Plan, incorporated by reference from the Company's Form 8-K filed December 16, 2024. |
| 10.7 | Abacus Life, Inc. 2023 Long-Term Equity Incentive Plan, incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 10.8 | Form of Restricted Stock Unit Award granted under the Abacus Life, Inc. 2023 Long-Term Equity Incentive Plan, incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 10.9 | Form of Option Award granted under the Abacus Life, Inc. 2023 Long-Term Equity Incentive Plan, incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 10.10 | Credit Agreement, dated as of December 10, 2024, by and among Abacus Life, Inc. as the Borrower, GLAS USA LLC, as the Administrative Agent, GLAS AMERICAS LLC, as the Collateral Agent and the Lenders from time to time party thereto, incorporated by reference from the Company's Form 8-K filed December 10, 2024. |
| 10.11 | Security Agreement, dated as of December 10, 2024, by and among the Grantors party thereto and GLAS USA LLC as Collateral Agent, incorporated by reference from the Company's Form 8-K filed December 10, 2024. |
| 10.12 | Guaranty, dated as of December 10, 2024 among Abacus Life, Inc. the Guarantors party thereto, and GLAS USA LLC as Administrative Agent, incorporated by reference from the Company's Form 8-K filed December 10, 2024. |
| 10.13 | Form of Employment Agreement, incorporated by reference from the Company's Form S-1 filed July 25, 2023. |
| 10.14 | Sponsor Support Agreement, dated as of August 30, 2022, by and among the East Resources Acquisition Company, Sponsor, LMA and Legacy Abacus, incorporated by reference from the Company's Form 8-K filed August 30, 2022. |
| 10.15 | Amendment No. 1 to the Sponsor Support Agreement, dated as of December 20, 2023, by and among Abacus Life, Inc., Longevity Market Assets, LLC, Abacus Settlements, LLC and East Sponsor, LLC, incorporated by reference from the Company's 8-K filed December 29, 2023. |

| Exhibit Number | Description |
|---|---|
| 10.16 | Company Support Agreement, dated as of August 30, 2022, by and among East Resources Acquisition Company, LMA, Legacy Abacus and the other parties signatory thereto, incorporated by reference from the Company's Form 8-K filed August 30, 2022. |
| 10.17 | Amendment No. 1 to the Company Support Agreement, dated as of December 20, 2023, by and among Abacus Life, Inc., Longevity Market Assets, LLC, Abacus Settlements, LLC, T. Sean McNealy, K. Scott Kirby, Matthew A, Ganovsky incorporated by reference from the Company's 8-K filed December 29, 2023. |
| 10.18 | Share Lock-Up and Standstill Agreement, dated as of December 2, 2024, by and among the Company and the Stockholders party thereto, incorporated by reference from the Company's Form 8-K filed December 2, 2024. |
| 10.19 | Notes Registration Rights Agreement, dated as of December 2, 2024, by and among the Company and the Holders of the New Notes named therein, incorporated by reference from the Company's Form 8-K filed December 2, 2024. |
| 10.20 | Equity Registration Rights Agreement, dated as of December 2, 2024, by and among the Company and the Holders of the common stock of the Company named therein, incorporated by reference from the Company's Form 8-K filed December 2, 2024. |
| 10.21* | Form of Abacus Option Agreement 2024 Plan. |
| 10.22* | Form of Abacus RSU Agreement 2024 Plan. |
| 14.1 | Code of Business Conduct and Ethics of Abacus Life, Inc., incorporated by reference from the Company's Form 8-K filed July 6, 2023. |
| 19.1* | Insider Trading Policy. |
| 21.1* | Subsidiaries of the Company. |
| 23.1* | Consent of Grant Thornton LLP. |
| 23.2* | Consent of Grant Thornton LLP - Predecessor. |
| 24.1* | Power of Attorney (included on the signature page). |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 97.1 | Clawback policy. |
| 101 | The following financial information from the Company's Annual Report on Form 10-K for the year ended December 31, 2023, formatted in Inline Extensible Business Reporting Language (iXBRL) includes: (i) the Consolidated Balance Sheets, (ii) the Consolidated Statements of Operations and Comprehensive Income, (iii) the Consolidated Statements of Stockholders' Equity, (iv) the Consolidated Statements of Cash Flows, (v) and (vi) the Notes to Consolidated Financial Statements. |
| 101.SCH* | XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | XBRL Taxonomy Calculation Linkbase Document. |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | XBRL Taxonomy Label Linkbase Document. |
| 101.PRE* | XBRL Taxonomy Presentation Linkbase Document. |
| 104* | Cover Page Interactive Data File (embedded within the Inline XBRL document) |
| | * Filed herewith |
| | ** Furnished herewith |

**Item 16. Form 10-K Summary**

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized in the City of Orlando, State of Florida, on March 28, 2025.

**ABACUS GLOBAL MANAGEMENT, INC.**

By: /s/ Jay Jackson
Jay Jackson
Chairman of the Board,
President and Chief Executive Officer

Date: March 28, 2025

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Jay J. Jackson and William H. McCauley, and each of them, his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him or her in any and all capacities, to sign any and all amendments to this Annual Report and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each said attorneys-in-fact, or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report has been signed by the following persons on our behalf in the capacities and on the date indicated above.

| Signature | Title |
|---|---|
| /s/ Jay Jackson<br>Jay Jackson | President and Chief Executive Officer (Principal Executive Officer) |
| /s/ William McCauley<br>William McCauley | Chief Financial Officer (Principal Accounting and Financial Officer) |
| /s/ Todd Sean McNealy<br>Todd Sean McNealy | Director |
| /s/ Adam Gusky<br>Adam Gusky | Director |
| /s/ Karla Radka<br>Karla Radka | Director |
| /s/ Cornelis Michiel van Katwijk<br>Cornelis Michiel van Katwijk | Director |
| /s/ Thomas W. Corbett, Jr.<br>Thomas W. Corbett, Jr. | Director |
| /s/ Mary Beth Schulte<br>Mary Beth Schulte | Director |

# AMENDED AND RESTATED BYLAWS
# OF
# ABACUS GLOBAL MANAGEMENT, INC. (THE "CORPORATION")

## ARTICLE I OFFICES

**Section 1.1. Registered Office**. The registered office of the Corporation within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

**Section 1.2. Additional Offices**. The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "***Board***") may from time to time determine or as the business and affairs of the Corporation may require.

## ARTICLE II STOCKHOLDERS MEETINGS

**Section 2.1. Annual Meetings**. The annual meeting of stockholders shall be held at such place, either within or without the State of Delaware, and time and on such date as shall be determined by the Board and stated in the notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a). At each annual meeting, the stockholders entitled to vote on such matters shall elect those directors of the Corporation to fill any term of a directorship that expires on the date of such annual meeting and may transact any other business as may properly be brought before the meeting.

**Section 2.2. Special Meetings**. Subject to the rights of the holders of any outstanding series of the preferred stock of the Corporation ("***Preferred Stock***"), and to the requirements of applicable law, special meetings of stockholders, for any purpose or purposes, may be called only by the Chairman of the Board, the Chief Executive Officer or the Board pursuant to a resolution adopted by a majority of the Board, and may not be called by any other person.
Special meetings of stockholders shall be held at such place, either within or without the State of Delaware, and at such time and on such date as shall be determined by the Board and stated in the Corporation's notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).

**Section 2.3. Notices**. Written notice of each stockholders meeting stating the place, if any, date, and time of the meeting, and the means of remote communication, if any, by which

stockholders and proxy holders may be deemed to be present in person and vote at such meeting and the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, shall be given in the manner permitted by Section 9.3 to each stockholder entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting, by the Corporation not less than 10 nor more than 60 days before the date of the meeting unless otherwise required by the General Corporation Law of the State of Delaware (the "***DGCL***"). If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto). Any meeting of stockholders as to which notice has been given may be postponed, and any meeting of stockholders as to which notice has been given may be cancelled, by the Board upon public announcement (as defined in Section 2.7(c)) given before the date previously scheduled for such meeting.

**Section 2.4. Quorum**. Except as otherwise provided by applicable law, the Corporation's Certificate of Incorporation, as the same may be amended or restated from time to time (the "***Certificate of Incorporation***") or these Bylaws, the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock of the Corporation representing a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business. If a quorum shall not be present or represented by proxy at any meeting of the stockholders of the Corporation, the chairman of the meeting may adjourn the meeting from time to time in the manner provided in Section 2.6 until a quorum shall attend. The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the voting power of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

**Section 2.5. Voting of Shares**.

(a) Voting Lists. The Secretary of the Corporation (the "***Secretary***") shall prepare, or shall cause the officer or agent who has charge of the stock ledger of the Corporation to prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders of record entitled to vote at such meeting; provided, however, that if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date, arranged in alphabetical order and showing the address and the number and class of shares

registered in the name of each stockholder. Nothing contained in this Section 2.5(a) shall require the Corporation to include electronic mail addresses or other electronic contact information on

such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 9.5(a), the list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting. The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 2.5(a) or to vote in person or by proxy at any meeting of stockholders.

(b) Manner of Voting. At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy. If authorized by the Board, the voting by stockholders or proxy holders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission (as defined in Section 9.3), provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxy holder. The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(c) Proxies. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. Proxies need not be filed with the Secretary until the meeting is called to order, but shall be filed with the Secretary before being voted. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority. No stockholder shall have cumulative voting rights.

(i) A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(ii) A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm,

proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such electronic transmission

must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(d) Required Vote. Subject to the rights of the holders of one or more series of Preferred Stock, voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, at all meetings of stockholders at which a quorum is present, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. All other matters presented to the stockholders at a meeting at which a quorum is present shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation, these Bylaws or applicable stock exchange rules, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e) Inspectors of Election. The Board may, and shall if required by law, in advance of any meeting of stockholders, designate one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof. The Board may appoint one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspectors of election or alternates are appointed by the Board, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall ascertain and report the number of outstanding shares and the voting power of each; determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots; count all votes and ballots and report the results; determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. No person who is a candidate for an office at an election may serve as an inspector at such election. Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors.

**Section 2.6. Adjournments**. Any meeting of stockholders, annual or special, may be adjourned by the chairman of the meeting, from time to time, whether or not there is a quorum, to reconvene at the same or some other place. Notice need not be given of any such adjourned meeting if the date, time, and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at

such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting the stockholders, or the holders of any class or series of stock entitled to vote

separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting. If the adjournment is for more than 30 days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with Section 9.2, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

**Section 2.7. Advance Notice for Business.**

(a) Annual Meetings of Stockholders. No business may be transacted at an annual meeting of stockholders, other than business that is either (i) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board,
(ii) otherwise properly brought before the annual meeting by or at the direction of the Board or
(iii) otherwise properly brought before the annual meeting by any stockholder of the Corporation
(x) who is a stockholder of record entitled to vote at such annual meeting on the date of the giving of the notice provided for in this Section 2.7(a) and on the record date for the determination of stockholders entitled to vote at such annual meeting and (y) who complies with the notice procedures set forth in this Section 2.7(a). Notwithstanding anything in this Section 2.7(a) to the contrary, only persons nominated for election as a director to fill any term of a directorship that expires on the date of the annual meeting pursuant to Section 3.2 will be considered for election at such meeting.

