# EXHIBIT 8

IN THE CIRCUIT COURT FOR THE SECOND JUDICIAL CIRCUIT IN AND FOR LEON COUNTY, FLORIDA

COVENTRY FIRST LLC, a
foreign Limited Liability Company,

Case No:

Petitioner,

v.

FLORIDA OFFICE OF INSURANCE
REGULATION and LAPETUS SOLUTIONS,
INC., a foreign for profit corporation,

Respondents.

_______________________________________/

**PETITION FOR WRIT OF MANDAMUS AND EXPEDITED HEARING FOR VIOLATIONS OF FLORIDA'S PUBLIC RECORDS ACT**

Petitioner COVENTRY FIRST LLC ("COVENTRY") files this Petition for Writ of Mandamus and Expedited Hearing for Violations of Florida's Public Records Act against Respondents FLORIDA OFFICE OF INSURANCE REGULATION ("OIR") and LAPETUS SOLUTIONS, INC. ("LAPETUS").

**NATURE OF THE ACTION**

1. In Florida, access to public records is a fundamental constitutional right. *See* art. I § 24, Fla. Const. This right is a "cornerstone of our political culture." *In re Report & Recommendations of Judicial Mgmt. Council of Fla. on Privacy & Elec. Access to Court Records*, 832 So. 2d 712, 713 (Fla. 2002). The Florida Constitution, as implemented through chapter 119, Florida Statutes, requires governmental agencies to conduct public business in the open, and public records must be available to all members of the public.

2. OIR's obligation to provide access to public records is mandatory: "Every person who has custody of a public record **shall permit** the record to be inspected and copied by any

person desiring to do so, at any reasonable time, under reasonable conditions, and under supervision by the custodian of public records." § 119.07(1)(a), Fla. Stat.[1] This right is broad, must be liberally construed, and the only exceptions are those established by law or by the Florida Constitution.

3. Pursuant to chapter 119, COVENTRY requested that OIR produce copies of audit reports that LAPETUS is required to file with OIR under section 626.99175. COVENTRY is forced to file this Petition to enforce its right to access these reports because OIR refuses to produce them under the misguided assumption that the reports constitute trade secrets. This assumption is based solely on representations from LAPETUS. Shielding these reports from public access is antithetical to the purpose of the Public Records Act, as well as section 626.99175, as described in more detail, below.

4. Section 626.99175 requires Life Expectancy Providers to, among other things, register with OIR and provide a triennial report that is "an audit of all life expectancies by the life expectancy provider for the 5 calendar years immediately preceding the audit." These reports are not trade secrets under any statutory definition. They do not qualify as a "design, process, procedure, list of suppliers, list of customers, business code, or improvement thereof" that LAPETUS has used "in the operation of a business and which provides the business an advantage, or an opportunity to obtain an advantage, over those who do not know or use it." Section 812.081(c). Nor do they derive independent value from not being known to other persons who could obtain economic value from their disclosure or use, as described in section 119.0715 and more fully set forth below.

---

[1] All emphasis in quotations is added unless otherwise noted. All statutory references are to the Florida Statutes (2024) unless otherwise noted.

**JURISDICTION, VENUE, AND THE PARTIES**

5. This is an action against OIR for violations of chapter 119 for failure to provide access to public records and for such other relief, including injunctive relief. This Court has jurisdiction pursuant to sections 26.012(1)(c) and 26.012(3).

6. Venue is proper in this Court pursuant to section 47.011, as OIR resides, and the cause of action accrued, in whole or in part in Leon County.

7. COVENTRY is a foreign limited liability company registered and licensed to do business in Florida with its principal place of business located in Pennsylvania. COVENTRY is a recognized leader in the regulated secondary market for life insurance and a licensed viatical settlement provider in Florida.

8. OIR is a legislatively created office within the Florida Department of Financial Services and is "responsible for all activities concerning insurers and other risk bearing entities, including licensing, rates, policy forms, market conduct, claims, issuance of certificates of authority, solvency, viatical settlements, premium financing, and administrative supervision, as provided under the insurance code or chapter 636." § 20.121(3)(a)1. As a public agency, OIR is obligated to comply with the provisions of chapter 119.

9. LAPETUS is a foreign for-profit corporation registered to do business in Florida with its principal place of business located in North Carolina. LAPETUS is a registered Life Expectancy provider in Florida that prepares Life Expectancy assessments evaluating an insured's risk of mortality in viatical settlements, which it sells to participants in the secondary market for life insurance, including but not limited to Life Settlement Providers, Life Settlement Brokers, and investors. LAPETUS is required to, and did, submit triennial reports to OIR pursuant to section 626.99175 and is named in this Petition because of its interest in the reports at issue, including the determination of applicable confidentiality and/or exemption.

