**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ABACUS GLOBAL MANAGEMENT, INC., a corporation,
Plaintiff,

v.

COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,
Defendants.

Case No. 6:25-cv-01401-RBD-RMN

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT, WITH PREJUDICE, AND INCORPORATED LEGAL MEMORANDUM IN SUPPORT**

Defendants Coventry First LLC ("Coventry") and Alan Buerger ("Mr. Buerger") hereby move to dismiss Plaintiff Abacus Global Management, Inc.'s ("Abacus") First Amended Complaint ("FAC") with prejudice: (1) for continued shotgun pleading, and (2) under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## INTRODUCTION

The First Amendment expresses "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Abacus, however, seeks to flip that principle on its head. Faced with criticism about serious problems of its own making, Abacus brought this meritless lawsuit to muzzle those who have highlighted the truth or expressed their constitutionally protected opinions. That it cannot do.

Abacus thus tries to mask the weakness of its claims behind yet another shotgun pleading. It haphazardly incorporates irrelevant allegations into each cause of action.

And it once again fails to pin down the conduct it believes supports each claim. These improper pleading techniques alone warrant dismissal—and now with prejudice since this is Abacus's second attempt to plead a viable case.

In any event, Abacus cannot overcome the raft of legal deficiencies that plague its claims. Abacus asserts a trio of defamation claims that supposedly "includ[e] but are not limited to" sixteen statements. But none contains a verifiably false assertion of fact. Defendants' opinions and demonstrably true statements are simply not actionable. Nor has Abacus plausibly alleged that Defendants acted with the "actual malice"—or subjective, reckless disregard for the truth—that the First Amendment and Florida law require to state a claim. Many of the challenged statements are also not defamatory as a matter of law. And those made in court filings are privileged.

Abacus's Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim likewise faces insurmountable legal hurdles. Defendants fall within the law's safe harbor as parties regulated by Florida's Office of Insurance Regulation ("OIR"). And Abacus fails to allege any actionable statement or harm to consumers, as required to state a claim. Nor does it show how the protected statements were made in "trade or commerce." It also cannot escape Florida's single publication doctrine, which prohibits parties from repackaging defamation claims as FDUTPA violations.

That leaves Abacus's claim for tortious interference with business relations, which falls flat on multiple grounds as well. Abacus inexplicably fails again to even specify a business relationship with which Mr. Buerger might have interfered. Nor has it plausibly alleged causation, a breach of relationship, or unjustified interference.

In short, Abacus has not cured any of the problems with its original Complaint. That is because it cannot do so. The Court should dismiss the FAC with prejudice.

## BACKGROUND

This case implicates an important and ongoing debate in the multibillion-dollar life settlement industry. "Life settlements" are transactions that enable individuals to monetize their life insurance policies during their lifetime. FAC ¶ 28. In a typical life settlement, the policyholder receives a lump sum for his or her policy. *Id.* ¶ 29. In exchange, the purchaser receives the right to collect the policy's death benefit at maturity, so long as it pays required premiums in the interim. *Id.* ¶ 30.

The insured's life expectancy is "of paramount importance for valuing" a policy. *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 984 (11th Cir. 2022) (quotation marks omitted). Abacus admits as much—as it must—both in its Complaint and in SEC filings. *See* Dkt. 1-1 ("Compl.") ¶¶ 26, 32, 34, 37, 60; FAC ¶¶ 37, 77; Ex. 4 at 3 ("[L]ife expectancy is one of the most critical factors for accurate valuation of a Mortality Contract.").[1] If a life expectancy is too short, that will overvalue the policy, because the valuation will fail to account for the longer string of premiums required to

---

[1] All attached exhibits are discussed extensively in the FAC. *See, e.g.*, FAC ¶¶ 13, 152–59 & n.25 (Ex. 1 – Morpheus Report); *id.* ¶¶ 98, 123–24, 199 & n.6 (Ex. 2 – Coventry Study); *id.* ¶¶ 99, 121 & n.7 (Ex. 3 – Peer Review of Coventry Study); *id.* ¶¶ 77–81, 83 (Ex. 4 – Abacus Fund Form N-2); *id.* ¶¶ 101–13, 199, 214 & n.8 (Ex. 5 – Transcript of LISA Conference Debate on YouTube); *id.* ¶¶ 143–50, 199, 214 (Ex. 6 – Transcript of Tegus Interview); *id.* ¶¶ 62, 73, 125, 138, 146 (Ex. 7 – Abacus 2024 10-K); *id.* ¶¶ 131–41, 199 (Ex. 8 – Coventry Writ). These materials may therefore be considered in ruling on the Motion to Dismiss. *See, e.g.*, *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023). Defendants also acknowledge the Court's preference against refiling documents. *See* Dkt. 42 at 9. But they are concerned that citing exhibits attached to an earlier motion to dismiss, which was denied as moot, *see* Dkt. 41, might not be sufficient for their consideration in this motion to dismiss a new complaint. Thus, in an abundance of caution, Defendants attach the exhibits again for the Court's convenience.

keep the policy in force and will project the death benefit payout to occur prematurely. *See, e.g.*, *In re Living Benefits Asset Mgmt., L.L.C.*, 916 F.3d 528, 531 (5th Cir. 2019). To the extent Abacus tries to abandon this reality and the undeniable importance of life expectancies in its FAC, this Court "may 'disregard the contradictory and manipulated allegations of [its] amended pleading.'" *Rubinstein v. Keshet Inter Vivos Tr.*, 2018 WL 8899230, at *5 (S.D. Fla. Oct. 17, 2018) (citation omitted).

Abacus and Coventry compete in the life settlement industry. FAC ¶ 3. But, unlike Coventry, Abacus is a public company. *Id.* ¶ 1. That is noteworthy since other public companies in this industry have repeatedly failed. *See, e.g.*, Ex. 1 at 57–58. For instance, Life Partners Holdings and GWG Holdings filed for bankruptcy after understating life expectancies to overvalue their assets. *See id.* at 3, 20, 57–58. Another large private corporation folded after "conduct[ing] one of the largest Ponzi schemes in Florida's history" by systematically underestimating life expectancies. FAC ¶ 113; *see SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 738–41 (11th Cir. 2005).

