**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Orlando Division**

| | |
|---|---|
| ABACUS GLOBAL MANAGEMENT, INC., a corporation,<br><br>Plaintiff,<br><br>v.<br><br>COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,<br><br>Defendants. | Case No.: 6:25-cv-01401-RBD-RMN |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## PRELIMINARY STATEMENT[1]

As set forth in the Amended Complaint, Defendants Coventry First LLC and its Co-Founder and Executive Chairman Alan Buerger have engaged in a calculated campaign to harm Plaintiff Abacus Global Management, Inc., their competitor in the life settlements market. Faced with the prospect of losing ground to its rival Abacus after the latter went public and increased its flow of growth capital, Coventry tried to impair Abacus's business and reputation by spreading falsehoods and misinformation in the marketplace. Yet Defendants, who profess concern about "serious problems" with Abacus's valuations, are just unprincipled bullies who have made materially false and misleading statements that they knew or recklessly disregarded were false—statements that have inflicted quantifiable harm on Abacus and its shareholders.

For over two years, Defendants have targeted Abacus, seeking any forum for their baseless accusations that Abacus's valuations are "not realistic," that Abacus is misrepresenting its fair value calculations in its audited financials and public filings, and that current investments in Abacus are "dead" because the company is about to "implode." Since Abacus went public, Defendants have raised their "concerns" with the SEC (which has taken no action against Abacus), with Abacus's auditor (which has approved Abacus's valuation methodology

[1] "Motion" or "Mot." refers to Defendants' Motion to Dismiss (Dkt. 47). "Complaint" or "FAC" refers to the First Amended Complaint (Dkt. 38). All other defined terms have those used in the Complaint. All emphases have been supplied, and all quotations and internal citations omitted, unless noted otherwise.

quarter after quarter), and with influential market analysts (who have not changed their rating of Abacus common stock). None of these efforts gained traction—until Defendants presented their inflammatory falsehoods directly to institutional investors through press releases, interviews, and conferences, which were then amplified by opportunistic short sellers. The consequences were swift and severe: Despite topping its revenue projections for more than eight consecutive quarters, Abacus's stock plummeted, its investors retreated, and its deal pipeline shrank due to Defendants' lies and tortious conduct.

Abacus brought this suit to recover the damages caused by Defendants' conduct. Although Defendants invoke the First Amendment, the law is clear: The First Amendment offers no shelter to competitors who abandoned fair competition in favor of defamation. Defendants cannot seek refuge in a truth defense when their statements are both false and made in bad faith. They cannot transform Abacus into a "public figure" entangled in a "matter of public concern" when the controversy was the product of their own defamation. And they cannot claim their fabrications are harmless "opinions" when Coventry boasts about "creat[ing] the secondary market for life insurance" and holds out Buerger as "the single most influential figure" in the business.[2] Indeed, no one knows the falsity of these claims better than Defendants themselves.

[2] *Who We Are*, Coventry, https://www.coventry.com/who-we-are/ (last visited Nov. 18, 2025); *The Man with the Plan: 6 Questions for Alan Buerger*, Nat'l Underwriter Life & Health at 30 (Aug. 2012), https://coventry.com/wp-content/uploads/2016/02/NU_Buerger_life_settlements_The_Man_with_the_Plan_20120801.pdf.

Defendants' remaining arguments, many of which raise factual issues not ripe for resolution on a motion to dismiss, fail as well. The Amended Complaint is not a shotgun pleading, but rather a detailed narrative of the attacks Coventry and Buerger have made, both in tandem and in unison. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim has merit because Coventry and Buerger destroyed Lapetus. And the tortious interference claim identifies specific damaged business relationships directly flowing from Defendants' misconduct. The Motion should be denied.

## FACTUAL BACKGROUND

### A. Abacus Relies on Market Transactions to Value its Marketable Assets.

Abacus is a publicly traded life settlements provider and asset manager based in Orlando. FAC ¶¶ 1, 19. "Providing" a life settlement means paying net present value to a policyholder in exchange for their policy, in what is known as the "secondary market." *Id.* ¶ 33. Abacus sells policies to investors—who are not licensed in the secondary market—in the "tertiary market." *Id.* ¶¶ 45-50. Abacus generates value for its shareholders from the markup it realizes when it leverages its position as a buyer in the secondary market to bring new policies to the tertiary market. *Id.* ¶ 48. Because Abacus plans to sell nearly every policy it acquires, it uses market transaction data to value its policies, which "reflect[s] assumptions about what factors market participants would use." *Id.* ¶¶ 69-74.

Pricing a policy on the secondary or tertiary market depends on many

factors, including the face value of the policy, the carrier, and the buyer's desired return and cost of capital. *Id.* ¶¶ 37, 50. The insured's life expectancy is another factor market participants consider, frequently using a third-party life expectancy estimate ("LE") to provide this value. *Id.* There are at least six LE providers widely used in the market, including by Abacus. *Id.* ¶ 79. But LE providers do ***not*** determine the value of the policies; Abacus's policy valuations are fundamentally anchored by the historical prices it has realized in the tertiary market. *Id.* ¶ 39.