(i) In addition to any other applicable requirements, for business (other than nominations) to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary and such business must otherwise be a proper matter for stockholder action. Subject to Section 2.7(a)(iii), a stockholder's notice to the Secretary with respect to such business, to be timely, must be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation. The public announcement of an adjournment or postponement of an annual meeting shall not commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 2.7(a).

(ii) To be in proper written form, a stockholder's notice to the Secretary with respect to any business (other than nominations) must set forth as to each such matter such stockholder proposes to bring before the annual meeting (A) a brief description of the business desired to be brought before the annual meeting, the text of the proposal or business (including

the text of any resolutions proposed for consideration and in the event such business includes a proposal to amend these Bylaws, the language of the proposed amendment) and the reasons for

conducting such business at the annual meeting, (B) the name and record address of such stockholder and the name and address of the beneficial owner, if any, on whose behalf the proposal is made, (C) the class or series and number of shares of capital stock of the Corporation that are owned beneficially and of record by such stockholder and by the beneficial owner, if any, on whose behalf the proposal is made, (D) a description of all arrangements or understandings between such stockholder and the beneficial owner, if any, on whose behalf the proposal is made and any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (E) any material interest of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made in such business and (F) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the annual meeting to bring such business before the meeting.

(iii) The foregoing notice requirements of this Section 2.7(a) shall be deemed satisfied by a stockholder as to any proposal (other than nominations) if the stockholder has notified the Corporation of such stockholder's intention to present such proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), and such stockholder has complied with the requirements of such rule for inclusion of such proposal in a proxy statement prepared by the Corporation to solicit proxies for such annual meeting. No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2.7(a), provided, however, that once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 2.7(a) shall be deemed to preclude discussion by any stockholder of any such business. If the Board or the chairman of the annual meeting determines that any stockholder proposal was not made in accordance with the provisions of this Section 2.7(a) or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 2.7(a), such proposal shall not be presented for action at the annual meeting. Notwithstanding the foregoing provisions of this Section 2.7(a), if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present the proposed business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

(iv) In addition to the provisions of this Section 2.7(a), a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein. Nothing in this Section 2.7(a) shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(b) Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting only pursuant to Section 3.2.

(c) Public Announcement. For purposes of these Bylaws, "***public announcement***" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated

Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act (or any successor thereto).

**Section 2.8. Conduct of Meetings**. The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the President or if the President is not a director, such other person as shall be appointed by the Board. The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the chairman of the meeting. The Board may adopt such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate. Except to the extent inconsistent with these Bylaws or such rules and regulations as adopted by the Board, the chairman of any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and procedures for maintaining order at the meeting and the safety of those present; (c) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (e) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary so appointed to act by the chairman of the meeting. In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

**Section 2.9. Consents in Lieu of Meeting**. Unless otherwise provided by the Certificate of Incorporation, until the Corporation consummates an initial public offering, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock entitled to vote thereon having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the

Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this section and the DGCL to the Corporation, written consents signed by a sufficient number of holders entitled to vote to take action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

## ARTICLE III DIRECTORS

**Section 3.1. Powers; Number**. The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws required to be exercised or done by the stockholders. Directors need not be stockholders or residents of the State of Delaware. Subject to the Certificate of Incorporation, the number of directors shall be fixed exclusively by resolution of the Board.

**Section 3.2. Advance Notice for Nomination of Directors**.

(a) Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided by the terms of one or more series of Preferred Stock with respect to the rights of holders of one or more series of Preferred Stock to elect directors. Nominations of persons for election to the Board at any annual meeting of stockholders, or at any special meeting of stockholders called for the purpose of electing directors as set forth in the Corporation's notice of such special meeting, may be made (i) by or at the direction of the Board or (ii) by any stockholder of the Corporation
(x) who is a stockholder of record entitled to vote in the election of directors on the date of the giving of the notice provided for in this Section 3.2 and on the record date for the determination of stockholders entitled to vote at such meeting and (y) who complies with the notice procedures set forth in this Section 3.2.

(b) In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary. To be timely, a stockholder's notice to the Secretary must be received by the Secretary at the principal executive offices of the Corporation (i) in the case of an annual meeting, not later than the close of business on the 90th day nor earlier than the close of business on the 120th day before the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so received no earlier than the close of business on the 120th day before the meeting and not later than the later of (x) the close of business on the 90th day before the meeting or (y) the close of business on the 10th day following the day on which public announcement of the date of the

annual meeting was first made by the Corporation; and (ii) in the case of a special meeting of stockholders called for the purpose of electing directors, not later than the close of business on

the 10th day following the day on which public announcement of the date of the special meeting is first made by the Corporation. In no event shall the public announcement of an adjournment or postponement of an annual meeting or special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described in this Section 3.2.

(c) Notwithstanding anything in paragraph (b) to the contrary, in the event that the number of directors to be elected to the Board at an annual meeting is greater than the number of directors whose terms expire on the date of the annual meeting and there is no public announcement by the Corporation naming all of the nominees for the additional directors to be elected or specifying the size of the increased Board before the close of business on the 90th day prior to the anniversary date of the immediately preceding annual meeting of stockholders, a stockholder's notice required by this Section 3.2 shall also be considered timely, but only with respect to nominees for the additional directorships created by such increase that are to be filled by election at such annual meeting, if it shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 10th day following the date on which such public announcement was first made by the Corporation.

(d) To be in proper written form, a stockholder's notice to the Secretary must set forth (i) as to each person whom the stockholder proposes to nominate for election as a director
(A) the name, age, business address and residence address of the person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation that are owned beneficially or of record by the person and (D) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder; and (ii) as to the stockholder giving the notice (A) the name and record address of such stockholder as they appear on the Corporation's books and the name and address of the beneficial owner, if any, on whose behalf the nomination is made, (B) the class or series and number of shares of capital stock of the Corporation that are owned beneficially and of record by such stockholder and the beneficial owner, if any, on whose behalf the nomination is made, (C) a description of all arrangements or understandings relating to the nomination to be made by such stockholder among such stockholder, the beneficial owner, if any, on whose behalf the nomination is made, each proposed nominee and any other person or persons (including their names), (D) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (E) any other information relating to such stockholder and the beneficial owner, if any, on whose behalf the nomination is made that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

(e) If the Board or the chairman of the meeting of stockholders determines that any nomination was not made in accordance with the provisions of this Section 3.2, or that the information provided in a stockholder's notice does not satisfy the information requirements of

this Section 3.2, then such nomination shall not be considered at the meeting in question. Notwithstanding the foregoing provisions of this Section 3.2, if the stockholder (or a qualified

representative of the stockholder) does not appear at the meeting of stockholders of the Corporation to present the nomination, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Corporation.

(f) In addition to the provisions of this Section 3.2, a stockholder shall also comply with all of the applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth herein. Nothing in this Section 3.2 shall be deemed to affect any rights of the holders of Preferred Stock to elect directors pursuant to the Certificate of Incorporation.

**Section 3.3. Compensation**. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board shall have the authority to fix the compensation of directors, including for service on a committee of the Board, and may be paid either a fixed sum for attendance at each meeting of the Board or other compensation as director. The directors may be reimbursed their expenses, if any, of attendance at each meeting of the Board. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of committees of the Board may be allowed like compensation and reimbursement of expenses for service on the committee.

## ARTICLE IV BOARD MEETINGS

**Section 4.1. Annual Meetings**. The Board shall meet as soon as practicable after the adjournment of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board. No notice to the directors shall be necessary to legally convene this meeting, except as provided in this Section 4.1.

**Section 4.2. Regular Meetings**. Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places (within or without the State of Delaware) as shall from time to time be determined by the Board.

**Section 4.3. Special Meetings**. Special meetings of the Board (a) may be called by the Chairman of the Board or President and (b) shall be called by the Chairman of the Board, President or Secretary on the written request of at least a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place (within or without the State of Delaware) as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request.
Notice of each special meeting of the Board shall be given, as provided in Section 9.3, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery; (ii) at least two days before the meeting if such notice is sent by a nationally recognized overnight delivery service; and (iii) at least five days before the meeting if such notice is sent through the United States mail. If the Secretary shall fail or refuse to give

such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting. Any and all business that may be transacted at a regular meeting of

the Board may be transacted at a special meeting. Except as may be otherwise expressly provided by applicable law, the Certificate of Incorporation, or these Bylaws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting. A special meeting may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 9.4.

**Section 4.4. Quorum; Required Vote**. A majority of the Board shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these Bylaws. If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

**Section 4.5. Consent In Lieu of Meeting**. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

**Section 4.6. Organization**. The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or in the absence (or inability or refusal to act) of the President or if the President is not a director, a chairman elected from the directors present. The Secretary shall act as secretary of all meetings of the Board. In the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary shall perform the duties of the Secretary at such meeting. In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

## ARTICLE V COMMITTEES OF DIRECTORS

**Section 5.1. Establishment**. The Board may, by resolution of the Board, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Each committee shall keep regular minutes of its meetings and report the same to the Board when required by the resolution designating such committee. The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.

**Section 5.2. Available Powers**. Any committee established pursuant to Section 5.1 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and may exercise all of the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

**Section 5.3. Alternate Members**. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. In the absence or disqualification of a member of the committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in place of any such absent or disqualified member.

**Section 5.4. Procedures**. Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee. At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business. The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these Bylaws or the Board. If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. Unless the Board otherwise provides and except as provided in these Bylaws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article III and Article IV of these Bylaws.

## ARTICLE VI OFFICERS

**Section 6.1. Officers**. The officers of the Corporation elected by the Board shall be one Chief Executive Officer, a Chief Financial Officer, a Secretary and such other officers (including without limitation, a Chairman of the Board, Chief Operating Officer, Presidents, Vice Presidents, Partners, Managing Directors and Senior Managing Directors) as the Board from time to time may determine. Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this Article VI. Such officers shall also have such powers and duties as from time to time may be conferred by the Board. The Chief Executive Officer or President may also appoint such other officers (including without limitation one or more Vice Presidents and Controllers) as may be necessary or desirable for the conduct of the business of the Corporation. Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these Bylaws or as may be prescribed by the Board or, if such officer has been appointed by the Chief Executive Officer or President, as may be prescribed by the appointing officer.