## FACTUAL BACKGROUND

**A. Viatical Settlements and Life Expectancy Reports.**

10. The ability to sell a life insurance policy for its fair market value is a well-recognized and valuable property right. *See, e.g., Grigsby v. Russell*, 222 U.S. 149 (1911) ("[I]t is desirable to give to life policies the ordinary characteristics of property. . . . To deny the right to sell . . . is to diminish appreciably the value of the contract in the owner's hands."); *McMullen v. St. Lucie Cty. Bk.*, 175 So. 721, 722 (Fla. 1937) (following *Grigsby* and explaining: "The rule is also settled that a life insurance policy is a chose in action which may be assigned in the same manner that other instruments of like character are assigned.") Recognizing this property right, the Florida Legislature enacted the Viatical Settlement Act, section 626.991, *et. seq.* 626.99295.

11. Consumers, life insurance policy owners known as "viators," exercise the life insurance policy's change of ownership clause in favor of a licensed buyer defined as a "viatical settlement provider." *See* §§ 626.9911(16) (defining "viator"); 626.9911(14) (defining "viatical settlement provider"). Viatical settlement providers purchase policies to either hold as an investment for themselves or to sell to investors who by law cannot negotiate and contract directly with a viator. Viatical settlement providers pay on average 500% of the issuing life insurance carrier's cash surrender value. Since its founding of the secondary market a quarter century ago, COVENTRY has paid in excess of $5.9 billion to viators.

12. A key determinant in the success or failure of every regulated viatical settlement transaction is the accuracy of the Life Expectancy reports used to value the policy. "Life Expectancy" is statutorily defined as "an opinion or evaluation as to how long a particular person is to live, or relating to such person's expected demise." § 626.9911(4).

13. A "Life Expectancy provider" creates the Life Expectancy report for the person whose life is insured under the life insurance policy. *See* § 626.9911(5) (defining "life expectancy

provider"). A shorter Life Expectancy estimate increases a policy's value by reducing the total expected premium payments required to maintain the policy and bringing forward the anticipated date for the payment of the policy's death benefit.

14. Accurate Life Expectancy reports are important not only for valuing the individual life insurance policies, but also for ensuring the reliability and integrity of the viatical settlement market. Viatical Settlement Providers determine their offers to consumers based in large part on the Life Expectancy report, and investors base their participation on the expected amount of premiums, based on the number of months of expected life needed to carry a policy to the death benefit.

15. Chronically and extremely short, inaccurate Life Expectancy reports are a danger to the viatical settlement market because investments based on inaccurate reports are doomed to long-term failure. OIR recognized this when it issued Bulletin OIR-03-003, regarding "issuers of life expectancy certifications [that] may be routinely issuing estimates of life expectancy which are substantially and consistently below those issued by most or all others issuing certifications. Such estimates undermine the ability of a viatical settlement purchaser to properly assess the risks and benefits of purchasing a life insurance policy." This Bulletin was issued in the throes of the Mutual Benefits fraud, which had its epicenter in Florida.[2]

[2] Mutual Benefits was a viatical settlement provider that purchased life policies which it overvalued and sold to retail investors based on chronically short life expectancies. After OIR and the Securities Exchange Commission shut down the fraud, investor losses were estimated at over $800 million. *See* U.S. Attorney's Office for the Southern District of Florida, *Former Mutual Benefits Corporation Head Sentenced To 20 Years In Prison for His Role in $1 Billion MBC* Scheme (Aug. 29, 2014) (available at https://www.justice.gov/usao-sdfl/pr/former-mutual-benefits-corporation-head-sentenced-20-years-prison-his-role-1-billion); *In the matter of: Mutual Benefits Corp.*, OIR Case No. 68502-03-CO, Emergency Cease and Desist Order (May 3, 2004) (available at https://www.floir.com/docs-sf/default-source/life-and-health/mbc_emergency_cease_desist_order.pdf?sfvrsn=837f9873_2).

16. Following the Mutual Benefits collapse, the Florida Legislature in 2005 established OIR's regulatory oversight of Life Expectancies by amending the Viatical Settlement Act to include section 626.99175. This section requires Life Expectancy Providers to, among other things, register with OIR and provide a triennial report that is "an audit of all life expectancies by the life expectancy provider for the 5 calendar years immediately preceding the audit." § 626.99175(5).