Now, Abacus's own valuation and business practices face similar scrutiny. Abacus invested in a life expectancy provider known as Lapetus Solutions, Inc. ("Lapetus"). FAC ¶ 135. It had a self-described "key partnershi[p]" with Lapetus to "build and develop current life expectancy tables." Abacus Form S-1, at 81 (Sept. 15, 2023), bit.ly/46Rig7q. And Abacus has admitted through SEC filings to using Lapetus life expectancies, including for determining the "fair value of the policies it holds." Ex. 7 at 14–15. Indeed, a Fund that Abacus plans to launch disclosed that it "expect[ed] to rely on Lapetus" as its "primary life expectancy provider." Ex. 4 at 46;

FAC ¶ 81. Lapetus, though, has recently "cease[d] all operations." FAC ¶ 188.

The OIR requires life settlement providers to "monitor" and "report[]" evidence of companies "routinely and consistently issuing estimates of life expectancy which are substantially and consistently below" those of others. Info. Bulletin No. 2003-003, 2003 WL 25159993, at *2 (Fla. Ins. Bul. Aug. 12, 2003). To that end, Coventry published a study in May 2024 (the "Coventry Study"), documenting its findings that Lapetus consistently underestimated life expectancies. *See* FAC ¶ 98; Ex. 2 at 1. Two professors then independently confirmed those findings. *See* FAC ¶ 99; Ex. 3 at 2, 4.

A few months later, Mr. Buerger participated in a public debate with Lapetus's CEO at a Life Insurance Settlement Association ("LISA") conference. FAC ¶ 101. There, Mr. Buerger echoed Coventry's concerns with Lapetus's consistently low life expectancies. *See id.* ¶¶ 101–02; Ex. 5 at 2–5, 15–16. Abacus alleges that, at the end of the debate, Mr. Buerger responded to a moderator's question by expressing his belief that the market overvalued Abacus. *See* FAC ¶¶ 105–13; Ex. 5 at 28–29.

Mr. Buerger was then invited for an interview by the business intelligence firm Tegus. FAC ¶ 143. During that interview, Mr. Buerger again expressed his concerns about Lapetus's short life expectancies and the effects that these—and other business practices—could have on Abacus's future. *See id.* ¶¶ 146–47; Ex. 6 at 1–5.

Defendants are not the only ones who have opined on these issues. Morpheus Research separately reported that Abacus has deployed "Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die." FAC ¶ 13. According to the report, former

Abacus employees confirmed that the company relied heavily on Lapetus's life expectancies. Ex. 1 at 3, 25. And, while Abacus boasted about "record" earnings for Q1 2025, it quietly slashed its discount rate to inflate the already questionable "unrealized gains" on its balance sheet—which have skyrocketed from 13% to 61% of the company's revenue in just three years. *Id.* at 5, 17–18, 36. "[W]ithout the changed discount rate, Abacus would have been loss-making" for the quarter. *Id.* at 36.[2]

After these concerns came to light, Abacus brought this suit. The FAC asserts three defamation claims, which supposedly "includ[e] but [are] not limited to" sixteen statements made by Coventry in court filings and in connection with the Coventry Study, as well as by Mr. Buerger during the LISA Conference and Tegus interview. FAC ¶¶ 199, 214, 230. Count Four alleges a FDUTPA violation, based on undifferentiated conduct "set forth above" in 65 paragraphs of Abacus's lengthy FAC. *Id.* ¶ 241. And Count Five claims that Mr. Buerger tortiously interfered with business relations, based on alleged "activities" directed at an unspecified credit union and a vague allusion to activities "like [that] with other customers." *Id.* ¶¶ 247–51.

**STANDARD OF REVIEW**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

---

[2] Abacus's public SEC filings show that the company has steadily reduced the discount rate used to value policies from 21% to 16% over the past year, thereby inflating the fair market value of the policies in its portfolio. *See* Abacus 10-Q at 27 (Aug. 12, 2025), bit.ly/476MsKH (16%); Abacus 10-Q at 22 (May 8, 2025), bit.ly/3L7MFFX (18%); Abacus 10-Q at 23 (Nov. 7, 2024), bit.ly/4n1enBK (20%); Abacus 10-Q at 22 (Aug. 12, 2024), bit.ly/46RiviQ (21%). Abacus's most recent 10-K also shows that small manipulations of the discount rate can drastically affect the company's portfolio valuation. *See* Ex. 7 at 106 (stating that a 4% difference in discount rate would lead to a 15% difference in fair value).

its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Id.*

## MEMORANDUM OF LAW AND ARGUMENT

Abacus's effort to obscure its claims behind another shotgun pleading runs afoul of well-settled precedent. And its claims—to the extent they can be discerned—suffer from a litany of incurable legal defects. The alleged conduct is simply not actionable as a matter of law, and the Court should dismiss the FAC with prejudice.

### I. The First Amended Complaint Is Another Impermissible Shotgun Pleading.

"Courts in the Eleventh Circuit have little tolerance for shotgun pleadings." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). For good reason. "Such pleadings impose on the Court the onerous task of sifting out irrelevancies to determine which facts are relevant to which causes of action." *Petersen v. Choice Hotels, Int'l, Inc.*, 2021 WL 3025833, at *1 (M.D. Fla. Feb. 25, 2021) (Dalton, J.). They also "violate the requirement that a plaintiff provide 'a short and plain statement of the claim,'" and they burden defendants with a lack of "adequate notice" of "'the grounds upon which each claim rests.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 732 (11th Cir. 2020) (citations omitted).