### B. Coventry and Buerger Made False Claims About How Abacus Values its Assets.

Defendants know the limited role LEs play in actual policy sales because Coventry competes with Abacus to buy policies based on the same set of factors. *Id.* ¶¶ 3, 44, 51. Yet for years Defendants have told the world that Abacus is defrauding its investors and counterparties. In January 2024, Buerger approached short sellers about writing a hit piece on Abacus. *Id.* ¶ 154. The next month, Coventry sent a letter to the SEC about Abacus's alleged conflicts of interest and improper valuation practices based on Lapetus LEs. *Id.* ¶ 92. The timing of Coventry's letter is no coincidence; the same month an Abacus-managed investment fund (wholly distinct from the public company), ABL Longevity and Growth Fund (the "Fund"), disclosed that it intended to use Lapetus Solutions, Inc. as its primary LE provider. *Id.* ¶¶ 80-81.

Defendants' attacks escalated in May 2024, when ***Buerger*** called Lapetus's founder, Professor Jay Olshansky, and encouraged Lapetus to lengthen

its LE estimates. *Id.* ¶ 95. According to Professor Olshansky, Buerger "appeared to have a particular ax to grind regarding Abacus." *Id.* ¶ 94. When Lapetus refused to bend to Buerger's pressure, Coventry immediately published a one-page "study" claiming Lapetus LEs were "consistently and materially shorter than those issued by other life expectancy providers," and that Coventry's "results cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies." *Id.* ¶ 98. Coventry repeated similar statements in a verification study by two professors it hired in July 2024, again claiming valuations based on LEs (and not on fair value) could cause "investor losses." *Id.* ¶ 100. But these studies questioning Lapetus were a sham, because ***Coventry itself bought and sold policies with Lapetus LEs***. *Id.* ¶¶ 86, 103.[3]

On October 24, 2024, Buerger took direct aim at Abacus while appearing onstage at a premier life settlement conference attended by market participants (the "LISA Conference") in his official capacity as Coventry's Executive Chairman. *Id.* ¶ 101. Buerger insisted Abacus's fair market value was "grossly overstated" and that the 21% discount rate Abacus reported as part of its fair value calculation was "not realistic" and that it was a product of "using Lapetus" *Id.* ¶¶ 104-106. Buerger knew these assertions were false or, at the least, were

[3] Defendants say they conducted these studies, and published the related press releases, because "Florida law *requires* . . . life settlement industry participant[s] to disclose such beliefs." Mot. at 24 (citing Fla. Stat. § 626.989(6)(a)). But the Florida law in question does not mandate public accusations tailor-made to harm competitors; rather, it requires a regulated entity "who believes that a fraudulent insurance act . . . is being or has been committed" to "send to the Division of Investigative and Forensic Services a report or information pertinent to such knowledge or belief." That Defendants picked up their megaphone rather than follow the laws they now cite as justification says everything you need to know about their real motives.

highly likely to be false, because he reads every Abacus filing—and attends all of Abacus's earnings calls. *Id.* ¶¶ 11, 146. Thus, he knew the discount rate used by Abacus did not come from Lapetus, but instead "reflect[s] the estimated discount rates that could reasonably be ***used in a market transaction***." *Id.* ¶ 110. Nonetheless, he then compared Abacus to the Mutual Benefits Corporation, a defunct life settlements company charged with fraud by the SEC. *See id.* ¶ 113. Buerger told the audience that "$250 million dollars" invested in Abacus "is dead"—just like Mutual Benefits. *See id.* ¶ 112.

Coventry spread similar falsehoods to market analysts, to Abacus's auditor, and in a meritless lawsuit against the Florida Office of Insurance Regulation ("OIR"), alleging that "investments [in Abacus] are dependent on the accuracy of the Life Expectancy estimates used to value policies." *Id.* ¶¶ 114, 125, 137.

On May 22, 2025—a month after the OIR lawsuit was filed—Buerger made several more damaging statements about Abacus that he knew to be false in an interview with Tegus, a market intelligence firm that shares industry insights with a subscriber network, including: (1) "Abacus uses Lapetus . . . not exclusively but primarily," *id.* ¶ 146(a); (2) Abacus's stockholders and lenders "will be subordinated to the asset-backed debt" (despite the fact that Abacus has no asset-backed debt), *id.* ¶ 146(b); (3) "nobody's using Lapetus anymore," *id.* ¶ 146(c); (4) Abacus's disclosed policy turnover rate "is just not accurate," *id.* ¶ 146(i); and (5) "it's just a matter of time before [Abacus] implode[s]," *id.* ¶ 147.

Buerger presented himself as an expert on Abacus during the Tegus

Interview, calling Abacus his "pet project," and boasting that he "know[s] every public document" Abacus has filed. *Id.* ¶ 146. Having read those filings, he knew his statements to Tegus that Abacus's valuation depended on Lapetus LEs were false. Nonetheless, Buerger accused Abacus of accounting fraud.