(a) Chairman of the Board. The Chairman of the Board shall preside when present at all meetings of the stockholders and the Board. The Chairman of the Board shall have general

supervision and control of the acquisition activities of the Corporation subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters. In the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The powers and duties of the Chairman of the Board shall not include supervision or control of the preparation of the financial statements of the Corporation (other than through participation as a member of the Board). The position of Chairman of the Board and Chief Executive Officer may be held by the same person and may be held by more than one person.

(b) Chief Executive Officer. The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board with respect to such matters, except to the extent any such powers and duties have been prescribed to the Chairman of the Board pursuant to Section 6.1(a) above. In the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The position of Chief Executive Officer and President may be held by the same person and may be held by more than one person.

(c) President and Chief Operating Officer. The President and Chief Operating Officer shall make recommendations to the Chief Executive Officer on all operational matters that would normally be reserved for the final executive responsibility of the Chief Executive Officer. In the absence (or inability or refusal to act) of the Chairman of the Board and Chief Executive Officer, the President and Chief Operating Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board. The President and Chief Operating Officer shall also perform such duties and have such powers as shall be designated by the Board. The position of President, Chief Operating Officer and Chief Executive Officer may be held by the same person.

(d) Vice Presidents. In the absence (or inability or refusal to act) of the President, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President. Any one or more of the Vice Presidents may be given an additional designation of rank or function.

(e) Secretary.

(i) The Secretary shall attend all meetings of the stockholders, the Board and (as required) committees of the Board and shall record the proceedings of such meetings in books to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, Chief Executive Officer or President. The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of

such Assistant Secretary. The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(ii) The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

(f) Chief Financial Officer. The Chief Financial Officer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the Corporation, which from time to time may come into the Chief Financial Officer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board, Chief Executive Officer or the President may authorize).

**Section 6.2. Term of Office; Removal; Vacancies**. The elected officers of the Corporation shall be appointed by the Board and shall hold office until their successors are duly elected and qualified by the Board or until their earlier death, resignation, retirement, disqualification, or removal from office. Any officer may be removed, with or without cause, at any time by the Board. Any officer appointed by the Chief Executive Officer or President may also be removed, with or without cause, by the Chief Executive Officer or President, as the case may be, unless the Board otherwise provides. Any vacancy occurring in any elected office of the Corporation may be filled by the Board. Any vacancy occurring in any office appointed by the Chief Executive Officer or President may be filled by the Chief Executive Officer, or President, as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

**Section 6.3. Other Officers**. The Board may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

**Section 6.4. Multiple Officeholders; Stockholder and Director Officers**. Any number of offices may be held by the same person unless the Certificate of Incorporation or these Bylaws otherwise provide. Officers need not be stockholders or residents of the State of Delaware.

## ARTICLE VII SHARES

**Section 7.1. Certificated and Uncertificated Shares**. The shares of the Corporation may be certificated or uncertificated, subject to the sole discretion of the Board and the requirements of the DGCL.

**Section 7.2. Multiple Classes of Stock**. If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the Corporation shall (a) cause

the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such

preferences and/or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; provided, however, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

**Section 7.3. Signatures**. Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by (a) the Chairman of the Board, the Chief Executive Officer, the President or a Vice President and (b) the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation. Any or all the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

**Section 7.4. Consideration and Payment for Shares**.

(a) Subject to applicable law and the Certificate of Incorporation, shares of stock may be issued for such consideration, having in the case of shares with par value a value not less than the par value thereof, and to such persons, as determined from time to time by the Board. The consideration may consist of any tangible or intangible property or any benefit to the Corporation including cash, promissory notes, services performed, contracts for services to be performed or other securities, or any combination thereof.

(b) Subject to applicable law and the Certificate of Incorporation, shares may not be issued until the full amount of the consideration has been paid, unless upon the face or back of each certificate issued to represent any partly paid shares of capital stock or upon the books and records of the Corporation in the case of partly paid uncertificated shares, there shall have been set forth the total amount of the consideration to be paid therefor and the amount paid thereon up to and including the time said certificate representing certificated shares or said uncertificated shares are issued.

**Section 7.5. Lost, Destroyed or Wrongfully Taken Certificates**.

(a) If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate representing such shares or such shares in uncertificated form if the owner: (i) requests such a new certificate before the Corporation has notice that the certificate representing such shares has

been acquired by a protected purchaser; (ii) if requested by the Corporation, delivers to the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made

against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(b) If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

**Section 7.6. Transfer of Stock**.

(a) If a certificate representing shares of the Corporation is presented to the Corporation with an endorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(i) in the case of certificated shares, the certificate representing such shares has been surrendered;

(ii) (A) with respect to certificated shares, the endorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the endorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(iii) the Corporation has received a guarantee of signature of the person signing such endorsement or instruction or such other reasonable assurance that the endorsement or instruction is genuine and authorized as the Corporation may request;

(iv) the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.8(a); and

(v) such other conditions for such transfer as shall be provided for under applicable law have been satisfied.

(b) Whenever any transfer of shares shall be made for collateral security and not absolutely, the Corporation shall so record such fact in the entry of transfer if, when the certificate for such shares is presented to the Corporation for transfer or, if such shares are uncertificated, when the instruction for registration of transfer thereof is presented to the Corporation, both the transferor and transferee request the Corporation to do so.

**Section 7.7. Registered Stockholders**. Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting

registration of transfer of uncertificated shares, the Corporation may treat the registered owner as the person exclusively entitled to inspect for any proper purpose the stock ledger and the other

books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

**Section 7.8. Effect of the Corporation's Restriction on Transfer**

(a) A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice, offering circular or prospectus sent by the Corporation to the registered owner of such shares within a reasonable time prior to or after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b) A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice, offering circular or prospectus sent by the Corporation to the registered owner of such shares within a reasonable time prior to or after the issuance or transfer of such shares.

**Section 7.9. Regulations**. The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares. The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

## ARTICLE VIII INDEMNIFICATION

**Section 8.1. Right to Indemnification**. To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify and hold harmless each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "***proceeding***"), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other

enterprise or nonprofit entity, including service with respect to an employee benefit plan (hereinafter an

"***Indemnitee***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all liability and loss suffered and expenses (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred by such Indemnitee in connection with such proceeding; provided, however, that, except as provided in Section 8.3 with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify an Indemnitee in connection with a proceeding (or part thereof) initiated by such Indemnitee only if such proceeding (or part thereof) was authorized by the Board.

**Section 8.2. Right to Advancement of Expenses**. In addition to the right to indemnification conferred in Section 8.1, an Indemnitee shall also have the right to be paid by the Corporation to the fullest extent not prohibited by applicable law the expenses (including, without limitation, attorneys' fees) incurred in defending or otherwise participating in any such proceeding in advance of its final disposition (hereinafter an "***advancement of expenses***"); provided, however, that, if the DGCL requires, an advancement of expenses incurred by an Indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon the Corporation's receipt of an undertaking (hereinafter an "***undertaking***"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified under this Article VIII or otherwise.

**Section 8.3. Right of Indemnitee to Bring Suit**. If a claim under Section 8.1 or Section 8.2 is not paid in full by the Corporation within 60 days after a written claim therefor has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall also be entitled to be paid the expense of prosecuting or defending such suit. In (a) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by an Indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (b) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final judicial decision from which there is no further right to appeal (hereinafter a "***final adjudication***") that, the Indemnitee has not met any applicable standard for indemnification set forth in the DGCL. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of

conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, shall be a defense to such suit.

In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement

of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article VIII or otherwise shall be on the Corporation.

**Section 8.4. Non-Exclusivity of Rights**. The rights provided to any Indemnitee pursuant to this Article VIII shall not be exclusive of any other right, which such Indemnitee may have or hereafter acquire under applicable law, the Certificate of Incorporation, these Bylaws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

**Section 8.5. Insurance**. The Corporation may maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

**Section 8.6. Indemnification of Other Persons**. This Article VIII shall not limit the right of the Corporation to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than Indemnitees. Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, to the fullest extent of the provisions of this Article VIII with respect to the indemnification and advancement of expenses of Indemnitees under this Article VIII.

**Section 8.7. Amendments**. Any repeal or amendment of this Article VIII by the Board or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these Bylaws inconsistent with this Article VIII, will, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Indemnitees on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision; provided, however, that amendments or repeals of this Article VIII shall require the affirmative vote of the stockholders holding at least 66.7% of the voting power of all outstanding shares of capital stock of the Corporation.

**Section 8.8. Certain Definitions**. For purposes of this Article VIII, (a) references to "***other enterprise***" shall include any employee benefit plan; (b) references to "***fines***" shall include any excise taxes assessed on a person with respect to an employee benefit plan;
(c) references to "***serving at the request of the Corporation***" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an

employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" for purposes of Section 145 of the DGCL.

**Section 8.9. Contract Rights**. The rights provided to Indemnitees pursuant to this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, agent or employee and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.

**Section 8.10. Severability**. If any provision or provisions of this Article VIII shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Article VIII shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VIII (including, without limitation, each such portion of this Article VIII containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## ARTICLE IX MISCELLANEOUS

**Section 9.1. Place of Meetings**. If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these Bylaws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 9.5 hereof, then such meeting shall not be held at any place.

**Section 9.2. Fixing Record Dates**.

(a) In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 9.2(a) at the adjourned meeting.

(b) In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

**Section 9.3. Means of Giving Notice**.

(a) Notice to Directors. Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any director, such notice shall be given either (i) in writing and sent by mail, or by a nationally recognized delivery service, (ii) by means of facsimile telecommunication or other form of electronic transmission, or (iii) by oral notice given personally or by telephone. A notice to a director will be deemed given as follows:
(i) if given by hand delivery, orally, or by telephone, when actually received by the director,
(ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iv) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (v) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (vi) if sent by any other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(b) Notice to Stockholders. Whenever, under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in Section 232 of the DGCL. A notice to a stockholder shall be deemed given as follows: (i) if given by hand delivery, when actually received by the stockholder, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, and (iv) if given by a form of electronic transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above,
(A) if by facsimile transmission, when directed to a number at which the stockholder has consented to receive notice, (B) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (C) if by a posting on an electronic

network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and (D) if by any other form of

electronic transmission, when directed to the stockholder. A stockholder may revoke such stockholder's consent to receiving notice by means of electronic communication by giving written notice of such revocation to the Corporation. Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(c) Electronic Transmission. "***Electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by telex, facsimile telecommunication, electronic mail, telegram and cablegram.