17. The key measurement for accuracy in the statutorily required Life Expectancy audit is "an actual-to-expected ratio of life expectancies." § 626.99175(5)(b). The Actual-to-Expected ratio is the industry standard for evaluating Life Settlement Provider accuracy, as established and adopted by the Actuarial Standards Board's Actuarial Standard of Practice No. 48, "Life Settlements Mortality," which was "developed by the Life Settlements Mortality Task Force of the Actuarial Standards Board."[3] Accordingly, the Actual-to Expected ratio reflected in LAPETUS' triennial reports is important for entities like COVENTRY to use in evaluating the trustworthiness of LAPETUS' Life Expectancies.

**B. COVENTRY's Public Records Request.**

18. LAPETUS' issuance of chronically short Life Expectancies has skewed the entire life settlement market. An independent tracker of the market recently published a "Life Settlement Market Update" which concluded that, despite the average age of insureds being evaluated in the market having dropped substantially, "the observed increase in [Life Expectancy] falls significantly short of expectations" because "we have witnessed a trend away from underwriters

---

[3] Under Actuarial Standard of Practice No. 48, sections 2.1 and 2.2, the Actual-to-Expected ratio is defined and described: "Actual-to-Expected (A/E) Analysis—The process of calculating and analyzing A/E ratios over a selected time period; for example, across different ages, genders, and durations. This is also known as an A/E study. Actual-to-Expected Ratio—Actual deaths (either face amount or number of lives) in a group of lives being evaluated, over a specified period divided by the expected deaths over the same period."

with long(er) operating history towards **in particular one [Life Expectancy] provider which entered the market more recently and of which the [Life Expectancies] are substantially shorter on average if compared to the peer**." *See* AAP Life Settlement Market Update, Volume 13, Issue 10 (Nov. 2024). The Life Expectancy provider that has distorted the entire market is LAPETUS, whose Life Expectancies have substantial influence on the market through, among other things, LAPETUS' unique relationship with Abacus Global, a group of life settlement companies which use LAPETUS as their preferred Life Expectancy provider.[4]

19. Specifically, the S-1 Registration Statement of Abacus' parent company, ABL, whose main asset is policies purchased by Abacus, describes a "key partnership . . . between Abacus and Lapetus Solutions, Inc."[5] In addition to public-shareholder owned ABL, Abacus' principals have formed another vehicle for investing in policies, ABL Longevity Growth and Income Fund, which "generally . . . expects to rely on Lapetus Solutions as its primary life expectancy provider."[6] And LAPETUS' co-CEO's LinkedIn page states that "Lapetus is proud to be a source of innovation and breakthrough technology for Abacus and the industry."[7]

---

[4] The unique relationship includes Abacus having held a seat on LAPETUS' board of directors through Abacus CEO Jay Jackson, and Abacus affiliates investing heavily in LAPETUS. *See* Donna Horowitz, "Abacus ties to Lapetus may violate Florida law," Life Settlements Report, May 14, 2024. Both of these relationships may violate the Life Expectancy reform law passed by the legislature in the wake of the Mutual Benefits collapse. Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their relationships, the legislature now requires independence between settlement providers and Life Expectancy providers. See Section 626.99175(6), Florida Statutes ("No . . . viatical settlement provider . . . in this state shall directly or indirectly own or be an officer, director, or employee of a life expectancy provider."). The relationship between Lapetus and Abacus is so close that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the market, bizarrely asserted that "Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions." ABL Longevity Growth and Income Fund, Form N-2, draft version dated October 16, 2024.

[5] https://www.sec.gov/Archives/edgar/data/1814287/000119312523193281/d527481ds1.htm

[6] https://www.sec.gov/Archives/edgar/data/1990804/000119312524064898/d542420dn2a.htm

[7] https://www.linkedin.com/posts/dr-karl-ricanek-jr-b670501_abacus-life-taking-a-deep-dive-into-the-activity-7108842763848228864-CkNs?trk=public_profile_like_view

20. One of the Abacus companies, Abacus Life Inc.—the main asset of which is life policies purchased by Abacus—is a publicly traded company whose shareholders' investments are dependent on the accuracy of the Life Expectancy estimates used to value policies. As of September 30, 2024, these life policies are valued at $273 million. That is a 124% increase in nine months, a time period coinciding with The Life Settlement Market Update which found that LAPETUS' Life Expectancies were so short that LAPETUS had singlehandedly caused industry wide Life Expectancy averages to "fall significantly short of expectations."

21. In reaction to these important developments in the secondary market, COVENTRY performed an independent study upon the more than 4,000 Life Expectancies in its possession issued by LAPETUS, which COVENTRY compared to other Life Expectancy providers' estimates on the same underlying lives. Two leading professors, Daniel Bauer and Nan Zhu, reviewed the 4,000 Life Expectancies and concluded: "The Lapetus Life Expectancy was shorter in approximately 83% of all cases by an average of approximately 29 months."