Notwithstanding that this issue was raised in the initial motion to dismiss, the FAC remains a textbook shotgun pleading. It again "employs a multitude of claims

and incorporates by reference all of its factual allegations into each claim, making it nearly impossible for Defendants and the Court to determine with any certainty which factual allegations give rise to which claims for relief." *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356 (11th Cir. 2018); *see* FAC ¶¶ 193, 208, 224, 239, 246. These problems infect each cause of action. For instance, the tortious interference count incorporates 192 paragraphs, calls out one allegation involving an unspecified credit union, and then claims this activity and others "like it" involving "other [unspecified] customers" harmed Abacus. FAC ¶¶ 246–51. The FDUTPA count vaguely gestures to unspecified conduct "set forth above" over 65 paragraphs. *Id.* ¶ 241; *see also id.* ¶ 242 ("*inter alia*"). And the defamation counts, for their part, incorporate allegations that have nothing to do with defamation, while repeatedly "us[ing] language such as 'including but not limited to,' which is clearly too broad for [Defendants] to know what facts [Abacus] identifies to support [its] claim." *Rivera v. Kijakazi*, 2023 WL 3098537, at *2 (M.D. Fla. Mar. 13, 2023); *see* FAC ¶¶ 199, 214, 230.

In all these ways, Abacus has utterly failed to cure the fundamental defects raised in the initial motion to dismiss. And, to make matters worse, one still "must labor through allegations" that appear to be included for no other purpose than to give Abacus "a megaphone for public relations" and a "platform to rage against an adversary" after its troubles were exposed. *Trump v. N.Y. Times Co.*, __ F. Supp. 3d __, 2025 WL 2680597, at *1–2 (M.D. Fla. 2025); *see, e.g.*, FAC ¶¶ 1–3, 53–63, 84–85, 95–96, 114, 156, 186–90; *see also id.* ¶ 159 (statements made by Morpheus).

Abacus's shotgun pleading is "'altogether unacceptable,'" and the FAC "must

be dismissed" for this reason alone. *Petersen*, 2021 WL 3025833, at *1 (quoting *Cramer v. Florida*, 117 F.3d 1258, 1263 (11th Cir. 1997)). Indeed, because Abacus's "amended complaint [is] afflicted with the same defects" as the first—and because Abacus was "on notice" of those defects from Defendants' initial motion to dismiss—the dismissal should be "with prejudice." *Jackson*, 898 F.3d at 1358–59; *see* Dkt. 31 at 7–8.

## II. Abacus Fails to State a Claim for Defamation (Counts 1, 2, 3).

In all events, Abacus fails to state a claim for defamation. A plaintiff asserting defamation under Florida law must plausibly allege: (1) "publication"; (2) the statement's actual "falsity," or the creation of a "false impression" for a claim of defamation by implication; (3) that "the statement was made with knowledge or reckless disregard as to the falsity" on a matter concerning a public figure; (4) "actual damages"; and (5) "the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262, 1271 (11th Cir. 2018). Every one of the sixteen challenged statements fails on multiple elements. *See* FAC ¶¶ 199, 214.

### A. None of the Challenged Statements Is False.

Start with the falsity element. Only a verifiably false factual statement can give rise to a defamation claim. "True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner*, 879 F.3d at 1262. Those that are not "perfectly accurate" are also protected if their "gist" or "sting" is true. *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. Dist. Ct. App. 1999) (citation omitted).

Whether a statement is "one of fact or opinion" is a "question[] of law for the

court." *Turner*, 879 F.3d at 1262–63. In making this determination, "the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication." *Keller v. Miami Herald Pub. Co.*, 778 F.2d 711, 717 (11th Cir. 1985) (citation omitted). The court must also "consider the context in which the statement was published and accord weight to cautionary terms used" by the defendant. *Id.* (citation omitted). Applying this context-dependent inquiry, it is clear that none of the challenged statements is "readily capable of being proven false." *Turner*, 879 F.3d at 1262.

1. In fact, many of the statements are garden-variety opinions. FAC ¶¶ 199(b), 199(c), 199(e), 199(f), 199(i), 199(j), 214(a), 214(b). For example, Abacus takes issue with Mr. Buerger's assertion that policy valuations premised on Lapetus life expectancies are "grossly overstated." *Id.* ¶¶ 199(f), 214(a). Yet, Abacus conspicuously ignores that Mr. Buerger was merely relaying his "belie[f]." Ex. 5 at 29. That is language "classically indicative of opinion." *Gregory v. ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–84 (2015)). Even if Mr. Buerger did not use this cautionary language, and even if one could construe his statement to also question Abacus's value, courts "frequently determine that investment analysis"—including a contention that a "company is overvalued"—constitutes protected "opinion." *Grifols, S.A. v. Yu*, 2025 WL 1826611, at *11 (S.D.N.Y. July 2, 2025) (quotation marks omitted) (collecting cases). That Mr. Buerger was "engaged in heated debate" at the time only reinforces that his statement was an opinion. *Horsley*

*v. Feldt*, 304 F.3d 1125, 1132 (11th Cir. 2002). Abacus cannot weaponize defamation law to stifle this legitimate debate.

The same goes for the statement that "it's just a matter of time before [Abacus] implodes." FAC ¶ 199(e). That is a "prediction of future events." *Utterback v. Morris*, 2024 WL 3809368, at *9 (N.D. Fla. July 24, 2024). And a "prediction, or statement about the future, is essentially an expression of opinion." *Id.* (quoting *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 680 (5th Cir. 1986)). Such a "subjective assessment" is not actionable. *Turner*, 879 F.3d at 1264.

Nor is Mr. Buerger's prediction that shareholders could be subordinated to "asset-backed debt." FAC ¶ 199(b). Abacus once again rips this statement out of context, omitting that it was one of "three things" Mr. Buerger "believed will *likely* happen" in the future. Ex. 6 at 2 (emphasis added). This prediction about Abacus's "future financial status" cannot support a claim. *Uline, Inc. v. JIT Packaging, Inc.*, 437 F. Supp. 2d 793, 803 (N.D. Ill. 2006); *see also Utterback*, 2024 WL 3809368, at *9.