### C. Defendants' Distortions Harm Abacus.

On June 4, 2025, hours after the release of Buerger's Tegus interview, Morpheus Research—a short seller associated with Hindenburg Research and Nathan Anderson, to whom Buerger pitched his hit piece in 2024—published a takedown of Abacus (the "Short Report"). *Id.* ¶ 152. Morpheus amplified falsehoods Defendants had been making about Buerger's "pet project" for over a year. *Id.* ¶ 159. The Short Report—specifically the portion that repeated Defendants' statements about Abacus's valuation practices—caused immediate reputational harm to Abacus, erased hundreds of millions of dollars in market capitalization overnight, and caused the company's stock to drop over 20% in a single day. *Id.* ¶¶ 163, 165. There has also been significant financial harm to Abacus's deal and policy origination pipelines. *Id.* ¶¶ 169-70, 177-82.

In Defendants' attacks on Abacus, Lapetus was collateral damage. Professor Olshansky blamed Coventry (and Buerger by extension) when he informed investors Lapetus would close as of September 1, 2025: "In May of 2024, one of [Lapetus's] clients, Coventry, began a major campaign to tarnish our reputation in the [life settlement] industry after we refused to fraudulently adjust our LEs for [Coventry's] financial benefit." *Id.* ¶ 189.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires only that the Complaint contain a "short and plain statement" of its claim and sufficient factual allegations to demonstrate that the claims is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts all factual allegations "as true" and "construe[s] them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).[4]

## ARGUMENT

### I. THE FAC IS NOT AN IMPERMISSIBLE "SHOTGUN" PLEADING.

Defendants' wrongly assert that the FAC is an impermissible shotgun pleading. To the contrary, the FAC presents a well-organized recitation of Defendants' years-long defamation campaign against Abacus. While Defendants claim that incorporating a complaint's initial set of factual allegations into each count is "textbook" shotgun pleading, Mot. at 7-8, the Eleventh Circuit held otherwise in *Weiland v. Palm Beach County Sheriff's Office*, ruling that re-

[4] In attaching seven exhibits to their Motion, Defendants appear to rely on the "incorporation-by-reference" doctrine. Mot. at 3 n.1 (citing *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023)). That doctrine is inapplicable here. First, Coventry commissioned at least two studies (*see* Mot., Exs. 2-3) whose access are directly controlled by Coventry, so Abacus quoted only the associated press releases. *See* FAC ¶¶ 99 & nn.6-7, 121 & nn.13-14, 122-23. Because at this stage, Abacus cannot be sure of the authenticity of Exhibits 2-3, they are not proper for the Court to consider. Second, Abacus cannot confirm the accuracy and authenticity of the Tegus Interview transcript attached by Defendants. (Mot., Ex. 6). Third, the transcript of the LISA Conference was clearly prepared by Coventry (*id.* Ex. 5); like the Tegus Interview transcript, the accuracy and authenticity of the LISA transcript are in dispute. *See Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002) (holding district court could not consider transcripts where authenticity was in dispute). Finally, Defendants are relying on the exhibits to raise factual dispute, which is a nonstarter on a motion to dismiss. *See Lake v. Aetna Life Ins. Co.*, 2021 WL 2649234, at *3 (M.D. Fla. June 28, 2021) (denying defendant's reliance on a letter to "prove a disputed fact" and finding such dispute "premature at the motion-to-dismiss stage").

alleging factual allegations into each count is *not* a shotgun pleading error. 792 F.3d 1313, 1324 (11th Cir. 2015) (no shotgun pleading where, as here, "[t]he allegations of each count are not rolled into every successive count").

The Eleventh Circuit has explained that, like here, where "multiple allegations relate to multiple counts," plaintiffs should be granted "flexibility" to "flesh out" their claims. *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1200-01 (11th Cir. 2025); *Williamson v. Travelport, LP*, 953 F.3d 1278, 1299 (11th Cir. 2020) (no shotgun pleading where some "extensive details and factual allegations" were not "entirely material"). That is even more so the case here where Buerger's tortious conduct is imputed to Coventry. *See Rety v. Green*, 546 So. 2d 410, 425 (Fla. Dist. Ct. App. 1989) (holding corporation liable for statement of its president).[5]

## II. THE FAC PLAUSIBLY ALLEGES DEFAMATION.[6]

To state a claim for defamation, Abacus is required to allege "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and

---

[5] Even if the Court found the FAC wanting, it should give Abacus an opportunity to cure the defect. *CNI Express, LLC v. BMO Harris Bank Nat'l Ass'n*, 2023 WL 5758932, at *2 (M.D. Fla. Sept. 6, 2023).