(d) Notice to Stockholders Sharing Same Address. Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation. Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(e) Exceptions to Notice Requirements. Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these Bylaws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings or of the taking of action by written consent of stockholders without a meeting to such stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records

of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required. Any action or meeting that shall be taken or held without

notice to such stockholder shall have the same force and effect as if such notice had been duly given. If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then current address, the requirement that notice be given to such stockholder shall be reinstated. In the event that the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230(b) of the DGCL. The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

**Section 9.4. Waiver of Notice**. Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these Bylaws, a written waiver of such notice, signed by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to such required notice. All such waivers shall be kept with the books of the Corporation. Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.5. Meeting Attendance via Remote Communication Equipment**.

(a) Stockholder Meetings. If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders entitled to vote at such meeting and proxy holders not physically present at a meeting of stockholders may, by means of remote communication:

(i) participate in a meeting of stockholders; and

(ii) be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxy holder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxy holders a reasonable opportunity to participate in the meeting and, if entitled to vote, to vote on matters submitted to the applicable stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxy holder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b) Board Meetings. Unless otherwise restricted by applicable law, the Certificate of Incorporation or these Bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Such participation in a meeting shall constitute presence in person at the meeting,

except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.6. Dividends**. The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

**Section 9.7. Reserves**. The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

**Section 9.8. Contracts and Negotiable Instruments**. Except as otherwise provided by applicable law, the Certificate of Incorporation or these Bylaws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize. Such authority may be general or confined to specific instances as the Board may determine. The Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, the Treasurer or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation. Subject to any restrictions imposed by the Board, the Chairman of the Board, the Chief Executive Officer, President, the Chief Financial Officer, the Treasurer or any Vice President may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

**Section 9.9. Fiscal Year**. The fiscal year of the Corporation shall be fixed by the Board.

**Section 9.10. Seal**. The Board may adopt a corporate seal, which shall be in such form as the Board determines. The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

**Section 9.11. Books and Records**. The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

**Section 9.12. Resignation**. Any director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary. The resignation shall take effect at the time it is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 9.13. Surety Bonds**. Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, the Chief Executive Officer, the President or the Board may

direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or

removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, the Chief Executive Officer, President or the Board may determine. The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

**Section 9.14. Securities of Other Corporations**. Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board, the Chief Executive Officer, the President, any Vice President or any officers authorized by the Board. Any such officer, may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed. The Board may from time to time confer like powers upon any other person or persons.

**Section 9.15. Amendments**. The Board shall have the power to adopt, amend, alter or repeal the Bylaws. The affirmative vote of a majority of the Board shall be required to adopt, amend, alter or repeal the Bylaws. The Bylaws also may be adopted, amended, altered or repealed by the stockholders; provided, however, that in addition to any vote of the holders of any class or series of capital stock of the Corporation required by applicable law or the Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power (except as otherwise provided in Section 8.7) of all outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders to adopt, amend, alter or repeal the Bylaws.

**ABACUS LIFE, INC.**
**DESCRIPTION OF SECURITIES**
**REGISTERED PURSUANT TO SECTION 12 OF**
**THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED**

*The following is a description of the common stock, public warrants and 9.875% Fixed Rate Senior Notes due 2028 of Abacus Global Management, Inc. (the "Company," "we," "our," or "us"), which are the only securities of the Company registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The following summary description is based on the provisions of our certificate of incorporation, our bylaws and the applicable provisions of the Delaware General Corporation Law. This summary does not purport to be complete and is subject to, and is qualified in its entirety by express reference to, the applicable provisions of our certificate of incorporation and our bylaws, which are filed as exhibits to this Annual Report on Form 10-K, of which this Exhibit is a part, and are incorporated by reference herein. We encourage you to read our certificate of incorporation. our bylaws and the applicable provisions of the Delaware General Corporation Law for more information.*

**General**

The following description is a summary, does not purport to be complete and is qualified in its entirety by reference to our certificate of incorporation, as amended, and our bylaws, which are filed as exhibits to the registration statement of which this prospectus is a part and are incorporated by reference into this prospectus.

**DESCRIPTION OF COMMON STOCK ("ABL")**

We are authorized to issue up to 201,000,000 shares of capital stock, of which 200,000,000 are shares of Common Stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, $0.0001 par value (the "Common Stock").

**Common Stock**

The holders of our Common Stock are entitled to the following rights:

*Voting Rights*. Our Common Stock is entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders, including the election of directors, and does not have cumulative voting rights. Accordingly, all elections shall be determined by a plurality of the votes cast, and except as otherwise required by law, all other matters shall be determined by a majority of the votes cast affirmatively or negatively.

*Dividends*. The holders of our Common Stock are entitled to receive dividends if any, as may be declared from time to time by our board of directors out of legally available funds.

*Liquidation*. In the event of our liquidation, dissolution, or winding up, holders of our Common Stock will be entitled to share ratably in the net assets legally available for distribution to stockholders after the payment of all of our debts and other liabilities, subject to the satisfaction of any liquidation preference granted to the holders of any outstanding shares of our preferred stock, if any.

*Rights and Preferences*. Holders of our Common Stock have no pre-emptive, conversion, or subscription rights, and there are no redemption or sinking fund provisions applicable to our Common Stock.

*Fully Paid and Nonassessable*. All of our outstanding shares of our Common Stock are, and the shares of our Common Stock to be issued in this offering will be, fully paid and nonassessable.

*Exclusive Forum*

Our Certificate of Incorporation provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (the "Court of Chancery") shall be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Company, (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or agent of the Company to the Company or the Company's stockholders, (c) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law, our Certificate of Incorporation or Bylaws, or (d) any action asserting a claim asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (a) through (d) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction; and subject to the preceding provisions of this Section 12.1, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended (the "Securities Act").

*Section 203 of the Delaware General Corporation Law*

We are subject to the provisions of Section 203 of the DGCL regulating corporate takeovers. This statute prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");
- an affiliate of an interested stockholder; or
- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

A "business combination" includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- our board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction; or

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of Common Stock.

**DESCRIPTION OF THE PUBLIC WARRANTS ("ABLLW"):**

Each warrant will entitle the registered holder to purchase one share of Common Stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing 30 days after the Closing. However, no warrants will be exercisable for cash unless the Company has an effective and current registration statement covering the shares of Common Stock issuable upon exercise of the warrants and a current prospectus relating to such shares of Common Stock. Notwithstanding the foregoing, if the Common Stock is not listed on a national security exchange at the time of any exercise of a warrant such Common Stock satisfies the definition of "covered security," under Section 18(b)(1) of the Securities Act, the Company may, at its option, require holders of the public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act, and, in such case, the Company will not be required to file or maintain in effect a registration statement, but will be required to use its best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. If that exemption or another exemption is not available, holders will not be able to exercise their warrants on a cashless basis. In the event of such cashless exercise, each holder would pay the exercise price by surrendering the warrants for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the warrants, multiplied by the excess of the fair market value over the exercise price of the warrants and the "fair market value" (defined subsequently) by (y) the fair market value. The "fair market value" means the average reported last sale price of the shares of Common Stock for the 10 trading days ending on the third trading day prior to the date on which the notice of exercise is sent to the holders of warrants. The warrants will expire on the fifth anniversary of the Closing at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

After the warrants become exercisable, the Company may call the warrants for redemption, in whole and not in part, as follows:

- at a price of $0.01 per warrant;
- upon not less than 30 days' prior written notice of redemption to each warrant holder;
- if, and only if, the reported last sale price of the shares of Common Stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, reclassifications, recapitalizations and the like), for any 20 trading days within a 30 trading day period commencing at any time after the warrants become exercisable and ending on the third business day prior to the notice of redemption to warrant holders; and
- if, and only if, there is a current registration statement in effect with respect to the shares of Common Stock underlying such warrants.

Commencing 90 days after the warrants become exercisable, the Company may redeem the outstanding warrants, in whole and not in part, as follows:

- at a price equal to a number of shares of Common Stock to be determined by reference to the table below, based on the redemption date and the fair market value (as defined above) of the Common Stock except as otherwise described below;
- upon not less than 30 days' prior written notice of redemption to each warrant holder;
- if, and only if, the last sale price of our Common Stock equals or exceeds $10.00 per share (as adjusted for stock splits, stock dividends, reorganizations, reclassifications, recapitalizations and the like) on the trading day prior to the date on which the Company sends the notice of redemption to the warrant holders; and
- if, and only if, there is a current registration statement in effect with respect to the shares of Common Stock underlying such warrants.

In both redemption scenarios, the Company has no obligation to notify holders of the warrants that they have become eligible for redemption. However, in the event that the Company decides to redeem the warrants, the Company shall fix a redemption date and must send a notice of redemption by first class mail, postage prepaid, to the registered holders of the warrants to be redeemed not less than 30 days prior to that redemption date.

The numbers in the table below represent the "redemption prices," or the number of shares of Common Stock that a warrant holder will receive upon redemption by the Company pursuant to the above redemption feature based on the fair market value of the Common Stock on the corresponding redemption date and the number of months that the corresponding redemption date precedes the expiration date of the warrants, each as set forth in the table below.

| Redemption Date (period to expiration of warrants) | Fair Market Value of Common Stock | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **$10.00** | **$11.00** | **$12.00** | **$13.00** | **$14.00** | **$15.00** | **$16.00** | **$17.00** | **$18.00** |
| 57 months | 0.257 | 0.277 | 0.294 | 0.310 | 0.324 | 0.337 | 0.348 | 0.358 | 0.365 |
| 54 months | 0.252 | 0.272 | 0.291 | 0.307 | 0.322 | 0.335 | 0.347 | 0.357 | 0.365 |
| 51 months | 0.246 | 0.268 | 0.287 | 0.304 | 0.320 | 0.333 | 0.346 | 0.357 | 0.365 |
| 48 months | 0.241 | 0.263 | 0.283 | 0.301 | 0.317 | 0.332 | 0.344 | 0.356 | 0.365 |
| 45 months | 0.235 | 0.258 | 0.279 | 0.298 | 0.315 | 0.330 | 0.343 | 0.356 | 0.365 |
| 42 months | 0.228 | 0.252 | 0.274 | 0.294 | 0.312 | 0.328 | 0.342 | 0.355 | 0.364 |
| 39 months | 0.221 | 0.246 | 0.269 | 0.290 | 0.309 | 0.325 | 0.340 | 0.354 | 0.364 |
| 36 months | 0.213 | 0.239 | 0.263 | 0.285 | 0.305 | 0.323 | 0.339 | 0.353 | 0.364 |
| 33 months | 0.205 | 0.232 | 0.257 | 0.280 | 0.301 | 0.320 | 0.337 | 0.352 | 0.364 |
| 30 months | 0.196 | 0.224 | 0.250 | 0.274 | 0.297 | 0.316 | 0.335 | 0.351 | 0.364 |
| 27 months | 0.185 | 0.214 | 0.242 | 0.268 | 0.291 | 0.313 | 0.332 | 0.350 | 0.364 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 24 months | 0.173 | 0.204 | 0.233 | 0.260 | 0.285 | 0.308 | 0.329 | 0.348 | 0.364 |
| 21 months | 0.161 | 0.193 | 0.223 | 0.252 | 0.279 | 0.304 | 0.326 | 0.347 | 0.364 |
| 18 months | 0.146 | 0.179 | 0.211 | 0.242 | 0.271 | 0.298 | 0.322 | 0.345 | 0.363 |
| 15 months | 0.130 | 0.164 | 0.197 | 0.230 | 0.262 | 0.291 | 0.317 | 0.342 | 0.363 |
| 12 months | 0.111 | 0.146 | 0.181 | 0.216 | 0.250 | 0.282 | 0.312 | 0.339 | 0.363 |
| 9 months | 0.090 | 0.125 | 0.162 | 0.199 | 0.237 | 0.272 | 0.305 | 0.336 | 0.362 |
| 6 months | 0.065 | 0.099 | 0.137 | 0.178 | 0.219 | 0.259 | 0.296 | 0.331 | 0.362 |
| 3 months | 0.034 | 0.065 | 0.104 | 0.150 | 0.197 | 0.243 | 0.286 | 0.326 | 0.361 |
| 0 months | — | — | 0.042 | 0.115 | 0.179 | 0.233 | 0.281 | 0.323 | 0.361 |