22. The LAPETUS situation has become so extreme that a debate between COVENTRY's Chairman and LAPETUS' co-founder was the featured session at the leading viatical settlement trade association's meeting in Miami Beach in October 2024.[8] At this event, COVENTRY's Chairman reported his company's findings regarding LAPETUS Life Expectancies and noted that LAPETUS in extolling its accuracy has never described having performed an actual-to-expected review compliant with industry and statutory standards.

23. At that meeting and in other public discussion, LAPETUS has described its performance of a test of accuracy that is not an actual-to-expected ratio compliant with Actuarial Standard of Practice No. 48. Instead of comparing the total number of "expected deaths" in the

[8] https://www.lisa.org/blog_home.asp?display=25

entire "group of lives being evaluated," as required by the Actuarial Standards Board, LAPETUS only questions, for the actual deaths in just a three-year period, whether its individual Life Expectancy predictions for those relatively small number of cases were that the insured would live longer than she actually did.

24. LAPETUS' proffered accuracy standard, which revolves around only the actual deaths during a short time period (i.e., the numerator of the industry standard actual-to-expected ratio), leaves out the most important question required under Actuarial Standard of Practice No. 48: How many deaths had LAPETUS predicted would occur during this window (i.e., the denominator)? This is crucial particularly in LAPETUS' case because LAPETUS' Life Expectancy predictions are so short that it can be expected to predict many more insureds will die during any given time period than any other Life Expectancy provider. In other words, in a proper actual-to-expected analysis, the denominator of the LAPETUS actual-to-expected ratio will be relatively large, causing its actual-to-expected ratio to be low.

25. At the industry conference, COVENTRY's Chairman explicitly pointed out that the LAPETUS co-founder's presentation regarding LAPETUS prediction accuracy had not included the expected number of deaths in the referenced population: "Last question. Do you know how many deaths . . . do you know how many you expected?" In response, LAPETUS' representative evaded and refused to answer the question of how many deaths it expected: "You're asking the wrong question." But expected deaths is the right question under industry practice, Actuarial Standard of Practice No. 48, and Florida law, section 626.99175(5)(b). Because that number for LAPETUS is extraordinarily high, far higher than all other Life Expectancy providers, it will result in a much larger denominator and a much lower ratio in the actual-to-expected calculation than

other Life Expectancy providers. LAPETUS' strategy appears to avoid any calculation based on its expected deaths, which it labeled "the wrong question."[9]

26. Professors Bauer and Zhu calculated an actual-to-expected ratio compliant with Actuarial Standard of Practice No. 48 for the Life Expectancy predictions that LAPETUS provided COVENTRY. They concluded that LAPETUS' true actual-to-expected ratio is less than 40%—an extraordinarily bad performance that will doom any investments in policies valued on LAPETUS Life Expectancies to catastrophic failure. The inevitable collapse of any pool of policies valued on LAPETUS Life Expectancies will likely harm the reputation of the market and diminish investor interest. This merits great public interest and concern because not only will investors in the current pools likely be harmed, but so will future potential viators, whose policies will be unlikely to fetch their true market value because of a resulting shortfall of investor capital in such a damaged marketplace.

27. Based on its understanding of the above, COVENTRY believes that LAPETUS may have filed non-compliant reports with OIR. LAPETUS is statutorily required to file actual-to-expected reports covering five years, but LAPETUS' statements indicate that it only evaluates three years of data and does not calculate a ratio including all expected deaths in the denominator. COVENTRY further believes that LAPETUS' failure to perform compliant actual-to-expected analyses of its performance must be publicly exposed in order to protect the market.

---

[9] *See* Life Insurance Settlement Association Conference, October 25, 2024, https://www.youtube.com/watch?v=-xwCWTM33VY, 1:12:10 mark. For instance, LAPETUS' co-founder was quoted in a trade press article claiming: "When predicting alive status . . . Lapetus has a track record of being over 97% accurate in the last three years. . . . The percentage of the Lapetus patient population living beyond their LE averages less than 3%." This is plainly not an actual-to-expected ratio. Instead, it is a standard based in no actuarial or legal authority which can only produce an artificially and extraordinarily high number. That is because the vast majority of insureds in the life settlement market have Life Expectancies of greater than three years, so that those who die in the first three years do so well before expectations.

28. In order to further document this concern, on February 28, 2025, Amy Welsh, COVENTRY's Senior Vice President and General Counsel, made a public records request to OIR on behalf of COVENTRY for LAPETUS' triennial reports filed pursuant to section 626.99175(5). **Exhibit 1.** That same day, OIR informed COVENTRY that LAPETUS had marked the requested records "trade secret" and claimed them to be exempt from public records disclosure. **Exhibit 2.** Notably, OIR did not provide COVENTRY with any affidavits from LAPETUS, which are required by section 624.4213 when filing "trade secret" information with OIR.