As to Mr. Buerger's remark that only "stupid" and "unsophisticated" investors use Lapetus, FAC ¶ 199(c), that "rhetorical hyperbole" about others is beyond the ambit of a defamation claim, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990) (citation omitted). Adjectives like "stupid" and "unsophisticated" connote inherently subjective perceptions. *See, e.g.*, *Cook-Benjamin v. MHM Corr. Servs., Inc.*, 571 F. App'x 944, 947 (11th Cir. 2014) ("stupider"); *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 493 (5th Cir. 2013) ("foolish"). It follows that Abacus's "reliance on [these]

unflattering adjective[s] to underpin a defamation claim offends the First Amendment." *Levinsky's Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 130 (1st Cir. 1997).

Abacus's challenge to the assertion that it does not hold policies for more than a "short period of time" suffers from the same defect. FAC ¶ 199(j). The "lack of precision" inherent in the phrase 'short period of time' makes this statement "incapable of being proven true or false." *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1297 (S.D. Fla. 2023).

Abacus also complains about Coventry's comment in a judicial filing that Abacus has a "close" relationship with Lapetus and was invested "heavily" in the company. FAC ¶ 214(b). "What it means to be 'close,'" however, is a subjective matter that is "not capable of being definitively answered." *Markle v. Markle*, 2024 WL 1075339, at *8 (M.D. Fla. Mar. 12, 2024). So is the concept of whether Abacus invested "heavily." *See Euroboor B.V. v. Grafova*, 2021 WL 4325694, at *23 (N.D. Ala. Sept. 23, 2021) (statement of "heavy" drug usage was non-actionable "opinion"). Coventry's opinion is well-supported in any event. Abacus does not deny that it "held a seat on [Lapetus's] board through Abacus CEO Jay Jackson," nor that it invested in Abacus through a "$1 million convertible note" that could result in "5% ownership upon conversion." FAC ¶¶ 135, 214(b); *see also* Ex. 6 at 4 (recounting these facts).[3]

[3] Though still unclear, to the extent Abacus also challenges the allegation that its relationship with Lapetus "may" have violated Florida's Life Expectancy Reform law, FAC ¶ 214(b), that is likewise non-actionable opinion, "couched in equivocal language." *Others First, Inc. v. Better Bus. Bureau*, 829 F.3d 576, 582 (8th Cir. 2016); *see also, e.g.*, *Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1317 (D. Colo. 1998). And that opinion is firmly grounded in the law's text, which prohibits any life settlement provider from "directly or indirectly own[ing] or be[ing] an officer, director, or employee of a life expectancy provider." Ex. 8 at 7 n.4 (quoting Fla. Stat. § 626.99175(6)).

There is nothing false about what Coventry said.

Nor is there anything false about the statement that "valuations based on Lapetus life expectancies could lead to significantly inflated asset values." FAC ¶ 199(i). The "conditional 'could' is denotative of only a possibility," rather than a statement of fact. *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 137 (D. Mass. 1996). And this "hedging language" underscores that Coventry was recounting "an interpretation" of the data from its internal review. *Pace v. Baker-White*, 432 F. Supp. 3d 495, 512–13 (E.D. Pa. 2020) (quotation marks omitted). That data in fact indicated that Lapetus's life expectancies were generally shorter than others. *See* Ex. 2 at 1. And it is beyond dispute that "the projected life expectancy of [an] insured [is] a 'key element' to determining the fair market value of a life insurance policy." *Bedtow Grp. II, LLC v. Ungerleider*, 684 F. App'x 839, 841–42 (11th Cir. 2017); *see* FAC ¶¶ 37, 77; Ex. 7 at 14–15. If one "underestimate[s] the insureds' life expectancy," the policies are worth "less" than they otherwise would appear. *Mut. Benefits*, 408 F.3d at 744.

2. Other allegedly defamatory statements are simply true, as shown by the FAC and documents incorporated therein. *See* FAC ¶¶ 199(a), 199(d), 199(g), 199(h), 214(c), 214(d), 214(e), 214(f). For instance, Abacus oddly challenges the statement that a company must "choose which accounting method" it will use for a policy "and can never change it." *Id.* ¶ 199(d). But Abacus concedes that this is true in the SEC filing that it quotes in the FAC. *See id.* ¶ 73 n.5 ("The valuation method is chosen upon contract acquisition and is irrevocable." (quoting Ex. 7 at 80)).

Similarly, Abacus's own SEC filings confirm that it would use Lapetus for

medical underwriting, "not exclusively but primarily." *Id.* ¶ 199(a); *see* Ex. 4 at 46 (noting that Abacus's Fund "expects to rely on Lapetus Solutions as its primary life expectancy provider" and that it would "generally defer to the [life expectancy] provided by Lapetus" if "inconsistent" with other estimates); Ex. 7 at 14–15 (stating that Abacus "utilizes a multitude of inputs to determine the fair value of the policies it holds, which may include life expectancy reports generated by a company [Lapetus] in which [Abacus] holds a minority ownership interest").

To the extent Abacus also complains about Mr. Buerger's remark that public companies "try[] to generate steady progress in [their] quarterly earnings," which creates a "temptation" to "manufacture earnings," FAC ¶ 199(a), that statement is true as well—or at a minimum, "not readily capable of being proven false," *Turner*, 879 F.3d at 1262. Such a temptation to satisfy profit-driven investors naturally exists, even if most companies never act fraudulently based on that motive. *See, e.g.*, David Millon, *Why Is Corporate Management Obsessed with Quarterly Earnings and What Should Be Done About It?*, 70 Geo. Wash. L. Rev. 890, 890–93 (2002).