[6] The Court should disregard the Defamatory Statement Appendix attached to Defendants' Motion. The Appendix does not present purported "Grounds for Dismissal" that can be recognized at this stage—rather, it injects factual disputes that require this Court to deny the motion. To pick one example, this Court cannot decide the eleven truth defenses asserted in the Appendix in Defendants' favor. *E.g.*, *Young v. Kopchak*, 368 So. 3d 1001, 1006 (Fla. Dist. Ct. App. 2023) (defense of truth presents a question of fact to be determined by the jury).

(5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). To allege a defamation-by-implication claim, Abacus must state facts that allege Defendants "(1) juxtapose[d] a series of facts so as to imply a defamatory connection between them, or (2) create[d] a defamatory implication by omitting facts." *Id.* Defendants may be liable for defamation-by-implication even if what they said or wrote was "literally true," if it "create[s] a false impression." *Id.* Because Abacus has plausibly alleged defamatory statements as well as defamatory implications, Defendants' Motion should be denied.

**A. The FAC Plausibly Alleges Falsity.**

Despite Defendants' arguments to the contrary, the FAC is replete with false statements in the press releases promoting the Coventry studies, in the Tegus Interview, and at the LISA Conference, as well as specific allegations of their falsity. First, the FAC alleges that Defendants made concrete statements that are "sufficiently factual to be susceptible of being proved true or false." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990); *see also Deeb v. Saati*, 778 F. App'x 683, 687 (11th Cir. 2019). For example, the FAC alleges that Defendants falsely asserted, among other things, that: (1) Abacus's fair market value is "grossly overstated" and its discount rate is "not realistic," FAC ¶¶ 105-06; (2) Abacus derived its discount rate from Lapetus LEs, *id.* ¶ 105; (3) "other than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus," *id.* ¶ 146(c); (4) the "$250 million dollars out there that investors have put up" with

Abacus "is dead," *id.* ¶ 112; and (5) Abacus lied to the market about its turnover rate, *id.* ¶ 146(i). These statements are verifiable factual assertions about Abacus's business, financial metrics, and investors that are—and as alleged were—demonstrably false.

The Complaint pleads falsity for each of these assertions: (1) Abacus's discount rate is a component of its auditor-approved model as described in its filings, *id.* ¶ 108; (2) the discount rate is derived from Abacus's historical trade spreads, not LEs, *id.* ¶ 69; (3) many market participants, ***including Coventry***, use Lapetus LEs, *id.* ¶ 86; (4) Abacus's investors continue to see returns from the company's increasing year-over-year performance, *id.* ¶ 9; and (5) Abacus continues to find willing and sophisticated buyers for its policies, while maintaining its high turnover rate, *e.g.*, *id.* ¶ 50.

At this stage, the Court need not evaluate the truth of these allegations; the only question is whether the Complaint sufficiently alleges facts demonstrating that Defendants' statements are false, which it plainly does. *See Fla. Med. Ctr., Inc. v. N.Y. Post Co.*, 568 So. 2d 454, 459 (Fla. Dist. Ct. App. 1990) (the court "must proceed on the premise that any statements which [it] find[s] have factual connotations are false"). This district has denied motions to dismiss defamation claims based on similar falsehoods concerning financial reporting. *See, e.g.*, *Techtronic Indus. Co. Ltd. v. Bonilla*, 2023 WL 8543762, at *6 (M.D. Fla. Dec. 11, 2023) (denying motion to dismiss defamation claim based on statement that

public company "overstated" its income "with manipulative accounting").[7]

### B. Defendants' Statements Are Not Mere Opinions.

It is well established that statements are not insulated from liability merely because a speaker dresses it up in cautionary language. *See Milkovich*, 497 U.S. at 18-19 ("Simply couching such statements in terms of opinion does not dispel these [defamatory] implications . . . .'"). "Whether a statement expresses or implies an assertion of fact and 'whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court.'" *Deeb*, 778 F. App'x at 688 (quoting *Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018)). "If a statement can reasonably be interpreted as stating or implying actual facts about the plaintiff, however, the statement may be actionable even if it is phrased as an opinion." *Id.* at 687. The determination depends on context, "including the medium . . . , the audience . . . , and any cautionary terms used." *Id.* at 688.

Many of the statements Defendants now shrug off as "garden-variety opinions," Mot. at 10, imply actionable, defamatory facts. Buerger is a titanic figure in the life settlements business. When he told LISA Conference attendees and investors that Abacus has "asset-backed debt," FAC ¶ 199(b), when he warned it was "just a matter of time before [Abacus] implodes," *id.* ¶ 199(e), when he compared Abacus to the Mutual Benefits collapse, *id.* ¶ 113, and when he said

---

[7] Alternatively, the Florida Constitution does not require proof of falsity for a party to be found liable for defamation. *See* Fla. Const. art. I, § 4 ("If the matter charged as defamatory is true ***and was published with good motives***, the party shall be acquitted or exonerated."). Therefore, "[p]ublication of a true statement if done with ill will can be defamatory." *Emergency Recovery, Inc. v. Gov't Emps. Ins. Co.*, 2024 WL 2332167, at *3 (M.D. Fla. Mar. 13, 2024) (quoting *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989)). The FAC contains numerous allegations establishing Defendants' bad motives. *E.g.*, FAC ¶¶ 3-5, 17, 206, 221.

investments in Abacus were already "dead," *id.* ¶ 199(f), he was implying he was aware of something presently, fatally wrong with Abacus.