The exact fair market value and redemption date may not be set forth in the table above, in which case, if the fair market value is between two values in the table or the redemption date is between two redemption dates in the table, the number of shares of Common Stock to be issued for each warrant redeemed will be determined by a straight-line interpolation between the number of shares set forth for the higher and lower fair market values and the earlier and later redemption dates, as applicable, based on a 365-day year. As reflected in the table above, the Company can redeem the warrants for no consideration in the event that the warrants are "out of the money" (i.e., the trading price of our Common Stock is below the exercise price of the warrants) and about to expire.

The right to exercise will be forfeited unless the warrants are exercised prior to the redemption date specified in the notice of redemption. On and after the redemption date, a record holder of a warrant will have no further rights except to receive the redemption price for such holder's warrant, as calculated pursuant to the above, upon surrender of such warrant.

The redemption criteria for the Company's warrants have been established at a price which is intended to provide warrant holders a reasonable premium to the initial exercise price and provide a sufficient differential between the then-prevailing share price and the warrant exercise price so that if the share price declines as a result of the Company's redemption call, the redemption will not cause the share price to drop below the exercise price of the warrants.

If the Company calls the warrants for redemption as described above, the Company's management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the warrants, multiplied by the excess of the fair market value (as defined above) over the exercise price of the warrants and by (y) the fair market value.

The warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and the Company. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity, or cure, correct or supplement any defective provision of the warrant agreement or to add or change any other provisions with respect to matters or questions arising under the warrant agreement as the parties to the warrant agreement may deem necessary or

desirable and that the parties deem to not adversely affect the interest of the registered holders of the warrants. The warrant agreement requires the approval, by written consent or vote, of the holders of at least 50% of the then outstanding public warrants in order to make any change that adversely affects the interests of the registered holders; provided that if an amendment adversely affects the Private Placement Warrants in a different manner than the public warrants or vice versa, then the vote or written consent of the registered holders of 65% of the public warrants and 65% of the Private Placement Warrants, voting as separate classes, is required.

The exercise price and number of shares of Common Stock issuable on exercise of the warrants may be adjusted in certain circumstances including in the event of a stock split, stock dividend, extraordinary dividend or the Company's recapitalization, reorganization, merger or consolidation. However, except as described below, the warrants will not be adjusted for issuances of shares of Common Stock at a price below their respective exercise prices.

In addition, if the Company issues additional shares of Common Stock or equity-linked securities for capital raising purposes in connection with the Closing at a newly issued price of less than $9.20 per share of the Common Stock (with such issue price or effective issue price to be determined in good faith by the Company's board of directors, and in the case of any such issuance to the Sponsor or its affiliates, without taking into account any Founder Shares held by the Sponsor or such affiliates, as applicable, prior to such issuance), the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the newly issued price. The warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price and any and all applicable taxes due in connection with the exercise of the warrant, by certified or official bank check payable to the Company, for the number of warrants being exercised. The warrant holders do not have the rights or privileges of holders of shares of Common Stock and any voting rights until they exercise their warrants and receive shares of Common Stock. After the issuance of shares of Common Stock upon exercise of the warrants, each holder will be entitled to one vote for each share held of record on all matters to be voted on by stockholders.

Warrant holders may elect to be subject to a restriction on the exercise of their warrants such that an electing warrant holder would not be able to exercise their warrants to the extent that, after giving effect to such exercise, such holder would beneficially own in excess of 9.8% of the shares of Common Stock outstanding.

No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, the number of shares of Common Stock to be issued to the warrant holder will be rounded up to the nearest whole number.

Subject to applicable law, any action, proceeding or claim against us or the Company arising out of or relating in any way to the warrant agreement, including under the Securities Act, will be brought and enforced in the courts of the State of New York or the United States District Court for the Southern District of New York, and we irrevocably submit to such jurisdiction, which jurisdiction will be the exclusive forum for any such action, proceeding or claim. This exclusive forum provision shall not apply to suits brought to enforce a duty or liability created by the Exchange Act, any other claim for which the federal district courts of the United States of America are the sole and exclusive forum.

**9.875% Fixed Rate Senior Notes due 2028 ("ABLLL")**

In November 2023, the Company issued 1,426,000 of its 9.875% Fixed Rate Senior Notes due 2028 (the "Notes") for a total raise of $35,650,000, and in February 2024, issued an additional 1,000,000 Notes for a total raise of $25,000,000. On December 2, 2024, the Company issued 2,909,083 Notes with an aggregate principal amount of $72,727,075 as partial consideration for the acquisition of Carlisle Management Company S.C.A.

A summary of the terms and conditions of the Notes follows:

| | |
|---|---|
| Title of the securities | 9.875% Fixed Rate Senior Notes due 2028 |
| Principal payable at maturity | 100% of the aggregate principal amount. The outstanding principal amount of the notes will be payable on the stated maturity date at the office of the trustee, paying agent and security registrar for the notes or at such other office as we may designate. |
| Maturity date | The Notes will mature on November 15, 2028. |
| Interest rate | 9.875% per annum. |
| Interest periods | The initial interest period is the period from and including the issue date, to, but excluding, the initial interest payment date, and the subsequent interest periods are the periods from and including an interest payment date to, but excluding, the next interest payment date or the stated maturity date, as the case may be. |
| Interest payment dates | Each February 15, May 15, August 15 and November 15 of each year ending on the maturity date. If an interest payment date falls on a non-business day, the applicable interest payment will be made on the next business day and no additional interest will accrue as a result of such delayed payment. |
| Interest day count convention | Interest is computed on the basis of a 360-day year consisting of twelve 30-day months. |
| Record dates | Interest is paid to the person in whose name a note is registered at the close of business on the 15th calendar day (whether or not a Business Day) preceding the related date an interest payment is due with respect to such note; provided that if the notes are global notes held by DTC, the record date for such notes will be the close of business on the Business Day preceding the applicable interest payment date. |
| Ranking | The Notes are the Company's senior unsecured obligations and will rank: (i) equal in right of payment to the Company's other outstanding and future senior unsecured indebtedness (including the Company's $10.5 million Amended and Restated Unsecured Senior Promissory Note, dated as of July 5, 2023); (ii) senior to any of the Company's existing and future indebtedness that expressly provides it is subordinated to the notes; (iii) effectively subordinated to all of the Company's existing and future secured indebtedness (including indebtedness that is initially unsecured to which the Company subsequently grants security), to the extent of the value of the assets securing such indebtedness (including the Company's $150 million senior secured credit facility dated as of December 10, 2024 (the "SSCF")); and (iv) structurally subordinated to all existing and future indebtedness and other obligations of any of the Company's subsidiaries (including the guarantees by the Company's subsidiaries of the SSCF). |

| | |
|---|---|
| Change of control offer to repurchase | If the Company is subject to a Change of Control Repurchase Event, each holder of the Notes may require the Company to purchase all or a portion of such holder's notes at a price equal to 100% of their principal amount, plus accrued and unpaid interest thereon, if any, to, but excluding, the date of purchase. |
| Repayment at holder's option | The notes are subject to repayment at the option of the holder at any time prior to the maturity date, except as set forth under "Description of the Notes-Offer to Repurchase Upon a Change of Control Repurchase Event" and will not be entitled to any sinking fund. |
| Events of default | Events of default include defaults in payment of principal or interest on the Notes, breach of a Note covenant, defaults in payment of debt of over $10 million, and bankruptcy or insolvency. Either the trustee or the holders of 25% of the principal amount of Notes outstanding can generally declare the Notes payable following an event of default. Subject to certain conditions, this declaration may be annulled by the holders of a majority in the principal amount of the Notes. In addition, the holders of a majority in principal amount of notes of all affected series (voting as one class except in the case of events of default regarding a default in any principal, premium or interest payment or deposit of any sinking fund, as to which each series so affected will vote as a separate class) may waive any past default with respect to the notes of such series. |
| Modification | The Company may amend the indenture in a manner that does not adversely affect the holders in any material respect. The consent of the holders of a majority of the principal amount of Notes outstanding is required to otherwise amend the indenture; provided that certain amendments require the consent of each affected Note holder, including changing the maturity or interest payments dates and reducing the amount of Notes the holders of which are required for indenture amendments or waivers. |
| Indenture and trustee | The Notes are issued under the indenture, dated as of November 10, 2023, between the Company and U.S. Bank Trust Company, National Association, as trustee, as supplemented by a supplemental indentures relating to the issuance of the notes. |
| Governing law | The Notes are to be governed by and construed in accordance with the laws of the State of New York. |

**ABACUS LIFE, INC.**
**STOCK OPTION AWARD AGREEMENT**
**(ABACUS LIFE, INC. AMENDED AND RESTATED 2024 LONG-TERM EQUITY COMPENSATION INCENTIVE PLAN)**

THIS STOCK OPTION AWARD AGREEMENT, (this "***Agreement***"), dated as of [ ] (the "***Date of Grant***"), is made by and between Abacus Life, Inc., a Delaware corporation (the "***Company***"), and [ ] (the "***Grantee***" or "***you***" or "***your***").