**TRADE SECRETS**

29. Section 624.4213 provides the required mechanism for an insurer submitting documents or information to OIR to protect the insurer's trade secrets. Specifically, section 624.4213 provides:

> (1) If any person who is required to submit documents or other information to the office or department pursuant to the insurance code or by rule or order of the office, department, or commission claims that such submission contains a trade secret, such person may file with the office or department a notice of trade secret as provided in this section. Failure to do so constitutes a waiver of any claim by such person that the document or information is a trade secret.
>
> (a) Each page of such document or specific portion of a document claimed to be a trade secret must be clearly marked as "trade secret."
>
> (b) All material marked as a trade secret must be separated from all non-trade secret material, such as being submitted in a separate envelope clearly marked as "trade secret."
>
> (c) In submitting a notice of trade secret to the office or department, the submitting party must include an affidavit certifying under oath to the truth of the following statements concerning all documents or information that are claimed to be trade secrets:
>
> 1. [I consider/My company considers] this information a trade secret that has value and provides an advantage or an opportunity to obtain an advantage over those who do not know or use it.

> 2. [I have/My company has] taken measures to prevent the disclosure of the information to anyone other than those who have been selected to have access for limited purposes, and [I intend/my company intends] to continue to take such measures.
>
> 3. The information is not, and has not been, reasonably obtainable without [my/our] consent by other persons by use of legitimate means.
>
> 4. The information is not publicly available elsewhere.
>
> 2) If the office or department receives a public records request for a document or information that is marked and certified as a trade secret, the office or department shall promptly notify the person that certified the document as a trade secret. The notice shall inform such person that he or she or his or her company has 30 days following receipt of such notice to file an action in circuit court seeking a determination whether the document in question contains trade secrets and an order barring public disclosure of the document. If that person or company files an action within 30 days after receipt of notice of the public records request, the office or department may not release the documents pending the outcome of the legal action. The failure to file an action within 30 days constitutes a waiver of any claim of confidentiality, and the office or department shall release the document as requested.
>
> (3) The office or department may disclose a trade secret, together with the claim that it is a trade secret, to an officer or employee of another governmental agency whose use of the trade secret is within the scope of his or her employment.

30. The affidavit required by section 624.4213(1)(c) follows the definition of "trade secret" set out in section 812.081(1)(f), which states as follows:

> (f) "Trade secret" means the whole or any portion or phase of any formula, pattern, device, combination of devices, or compilation of information, which is for use, or is used, in the operation of a business and which provides the business an advantage, or an opportunity to obtain an advantage, over those who do not know or use it. The term includes any scientific, technical, or commercial information, including financial information, and includes any design, process, procedure, list of suppliers, list of customers, business code, or improvement thereof. Irrespective of novelty, invention, patentability, the state of the prior art, and the level of

> skill in the business, art, or field to which the subject matter pertains, a trade secret is considered to be:
>
> 1. Secret;
>
> 2. Of value;
>
> 3. For use or in use by the business; and
>
> 4. Of advantage to the business, or providing an opportunity to obtain an advantage, over those who do not know or use it
>
> when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

31. The statutory definition of "trade secret" encompasses "[d]ata, programs, or supporting documentation that is a trade secret as defined in s. 812.081, that is held by an agency as defined in chapter 119, and that resides or exists internal or external to a computer, computer system, computer network, or electronic device is confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution." § 815.04(3).

32. The Florida Legislature specifically exempted from public records disclosure "trade secret" information as defined in section 812.081, and as provided for in section 815.04(3). Importantly, the Florida Legislature recognized that:

> Disclosing trade secrets in an agency's possession would negatively impact the business interests of those providing an agency such trade secrets by damaging them in the marketplace, and those entities and individuals disclosing such trade secrets would hesitate to cooperate with that agency, which would impair the effective and efficient administration of governmental functions. Thus, the public and private harm in disclosing trade secrets significantly outweighs any public benefit derived from disclosure, and the public's ability to scrutinize and monitor agency action is not diminished by nondisclosure of trade secrets.

§ 815.045.

33. In 2021, the Florida Legislature also codified section 119.0715, which provides that "a trade secret held by an agency" is confidential and exempt from disclosure. The term "trade secret" is defined by reference to section 688.002, as: "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain secrecy." § 119.0715(1).