Abacus next claims that the Coventry Study does not show Lapetus life expectancies are "shorter" than others and does not "cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies." FAC ¶ 199(g)–(h). Yet, that is exactly what the Study does. It reflects Coventry's observation—based on "all Lapetus life expectancy reports [Coventry] was aware of" for which another underwriter provided a report "within 3 months" of Lapetus's own—that Lapetus was "shorter in 85% of cases" by an average of 31 months. Ex. 2 at 1. These results were

verified by independent researchers. *See* Ex. 3 at 2, 4. And Abacus concedes—as it must—that "[t]he valuation of . . . life insurance policies will vary depending on the dates of the related mortality estimates and the medical underwriting firms that provide" them. Ex. 7 at 15. In other words, it admits that the Coventry Study "cast[s] doubt" on assets valued using Lapetus life expectancies. FAC ¶ 199(h).

Abacus's remaining attacks similarly fall flat. It challenges the statement that Coventry does a "fair value calculation" on its policies, but that statement is not about Abacus, is not defamatory, and is unsupported by any allegation of falsity. *Id.* ¶ 214(d). Nor does Abacus anywhere refute the uncomfortable truth that other public companies focused on life settlements historically "have gone bankrupt." *Id.* ¶ 214(c). Abacus likewise does nothing to undermine the fact that—as SEC filings reveal—its "inventory" and "amount of money they're investing each quarter" is producing increasing "unrealized gains." *Id.* ¶ 214(e). Nor does it rebut the non-defamatory statement that it was "trying to get the stock price up through [its] stock repurchase plan." *Id.* ¶ 214(f). Simply put, Abacus fails to plead any "facts that indicate the falsity" of any challenged statement. *Geller v. Von Hagens*, 2010 WL 4867540, at *3 (M.D. Fla. Nov. 23, 2010). That alone requires dismissal of the defamation claims.

### B. Even if any Statement Were False, Abacus Does Not Plausibly Allege Knowledge or Reckless Disregard for the Purported Falsity.

In addition, Abacus fails to "allege facts sufficient to give rise to a reasonable inference" that any purportedly false statement "was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Turner*, 879 F.3d at

1273 (citation omitted). That failure independently sinks the defamation claims.

1. Abacus plainly qualifies as a public figure. Whether a plaintiff "is a public figure—and thus subject to the actual malice analysis—is a question of law for the court." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). Corporations can qualify as public figures. *See, e.g.*, *Silvester v. Am. Broadcasting Cos.*, 839 F.2d 1491, 1496–97 (11th Cir. 1988). And Abacus is itself a public figure "in the general sense," as a publicly held company that touts its transparency, operating "in a field subject to close state regulation." *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977); *see* FAC ¶¶ 1, 3, 61–64; Fla. Stat. §§ 626.9912–626.99295.

At the very least, Abacus is a "limited public figure" for purposes of this action. *Silvester*, 839 F.2d at 1494. When assessing limited public figure status, "the court must (1) isolate the public controversy, (2) examine the [plaintiff's] involvement in the controversy, and (3) determine whether 'the alleged defamation was germane to the [plaintiff's] participation in the controversy.'" *Id.* (alteration adopted; citation omitted). Here, Abacus's own suit confirms that its methods have been—and continue to be—the subject of a robust public debate.

A "public controversy" is one where "resolution of the controversy will affect people who do not directly participate in it." *Id.* at 1494–95. Notably, this dispute concerns an ongoing debate about Lapetus life expectancies and how Abacus's use of those estimates—along with other questionable practices—threatens the investments of shareholders across the country. These sorts of issues have plagued the industry before, *see, e.g.*, FAC ¶ 113; Ex. 1 at 3; *Mut. Benefits*, 408 F.3d at 738–41, and so the

propriety of Lapetus life expectancies featured prominently at an industry conference, FAC ¶ 101. Investors then "reacted negatively" when Morpheus highlighted concerns with Abacus's public disclosures. *Id.* ¶ 162. All this underscores that "the public has a marked interest in [the] controversy." *Silvester*, 839 F.2d at 1495.

Abacus was also "intimately involved in the public controversy" from the get-go. *Id.* at 1496. It "voluntarily enter[ed] a strictly regulated, high-profile industry," became its only current publicly traded participant, and then made public disclosures that led it to become "the primary . . . focus of certain aspects of the controversy." *Id.* at 1497; *see, e.g.*, FAC ¶¶ 1, 61, 79–83; Ex. 7 at 14–15. By becoming an "important member[] of the regulated [life settlement] industry," Abacus "invited public scrutiny, discussions, and criticism." *Silvester*, 839 F.2d at 1497. It also had "ready access to the media" as a large public corporation. *Id.* at 1498. And it "took advantage of [that] familiarity with the media by commissioning a response" to allegations of the company's overvaluation. *Turner*, 879 F.3d at 1272; *see* FAC ¶ 160 & n.27.

Finally, Abacus cannot dispute that the challenged statements were "germane to [its] participation in the controversy." *Silvester*, 839 F.2d at 1498. They all relate to Lapetus's life expectancies, the Abacus-Lapetus relationship, Abacus's accounting methods, or Abacus's valuation. *See* FAC ¶¶ 199, 214. Thus, Abacus is a public figure.

2. "Because [Abacus] is a public figure, [it] must establish 'actual malice' on behalf of [Defendants]." *Turner*, 879 F.3d at 1273. Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or

ill will." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991). Rather, it means that the defendant "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Michel*, 816 F.3d at 703. The plaintiff must make this exacting showing for "each statement" challenged. *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 757 (4th Cir. 2023).

But nowhere does Abacus allege facts sufficient to establish actual malice as to any statement, let alone all of them. Its only attempt is to point to Mr. Buerger's "claim that he has read each and every one of Abacus's SEC filings." FAC ¶ 12. This bare allegation does not advance Abacus's burden for several reasons.

*First*, it is irrelevant to the statements made by others associated with Coventry. *See id.* ¶¶ 199(g), 199(h), 199(i), 214(b). Actual malice must be shown as to "each defendant" individually, not by imputing generalized knowledge across all speakers. *Revell v. Hoffman*, 309 F.3d 1228, 1234 (10th Cir. 2002) (citing *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968)). Abacus cannot avoid that black-letter law.