Defendants argue some of these statements were inactionable future predictions. But putting a defamatory statement in the future tense does not immunize it. For example, in *Deeb*, the Eleventh Circuit found that the prediction that the plaintiffs "***will be handcuffed*** and en route to the American prisons" was defamatory, because it "could reasonably be interpreted not as impassioned rhetoric about alleged intimidation tactics but as asserting or implying . . . that Deeb had either committed or been accused of committing [crimes]." 778 F. App'x at 688. Here, Buerger's claims that Abacus investments were already dead or about to implode were meant to convey that Abacus was a fraud.

Finally, Buerger's statement in the Tegus Interview that only "unsophisticated, frankly stupid investors" are "using Lapetus anymore," FAC ¶ 146(c), is not "rhetorical hyperbole." Mot. at 11. It is just false: Coventry was buying LEs from Lapetus before and after the Tegus Interview. FAC ¶ 86.

### C. The FAC Plausibly Alleges the Requisite State of Mind.

Defendants knock the Complaint for failure to allege actual malice, but: (1) actual malice is not required, and (2) it is amply alleged here.

#### 1. Actual Malice Is Not Required Because Abacus Is Not a Public Figure.[8]

[8] At a minimum, the public figure question "lends itself more readily to a motion for summary judgment rather than a motion to dismiss." *O'Boyle v. Sweetapple*, 2015 WL 13574304, at *5 (S.D. Fla. June 4, 2015) (collecting cases).

The four sentences Defendants devote to their argument that Abacus is a general public figure do not justify their conclusion. *See* Mot. at 16; *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1346 (S.D.N.Y. 1977) ("Whether one is a public figure presents a mixed question of fact and law as to which ***defendants have the burden of persuasion***."). Only plaintiffs with "general fame or notoriety in the community, and pervasive involvement in the affairs of society" are deemed general public figures such that they must prove actual malice in all cases. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). To meet this "strict" standard, the plaintiff's name should be a "household word." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980); *see Wolston v. Reader's Dig. Ass'n, Inc.*, 443 U.S. 157, 165 (1979) (noting that only a "small group of individuals . . . are public figures for all purposes").

Defendants point to Abacus's status as a publicly traded company subject to regulation, but those factors are insufficient to confer public figure status. *See, e.g.*, *Comput. Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 535 (E.D. Pa. 1999) (holding that HP, "one of the largest and most influential corporations in the world . . . ," lacked the requisite "pervasive fame or notoriety" for public figure status); *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 688 (4th Cir. 1989) (businesses retain protection from defamation even when "subject to pervasive governmental regulation"); *Bank of Oregon v. Indep. News, Inc.*, 298 Or. 434, 443 (1985) ("[O]ffering stock for public sale . . . [does not] establish that a

corporation is a public figure."). If HP, a much older and larger company, does not have "pervasive fame and notoriety," Abacus does not either. *See also Techtronic*, 2025 WL 2687164, at *12 ("While the products it makes are well-known . . . [plaintiff] is not well known.").

Abacus is not a limited public figure, either. A limited public figure has "thrust [itself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. Courts must assess limited public figure status with a three-part test: "(1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988) (quoting *Waldbaum*, 627 F.2d at 1297). Abacus does not qualify.

As to the first prong, "[a] public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum*, 627 F.2d at 1296; *see also Young v. Kopchak*, 368 So. 3d 1001, 1006 (Fla. Dist. Ct. App. 2023) ("A public controversy is any topic upon which sizeable segments of society have different, strongly held views."). Critically for this case, "[t]he public controversy must have preexisted the alleged defamation." *Little v. Breland*, 93 F.3d 755, 757 (11th Cir. 1996). That is not the case here: Defendants say that this "dispute" concerns an "ongoing debate" about Lapetus LEs and how Abacus's use

of them "threatens the investments of shareholders across the country." Mot. at 16. But their only support for this claim is that LEs "featured prominently at an industry conference," *id.* at 17, where Buerger made defamatory remarks about Abacus, ***after*** Coventry had released two press releases implying Abacus's valuations were overstated. Since the sham controversy does not precede the defamation, this factor does not support limited public figure status. *See also Techtronic*, 2025 WL 2687164, at *13 (no limited public figure status where "there was no controversy" before defamation).