WHEREAS, Grantee is employed by the Company or an Affiliate;

WHEREAS, as a matter of separate inducement and agreement in connection with Grantee's employment, and not in lieu of any salary or other compensation for Grantee's services, the Company desires to enter into this Agreement with Grantee; and

WHEREAS, the Company desires to grant to Grantee, subject to the restrictions set forth herein and the Company's Amended and Restated 2024 Long-Term Equity Compensation Incentive Plan (the "***Plan***"), an option to purchase the number of shares of the Company's Stock (this "***Option***"), as set forth below.

NOW, THEREFORE, in consideration of the recitals and the mutual agreements herein contained, the parties hereto agree as follows:

## I. GRANT OF OPTION

As of the Date of Grant, the Company hereby grants to you the following Option, on the terms and conditions set forth in this Agreement:

| | |
|---|---|
| Number of Option Shares Awarded: | ____________________ |
| Grant Price (Fair Market Value as of Date of Grant): | $____/Share____________________ |
| Expiration Date (10th anniversary of Date of Grant): | ____________________ |

## II. TERMS AND CONDITIONS OF AWARD

The grant of the Option provided in Article I shall be subject to the following terms, conditions and restrictions:

(a) **Plan**. This Award is issued under the Plan and is subject to the terms and conditions set forth in the Plan. In the event of a conflict between the terms of this Agreement and the Plan, the terms of the Plan shall control. Any capitalized term used in this Agreement that is not defined herein shall have the meaning set forth in the Plan. By accepting this Award, Grantee acknowledges receiving a copy of the Plan.

(b) **Award of Option**. The Company has granted the Option to Grantee effective as of the Date of Grant. The Option represents the right to purchase from the Company, for the Grant Price per Share set forth above, the number of Shares set forth above. The Option is not intended to constitute an "incentive stock option" within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

(c) **Vesting Schedule**. In general, you may exercise this Option, in whole or in part, in accordance with the vesting provisions set forth on Schedule A attached hereto. Vesting will be based or continued service with the Company or any of its subsidiaries and/or achievement of performance goals as determined by the Committee.

The Plan contains additional terms regarding vesting that apply upon the consummation of a Corporate Change that depend on whether this Award is assumed or not in the transaction.

(d) **Method of Exercise**. Subject to the terms and provisions of the Plan, the Option may be exercised in whole or in part from time to time by the delivery of written notice in the manner designated by the Committee stating (1) that you wish to exercise such Option on the date such notice is so delivered, (2) the number of shares with respect to which the Option is to be exercised, and (3) the address to which any certificate representing such shares should be mailed or delivered. Except in the case of exercise by a third party broker as provided in the Plan, in order for the notice to be effective the notice must be accompanied by payment of the option price by any combination of the following: (A) cash, certified check, bank draft or postal or express money order for an amount equal to the option price under the Option, (B) an election to make a cashless exercise through a registered broker-dealer (if approved in advance by the Committee or an executive officer of the Company), or (C) any other form of payment which is acceptable to the Committee.

(e) **Post-Termination Exercise Period**. Unless otherwise provided in the Plan or otherwise provided by the Committee, in the event of the severance of your employment relationship between the Company and all Affiliates for any reason, the vested and unvested portion of the Option shall be automatically terminated as of the date of severance, except in the circumstances below in which the vested portion of the Option will remain exercisable for a period of time:

(i) Upon your death, your executors, administrators, or any person or persons to whom the Option is transferred by will, by the laws of descent and distribution or by beneficiary designation shall have the right to exercise the Option, in whole or in part, prior to the earlier of (1) the Expiration Date or (2) the first (1st) anniversary of the date of your death.

(ii) Upon your involuntary severance from employment without cause or resignation for good reason], you shall have the right to exercise the vested portion of the Option, in whole or in part, prior to the earlier of (1) the Expiration Date or (2) three (3) months following the date of your involuntary severance from employment without cause or resignation for good reason, provided that the Committee can permit the Option to remain exercisable for a longer period but in no event past the Expiration Date.

The Plan contains additional terms regarding exercisability that apply upon the consummation of a Corporate Change that depend on whether this Award is assumed or not in the transaction.

**III. MISCELLANEOUS**

(a) **No Rights as Shareholder**. Grantee shall have no rights as a shareholder with respect to the Shares underlying the Option until the Grantee exercises the Option, satisfies the Grant Price and the Shares are issued to Grantee.

(b) **Status of Stock**. The Company has registered the issuance of the Shares, to the extent such Common Stock is delivered upon exercise of an Option, under the Securities Act of 1933, as amended (the "Act") and intends to keep such registration effective throughout the period that this Award remains in effect. In the absence of such effective registration or an available exemption from registration under the Act, no sale or disposition of shares of Common Stock acquired under this Award shall be made unless an opinion of counsel or other evidence satisfactory to the Company that such sale or disposition will not constitute a violation of the registration provisions of the Act or any other applicable securities laws is first obtained. The certificates representing shares of Common Stock acquired under this Award may bear such legend as the Company deems appropriate, referring to the provisions of this paragraph.

(c) **Restrictions on Transfer**. Subject to and except as otherwise provided in the Plan, this Award is not transferrable by you other than by will or the laws of descent and distribution.

(d) **No Guarantee of Tax Treatment**. Notwithstanding anything herein to the contrary, a Grantee shall be solely responsible for the taxes imposed on such Grantee relating to the grant or vesting of, or payment pursuant to, any Award, and none of the Company, any Affiliate, the Board or the Committee (or any of their respective members, officers or employees) guarantees any particular tax treatment with respect to any Award.

(e) **Withholding**. The Company or any Affiliate shall be entitled to deduct from any other compensation payable to Grantee any sums required by federal, state, local or foreign tax law to be withheld with respect to an

Award including the vesting or exercise of an Award. Alternatively, the Company or any Affiliate may require Grantee (or other person validly exercising the Award on behalf of Grantee) to pay such sums for taxes directly to the Company or Affiliate in cash or by check upon the vesting or exercise. Alternatively, in the discretion of the Committee, the Company may reduce the number of shares issued to the Grantee upon the exercise or vesting of the Option to satisfy the tax withholding obligations of the Company or an Affiliate. The Grantee may make alternative arrangements satisfactory to the Company, as determined in the Committee's discretion, for the satisfaction of any tax obligations that arise by reason of any such payment or distribution. The Committee may, in its discretion, allow a Grantee to use "Mature Shares" (as defined in the Plan) to satisfy the Company's or Affiliate's tax withholding obligations with respect to an Award.

(f) **Not a Contract of Employment**. Nothing in the Plan or this Award confers upon Grantee any right to continue in the employ or service of the Company or any Affiliate or interferes with or restricts in any way the rights of the Company and its Affiliates, which rights are hereby expressly reserved, to discharge or terminate the services of Grantee at any time for any reason whatsoever, with or without cause, except to the extent expressly provided otherwise in a written agreement between the Company or an Affiliate and Grantee.

(g) **No Fractional Shares**. No fractional Shares shall be delivered by the Company to any Grantee, nor shall any cash in lieu of fractional Shares be paid by the Company to any Grantee.

(h) **Successors**. The terms of this Agreement shall be binding upon and inure to the benefit of the Company, its successors and assigns, and to you and your beneficiaries, executors, administrators, heirs and successors.

(i) **Invalid Provision**. The invalidity or unenforceability of any particular provision thereof shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had been omitted.

(j) **Amendment**. Grantee further acknowledges and agrees that this Agreement may not be modified, amended or revised except as provided in the Plan.

(k) **Entire Agreement and Clawback/Recovery**. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and therein and supersede all prior communications, representations and negotiations in respect thereto. This Agreement and the Award granted hereunder are subject to recoupment in accordance with any clawback policy that the Company is specifically required to adopt pursuant to the listing standards of any national securities exchange or association on which the Company's securities are listed or as is otherwise specifically required by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other applicable law. In addition, the Committee may impose such other clawback, recovery or recoupment provisions in this Agreement or on the Award as the Committee determines necessary or appropriate including, but not limited to, a reacquisition right in respect of previously acquired shares of stock or other cash or property upon the occurrence of Grantee's termination of employment for cause. As of the Date of Grant, the Company's clawback policy provides, to the extent permitted by law, that the Company will seek to recoup any incentive-based compensation, including Awards under the Plan, paid to any current or former executive officer if: (a) the amount of such payment was based on the achievement of certain financial results that were subsequently the subject of a restatement, (b) the Board determines that such executive officer engaged in misconduct that resulted in the obligation to restate, and (c) a lower payment would have been made to the executive officer based upon the restated financial results.

(l) **Governing Law**. The provisions of this Agreement shall be governed by, and construed solely in accordance with, the laws of the State of Delaware, without regard to conflicts of laws principles thereof or the application of any law of any other jurisdiction.

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto as of the [ ] day of [ ].

**Company:** **Grantee:**

| | |
|---|---|
| **Abacus Life, Inc.** | **[ ]** |
| By: ____________________ | ____________________ |
| Signature | Signature |
| Title: ____________________ | Date: ____________________ |
| Date: ____________________ | |

**Attachment I:** Abacus Life, Inc. Amended and Restated 2024 Long-Term Equity Compensation Incentive Plan

*Signature Page to Stock Option Award Agreement*

**SCHEDULE A**

**[Add vesting provisions]**

**Attachment I**

**ABACUS LIFE, INC. AMENDED AND RESTATED 2024 LONG-TERM EQUITY COMPENSATION INCENTIVE PLAN (**attached)

**ABACUS LIFE, INC.**
**RESTRICTED STOCK UNIT AWARD AGREEMENT**
**(ABACUS LIFE, INC. AMENDED AND RESTATED 2024 LONG-TERM EQUITY COMPENSATION PLAN )**

THIS RESTRICTED STOCK UNIT AWARD AGREEMENT, (this "***Agreement***"), dated as of [ ] (the "***Date of Grant***"), is made by and between Abacus Life, Inc., a Delaware corporation (the "***Company***"), and [ ] (the "***Grantee***" or "***you***" or "***your***").

WHEREAS, Grantee is employed by the Company or an Affiliate;

WHEREAS, as a matter of separate inducement and agreement in connection with Grantee's employment, and not in lieu of any salary or other compensation for Grantee's services, the Company desires to enter into this Agreement with Grantee; and

WHEREAS, the Company desires to grant to Grantee, subject to the restrictions set forth herein and the Company's Amended and Restated 2024 Long-Term Equity Compensation Incentive Plan (the "***Plan***"), Restricted Stock Units (the "***RSUs***"), as set forth below.