34. LAPETUS' triennial reports filed pursuant to section 626.99175(5) do not meet the "trade secret" definition of either section 812.081(1)(f) or 119.0715. The contents of these reports, including the post hoc accuracy analysis in the statutorily required actual-to-expected ratio, is not a "design, process, procedure, list of suppliers, list of customers, business code, or improvement thereof" which LAPETUS has used "in the operation of a business and which provides the business an advantage, or an opportunity to obtain an advantage, over those who do not know or use it." § 812.081(c). Nor do these reports derive independent value from not being known to other persons who could obtain economic value from their disclosure or use, as described in section 119.0715.

35. LAPETUS' business is the sale of Life Expectancy reports to viatical settlement brokers, viatical settlement providers, and/or investors. The information in LAPETUS' OIR reports is created for the purpose of complying with a regulatory statute, not for the purpose of selling Life Expectancy reports. LAPETUS' reports to OIR are not used in the operation of its business of selling Life Expectancy reports to customers and certainly do not provide its business an advantage in selling Life Expectancy reports to customers.

36. Further, LAPETUS has not taken measures to prevent the contents of its reports to OIR, and particularly its actual-to-expected ratios, from becoming available to persons other than

those selected by the owner to have access thereto for limited purposes, as required to shield the reports from public exposure as trade secrets. To the contrary, LAPETUS frequently publicizes its purported actual-to-expected ratio, with specific references to its statutorily required reports, in its marketing and other public statements.

37. For example, on its website LAPETUS states what its A/E ratio is and that its competence is ratified by OIR:

> Transforming the Life Settlements Industry. . . . All Lapetus LE reports are completed by board certified physicians whose specialties are matched to the insured's impairments. This unique method provides a greater level of insight and an actual to expected ratio of over 96%. . . . Certified LE Provider by the states of Florida and Texas.

*See* Lapetus Health Intelligence Solutions, *Life Settlements* (available at https://lapetussolutions.com/life-settlements/).

38. Similarly, in marketing, LAPETUS has provided versions of its reports filed with OIR to prospective customers. For instance, LAPETUS Co-Founder Jay Olshansky emailed COVENTRY's Chief Origination Officer on February 4, 2022:

> Please find attached several marketing documents that you should feel free to share as you see fit. Here's a summary. 1. FAQ 2022. This includes a detailed explanation of our procedures, data, assumptions, and importantly, three redacted examples of our new report. 2. A redacted A/E report that is about to be submitted to the State of Florida -- our accuracy rate is 96.3%. . . . All of these documents combined provide a thorough assessment of what we do and how we do it so anyone considering investing in life settlements can gain a significant level of comfort with our approach and reputation.

The redacted version of LAPETUS' report to OIR provided to COVENTRY stated: "Lapetus Solutions, Inc. A/E report State of Florida February 1, 2022, Executive Summary. Lapetus Solutions is pleased to report that our formal measurement of Actual/Expected (A/E) is 96.3 percent for the time period February 20, 2019 to February 1, 2022."

39. Additionally, a Frequently Asked Questions document provided by LAPETUS, titled "Life Expectancy Assessments at Lapetus/Frequently Asked Questions" also explicitly and repeatedly discusses the purported Lapetus A/E ratio filed with OIR as follows:

- Validation of the predictive power of these risk factors is based on data from a representative sample of the U.S. population dating back to the 1970s, which indicate that our accuracy rates, in accordance with guidelines set forth by the State of Florida is currently about 95%.

- We then compared the observed ages at death with our projected ages at death using the standards for accuracy defined by the State of Florida Office of Insurance Regulation. The prediction accuracy exceeded the standards for accuracy set by the State of Florida.

- Accuracy rates and A/E equivalent is as good as or better than other LE providers, using State of Florida requirements as a guideline.

- External actuarial oversight of Lapetus. The Lapetus science team and methodology has been certified by actuaries at The Terry Group in Chicago [https://terrygroup.com/]. Their formal evaluation concluded that our methodology in assessing mortality and survival is appropriate, and the back tests of our methodology yielded results that are consistent with the standards set forth by the State of Florida.

40. One of LAPETUS' founders, Dr. Olshansky, recently publicly described LAPETUS' accuracy numbers with reference to its statutory OIR report in on-the-record statements to the trade press, in which he said he intended to make his report's results public:

> "When predicting alive status for patients aged 60-90, Lapetus has a track record of being over 97% accurate in the last three years," Olshansky said. "The percentage of the Lapetus patient population living beyond their LE averages less than 3% — definitive evidence that only the far left side of the survival distribution is being observed in the Lapetus database." He said he plans to submit an actual-to-expected analysis to the Florida Office of Insurance Regulation in the third week of this month and will report a simplified version of the firm's results after that.[10]

[10] Donna Horowitz, "Coventry makes new allegations against Lapetus," Life Settlements Report, February 11, 2025.