*Second*, even with respect to Mr. Buerger, merely having reviewed SEC filings does not plausibly suggest that he "actually entertained serious doubts" about the truth of his statements or was "highly aware" of probable falsity. *Michel*, 816 F.3d at 703. To the contrary, Abacus's SEC filings corroborate Mr. Buerger's statements. Its most recent 10-K states that "[t]he returns of the Company's hold portfolio is almost entirely dependent upon how accurate the actual longevity of an insured is as compared to *the Company's expectation for that insured*." Ex. 7 at 15 (emphasis added). "In determining the life expectancy of an insured, the Company relies on medical underwriting

conducted by various medical underwriting firms." *Id.* And Lapetus often performed this work: Abacus "utilizes a multitude of inputs to determine the fair value of the policies it holds, *which may include life expectancy reports generated by a company [Lapetus]* in which [Abacus] holds a minority ownership interest." *Id.* at 14–15 (emphasis added). Former Abacus employees also reported that Abacus "relies heavily on Lapetus." Ex. 1 at 25. In fact, Abacus's Fund stated that it "expect[ed] to rely on Lapetus" as "its primary life expectancy provider," and would "generally defer" to Lapetus life expectancies if they were "inconsistent" with others. Ex. 4 at 46. These public disclosures foreclose any plausible inference of actual malice.

So, too, does the Coventry Study. "The law is clear that individuals are entitled to rely on 'previously published reports' from 'reputable sources.'" *Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020) (citation omitted). That is what Mr. Buerger did. The Coventry Study explained its rigorous methodology: It compared "all" 3,845 Lapetus reports that Coventry "was aware of," with "all other reports Coventry was aware of" from other underwriters "dated within 3 months of the corresponding Lapetus life expectancy on the same underlying life." Ex. 2 at 1. Two professors then independently verified this study, which indicated—as Mr. Buerger claimed—that Lapetus life expectancies have been materially shorter than those of its peers. Ex. 3 at 4. Simply put, Abacus "does not plead any facts that would allow [the Court] to infer that [Defendants] doubted the veracity" of any challenged statement. *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021).

*Third*, to the extent Abacus believes Defendants harbored a "motive[] for

attacking Abacus," FAC ¶¶ 52, 206, that is irrelevant. "[I]ll-will, improper motive or personal animosity plays no role in determining whether a defendant acted with actual malice." *Project Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024) (citation omitted). Abacus's failure to plausibly allege that any Defendant knew or recklessly disregarded the falsity of any particular statement requires dismissal.

**C. Many of the Challenged Statements Are Not Defamatory.**

Even if Abacus plausibly alleged falsity and actual malice—which it has not—many of the challenged statements are not defamatory. A "defamatory statement is one that tends to harm the reputation of another." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108–09 (Fla. 2008). But charges that Abacus is trying to "get [its] stock price up," or must "choose which accounting method" it will use for policies could not possibly injure the company's reputation. FAC ¶¶ 199(d), 214(f).

Other statements are not defamatory because they do not concern Abacus. "[A] defamatory statement must be 'of and concerning' the plaintiff to be actionable." *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (citation omitted). Yet Abacus attacks several statements concerning other parties. *See* FAC ¶ 199(g), 199(h), 199(i) (Lapetus); *id.* ¶ 214(d) (Coventry); *id.* ¶¶ 199(c), 214(c) (other companies). These are not "about [Abacus]" and are therefore not actionable. *Moore v. Cecil*, 109 F.4th 1352, 1367 (11th Cir. 2024).

Abacus's attempt to logroll every statement into a defamation *per se* claim also fails. A statement can support a defamation *per se* claim only if it is "'actionable on its face' and does not 'require[] additional explanation of the words used to show that

they have a defamatory meaning or that the person defamed is the plaintiff.'" *Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259 (S.D. Fla. 2021) (citation omitted). Here, most of the challenged statements cannot possibly harm Abacus's reputation "alone and without innuendo" or elaboration. *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015); *see* FAC ¶¶ 199(a), 199(c), 199(d), 199(f)–(j), 214(b)–(f).

### D. The Challenged Statement Made in a Court Filing Is Privileged.

Coventry is also immune from defamation liability for its statement describing Lapetus's relationship with Abacus in a judicial filing. *See* FAC ¶ 214(b). "Florida law recognizes an absolute privilege for conduct occurring during the course of a judicial proceeding." *Grippa v. Rubin*, 133 F.4th 1186, 1193 (11th Cir. 2025). And this privilege shields litigants from liability for "defamatory words published in the course of judicial proceedings, regardless of how false or malicious the statements may be, as long as the statements bear some relation to or connection with the subject of inquiry." *Debrincat v. Fisher*, 217 So. 3d 68, 69–70 (Fla. 2017) (citation omitted).[4]

The allegations in Coventry's petition fall squarely within that privilege. Coventry described the Abacus-Lapetus relationship in a court filing to show how Lapetus's "issuance of chronically short Life Expectancies has skewed the entire life settlement market," and why Coventry believes Lapetus "may have filed non-

[4] Despite discussing it in the FAC again, Abacus still does not appear to challenge Coventry's alleged contact with the SEC. *Cf.* FAC ¶¶ 92, 116. To the extent it does, "register[ing] complaints with the SEC" is "privileged as petitioning activity" by the First Amendment. *Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 650 (7th Cir. 1983); *see also TEC Cogeneration v. Fla. Power & Light Co.*, 76 F.3d 1560, 1570–73 (11th Cir. 1996) (discussing the "*Noerr/Pennington* doctrine of immunity").

compliant reports." Ex. 8 ¶¶ 18, 27. Because the statement "bear[s] some relation to or connection with the subject of inquiry," it is absolutely privileged. *Debrincat*, 116 So. 3d at 70 (citation omitted); *see also Myers v. Hodges*, 44 So. 357, 362 (Fla. 1907) (explaining that "much latitude must be allowed to the judgment and discretion of those who maintain a cause in court" when "determining what is pertinent").