The second prong requires the plaintiff to "'thrust [itself] to the forefront' of the controvers[y] so as to become [a] factor[] in [its] ultimate resolution." *Waldbaum*, 627 F.2d at 1297 (quoting *Gertz*, 418 U.S. at 345)). "A mere defense of one's conduct against public charges is not enough . . . ." *Foretich v. Advance Mag. Publishers, Inc.*, 765 F. Supp. 1099, 1108 (D.D.C. 1991) (citing *Wolston*, 443 U.S. at 168). Abacus did not start this fire. Abacus's public involvement in the "debate" has been limited to a news release refuting Defendants' false claims, which is plainly insufficient to meet the second prong. *See* FAC ¶ 160 n.27. As to the third prong, because Abacus's "participation in the controversy" has been purely defensive, the alleged defamation cannot be said to be germane to that participation. Finally, because Defendants' claimed "public controversy" is entirely the product of the alleged defamation, it cannot be the basis for holding that Abacus is a limited public figure. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("[T]hose charged with defamation cannot, by their own conduct,

create their own defense . . . .").[9]

### 2. In Any Event, Abacus Plausibly Alleges Actual Malice.

Even if Abacus were some sort of public figure and was required to plead actual malice, the Complaint would survive the Motion. To allege actual malice the Complaint must allege that Defendants "either knew the alleged defamatory statements were false or published them with reckless disregard despite awareness of their probable falsity." *Grayson v. No Labels, Inc.*, 599 F. Supp. 3d 1184, 1188 (M.D. Fla. 2022). Allegations relevant to establishing actual malice include: (1) turning a blind eye to discoverable facts, *see King v. S. Poverty L. Ctr., Inc.*, 2023 WL 3061825, at *18 (M.D. Ala. Apr. 24, 2023) and/or (2) motive, including the profit motive or to injure the plaintiff, *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). Abacus alleges both.

***Defendants Disregarded Public Disclosures.*** Abacus clearly and transparently discloses its policy valuation methodology, based on historical market transaction prices, in its SEC filings. *See* FAC ¶¶ 73-75. Defendants either cherry-picked from Abacus's disclosures or neglected to review them when they said Abacus was valuing policies with Lapetus LEs. *E.g.*, *id.* ¶ 109. Furthermore, Coventry knew that ***it was still buying from Lapetus***. *Id.* ¶ 86. In either

---

[9] Defendants' arguments rely exclusively on *Silvester*, 839 F.2d 1491, and *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018), but both are readily distinguishable. In *Silvester*, the public controversy was legitimate and well-established by the time of the alleged defamatory statements, as evidenced by ongoing state investigations and news reporting. *Id.* at 1495. Unlike here, the plaintiffs in *Silvester* thrust themselves into the controversy, including by being the first to make public statements. *Id.* at 1497. And in *Turner*, the plaintiff conceded the existence of a public controversy. 879 F.3d at 1272 n.6.

instance, Defendants had access to more context, but turned a blind eye to it before speaking. In Buerger's case, he had read the explanatory information, and thus spoke with knowledge that his statements were false. *Id.* ¶¶ 11, 146.

***Defendants Profit from Harming Abacus.*** Allegations of bad motive may also support an inference of actual malice. *See Harte-Hanks*, 491 U.S. at 692 ("[I]t cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."). In *Mishiyev v. Davis*, the court held that the plaintiff sufficiently alleged actual malice where the defendant knew the plaintiff lived a drug-free lifestyle but claimed he was a drug user to harm his career. 402 So. 3d 443, 450-51 (Fla. Dist. Ct. App. 2025).

Here, Defendants' animosity towards Abacus, as evidenced by their interference with auditors, regulators, analysts, investors, and the Florida state court system, also indicates bad motive supporting an inference of actual malice. *Corp. Fin., Inc. v. Principal Life Ins. Co.*, 461 F. Supp. 2d 1274, 1294 (S.D. Fla. 2006) (false statements to regulators motivated by intent to injure plaintiff supported actual malice); *Randolph v. Beer*, 695 So. 2d 401, 404 (Fla. Dist. Ct. App. 1997) (evidence defendant made up rumor specifically to do harm would support malice). As in *Randolph*, 695 So. 2d at 404, Defendants cite a dubious "require[ment]" to report wrongdoing. Mot. at 24. Yet malice is more plausible, given what Defendants stood to gain. *See* FAC ¶¶ 3-4.

Lastly, Defendants fault Abacus for not showing actual malice as to each Defendant, and that Abacus cannot impute "statements made by others

associated with Coventry" to Coventry. Buerger is not someone merely "associated with Coventry," Mot. at 18; as Coventry's and Executive Chairman, his knowledge can be imputed. *See Rety*, 546 So. 2d at 425 (corporation liable for defamation by "corporation's president rather than a lower echelon employee"). Coventry is also liable because Buerger defamed Abacus to benefit Coventry. *See Carroll v. TheStreet.com, Inc.*, 2014 WL 5474061, at *10 (S.D. Fla. July 10, 2024) (company and manager liable where "[b]oth benefited by seeing the [plaintiff's] stock price . . . decline"). Particularly where Coventry publicly stood in lockstep with Burger, it makes little sense to divorce the two. *See, e.g.*, FAC ¶¶ 120-24 (Coventry studies);[10] *id.* ¶ 121 n.13 (Coventry press release about Buerger's statements at LISA Conference). Coventry's claimed ignorance rings hollow.