NOW, THEREFORE, in consideration of the recitals and the mutual agreements herein contained, the parties hereto agree as follows:

**I. GRANT OF RSUs**

As of the Date of Grant, the Company hereby grants to you the following RSUs, on the terms and conditions set forth in this Agreement:

| | |
|---|---|
| Number of Restricted Stock Units: | ________ RSUs |
| Value Per Restricted Stock Unit: | One Share of Stock shall be delivered for each vested RSU |
| Number of Dividend Equivalent Rights | ________ |

**II. TERMS AND CONDITIONS OF AWARD**

The grant of the RSUs provided in Article I shall be subject to the following terms, conditions and restrictions:

(a)**Plan**. This Award is issued under the Plan and is subject to the terms and conditions set forth in the Plan. In the event of a conflict between the terms of this Agreement and the Plan, the terms of the Plan shall control. Any capitalized term used in this Agreement that is not defined herein shall have the meaning set forth in the Plan. By accepting this Award, Grantee acknowledges receiving a copy of the Plan.

(b) **Award of RSUs and Dividend Equivalents**. The RSUs issued pursuant to this Agreement shall become vested as provided on Schedule A attached hereto subject to Section II(c) below. Vesting will be based on continued service with the Company or any of its subsidiaries and/or achievement of performance goals as determined by the Committee. The Company shall deliver to Grantee one share of Common Stock or cash, as determined by the Committee, for each vested RSU on the date such RSU becomes vested. Grantee will have no right to the distribution of any Shares or payment of any cash until the time (if ever) the RSUs have vested. The Committee may provide in Section I above that Grantee will be granted Dividend Equivalents that will accrue on behalf of Grantee. Subject to Section II(d) below, each Dividend Equivalent, if granted to the Grantee, will pay Grantee an amount of cash equal to the sum of the cash dividends declared and paid by the Company with respect to a share of Common Stock while Grantee's RSUs are outstanding. No interest will accrue on the

Dividend Equivalents. Dividend Equivalents will vest or be forfeited, as applicable, upon the vesting or forfeiture of the RSU with respect to which the Dividend Equivalent relates.

The RSUs and any Dividend Equivalents will at all times prior to settlement represent an unsecured Company obligation payable only from the Company's general assets.

(c) **Change in Control**. The Plan contains additional terms that apply upon the consummation of a Corporate Change that depend on whether this Award is assumed or not in the transaction.

(d) **Payment of RSUs and Dividend Equivalents.** RSUs and any Dividend Equivalents will be paid in Shares or cash at the Company's option as soon as administratively practicable after the vesting of the applicable RSU, but in no event more than 60 days after the RSU's vesting date. If an RSU is paid in cash, the amount of cash paid with respect to the RSU will equal the Fair Market Value of a Share on the day immediately preceding the payment date. If a Dividend Equivalent is paid in Shares, the number of Shares paid with respect to the Dividend Equivalent will equal the quotient, rounded down to the nearest whole Share, of the Dividend Equivalent balance divided by the Fair Market Value of a Share on the day immediately preceding the payment date.

**III. MISCELLANEOUS**

(a) **No Rights as Shareholder**. Grantee shall have no rights as a shareholder with respect to the Shares until the effective date of issuance of such Shares following vesting of the RSUs, and no adjustment will be made for dividends or other rights for which the record date is prior to the date of settlement unless otherwise determined by the Committee pursuant to Article XIII of the Plan. Grantee shall not receive dividends with respect to any of the RSUs, and has no right to receive such amounts.

(b) **Status of Shares.** The Company has registered the issuance of the Shares, to the extent such Common Stock is delivered upon vesting of an RSU, under the Securities Act of 1933, as amended (the "Act") and intends to keep such registration effective throughout the period that this Award remains in effect. In the absence of such effective registration or an available exemption from registration under the Act, no sale or disposition of shares of Common Stock acquired under this Award shall be made unless an opinion of counsel or other evidence satisfactory to the Company that such sale or disposition will not constitute a violation of the registration provisions of the Act or any other applicable securities laws is first obtained. The certificates representing shares of Common Stock acquired under this Award may bear such legend as the Company deems appropriate, referring to the provisions of this paragraph.

(c) **Restrictions on Transfer**. Subject to and except as otherwise provided in the Plan, this Award is not transferrable by you other than by will or the laws of descent and distribution.

(d) **No Guarantee of Tax Treatment**. Notwithstanding anything herein to the contrary, a Grantee shall be solely responsible for the taxes imposed on such Grantee relating to the grant or vesting of, or payment pursuant to, any Award, and none of the Company, any Affiliate, the Board or the Committee (or any of their respective members, officers or employees) guarantees any particular tax treatment with respect to any Award.

(e) **Withholding**. The Company or any Affiliate shall be entitled to deduct from any other compensation payable to Grantee any sums required by federal, state, local or foreign tax law to be withheld with respect to an Award including the settlement of an Award. Alternatively, the Company or any Affiliate may require Grantee (or other person validly exercising the Award on behalf of Grantee) to pay such sums for taxes directly to the Company or Affiliate in cash or by check upon settlement. Alternatively, in the discretion of the Committee, the Company may reduce the number of shares issued to the Grantee upon the settlement of the Award to satisfy the tax withholding obligations of the Company or an Affiliate. The Grantee may make alternative arrangements satisfactory to the Company, as determined in the Committee's discretion, for the satisfaction of any tax obligations that arise by reason of any such payment or distribution. The Committee may, in its discretion, allow a Grantee to use Mature Shares to satisfy the Company's or Affiliate's tax withholding obligations with respect to an Award.

(f) **Not a Contract of Employment**. Nothing in the Plan or this Award confers upon Grantee any right to continue in the employ or service of the Company or any Affiliate or interferes with or restricts in any way the

rights of the Company and its Affiliates, which rights are hereby expressly reserved, to discharge or terminate the services of Grantee at any time for any reason whatsoever, with or without cause, except to the extent expressly provided otherwise in a written agreement between the Company or an Affiliate and Grantee.

(g) **No Fractional Shares**. No fractional Shares shall be delivered by the Company to any Grantee, nor shall any cash in lieu of fractional Shares be paid by the Company to any Grantee.

(h) **Successors**. The terms of this Agreement shall be binding upon and inure to the benefit of the Company, its successors and assigns, and to you and your beneficiaries, executors, administrators, heirs and successors.

(i) **Invalid Provision**. The invalidity or unenforceability of any particular provision thereof shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had been omitted.

(j) **Amendment**. Grantee further acknowledges and agrees that this Agreement may not be modified, amended or revised except as provided in the Plan.

(k) **Entire Agreement and Clawback/Recovery**. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and therein and supersede all prior communications, representations and negotiations in respect thereto. This Agreement and the Award granted hereunder are subject to recoupment in accordance with any clawback policy that the Company is specifically required to adopt pursuant to the listing standards of any national securities exchange or association on which the Company's securities are listed or as is otherwise specifically required by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other applicable law. In addition, the Committee may impose such other clawback, recovery or recoupment provisions in this Agreement or on the Award as the Committee determines necessary or appropriate including, but not limited to, a reacquisition right in respect of previously acquired shares of stock or other cash or property upon the occurrence of Grantee's termination of employment for cause. As of the Date of Grant, the Company's clawback policy provides, to the extent permitted by law, that the Company will seek to recoup any incentive-based compensation, including Awards under the Plan, paid to any current or former executive officer if: (a) the amount of such payment was based on the achievement of certain financial results that were subsequently the subject of a restatement, (b) the Board determines that such executive officer engaged in misconduct that resulted in the obligation to restate, and (c) a lower payment would have been made to the executive officer based upon the restated financial results.

(l) **Governing Law**. The provisions of this Agreement shall be governed by, and construed solely in accordance with, the laws of the State of Delaware, without regard to conflicts of laws principles thereof or the application of any law of any other jurisdiction.

[*Signature Page Follows*]

IN WITNESS WHEREOF, this Agreement has been executed and delivered by the parties hereto as of the [ ] day of [ ].

| | |
|---|---|
| **Company:** | **Grantee:** |
| **Abacus Life, Inc.** | **[ ]** |
| By: ____________________ Signature | ____________________ Signature |
| Title: ____________________ | Date: ____________________ |
| Date: ____________________ | |

**Attachment I: Amended and Restated 2024 Long-Term Equity Compensation Incentive Plan**

**SCHEDULE A**

[Add vesting provisions]

**Attachment I**
**ABACUS LIFE, INC. AMENDED AND RESTATED 2024 LONG-TERM EQUITY COMPENSATION PLAN**

(attached)

# ABACUS GLOBAL MANAGEMENT, INC.

## INSIDER TRADING POLICY

**Purpose**

This Insider Trading Policy ("Policy") provides guidelines with respect to transactions in the securities of Abacus Global Managemnt, Inc. (together with its subsidiaries, "Abacus") and the handling of confidential information about Abacus and the companies with which Abacus does business.

**Persons Subject to the Policy**

All directors, officers, employees and advisory board members of Abacus, and any family members living in such a person's household, other members of such a person's household and any entity controlled by such a person (each a "Covered Person") are subject to, and must comply with, this Policy. The Office of the General Counsel shall maintain a list of all Abacus employees identified as a "Designated Employee" for purposes of this Policy. Abacus reserves the right to take whatever disciplinary or other measure(s) it determines in its sole discretion to be appropriate in any particular situation, including disclosure of wrongdoing to governmental authorities.

**Transactions Subject to the Policy**

This Policy applies to transactions in Abacus's securities, including Abacus's common stock, warrants, options for common stock, restricted stock units and any other securities Abacus may issue from time to time, as well as derivative securities not issued by Abacus, such as exchange-traded put or call options or swaps relating to Abacus's securities (collectively referred to in this Policy as "Abacus Securities").

**Statement of Policy**

No Covered Person who is aware of Material Nonpublic Information (defined below) relating to Abacus may, directly or indirectly, through family members or other persons or entities:

(1) Engage in transactions in Abacus Securities, except as otherwise specifically permitted by this Policy or Abacus;

(2) Recommend the purchase or sale of any Abacus Securities;

(3) Disclose Material Nonpublic Information to persons within Abacus whose jobs do not require them to have that information, or to persons outside of Abacus, unless any such disclosure is required in fulfillment of their job responsibilities and subject to appropriate confidentiality restrictions; or

(4) Assist anyone engaged in the above activities.

In addition, a Covered Person who, in the course of working for Abacus, learns of Material Nonpublic Information about a company with which Abacus has a relationship or does business, including a customer or supplier of Abacus, may not:

- Trade in that company's securities until the information becomes public or is no longer material; or
- Disclose such information to anyone other than a co-worker within Abacus with a business need to know such information.

Anyone with any questions regarding trading in Abacus Securities, including questions regarding restrictions on a specific transaction, should contact Abacus's Office of the General Counsel.