41. LAPETUS has not taken reasonable measures to protect the secrecy of this information. Rather, LAPETUS frequently publicly discloses this information. As a matter of law, the reports cannot constitute trade secrets under any statutory definition and must be produced in response to COVENTRY's public records request.

42. Even if the reports did constitute trade secrets (which they do not), upon information and belief, none of LAPETUS' filings with OIR have been accompanied by an affidavit asserting their contents' confidentiality as trade secret. LAPETUS' failure to file the statutorily required affidavit is noteworthy, given that such an affidavit is required to certify under oath that the contents of the information are protected trade secrets and asserting, among other things, that "[t]he information is not publicly available elsewhere." § 624.4213. It also demonstrates that LAPETUS has not taken sufficient measures to maintain the secrecy of the reports, as required by sections 119.0715(1) and 812.081(1)(f) to meet the definition of a "trade secret."

**COUNT I- PETITION FOR WRIT OF MANDAMUS**

43. COVENTRY re-alleges and incorporates the allegations in paragraphs 1 through 42 above.

44. Under chapter 119, an agency and its employees and agents, as custodians of public records, "shall permit the record[s] to be inspected and copied by any person desiring to do so." § 119.07(1)(a).

45. OIR is a "public agency" for the purpose of Florida's Public Records Law. § 119.011(2) ("'Agency' means any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law ... and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.").

46. As a public agency, OIR and its respective employees and agents have a duty to promptly acknowledge and respond in good faith. "A good faith response includes making reasonable efforts to determine from other officers or employees within the agency whether such a record exists and, if so, the location at which the record can be accessed." § 119.07(1)(c); *Hewlings v. Orange County*, 87 So. 3d 839 (Fla. 5th DCA 2012). COVENTRY has a constitutional and statutory right to have OIR perform this duty.

47. Mandamus is an appropriate vehicle to challenge the denial of a public records request, even where an exemption has been asserted. *Deeson Media, LLC v. City of Tampa*, 291 So. 3d 974 (Fla. 2d DCA 2019). The required elements for a writ of mandamus are: (1) the petitioner has a clear and certain legal right; (2) to the performance of a particular duty; (3) by a government or a representative of the government; (4) whose performance of that duty is ministerial and not discretionary; (5) who has failed to perform despite an adequate request; and (6) who has left the petitioner with no other legal method for obtaining relief. *See Huffman v. State*, 813 So. 2d 10 (Fla. 2000). Since COVENTRY's Petition presents a prima facie claim for relief, an order to show cause should be issued so that the claim may receive further consideration on the merits. *Staton v. McMillan*, 597 So. 2d 940 (Fla. 1st DCA 1992).

48. The Florida Constitution creates a broad right to inspect the records of a governmental body. Article I, section 24(a) of the Florida Constitution grants "[e]very person the right to inspect or copy any public record made or received in connection with the official business of any public body, officer or employee of the state, or persons acting on their behalf." Article I, section 24(c) of the Florida Constitution provides that the right to inspect public records shall be "self-executing." The rights created by the Constitution may be enforced under the procedures in chapter 119.

49. Florida courts construe chapter 119 liberally in favor of the State's policy of open government. *See Lightbourne v. McCollum*, 969 So. 2d 326, 332-33 (Fla. 2007). If there is any doubt about the application of the law in a particular case, the doubt is resolved in favor of disclosure. *See Dade County Aviation Consultants v. Knight Ridder, Inc.*, 800 So. 2d 302, 304 (Fla. 3d DCA 2001).

50. Documents are public records even if prepared and maintained by a private organization if they were "received" by agents of a public agency and used in connection with public business. *Nat'l Collegiate Athletic Ass'n v. Associated Press*, 18 So. 3d 1201, 1207 (Fla. 1st DCA 2009), *rev. denied*, 37 So. 3d 848 (Fla. 2010). A public record cannot be transformed into a private record merely because an agent of the government has promised that it will be kept private. Nor is it material that LAPETUS had an expectation that the documents would remain private. *Id.* at 1208-1209.

51. Where an exemption is asserted, section 119.07(1)(d) requires the custodian of the document to redact only the exempt portion of the record and to provide the remainder of the record for inspection and copying. *See, e.g., City of Riviera Beach v. Barfield*, 642 So. 2d 1135, 1137 (Fla. 4th DCA 1994), *rev. denied*, 651 So. 2d 1192 (Fla. 1995).

52. COVENTRY submitted a public records request to OIR on February 28, 2025 seeking LAPETUS' triennial reports filed pursuant to section 626.99175(5). *See* **Exhibit 1**.