In short, Abacus's defamation claims fail several times over as a matter of law. For the Court's convenience, the Appendix contains a chart summarizing the grounds (in addition to shotgun pleading) for dismissing the defamation counts with prejudice.

## III. Abacus Fails to State a FDUTPA Claim (Count 4).

Abacus fares no better on its FDUTPA claim. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Thus, "[t]o assert a claim under FDUTPA, a plaintiff must allege (1) a deceptive or unfair act in the conduct of trade or commerce; (2) causation; and (3) actual damages." *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023). Abacus has not done so.

### A. Defendants Fall Within FDUTPA's Safe Harbor.

Abacus's claim fails at the outset because FDUTPA "does not apply" to "[a]ny person or activity regulated under laws administered by" OIR. Fla. Stat. § 501.212(4). "The disjunctive 'or' in section 501.212(4) indicates that there are two separate and distinct exclusions from liability under FDUTPA—either 'persons' regulated under laws administered by certain administrative agencies, or 'activities' regulated under the same." *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1190 (M.D. Fla. 2022)

(citation omitted); *see also* Fla. Stat. § 626.9511(1) (the term "person" includes entities).

That exclusion applies here. Coventry is regulated by OIR as a life settlement company. *See* Fla. Stat. §§ 20.121(3)(a)(1), 626.9912(1). And so is Mr. Buerger as the company's co-founder and chairman. FAC ¶ 21; *see also* Fla. Stat. §§ 624.05(3), 626.9561 (OIR has jurisdiction to "examine and investigate the affairs of every person involved in the business of insurance" for "any unfair or deceptive act"). Accordingly, "there is no cause of action for violation of FDUTPA" against either Defendant. *Asokan v. Am. Gen. Life Ins. Co.*, 302 F. Supp. 3d 1303, 1314 (M.D. Fla. 2017).

**B. Abacus Fails to Allege any Deceptive or Unfair Trade Practice.**

Even if this safe harbor did not apply, Abacus fails to allege any deceptive or unfair trade practice. A practice is considered "deceptive" if it is "likely to mislead the consumer." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quotation marks omitted). And a practice is considered "unfair" if it both "offends established public policy" and "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (quotation marks omitted).

Abacus does not plausibly allege either theory. Its shotgun pleading makes little effort to describe what conduct Abacus believes violated FDUTPA. *See* FAC ¶¶ 239–41. But Abacus appears to premise its claim on the same statements it alleges are defamatory. *Cf. id.* ¶ 241. Its claim therefore fails for the reasons explained above. *See supra* Section II. Defendants' opinions and true statements are not deceptive or unfair. On the contrary, they are protected by the First Amendment.

Abacus does identify one other statement, complaining that Mr. Buerger said

he "believe[d]" Lapetus's chronically short life expectancies posed an "existential threat" to the industry. Ex. 5 at 22; FAC ¶ 242. The First Amendment similarly protects that opinion—particularly because it was made in the context of a formal debate. *See, e.g.*, *Kajeet, Inc. v. Qustodio*, 2019 WL 13149928, at *10 (C.D. Cal. Aug. 22, 2019) (stating plaintiff was a "threat to our industry" was non-actionable opinion); *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (same, for "future threat to others"). Not only that, but Florida law *requires* Mr. Buerger as a life settlement industry participant to disclose such beliefs about short life expectancies. *See* Info. Bulletin No. 2003-003, 2003 WL 25159993, at *2; Fla. Stat. § 626.989(6)(a). And FDUTPA "does not apply" to an act "required or specifically permitted" by law. Fla. Stat. § 501.212(1).

### C. The Statements Were Not Made in "Trade or Commerce."

Also, none of the challenged statements was made in "trade or commerce." Fla. Stat. § 501.204(1). As a consumer-protection law, FDUTPA limits "trade or commerce" to mean "the advertising, soliciting, providing, offering, or distributing" of "goods, services, property," "or any other article, commodity, or thing of value." *Id.* § 501.203(8). The law does not apply to Defendants' "publication of information" here. *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020).

### D. Abacus Fails to Allege Harm to Consumers.

Abacus has not adequately alleged actual damages either. A FDUTPA plaintiff "must 'prove that there was an injury or detriment to consumers.'" *Ounjian*, 89 F.4th at 860 (citation omitted). But Abacus "allege[s] conduct directed at [itself]" and harm

to its investors, "rather than conduct directed at and injurious to consumers." *Id.* at 861; *see* FAC ¶ 241. That requires dismissal of the bulk of Abacus's FDUTPA claim.

Apparently recognizing this deficiency, Abacus adds a new theory in the FAC, claiming it was harmed as a Lapetus customer. FAC ¶ 243. Yet its damages theory still makes no sense. For purposes of FDUTPA, "actual damages" is a term of art "defined as the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. Dist. Ct. App. 2010) (quotation marks omitted). Actual damages "do not include consequential damages, personal injury, or damage to other property." *Kendall v. Bos. Sci. Corp.*, 2018 WL 3910883, at *6 (M.D. Fla. Apr. 17, 2018) (Dalton, J.).

Here, the FAC "lacks any facts" suggesting Abacus (or anybody else) suffered the type of damages contemplated by FDUTPA. *Id.* That is unsurprising. Businesses rarely "suffer actual damages from unfair and deceptive practices of competitors." *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 214 (Fla. Dist. Ct. App. 2019). This case is no exception. In fact, discussing the propriety of another's life expectancy estimates is simply not a consumer product. Abacus has no viable FDUTPA claim.

**E. The Single Publication Doctrine Bars the FDUTPA Claim.**

Furthermore, "the single publication doctrine bars actions that 'arise from the same publication upon which a failed defamation claim is based.'" *Bongino*, 477 F. Supp. 3d at 1320 (citation omitted). "[A] single publication gives rise to a single cause

of action." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. Dist. Ct. App. 2002). And that doctrine precludes Abacus from repackaging its failed defamation claims as a FDUTPA claim. *See Bongino*, 477 F. Supp. 3d at 1320–21. Indeed, Abacus's FDUTPA claim must be dismissed even if its defamation claims could somehow survive. The single publication doctrine requires that "courts likewise dismiss alternative tort claims even where the defamation count does not fail." *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1286 (S.D. Fla. 2021). In other words, Abacus cannot double-dip. The FDUTPA claim should be dismissed.