## III. THE FAC PLAUSIBLY ALLEGES A FDUTPA CLAIM.

Coventry's smear campaign and destruction of Lapetus satisfy the elements of a FDUTPA claim: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. GM Co.*, 823 F.3d 977, 983 (11th Cir. 2016).

### A. FDUTPA's Safe Harbor Does Not Apply.

At the outset, Defendants argue they are exempted from FDUTPA as "person[s] . . . regulated under laws administered by [OIR]." Mot. at 22-23 (citing Fla. Stat. § 501.212(4)). But this safe harbor provision protects only

---

[10] Relatedly, Buerger cannot "rely on 'previously published reports' from 'reputable sources,'" when he means the Coventry Study. Mot. at 19 (quoting *Berisha v. Lawson*, 973 F. 3d 1304, 1313 (11th Cir. 2020)). In *Berisha*, the defendant author's "reputable sources" included "four published news articles . . . , two separate books . . . , leaked diplomatic cables . . . , and [an] investigative report." *Berisha*, 973 F.3d at 1313. Here, Buerger relies on "analysis" Coventry put out the same day Buerger failed to coerce Lapetus, FAC ¶ 98; there is no reason this Court should consider that "reputable."

"activit[ies] . . . subject to the regulatory authority of [OIR]." *Omni Healthcare, Inc. v. Health First, Inc.*, 2015 WL 275806, at *14 (M.D. Fla. Jan. 22, 2015) (Dalton, J.) (quoting *State Farm Mut. Auto. Ins. Co. v. Physicians Inj. Care Ctr., Inc.*, 427 F. App'x 714, 723 (11th Cir. 2011)). If the conduct "is not . . . regulated by [OIR], the exemption . . . does not apply." *State Farm*, 427 F. App'x at 723.

Abacus's FAC alleges that Defendants have (1) "engag[ed] in a deceptive and unfair smear campaign to damage Abacus," and (2) presented Lapetus as "an 'existential] threat to the life settlements business," running Lapetus out of business and shrinking consumer choice. FAC ¶¶ 241-42. Defendants fail to tie these activities "to the regulatory authority of [OIR]," which means they have failed to establish that the safe harbor mandates dismissal of the FDUTPA claim. *Omni Healthcare*, 2015 WL 275806, at *14 (denying motion to dismiss FDUTPA claim based on "attempt . . . to create a . . . healthcare monopoly"); *Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1269 (S.D. Fla. 2015) (safe harbor did not apply to FDUTPA kickback claims "not related to the business of insurance"). The safe harbor is a narrow exception that shields the "business of insurance" from FDUTPA claims. OIR does not regulate tortious interference or baseless accusations of accounting fraud, so the safe harbor does not apply.

**B. The FAC Alleges a Deceptive or Unfair Trade Practice.**

Defendants say that Abacus "fails to allege any deceptive or unfair trade practice," Mot. at 23, on the same First Amendment grounds it raised against the defamation claims. But as argued above, Abacus has plausibly alleged

defamation, thus those same facts can support a FDUTPA claim. *See, e.g.*, *Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1262-63 (N.D. Fla. 2007) ("[S]tatements found to be defamatory also constituted violations of FDUTPA . . . ."); *Buckley v. Moore*, 2021 WL 3173185, at *8 (S.D. Fla. July 26, 2021) (finding that allegation that "Defendants published false information to deter reasonable consumers" stated a FDUTPA claim). Regardless, Abacus's FDUTPA claim is not duplicative; Abacus also alleges that Coventry threatened Lapetus and ran it out of business. FAC ¶¶ 186-91.

**C. Defendants Acted in the Conduct of Trade or Commerce.**

Next, Defendants argue that Abacus fails to allege deceptive acts in "trade or commerce." Mot. at 24 (quoting Fla. Stat. § 501.204(1)). Courts have consistently construed this "trade or commerce" requirement broadly, and have held that conduct analogous to that alleged in the FAC is sufficient to state a claim. *See, e.g.*, *NITV Fed. Servs., LLC v. Dektor Corp.*, 2019 WL 7899732, at *6 (S.D. Fla. May 17, 2019) ("nationwide campaign of disparaging [competitor] . . . through websites, in emails, during phone calls, and at speaking engagements"); *Diamond Resorts Int'l, Inc. v. Aaronson*, 2018 WL 735627, at *9 (M.D. Fla. Jan. 26, 2018) (Dalton, J.) (misleading statements and videos suggesting plaintiff broke law). The FACs alleges deceptive acts in "trade or commerce."

**D. The FAC Plausibly Alleges Actual Damages to Consumers.**

Defendants further argue that the FDUTPA claim should be dismissed for failure to allege actual damages or an injury to consumers. Wrong.