**Definition of Material Nonpublic Information**

"Material Nonpublic Information" is positive or negative information that is not generally known to the public and, if publicly known, would be considered by a reasonable investor to be important in making a decision to buy, hold or sell securities or might reasonably be expected to affect the market for or price of Abacus Securities (or the securities of a company with which Abacus has a relationship or does business). While it is not possible to define all categories of Material Nonpublic Information, there are various categories of information that are particularly sensitive and, as a general rule, should be considered material. Examples of such information include:

- Financial results;
- Projections of future earnings or losses, or other earnings guidance;
- A pending or proposed acquisition or disposition of a significant asset;
- A pending or proposed merger, acquisition or tender offer;
- A change in dividend policy, the declaration of a dividend or a stock split, or an offering of additional securities;
- Bank borrowings or other financing transactions out of the ordinary course;
- The establishment of a repurchase program for Abacus Securities;
- A change in management or key personnel;
- Pending or threatened significant litigation, or the resolution of such litigation;
- Bankruptcies;
- Cybersecurity or data security incidents; and
- The gain or loss of a significant customer or business partner.

**Directors, Officers, Advisory Board and Designated Employees: Special and Prohibited Transactions**

Abacus has determined that there is a heightened legal risk and/or the appearance of improper or inappropriate conduct if Abacus's directors, officers, advisory board members or Designated Employees engage in certain types of transactions. It therefore is Abacus's policy that directors, officers, advisory board members and Designated Employees may not engage in any of the following transactions:

- Short sales of Abacus Securities;
- Transactions in publicly-traded options, including put options, call options or other derivative securities, on an exchange or in any other organized market; but excluding transactions in warrants to purchase Abacus common stock;

- Hedging or monetization transactions, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars and exchange funds;

- Any other hedging or derivative transactions designed to hedge or offset the effect of a change in the market price of Abacus Securities.

**Margin Accounts and Pledges**

Directors, officers, advisory board members or Designated Employees are prohibited from pledging company securities as collateral for a loan, unless pre-cleared by the General Counsel. Securities held in a margin account may be sold by the broker without the customer's consent if the customer fails to meet a margin call. Similarly, securities pledged (or hypothecated) as collateral for a loan may be sold in foreclosure if the borrower defaults on the loan. A margin sale or foreclosure sale may occur at a time when the pledgor is aware of Material Nonpublic Information or otherwise is not permitted to trade in company securities pursuant to a Blackout Period restriction. Any directors, officers, advisory board members or Designated Employees preparing to pledge company securities must clearly demonstrate the financial capacity to repay the loan without resort to the pledged securities. Any person proposing to pledge company securities as collateral for a loan must submit a request for approval to the General Counsel at least two weeks prior to the proposed execution of documents evidencing the proposed pledge.

**Directors, Executive Officers, Advisory Board and Designated Employees: Additional Procedures**

Abacus has established the following additional procedures applicable to directors, executive officers, advisory board members and Designated Employees:

- Pre-Clearance Procedures. No one subject to these procedures may engage in any transaction in Abacus Securities without first obtaining pre-clearance of the transaction from Abacus. A request for pre-clearance should be submitted to Abacus's Office of the General Counsel at least three (3) business days in advance of the proposed transaction, or such shorter period as may be acceptable to such Office.

Any pre-clearance received from the Office of the General Counsel to engage in a proposed transaction is effective as of the first to occur of (a) five (5) business days from the preclearance date, (b) the beginning of a Blackout Period (as defined below) or (c) the time at which such person comes into possession of Material Nonpublic Information, after which preapproval must be requested again. If anyone subject to these procedures comes into possession of Material Nonpublic Information after obtaining pre-clearance, he or she should **immediately** stop any transactions in Abacus Securities.

- Quarterly Trading Restrictions. No one subject to this restriction may conduct any transactions involving Abacus Securities (other than as specified by this Policy), during a "Blackout Period" beginning 10 calendar days prior to the end of each fiscal quarter and ending on the third business day following the date of the public release of Abacus's earnings results for that quarter. Following the receipt of pre-clearance as described above, those persons subject to this restriction generally may conduct transactions in Abacus Securities during the "Window Period" beginning on the third business day following the public release of Abacus's quarterly earnings and ending 10 calendar days prior to the close of the next fiscal quarter.

- Event-Specific Trading Restriction Periods. From time to time, an event may occur that is material to Abacus and is known by only a few directors, officers and/or employees. So long as the event remains material and nonpublic, the persons designated by the Office of the General

Counsel may not trade Abacus Securities. In that situation, the Office of the General Counsel may notify these persons that they should not trade in Abacus Securities.

- Exceptions. The requirement for pre-clearance, the quarterly trading restrictions and event-driven trading restrictions do not apply to transactions conducted pursuant to approved Rule 10b5-1 Plans (as defined below).

**Rule 10b5-1 Plans**

If an individual enters into a plan that meets the requirements of Rule 10b5-1, as amended from time to time (a "Rule 10b5-1 Plan"), Abacus Securities may be purchased or sold pursuant to such Rule 10b5-1 Plan by that person without regard to certain insider trading restrictions. To comply with the Policy, a Rule 10b5-1 Plan must be approved by Abacus and meet the requirements of Rule 10b5-1. In general, a Rule 10b5-1 Plan must be entered into at a time when the person entering into the plan is not aware of Material Nonpublic Information. Once the Rule 10b5-1 Plan is adopted, the person must not exercise any influence over the amount of securities to be traded, the price at which they are to be traded or the date of the trade. The plan must either specify the amount, pricing and timing of transactions in advance or delegate discretion on these matters to an independent third party. No further pre-approval of transactions conducted pursuant to an Abacus-approved Rule 10b5-1 Plan will be required. However, any modification or termination of a Rule 10b5-1 Plan must be promptly disclosed to the Company's General Counsel and CEO.

**Post-Termination Transactions**

This Policy continues to apply to transactions in Abacus Securities even after termination of an individual's service to Abacus. If an individual is in possession of Material Nonpublic Information when his or her service terminates, that individual may not trade in Abacus Securities until that information has become public or is no longer material.

**Transactions Not Involving a Purchase or Sale**

*Bona fide* gifts of securities, unless the individual making the gift knows, or is reckless in not knowing, the recipient intends to trade the securities while the donor is in possession of Material Nonpublic Information, are not transactions subject to this Policy.

**Consequences of Violations**

The purchase or sale of Abacus Securities or other relevant securities while aware of Material Nonpublic Information, or the disclosure of Material Nonpublic Information to others who then trade in Abacus Securities or other relevant securities, is prohibited by federal and state laws (as well as the laws of foreign jurisdictions). Insider trading violations are pursued vigorously by the U.S. Securities and Exchange Commission, U.S. Attorneys and state enforcement authorities. Punishment for insider trading violations is severe, and could include significant fines and imprisonment. In addition, an individual's failure to comply with this Policy may subject the individual to Abacus-imposed sanctions, including dismissal for cause, whether or not the employee's failure to comply results in a violation of law.

**Company Assistance**

Any person who has a question about this Policy or its application to any proposed transaction may obtain additional guidance from the Office of the General Counsel.

**Adopted November 9, 2023 by the Board of Directors of Abacus (revised for name change 3/2025)**

# Abacus Global Management, Inc.

## Subsidiaries

| Subsidiaries | State of Incorporation or Organization |
|---|---|
| Longevity Market Assets, LLC<br>Entity also does business under the name:<br>• ABL Tech<br>• ABL Technologies | Delaware |
| Abacus Settlements, LLC<br>Entity also does business under the name:<br>• Abacus Life | Delaware |
| ABL Technologies, LLC | Florida |
| Longevity Market Admin, LLC | Florida |
| Longevity Market Advisors, LLC | Delaware |
| Regional Investment Services, Inc. | Ohio |
| ABL Wealth Advisors, LLC | Delaware |
| LMX Series, LLC | Florida |
| LMATT Series 2024, Inc. | Delaware |
| LMA Series, LLC | Florida |
| LMATT Growth Series 2.2024, Inc. | Delaware |
| LMATT Growth and Income Series 1.2026, Inc. | Delaware |
| LMA Income Series GP, LLC | Delaware |
| LMA Income Series LP | Delaware |
| LMA Income Series II GP, LLC | Delaware |
| LMA Income Series II LP | Delaware |
| Abacus FCF Advisors, LLC | New York |
| Carlisle Management Company S.C.A. | Luxembourg |

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We have issued our report dated March 28, 2025, with respect to the consolidated financial statements included in the Annual Report of Abacus Global Management, Inc. on Form 10-K for the year ended December 31, 2024. We consent to the incorporation by reference of said report in the Registration Statements of Abacus Global Management, Inc. on Forms S-3 (File 333-284325 and File 333-282747); Forms S-8 (File 333-280571 and File 333-275179); and Post-effective Amendment No. 1 to Form S-1 on Form S-3 (File 333-273411).

/s/ GRANT THORNTON LLP

Philadelphia, Pennsylvania

March 28, 2025

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We have issued our report dated May 30, 2024, with respect to the financial statements of Abacus Settlements, LLC included in the Annual Report of Abacus Global Management, Inc. on Form 10-K for the period January 1, 2023 to June 30, 2023. We consent to the incorporation by reference of said report in the Registration Statements of Abacus Global Management, Inc. on Forms S-3 (File 333-284325 and File 333-282747); Forms S-8 (File 333-280571 and File 333-275179); and Post-effective Amendment No. 1 to Form S-1 on Form S-3 (File 333-273411).

/s/ GRANT THORNTON LLP

Philadelphia, Pennsylvania

March 28, 2025

**EXHIBIT 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO RULE 13A-14(A) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Jay Jackson, certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2024 of Abacus Global Management, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared; and

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 28, 2025

/s/ Jay Jackson
Jay Jackson
Chief Executive Officer
(Principal Executive Officer)

**EXHIBIT 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO RULE 13A-14(A) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, William McCauley, certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2024 of Abacus Global Management, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared; and

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 28, 2025

/s/ William McCauley
William McCauley
Chief Financial Officer
(Principal Accounting and Financial Officer)

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Abacus Global Management, Inc. (the "Company") on Form 10-K for the year ended December 31, 2024, as filed with the Securities and Exchange Commission (the "Report"), I, Jay Jackson, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as added by §906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. To my knowledge, the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report.

Dated: March 28, 2025

/s/ Jay Jackson
Jay Jackson
Chief Executive Officer
(Principal Executive Officer)

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Abacus Global Management, Inc. (the "Company") on Form 10-K for the year ended December 31, 2024, as filed with the Securities and Exchange Commission (the "Report"), I, William McCauley, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as added by §906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. To my knowledge, the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report.

Dated: March 28, 2025

/s/ William McCauley
William McCauley
Chief Financial Officer
(Principal Accounting and Financial Officer)