53. The requested reports are public records under chapter 119.

54. OIR maintains custody of these reports and uses them in the transaction of official business.

55. OIR refused to respond to COVENTRY's request. Specifically, OIR failed to produce a single responsive document, claiming the reports were designated as trade secrets by LAPETUS. This refusal violates the Public Records Act.

56. OIR has failed to perform its obligations under chapter 119 and COVENTRY has been denied the right to inspect or copy public records in violation of chapter 119. COVENTRY has no other legal method to obtain records responsive to its request.

WHEREFORE, COVENTRY respectfully requests this Court:

a. Enter an Alternative Writ/Order to Show Cause directing OIR to show cause why the relief sought in this Petition should not be granted;

b. Find that the requested records are public records subject to disclosure under chapter 119;

c. Find that OIR unlawfully refused to permit access to the requested records in violation of chapter 119 and article I, section 24 of the Florida Constitution;

d. Enter an Order directing OIR to immediately provide the requested records to COVENTRY; and

e. Grant any other relief this Court deems necessary and appropriate at law or in equity.

**<u>REQUEST FOR EXPEDITED HEARING</u>**

57. Section 119.11(1) provides that actions brought under chapter 119 are entitled to immediate hearings and take priority over other pending cases. The availability of an accelerated civil action "plays a critical role in the enforcement of the Public Records Act." *Jacksonville Police & Fire Pension Fund v. Lee*, 189 So. 3d 120, 124 (Fla. 2016). Consequently, COVENTRY requests that this matter be set for an expedited hearing at the Court's earliest convenience.

Respectfully submitted this 21st day of March 2025.

**STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.**

*s/ Liz Desloge Ellis*
**Erin J. Tilton**
Florida Bar No. 104729
**Liz Desloge Ellis**
Florida Bar No. 97873
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, Florida 32301
Telephone: (850) 580-7200
Facsimile: (850) 329-4844
etilton@stearnsweaver.com
lellis@stearnsweaver.com
***Attorneys for Coventry First, LLC***

**From:** Amy Welsh <awelsh@coventry.com>
**Sent:** Friday, February 28, 2025 9:50 AM
**To:** PublicRecords@floir.com
**Subject:** Public Records Request

To whom it may concern:

Re: Lapetus Solutions, Inc.

Pursuant to chapter 119, Florida Statutes, I am requesting any and all (including the report due March 1, 2025) audits of life expectancies required to be filed with the office pursuant to Section 626.99175(g)(5) by the above referenced entity, Lapetus Solutions, Inc.

I would appreciate production of the above-requested documents within a reasonable time, as required by Florida law. If the documents are maintained in electronic format, please provide them in that electronic format, and if there is a cost associated with producing them, please provide me with an estimate of the cost prior to producing.

If any of the requested documents are the subject of a Notice of Trade Secret filed pursuant to Section 624.4213, Florida Statutes, and are clearly marked as "trade secret" as required by that statute, you may exclude such documents from this request. Pursuant to Section 119.07(1)(d)-(f), if you contend that any portions of the requested documents are exempt from public disclosure, please redact those portions of the document that you claim are exempt and produce the remainder of that document. Pursuant to the same subsection, please also state the statutory basis for any claimed exemption, and state in writing and with particularity the reasons for your conclusion that the particular records are exempt.

Thank you for your assistance. As soon as the documents are ready, please email them to me at awelsh@coventry.com. If you have any questions or wish to discuss, please call me at 215-836-8348.



EXHIBIT
1

**From:** Amy Welsh <awelsh@coventry.com>
**Sent:** Friday, February 28, 2025 8:02 PM
**To:** Florida Office of Insurance Regulation
**Cc:** mike.covington@floir.com
**Subject:** Re: FLOIR [RE: FL Filing Number 25-011646]

Thank you for your prompt reply. We do wish to proceed with the request and we ask you to produce the report(s) with any trade secrets redacted.

Thank you.

---

**From:** Florida Office of Insurance Regulation <Mike.Covington@floir.com>
**Sent:** Friday, February 28, 2025 1:36:08 PM
**To:** Amy Welsh <awelsh@coventry.com>
**Cc:** mike.covington@floir.com <mike.covington@floir.com>
**Subject:** FLOIR [RE: FL Filing Number 25-011646]

[External Sender]
Good afternoon,

Regarding your recent public records request ID # 25-011646, the Office of Insurance Regulation has nothing responsive to your request due to the fact that all documents submitted by this entity were submitted as Trade Secret.

If as stated, you do not wish to proceed with your request then this will complete your public records request at this time. Please let me know if we can be of further assistance.

Sincerely,

Mike Covington
Administrative Assistant I
Office of Insurance Regulation Legal
14214
Mike.Covington@floir.com



EXHIBIT
2