## IV. Abacus Fails to State a Claim for Tortious Interference (Count 5).

Abacus's claim for tortious interference with business relations is equally meritless. To state such a claim, a plaintiff must plausibly allege: (1) "the existence of a business relationship"; (2) the defendant's "knowledge of the relationship"; (3) "intentional and unjustified interference"; and (4) "damage to the plaintiff as a result of the breach of that relationship." *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1279 (11th Cir. 2015) (citation omitted). Abacus again falls short.

For one thing, "the party allegedly interfered with must be actual and identifiable, and not just a large group such as the 'community at large.'" *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329, 1336 (S.D. Fla. 2002) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994)). The FAC once again runs afoul of this basic requirement. Abacus vaguely alludes to its "business relationships with several large investors, including [a] large credit union." FAC ¶ 247. But it does not specify who any of those investors are. Abacus's "vague and

abstract" references to unspecified parties cannot "satisfy the first element of a tortious interference claim." *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010).

Abacus's failure to name a counterparty makes it virtually impossible to respond to or analyze the remaining elements. Yet, even if Abacus had alleged this essential detail, it still has not shown causation or a breach of a cognizable relationship. An "action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen*, 647 So. 2d at 815. But Abacus pleads no facts suggesting that the unidentified credit union would have agreed to a "fund-of-one investment" absent the alleged interference. FAC ¶ 250; *see, e.g.*, *Marino v. Phaidon Int'l, Inc.*, 2022 WL 1913266, at *5 (S.D. Fla. May 17, 2022).

In any case, Abacus has not plausibly alleged "unjustified" interference. It takes issue with an alleged sharing of the Coventry Study with the credit union CFO. FAC ¶ 249. But there is "no cause of action for interference" where a party gives "truthful information." *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir. 1994). Abacus fails to plead facts suggesting that the Coventry Study—which was verified by independent professors—reflects anything but Coventry's true findings. Abacus's interference claim is utterly implausible, even after it has had the chance to amend.

## CONCLUSION

The Court should grant Defendants' Motion to Dismiss with prejudice.

**LOCAL RULE 3.01(g) CERTIFICATION**

Defendants certify that on October 14, 2025, counsel for Defendants conferred with counsel for Plaintiff, via telephone, regarding the relief sought herein and Plaintiff opposes this Motion in its entirety.

Dated: October 14, 2025

Respectfully Submitted,

*/s/ Andrew J. Levander*

ANDREW J. LEVANDER (*pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
andrew.levander@dechert.com

ERIC AUSLANDER (*pro hac vice*)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006

MICHAEL H. MCGINLEY (*pro hac vice*)
BRIAN A. KULP (*pro hac vice*)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

ALFRED J. BENNINGTON, JR.
GLENNYS ORTEGA RUBIN
BENJAMIN F. ELLIOTT
SHUTTS & BOWEN LLP
300 South Orange Ave.
Suite 1600
Orlando, FL 32801

*Counsel for Defendants Coventry First LLC and Alan Buerger*

# APPENDIX

| Statement (Paragraph in FAC) | Grounds for Dismissal |
|---|---|
| 199a – Abacus "primarily" uses Lapetus for underwriting, and public companies are "tempt[ed]" to manufacture earnings | (1) True/Opinion; (2) No Actual Malice; (3) Not *per se* |
| 199b – Shareholders could in future be subordinated to "asset-backed debt" | (1) True/Opinion; (2) No Actual Malice |
| 199c – Only "stupid" and "unsophisticated" investors use Lapetus | (1) Opinion; (2) No Actual Malice; (3) Not About Abacus; (4) Not *per se* |
| 199d – A company cannot "change" accounting method for policies | (1) True; (2) No Actual Malice; (3) Not Defamatory; (4) Not *per se* |
| 199e – Prediction that Abacus will "implode" at some point in the future | (1) Opinion; (2) No Actual Malice |
| 199f – Lapetus valuations are "grossly overstated" | (1) Opinion; (2) No Actual Malice; (3) Not About Abacus; (4) Not *per se* |
| 199g – Lapetus estimates appear "shorter" than those from other providers | (1) True; (2) No Actual Malice; (3) Not About Abacus; (4) Not *per se* |
| 199h – Coventry Study results "cast doubt" on assets valued based on Lapetus | (1) True; (2) No Actual Malice; (3) Not about Abacus; (4) Not *per se* |
| 199i – Valuations based on Lapetus "could" lead to inflated asset values | (1) True/Opinion; (2) No Actual Malice; (3) Not about Abacus; (4) Not *per se* |
| 199j – Abacus does not hold policies for more than a "short" period | (1) Opinion; (2) No Actual Malice; (3) Not *per se* |
| 214a – Abacus's value is "grossly overstated" like Mutual Benefits' was | (1) Opinion; (2) No Actual Malice |
| 214b – Abacus has a "close" relationship with Lapetus and invested "heavily" | (1) True/Opinion; (2) No Actual Malice; (3) Privileged; (4) Not *per se* |
| 214c – Public life settlement companies have historically "gone bankrupt" | (1) True; (2) No Actual Malice; (3) Not about Abacus; (4) Not *per se* |
| 214d – Coventry does "fair value" calculations on its policies | (1) True; (2) No Actual Malice; (3) Not About Abacus; (4) Not *per se* |
| 214e – Abacus inventory growth "quite substantial" producing "unrealized gains" | (1) True/Opinion; (2) No Actual Malice; (3) Not *per se* |
| 214f – Abacus trying to "get the stock price up" through "stock repurchase plan" | (1) True; (2) No Actual Malice; (3) Not Defamatory; (4) Not *per se* |