First, Defendants misstate the law when they claim that FDUTPA damages are limited to differences in market prices caused by the deception. Mot. at 25. Recent decisions recognize that lost profits are also available as "actual damages" under FDUTPA. *See Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1286 (S.D. Fla. 2021) ("[A] corporate-competitor plaintiff may seek lost profits damages under the FDUTPA."). This Court agreed in *Diamond Resorts*, 371 F. Supp. 3d 1088, 1115 (M.D. Fla. 2019) (Dalton, J.) ("[A]ctual lost profits [are] . . . recoverable under FDUTPA."). Because Abacus has alleged "los[t] revenue and profits," FAC ¶ 244, the Court should follow its own precedent and find that Abacus has adequately pled its FDUTPA claim.

Abacus alleges an injury to itself as well as consumers: the "professional fees and switching costs" caused by the loss of Lapetus. *Id.* ¶ 245. Courts award similar types of FDUTPA damages that result "when Defendants [publish] false information to deter reasonable consumers." *See, e.g.*, *Buckley*, 2021 WL 3173185, at *10 (damages alleged via cost of "reputation management services").

### E. The Single Publication Doctrine Is Not Applicable.

Defendants are wrong to argue that the FDUTPA claim should be dismissed because it overlaps with Abacus's defamation claim. Mot. at 25. First, while the FDUTPA claim incorporates the defamatory statement, it also covers Defendants' attacks "directed at Lapetus." FAC ¶¶ 242-43. Because the FDUTPA claim is about more than the false statements, the single publication doctrine does not apply. *See Fridovich v. Fridovich*, 598 So. 2d 65, 69-70 (Fla. 1992).

Second, even if the facts underlying the defamation and FDUTPA claims were identical (they are not), dismissal would still be inappropriate. As a court in this district explained in *Emergency Recovery, Inc. v. Government Employees Insurance Co.*, the single publication rule only bars claims arising from false statements "when they arise from the same publication upon which ***a failed defamation claim*** is based." 773 F. Supp. 3d 1304, 1317 (M.D. Fla. 2025). A defamation claim has only failed at the pleading stage if the complaint "shows the conclusive applicability of [an affirmative] defense" that bars the defamation claim entirely, such as the litigation privilege or statute of limitations. *Id.* at 1312. The court declined to dismiss the defamation claim because the litigation privilege applied to some, but not all, of the defamatory statements, concluding that "where a defendant has not successfully invoked an affirmative defense to defamation, the single action rule presents no bar to a plaintiff's tortious interference claim premised on the same publication." *Id.* at 1319-20. Here, Defendants have not established an absolute bar to defamation, so the FDUTPA claim cannot be dismissed.

## IV. THE FAC PLAUSIBLY ALLEGES TORTIOUS INTERFERENCE.

Tortious interference requires "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship; and (4) damage to the plaintiff as a result." *Total Mktg. Techs., Inc. v. Angel Medflight Worldwide Air Ambulance Servs., LLC*, 2012 WL 33150, at *2 (M.D. Fla. Jan. 6, 2012).

Defendants argue Abacus must identify a specific counterparty by name to satisfy the first element of a tortious interference claim. Mot. at 26-27. But all that is required at this stage of the case is that the alleged business relationship "refers to a group of third parties narrower than the general population" who "may be identifiable through discovery." *Total Mktg. Techs.*, 2012 WL 33150, at *3. Here, Abacus specifically identified a "credit union [that] was invested with Abacus," "considering a fund-of-one investment in the range of $30-40 million," adequately specifying a relationship with a specific counterparty. FAC ¶¶ 170, 247-48. That is enough.[11]

Next, Defendants argue Abacus fails to allege that Buerger's interference caused the credit union to forego a fund-of-one investment. Mot. at 27. But cause and effect could not be clearer: After Buerger reached out, the credit union took a "wait-and-see approach" to its investment. FAC ¶ 170. Lastly, Defendants argue Buerger's statements to investors cannot be an "unjustified interference" because they are true. Mot. at 27. But this Court cannot resolve truthfulness on a motion to dismiss. *Worldwide Primates v. McGreal*, 26 F.3d 1089, 1090 (11th Cir. 1994). Here, Abacus disputes truthfulness, so the interference was unjustified.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion.[12]

[11] Buerger does not dispute he knew the union "was invested with Abacus." FAC ¶ 248.

[12] If the Court grants the Motion, Plaintiff respectfully requests leave to amend the FAC.

DATED: November 18, 2025

*/s/ Alex Zuckerman*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Alex Zuckerman (*pro hac vice*)
alexzuckerman@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000

Jason D. Sternberg (Fla. Bar No. 72887)
jasonsternberg@quinnemanuel.com
Osvaldo Rodriguez (Fla. Bar No. 1039307)
osvaldorodriguez@quinnemanuel.com
David M. Walsh (Fla. Bar No. 1048823)
davidwalsh@quinnemanuel.com
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
(305) 402-4880

Kathleen S. Messinger (*pro hac vice*)
kathleenmessinger@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Attorneys for Plaintiff Abacus Global Management, Inc.*