# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA CHARLOTTE DIVISION

| | |
|---|---|
| COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,<br>    Petitioners,<br><br>  v.<br><br>LAPETUS SOLUTIONS, INC.,<br>    Third Party. | Misc. Case No.: |
| ABACUS GLOBAL MANAGEMENT, INC., a corporation,<br>    Plaintiff,<br><br>  v.<br><br>COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,<br>    Defendants. | Related Case: No. 25-cv-01401-RBD-RMN (M.D. Fla. 2025)<br><br>**MOTION TO COMPEL DOCUMENTS RESPONSIVE TO SUBPOENA TO THIRD PARTY LAPETUS SOLUTIONS, INC., AND INCORPORATED LEGAL MEMORANDUM, WHICH LAPETUS HAS CONSENTED TO TRANSFER PURSUANT TO FED. R. CIV. P. 45(f)** |

Defendants Coventry First LLC ("Coventry") and Alan Buerger ("Mr. Buerger") (together, "Defendants") move to compel documents responsive to its Rule 45 Subpoena (the "Subpoena"), Ex. A, issued to third-party Lapetus Solutions, Inc. ("Lapetus") in connection with a lawsuit pending in the District Court for the Middle District of Florida, captioned *Abacus Global Management, Inc. v. Coventry First LLC et al.*,

1

No. 25-cv-01401-RBD-RMN (M.D. Fla. 2025) (the "Litigation").[1]    Lapetus's

Responses & Objections, *see* Ex. B, are insufficient.

Defendants' requests are relevant to the Litigation. Abacus's Amended

Complaint puts Lapetus front and center by referencing Lapetus 213 times, including

this unambiguous statement about Lapetus's centrality:

> Since the beginning of 2024, Coventry and Buerger have routinely
> disseminated false and misleading statements about Abacus, in particular
> targeting Abacus's relationship with Lapetus Solutions, Inc. ("Lapetus"),
> a third-party life expectancy estimate provider that recently dissolved
> because of Defendants' conduct. *Defendants' core claim is that Lapetus life
> expectancies are too short*, and that Abacus relies on those estimates to
> intentionally overvalue the policies it buys and sells.

Ex. C at ¶ 6 (emphasis added).

Discovery has confirmed that Lapetus is a central figure. Lapetus's former

Chief Executive Officer, John Dippold, produced text messages in which he told a

Lapetus board member that he was resigning because he "had concerns about

[Lapetus's life expectancy] business since pretty much joining the company and [has]

concerns about the response to" Coventry's statements. Ex. D at 11. Dippold's

messages also state that Abacus was Lapetus's "primary and basically only client,"

and that Dippold had "concerns" about Abacus. *Id.* Indeed, he resigned from Lapetus

because, in his words, "I don't trust [Abacus]." *Id.*

---

[1] Lapetus consented to transfer this Motion to the Issuing Court, the Middle District of Florida. This Motion is therefore consistent with both the Western District of North Carolina's Local Rules and the Middle District of Florida's Order on Short Form Discovery Motions, which limits the motion and accompanying legal argument to 500 words. *See* https://www.flmd.uscourts.gov/sites/flmd/files/judges/forms/flmd-norway-order-on-short-form-discovery-motions.pdf.

Lapetus initially produced only a *single* document.  *See* Ex. E.  And yesterday, Lapetus made a limited production of sixteen cherry-picked documents that was woefully inadequate.  Defendants are entitled to obtain relevant information about Lapetus's life expectancy estimates, its relationship with Abacus, the reasons behind Mr. Dippold's concerns and distrust of Abacus, and Lapetus's decision to end operations.  Those topics are squarely within Abacus's allegations in the Amended Complaint.

Lapetus's "barebones claims of hardship" are insufficient under Rule 45.  *TIC Park Ctr. 9 v. Cabot*, 2017 WL 3099317, at *3 (S.D. Fla. Apr. 12, 2017).  Lapetus's request for cost-shifting, *see* Ex. F at 5, is also unwarranted.  Lapetus is not a "disinterested third party."  *Id.*  Abacus not only financially backed Lapetus, including a $1 million convertible note, *see* Ex. G at 2, but it thrust Lapetus into the Litigation.

Defendants respectfully urge this Court to enforce the Subpoena, Ex. A, or at a minimum order Lapetus to begin producing the priority documents outlined in Defendants' November 19, 2025 Letter.  Ex. H.

3

## CERTIFICATE OF GOOD FAITH CONFERRAL

Counsel for Defendants met and conferred with counsel for Lapetus, via teleconference, on October 31, 2025, December 3, 2025, and December 16, 2025, to no avail. Between those conferrals, Defendants sent several substantive letters to Lapetus in a good faith effort to resolve the issues raised by this Motion. *See* Exs. H, I. Despite such efforts, the parties were unable to resolve the above-referenced issues, and Lapetus opposes this Motion in its entirety.

Date: December 18, 2025                     Respectfully submitted,

                                            */s/ Eric Evans*
                                            Eric Evans
                                            DECHERT LLP
                                            300 South Tryon Street, Suite 800
                                            Charlotte, NC, 28202

                                            Michael H. McGinley (*pro hac vice forthcoming*)
                                            DECHERT LLP
                                            Cira Centre
                                            2929 Arch Street
                                            Philadelphia, PA 19104

                    *Counsel for Defendants Coventry First LLC and Alan Buerger*

4

**CERTIFICATE REGARDING USE OF ARTIFICIAL INTELLIGENCE**

Pursuant to this Court's Local Standing Order related to the use of artificial intelligence platforms ("AI") in connection with the submission of briefs and other filings before this Court, *In Re: Use of Artificial Intelligence*, Case No. 3:24-mc-104 (W.D.N.C. June 18, 2024), Defendants certify as follows:

1.    No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2.    Every statement and every citation to any authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Date: December 17, 2025                    */s/ Eric Evans*
                                           Eric Evans
                                           DECHERT LLP
                                           300 South Tryon Street, Suite 800
                                           Charlotte, NC, 28202

                                           Michael H. McGinley (*pro hac vice forthcoming*)
                                           DECHERT LLP
                                           Cira Centre
                                           2929 Arch Street
                                           Philadelphia, PA 19104

        *Counsel for Defendants Coventry First LLC and Alan Buerger*

5

## CERTIFICATE OF SERVICE

All counsel of record who are deemed to have consented to electronic service are being served with a true and correct copy of the Motion via electronic mail on December 18, 2025 through the Court's electronic filing system.

*/s/ Eric Evans*
Eric Evans
DECHERT LLP
300 South Tryon Street, Suite 800
Charlotte, NC, 28202

Michael H. McGinley (*pro hac vice forthcoming*)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

*Counsel for Defendants Coventry First LLC and Alan Buerger*

6

# EXHIBIT A



ALFRED J. BENNINGTON, JR.
Senior Litigation Partner
Member Florida & Colorado Bar
Shutts & Bowen LLP
300 South Orange Avenue
Suite 1600
Orlando, FL 32801
DIRECT    (407) 835-6755
FAX        (407) 849-7255
EMAIL    BBennington@shutts.com

August 29, 2025

**<u>VIA HAND DELIVERY</u>**

Lapetus Solutions, Inc.
c/o CT Corporation System
160 Mine Lake Ct. Ste 200
Raleigh, NC 27615

   Re: *Abacus Global Management, Inc. vs. Coventry First, LLC and Alan Buerger*
     Case No.: 6:25-cv-01401-RBD-RMN

Dear Sir/Madam:

   In connection with the above-referenced matter, enclosed please find a Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena").

   Should you prefer, you may comply with the Subpoena by sending electronic copies of responsive materials via email[1], sharefile transfer, or flashdrive to counsel of record for Defendants in this litigation. Please do not hesitate to contact me if you have any questions,

    Very truly yours,

    */s/ Alfred J. Bennington, Jr.*

    Alfred J. Bennington, Jr., Esq.

B1B/dmr
Enclosure

---

[1] Please direct email correspondence to the following: andrew.levander@dechert.com; michael.mcginley@dechert.com; brian.kulp@dechert.com; eric.auslander@dechert.com; bbennington@shutts.com; grubin@shutts.com; belliott@shutts.com; and dreyes@shutts.com.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida ▼

| | |
|---|---|
| Abacus Global Management, Inc | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 6:25-cv-01401-RBD-RMN |
| Coventry First LLC and Alan Buerger | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      Lapetus Solutions, Inc
c/o CT Corporation System, 160 Mine Lake Ct. Ste 200, Raleigh, NC 27615

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:   See Schedule A.

| Place: Dechert LLP | Date and Time: |
|---|---|
| 300 South Tryon Street, Suite 800 Charlotte, NC 28202 | 09/12/2025 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     08/29/2025

*CLERK OF COURT*

OR

_____        /s/ Alfred J. Bennington, Jr.
*Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Coventry First LLC and Alan Buerger _____ , who issues or requests this subpoena, are:
Alfred J. Bennington, Jr., bbennington@shutts.com, (407) 423-3200, 300 South Orange Ave, Suite 1600, Orlando, FL 32801

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 6:25-cv-01401-RBD-RMN

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Print          Save As...          Add Attachment                    Reset

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ABACUS GLOBAL
MANAGEMENT, INC., a
corporation,

        Plaintiff,

    v.

COVENTRY FIRST LLC, a limited
liability company; ALAN
BUERGER, an individual,

        Defendants.

Case No. 6:25-cv-01401-RBD-RMN

Judge Roy B. Dalton, Jr.

Magistrate Judge Robert M. Norway

## DEFENDANTS' NOTICE OF ISSUANCE OF SUBPOENA DUCES TECUM
## TO NON-PARTY

Please take notice that, pursuant to Rule 45 of the Federal Rules of Civil
Procedure and Local Rule 3.04 of the Middle District of Florida, Defendants have
issued the attached subpoena duces tecum directed to: Lapetus Solutions, Inc., c/o CT
Corporation System, 160 Mine Lake Ct. Ste 200, Raleigh, NC 27615, for immediate
service on said non-party and said subpoena to be responded to within the time frame
set forth therein.

1

Dated: August 29, 2025                  Respectfully Submitted,

                                        */s/ Alfred J. Bennington*
MICHAEL H. MCGINLEY (*pro hac vice*)    ALFRED J. BENNINGTON, JR.
BRIAN A. KULP (*pro hac vice*)          GLENNYS ORTEGA RUBIN
DECHERT LLP                             BENJAMIN F. ELLIOTT
Cira Centre                             SHUTTS & BOWEN LLP
2929 Arch Street                        300 South Orange Ave.
Philadelphia, PA 19104                  Suite 1600
Telephone: (215) 994-4000               Orlando, FL 32801
Facsimile: (215) 994-2222               Telephone: (407) 423-3200
michael.mcginley@dechert.com            Facsimile: (407) 425-8316
brian.kulp@dechert.com                  bbenington@shutts.com
                                        grubin@shutts.com
ERIC AUSLANDER (*pro hac vice*)         belliott@shutts.com
DECHERT LLP
1900 K Street, NW                       ANDREW J. LEVANDER (*pro hac vice*)
Washington, DC 20006                    DECHERT LLP
Telephone: (202) 261-3300               Three Bryant Park
Facsimile: (202) 261-3333               1095 Avenue of the Americas
eric.auslander@dechert.com              New York, NY 10036
                                        Telephone: (212) 698-3500
                                        Facsimile: (212) 698-3599
                                        andrew.levander@dechert.com


*Counsel for Defendants Coventry First LLC and Alan Buerger*

2

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2025, a copy of the subpoena has been served

via email on counsel for Plaintiff at the addresses set out in the Service List below.

/s/ Alfred J. Bennington, Jr.
ALFRED J. BENNINGTON, JR.
SHUTTS & BOWEN LLP
300 South Orange Ave.
Suite 1600
Orlando, FL 32801
Telephone: (407) 423-3200
Facsimile: (407) 425-8216

## SERVICE LIST

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Zuckerman
295 5th Avenue, 9th Floor
New York, NY 10016
alexzuckerman@quinnemanuel.com

Jason D. Sternberg
David M. Walsh
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
jasonsternberg@quinnemanuel.com
davidwalsh@quinnemanuel.com

Kathleen S. Messinger
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
kathleenmessinger@quinnemanuel.com


GUNSTER, YOAKLEY & STEWART P.A.
Jason W. Johnson
200 South Orange Avenue, Suite 1400
Orlando, FL 32801
JJohnson@Gunster.com

## SCHEDULE A

Pursuant to Federal Rule of Civil Procedure 45, Defendants request the
production of documents identified below.

## DEFINITIONS

Terms used herein shall have the following meanings:

1. The term "Abacus" means Abacus Global Management, Inc., and its
current and former agents, employees, representatives, affiliates, officers, directors,
partners, managers, predecessors in interest, and subsidiaries, and anyone acting or
purporting to act on its behalf, including without limitation Abacus Settlements, LLC,
Longevity Market Assets, LLC, Abacus Life, Inc., Abacus Enhanced Income Fixed
LP, Abacus Enhanced Income Plus LP, Abacus Premiere Income Fixed LP, Abacus
Premiere Income Plus LP, National Insurance Brokerage, Carlisle Management
Company S.C.A., and ABL Longevity Growth & Income Fund.

2. The terms "and" and "or" have both the conjunctive and disjunctive
meanings, and the terms "each," "any," and "all" mean "each and every."

3. The term "Alan Buerger" means Alan Buerger, the Executive Chairman
and co-founder of Coventry.

4. The term "Communication" means any form of contact, disclosure,
transfer, or exchange of information, whether documentary, written, or oral, formal
or informal, at any time or place and under any circumstances whatsoever whereby
information of any nature is transmitted or transferred by any means, including letters,
memoranda, minutes, reports, emails, text messages, SMS messages, instant

messages, ephemeral messages, telegrams, invoices, telephone conversations, voicemail messages, audio recordings, face-to-face meetings and conversations, and any other form of communication or correspondence.

5.     The term "Concerning" means alluding to, confirming, constituting, comprising, containing, commenting upon, discussing, describing, embodying, evaluating, evidencing, identifying, in connection with, involving, mentioning, noting, pertaining to, probative of, relating to, reflecting, referring to, regarding, setting forth, supporting, stating, showing, touching upon, dealing with, assessing, recording, bearing upon, connected with, in respect of, about, indicating, memorializing, proving, suggesting, having anything to do with, contradicting, or summarizing in any way, directly or indirectly, in whole or in part, the subject matter referred to.

6.     The term "convertible note" means any debt instrument or promissory note that includes provisions allowing or requiring the principal amount, accrued interest, or other amounts owed under the note to be converted into equity or other ownership interests in the issuer or another entity, whether automatically or at the election of the holder or issuer, and whether contingent upon specific events, conditions, or at a specified time.

7.     The term "Coventry" means Coventry First LLC and its current and former agents, employees, representatives, affiliates, officers, directors, partners, managers, predecessors in interest, and subsidiaries, and anyone acting or purporting to act on its behalf.

8.     The term "Document" is used in a comprehensive sense, as contemplated by Rule 1001 of the Federal Rules of Evidence or Rule 34 of the Federal Rules of Civil Procedure, and includes, without limitation, any and all written, printed, typed, recorded, filmed, punched, transcribed, taped, charted, photographed, photostatted, photocopied, or other graphic matter of any kind or nature, however produced, reproduced, or stored, in any format including paper, digital, electronic, or otherwise, whether sent or received or neither, and whether permanent or temporary, including all originals, drafts, copies, and non-identical copies bearing notations or marks not found on the original(s).  The term "Document" specifically includes email, audio and video tapes, microfiche, notes (handwritten and typed), internal memoranda, facsimiles, telexes, telephone records, electronic mail, SMS messages, text messages, messages sent via instant messaging tools, online platforms or mobile apps, other electronically stored information ("ESI") (including any exchange of information between computers and all information stored in an electronic form or computer database), tape recordings (and transcripts of them), voicemail recordings, voicemail transcriptions, letters, drafts, non-identical copies, audit papers, ledgers, books of accounts, and files maintained on or in computer hard drives, servers, portable diskette drives, laptop computers, floppy diskettes, or off-site backup computer files.  A draft or non-identical copy is a separate Document within the meaning of this term.  For the avoidance of doubt, any request for "Documents" includes Communications.

9.     The term "financial arrangement" means any agreement, understanding, or transaction involving the provision, allocation, or exchange of monetary value or financial resources, including but not limited to loans, investments, guarantees, credit facilities, equity contributions, convertible instruments, or any other form of financial commitment or obligation.

10.    The term "identify" means, with respect to Documents, to state the type of Document; the date appearing on the Document or, if it has no date, the date or approximate date such Document was prepared; the author(s), addressee(s), and recipient(s) of the Document; and the names of the person(s) having present possession, custody, or control of the Document.

11.    The term "including" means including but not limited to. The term "includes" has a correlative meaning.

12.    The terms "investor" and "prospective investor" mean any person or entity that has provided, committed to provide, or is considering providing capital, funding, or other financial resources to Abacus, whether in exchange for equity, debt, convertible securities, or any other form of consideration or return on investment.

13.    The terms "Lapetus" or "You" mean Lapetus Solutions, Inc. and its current and former agents, employees, representatives, affiliates, officers, directors, partners, managers, predecessors in interest, and subsidiaries, and anyone acting or purporting to act on its behalf.  The term "Your" has a correlative meaning.

14.    The term "life expectancy estimates" means any calculations, projections, assessments, or evaluations of the anticipated lifespan or remaining years

of life of an individual or group of individuals, whether derived from actuarial data, medical opinions, statistical models, or other methodologies.

15.    The term "Life Insurance Settlement Association Conference" means the Life Insurance Association Conference held in Miami, Florida from October 23-25, 2024.

16.    The term "provider" refers to any entity engaged in the business of preparing, offering, or supplying life expectancy estimates to life settlement providers.

## INSTRUCTIONS

1.    References to any natural person include that natural person's agents, attorneys, representatives, employees, and successors.

2.    References to any non-natural person (*e.g.*, corporation, partnership) include that non-natural person's respective predecessors, successors, divisions, subsidiaries, parents, assigns, and affiliates, foreign or domestic, each other person that is directly or indirectly, wholly or in part, owned by, controlled by, or associated with them, and any others acting or purporting to act on their behalf for any reason, and the present and former officers, directors, partners, managers, advisors, representatives, servants, employees, assigns, attorneys, and agents of any of them.

3.    The use of the singular form of any word includes the plural and vice versa.

4.    The use of the past tense includes the present tense and vice versa, as necessary to bring within the scope of each request all responses that might otherwise be considered outside its scope.  Whenever a term is used herein in the present, past,

future, subjunctive, or other tense, voice, or mood, it shall also be construed to include all other tenses, voices, or moods.

5.     If You object to any of the following requests ("Requests"), state the reasons for Your objections.  If You object to any part of a Request, specify the part. Similarly, if You do not object to a particular Request, but are unable to respond fully to that Request, respond to the fullest extent possible and provide an explanation for your lack of a full response.

6.     If, in responding to any of the following Requests, You encounter any ambiguity or confusion in construing either the Request or a Definition or Instruction relevant to a Request, set forth the matter deemed ambiguous, select a reasonable interpretation that you believe resolves the ambiguity, respond to the Request using that interpretation, and explain with particularity the construction or interpretation selected by You in responding to the Request.

7.     You are required to produce all Documents and Communications, wherever located, that are described below and that are in your possession, custody or control, or to which You have access.

8.     All Documents should be Bates labeled, and should be produced in single page TIFF images (except that excel spreadsheets and other such file types that include logical formulae or files that, when converted to image format, take on an appearance noticeably different from the one the running-native file took when viewed on a computer screen, should be produced in native, with a "nativelink" file) with extracted

text or OCR at the Document level and with the following load files: LFP, OPT and DAT. TIFF images should be 300 DPI Group IV compressed TIFF images. The load files should be provided as delimited load files. All metadata should be provided, including (at a minimum) the following: BEGDOC, ENDDOC, BEGATTACH, ENDATTACH, Page Count, Author, To, Cc, Bcc, Custodian, Date Sent, Time Sent, Subject, File Name, Date Last Modified, MD5Hash and NATIVELINK (link to native on media if applicable).

9.    Each Request seeks production of every responsive Document in its entirety, without abbreviation or expurgation, including attachments and/or other matters affixed thereto, notwithstanding that portions of a Document may contain information that is not responsive. You should produce all drafts as well as final versions of a Document, as well as copies that are not identical to the original Document, whether due to handwritten notations, revisions, enclosures, attachments, underlining, highlighting, or otherwise.

10.    You should produce all responsive Documents as they are kept in the usual course of business, and as to each Document, identify the file or location from which it was taken, as well as the name, affiliation, and position for the custodian involved.

11.    If any Document responsive to any particular Request is withheld in whole or in part based upon a claim of attorney-client privilege, the work product doctrine, or upon any other legal ground, You shall submit, with respect to each

Document so withheld, a privilege log supporting the application of the privilege or work product protection.  If You claim privilege or any other basis for nondisclosure with regard to only part of a document, produce all other parts of the Document.  If a Document is withheld on the ground of privilege, state the specific basis for the claim of privilege, and provide the following information: (i) the date appearing on the Document; (ii) a description of the general nature of the Document (*e.g.*, whether it is a letter, memorandum, e-mail, etc.); (iii) the author of the Document; and (iv) the identity of each person to whom the Document was addressed and the identity of each person to whom a copy was sent.

12.     Unless otherwise specified in an individual Request, these Requests seek Documents and information prepared, sent, provided, received, or in Your possession during the period from January 1, 2022, through and including the present (the "Relevant Period").

## DOCUMENTS TO BE PRODUCED

1.     All Documents and Communications Concerning or with Abacus, including any agreements, contracts, business relationships, or strategic partnerships with Abacus.

2.     All Documents and Communications Concerning (i) investments, (ii) convertible notes, or (iii) any other financial arrangements involving Abacus.

3.     All Documents and Communications Concerning or with Coventry, except Documents maintained pursuant to any professional services agreement between Lapetus and Coventry.

4.      All Documents and Communications Concerning or with Alan
Buerger, except Documents maintained pursuant to any professional services
agreement between Lapetus and Coventry.

5.      All Documents and Communications Concerning Jay Jackson's role
with Abacus or Lapetus, including as a director of Lapetus.

6.      All Documents and Communications Concerning the Life Insurance
Settlement Association Conference, including presentations or statements made at
the conference and any preparatory materials regarding the presentations or
statements made at the conference.

7.      All Documents and Communications Concerning or with any investor
or prospective investor in Abacus, including any fund or other entity managed or
controlled by Abacus.

8.      All Documents and Communications Concerning the accuracy of
Lapetus's life expectancy estimates, including analyses, studies, and reviews
comparing Lapetus's life expectancy estimates with estimates provided by other
providers.

9.      All Documents and Communications Concerning any criticisms or
questioning of Lapetus's life expectancy estimates.

10.     All Documents and Communications Concerning any complaints
Lapetus received Concerning its life expectancy estimates.

11.     All Documents and Communications Concerning Lapetus's life
expectancy calculations, estimations, projections, medical underwriting, actual-to-
expected analyses, reconciliation reports, or methodologies related to Abacus,
including all data related thereto.

12.     All Documents and Communications Concerning press releases,
website postings, conference presentations, and public remarks referencing or
Concerning Abacus, Coventry, Lapetus's life expectancy estimates, or the valuation
of life settlements.

13.     All Documents and Communications Concerning Lapetus's decision to
end operations on August 31, 2025.

14.     All Documents and Communications Concerning any "pressure from
some clients to raise or lower" life expectancies, including any such pressure from
Abacus, and any resulting reassessments by Lapetus.

15.     All Documents and Communications Concerning audits of life
expectancies required to be filed with the Office of Insurance Regulation pursuant to
Section 626.99175(g)(5) of the Florida Statutes, including final submissions, drafts,
and any Documents used to generate such audits.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ABACUS GLOBAL
MANAGEMENT, INC., a
corporation,

                    Plaintiff,

      v.

COVENTRY FIRST LLC, a limited
liability company; ALAN
BUERGER, an individual,

                  Defendants.

Case No.: 25-cv-01401-RBD-RMN

## LAPETUS SOLUTIONS, INC.'S RESPONSES AND OBJECTIONS
## TO DEFENDANTS' SUBPOENA *DUCES TECUM*

Non-party Lapetus Solutions, Inc. ("Lapetus" or "Responding Party"), by and through undersigned counsel, and, pursuant to Federal Rules of Civil Procedure 34 and 45, responds and objects to the Subpoena *Duces Tecum* issued by Defendants Coventry First LLC ("Coventry") and Alan H. Buerger ("Buerger" and together with Coventry, "Defendants" or "Propounding Party"), and in support thereof states as follows:

## <u>GENERAL OBJECTIONS</u>

1.     Responding Party's investigation and development of all facts and circumstances relating to this matter is ongoing. These responses and objections are made without prejudice to, and are not a waiver of, Responding Party's right to rely on other facts or documents at a later point.

1

2.      By making the accompanying responses and objections to Propounding Party's requests for documents, Responding Party does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege.  Further, Responding Party makes the responses and objections herein without in any way implying that it considers the requests, and responses to the requests, to be relevant or material to the subject matter of this action.

3.      Responding Party will produce responsive documents only to the extent that such documents are in the possession, custody, or control of the Responding Party, as set forth in the Federal Rules of Civil Procedure. The Responding Party's possession, custody, or control does not include any constructive possession that may be conferred by the Responding Party's right or power to compel the production of documents or information from third parties or to request their production from other parties in this action.

4.      A response to a document request stating that objections and/or indicating that documents will be produced shall not be deemed or construed that there are, in fact, responsive documents, that the Responding Party performed any of the acts described in the document request, or definitions and/or instructions applicable to the document request, or that the Responding Party acquiesces in the characterization of the conduct or activities contained in the document request, or definitions and/or instructions applicable to the document request.

5.      Responding Party expressly reserves the right to supplement, clarify, revise,

2

or correct any or all of the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

6.    Publicly available documents including, but not limited to, newspaper clippings, court papers, and documents available on the Internet, will not be produced.

7.    Responding Party objects to each instruction, definition, document request, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of this Court.

8.    Documents in the possession, custody or control of the Responding Party are not segregated into the category set forth in the propounding party's request, but are produced as they are kept in the usual course of business. The Responding Party has made and is making reasonable efforts to locate and produce all documents in its possession with their compliance with each unobjectionable request as the Responding Party understands and interprets each such request. If the Propounding Party subsequently asserts an interpretation of any request which differs from that of the Responding Party, the Responding Party reserves the right to supplement their responses and objections.

9.    The responses set forth below represent the Responding Party's present knowledge based on its discovery, investigation, and preparation to date. Its discovery, investigation and preparation may be ongoing. Responding Party expressly reserves the right to rely upon any further information revealed upon completion of discovery, investigation, and any additional preparation.

3

10.     Lapetus objects to Instruction Nos. 7 and 10 as they impose requirements beyond the applicable Federal Rules of Civil Procedure.

11.     Lapetus objects to Instruction No. 8 and will seek agreement with Defendants to agree upon reasonable production protocols to provide for the production of ESI in the manner in which documents and communication are regularly maintained in the ordinary course by Lapetus and in a manner commensurate with the needs of the case.

12.     Lapetus objects to the timeframe of January 1, 2022, through the present as overbroad and unduly burdensome, because it far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

13.     Any response by Lapetus that it will produce information or documents in response to a request is not an acknowledgement that any such information or document exists or ever exists. Lapetus agrees only to conduct a reasonable search if required over any applicable objections and, if found, produce relevant, responsive, non-privileged information or documents not subject to the General Objections or any other specific objections.

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANTS *DUCES TECUM* REQUESTS

*1.     All Documents and Communications Concerning or with Abacus, including any agreements, contracts, business relationships, or strategic partnerships with Abacus.*

**RESPONSE:**

4

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning or with Abacus," which under the Defendant's vague and overbroad definition of the term "concerning," that includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass literally every document in the possession of Lapetus that implicates its life expectancy services, for which Abacus has been a significant customer, or the life settlement industry in which Abacus is a major participant. Lapetus therefore reasonably interprets the request to mean "all documents that expressly state or identify Abacus and any communications between Lapetus and Abacus."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly state or identify Abacus and any communications between Lapetus and Abacus," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. The documents of Lapetus and communications between Lapetus and Abacus have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly

5

overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus'

assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in

its annual report, (x) that Abacus lied when it stated Lapetus produces the most

conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii)

Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains,

and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214,

230, 241. There is no affirmative defense to which the Request could possibly relate, as

Defendants have not answered the Amended Complaint. The Request, even as reasonably

interpreted, would require the production of hundreds of thousands of pages documents

and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through

the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to

Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and

disproportionate to the needs of this case as it would require Lapetus, a non-party in this

proceeding, (i) to literally review each of the hundreds of thousands of documents in its

possession, custody or control, in order to even identify those that expressly state or

identify Abacus, and (ii) assemble, review and produce all of its communications with

Abacus that span approximately a decade.

The Request is further unduly burdensome in that it imposes a burden upon a non-

party that can easily be satisfied by first seeking the requested information from a party to

this action—which Defendants have neglected to do. Any documents or communications

between Lapetus and Abacus can easily be obtained from Abacus. Even there was to be a determination that certain Lapetus documents or communications are related to the claims in this action, the Request will still be unduly burdensome because they can first be sought from Abacus. It is unduly burdensome to impose upon a non-party a requirement to produce what is necessarily in the possession, custody or control of a party to this action without at least first seeking the documents from the party—much less to the magnitude requested here.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. By way of example, and without limitation, the Request, even as reasonably interpreted, would require Lapetus to produce all of the approximately 10,000 life expectancy reports produced by Lapetus for Abacus over approximately the past decade. The Request would not only require Lapetus to produce its proprietary life expectancy reports themselves, but also all of Lapetus' related internal documentation and work product, all of which would disclose Lapetus' proprietary processes, methodologies, data and trade secrets. The Request would further require Lapetus to disclose communications with Abacus in which Lapetus provided opinions and memoranda which constitute Lapetus' confidential and proprietary commercial information. Disclosure of Lapetus' trade secrets and confidential information to Defendants—who are in the very same industry life settlements industry—would cause significant and irreparable competitive harm to Lapetus because it could be used by Defendants to reverse engineer Lapetus' proprietary processes to compete with or otherwise harm Lapetus' financial interests.

7

Lapetus further objects to this Request because it demands production of Abacus' confidential information that is restricted from disclosure under Lapetus' Professional Services Agreement with Abacus. The documents and communications that are the subject of this Request contain not only Lapetus' own proprietary and confidential data, but also the confidential information of Abacus. Lapetus' production of Abacus' confidential information would cause it to breach the very same confidentiality obligations that the Defendants have demanded Lapetus honor as to their own Professional Services Agreement with Lapetus.

Lapetus further objects to this Request because it demands production of information constituting "protected health information" as defined in 45 C.F.R. § 160.103, for approximately 10,000 individuals whose health information was provided by Abacus in connection with Lapetus' preparation of a life expectancy report or other opinion for Abacus. Beyond being entirely irrelevant to the claims in this action, disclosure of these patients private health information is precluded by the Health Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this Request, it must be narrowly tailored to the needs of this case and further be conditioned upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Compliance with the Request would require a physical review of the entirety of Lapetus' documents to determine which mention Abacus, along with a review of every communication Lapetus ever had with Abacus over a decade—totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Lapetus further objects to the Request as an improper attempt to avoid discovery limitations in the currently pending state court action *Lapetus Solutions, Inc. v. Florida Office of Insurance Regulation*, Case No. 2025-CA-516 pending in the Circuit Court of the Second Judicial County in and for Leon County, Florida (the "State Court Case"), in which Coventry has intervened as party defendant. Defendants should not be permitted to obtain

as discovery in this matter documents that it cannot rightfully obtain in the State Court Case.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

2.    ***All Documents and Communications Concerning (i) investments, (ii) convertible notes, or (iii) any other financial arrangements involving Abacus.***

**RESPONSE:**

Lapetus objects to this Request as vague, as the terms "investments" is undefined and capable of various interpretations. As drafted, the Request could be interpreted to include virtually any broadly defined "financial arrangement" or unspecified "investment" Lapetus may be deemed to have with Abacus—an entity that it has done business with for approximately a decade. Lapetus further objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" these items. Defendant's vague and overbroad definition of the term "concerning," includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" that could be read to encompass literally every document in the possession of Lapetus that in any way remotely touches on its business of Abacus.  Lapetus therefore reasonably interprets this Request to require the production of "all Documents and Communications that expressly identify or discuss a promissory note that evidences a loan from Lapetus to Abacus or the purchase by Lapetus of shares of stock in Abacus."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly identify or discuss a promissory note that evidences a loan from Lapetus to Abacus or the purchase by Lapetus of shares of stock in Abacus," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents or communications of Lapetus have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably interpreted, would require the production of documents and communications that have no bearing on this case.

11

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome as it imposes a burden upon a non-party that can easily be satisfied by first seeking the requested information from a party to this action—which Defendants have neglected to do. Any such documents and communications between Lapetus and Abacus can easily be obtained from Abacus. Even there was to be a determination that certain Lapetus documents or communications are related to the claims in this action, the Request will still be unduly burdensome because they can first be sought from Abacus. It is unduly burdensome to impose upon a non-party a requirement to produce what is necessarily in the possession, custody or control of a party to this action without at least first seeking the documents from the party.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' confidential commercial information. Beyond what is required to be disclosed by Abacus with the United States Security and Exchange Commission or has otherwise been publicly made available by Abacus, the existence and terms of any loan to or investment of Lapetus is its confidential commercial information. The Request would further require Lapetus to disclose communications with Abacus concerning Lapetus' confidential commercial information. Disclosure of Lapetus' confidential information to Defendants—who are in the very same industry life settlements industry—would cause significant and irreparable competitive harm to Lapetus because it could disadvantage its commercial interests in the

12

marketplace by disclosing its assets and the terms upon which it engages in financial transactions.

If the Court requires any production is required by Lapetus in response to this Request, it must be narrowly tailored to the needs of this case and further be conditioned upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

   *3.*     ***All Documents and Communications Concerning or with Coventry, except Documents maintained pursuant to any professional services agreement between Lapetus and Coventry.***

   **RESPONSE**:

13

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning or with Coventry," which under the Defendant's vague and overbroad definition of the term "concerning," that includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass literally every document in the possession of Lapetus that implicates its life expectancy services, for which Coventry has been a significant customer, or the life settlement industry in which Coventry is a major participant. The Request is further objectionable as vague in that it requires Lapetus to guess at which documents and communications are "maintained pursuant to any professional services agreement between Lapetus and Coventry."

Lapetus therefore reasonably interprets the request to mean "all documents that expressly state or identify Coventry and any communications between Lapetus and Coventry."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly state or identify Coventry and any communications between Lapetus and Coventry," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents or communications have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by

14

life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably interpreted, would require the production of tens, if not hundreds, of thousands of pages documents and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review each of the hundreds of thousands of documents in its possession, custody or control, in order to even identify those that expressly state or identify Coventry, and (ii) assemble, review and produce all of its communications with Coventry that span a number of years.

15

The Request is further unduly burdensome in that it imposes a burden upon a non-party that can easily be satisfied by Coventry reviewing its own records—which Defendants have neglected to do. Any documents and communications between Lapetus and Coventry can easily be obtained from Coventry itself. Even there was to be a determination that certain Lapetus documents or communications are related to the claims in this action, the Request will still be unduly burdensome because Coventry can obtain the records from its own records. It is unduly burdensome to impose upon a non-party a requirement to produce what is necessarily in the custody or control of the requesting party—much less to the magnitude requested here.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. By way of example, and without limitation, the Request, even as reasonably interpreted, would require Lapetus to produce all of the thousands of life expectancy reports produced by Lapetus for Coventry over a period of years—which Coventry already has but if produced will be required to be disclosed with Abacus in this proceeding.   The Request would not only require Lapetus to produce its proprietary life expectancy reports themselves, but also all of Lapetus' related internal documentation and work product, all of which would disclose Lapetus' proprietary processes, methodologies, data and trade secrets. The Request would further require Lapetus to disclose communications with Coventry in which Lapetus provided opinions and memoranda which constitute Lapetus' confidential and proprietary commercial information. Disclosure of Lapetus' trade secrets and confidential information to Defendants or Lapetus—who are in the very same industry

16

life settlements industry—would cause significant and irreparable competitive harm to
Lapetus because it could be used by Defendants to reverse engineer Lapetus' proprietary
processes to compete with or otherwise harm Lapetus' financial interests.

Lapetus further objects to this Request because it demands production of
information in this case constituting "protected health information" as defined in 45 C.F.R.
§ 160.103, for approximately 10,000 individuals whose health information was provided
by Coventry in connection with Lapetus' preparation of a life expectancy report or other
opinion for Coventry. Beyond being entirely irrelevant to the claims in this action,
disclosure of these patients' private health information is precluded by the Health
Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and
regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this
Request, it must be narrowly tailored to the needs of this case and further be conditioned
upon a confidentiality order enforceable by the Court that will, among other things, strictly
limit the review and disclosure of any documents produced to an "attorneys' eyes only"
level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an
undue financial burden on Lapetus, who is not a party in this action. The cost of any
production should be shifted to the Defendants. Compliance with the Request would
require a physical review of the entirety of Lapetus' documents to determine which
mention Coventry, along with a review of every communication Lapetus ever had with
Coventry over a period of years—totaling hundreds of thousands of pages—the cost of

17

which could exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Lapetus further objects to the Request because it conflicts with Coventry's prior demand that Lapetus not produce any documents that are subject to the confidentiality provisions of Lapetus' Professional Services Agreement with Coventry. Lapetus may be placed in legal jeopardy by producing responsive documents that Coventry later deems were supposed to be kept confidential.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

   *4.    **All Documents and Communications Concerning or with Alan Buerger, except Documents maintained pursuant to any professional services agreement between Lapetus and Coventry.***

   **RESPONSE:**

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning or with Alan Buerger," which under the Defendant's vague and overbroad definition of the term "concerning," that includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass literally every document in the possession of Lapetus that implicates its life expectancy services, for which Buerger through Coventry has been a significant customer, or the life settlement industry in which Buerger is a major participant. The Request is further objectionable as vague in that it requires Lapetus to guess at which documents and communications are "maintained pursuant to any professional services agreement between Lapetus and Coventry."

Lapetus therefore reasonably interprets the request to mean "all documents that expressly state or identify Buerger and any communications between Lapetus and Buerger."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly state or identify Buerger and any communications between Lapetus and Buerger," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents or communications have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus

19

manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably interpreted, would require the production of tens, if not hundreds, of thousands of pages documents and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review each of the hundreds of thousands of documents in its possession, custody or control, in order to even identify those that expressly state or

20

identify Buerger, and (ii) assemble, review and produce all of its communications with Buerger and Coventry that span a number of years.

The Request is further unduly burdensome in that it imposes a burden upon a non-party that can easily be satisfied by Coventry and Buerger reviewing their own records—which Defendants have neglected to do. Any documents or communications between Lapetus and Buerger can easily be obtained from Coventry or Buerger. Even if there was to be a determination that certain Lapetus documents or communications are related to the claims in this action, the Request will still be unduly burdensome because Defendants can obtain the records from their own records. It is unduly burdensome to impose upon a non-party a requirement to produce what is necessarily in the possession, custody or control of the requesting party—much less to the magnitude requested here.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. By way of example, and without limitation, the Request, even as reasonably interpreted, would require Lapetus to produce all of the thousands of life expectancy reports produced by Lapetus for Coventry over a period of years—which Coventry already has but if produced will be required to be disclosed with Abacus in this proceeding. The Request would not only require Lapetus to produce its proprietary life expectancy reports themselves, but also all of Lapetus' related internal documentation and work product, all of which would disclose Lapetus' proprietary processes, methodologies, data and trade secrets. The Request would further require Lapetus to disclose communications with Buerger in which Lapetus provided opinions and memoranda which constitute Lapetus'

21

confidential and proprietary commercial information. Disclosure of Lapetus' trade secrets and confidential information to Defendants or Lapetus—who are in the very same industry life settlements industry—would cause significant and irreparable competitive harm to Lapetus because it could be used by Defendants to reverse engineer Lapetus' proprietary processes to compete with or otherwise harm Lapetus' financial interests.

Lapetus further objects to this Request because it demands production of information in this case constituting "protected health information" as defined in 45 C.F.R. § 160.103, for approximately 10,000 individuals whose health information was provided by Coventry in connection with Lapetus' preparation of a life expectancy report or other opinion for Coventry. Beyond being entirely irrelevant to the claims in this action, disclosure of these patients' private health information is precluded by the Health Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this Request, it must be narrowly tailored to the needs of this case and further be conditioned upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Compliance with the Request would require a physical review of the entirety of Lapetus' documents to determine which

22

mention Buerger, along with a review of every communication Lapetus ever had with Buerger over a period of years—totaling hundreds of thousands of pages—the cost of which could exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Lapetus further objects to the Request because it conflicts with Coventry's prior demand that Lapetus not produce any documents that are subject to the confidentiality provisions of Lapetus' Professional Services Agreement with Coventry. Lapetus may be placed in legal jeopardy by producing responsive documents that Coventry later deems were supposed to be kept confidential.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

5.    ***All Documents and Communications Concerning Jay Jackson's role with Abacus or Lapetus, including as a director of Lapetus.***

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that

it seeks the production of all documents and communications "concerning" Jay Jackson's

role with Abacus or Lapetus," which under the Defendant's vague and overbroad definition

of the term "concerning," that includes undefined and terms and phrases including, without

limitation "connected with," "bearing upon," and "touching upon" could be read to

encompass literally every document in the possession of Lapetus that implicates its

business or the life settlement industry in which Jay Jackson ("Jackson") and Abacus are

major participants. The request is further objectionable as vague in that the term "role" is

undefined and capable of various interpretations. Lapetus therefore reasonably interprets

the request to mean "all documents and communications that expressly state or identify Jay

Jackson and expressly discuss the contractual terms of any then existing employment or

director position with either Abacus or Lapetus."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad,

unduly burdensome and disproportionate to the needs of this case. The request for "all"

documents and communications "that expressly state or identify Jay Jackson and expressly

discuss the contractual terms of any then existing employment or director position with

either Abacus or Lapetus," is not reasonably tethered to any claims asserted by Abacus in

the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended

Complaint")*. Any such documents or communications of Lapetus have no bearing upon

the falsity or misleading nature of Defendants' statements that Abacus alleges in the

Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus

24

manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review each of the hundreds of thousands of documents and communications in its possession, custody or control, in order to identify those that expressly state or identify Jackson, and expressly mention the contractual terms of any then existing employment or director position with either Abacus or Lapetus.

The Request is further unduly burdensome in that it imposes a burden upon a non-party that can easily be satisfied by first seeking the requested information from a party to

25

this action—which Defendants have neglected to do. Any documents or communications between Lapetus and Jackson can easily be obtained from Abacus. Even there was to be a determination that certain Lapetus documents or communications are related to the claims in this action, the Request will still be unduly burdensome because they can first be sought from Abacus. It is unduly burdensome to impose upon a non-party a requirement to produce what is necessarily in the possession, custody or control of a party to this action without at least first seeking the documents from the party—much less to the magnitude requested here.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. By way of example, and without limitation, the Request, even as reasonably interpreted, would require Lapetus to produce all of the approximately 10,000 life expectancy reports produced by Lapetus for Abacus over approximately the past decade. The Request would not only require Lapetus to produce its proprietary life expectancy reports themselves, but also all of Lapetus' related internal documentation and work product, all of which would disclose Lapetus' proprietary processes, methodologies, data and trade secrets. The Request would further require Lapetus to disclose communications with Abacus in which Lapetus provided opinions and memoranda which constitute Lapetus' confidential and proprietary commercial information. Disclosure of Lapetus' trade secrets and confidential information to Defendants—who are in the very same industry life settlements industry—would cause significant and irreparable competitive

harm to Lapetus because it could be used by Defendants to reverse engineer Lapetus'
proprietary processes to compete with or otherwise harm Lapetus' financial interests.

Lapetus further objects to this Request because it demands production of Abacus'
confidential information that is restricted from disclosure under Lapetus' Professional
Services Agreement with Abacus. The documents and communications that are the subject
of this Request contain not only Lapetus' own proprietary and confidential data, but also
the confidential information of Abacus. Lapetus' production of Abacus' confidential
information would cause it to breach the very same confidentiality obligations that the
Defendants have demanded Lapetus honor as to their own Professional Services
Agreement with Lapetus.

Lapetus further objects to this Request because it demands production of
information constituting "protected health information" as defined in 45 C.F.R. § 160.103,
for approximately 10,000 individuals whose health information was provided by Abacus
in connection with Lapetus' preparation of a life expectancy report or other opinion for
Abacus. Beyond being entirely irrelevant to the claims in this action, disclosure of these
patients' private health information is precluded by the Health Information Portability and
Accountability Act of 1996 ("HIPAA"), as amended, and regulations promulgated
thereunder.

If the Court requires any production is required by Lapetus in response to this
Request, it must be narrowly tailored to the needs of this case and further be conditioned
upon a confidentiality order enforceable by the Court that will, among other things, strictly

limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Compliance with the Request would require a physical review of the entirety of Lapetus' documents to determine which mention Abacus, along with a review of every communication Lapetus ever had with Abacus over a decade—totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

6.    ***All Documents and Communications Concerning the Life Insurance***

28

*Settlement Association Conference, including presentations or statements made at the conference and any preparatory materials regarding the presentations or statements made at the conference.*

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning or the Life Insurance Settlement Association Conference," (the "LISA Conference") which under the Defendant's vague and overbroad definition of the term "concerning," that includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass literally every document in the possession of Lapetus that implicates its life expectancy services or the life settlement industry, which is the focus of the annual LISA Conference. Lapetus therefore reasonably interprets the request to mean "all documents and communications that expressly state or identify the presentation of Lapetus at the 2024 annual Life Insurance Settlement Association Conference."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly state or identify the presentation of Lapetus at the 2024 annual Life Insurance Settlement Association Conference," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents or communications of Lapetus have no bearing upon the falsity or misleading

29

nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint.

The Request is further unduly burdensome in that it imposes a burden upon a non-party that can easily be satisfied by obtaining the requested information from the public domain—which Defendants have neglected to do. Lapetus' presentation and statements at the 2024 LISA Conference are available on the internet. It is unduly burdensome to impose upon a non-party a requirement to produce what is easily obtainable by going online.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. Beyond power-point presentation that was presented publicly by Lapetus at the 2024 LISA Conference, and publicly available video from the 2024 LISA Conference

that contains both it and the related statements by Lapetus, any other documentation or communications concerning Lapetus' assessment of the life settlement industry or its preparation of the 2024 LISA Conference presentation are its confidential commercial information and not subject to disclosure.

If the Court requires any production is required by Lapetus in response to this Request, it must be narrowly tailored to the needs of this case and further be conditioned upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce the Lapetus 2024 LISA Conference power point presentation in response to this Request.

7.    ***All Documents and Communications Concerning or with any investor or prospective investor in Abacus, including any fund or other entity managed or controlled by Abacus.***

**RESPONSE**:

31

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning or with any investor or prospective investor in Abacus," which under the Defendant's vague and overbroad definition of the term "concerning," that includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass literally every document in the possession of Lapetus that implicates its life expectancy services, for which Abacus has been a significant customer, or the life settlement industry in which Abacus is a major participant—all of which could arguably connected the universe of unknown actual or prospective investors in Abacus.  Lapetus further objects to the Request as vague, over broad and unduly burdensome in that it seeks production as to "prospective investors," as the phrase is incapable of any cogent interpretation and Lapetus would have no way of discerning who or who is not a "prospective" investor in Abacus. Lapetus further objects to the Request as vague, over broad and unduly burdensome in that it seeks production as to "investors" which term is subject to various interpretations.

Lapetus therefore reasonably interprets the request to mean "all documents that expressly state or identify a person, other than Lapetus, in favor of whom Abacus has executed a promissory note or who then owned shares of stock in Abacus and expressly mention or discuss the promissory note or stock of Abacus."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly state or identify a person, other than

32

Lapetus, in favor of whom Abacus has executed a promissory note or who then owned shares of stock in Abacus and expressly mention or discuss the promissory note or stock of Abacus," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents or communications have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably interpreted, would require the production of hundreds of thousands of pages documents and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding to literally review each of the hundreds of thousands of documents and communications in its possession, custody or control, in order to even identify those that expressly state or identify a person, other than Lapetus, in favor of whom Abacus has executed a promissory note or who then owned shares of stock in Abacus and expressly mention or discuss the promissory note or stock of Abacus.

The Request is further unduly burdensome in that it imposes a burden upon a non-party that can easily be satisfied by first seeking the requested information from a party to this action—which Defendants have neglected to do. Any documents or communications that expressly state or identify a person, other than Lapetus, in favor of whom Abacus has executed a promissory note or who then owned shares of stock in Abacus and expressly mention or discuss the promissory note or stock of Abacus can easily be obtained from Abacus. Even there was to be a determination that certain Lapetus documents or communications are related to the claims in this action, the Request will still be unduly burdensome because they can first be sought from Abacus. It is unduly burdensome to impose upon a non-party a requirement to produce what is necessarily in the possession, custody or control of a party to this action without at least first seeking the documents from the party.

34

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Compliance with the Request would require a physical review of the entirety of Lapetus' documents to determine which mention Abacus, along with a review of every communication Lapetus ever had with Abacus over a decade—totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Without waiving the foregoing objections, Lapetus states that is unaware of responsive documents that are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

**8.    *All Documents and Communications Concerning the accuracy of Lapetus' life expectancy estimates, including analyses, studies, and reviews comparing Lapetus's life expectancy estimates with estimates provided by other providers.***

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" the accuracy of Lapetus' life expectancy estimates. The Defendant's vague and overbroad definition of the term "concerning," includes undefined and terms and phrases including, without

limitation "connected with," "bearing upon," and "touching upon" could be read to encompass virtually every document in the possession of Lapetus that implicates its life expectancy services and by definition their accuracy. Lapetus therefore reasonably interprets the request to mean "all documents and communications that expressly identify a specific life expectancy estimate prepared by Lapetus and compare that estimate to the actual lifespan of the individual whose life expectancy was estimated."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly identify a specific life expectancy estimate prepared by Lapetus and compare that estimate to the actual lifespan of the individual whose life expectancy was estimated," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents or communications of Lapetus have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi)

Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably interpreted, would require the production of thousands, if not tens of thousands, of pages documents and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review tens of thousands, if not hundreds of thousands, of documents in its possession, custody or control, in order to even identify those that expressly identify a specific life expectancy estimate prepared by Lapetus and compare that estimate to the actual lifespan of the individual whose life expectancy was estimated, and (ii) assemble, review and produce all of its communications spanning more than a decade to uncover those that expressly identify and a specific life expectancy estimate prepared by Lapetus and compare that estimate to the actual lifespan of the individual whose life expectancy was estimated.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial

information. By way of example, and without limitation, the Request, even as reasonably interpreted, would require Lapetus to produce all of its tens of thousands of life expectancy reports produced by Lapetus over a decade. The Request would not only require Lapetus to produce its proprietary life expectancy reports themselves, but also all of Lapetus' related internal documentation and work product, all of which would disclose Lapetus' proprietary processes, methodologies, data and trade secrets. The Request would further require Lapetus to disclose its distance to death calculations which constitute Lapetus' confidential and proprietary commercial information. Disclosure of Lapetus' trade secrets and confidential information to Defendants—who are in the very same industry life settlements industry—would cause significant and irreparable competitive harm to Lapetus because it could be used by Defendants to reverse engineer Lapetus' proprietary processes to compete with or otherwise harm Lapetus' financial interests.

Lapetus further objects to this Request because it demands production of Abacus' confidential information that is restricted from disclosure under Lapetus' Professional Services Agreement with its customers. The life expectancy reports and communications that would fall under this Request contain not only Lapetus' own proprietary and confidential data, but also the confidential information of its customers. Lapetus' production of this confidential information would cause it to breach the very same confidentiality obligations that the Defendants have demanded Lapetus honor as to their own Professional Services Agreement with Lapetus.

Lapetus further objects to this Request because it demands production of information constituting "protected health information" as defined in 45 C.F.R. § 160.103,

38

for approximately tens of thousands of individuals whose health information was provided by a Lapetus customer in connection with Lapetus' preparation of a life expectancy report or other opinion for the customer.  Beyond being entirely irrelevant to the claims in this action, disclosure of these patients' private health information is precluded by the Health Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this Request, it must be narrowly tailored to the needs of this case and further be conditioned upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Compliance with the Request would require a physical review of the entirety of Lapetus' documents to determine which that expressly identify a specific life expectancy estimate prepared by Lapetus and compare that estimate to the actual lifespan of the individual whose life expectancy was estimated, along with a review of every internal and external communication Lapetus ever had— totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege.  Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should

39

be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Lapetus further objects to the Request as an improper attempt to avoid discovery limitations in the currently pending state court action *Lapetus Solutions, Inc. v. Florida Office of Insurance Regulation*, Case No. 2025-CA-516 pending in the Circuit Court of the Second Judicial County in and for Leon County, Florida (the "State Court Case"), in which Coventry has intervened as party defendant. Defendants should not be permitted to obtain as discovery in this matter documents that it cannot rightfully obtain in the State Court Case.

Lapetus further objects to the Request as unduly burdensome to the extent Defendants seek the third party "analysis" prepared by Morpheus Research that is identified in the Complaint, as the same is publicly available.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

*9.    All Documents and Communications Concerning any criticisms or questioning of Lapetus's life expectancy estimates.*

40

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" any criticisms or questioning of Lapetus' life expectancy estimates. The Defendant's vague and overbroad definition of the term "concerning," includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass virtually every document in the possession of Lapetus that implicates its life expectancy services and by definition their accuracy. The Request is further objectionable as vague in that the term "criticism" could mean any comment concerning any of Lapetus' life expectancy estimates—whether positive, negative, indifferent or otherwise. The Request is further objectionable as vague in that the term "questioning" is subject to various interpretations. Lapetus therefore reasonably interprets the request to mean "all documents and communications that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents have no bearing

41

upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review tens of thousands, if not hundreds of thousands, of documents in its possession, custody or control, in order to even identify those that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the

42

individual, and (ii) assemble, review and produce all of its communications spanning more than a decade to uncover those that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. The Request, even as reasonably interpreted, would require Lapetus to produce documents that are the confidential commercial information of Lapetus to the extent any even exist. Disclosure of such confidential information of Lapetus to Defendants—if any even exist—would cause significant and irreparable competitive harm to Lapetus because it would disclose Lapetus' internal communications with customers and would unnecessarily negatively impact Lapetus' reputation without Lapetus being able to present the same in context and provide an appropriate explanation or rebuttal.

Lapetus further objects to this Request because it demands production of Abacus' confidential information that is restricted from disclosure under Lapetus' Professional Services Agreement with its customers. Any documents or communications that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual would not only be Lapetus' own confidential commercial information, but also the confidential information of the respective customer. Lapetus' production of this confidential information would cause it to breach the very same confidentiality obligations

43

that the Defendants have demanded Lapetus honor as to their own Professional Services
Agreement with Lapetus.

Lapetus further objects to this Request because it demands production of
information, which if it existed, would constitute the "protected health information" as
defined in 45 C.F.R. § 160.103, for individuals whose health information was provided by
the Lapetus customer made the negative statement of Lapetus due to a specific life
expectancy estimate prepared by Lapetus for the customer having deviated from the actual
lifespan of the individual. Beyond being entirely irrelevant to the claims in this action,
disclosure of these patients' private health information is precluded by the Health
Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and
regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this
Request, it must be narrowly tailored to the needs of this case and further be conditioned
upon a confidentiality order enforceable by the Court that will, among other things, strictly
limit the review and disclosure of any documents produced to an "attorneys' eyes only"
level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an
undue financial burden on Lapetus, who is not a party in this action. The cost of any
production should be shifted to the Defendants. Compliance with the Request would
require a physical review of the entirety of Lapetus' documents to determine any that
contain a negative statement by a customer of Lapetus due to a specific life expectancy
estimate prepared by Lapetus for the customer having deviated from the actual lifespan of

44

the individual, along with a review of every internal and external communication Lapetus ever had—totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege.  Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Without waiving the foregoing objections, Lapetus states that is unaware of responsive documents that are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

**10.** ***All Documents and Communications Concerning any complaints Lapetus received Concerning its life expectancy estimates.***

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" any complaints Lapetus received "concerning" Lapetus' life expectancy estimates. The Defendant's vague and overbroad definition of the term "concerning," includes undefined and terms and

45

phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass virtually every document in the possession of Lapetus that implicates any "complaint." The Request is further objectionable as vague in that the term "complaint" is subject to various interpretations. Lapetus therefore reasonably interprets the request to mean "all documents and communications that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "all documents and communications that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in

46

its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review tens of thousands, if not hundreds of thousands, of documents in its possession, custody or control, in order to even identify those that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual, and (ii) assemble, review and produce all of its communications spanning more than a decade to uncover those that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. The Request, even as reasonably interpreted, would require Lapetus to

47

produce documents that are the confidential commercial information of Lapetus to the extent any even exist. Disclosure of such confidential information of Lapetus to Defendants—if any even exist—would cause significant and irreparable competitive harm to Lapetus because it would disclose Lapetus' internal communications with customers and would unnecessarily negatively impact Lapetus' reputation without Lapetus being able to present the same in context and provide an appropriate explanation or rebuttal.

Lapetus further objects to this Request because it demands production of Abacus' confidential information that is restricted from disclosure under Lapetus' Professional Services Agreement with its customers. Any documents or communications that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual would not only be Lapetus' own confidential commercial information, but also the confidential information of the respective customer. Lapetus' production of this confidential information would cause it to breach the very same confidentiality obligations that the Defendants have demanded Lapetus honor as to their own Professional Services Agreement with Lapetus.

Lapetus further objects to this Request because it demands production of information, which if it existed, would constitute the "protected health information" as defined in 45 C.F.R. § 160.103, for individuals whose health information was provided by the Lapetus customer made the negative statement of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual.  Beyond being entirely irrelevant to the claims in this action,

48

disclosure of these patients' private health information is precluded by the Health Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this Request, it must be narrowly tailored to the needs of this case and further be conditioned upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Compliance with the Request would require a physical review of the entirety of Lapetus' documents to determine any that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual, along with a review of every internal and external communication Lapetus ever had—totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Without waiving the foregoing objections, Lapetus states that is unaware of responsive documents that are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

*11.* **All Documents and Communications Concerning Lapetus' life expectancy calculations, estimations, projections, medical underwriting, actual-to-expected analyses, reconciliation reports, or methodologies related to Abacus, including all data related thereto.**

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" Lapetus' life expectancy calculations, estimations, projections, medical underwriting, actual-to-expected analyses, reconciliation reports, or methodologies related to Abacus, including all data related thereto. The Defendant's vague and overbroad definition of the term "concerning," includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass virtually every document in the possession of Lapetus that implicates any life expectancy services for Abacus, or the life settlement industry in which Abacus is a major participant.

50

Lapetus therefore reasonably interprets the request to mean "all documents that expressly state or identify Abacus and any communications between Lapetus and Abacus."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that expressly state or identify Abacus and any communications between Lapetus and Abacus," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. The documents of Lapetus and communications between Lapetus and Abacus have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably

interpreted, would require the production of hundreds of thousands of pages documents and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review each of the hundreds of thousands of documents in its possession, custody or control, in order to even identify those that expressly state or identify Abacus, and (ii) assemble, review and produce all of its communications with Abacus that span approximately a decade.

The Request is further unduly burdensome in that it imposes a burden upon a non-party that can easily be satisfied by first seeking the requested information from a party to this action—which Defendants have neglected to do. Any documents or communications between Lapetus and Abacus can easily be obtained from Abacus. Even there was to be a determination that certain Lapetus documents or communications are related to the claims in this action, the Request will still be unduly burdensome because they can first be sought from Abacus. It is unduly burdensome to impose upon a non-party a requirement to produce what is necessarily in the possession, custody or control of a party to this action without at least first seeking the documents from the party—much less to the magnitude requested here.

Lapetus further objects to this Request on the grounds that it seeks Lapetus'
proprietary trade secrets and other confidential research, development and commercial
information. By way of example, and without limitation, the Request, even as reasonably
interpreted, would require Lapetus to produce all of the approximately 10,000 life
expectancy reports produced by Lapetus for Abacus over approximately the past decade.
The Request would not only require Lapetus to produce its proprietary life expectancy
reports themselves, but also all of Lapetus' related internal documentation and work
product, all of which would disclose Lapetus' proprietary processes, methodologies, data
and trade secrets. The Request would further require Lapetus to disclose communications
with Abacus in which Lapetus provided opinions and memoranda which constitute
Lapetus' confidential and proprietary commercial information. Disclosure of Lapetus'
trade secrets and confidential information to Defendants—who are in the very same
industry life settlements industry—would cause significant and irreparable competitive
harm to Lapetus because it could be used by Defendants to reverse engineer Lapetus'
proprietary processes to compete with or otherwise harm Lapetus' financial interests.

Lapetus further objects to this Request because it demands production of Abacus'
confidential information that is restricted from disclosure under Lapetus' Professional
Services Agreement with Abacus. The documents and communications that are the subject
of this Request contain not only Lapetus' own proprietary and confidential data, but also
the confidential information of Abacus. Lapetus' production of Abacus' confidential
information would cause it to breach the very same confidentiality obligations that the

53

Defendants have demanded Lapetus honor as to their own Professional Services Agreement with Lapetus.

Lapetus further objects to this Request because it demands production of information constituting "protected health information" as defined in 45 C.F.R. § 160.103, for approximately 10,000 individuals whose health information was provided by Abacus in connection with Lapetus' preparation of a life expectancy report or other opinion for Abacus. Beyond being entirely irrelevant to the claims in this action, disclosure of these patients' private health information is precluded by the Health Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this Request, it must be narrowly tailored to the needs of this case and further be conditioned upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Compliance with the Request would require a physical review of the entirety of Lapetus' documents to determine which mention Abacus, along with a review of every communication Lapetus ever had with Abacus over a decade—totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and

54

legal expenses, including attorney review for confidentiality and privilege.  Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Lapetus further objects to the Request as an improper attempt to avoid discovery limitations in the currently pending state court action *Lapetus Solutions, Inc. v. Florida Office of Insurance Regulation*, Case No. 2025-CA-516 pending in the Circuit Court of the Second Judicial County in and for Leon County, Florida (the "State Court Case"), in which Coventry has intervened as party defendant.  Defendants should not be permitted to obtain as discovery in this matter documents that it cannot rightfully obtain in the State Court Case.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

*12.    All Documents and Communications Concerning press releases, website postings, conference presentations, and public remarks referencing or Concerning Abacus, Coventry, Lapetus' life expectancy estimates, or the valuation of life settlements.*

55

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" press releases, website, conference presentations, and public remarks referencing or "concerning" Abacus, Coventry, Lapetus' life expectancy estimates, or the valuation of life settlement. The Defendant's vague and overbroad definition of the term "concerning," that includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass literally every document in the possession of Lapetus. The Request is further objectionable as vague in that the term "public remark" is subject to varying interpretations and could mean, among other things, any remark made Lapetus to any person outside of Lapetus, and/or any remark by anyone on the planet other than Lapetus. Lapetus therefore reasonably interprets the request to mean "all documents and communications that contain a statement by a person other than Lapetus that is contained in a press release, website, conference presentation, periodical publication or newspaper that expressly identifies any of Abacus, Coventry, a life expectancy report of Lapetus or the valuation of life settlements."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that contain a statement by a person other than Lapetus that is contained in a press release, website, conference presentation, periodical publication or newspaper that expressly identifies any of Abacus, Coventry, a life expectancy report of Lapetus or the valuation of life settlements," is not reasonably tethered to any claims

56

asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. The such documents no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at ¶¶ 199, 214, 230, 241.* There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request is further unduly burdensome in that it imposes a burden upon a non-party that can necessarily be satisfied by obtaining the requested information from the public domain—which Defendants have neglected to do. It is unduly burdensome to

impose upon a non-party a requirement to produce what is easily obtainable by going online.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. The cost of any production should be shifted to the Defendants. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Without waiving the foregoing objections, Lapetus states that responsive documents are being withheld on the basis of its objections and that it will produce no documents responsive to this Request.

13.    ***All Documents and Communications Concerning Lapetus' decision to end operations on August 31, 2025.***

**RESPONSE:**

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" an assumed "decision to end operations on August 31, 2025." Lapetus therefore reasonably interprets the request to mean "all documents and communications that evidence the decision of Lapetus' board of directors to voluntary dissolve Lapetus as an entity."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all" documents and communications "that evidence the decision of Lapetus' board of directors

58

to voluntary dissolve Lapetus as an entity," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents of Lapetus have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably interpreted, would require the production of hundreds of thousands of pages documents and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

Lapetus further objects to this Request on the grounds that it seeks Lapetus'
proprietary trade secrets and other confidential research, development and commercial
information. The Request would require Lapetus to produce its internal documentation and
communications evidencing a monumental and intimately private corporate decision that
if made has not been revealed to the public. Disclosure of Lapetus' confidential information
to Defendants—who are in the very same industry life settlements industry—would cause
significant and irreparable competitive harm to Lapetus because it would prematurely make
public its internal decision to voluntarily dissolve and necessarily harm Lapetus' value in
seeking to maximize its value in connection with any dissolution, including without
limitation any liquidation of its assets prior to dissolution.

If the Court requires any production is required by Lapetus in response to this
Request, it must be narrowly tailored to the needs of this case and further be conditioned
upon a confidentiality order enforceable by the Court that will, among other things, strictly
limit the review and disclosure of any documents produced to an "attorneys' eyes only"
level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an
undue financial burden on Lapetus, who is not a party in this action. Should the Court
require any production in response to this Request, the cost should be shifted to Defendants,
and Defendants should be required to advance the reasonably estimated cost of compliance
before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of
documents or communication subject to the attorney-client or work product privileges.

60

Until the Court establishes the appropriate scope of production (if any) in response to this
Request, it is not possible for Lapetus to conduct the necessary privilege review and
produce any privilege log that may be required.

Without waiving the foregoing objections, Lapetus states that it has no documents
in its possession, custody or control responsive to the Request and therefore will produce
none.

*14.    **All Documents and Communications Concerning any "pressure from
some clients to raise or lower" life expectancies, including any such pressure from
Abacus, and any resulting reassessments by Lapetus.***

**RESPONSE:**

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that
it seeks the production of all documents and communications "concerning" any
"pressure from some clients to raise or lower" life expectancies, which phrase is uncertain
and subject to varying interpretations. Lapetus therefore reasonably interprets the request
to mean "all documents and communications that contain a express statement by a
customer of Lapetus to change a life expectancy estimate prepared by Lapetus for the
customer."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad,
unduly burdensome and disproportionate to the needs of this case. The request for "all"
documents and communications "that contain an express statement by a customer of
Lapetus requesting Lapetus to change a life expectancy estimate prepared by Lapetus for
the customer," is not reasonably tethered to any claims asserted by Abacus in the instant

61

proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. Any such documents have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

The Request, even as reasonably interpreted, is further unduly burdensome and disproportionate to the needs of this case as it would require Lapetus, a non-party in this proceeding, (i) to literally review tens of thousands, if not hundreds of thousands, of documents in its possession, custody or control, in order to even identify those that contain

an express statement by a customer of Lapetus requesting Lapetus to change a life expectancy estimate prepared by Lapetus for the customer, and (ii) assemble, review and produce all of its communications spanning more than a decade to uncover those that contain an express statement by a customer of Lapetus requesting Lapetus to change a life expectancy estimate prepared by Lapetus for the customer.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. The Request, even as reasonably interpreted, would require Lapetus to produce documents that are the confidential commercial information of Lapetus to the extent any even exist. Disclosure of such confidential information of Lapetus to Defendants—if any even exist—would cause significant and irreparable competitive harm to Lapetus because it would disclose Lapetus' internal communications with customers and would unnecessarily negatively impact Lapetus' reputation without Lapetus being able to present the same in context and provide an appropriate explanation or rebuttal.

Lapetus further objects to this Request because it demands production of Abacus' confidential information that is restricted from disclosure under Lapetus' Professional Services Agreement with its customers. Any documents or communications that contain a negative statement by a customer of Lapetus due to a specific life expectancy estimate prepared by Lapetus for the customer having deviated from the actual lifespan of the individual would not only be Lapetus' own confidential commercial information, but also the confidential information of the respective customer. Lapetus' production of this confidential information would cause it to breach the very same confidentiality obligations

63

that the Defendants have demanded Lapetus honor as to their own Professional Services

Agreement with Lapetus.

Lapetus further objects to this Request as unduly burdensome as it pertains to such

statements by Coventry, as it requires the production of documents that are necessarily in

the possession of Coventry

Lapetus further objects to this Request because it demands production of

information, which if it existed, would constitute the "protected health information" as

defined in 45 C.F.R. § 160.103, for individuals whose health information was provided by

the Lapetus customer made the negative statement of Lapetus due to a specific life

expectancy estimate prepared by Lapetus for the customer having deviated from the actual

lifespan of the individual. Beyond being entirely irrelevant to the claims in this action,

disclosure of these patients' private health information is precluded by the Health

Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and

regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this

Request, it must be narrowly tailored to the needs of this case and further be conditioned

upon a confidentiality order enforceable by the Court that will, among other things, strictly

limit the review and disclosure of any documents produced to an "attorneys' eyes only"

level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an

undue financial burden on Lapetus, who is not a party in this action. The cost of any

production should be shifted to the Defendants. Compliance with the Request would

require a physical review of the entirety of Lapetus' documents to determine any that contain an express statement by a customer of Lapetus requesting Lapetus to change a life expectancy estimate prepared by Lapetus for the customer, along with a review of every internal and external communication Lapetus ever had—totaling hundreds of thousands of pages—the cost of which could easily exceed $100,000 in the aggregate for internal, third-party e-discovery vendor and legal expenses, including attorney review for confidentiality and privilege.  Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Without waiving the foregoing objections, Lapetus states that is unaware of responsive documents that are being withheld on the basis of its objections other than statements made by Coventry and that it will produce no documents responsive to this Request.

*15.    All Documents and Communications Concerning audits of life expectancies required to be filed with the Office of Insurance Regulation pursuant to Section 626.99175(g)(5) of the Florida Statutes, including final submissions, drafts, and any Documents used to generate such audits.*

**RESPONSE**:

Lapetus objects to this Request as vague, overbroad and unduly burdensome in that it seeks the production of all documents and communications "concerning" audits of life expectancies required to be filed with the Office of Insurance Regulation pursuant to Section 626.99175(g)(5) of the Florida Statutes. The Defendant's vague and overbroad

65

definition of the term "concerning," includes undefined and terms and phrases including, without limitation "connected with," "bearing upon," and "touching upon" could be read to encompass virtually every document in the possession of Lapetus that implicates any life expectancy services for its customers, or the life settlement industry generally. Lapetus therefore reasonably interprets the request to mean "all audits of life expectancies required to be filed with the Office of Insurance Regulation pursuant to Section 626.99175(g)(5) of the Florida Statutes."

Lapetus objects to the Request as reasonably interpreted as irrelevant, overbroad, unduly burdensome and disproportionate to the needs of this case. The request for "all audits of life expectancies required to be filed with the Office of Insurance Regulation pursuant to Section 626.99175(g)(5) of the Florida Statutes," is not reasonably tethered to any claims asserted by Abacus in the instant proceeding. *See Amended Complaint of Abacus (Doc. No. 38) (the "Amended Complaint")*. The audits of Lapetus required to be filed with the Office of Insurance Regulation pursuant to Section 626.99175(g)(5) of the Florida Statutes have no bearing upon the falsity or misleading nature of Defendants' statements that Abacus alleges in the Amended Complaint are defamatory or otherwise injurious, i.e. that (i) Abacus manufactures its earnings, (ii) Abacus equity holders are subordinated to debt backed by life insurance policies, (iii) no companies other than Abacus utilize the services of Lapetus, (iv) Abacus improperly changes its accounting methods, (v) Abacus is about to implode, (vi) Abacus' fair market value is grossly overstated, (vii) Abacus uses life expectancy reports prepared by Lapetus to value Abacus' assets on its own balance sheet, (viii) engages in dishonest accounting, (ix) Abacus' lies in

66

its annual report, (x) that Abacus lied when it stated Lapetus produces the most conservative reports in the life settlements industry, (xi) Abacus will go bankrupt, (xii) Abacus does not fairly value its assets, (xiii) Abacus improperly reports unrealized gains, and (xiii) Abacus engages in stock manipulation. *See Amended Complaint at* ¶¶ 199, 214, 230, 241. There is no affirmative defense to which the Request could possibly relate, as Defendants have not answered the Amended Complaint. The Request, even as reasonably interpreted, would require the production of thousands, if not tens of thousands, of pages documents and communications that have no bearing on this case.

The Request is further objectionable as the timeframe of January 1, 2022, through the present is overbroad and unduly burdensome, far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint.

Lapetus further objects to this Request on the grounds that it seeks Lapetus' proprietary trade secrets and other confidential research, development and commercial information. By way of example, and without limitation, the Request, even as reasonably interpreted, would require Lapetus to produce all of the audits required to be filed with the Office of Insurance Regulation pursuant to Section 626.99175(g)(5) of the Florida Statutes by Lapetus for Abacus over more than a decade.   The Request would not only require Lapetus to produce its proprietary life expectancy reports themselves, but also all of Lapetus' related internal documentation and work product, all of which would disclose Lapetus' proprietary processes, methodologies, data and trade secrets. The Request would further require Lapetus to disclose communications which contain and constitute Lapetus' confidential and proprietary commercial information. Disclosure of Lapetus' trade secrets

67

and confidential information to Defendants—who are in the very same industry life

settlements industry—would cause significant and irreparable competitive harm to Lapetus

because it could be used by Defendants to reverse engineer Lapetus' proprietary processes

to compete with or otherwise harm Lapetus' financial interests.

Lapetus further objects to this Request because it demands production of Abacus'

confidential information that is restricted from disclosure under Lapetus' Professional

Services Agreement with Abacus. The documents and communications that are the subject

of this Request contain not only Lapetus' own proprietary and confidential data, but also

the confidential information of Abacus. Lapetus' production of Abacus' confidential

information would cause it to breach the very same confidentiality obligations that the

Defendants have demanded Lapetus honor as to their own Professional Services

Agreement with Lapetus.

Lapetus further objects to this Request because it demands production of

information constituting "protected health information" as defined in 45 C.F.R. § 160.103,

for approximately thousands of individuals whose health information was provided by a

customer of Lapetus in connection with Lapetus' preparation of the life expectancy report

filed with the relevant audit. Beyond being entirely irrelevant to the claims in this action,

disclosure of these patients' private health information is precluded by the Health

Information Portability and Accountability Act of 1996 ("HIPAA"), as amended, and

regulations promulgated thereunder.

If the Court requires any production is required by Lapetus in response to this

Request, it must be narrowly tailored to the needs of this case and further be conditioned

upon a confidentiality order enforceable by the Court that will, among other things, strictly limit the review and disclosure of any documents produced to an "attorneys' eyes only" level of restriction in order to protect Lapetus' viable commercial interests.

Lapetus further objects to the Request as unduly burdensome because it imposes an undue financial burden on Lapetus, who is not a party in this action. Should the Court require any production in response to this Request, the cost should be borne by Defendants, and Defendants should be required to advance the reasonably estimated cost of compliance before production is undertaken by Lapetus.

Lapetus further objects to the Request to the extent that it requires the production of documents or communication subject to the attorney-client or work product privileges. Until the Court establishes the appropriate scope of production (if any) in response to this Request, it is not possible for Lapetus to conduct the necessary privilege review and produce any privilege log that may be required.

Lapetus further objects to the Request as an improper attempt to avoid discovery limitations in the currently pending state court action *Lapetus Solutions, Inc. v. Florida Office of Insurance Regulation*, Case No. 2025-CA-516 pending in the Circuit Court of the Second Judicial County in and for Leon County, Florida (the "State Court Case"), in which Coventry has intervened as party defendant. Defendants should not be permitted to obtain as discovery in this matter documents that it cannot rightfully obtain in the State Court Case.

Without waiving the foregoing objections, Lapetus states that responsive documents
are being withheld on the basis of its objections and that it will produce no documents
responsive to this Request.

Date: September 26, 2025.          Respectfully submitted,

*/s/Paul N. Mascia*
Paul N. Mascia, Esq.
Florida Bar No. 0489670
Michael A. Nardella, Esq.
Florida Bar No. 051265
**Nardella & Nardella, PLLC**
135 W. Central Blvd., Ste. 300
Orlando, Florida 32801
Phone: (407) 966-2680
Facsimile: (407) 966-2681
Email: pmascia@nardellalaw.com
Email: mnardella@nardellalaw.com
Secondary email: rsanchez@nardellalaw.com

*Counsel for Lapetus Solutions, Inc.*

70

## <u>CERTIFICATE OF SERVICE</u>

Lapetus Solutions, Inc., by and through undersigned counsel, certifies that on

September 26, 2025, a true and correct copy of the foregoing has been served on counsel

Defendants via email to the email addresses set out in the Service List below.

### <u>SERVICE LIST</u>

Alfred J. Bennington, Jr.
Glennys Ortega Rubin
Benjamin Elliott,
SHUTTS & BOWEN LLP
300 South Orange Ave.
Suite 1600
Orlando, FL 32801
Telephone: (407) 423-3200
Facsimile: (407) 425-8316
bbenington@shutts.com
grubin@shutts.com
belliott@shutts.com

Andrew Levander (pro hac vice)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
andrew.levander@dechert.com

*/s/ Paul N. Mascia*
Paul N. Mascia, Esq.

71

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Orlando Division

| | |
|---|---|
| ABACUS GLOBAL MANAGEMENT, INC., a corporation, | Case No.: 6:25-cv-01401-RBD-RMN |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual, | |
| Defendants. | |

Plaintiff Abacus Global Management, Inc. ("Abacus" or the "Company"), by and through its undersigned counsel, brings this First Amended Complaint against Coventry First LLC ("Coventry") and its co-founder and Executive Chairman Alan Buerger ("Buerger") (collectively, "Defendants") and pleads as follows:

## NATURE OF THE ACTION

1.      Founded two decades ago, Abacus entered the life settlements business with a distinctive business model predicated on transparency and fair pricing.  Unlike its competitors who operate through opaque valuation processes, Abacus built its reputation—and its status as the industry's only

publicly traded company—by providing policyholders with unprecedented access to policy valuations through its proprietary Life Settlement Calculator. This tool enables policyholders to understand the net present value ("NPV") of their policies, fundamentally altering the traditional information asymmetry that has long characterized this market. The result is that Abacus consistently pays higher prices as a percentage of each policy's face value than its competitors—a premium that reflects both its commitment to transparency and the competitive advantage such transparency creates.

2.     This approach has proven commercially successful: After steadily growing for years, the Company's quarterly revenues have quadrupled since 2023. Today, Abacus acquires over 25% of all life insurance policies sold in first-time life settlement transactions, and its market share continues to increase.

3.     Coventry is a direct competitor of Abacus in the life settlements space. Rather than embracing transparency as Abacus has done, Coventry has gone on a very different journey over the last twenty years. Coventry's pattern of misconduct is extensive and well-documented. Coventry faced bid-rigging charges from the Office of the New York Attorney General, and it settled a multi-billion-dollar fraud case brought by insurance giant AIG. A federal Court of Appeals characterized Coventry's policy origination practices

as "*illegal*." Unlike Abacus, Coventry operates without pricing transparency, concealing its valuation methodology from policyholders while simultaneously representing to investors that it achieves profit margins of 40–60% or more on individual policies—a spread made possible only by systematically undervaluing policyholder assets. Coventry can afford to operate this way because it is not a publicly traded company like Abacus, and thus faces less regulatory scrutiny and fewer disclosure obligations. And despite generating profits by acquiring policies substantially below what Abacus deems to be a fair representation of NPV, Coventry is losing market share to Abacus every year.

4. Unable to match Abacus's transparent pricing model or market performance, Coventry's co-founder and Chairman, Alan Buerger devised a scheme to undermine Abacus through false and misleading statements: convince the market that Abacus pays policyholders ***too much*** for their policies—and that this alleged "overvaluation" (which amounts to paying a policyholder too large of a lump sum payment for their life insurance policies) is fraudulently reflected in Abacus's ***audited*** financial statements, thus artificially inflating the Company's stock price. In other words, according to Coventry, the very business model that Abacus uses to deliver greater value and higher monetary payments to policyholders is actually a massive fraud against its shareholders—a baseless and defamatory narrative.

3

5. In spreading these falsehoods, Coventry deliberately ignores Abacus's consistent and legally mandated disclosures that policies on its balance sheet are valued "under the fair value method"—that is, market price, which is fundamentally distinct from the NPV used in the Life Settlement Calculator for policyholder transactions. The statements by Coventry and Buerger, also ignore fundamental realities of the life settlements business and are designed to confuse the investing public.

6. Since the beginning of 2024, Coventry and Buerger have routinely disseminated false and misleading statements about Abacus, in particular targeting Abacus's relationship with Lapetus Solutions, Inc. ("Lapetus"), a third-party life expectancy estimate provider that recently dissolved because of Defendants' conduct. Defendants' core claim is that Lapetus life expectancies are too short, and that Abacus relies on those estimates to intentionally overvalue the policies it buys and sells.

7. This is false, misleading, and defamatory for several reasons, including that:

    a. Lapetus life expectancies are not less accurate than the estimates of any other life expectancy provider;

    b. Abacus considers life expectancy estimates from at least half a dozen providers, and thus does not solely or even primarily rely on Lapetus life expectancies;

4

c. Abacus does not use a life-expectancy-based methodology to value the policies on its balance sheet; it instead uses a market-based valuation approach;

d. Abacus's market-based valuation methodology consistently values the policies on its book within Abacus's stated margin of error of 2%; and

e. Neither Coventry nor Buerger have explained why, if they consider Lapetus estimates to be incorrect, ***Coventry has purchased Lapetus life expectancies <u>over 4,000 times</u>***, both before ***and after*** Lapetus rebuffed Buerger's attempts to interfere with Lapetus's life expectancy methodology.

8. Coventry, and in particular Buerger, have intentionally made false and misleading statements about Abacus and its use of Lapetus. They did this through self-proclaimed independent but paid studies that purport to show that Lapetus underestimates life expectancy, causing Abacus to overpay policyholders, and then overvalue the policies on its book. From May 2024 to June 2025, Defendants spread these false claims across a wide range of audiences, each deliberately chosen to inflict maximum harm on Abacus. Coventry presented its lies to Abacus's auditor, Grant Thornton; market analysts that track Abacus's stock, such as TD Securities; and government agencies, including the Securities and Exchange Commission ("SEC").

5

Coventry then filed and voluntarily dismissed a meritless lawsuit, for which it had no standing, against the Florida Office of Insurance Regulation ("OIR"), seeking Lapetus's audit records. Coventry's OIR filing included even more false and malicious claims, including that Abacus "is a publicly traded company whose shareholders' investments are dependent" upon Lapetus life expectancy estimates.

9. Despite Defendants' defamatory campaign, Abacus's financial performance has continued to demonstrate the falsity of Defendants' claims. In the first quarter of 2025, Abacus reported a 105% increase in year-over-year revenue; a 111% increase in year-over-year adjusted EBITDA; and a 158% increase in adjusted year-over-year net income. This explosive growth is inconsistent with Defendants' implication that Abacus is ***overpaying*** for its core assets in economically inefficient transactions—because Defendants' claim is false.

10. Defendants needed to do more to stop Abacus's forward momentum. So Buerger—giving an interview in his capacity as Coventry's chairman and founder—took these insinuations to the next level in a May 22, 2025 interview with Tegus, Inc., a financial expert network (the "Tegus Interview"). In a barely five-page transcript, Buerger accused Abacus of "manufactur[ing] earnings," said that its "stockholders . . . will be subordinated to the asset-backed debt, which is to say they will all be wiped

out when this thing goes upside down," repeated that Abacus was "us[ing] Lapetus . . . primarily," and predicted, "it's just a matter of time before [Abacus] implode[s]."

11.     Buerger claimed to speak with authority about Abacus, calling the Company his "***pet project***."   An authority Buerger apparently also developed by attending all or virtually all of Abacus's earning calls since 2023, including on August 7, 2025, weeks after Abacus filed its initial complaint.   Claiming to "know every public document" Abacus has filed, Buerger apparently ignored that Abacus clearly and repeatedly disclosed: (i) Abacus's financial statements and internal controls over its financial reporting have been found in compliance with Generally Accepted Accounting Principles ("GAAP") by a respected public company auditor, Grant Thornton, in every annual audit since the Company's inception; (ii) Abacus has zero "asset-backed debt"; and (iii) Abacus has ***never said that it uses Lapetus to value the assets on its balance sheet, nor has it ever done so***.

12.     These false statements were made with full knowledge of their inaccuracy in light of Buerger's claim that he has read each and every one of Abacus's SEC filings.   On June 4, 2025—the same morning that Buerger's Tegus Interview was published and/or circulated to Tegus subscribers, including some of Abacus's largest stockholders—the other shoe dropped.

13.     For over a year, Defendants have been soliciting multiple short sellers to write a hit piece on Abacus, regurgitating the same false claims about Lapetus and Abacus's pricing practices and valuation methodology.  At least one prominent short seller turned them down because the narrative that senior citizens are making ***too much money*** from selling their insurance policies is not a compelling story.  But, eventually, short seller Morpheus Research L.L.C. ("Morpheus") agreed to participate in Defendants' smear campaign.  The same morning the Tegus Interview with Buerger was released to investors, Morpheus released a report (the "Short Report") citing Coventry's "research" on Lapetus and quoting some of Defendants' most inflammatory accusations, under the title:  "Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die."  Within minutes, Abacus stock (NASDAQ: ABL) dropped over 21%, erasing more than $157 million in market capitalization in a single day, and roughly $287,400,000 over the next four weeks.

14.     Defendants' relentless campaign against Abacus has caused substantial harm to the Company and its stockholders.  Defendants' false narrative attempts to project Coventry's own financial vulnerabilities onto Abacus, but the facts demonstrate otherwise.  The market analysts who came to Abacus's defense after the Short Report recognize the truth:  Abacus's

8

transparent approach is a ray of sunshine in an otherwise beleaguered industry, and that explains its rapid rise.

15.     Yet many Abacus investors have raised concerns in the wake of the Tegus Interview and the Short Report that parrot the same false statements Defendants have been making for over a year.  Critically, these investors have focused on the parts of the Short Report that simply repeat Defendants' prior defamatory remarks, such as that "[Abacus's] fair market value is grossly overstated" and that "[f]unds and companies like Abacus that rely on Lapetus . . . could soon face growing challenges with serious consequences for investors."

16.     In fact, ***Buerger is communicating directly with Abacus investors and disseminating Coventry's misleading "studies" of Lapetus***.  Of course, Buerger's communications omit that Lapetus has thoroughly rebutted Coventry's one-sided studies with its own independent report, which has caused market analysts to conclude that "there is no evidence that [Lapetus] under-estimates [life expectancy]."

17.     To be clear, this case is not about legitimate competitive practices or good faith criticism of a competitor's business model.  Competition through superior products, services, or pricing benefits consumers and strengthens markets.   Defendants' conduct, however, crosses the line from lawful competition into tortious interference and defamation.   Rather than

competing on the merits by offering policyholders better terms or more transparent pricing, Defendants have chosen to attack Abacus through a systematic campaign of false and misleading statements designed to damage Abacus's reputation, confuse its customers, and undermine investor confidence. This calculated campaign to harm a competitor through deception and falsehoods rather than through a legitimate business strategy has no place in a properly functioning marketplace.

18. Abacus therefore brings this action to put an end to Defendants' unjust and anticompetitive scheme of spreading false and misleading statements about Abacus's business, and to restore its reputation. Abacus seeks compensation for the substantial economic and reputational harm Defendants' falsehoods have caused.

## **PARTIES AND JURISDICTION**

19. Abacus is a corporation organized under the laws of the state of Delaware with its principal place of business in Orlando, Florida.

20. Coventry is a limited liability company organized under the laws of Delaware, with its principal place of business in Fort Washington, Pennsylvania. ECF No. 1 (Defendants' Notice of Removal) ¶ 20. According to Coventry, it has one member—Dash Investments LLC ("Dash")—which has its principal place of business in Fort Washington, Pennsylvania. *Id.* ¶ 22. Dash in turn has two members—the Buerger 2003 Family Trust and Alan H.

10

Buerger 2003 Trust for Reid S. Buerger—that Coventry contends are citizens of Pennsylvania. *Id.* ¶¶ 23–24. In short, Coventry contends it is a citizen of Pennsylvania. *Id.* ¶ 31. Coventry is also registered and licensed to do business in Florida.

21. Alan Buerger, the co-founder and Executive Chairman of Coventry, is a citizen of the state of Pennsylvania.

22. The Court has subject matter jurisdiction over this case pursuant to Section 1332(a)(3) of Title 28 of the U.S. Code because the suit is between citizens of different States and the amount in controversy is in excess of $75,000, exclusive of interest, costs, and attorneys' fees.

23. This Court has personal jurisdiction over Defendants, pursuant to Federal Rule of Civil Procedure 4(k)(1)(A). Defendants engage in substantial and not isolated activity within the state of Florida. This Court also has personal jurisdiction over Defendants because the causes of action in this Amended Complaint arising from Defendants acts were committed within this state and caused injury to a citizen of this state.

24. Venue is proper in the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District, and Abacus has suffered significant reputational and economic harm within this District as a direct result of Defendants' conduct.

11

## FACTUAL BACKGROUND

I. **ABACUS AND COVENTRY COMPETE IN A GROWING MARKET.**

A. **A New Asset Class For An Uncertain Time**

25.     While life insurance often provides the policyholder and their family with peace of mind, in most cases it fails to deliver a financial benefit.

26.     Of the approximately $13 trillion in potential benefits currently underwritten in the United States, insurance industry forecasts predict that over 90% will never pay out, due to the policyholder's inability to pay the premiums necessary to keep the policy in force.

27.     As a result, many policyholders end up wasting the value built up in their policies, even though life insurance is considered valuable and transferable personal property. *See Grigsby v. Russell*, 222 U.S. 149 (1911).

28.     The life settlements industry helps solve this problem by allowing policyholders the opportunity to monetize their policies.  A "life settlement" transaction allows the original policyholder to sell their life insurance policy to a licensed third party at the policy's then-NPV, where NPV equals the face value of the policy upon maturity and any future premium payments discounted to the present, with the total forecasted discounting period being based on the policyholder's life expectancy at the time of the settlement.

29.     In a typical life settlement transaction, the original policyholder receives a lump-sum cash payment, which can be quite meaningful because life insurance is often a senior citizen's largest asset (including their home). On average, life settlements companies pay sellers nearly eight times more than the current cash surrender value the seller could get from their insurance carrier.  Sellers are freed from paying premiums, and are able to use the proceeds to support their retirement, transfer wealth, and pay medical bills.

30.     In exchange, the purchaser in a life settlement transaction receives the right to collect the face value of the policy at maturity, provided that the purchaser maintains the premiums as required under the original insurance contract.

31.     For the same reasons that life insurance offers peace of mind to the original policyholder, life settlements are a very stable investment.  The payouts under life insurance policies are cash reserved by highly-rated insurance companies and not correlated to market trends.

32.     Abacus estimates that the scale of the life settlements market opportunity is $233 billion each year, yet only 2% of those policies are captured in life settlement transactions, which means this market offers significant growth opportunities.

## B.     The Life Settlements Value Proposition

33.     After the initial issuance of a life insurance policy, life insurance policies are sometimes bought and sold in two distinct markets.  Transactions in which the policy passes from the policyholder to a licensed life settlements provider occur in what is known as the "secondary market."  Transactions in which the policy passes from one investor (including the life settlements providers like Abacus and Coventry) to another investor interested in this new alternative investment opportunity occur in the "tertiary market."

34.     As life settlements providers, Abacus and Coventry can operate in both markets, and realize their profits by optimizing policy value in between the purchase from the policyholder and the sale to the investor.

35.     Neither Abacus nor Coventry are insurance providers.

### 1.     The Secondary Market and the Role of Life Expectancy Estimates

36.     The price paid in a secondary transaction takes into account the value of the policy to the original policyholder, meaning that it assumes the only alternatives to selling the policy are making premium payments to keep the policy in force, or allowing the policy to lapse—which would result in a loss of the death benefit.

37.     Defendants, having operated in the secondary market for life settlements for over four decades, know that the NPV of a particular policy

generally depends on the characteristics of the policy—such as the amount of remaining premiums to be paid and the face value of the policy—as much as, if not more, than the policyholder's life expectancy, ("LE" or collectively, "LEs").  While buyers in the secondary market look to LEs (both from third-party providers and the buyers' own internal estimates) as one data point when pricing a transaction, the potential to generate positive cash flows from a life settlement transaction depends on, among other things:

    a.  The age of the insured (irrespective of life expectancy or present health conditions);

    b.  The carrier underwriting the policy;

    c.  The annual premiums relative to the size of the death benefit;

    d.  Risk of loss, which includes (i) the probability that the owner of the policy will have to pay more in premiums than the face value of the death benefit before the insured passes away; and (ii) the probability that the insured will outlive the coverage of the policy;

    e.  The desired internal rate of return of the potential investment in the underlying life insurance policy; and

    f.  The purchaser's cost of capital.

38.     LEs (whether generated by a third-party or an internal analysis) do not dictate those variables, or the relative weight that potential buyers and sellers will give to each of them.  Some of the relevant pricing factors are immutable, like the insured person's age; other pricing factors are creatures of contract and may be reduced, like the monthly premiums.

39.     When a life settlements provider like Abacus considers whether to buy a policy, and how much to pay, it considers the totality of these factors, not just LEs.  For example, Abacus realizes significant value from optimizing the premium payment schedule of its policies.  Therefore, the relative length of the insured's life, whether estimated too short, too long, or just right, is not dispositive of any decision to purchase a policy, or the price paid.

40.     Companies like Abacus and Coventry use an array of LE providers in addition to their internal estimates:  they buy policies that have more than one LE from different providers; they also buy policies without the aid of any LE.

41.     In at least a quarter of its secondary market purchases, Abacus has zero control over what LE is used, because those policies are immediately sold to an investor, with that investor dictating which LE (if any) will be used to price the deal.

42.     It is even common in secondary market transactions for a life settlements provider like Abacus or Coventry to obtain an LE, disagree with

the result, and ignore it based on their own internal analysis. That is because it is well-known in the industry that certain LE providers have different strengths (*e.g.*, when assessing a particular health condition, or when assessing a relatively young insured's life).

43.     Therefore, while a difference in estimated life expectancy is of the utmost importance to an insured person and their loved ones, neither the identity of the LE provider, nor the methodology that particular provider uses, dictates the price that Abacus or any other buyer will ultimately pay for that individual's insurance policy.

44.     Coventry and Buerger are well aware of these dynamics in the secondary market, because they frequently compete with Abacus for the rights to particular policies.

### 2.     The Tertiary Market

45.     Tertiary sales of policies—*e.g.*, from one investment fund to another investment fund—operate like sales of other fixed-income assets that trade over-the-counter, such as mortgages or collateralized loan obligations. The buyers in the tertiary market are not licensed intermediaries and do not interact with the insured. The buyers in the tertiary market are investors, and the discount rate they apply to policies they purchase is primarily driven by the investor's costs of capital, and the current supply and demand of policies; thus, individual life expectancy estimates are far less important.

17

46. Buyers in the tertiary market—frequently large institutional investors seeking exposure to the uncorrelated yield of life settlements— typically do not buy policies one at a time. Rather, tertiary market buyers generally buy groups of policies in pools, assessing the risk and appropriate discount rate on a pool-wide basis.

47. The buyers in the tertiary markets have their own internal pricing models, LEs, and diligence processes to arrive at the ideal price for their investments in life settlements. Because many tertiary market buyers are general partners of investment funds, it is not unusual for those buyers to rely primarily on a single life expectancy provider to ensure consistent daily and weekly marking of the fund units backed by their array of policy acquisitions.

48. Abacus has realized trade spreads (gains-on-sale for policies sold) in excess of 20% each of the last six fiscal quarters. These gains do not reflect a particular method for calculating life expectancy; rather, they reflect Abacus's competitive edge and ability to optimize premium schedules by identifying the true cost of insurance for a particular policy, thereby reducing cash outflows and maximizing upside.

49. Abacus's trade spreads also reflect the high demand for policies in the tertiary market by investors who are unable or unwilling to overcome the high barriers to entry in the secondary market. Life settlements

providers like Abacus undertake substantial costs related to licensing, origination, and marketing so that they may purchase policies directly from the insured persons. The trade spreads reflect the premium investors are willing to pay for Abacus's access to this market.

50. As discussed in further detail below (*infra* ¶¶ 68–76), Abacus's valuation of policies it holds on its balance sheet reflects its historical success in realizing these trade spreads in the tertiary market. Just like Abacus, the sophisticated institutional investors that buy policies from Abacus use an array of LE providers and take LEs into account in their own way. The prices reached between the willing seller (Abacus) and each willing buyer are the product of all of the factors discussed above (*supra* ¶ 37), from the perspective of both sides of the deal.[1]

51. Again, Defendants are keenly aware of these market dynamics, and the unimportance of individual LE providers with respect to those dynamics, because they are Abacus's largest competitor in the tertiary market.

---

[1] If, as Coventry has suggested, (i) the LE was a determining factor in price; and (ii) one LE provider was consistently wrong in one direction (say, if their LEs were too short); and (iii) Abacus relied on that LE provider to value either the policies on its book or a large portion of the policies it sought to trade, then Abacus would be systematically overpricing its policies relative to fair market value, it would not be able to find sophisticated repeat trading partners, and its business would be shrinking. But because none of the preceding conditions is true, Abacus is only getting larger and gaining more market share.

## II.    ABACUS AND COVENTRY HAVE A HISTORY OF DOING BUSINESS IN VERY DIFFERENT WAYS.

52.    On a surface level, Coventry and Abacus both fill the intermediary role of buying policies on the secondary market and trading them on the tertiary market.  But each company's practices shed light on the current state of the life settlements space and expose Defendants' motives for attacking Abacus.

### A.    Coventry's Checkered History

53.    Coventry claims on its website to have coined the term "life settlement" in 1998.  It has also garnered more than its fair share of negative attention for how it has sourced the life insurance policies it purchases.

54.    Upon information and belief, Coventry first began buying life insurance policies on the secondary market in 2000.  Upon information and belief, Coventry generates profits well above industry standards in many cases by paying policyholders less than a fair price for their policies. Coventry has bragged to investors that it can realize 40–60% profits on a given policy, up to three times the average Abacus realizes.

55.    Over the next two decades, these high profit margins lifted Coventry to the top of the life settlements business in terms of total policies purchased and total revenue.  Coventry grew to dominate the secondary market—in 2022, Coventry and its wholly-owned affiliate Life Equity LLC

bought 52.1% of the life insurance policies sold by policyholders in the United States.

56.     This growth did not come without criticism, or, indeed, legal exposure.   In 2006, the Office of the New York Attorney General accused Coventry of bid-rigging and aiding and abetting breaches of fiduciary duty perpetrated by insurance brokers against their clients. *See* Complaint, *New York v. Coventry First LLC, et al.*, Index No. 0404620/2006, 2006 WL 6199670 (N.Y. Sup. Ct. Oct. 26, 2006).

57.     The next year, OIR opened an investigation into Coventry for similar practices, which resulted in a consent order requiring Coventry to adopt a remedial business plan. *In re Coventry First LLC*, No. 88270-06-CO (Fla. OIR Sept. 28, 2007).[2]

58.     Coventry has also been a leading player in the so-called "stranger-originated life insurance" ("STOLI") space, which refers to the practice of a lender providing up-front financing of life insurance policies for seniors who could not otherwise afford to obtain them, in exchange for the lender taking control of the policy after a reasonable interval.   STOLI policies have been highly controversial.

---

[2]   *Available at* https://floir.com/docs-sf/default-source/life-and-health/coventryfirst88270-06-co.pdf?sfvrsn=214bcecb.

Case 6:25-cv-01401-RBD-RMN   Document 64-1   Filed 09/18/25   Page 22 of 81 PageID 841
Case 3:25-mc-00169   Document 1-3   Filed 12/18/25   Page 22 of 255
PageID 1698

59.     As discussed in a 2010 report from the SEC's Life Settlements Task Force, STOLI policies are "inconsistent with the historical social policy of insurance, which is to protect families and businesses from potential economic hardship caused by untimely death of the insured," "may encourage insurance fraud," and "could make life insurance more expensive."[3]

60.     Moreover, several courts across the country have expressly held that STOLI policies, and particularly ***Coventry's STOLI policies***, are "***illegal***" insofar as they allow a third party to take out an insurance contract for a life in which they do not have an insurable interest.  In *Estate of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186 (11th Cir. 2021), the Eleventh Circuit explicitly upheld a lower court ruling invalidating an insurance policy, the circumstances of which "[did] not show [the insured], [the broker], and Coventry intended to purchase the Policy for lawful insurance purposes. . . .  Rather, the arrangement appears to . . . create an illegal wagering contract by which Coventry gambled on [the insured's] life and from which Coventry and [the broker] profited."  *Id.* at 1196–97.

## B.     Abacus Empowers Its Clients And Its Investors.

61.     Abacus has built its business on a fundamentally different model than Coventry's.  Rather than buying low from seniors and selling high to investors, Abacus is developing a comprehensive suite of products and

---

[3] Life Settlements Task Force, Staff Rep. to U.S. Sec. & Exch. Comm'n 12–13 (2010), https://www.sec.gov/news/studies/2010/lifesettlements-report.pdf.

solutions around the life settlement asset to serve a variety of stakeholders. As the only publicly-traded life settlements company, Abacus functions as both an originator and market maker of this asset; it also publicly discloses its valuation methodologies and financial statements.

62.     Abacus has purchased $10 billion in face value of policies since 2004. Abacus Global Management, Inc., Annual Report (Form 10-K), at 2 (Mar. 28, 2025) ("Abacus 2024 Form 10-K"). In 2023, the Company went public through a de-SPAC transaction with East Resource Acquisition Company. The next year, Abacus purchased 22% of the face value of policies sold on the secondary market.

63.     Abacus is committed to expanding the underlying premise of life settlements—that one's lifespan can be treated as a monetizable asset—into newly profitable investment strategies beyond the ultimate maturity of the underlying policies. Abacus has expanded its reach and built its reputation in large part through the "Abacus Pays" portal, a free online policy value calculator that informs policyholders of the approximate NPV of their policy based on basic demographic characteristics, policy type, and face value. This transparency, in marked contrast to Coventry's practices, has resulted in Abacus making larger life settlement payments to policyholders, measured as a percentage of policy face value, than its competitors.

64.     Today, four divisions of the public entity, Abacus Global

Management, Inc., are driving its growth:

   a.  **Abacus Life Solutions** buys policies in individual secondary life
       settlement transactions, and specializes in raising awareness
       among consumers of the life settlement path, including through
       direct marketing and by outreach to financial advisors and their
       client networks.

   b.  **Abacus Asset Group** serves "institutional investors alongside
       select private clients, providing excess returns across the risk-
       reward spectrum" through a suite of public and private fund
       offerings.

   c.  **Abacus Wealth Advisors** is a registered investment adviser
       leveraging more than two decades of proprietary data and
       algorithms that helps financial advisors create customized plans
       based on clients' health, longevity, and overall financial
       wellbeing.

   d.  **ABL Technologies** creates technology products that are
       revolutionizing the life planning industry by processing and
       analyzing an ever-expanding universe of mortality data, not only
       improving the precision of pricing that the Life Solutions division
       can offer to policyholders, but also delivering valuable data
       resources to pension funds, government agencies, and insurance-
       related businesses that may struggle to track members and
       beneficiaries without cutting-edge tools. The division has
       developed platforms that conduct real-time mortality verification,
       locate missing participants, and service the secondary life
       insurance market with unprecedented speed and accuracy.

65.     In addition, on October 16, 2024, a newly-organized Abacus

affiliate, ABL Longevity Growth and Income Fund (the "Fund"), filed a

preliminary prospectus with the SEC, seeking approval to launch an interval

fund—a specialized type of investment company that continually offers

shares for purchase, but only permits repurchase or sale of shares on a

quarterly basis.  ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (Oct. 16, 2024).[4]

66.   The Fund is a vehicle for extending the opportunities that institutional investors realize through the Abacus Asset Group to a broader class of retail investors.

67.   The Fund is purpose-built to act as a buyer on the tertiary market.  Unlike Abacus Life Solutions, the Fund does not participate in secondary market purchases, and will not reach out to policyholders directly, nor will the Fund buy any policies from any Abacus affiliate (which is expressly prohibited by the Investment Company Act of 1940).

## III.   ABACUS AND ITS AFFILIATES MAKE CLEAR AND CONSISTENT DISCLOSURES REGARDING THEIR VALUATION METHODOLOGIES.

### A.   Abacus Uses A Fair Value Approach.

68.   Beginning in October 2024, Coventry launched a campaign falsely claiming that Abacus misrepresents the value of policies on its balance sheet.  Coventry's central accusation—that Abacus uses Lapetus life expectancy estimates to inflate the value of policies on Abacus's books—is demonstrably false, as Abacus's public disclosures make clear.

---

[4]  The Fund recently filed updated N-2s on June 17, 2025 and August 15, 2025.  *See* ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (June 17, 2025); ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (August 15, 2025).

69.     For one thing, Abacus has never stated that it uses a single life expectancy provider for any part of its deal flow or valuation.  For another, ***as it has repeatedly disclosed, Abacus does not use a life expectancy valuation model to value the policies on its balance sheet* (instead, it uses tertiary market-based fair value accounting pursuant to GAAP)**.

70.     Using a single LE as the predominant variable in fair value analysis that reflected trade spreads would be inappropriate, because the parties with whom Abacus trades do not price policies based on a single LE— they take into account the broader set of inputs set forth above (*supra* ¶ 37).

71.     For the vast majority of its policies, Abacus realizes revenues from trading the policies to investors, not from claiming the death benefit. The trade value of the policy is far more salient than the anticipated cash flows from holding a policy until maturity.

72.     Therefore, the fair value calculation Abacus actually uses reflects the value it could reasonably expect to capture in a subsequent transaction.

73.     As of 2025, over 99% of the policies on the Company's balance sheet were valued using the fair value method, which dictates "fair value as ***an exit price*** representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly

Case 6:25-cv-01401-RBD-RMN Document 64 Filed 09/18/25 Page 27 of 26 PageID 846
Case 3:25-mc-00169 Document 1-3 Filed 11/18/25 Page 27 of 26 Page 255
PageID 1703

transaction between market participants at the measurement date." Abacus

2024 Form 10-K at 80 (emphasis added).[5]

74.    The annual report reminds investors (and competitors, should they be reviewing each and every filing, as Buerger claims he does) that "fair value is a market-based measurement," which "reflect[s] assumptions about what factors market participants would use in pricing life settlement policies." *Id.*

75.    These disclosures indicate that Abacus values over 99% of the policies on its balance sheet based on assumptions about the value of tertiary market transactions.

76.    Since Abacus became a public company, Grant Thornton, a reputable public accounting firm, has audited the Company's consolidated financial statements and has issued unqualified opinions, including as to this valuation approach.

---

[5] Abacus values the life insurance policies on its balance sheet in accordance with ASC 325-30, *Investments in Insurance Contracts*. As explained in the Company's most recent annual report, dated March 28, 2025:

> For all policies purchased after June 30, 2023, the Company accounts for these under the fair value method. For policies purchased before June 30, 2023, the Company elected to use either the fair value method or the investment method (cost, plus premiums paid). The valuation method is chosen upon contract acquisition and is irrevocable.

*Id.*

### B.    The Fund Uses A Fair Value Approach.

77.    The Fund is a separate pending investment product, and the value of which will be based on assets other than those Abacus holds on its balance sheet.  As part of the SEC registration process, which is still ongoing, the Fund also discloses its valuation methodology.  In the most recent Form N-2 filed with the SEC before Buerger's most recent inflammatory statements (*see infra* ¶¶ 143–151), the Fund disclosed that it relies on "[t]he Valuation Methodology developed by ABL Technologies that is leveraged by the Manager, enabl[ing] the Manager to deploy a dual criterion evaluation system."  ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2) at 3 (Apr. 14, 2025) ("April 14 Form N-2").  The two criteria are as follows:

> a.  "The first criterion focuses on the valuation of Mortality Contracts using a defined risk-adjusted market discount rate, coupled with a projected life expectancy. ***The market discount rate is derived from ABL Technologies' proprietary database of historical transactions completed by the Sponsor and its affiliates that span the prior rolling five-year period***, which are then adjusted for policy specific risks (including factors such as life expectancy, maturity date, and premiums)."

> b.  "The second criterion derives its valuation from the cost basis of the Mortality Contract and is adjusted based upon our risk-adjusted historical trade spread. This inclusion allows the Fund to consider the dynamics of ***historical trading of over 1,000 realized Mortality Contract trades spread on average***, evenly over the prior five-year period."

*Id.* at 3–4 (emphasis added).

28

Case 3:25-mc-00169-RBM Document 64 Filed 09/18/25 Page 29 of 82 PageID 855
Case 2:25-cv-01401-RBM Document 38 Filed 09/18/25 Page 29 of 82 Page 848
PageID 1705

78.     In other words, the ABL Technologies formula for valuing the life
insurance polices that the Fund will purchase—which it values as a pool
making up the assets of the Fund—depends upon historical transactions in
the tertiary market.  Or, as the Fund disclosed in the same Form N-2:  "[f]or
purposes of calculating [net asset value], portfolio investments are valued
using fair value."  *Id.* at 45.  Meanwhile, the Fund manager has no particular
interest in those fair value marks; management fees are charged ***the lower
of*** the fair value mark or the purchase price of the asset, so that the manager
has no incentive to inflate the marks of Fund assets in the fair value
analysis.  *Id.* at 44.

**C.     In 2024, the Fund First Disclosed Lapetus As Its Primary
          LE Provider.**

79.     Separately, the Fund discloses that "[t]he value of an ***individual***
Mortality Contract is determined through the development of probabilistic
survivability curves based on the medical underwritings . . . such as those
provided by ITM 21st, Fasano & Associates, Predictive Analytics, Lapetus
Solutions, Polaris, and LSI Longevity Solutions Inc."  *Id.* at 45–46 (emphasis
added).  Those six firms provide life expectancy estimates.

80.     The Fund has been clear in its disclosures to the SEC throughout
the registration process:  it is set up to act as a tertiary market participant,

which, as a matter of practice, rely on a single LE for all of their policies in order to ensure consistent day-to-day marking.

81.     Accordingly, while the Fund reviews all available LEs for a particular policy, the Fund discloses that "[c]onsistent with standard practice in the life settlement market, the Manager will typically engage a single life expectancy provider with respect to any given Mortality Contract."  From February 2024 through August of 2025, the fund identified Lapetus as its anticipated primary LE provider.

82.     But no matter the LE provider the Fund uses for its daily marks, it remains an interval fund that, if registered, will distribute investor risk across hundreds of policies.  ***Once the Fund is registered, no investor in the Fund will ever buy or sell units based on a valuation derived solely from an LE***; rather, units will be exchanged according to the net asset value ("NAV") calculation generated by the ABL Technologies algorithm, which is based on "fair value," in particular "historical trading" on the tertiary market.  ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2) at 46 (Aug. 15, 2025).

83.     The Fund had good reason to select Lapetus as its primary LE provider. The Fund's disclosures explain that Lapetus's "data set is significantly larger than other life expectancy providers" and Lapetus (unlike other providers) engages in medical underwriting.  April 14 Form N-2 at 46

84.     Also, the Fund decided to use Lapetus because it knows Lapetus to be an honest broker.  The Fund and Abacus have reason to believe that other LE providers have shared confidential policyholder data with Coventry to give Coventry a competitive edge in bidding processes.

85.     The Fund understands that Lapetus has not succumbed to Coventry's pressure to engage in these unfair and deceptive tactics.  And so, it chose Lapetus as the primary LE provider.

86.     Besides, many life settlements providers use Lapetus LEs as a data point, including Coventry.  ***Since 2019, Coventry has purchased over 4,000 LEs from Lapetus.***  As recently as 2024, Coventry was offering bundles of policies for sale to investors using Lapetus LEs as a pricing input.  One of these offers came directly from Coventry's CEO, Reid Buerger.  Upon information and belief, prior to 2024, Coventry was one of Lapetus's largest customers, making up over a quarter of Lapetus's business.

## IV.  WITH ABACUS GAINING MARKET SHARE, REVENUE, AND RESPECT IN THE MARKET, COVENTRY SEEKS TO DISCREDIT LAPETUS AND DESTROY ABACUS'S REPUTATION.

87.     The trigger for Defendants' defamation campaign occurred on February 2, 2024, when the Fund first disclosed its selection of Lapetus as its preferred life expectancy provider for single policy purchases.  Since that

31

time, Coventry has pursued an array of media strategies to convince the market of three lies clearly refuted by Abacus in its public disclosures:

    a.  Lapetus life expectancies are inaccurate;

    b.  Abacus uses Lapetus LEs to inflate the fair value of policies on its balance sheet; and

    c.  Abacus's realized gains are the product of fraud, and the company's stock is overvalued because of its reliance on Lapetus.

88.    As set forth below (*infra* ¶¶ 89–151), Defendants' efforts to discredit Lapetus, and associate Lapetus with the value of Abacus—even though no such association exists—have been brazen, persistent, and defamatory.

**A.    Defendants Fail to Coerce Lapetus, then Discredit Lapetus to Hurt Abacus.**

89.    Defendants have been eager for a way to take down Abacus since the Company first went public in June of 2023.

90.    Upon information and belief, as early as October of 2023, Defendants have been spreading false statements that Abacus owns Lapetus and that Abacus uses Lapetus to obtain "favorable" LEs.

91.    Industry insiders told Abacus employees that Coventry was going to use Abacus's falsely-claimed "ownership" of Lapetus to damage the image and stock price of Abacus, with one broker telling an Abacus employee that Coventry viewed Lapetus as the only thing Coventry had "against" Abacus.

92.     A few months later, in February 2024, after the Fund filed its first N-2, Coventry wrote a letter to the SEC highlighting what it purported to be actionable conflicts of interest (an oblique reference to Abacus) and accounting misstatements.  The SEC took no action on the February 2024 letter.

93.     On May 7, 2024, a few months after the Fund first disclosed its selection of Lapetus, Buerger called Dr. Jay Olshanksy, the Chief Scientist and co-founder of Lapetus.

94.     Buerger expressed his view that Lapetus LEs were shorter than others in the industry, and specifically expressed his concern that Abacus in particular was using Lapetus LEs.  Dr. Olshansky later reported to the CEO of Lapetus that Buerger was "very annoyed" by Abacus, and that Buerger "appeared to have a particular ax to grind regarding Abacus."

95.     Buerger asked Dr. Olshanksy whether he (Olshansky) wanted Lapetus's clients, like Coventry, "to make money."  Buerger also suggested that Lapetus lengthen its LE estimates so that Lapetus and "others in the industry . . . have our goals aligned with the investors."

96.     Upon information and belief, Buerger contacted other LE providers with similar requests, and those other providers agreed to lengthen their estimates, which gave Coventry and Buerger an "independent" estimate to justify paying seniors lower prices for their policies.

97.     But Lapetus was different.  Dr. Olshansky, a university professor and nationally-recognized expert who has been publishing on the topics of longevity and aging for three decades, responded that Lapetus had to maintain its independence from its clients and its clients' investors.

98.     Apparently, Buerger did not get what he wanted from Lapetus or Dr. Olshansky.  So, the same day that Buerger spoke to Dr. Olshansky, Coventry published an "internal review" of Lapetus's life expectancy estimates purporting to show that Lapetus's estimates were "consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies and investor losses."  Coventry then concluded that its "results cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies."[6]

99.     Then, in July 2024, Coventry commissioned an "independent study," performed by two professors to "replicat[e]" and "confirm[] the results of [Coventry's] internal analysis."  Coventry's core claim is that Lapetus LEs are shorter for 85% of underwritten cases, and that the average difference is 31 months.  Coventry went on to opine "valuations based on Lapetus life

---

[6]  *Coventry Study Finds Lapetus Life Expectancies are Shorter than Competitors in 85% of Cases Reviewed*, Coventry (May 7, 2024), https://www.coventry.com/coventry-study-finds-lapetus-life-expectancies-are-shorter-than-competitors-in-85-of-cases-reviewed/.

expectancies could lead to significantly inflated asset values and investor losses."[7]

100. Despite Coventry's harmful and untrue statements that using Lapetus LEs could lead to "investor losses," it continued purchasing LEs from Lapetus.

101. On October 24, 2024, Buerger spoke at the Life Insurance Settlement Association ("LISA") Life Settlement Conference, in Miami. The occasion for his remarks was discussion between Buerger and Dr. Olshanksy, CEO of Lapetus, held in front of an audience of life settlements industry professionals.

102. In a video of the presentation available on YouTube, Buerger doubles down on the claims in Coventry's "internal review," stating, among other things, that Lapetus systematically underestimates life expectancy. Buerger repeatedly challenged Lapetus's work, but when asked by Dr. Olshansky to review the underlying data together, refused that offer.[8]

103. Specifically, Dr. Olshansky presented data on the over 4,000 LEs Lapetus had generated for Coventry, and showed that for **over** 95% of the

---

[7] *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, Coventry (July 22, 2024), https://www.coventry.com/coventry-releases-peer-review-of-lapetus-life-expectancy-study/.

[8] *See* Opening Keynote Fireside Chat Between Buerger and Dr. Olshansky at the 30th Annual Life Settlement Conference (YouTube, Oct. 25, 2025), https://youtu.be/-xwCWTM33VY?feature=shared&t=4482 (the "Fireside Chat").

LEs Lapetus had provided to Coventry as of that date, Lapetus had **overestimated, not underestimated**, life expectancy. In such cases, the individual insured passed away earlier, not later, than estimated, and Lapetus's LE estimate was ***too long***, rather than too short, as claimed by Buerger.

104. By way of response, Buerger claimed that he did not understand what Dr. Olshansky was telling him, but remained firm in his belief that Lapetus life expectancies were so incorrect that they posed an "existential threat" to the life settlements industry.

105. When asked about Abacus, Buerger said "I don't think its appropriate . . . for me to comment on Abacus . . . ." But then he could not help himself; he began talking about a valuation "using Lapetus at a discount rate of **21%**." Buerger stated that Coventry does not "use a discount of **21%, because 21%, we all know . . . [is] not realistic**." (emphasis added).

106. Buerger then stated that "fair market value is grossly overstated, even if you use **21%**" based on his "knowledge of the market." (emphasis added).

107. Buerger did not pull 21% from thin air, and it was not meant to understood in the room as a hypothetical. He was talking about Abacus.

108. As Buerger would later admit, he reads every Abacus SEC filing. Thus, he picked 21% during his diatribe because Abacus had disclosed a 21%

discount rate in its fair value calculation in its last quarterly filing before the

LISA conference:

> For policies carried at fair value, the valuation is based on Level 3
> inputs that reflect our assumptions about what factors market
> participants would use in pricing the asset or liability, such as life
> expectancies and cash flow discount rates. The inputs are developed
> based on the best available information, including our own data. The
> valuation model is based on a discounted cash flow analysis and is
> sensitive to changes in the discount rate used. ***The Company utilized
> a blended average discount rate of 21% and 21% for policy
> valuations*** at June 30, 2024 and at December 31, 2023, respectively,
> which is based on economic and company-specific factors. The
> Company re-evaluates its discount rates at the end of every reporting
> period in order to reflect the estimated discount rates that could
> reasonably be used in a market transaction involving the Company's
> portfolio of life settlements.

Abacus Global Management, Inc., Quarterly Report (Form 10-Q) at 22
(Aug. 12, 2024) (emphasis added).

109.    Because Buerger did not tell the audience at the LISA Conference

that Abacus's August 12, 2024 disclosure regarding its methodology did not

mention Lapetus, his suggestion that Abacus was "using Lapetus at a

discount rate of 21%" was false and misleading.  Buerger knew that his

statements were incomplete, having read every one of Abacus's filings, and

thus spoke with, at a minimum, reckless disregard for the truth of the

metrics Abacus actually uses to generate its fair value calculation.

110.    Buerger also failed to explain that the paragraph he pulled the

21% number from makes clear that Abacus does not "use Lapetus" to derive

its discount rate; rather, the filing Buerger clearly read before the LISA

conference states that the discount rate used by Abacus "reflect[s] the

estimated discount rates that could reasonably be ***used in a market transaction*** involving the Company's portfolio of life settlements." *Id.* (emphasis added).

111.  No one with Alan Buerger's four decades of experience in the secondary and tertiary markets for life insurance policies would read Abacus's public filings and have any reasonable basis to say that Abacus (and every one of its trading partners) was "using Lapetus" to define its discount rate. Therefore, Buerger's claims that Abacus's discount rate is based on Lapetus LEs were objectively unreasonable under the circumstances.

112.  Nonetheless, after saying that "fair market value is grossly overstated, even if you use **21%**"—clearly referring to Abacus—Buerger made another false claim:  the "$250 million dollars out there that investors have put up" with Abacus "is dead." (emphasis added).

113.  He continued, "and I worry that it's going to be $300, $400, $600, and $1 billion.  With Mutual Benefits, it was $800 million. . . .  It's going to be awful for us.  The longer it takes, and the bigger it gets, the worse it will be."[9] By referring to the Mutual Benefits Corporation, Buerger implied Abacus was similar to a company that conducted one of the largest Ponzi schemes in Florida's history, and whose CEO has been sentenced to 20 years in prison.

---

[9]  *See* Fireside Chat, *supra* note 8.

**B.**     **Coventry Runs To Abacus's Auditor And Then The SEC About The Fund's Disclosure With Respect To Lapetus.**

114.   Unsatisfied by its efforts to bring down Abacus by bringing down Lapetus, Coventry took its defamation campaign a step further.     On information and belief, a week after Abacus's Lapetus disclosure in the Fund's N-2 on February 2, 2024, Coventry approached a partner at Abacus's auditor, Grant Thornton.  Coventry tried to influence Grant Thornton's audit of Abacus's audited financials by disseminating the same lies that were disseminated to other third parties, including the false and misleading statements contained in Coventry's own study of Lapetus's life expectancy estimates (as "confirm[ed]" by the professors it paid) and that Abacus uses Lapetus in its valuation process.

115. On November 1, 2024, nine months after the Fund first mentioned Lapetus in its registration statement, but within days of the letter to Grant Thornton and Buerger's public comments, the SEC curiously and suddenly issued a Comment Letter on Abacus's Form S-1/S-3 filing, asking the Fund to "provide a detailed explanation of any relationship and disclose the extent to which you have relied upon Lapetus or any of its co-owned entities for valuation of life insurance policies."[10]

---

[10]  *See* Abacus's Resp. to SEC Nov. 1, 2024 Comment Letter (Nov. 4, 2024), https://www.sec.gov/Archives/edgar/data/1814287/000162828024044861/filename1.htm.

116. On information and belief, the SEC issued the November 1 comment letter because Coventry contacted the SEC in October of 2024 and urged the SEC to inquire further into Abacus's disclosures about Lapetus.

117. In the SEC November 1 comment letter, it asked pointed questions about (1) whether Abacus or its officers and directors had an interest or relationship in Lapetus and (2) "[i]f Lapetus is a related party," what limitations that placed on Abacus's ability "to value life insurance policies under any relevant state laws."[11]  These questions from the SEC largely mirror the accusations contained in the letter from Coventry to Abacus's auditor as well as the biased conclusions contained in Coventry's internal study. *See infra* ¶¶ 114, 120–124.

118. In any event, Abacus disclosed the truth to the SEC, investors, and the public that Abacus and Lapetus are not related parties, and that Abacus complied "with all relevant state laws."  Abacus also disclosed that with respect to Abacus's valuation process, "Lapetus's role involves generating life expectancy reports, which [Abacus] incorporates as one of multiple inputs into its valuation process."  Indeed, Abacus further disclosed that "it does not rely solely . . . on Lapetus's life expectancy reports."  And critically, "Lapetus does not engage in the valuation of policies" thus,

---

[11]  *Id.*

Abacus's "use of Lapetus as an input" is "limited and immaterial to [Abacus's] overall valuation process."[12]

119.   After reviewing these fulsome disclosures, the SEC did not raise any concerns about Abacus's valuation methodology or the relationship between Lapetus and Abacus again.

### C.   Coventry Commissions A Hit Job On Lapetus With The Goal Of Harming Abacus.

120.   Having failed to gain traction through its direct attacks on Abacus's auditor, analysts, and regulators, Coventry escalated its campaign.

121.   To add a veneer of legitimacy to its attacks on Lapetus and Abacus, in December 2024, Coventry commissioned a "comprehensive new study" purporting to show that Lapetus's life expectancy estimates were far shorter than other providers.[13]   What Coventry failed to disclose about this purportedly objective analysis is that *Coventry paid* the two professors to validate the conclusions in Coventry's predetermined narrative, which

---

[12]   *Id.*

[13]   *Flaws in Lapetus Life Expectancy Estimates Exposed in New Study Following Olshansky-Buerger Debate at LISA Conference*, Coventry (Feb. 10, 2025), https://www.coventry.com/flaws-in-lapetus-life-expectancy-estimates-exposed-in-new-study-following-olshansky-buerger-debate-at-lisa-conference; *see also* Daniel Bauer & Nan Zhu, *Lapetus Actual-to-Expected Deaths Study* (Dec. 2024), https://www.slideshare.net/secret/9fjnG9zXIx1jM8?ref=morpheus-research.com.

Coventry had already set out in its May 2024 "internal review" and paid the two professors to "confirm[]" in July 2024 in an "independent" review.[14]

122.  Lapetus refuted the Coventry studies with its own independent analysis.  Lapetus's auditor examined Lapetus data "with matched medical records" for the same lives in Coventry's analysis and concluded that "Lapetus has proved to produce more accurate estimates" than its competitors, and that "[there] is no direct evidence at this stage to suggest that the life estimates produced by other LE providers will prove to be more accurate for such lives."[15]

123.  Coventry published a press release stating only the high-level "conclusions" of its "new study," but did not make the details of the study public.[16]  Coventry hides the details underlying its attacks on Lapetus behind a click-through agreement that requires anyone who wants to see the various Coventry studies to agree that they will only access it "for informational

---

[14]  *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, *supra* note 7.

[15]  Daniel G. Ryan, COIOS Limited, *Independent Assessment of Lapetus Methodology for Estimating Individual Lifespans* (June 4, 2025).  To be sure, Lapetus maintains a license to operate in Florida, which has one of the nation's most stringent regulatory frameworks. Among other things, Lapetus must (i) file routine audits by "a nationally recognized actuarial firm," of all life expectancy calculations, including "actual-to-expected ratio[s] of life expectancies" across seven time categories; (ii) maintain detailed "policies and procedures covering all life expectancy determination criteria and protocols"; and (iii) provide OIR with "[a] description of the training, including continuing training, of the individuals who determine life expectancies." Fla. Stat. § 626.99175.

[16]  *Flaws in Lapetus Life Expectancy Estimates Exposed in New Study Following Olshansky-Buerger Debate at LISA Conference*, *supra* note 13.

purposes."[17]   And even if one fills out the form, it is only to "Submit [a] Request," which requires the interested party to provide its name, email address, phone number, company, publication, and which document the party is interested in.[18]   There is no guarantee that, once the user forfeits the information, they will actually gain access to the various Coventry Studies.

124.   The Coventry studies serve not as genuine research but as a manufactured credential—allowing Coventry to cite purportedly independent academic findings while ensuring the underlying methodology remains hidden from scrutiny.   This approach enables Coventry to disseminate its false claims about Lapetus and Abacus across multiple platforms while avoiding accountability for the study's flawed foundations.

**D.    Coventry Tells Market Analysts At TD Securities To Downgrade Abacus Based On The Coventry Studies.**

125.   Coventry was trying, and largely not succeeding, in convincing the market that Lapetus was wrong, and thus Abacus was misvaluing the insurance policies it owned.   Yet sophisticated institutional investors and market analysts disagreed, likely because Abacus repeatedly disclosed that its asset valuation was based on market transactions and "reflect[ed] . . . assumptions about what factors market participants would

---

[17] *Request    Lapetus    Life    Expectancy    Study    Information*,    Coventry, https://www.coventry.com/research/ (last visited September 17, 2025).

[18] *Id.*

use in pricing life settlement policies," and not on the output of a single life expectancy provider. Abacus 2024 Form 10-K at 80.

126. On March 9, 2025, Coventry contacted TD Securities, one of the analysis firms that frequently comments on the strength and value proposition represented by Abacus's common stock. Later that day, an analyst at TD Securities emailed Abacus Chairman Jay Jackson and Abacus Chief Financial Officer Bill McCauley, stating that an "Abacus competitor informed us of some recent . . . news" about Lapetus that required Abacus's feedback. The TD Securities analyst specifically referenced the statistics Coventry had put out about Lapetus in 2024.

127. Mr. Jackson later learned that the "Abacus competitor" was none other than Coventry. The analyst regurgitated the same biased conclusions and flaws in the Coventry studies, including that Lapetus has shorter life expectancies than other providers. Mr. Jackson made clear that Lapetus's estimates reported to the state of Florida are in line with other life expectancy providers. In addition, the analyst addressed the specter of concern raised by Coventry around Abacus's and Mr. Jackson's relationship with Lapetus which, according to Coventry, violates Florida regulations.

128. Abacus's communications with TD Securities continued with Abacus having to correct the myriad of false and misleading statements advanced by Coventry. For example, on March 21, 2025, the TD Securities

analyst asked Mr. Jackson "[w]hat percentage of the life settlement policies on your books are based on Lapetus LEs to set the fair value?"—apparently buying the line from Coventry that the fair value calculations depended on Lapetus life expectancies, when in fact, the Lapetus LEs are not used *at all* in the fair value analysis.

129. A few weeks later, in an April 2025 phone call between Mr. Jackson and the TD Securities analyst, Mr. Jackson learned not only that Buerger was the "industry source" sowing doubt to TD Securities, but that Buerger reached out to TD Securities directly to inform the analyst that Abacus's balance sheet was overvalued due to Abacus's use of Lapetus's life expectancy estimates. The goal? Buerger suggested to the analyst that TD Securities ***drop its coverage*** of Abacus's stock.

130. TD Securities did not follow that invitation, convinced that Coventry's co-founder and Chairman's smear campaign was simply not true.

**E.    Coventry Files a Meritless Lawsuit Seeking Lapetus's Trade Secrets, While Simultaneously Smearing Abacus For Using The Data.**

131. At the same time, Coventry made defamatory statements about Abacus directly to regulators as part of a pleading seeking disclosure of information Lapetus provided to Florida OIR. *See* Petition for Writ of Mandamus and Expedited Hearing for Violations of Florida's Public Records Act, *Coventry First LLC v. Fla. Office of Ins. Regul. & Lapetus Sols., Inc.*,

Case No. 2025 CA 000463 (Fla. 2d Cir. Ct. Mar. 21, 2025) ("Coventry Writ" or the "Writ").

132. A few weeks after the initial email exchange between Mr. Jackson and the TD Securities analyst in which Mr. Jackson informed the analyst of the life expectancy data reported to Florida regulators, Coventry filed a petition to gain access to Lapetus's Florida audit reports. *Id.* The Coventry Writ alleged that the OIR violated Florida's Public Records Act because OIR did not satisfy Coventry's request to produce the life expectancy audit reports that Lapetus is required to submit to OIR. *Id.* ¶¶ 3–4, 16. Coventry claimed that Lapetus's "issuance of chronically short Life Expectancies has skewed the entire life settlement market." *Id.* ¶ 18.

133. Regardless of the "merits" of Coventry's claim, Coventry's true motivation for its Writ is laid bare in paragraph 18 of the Writ—yet another public vehicle to attack Abacus by way of attacking Lapetus.

134. Although wholly irrelevant to Coventry's claimed right to the information held by OIR, the Writ alleged that Lapetus's "Life Expectancies have substantial influence on the market through . . . [its] *unique relationship* with Abacus Global, ***a group of life settlement companies which use LAPETUS as their preferred Life Expectancy provider***." *Id.* (emphasis added). Abacus has never made any such claim.

Case 3:25-mc-00169-RBD-MRM  Document 64-1  Filed 09/18/25  Page #? of 255  Page 146
Case 3:25-cv-01401-RBD-MRM  Document 38  Filed 09/18/25  Page 47 of 85  Page 235 866
PageID 1723

135. The support Coventry cites to underscore this "unique relationship"? A **prior unpaid** nominal board position held by Mr. Jackson in which Mr. Jackson was in an advisory position, he did not have authority or capacity to act on Lapetus's behalf, and he was only minimally involved with Lapetus's operations.[19] And Abacus purportedly "invest[ed] heavily in Lapetus." The heavy investment? A $1 million convertible note, that may result in at most 5% ownership upon conversion, which "would not grant [Abacus] any influence or control over Lapetus."[20]

136. Coventry falsely asserts that Mr. Jackson's prior Lapetus board position and the minor convertible note Abacus maintains in Lapetus "may violate the Life Expectancy reform law passed by the legislature in the wake of the Mutual Benefits collapse," and goes on to falsely compare Abacus to Mutual Benefits: "Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their relationships, the legislature now requires independence between settlement providers and Life Expectancy providers. . . . The relationship between Lapetus and Abacus is so close that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the market,

---

[19] *See* Abacus's Resp. to SEC Nov. 1, 2024 Comment Letter (Nov. 4, 2024), https://www.sec.gov/Archives/edgar/data/1814287/000162828024044861/filename1.htm.

[20] *See id.*

bizarrely asserted that 'Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions.'" Coventry Writ ¶ 18 n.4.

137. The Coventry Writ also contains the clearest statement of Coventry's Big Lie: "One of the Abacus companies, **Abacus Life Inc.[21]—the main asset of which is life policies purchased by Abacus—is a publicly traded company whose shareholders' investments are dependent on the accuracy of the Life Expectancy estimates used to value policies**." *Id.* ¶ 20 (emphasis added).

138. This is not even a little bit true, about *any* securities issued by any Abacus entity. The stock of the publicly traded company is valued according to "an exit price representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date." Abacus 2024 Form 10-K at 80.

139. The units of the Fund—which *has no investors because it has not yet been approved*—will depend upon "ABL Technologies' proprietary database of historical transactions" and its "risk-adjusted historical trade spread." April 14 Form N-2 at 4.

140. Neither metric depends solely upon a specific life expectancy calculation, let alone Lapetus's. Rather, Lapetus is one of six life expectancy

---

[21] Abacus Global Management, Inc. was previously named Abacus Life Inc.

Case 6:25-cv-01401-RBD-RMN Document 64-1 Filed 09/18/25/25 Page 49 of 81 PageID 868
Case 3:25-mc-00169 Document 1-3 Filed 09/18/25 Page 2 of 255
PageID 1725

providers that Abacus may consider for initial policy pricing and Abacus relies on market transactions to value the policies it holds on its balance sheet.[22]

141.  Once again, Coventry's assertions—both express and/or implied—are false.  Abacus does not use Lapetus as its "preferred" Life Expectancy Provider (Coventry Writ ¶ 18), nor does Abacus use Lapetus as part of its valuation.

142.  While Coventry recently voluntarily dismissed its Writ after Abacus filed its initial complaint (*see* Notice of Voluntary Dismissal, *Coventry First LLC v. Fla. Office of Ins. Regul. & Lapetus Sols., Inc.*, Case No. 2025 CA 000463 (Fla. 2d Cir. Ct. July 24, 2025), Coventry continues its quest for Lapetus's data and its campaign to publicly defame Abacus as an intervenor in a separate lawsuit Lapetus filed against OIR to prevent the very disclosure Coventry seeks.  *See* Coventry First LLC's Mot. to Intervene as Party Defendant, *Lapetus Sols., Inc. v. Fla. Office of Ins. Regul.*, Case No. 2025 CA 000516 (Fla. 2d Cir. Ct. Apr. 10, 2025) (Coventry attaching its Writ as

---

[22]  *See id.*  Coventry's false statements about Abacus's compliance with Florida laws is particularly ironic where, as here, Coventry has long resisted any attempts by the OIR to regulate life settlement providers.  For example, in 2010, Coventry attempted to block OIR's full review of company records in order to determine which files were subject to Florida laws.  A federal appeals court affirmed OIR's right to inspect non-Florida records.  And in 2023, Coventry filed to block an OIR request to examine almost six years of records from life settlement providers after the OIR launched the investigation into Coventry because it had received complaints about Coventry First and its subsidiary Life Equity in 2022.

Case 3:25-mc-00169-RBM-MSB Document 64 Filed 09/18/25 Page 50 of 81 PageID 869
Case 3:25-cv-01401-TJC-PDB Document 1-3 Filed 11/18/25 Page 51 of 81 PageID 255
PageID 1726

Exhibit A to its Motion to Intervene); *see also* Order Granting Coventry First LLC's Motion to Intervene as a Party Defendant, *Lapetus Sols., Inc. v. Fla. Office of Ins. Regul.*, Case No. 2025 CA 000516 (Fla. 2d Cir. Ct. Aug. 4, 2025).

**F.    Coventry Broadcasts Its View Of Abacus To A Wider Audience, Telling Market Analysts And Institutional Investors That Flaws In The Lapetus LE Indicate That Abacus "Will Implode" "Soon."**

143.   Following Coventry's bogus Writ filed in Leon County, Coventry continued its defamatory campaign when, on May 22, 2025, Buerger conducted an interview with Tegus, a subsidiary of AlphaSense, Inc. Tegus is a business intelligence and expert network firm that provides one-on-one interviews with industry experts to investors and subscribers.[23]

144.   Tegus subscribers pay $20,000 or more annually to get access to interviews held with "industry experts" on various topics of interest. Tegus's subscribers include Fortune 500 companies, world-renowned private equity firms, hedge funds, and other institutional investors. The client that requests the specific interview gets priority on the expert information, but then these interviews are transcribed and the transcripts are emailed to all of Tegus's subscriber network after a waiting period.

145.   Therefore, experts and industry insiders that sit down with Tegus or a Tegus client for an interview know that their words will be

---

[23] *See* AlphaSense and Tegus, https://www.alpha-sense.com/compare/alphasense-and-tegus/ (last visited Sept. 17, 2025).

transmitted to market-movers, including the blue-chip financial institutions that have played a part in Abacus's success over the past 20 years.

146.   In the May 22 Tegus Interview, Buerger spoke almost exclusively about Abacus.  After bragging that he had made Abacus his "***pet project***" and "know[s] every public document" Abacus has filed, Buerger doubled-down on his and Coventry's defamatory remarks about Abacus, Abacus's use of Lapetus, Abacus's valuation process, and even the financial health of Abacus as a company.  Indeed, Buerger's false and misleading statements in the Tegus Interview include:

a. "***If you're a public company***, you're trying to generate steady progress in your quarterly earnings like any public company. ***The temptation that creates is to  manufacture earnings***, which with a Level three asset is an easy temptation to fulfill. Specifically . . . Abacus uses Lapetus as their so-called independent medical underwriting company, ***not exclusively but primarily***."  Buerger's meaning is unmistakable, and unmistakably false—these statements cannot be read to mean anything other than that Abacus uses Lapetus as its primary life expectancy provider.  No public document says that, as Buerger is aware from his self-proclaimed close study of those filings.  And Abacus does not use Lapetus to value the policies on its balance sheet.  *See* Abacus 2024 Form 10-K at 80; *see supra* ¶¶ 68–78.

b. "The problem with that is the stockholders, the baby bondholders, and even the [Sagard] loan ***will be subordinated to the asset-backed debt***, which is to say they will all be wiped out when this thing goes upside down."  The implication—that stockholders' equity is subordinated to debt backed by investments in assets, *i.e.* life insurance policies—is not only false, but is a dog whistle for anyone familiar with life settlements.  "Asset-backed debt"—which Abacus carries none of—has been linked to other failed life settlement companies.

c. "[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore." This contradicts the fact that Coventry itself, including Buerger's son, Reid, was trying to sell policies purchased on the secondary market with the Lapetus LE, less than a year ago.

d. "[Y]ou have to choose which accounting method you'll use for that policy and you can never change it." The implication is, contrary to Grant Thornton's conclusion, that Abacus has changed its accounting method for policies it has already purchased. But that is not the case: Abacus clearly discloses which policies it values by which method, and it has not switched the valuation of a policy once purchased.

e. "As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q." Buerger's suggestion is that Abacus is engaged in dishonest accounting, and that it *only* generates revenue through unrealized gains. Buerger fails to mention that Abacus is routinely audited and that Abacus sells hundreds of policies per quarter which results in realized gains.

f. "[R]ight now they've been trying to get the stock price up through their stock repurchase plan." This statement—made without any awareness of Abacus's internal decision making—suggests Abacus was somehow manipulating the market by implementing a routine stock repurchase.

g. "There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements. There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and all of them have gone bankrupt." Buerger is clearly implying that Abacus, the only publicly-traded life settlements company, will go bankrupt, notwithstanding the Company's record financial success in the year leading up to his interview.

h. "I should tell you also that Abacus has a $1 million investment in Lapetus Solutions, which was disclosed in correspondences with the SEC. The CEO of Abacus was on the board of Lapetus. In

industry publications, there are articles about this and once those articles came out, the CEO of Abacus immediately resigned from the Lapetus board." Read in context, Buerger made this statement to suggest Abacus unlawfully controlled Lapetus's independent, audited life expectancy calculations. This is patently false.

i. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "[n]otwithstanding that they do say that, it is just not accurate." His implication was that Abacus lied in its 2024 Annual Report, where it discussed the ongoing growth of its "hold" portfolio made possible by increased access to capital. Abacus 2024 Form 10-K at 7–8.

147. And perhaps one of Buerger's most brazen lies and statements to sow doubt about Abacus: "[I]t's just a matter of time before [Abacus] implode[s]."

148. Buerger knew these assertions were wrong, or at the very least, recklessly failed to apprise himself of the truth. Indeed, Buerger even conceded that the fair value approach Abacus actually uses to value its policies is the correct one: "[W]e"—referring to Coventry—"do a fair value calculation because *I want to know what my policies are worth.*" The implication that Abacus does anything else is patently false, as anyone familiar with Abacus's disclosures would know.

149. While it is not yet known why Buerger was selected as a so-called industry "expert" on Abacus, it is clear that Buerger's sole purpose in giving the interview was to sow doubt about Abacus to industry leaders, experts, and investors, including Abacus's own investors. Indeed, Buerger knew or

should have known the content of his interview with Tegus would be published and broadcasted to all of Tegus's subscribers.

150.  On June 4, 2025, at 8:00 a.m. ET, 90 minutes before the market opened, a transcript of the May 22 Tegus Interview was circulated to all of Tegus's subscribers.  Indeed, on the evening of June 4, Mr. Jackson received an unsolicited email from a third party attaching the Tegus Interview transcript and informing Mr. Jackson that Buerger's interview about Abacus was "getting circulated" amongst key investors, including investors with large stakes in Abacus.

151.  In addition, according to this third party, the Tegus Interview being circulated on June 4 appeared to be "very coordinated" with another hit piece published on June 4 that focused on amplifying Defendants' false and misleading statements about Abacus.

## V.  MORPHEUS PUTS OUT THE SHORT REPORT BASED ON DEFENDANTS' LIES.

152.  Three hours after institutional investors, including some with large positions in Abacus stock, received the Tegus Interview in their inboxes, Morpheus, a "research" group that appears to be a spin-off of the now-defunct Hindenburg Research group led by Nathan Anderson,[24] published the Short Report, a false, scathing and lengthy exposé purporting to reveal Abacus's

---

[24] *See* Nate Anderson (@NateHindenburg), X (Mar. 14, 2025, at 1:13 P.M. ET), https://tinyurl.com/dravzjzv ("This is a great team that I have known for a long time and includes some Hindenburg alumni.").

accounting fraud and "fake revenue" by undervaluing life expectancy estimates.[25]

153. While purporting to base the Short Report on "extensive research," the reality is that Buerger and Coventry have been working on this dossier since 2023, when Defendants first put Abacus in their crosshairs.

154. As early as January 2024, Buerger had previously shopped a hit piece to Morpheus's predecessor, Hindenburg Research, but Hindenburg passed.

155. Over the course of 2024, Buerger said he was reaching out to a number of other short sellers and former SEC whistleblowers, seeking a seemingly "independent" outlet to publish his defamatory statements.

156. Upon information and belief, Buerger and Coventry finally found a useful idiot in Morpheus. Morpheus is an LLC formed under the laws of the State of Delaware, with its authorized person being John H. Sutter, an attorney who represents short sellers seeking bounties from the federal government. In finding Morpheus, Defendants finally found a partner willing to amplify the lies that had failed to convince the markets for nearly two years.

---

[25] *See Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die*, Morpheus Research (June 4, 2025), https://www.morpheus-research.com/abacus/.

157.   Accordingly, the Short Report parrots the same or similar false and misleading statements that Defendants had previously peddled.   As Morpheus acknowledges, one of its "sources" for the Short Report includes "Abacus competitors," a.k.a. Coventry.   In fact, the Short Report includes several direct quotes from Buerger.

158.   Morpheus timed the Short Report perfectly to coincide with the release of the Tegus Interview.   Although Morpheus uploaded supporting documents to a document sharing website on June 2, the Short Report was not released for another two days, when it would have maximum impact. Upon information and belief, Buerger informed Morpheus of his defamatory comments in the Tegus Interview, and Morpheus waited to publish its Short Report until Buerger's Tegus Interview had been shared with Tegus subscribers.

159.   Like Coventry and Buerger, the Short Report attacks Abacus's purported relationship with Lapetus; falsely claims that Abacus uses Lapetus to value its balance sheet; and falsely claims that Abacus is overvalued. Specifically, the Short Report falsely repeats the following, playing all of Coventry's hits:

   a. **The Short Report criticizes and aggrandizes Abacus's "relationship" with Lapetus**, saying the LE provider is an "intimately-linked" Abacus vendor;

b. **The Short Report implies Abacus is in violation of Florida Laws and Regulations:** "Abacus' initial hesitancy to fully disclose the Lapetus investment may have been due to Florida's prohibition against direct or indirect ownership of a life expectancy provider by a life settlements provider, due to the inherent conflict of interest it presents."

c. **The Short Report reprises Coventry's claims about Lapetus LE**, freely admitting that the claims that Lapetus has shorter life expectancy estimates come directly from the biased and flawed studies commissioned by Coventry.

d. **The Short Report falsely implies that Abacus uses Lapetus to value its balance sheet**. Morpheus directly quoted Buerger's public statement that Abacus's use of Lapetus means that "fair market value is grossly overstated." And by Morpheus's own words, Buerger's words "appear[] to have been aimed squarely at Abacus, which he seems to have likened to Mutual Benefits Corporation, an infamous life settlements fraud that claimed $250 million of investor capital in the early 2000s."

e. **The Short Report repeats Coventry's Claim that Abacus is overvalued due to counterfactual reliance on Lapetus:** Morpheus writes, "Abacus' Reliance On Lapetus Presents A Material Risk To The 'Unrealized Gains' Generated From Valuation Mark-Ups On Its Held Portfolio – Presenting An Estimated Writedown Risk Of At Least 35 - 50%." Morpheus also writes, "Abacus' reliance on Lapetus LE data to value its portfolio presents a material risk to its 'held' portfolio, which could be turned 'upside down' if the policies take longer to mature than anticipated." These statements similarly flow from Coventry. As highlighted above (*supra* ¶¶ 87–151), Coventry has publicly stated and privately told Abacus's stock valuator and auditor about Coventry's belief that Abacus is overvalued.[26]

---

[26] The Short Report included several other mischaracterizations, exaggerations and falsehoods regarding the prior associations and private lives of Abacus executives, each of whom continues to weigh appropriate legal action against Morpheus, Coventry, and any other potentially responsible party.

160.    Notably, none of the market analysts familiar with Abacus, and whom Coventry was unable to persuade, bought the falsehoods in the Short Report.  In an extraordinary series of third-party rebuttals, Bernstein Research called the Morpheus claims "misleading"; TD Securities stated that "ABL's model . . . would seem to argue against overvaluation of policies"; and Piper Sandler called the reaction to the Short Report "overdone."[27]  These rapid reactions—*i.e.*, the truth—help explain why Coventry has had to be so underhanded in its effort to slow Abacus's rise in the life settlements world.

161.  Despite the claims in the Short Report, Abacus received strong support from market analysts that have paid close attention to the Company's increasing success in recent years.

162.    But many investors and traders are less familiar with Abacus, since Abacus does not have a regular media presence or a way to control the perception of its company in the public square.  Those investors reacted negatively to the false and misleading statements contained in the Short Report, as well as Buerger's comments in the Tegus Interview released on the same day.

163.  Abacus's stock dropped over 21% on June 4, 2025, causing the company to lose more than $157 million in market capitalization in a single

---

[27] *Abacus Refutes Misleading Balance Sheet Claims With Independent Third-Party Actuarial Valuation*, Abacus Global Management, Inc. (June 10, 2025), https://ir.abacusgm.com/news-releases/news-release-details/abacus-refutes-misleading-balance-sheet-claims-independent-third.

trading session.  By June 27, Abacus's market capitalization had fallen some $287,400,000, for a total loss of roughly 39%.

## VI. DEFENDANTS' FALSE CLAIMS CAUSE ABACUS IMMEDIATE REPUTATIONAL AND FINANCIAL HARM.

164.  After half a dozen attempts to find an effective attack on Abacus, it appears Coventry has finally dealt Abacus substantial reputational harm through the Tegus Interview and the Short Report.

165.  Indeed, since Defendants' statements were published, dozens of shareholders have contacted Abacus about the false and misleading accusations.  And, although the Morpheus report contains numerous claims that are not obvious repetitions of Defendants' other attacks, the incoming calls are only concerned with Lapetus and valuation issues, and specifically based on the premises that (i) Abacus uses Lapetus to value insurance policies; and (ii) valuations based on Lapetus LEs should be discounted.

166.  In other words, it is the false claims by Buerger and Coventry, and nothing else in the Morpheus report, that has materially altered the market's view of Abacus as a company.

### A. Defendants' False Claims Taint Abacus In The Eyes Of Servicing Providers And Investors.

167.  Abacus has lost client relationships as a result of the Short Report.  For instance, one of its service providers, a consultancy that furnishes data on the populations from whom Abacus buys insurance policies,

Case 3:25-mc-00169-RBM-DHR Document 64 Filed 09/18/25 Page 60 of 85 PageID 879
Case 3:25-mc-00401-RB-DHR Document 1 Filed 09/18/25 Page 61 of 255
PageID 1736

broke off an agreement in principle with Abacus after seeing Defendants' falsehoods reprinted in the Short Report. This lost contract cost Abacus approximately $2.5 million in profits, as well as access to valuable information about nine million individuals, which Abacus could have used to strengthen its predictive models used for pricing and valuation.

168. Likewise, a distributor network from whom Abacus originates policies through broker and agent network paused its listing of Abacus as a life settlement provider for several weeks following the change in market perception.

169. Institutional investors have also paused or broken off their interest in Abacus funds. For example, the day before the Short Report issued, Abacus was in discussions with an intermediary representing a multi-trillion-dollar investment company to form a fund-of-one with a minimum duration of five years and a minimum investment of $100 million. Abacus Asset Group, a subsidiary of Abacus, would have managed the fund for a flat 1.5% annual management fee, and the fund's assets would be policies purchased in tertiary market transactions from Abacus Life Solutions (d/b/a Longevity Market Assets). The day after the Short Report issued, the investment company broke off the talks, causing Abacus to lose out on (i) at least $7.5 million in management fees; and (ii) at least $18 million in gain-on-

sale on the tertiary transactions, based on the Company's historical trade spreads.

170. Likewise, a credit union that was considering a fund-of-one investment in the range of $30–40 million has taken a wait-and-see approach since June 4, 2025, causing Abacus to lose out on at least $7 million in fees and gain-on-sale proceeds.

171. More generally, the Short Report has been widely discussed at recent investor conferences, and Abacus and its subsidiaries and affiliates are losing leads as a result.

172. For example, in the week after the Short Report, a portfolio manager at a major asset management firm told the head of Abacus investor relations that the company would "never recover" from the stock drop following the report.

173. Defendants' false and defamatory statements caused significant damages to Abacus's reputation and stock price and caused it to suffer financial harm by being forced to incur expenses to respond to the statements, including professional fees such as legal and accounting costs

**B.      Defendants' False Claims Harm Abacus's Most Recent Major Acquisition.**

174.   In 2024, Abacus purchased one hundred percent of Carlisle Management Company, an investor in the life settlement space that manages investment funds with policies underwritten in the tertiary market.

175.   At Abacus's April 2025 Board meeting, Carlisle reported a pipeline of potential commitments to its ongoing fund raise. Those pipeline funds would have redounded to Abacus's benefit in at least four ways: (i) Carlisle's management fees 100% of which would have flown to Abacus; (ii) Carlisle's performance fees, 100% of which would have flown to Abacus; (iii) origination revenue, realized when Abacus sold policies to Carlisle; and (iii) servicing revenue, which Abacus would have realized as its subsidiary Longevity Market Assets would have continued to service any policy Abacus sold.

176.   Following the release of the Short Report, Carlisle's pipeline has shrunk, and it has been as a direct result of investors questioning Carlisle's corporate parent (Abacus) and its practices.

177.   For example, one large distributor, which had previously invested $100 million on behalf of its clients, in funds managed by Carlisle Asset Management (d/b/a/ Abacus Asset Group), asked Carlisle "[i]f policies valued using Lapetus and acquired from Abacus were marked down by 30%, what

62

would be the impact on aggregate NAV?"  This distributor has not sent Carlisle a single lead since the publication of the Short Report.

### C. The Defamation And Accompanying Stock Drop Interrupt Abacus's Deal Flow.

178.  As Abacus grows, it always looks for potentially accretive strategic transactions to diversify its revenue streams and expand its reach into new, but complementary, markets and verticals.

179.  To negotiate and close these types of transaction, Abacus relies on both its available balance sheet cash, borrowing capacity and its stock as forms of consideration.  Deals that use stock as some or all of the consideration depend upon the company's reputation in public markets.

180.  On the date of the Short Report, when Defendants' claims reached a wide audience, as they could have reasonably expected, Abacus had more than one deal in progress which was negotiated on the basis that Abacus stock would constitute the majority of the purchase consideration.

181.  The publication of the Short Report, and the attendant drop in the price of Abacus stock, interrupted the progress of those transactions while Abacus management and their in-house and outside counsel were forced to respond to the falsehoods spread by Defendants and Abacus's M&A counterparties evaluated the fallout from the Short Report before returning to negotiations.

182.   While Abacus continues to explore strategic M&A transactions using its stock as consideration, the delay has resulted in lost revenue opportunities entitling Abacus to compensatory damages in an amount to be proven at trial.   Those lost opportunities are the direct result of Defendants poisoning the market.

## VII.   COVENTRY AND BUERGER PUSH THEIR BIG LIE DIRECTLY TO ABACUS'S INVESTORS.

183.   But reputational harm and lost opportunities are not enough for Coventry and Buerger.  Since Defendants found an amplifier for their false and misleading statements aka when the Short Report was published, ***Buerger has been directly contacting Abacus's prospective and current investors that hold large positions***, recirculating the same misleading Coventry studies, and instructing them on what questions to ask Abacus to challenge Abacus's valuation practices.

184.   Specifically, on June 17, 2025, Buerger sent the Coventry studies to the chief financial officer of an organization already holding a large position and which is interested in increasing its investments in Abacus life settlements.   Buerger told the investor that the Coventry studies—which pertains to one of six LE providers Abacus uses, and which does not include any information about how Abacus values policies for investors—"will be . . . helpful with your diligence."

185.  Again, Coventry's aim is to suggest that Abacus's use of an LE in the secondary market—which puts more money in the pocket of seniors selling their life insurance policies—is actually evidence of a widespread fraud.

## VIII. DEFENDANTS TIGHTEN THEIR STRANGLEHOLD ON THE INDUSTRY BY DRIVING LAPETUS OUT OF BUSINESS.

186.  Over the 18 months that Defendants were disparaging and discounting Lapetus and Dr. Olshansky, the LE provider's business dwindled.

187.  Controlling 50% of the life settlements business, and demonstrating a newfound animosity toward Lapetus LEs, Coventry was able to force brokers and tertiary market participants to seek LEs from one of the providers that had folded to its pressure.

188.  Since the filing of the initial complaint, Defendants finally succeeded in destroying Lapetus and Dr. Olshansky's good name:  On August 18, 2025, Lapetus announced that it would wind down and cease all operations.  And, as of September 1, 2025, Lapetus did in fact cease all operations.

189.  To be clear, Lapetus's financial ruin does not stem from its LE methodology, but rather, as Lapetus informed its investors, "in May of 2024, *one of [Lapetus's] clients, Coventry*, began a major campaign to tarnish

our reputation in the [life settlement] industry **after we refused to fraudulently adjust our LEs for [Coventry's] financial benefit**." (emphasis added).

190. Lapetus also issued a public statement, cited in Defendants' motion to dismiss (although not attached as an exhibit), noting one reason it had been forced to close was its integrity, referencing the pressure put on by Buerger and Coventry: "Lapetus did face pressure from some clients to raise or lower our LEs for certain cases or even entire books of lives. While we have agreed to reassess a case if it is documented that we missed something in the medical records, Lapetus never acquiesced to pressure to change our LEs to favor anyone."

191. With Lapetus no longer providing LEs, the Fund amended its N-2 to reflect the fact that Coventry forced Lapetus to shut down its operations. Now the Fund expects to rely on the LE provider that has produced the most current life expectancy report with respect to a given Mortality Contract." ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2) at 46 (Aug. 15, 2025).

*       *       *

192. Abacus now seeks compensation for the great harm done to its reputation and the specific damages it has suffered as a result of Defendants'

Case 3:25-mc-00169-RBM-MHM Document 64 Filed 09/18/25 Page 67 of 255 PageID 886
Case 3:25-mc-00169 Document 1-3 Filed 12/18/25 Page 67 of 81
PageID 1743

campaign of falsehoods. This harm is ongoing, because Defendants' campaign to ruin Abacus is ongoing.

<u>**COUNT I**</u>
**(Defamation against all Defendants)**

193. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

194. Abacus is not a public figure or a limited public figure.

195. Coventry and Buerger are non-media defendants.

196. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

197. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

198. Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

199. Coventry's and Buerger's statements about Abacus are false, including but not limited to:

    a. "*If you're a public company*, you're trying to generate steady progress in your quarterly earnings like any public company. *The temptation that creates is to manufacture earnings*, which with a Level three asset is an easy temptation to fulfill. Specifically . . . Abacus uses Lapetus as their so-called

independent medical underwriting company, ***not exclusively but primarily***."

b. "The problem with that is the stockholders, the baby bondholders, and even the [Sagard] loan ***will be subordinated to the asset-backed debt***, which is to say they will all be wiped out when this thing goes upside down."

c. "[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore."

d. "[Y]ou have to choose which accounting method you'll use for that policy and you can never change it."

e. "[I]t's just a matter of time before [Abacus] implode[s]."

f. Abacus's "fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up" with Abacus "is dead."

g. Lapetus's life expectancy estimates are "consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies and investor losses."

h. Coventry's own "internal review" "results cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies."

i. "[V]aluations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses."

j. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "***[n]otwithstanding that they do say that, it is just not accurate***."

200. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

Case 3:25-mc-00169 RBM Document 64 Filed 09/18/25 Page 69 of 81 PageID 888
Case 3:25-cv-01401-RBM-DMR Document 38 Filed 09/18/25 Page 69 of 81 PageID 1745
PageID 1745

a. Abacus has sustained a loss of market capitalization;

b. Abacus lost out on 1.5% management fees in connection with a $100 million private fund deal over the course of five years;

c. Abacus and its direct subsidiaries have lost several prospective customers, representing investible funds in an amount to be proven at trial;

d. Abacus has lost several current customers;

e. Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million per year for five years, totaling $5.5 million, the profits of which would have been $2.5 million or more, and which would have given the company valuable data on approximately nine million individuals; and

f. Due to the drop in stock price caused by the Defendants, Abacus has suffered damages in an amount to be proven at trial flowing from the interruption to the company's deal flow.

201. Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

202. Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

203. Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

204. Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

205. Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation, including with regard to Carlisle's fundraising efforts.

206. Convetry's and Buerger's statements were published with express malice, primarily motivated by an intent to injure Abacus, as demonstrated without limitation in Paragraph 91.

207. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

## COUNT II
### (Defamation by Implication against all Defendants)

208. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

209. Abacus is not a public figure or a limited public figure.

210. Coventry and Buerger are non-media defendants.

211. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

70

Case 6:25-cv-01401-RBD-RMN Document 64 Filed 09/18/25 Page 72 of 81 PageID 890
Case 3:25-mc-00169 Document 1-3 Filed 12/18/25 Page 170 of 255
PageID 1747

212. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

213. Coventry and Buerger created a defamatory implication about Abacus by falsely comparing Abacus to past life settlements companies that failed, implying Abacus violated various state and federal laws, and suggesting Abacus improperly inflated its enterprise valuation. Coventry and Buerger did so by juxtaposing and/or omitting facts with the intention of creating a defamatory implication.

214. Coventry and Buerger created a defamatory implication about Abacus using intentionally misleading statements, including but are not limited to:

    a. "[Abacus's] fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up . . . is dead. . . . I worry that it's going to be $300, $400, $600, and $1 billion. With Mutual Benefits, it was $800 million. . . . It's going to be awful for us."

    b. "The unique relationship includes Abacus having held a seat on LAPETUS' board of directors through Abacus CEO Jay Jackson, and Abacus affiliates investing heavily in LAPETUS. . . . Both of these relationships may violate the Life Expectancy reform law passed by the legislature in the wake of the Mutual Benefits collapse. ***Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their relationships***, the legislature now requires independence between settlement providers and Life Expectancy providers. . . . ***The relationship between Lapetus and Abacus is so close*** that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the

market, bizarrely asserted that 'Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions.'"

c. "There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements. There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and **all of them have gone bankrupt**."

d. "[W]e"—referring to Coventry—"do a fair value calculation because I want to know what my policies are worth."

e. "As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q."

f. "[R]ight now they've been trying to get the stock price up through their stock repurchase plan."

215. Upon information and belief, Defendants have made other defamatory implications about Abacus that will be revealed through discovery in this action.

216. Coventry's and Buerger's defamatory implications exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization;

b. Abacus lost out on 1.5% management fees in connection with a $100 million private fund deal over the course of five years;

c. Abacus and its direct subsidiaries have lost several prospective investors, representing investible funds in an amount to be proven at trial;

    d.  Abacus has lost several current customers;

    e.  Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million per year for five years, totaling $5.5 million, the profits of which would have been $2.5 million or more, and which would have given the company valuable data on approximately nine million individuals; and

    f.  Due to the drop in stock price caused by the Defendants, Abacus has suffered damages in an amount to be proven at trial flowing from the interruption to the company's deal flow.

217. Coventry and Buerger published these defamatory implications about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

218. Coventry and Buerger knew the false and implications statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

219. Coventry's and Buerger's false and defamatory implications do not enjoy any absolute or qualified privilege.

220. Coventry and Buerger published these false and defamatory implications about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

221. Coventry's and Buerger's statements were published with express malice, primarily motivated by an intent to injure Abacus, as demonstrated without limitation in Paragraph 91

73

222.   Coventry's and Buerger's false and defamatory implications have adversely affected Abacus's otherwise good business reputation, including with regard to Carlisle's fundraising efforts.

223.   As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

## <u>COUNT III</u>
### (Defamation *Per Se* against all Defendants)

224.   Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein.  Abacus further alleges:

225.   Abacus is not a public figure or a limited public figure.

226.   Coventry and Buerger are non-media defendants.

227.   Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

228.   Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

229.   Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

230. Coventry's and Buerger's statements about Abacus are false, including but not limited to the statements listed in Paragraphs 199 and 214.

231. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation.

232. Coventry's and Buerger's false statements are defamatory *per se* because, when considered alone without innuendo, these statements subject Abacus to distrust, contempt, or disgrace and/or injure Abacus in its trade or profession by accusing Abacus of securities law violations as well improperly inflating its enterprise valuation.

233. Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

234. Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

235. Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

236. Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

Case 3:25-mc-00169 Document 1-3 Filed 09/18/25 Page 77 of 81 PageID 895
Case 1:25-cv-01401-RDB-DHM Document 64 Filed 09/18/22/25 Page 8 of 75 Page 255
PageID 1752

237.  Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation, including with regard to Carlisle's fundraising efforts.

238.  As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

## COUNT IV
### (Deceptive and Unfair Trade Practices, Fla. Stat. § 501.204, against all Defendants)

239.  Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein.  Abacus further alleges:

240.  At all relevant times, Coventry and Buerger were engaged in trade or commerce as defined in section 501.203(8) of the Florida Statutes.

241.  Coventry and Buerger violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") by engaging in a deceptive and unfair smear campaign to damage Abacus's share price, reputation in the marketplace, and business relationships, as set forth above (*supra* ¶¶ 87–151), for Coventry's and Buerger's perceived gain.

242.  Coventry and Buerger further violated FDUTPA in its statements directed at Lapetus, including, *inter alia*, claiming that Lapetus LEs posed an "existential threat" to the life settlements business.  These

statements were substantially the cause of Lapetus going out of business in August of 2025.

243. The Defendants' attacks on Lapetus misconstrued data, misrepresented facts, and misled Lapetus's customers, one of which was Abacus. The attacks were untrue, and thus their dissemination was immoral, unethical, oppressive, and unscrupulous.

244. Coventry's and Buerger's deceptive and unfair trade practices have caused Abacus actual harm, including but not limited to by causing Abacus's share price to drop, causing Abacus to lose revenue and profits, and causing Abacus to suffer other commercial injuries. Coventry's and Buerger's deceptive and unfair trade practices have also harmed consumers by misleading investors and artificially consolidating market share in Coventry.

245. Coventry and Buerger's deceptive and unfair trade practices have also harmed Abacus as a customer for LEs as it incurs professional fees and switching costs to recoup the unique medical underwriting information that it was only able to obtain from Lapetus, in an amount to be proven at trial.

## <u>COUNT V</u>
### (Tortious Interference with Business Relations against Buerger)

246. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

247.   Abacus has business relationships with several large investors, including the large credit union referenced in Paragraph 170.

248.   Buerger spoke to the CFO of the credit union specifically because Buerger was aware the credit union was invested with Abacus.

249.   Buerger intentionally and unjustifiably encouraged the credit union CFO to question and distrust Abacus's valuation marks through his use of the Coventry studies.

250.   As a result, the CFO took a wait-and-see approach since June 4, 2025, on a fund-of-one investment in the range of \$30–40 million, causing Abacus to lose out on at least \$7 million in fees and gain-on-sale proceeds. This was a breach in a business relationship.

251.   Buerger's activities, and those like it with other customers, have caused Abacus reputational harm.

252.  The Defendants' misconduct, as alleged herein, was grossly negligent in that it was so reckless or wanting in care that it constituted a conscious disregard of Abacus's rights. Alternatively, Defendants' misconduct, as alleged herein, was intentional such that they had actual knowledge of the wrongfulness of the conduct and of the high probability that injury or damage would result to Abacus and, despite that knowledge, intentionally pursued their course of conduct.

## **RELIEF**

WHEREFORE, Abacus demands judgment against Defendants and requests relief as follows:

      a. Compensatory damages in an amount to be proven at trial, including but not limited to for redress of reputational harms;

      b. An award of punitive damages;

      c. A judicial declaration that the statements listed in Paragraphs 199 and 214 are defamatory;

      d. An order requiring Defendants to retract all previously published defamatory statements;

      e. Attorneys' fees and costs;

      f. Pre- and post-judgment interest, to the maximum extent provided by law; and

      g. Any and all other legal or equitable relief to which Abacus is entitled.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Abacus respectfully demands a trial by jury on all issues so triable.

79

DATED: September 18, 2025

/s/ Jason Sternberg

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Alex Zuckerman (*pro hac vice*)
alexzuckerman@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000

Jason D. Sternberg (Fla. Bar No. 72887)
jasonsternberg@quinnemanuel.com
David M. Walsh (Fla. Bar No. 1048823)
davidwalsh@quinnemanuel.com
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
(305) 402-4880

Kathleen S. Messinger (*pro hac vice*)
kathleenmessinger@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Attorneys for Plaintiff Abacus Global Management, Inc.*

# EXHIBIT D

10:54



Sean >

iMessage
Tue, Feb 11 at 5:49 AM

Hi Sean.  Good morning.  This is John Dippold from Lapetus.  I'm the Chief Sales Officer – we met at the LISA conference in Oct.

Karl shared you had reached out re the Coventry press release.  We're already in process on a response and I can share with you what we've been doing and are doing.

When's a good time for a quick call today?

Tue, Feb 25 at 5:57 AM

Hi Sean.....GM!  It's John Dippold from Lapetus.  Hope all is well.

We're developing a new product that we think, in

iMessage

DIPPOLD -0001





**Sean** ›

combination with our existing LE product, will bring tremendous value to the ABL, the industry in general, and also address some of the issues raised by Alan (hopefully putting that whole swirl to rest). We're developing this because it allows us to significantly expand our business in multiple potential ways.

I'd like to share this with you to get your thoughts/feedback and then we can discuss further expanding the group within ABL that's aware of this effort. We intend to keep this confidential until it's ready to launch.

When's generally a good time of day to try to reach you? I'm fine just giving you a call and seeing if that time happens to work. I'll aim for around 11:30am ET this morning but if




10:54



Sean ›

effort.  We intend to keep this confidential until it's ready to launch.

When's generally a good time of day to try to reach you?  I'm fine just giving you a call and seeing if that time happens to work.  I'll aim for around 11:30am ET this morning but if there's another time that's better let me know.

Hello John, I am available at 10:00 AM. Does that work for you?

That works!  I'll call you then

Thu, Jul 24 at 2:25 PM

Hi Sean.  It's John Dippold. Quick fyi I'm no longer working at Lapetus.  Please reach out to Jay Olshansky for any questions regarding Lapetus.

Delivered

iMessage

IN THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT IN AND
FOR LEON COUNTY, FLORIDA

CASE NO.: 2025-CA-463

COVENTRY FIRST, LLC, a
Foreign Limited Liability Company

       Petitioner,

vs.

FLORIDA OFFICE OF INSURANCE
REGULATION    and    LAPETUS
SOLUTIONS, INC., a foreign for profit
corporation,

       Respondents.

_____/

## **AFFIDAVIT**

STATE OF CALIFORNIA
COUNTY OF SAN MATEO

    Before me the undersigned authority personally appeared John Dippold, who, after being

duly sworn, deposes and states as follows:

    1.    I have reached the age of majority, am competent to testify, and make the

following statements on personal knowledge.

    2.    I am the Chief Executive Office for Lapetus Solutions, Inc. ("Lapetus").

    3.    As required by Florida law, Lapetus submitted triennial reports ("Reports") to the

Florida Office of Insurance Regulation ("OIR").

    4.    The Reports contained audits of all life expectancies by Lapetus for the three

calendar years prior to each Report.

    5.    The Reports were conducted and certified by a nationally recognized actuarial

firm.

6.    The Reports contained a mortality table.

7.    The Reports contained the number, percentage, and an actual-to-expected ratio of life expectancies in the following categories: life expectancies of less than 24 months, life expectancies of 25 months to 48 months, life expectancies of 49 months to 72 months, life expectancies of 73 months to 108 months, life expectancies of 109 months to 144 months, life expectancies of 145 months to 180 months, and life expectancies of more than 180 months.

8.    The Reports contained trade secrets that are confidential and proprietary, and have never been made available to the public.

9.    Each page of the Reports was clearly marked as "trade secret."

10.    There were no non-trade secret materials submitted with the Reports.

11.    A notice of trade secrets was duly submitted to the OIR with the Reports, which included affidavits certifying under oath that all documents and information are trade secrets. The affidavits are attached hereto as **Composite Exhibit A**.

**FURTHER AFFIANT SAYETH NOT**

2

DIPPOLD -0005

Affiant: John Dippold

STATE OF CALIFORNIA
COUNTY OF SAN MATEO


Sworn to and subscribed before me by means of ✓ physical presence or online notarization, this _____ day of 5/8/2025. Such person did take an oath and: *(Notary must check applicable box).*

☐ is/are personally known to me.
☑ produced a current driver's license as identification.
☐ produced _____ as identification.

{Notary Seal must be affixed}

_____
SIGNATURE OF NOTARY

_____
Name of Notary *(Typed, Printed or Stamped)*

D. ZANASSI
COMM. # 2363951
NOTARY PUBLIC - CALIFORNIA
SAN MATEO COUNTY
COMM. EXPIRES JULY 3, 2025

DIPPOLD -0006

**GENERAL AFFIDAVIT**

State of __California_____

County of ____San Mateo_____

I, John Dippold, of Lapetus Solutions, Inc (1213 West Morehead Street, Charlotte, NC

28208) do hereby swear under oath that the supplemental information provided to

amend the Lapetus 2025 Florida Office of Insurance Regulation submission:

1. My company considers this information a trade secret that has value and provides an advantage or an opportunity to obtain an advantage over those who do not know or use it.
2. My company has taken measures to prevent the disclosure of the information to anyone other than those who have been selected to have access for limited purposes, and [I intend/my company intends] to continue to take such measures.
3. The information is not, and has not been, reasonably obtainable without my consent by other persons by use of legitimate means.
4. The information is not publicly available elsewhere.

Under penalty of perjury, I hereby declare that and affirm that the above stated facts, to the best of my knowledge, are true and correct.

DATED the __7__ day of May, 2025

_____
Signature of Affiant

SWORN to subscribed before me, this _____ day of May, 2025

_____
NOTARY PUBLIC

My Commission Expires: _____

See Attached California All Purpose
Certificate of Acknowledgement/Jurat

DIPPOLD -0007

# CALIFORNIA
# JURAT CERTIFICATE

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of __San Mateo_____

Subscribed and sworn to (or affirmed) before me on this __7th__ day of __May_____,

20__25__ , by __John Dippold_____,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS MY HAND AND OFFICIAL SEAL.

```
D. ZANASSI
COMM. # 2363951
NOTARY PUBLIC · CALIFORNIA
SAN MATEO COUNTY
COMM. EXPIRES JULY 3, 2025
```

_____
Signature of Notary Public                                                    (Notary Seal)

## OPTIONAL INFORMATION

*The jurat contained within this document is in accordance with California law. Any affidavit subscribed and sworn to before a notary shall use the preceding wording or substantially similar wording pursuant to Civil Code sections 1189 and 8202. A jurat certificate cannot be affixed to a document sent by mail or otherwise delivered to a notary public, including electronic means, whereby the signer did not personally appear before the notary public, even if the signer is known by the notary public. The seal and signature cannot be affixed to a document without the correct notarial wording. As an additional option an affiant can produce an affidavit on the same document as the notarial certificate wording to eliminate the use of additional documentation.*

DESCRIPTION OF ATTACHED DOCUMENT

__General Affidavit_____
(Title of document)

Number of Pages __2____ (Including jurat)

Document Date __May 7th 2025__

_____
(Additional Information)

CAPACITY CLAIMED BY THE SIGNER

- [ ] Individual
- [✔] Corporate Officer
- [ ] Partner
- [ ] Attorney-In-Fact
- [ ] Trustee
- [ ] Other: _____

MMX V. BAN2 510.409.1334    www.BayAreaNotary.com

## GENERAL AFFIDAVIT

State of __California_____

County of ____San Mateo_____


I, John Dippold, of Lapetus Solutions, Inc (1213 West Morehead Street, Charlotte, NC

28208) do hereby swear under oath that the supplemental information provided to

amend the Lapetus 2025 Florida Office of Insurance Regulation submission:


1. My company considers this information a trade secret that has value and provides an advantage or an opportunity to obtain an advantage over those who do not know or use it.
2. My company has taken measures to prevent the disclosure of the information to anyone other than those who have been selected to have access for limited purposes, and [I intend/my company intends] to continue to take such measures.
3. The information is not, and has not been, reasonably obtainable without my consent by other persons by use of legitimate means.
4. The information is not publicly available elsewhere.


Under penalty of perjury, I hereby declare that and affirm that the above stated facts, to the best of my knowledge, are true and correct.

DATED the __7__ day of May, 2025


_____
Signature of Affiant



SWORN to subscribed before me, this _____ day of May, 2025


_____
NOTARY PUBLIC

My Commission Expires: _____

See Attached California All Purpose
Certificate of Acknowledgement/Jurat

# CALIFORNIA
# JURAT CERTIFICATE

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _San Mateo_

Subscribed and sworn to (or affirmed) before me on this _7th_ day of _May_,

20_25_, by _John Dippold_,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS MY HAND AND OFFICIAL SEAL.

_____
Signature of Notary Public

D. ZANASSI
COMM. # 2363951
NOTARY PUBLIC · CALIFORNIA
SAN MATEO COUNTY
COMM. EXPIRES JULY 3, 2025

(Notary Seal)

## OPTIONAL INFORMATION

*The jurat contained within this document is in accordance with California law. Any affidavit subscribed and sworn to before a notary shall use the preceding wording or substantially similar wording pursuant to Civil Code sections 1189 and 8202. A jurat certificate cannot be affixed to a document sent by mail or otherwise delivered to a notary public, including electronic means, whereby the signer did not personally appear before the notary public, even if the signer is known by the notary public. The seal and signature cannot be affixed to a document without the correct notarial wording. As an additional option an affiant can produce an affidavit on the same document as the notarial certificate wording to eliminate the use of additional documentation.*

DESCRIPTION OF ATTACHED DOCUMENT

_General Affidavit_
(Title of document)

Number of Pages _2_ (Including jurat)

Document Date _May 7th 2025_

_____
(Additional Information)

CAPACITY CLAIMED BY THE SIGNER

[ ] Individual
[✔] Corporate Officer
[ ] Partner
[ ] Attorney-In-Fact
[ ] Trustee
[ ] Other: _____

MMX V. BAN2 510.409.1334    www.BayAreaNotary.com

9:47  

 **David Lloyd** 

**Thu, Jun 5**

Hi David,

Sharing a couple quick thoughts / items with you in advance of the call today.  I discussed these points with Gary last night.  Note it's critical you join if you can as these are some fundamental issues to be discussed as soon as possible.

1). I've had concerns about the LE business since pretty much joining the company and concerns about the response to the Coventry press release.  Our meeting in April at ABL increased those concerns and the article yesterday has enough correct info in it that I can't in good faith continue to work with ABL.  I don't trust them.  Since they're our primary and basically only client I can no longer lead this business.

  

9:48

  **David Lloyd**  

no longer lead this business.

2). I've also had growing concerns about the viability of the facial analytics business. Recent developments over the past couple weeks lead me to question whether it's a viable product. Short story is the tech / market seems to have moved and is moving to video as the future. Our approach (we need a photo-quality selfie - not an image pulled from a video) appears to not be compatible or accommodative with that fact and per Ben and Harry yesterday "video is the future". I think we as a business have not evolved the approach quickly enough to make FA a scalable product. I may be wrong but my recent trip to India (2 weeks ago) and our struggles to achieve the MML performance targets highlights that the way we're seeking to do this and what we're able to

   

9:48

**David Lloyd**

compatible or accommodative with that fact and per Ben and Harry yesterday "video is the future". I think we as a business have not evolved the approach quickly enough to make FA a scalable product. I may be wrong but my recent trip to India (2 weeks ago) and our struggles to achieve the MML performance targets highlights that the way we're seeking to do this and what we're able to deliver doesn't match market needs/requirements.

For the call today we need to discuss the path forward.

If you're not able to join the call today we should find a day/tim...

**Read more**                     1:52 AM ✓✓

Thanks John, I will do my very best to join the call        1:57 AM

Thank you   2:24 AM ✓✓

DIFFOLD -0013

# EXHIBIT E

# Centenarians, Survival Dynamics, Lapetus LEs, and Growing the Life Settlement Industry Through Standardization

## S. Jay Olshansky, Ph.D.

jay@lapetussolutions.com

**Chief Scientist, Lapetus Solutions, Inc.**

**Professor, University of Illinois at Chicago**

Advisory Board: American Federation for Aging Research, PepsiCO, U.S. Social Security Administration

Advisor: JPMorgan, Prudential, AIG, Swiss Re, UK Government, Swiss Government, United Nations, WHO…

**TESTIMONY ON THE FUTURE OF HUMAN LONGEVITY: U.S. CONGRESS, 9/22**





LSI000001



- Why Living to 100 Will Remain Rare: Latest Results from Nature Aging

- Observed Survival in the Lapetus Database & How Patients are Medically Underwritten at Lapetus

- Growing the Life Settlement Industry by Standardizing Data Analytics and Survival Analysis?

**LSI000002**



- Why Living to 100 Will Remain Rare: Latest Results from Nature Aging

**LSI000003**

JOURNAL ARTICLE

# In Search of Methuselah: Estimating the Upper Limits to Human Longevity

**S. Jay Olshansky, Bruce A. Carnes and Christine Cassel**



Science

New Series, Vol. 250, No. 4981 (Nov. 2, 1990), pp. 634–640 (7 pages)

Published By: American Association for the Advancement of Science

## nature aging

Analysis
https://doi.org/10.1038/s43587-024-00702-3

# Implausibility of radical life extension in humans in the twenty-first century

Received: 14 June 2023

Accepted: 5 August 2024

**S. Jay Olshansky [1] ✉, Bradley J. Willcox[2], Lloyd Demetrius[3] & Hiram Beltrán-Sánchez[4]**

LSI000004



Figure. Age Distribution of Life Table Deaths for Women in the United States, per 100 000 People, 1900 and 2016

The red zone represents a period in life when the risk of frailty and disability begins to increase rapidly. The goal of aging science is to delay and compress the red zone, which may extend healthy life. Sources: 1900 data from Bell and Miller[1]; 2016 data from Human Mortality Database.[2]

1. The slowdown in the rise in longevity is a product of success, not failure. Most people living beyond age 60 are living on "manufactured time".

2. As life expectancy rises, mortality improvements MUST slow down. This was hypothesized by us in *Science* in 1990; <u>it has now been proven</u>.

3. Mortality improvement factors that assume death rates will decline in a linear fashion in the future, will <u>overestimate</u> survival. This is the case with VBT tables and other specialized tables (including cohort life tables) for insured populations.

Source: Olshansky, S.J. 2018. *JAMA*.320(13):1323-1324

LSI000005



**Source:** Olshansky, S.J., Willcox, B.J., Demetrius, L. *et al.* Implausibility of radical life extension in humans in the twenty-first century. *Nat Aging* (2024). https://doi.org/10.1038/s43587-024-00702-3

LSI000006

# What Does This Mean for Life Settlements?

- Survival to age 100 will remain a rare event, even among insured populations. Rising prevalence of centenarians is baked in

- Mortality improvement factors in the 1-2%+ range annually will overestimate survival

- The life settlement industry can remain confident in the constancy and stability of human mortality

- Geoscience will eventually slow aging, but not in enough time to influence current investments in life settlements

**LSI000007**



LSI000008



- **Observed Survival in the Lapetus Database & How Patients are Medically Underwritten at Lapetus**


LSI000009



LSI000010

# Life Settlements at Lapetus: The Facts

**~ 15,000 + total case reviews**

**~ 11,000 + unique cases**

**~ 800 + unique maturations**

**23.6% of cases are <u>duplicates</u> – the same person evaluated multiple times for the same or different clients; often with different medical records**

**% of maturations that occurred earlier than point estimate:  ~ 94.0%**

**% of maturations that occurred later than point estimate:  ~ 6.0%**

**% of cases reviewed now alive that were predicted to be alive:  ~ 98.7%**

**LSI000011**

# Life Settlements at Lapetus: The Facts



**Distribution of LEs in the Lapetus Database**

LSI000012

# Life Settlements at Lapetus [for Coventry]: The Facts

~ 4,000 + case reviews

Percentage of cases reviewed for Coventry that are <u>duplicates</u>: **9.7%**

~ 200 + unique maturations

% of maturations that occurred earlier than point estimate: **95.5%**

% of maturations that occurred later than point estimate: **4.5%**

% of cases reviewed now alive that were predicted to be alive: **99.1%**

LSI000013

# This is How to Create an Apples-to-Apples Comparison of Lapetus LEs to Other LE Providers Evaluating the Same Patient



* All compared assessments must be clinical/medical reviews.

* Medical records on the same patient must match perfectly.

* Adjust the LEs to account for Lapetus interpolation of life tables to the day.

* Adjust the LEs to account for time that passed between assessments. Simply subtracting time between assessments will yield erroneous results – life tables do not work that way.

* Lapetus generates multiple clinical reviews on the same patient [duplicates]. The choice of which clinical review to choose is critical since health transitions often take place between reviews.

- All published research in science <u>must include</u> a section on "Data and Methods" so the work can be replicated and validated by anyone.
- Absence of this critical step generates an instant rejection and invalidates the science.



**LSI000014**

# How Lapetus Operates



- 100% of Lapetus LEs are clinical/medical reviews



- Most Lapetus clinical LEs are reviewed internally by Ph.D.s with expertise in survival analysis

- Lapetus is a certified LE provider through the States of Florida and Texas







- All Lapetus LE reports contain evidence with citations [NO BLACK BOX]

LSI000015

# Should VBT or Related Special Life Tables be Used When Assessing Survival in Medical Reviews?

## NO! Why not?

Hazard Ratio for total mortality for smokers vs nonsmokers
HR = 1.90 (95% CI: 1.69 – 2.14)

**Frame of Reference: nonsmokers from the <u>general population</u> = 1.0**

- VBT or related specialized life tables should not be used for medical underwriting
- Medical underwriting requires that the frame of reference match the studies upon which the HRs are based
- Using such tables would <u>overestimate survival</u>

**LSI000016**

# Life Settlements at Lapetus: The Data



**NHANES – the gold standard in human health and longevity.**

**Medical Literature:  Tens of thousands of clinical trials linking impairments to survival.**





**Observed survival dynamics in life settlement populations (AVS + multiple other companies) + National Health Surveys globally + Human Mortality Database + WHO Life Tables + SSA Life Tables + SOA / VBT tables, etc., etc.**

LSI000017

# Life Settlements at Lapetus: The Science

## The Big Three Determinants of Survival

### Observed Survival Outcomes for People with Impairments



### Social Determinants of Health



### Genetics of Exceptional Longevity



**LSI000018**

# Life Settlements at Lapetus: The Science

**The value of a LE report is not just in the point estimate of survival. It's the subtle elements of a person's life that influence how long they're likely to live. Some can be quantified, and others cannot. Contained within Lapetus LE reports are "signals" that clients can use to gauge the stability or instability of the survival estimate. Non-quantifiable attributes can be highly relevant.**





Survival Skews



Baseline LE: 42.0 months
Lapetus LE: 20 months
Lapetus LE Range: 10 to 35 months
Lapetus Projected Death Age: 94.6 years

Lapetus Projected Death Age Range:
93.7 to 95.8 years
**Lapetus Survival Skew: 5 months toward older ages***

**Explanation for Skew: Family history of longevity, few medications, and physical activity. He still has risk factors that bring the survival average down significantly, but we have to acknowledge the possibility that he is a super ager.**

**Summary**

Current age: 70.3 years
Baseline LE: 258 months
Lapetus LE: 192 months
Lapetus LE Range: 120-222 months
Lapetus Survival Skew: [ Asymmetrical – left skew * 4 months]

Doctor comments: This patient is polypharmacy, experiencing frailty syndrome, has a history of falling, is at an exceptionally high risk of another fall, and has expressed suicidal ideation.

Superager Status





4 Habits of 'SuperAgers' | Northwestern Medicine

LSI000019

# Life Settlements at Lapetus: The Science

## Health Status Summary

In my opinion as a physician, based on the medical records provided, there is evidence to suggest the patient's recent health status is: **Stable**

Are there signals in the medical record suggesting the patient could be a super ager*?: **Yes**

Explanation:
Controlled comorbidities, good medical support, physically active, no cognitive impairment.

* A superager is a member of a subgroup of the population that has already survived to at least age 80, and who retain their cognitive functioning longer than average and tend to live beyond what is considered average for their age and gender.

**SEER Relative Survival Rates by Stage at Diagnosis For Pancreas Cancer, All Races, All Ages, Both Sexes SEER 9 Registries for 1988-2003**

|  | Localized | Regional | Distant | Unstaged |
|---|---|---|---|---|
| Time zero | 100.0% | 100.0% | 100.0% | 100.0% |
| 1-year | 40.5% | 38.0% | 10.5% | 20.8% |
| 2-year | 24.5% | 16.7% | 4.1% | 9.3% |
| 3-year | 19.5% | 10.5% | 2.6% | 6.2% |
| 4-year | 18.0% | 8.2% | 1.9% | 5.1% |
| 5-year | 17.4% | 7.2% | 1.6% | 4.7% |
| 6-year | 16.8% | 6.7% | 1.4% | 4.6% |
| 7-year | 16.8% | 6.1% | 1.2% | 4.4% |
| 8-year | 16.8% | 5.7% | 0.9% | 4.1% |
| 9-year | 16.8% | 5.6% | 0.8% | 3.9% |
| 10-year | 16.6% | 5.3% | 0.7% | 3.6% |

**LSI000020**



- **Growing the Life Settlement Industry by Standardizing Data Analytics and Survival Analysis?**

LSI000021

# Standardize Elements of Life Settlement Operations

1. Create a gold standard life table for life settlement industry. Everyone should have access to the same data on observed survival in a life settlement population. Cooperation Required.

2. Eliminate the wait for life table updates. Deploy a live life table that is standardized for industry use. Cooperation Required.

3. Construct impairment-specific survival curves for life settlement populations using #1 and #2. Use this to augment [not replace] the medical literature. Cooperation Required.

4. Standardize calculation of metrics of success and accuracy. This may very depending on methods of analysis chosen by LE providers. Cooperation Required.

LSI000022



2) **Relationship between insured and general population mortality.** We did not observe strong support to suggest the insured mortality at the **Older Ages** exhibited a different pattern of mortality than the general U.S. population, once normalized for socioeconomic equivalency.

LSI000023

# EXHIBIT F



Phone: 407 966 2680
Fax: 407 966 2681
pmascia@nardellalaw.com

December 3, 2025

**VIA EMAIL ONLY:**
Michael.McGinley@dechert.com

Michael McGinley, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808

> **Re:**    ***Abacus Global Management, Inc. ("Abacus") v. Coventry First, LLC et al.,
> Case No. 25-cv-01401 (M.D. Fla. 2025) (the "Litigation")- Lapetus Solutions,
> Inc. Response to Third Party Subpoena dated August 29, 2025 (the
> "Subpoena")***

Dear Michael:

As you are aware, we represent Lapetus Solutions, Inc. ("Lapetus"), concerning the Subpoena issued by defendants Coventry First, LLC, and Alan Buerger (together "Defendants") in the above referenced Litigation.  This letter is in response your letter dated October 20, 2025 (the "First Letter"), our meet and confer on October 31, 2025 (the "Initial Call"), your ensuing letter dated November 19, 2025 (the "Second Letter" and referred to together with the First Letter as the "Letters").

This letter response will serve as Lapetus' supplement and amendment to its previously timely served *Responses and Objections to Defendants' Subpoena* dated September 26, 2025 (the "Initial Objections") and will govern to the extent of any inconsistency with the Initial Objections.

Lapetus has engaged in a good faith dialogue with Defendants to address its objections to the Subpoena.  Subject to and without waiving any of its objections, and in otherwise in accordance with the terms of this letter, Lapetus will commence its production of documents responsive to Defendants' non-objectionable requests as set forth below, and on a rolling basis, on or before December 17, 2025.

***Relevance Generally***



Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801

Michael McGinley, Esq.
December 3, 2025
Page 2 of 15



As an initial matter, the Second Letter is not accurate in stating that I articulated Lapetus' "main concern" is being the "relevance threshold." While we did discuss relevance issues at length during the Initial Call, it is not the necessarily the "main" concern of Lapteus—but rather one of its many valid objections.

Lapetus disputes Defendants' assessment of Abacus's bases for the causes of action brought by Abacus in the Litigation, as set forth in Abacus' pending *First Amended Complaint* (Dkt. No. 38) (the "Complaint") and further articulated in Abacus' Response in Opposition to Defendants' Motion to Dismiss (Dkt. No. 51) (the "MTD Response").

Abacus has sued Defendants for specific defamatory statements made by Defendants "***about Abacus***" that concern:

- Abacus' supposed dishonest inflation of its enterprise value ***due to Abacus' purported use of Lapetus' life expectancy reports to value its assets***;

- Abacus' alleged manipulation of its financial statements to generate unrealized gains that inaccurately reflected its true earnings ***due to Abacus' purported use of Lapetus' life expectancy reports to value its assets***;

- Abacus' alleged securities law and state law violations;

- ***Abacus'*** alleged use of asset back debt;

- ***Abacus' resemblance*** to another public life settlements company that failed; and

- Other ***business practices of Abacus***.

*See Complaint* at Count I (Defamation) ¶¶ 193 – 207, 198, 199; Count II (Defamation by Implication) ¶¶ 208 – 223, 212, 213; Count III (Defamation *Per Se*) ¶¶ 224 – 238, 229, 230.

Abacas also brings a claim under the Florida Deceptive and Unfair and Practices Act ("FDUTPA") by alleging that these same false and defamatory statements constitute the "unfair trade or practice" for its FDUTPA claim. *See Complaint* at Count IV (FDUTPA) ¶¶ 239 - 245; *MTD Response* at 21 – 22. Finally, Abacus brings a tortious interference claim that does not implicate Lapetus. *See Complaint* at Count V (Tortious Interference with Business Relations) ¶¶ 246 – 253.

Defendants contend that the ***accuracy*** (or inaccuracy) of Lapetus' life expectancy report (a "LE") is relevant to Abacus' defamation and FDUTPA claims. In the Second Letter, Defendants point to

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801

Case 3:25-mc-00169   Document 1-6   Filed 12/18/25   Page 3 of 16



Michael McGinley, Esq.
December 3, 2025
Page 3 of 15

the many times that Lapetus appears in the general allegations of Abacus' Complaint, and quote Paragraph 6 of the Complaint which provides in relevant part:

> *Defendants core claim is that Lapetus life expectancies are too short, **and that Abacus relies on those estimates to intentionally overvalue the policies it buys and sells.*** (emphasis added).

Defendants take this sentence and the ensuing general allegation at paragraph 7(a) out of context and entirely misses the that real crux of Abacus' defamation and FDUTPA claims do not center on the ***accuracy*** (or inaccuracy) of Lapetus' LEs—but rather Defendants' defamatory claim that ***Abacus uses*** Lapetus' LEs to (over)value its assets and engineer fictitious unrealized gains. Simply put, the accuracy (or inaccuracy) of Lapetus' LEs have no relevance to Abacus' claims.

To the extent Defendants have missed the central thrust Abacus' claims by their reading of the Amended Complaint, Abacus' MTD Response puts to rest any doubt. None of the Defendants' defamatory statements complained of by Abacus have anything to do with ***the accuracy*** of Lapetus' LEs. They instead have to do with ***Abacus' own alleged use*** of the Lapetus LEs—which Abacus refutes by explaining that it does not use Lapetus LEs in valuing its assets or pricing its policies for sale on the tertiary market. *See MTD Response*. Accordingly, Lapetus maintains its relevance objections.

### *Other Issues Raised in the Letters*

Defendants' First Letter asserted that Lapetus has failed to exercise "reasonable efforts" to locate and produce all documents in its possession in order to comply with each unobjectionable request. Defendants do not reiterate this concern in the Second Letter. To the extent that Defendants maintain this assertion after the Initial Call, Lapetus disputes the same. Lapetus will continue to fulfil its obligations under the Federal Rules by undertaking reasonable efforts to locate and produce documents in its possession, custody or control, in order to comply with each unobjectionable request, and in conformity with Lapetus' good faith efforts to to resolve its objections meeting and conferring with Defendants.

Lapetus further asserts that as to unobjectionable request, it need only exercise "reasonable efforts" to locate and produce such nonprivileged documents as are in its "possession, custody or control" to comply with Federal Rule 45. Defendants asserted in the First Letter that Lapetus must additionally produce documents in its "constructive possession"—which it appeared to define as documents "to which [Lapetus] has access." Lapetus therefore interprets Defendants' demand to produce applicable case law defines as documents within Lapetus' "control", which extend to documents that Lapetus has "a legal right, authority or practical ability to obtain on demand." *See Selectica, Inc. v. Novatus, Inc.*, No. 6:13-cv-1708-Orl40TBS, 2015 U.S. Dist. LEXIS 30460, at *9

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801




Michael McGinley, Esq.
December 3, 2025
Page 4 of 15



(M.D. Fla. Mar. 12, 2015). Defendants appear to demand in the First Letter that Lapetus extend its search to Lapetus former employees, affiliates, subsidiaries and a non-entity branded initiative referenced in one of Abacus's public SEC filings.

Lapetus currently has only one employee. It conducted an exit protocol with former employees to collect any documents pertaining to their work at the time of termination. As such, it is not reasonable to require that Lapetus again undertake efforts to seek documents from former employees in order to comply with the Subpoena. As for subsidiaries or affiliates, Lapetus has none. As for the "partnership" referred to in Abacus' 2024 SEC 10(k) filing as "Lapetus Life Event Solutions," it was merely proposed collaboration that never materialized—not an entity upon which Lapetus may make a demand for responsive documents. In short, Lapetus will comply with its obligations under the Federal Rules. However, neither the rules nor any applicable case law use the phrase "constructive possession" set forth in the First Letter.

Lapetus continues to maintain its overbreadth objection as to the Subpoena's timeframe of January 1, 2022, to the present date. As Defendants observe in the First Letter, Abacus' allegations are as to defamatory statements of Defendants arising "as early as October of 2023." *See Complaint* at ¶ 90. The earliest dates referenced in the Complaint are all in 2023. *See Complaint* at ¶ 89 ("Defendants have been eager for a way to take down Abacus since the Company first went public in June of 2023"); ¶ 153 ("… the reality is that Buerger and Coventry have been working on this dossier since 2023, when Defendants first put Abacus in its crosshairs."). **Accordingly, Lapetus proposes in good faith an alternate timeframe for the Subpoena of January 1, 2023, to the present date.**

Lapetus amends its Initial Objections to the extent it objected to having to produce a "decade" worth of documents. However, even with a few year timeframe as to documents sought under the Subpoena, Lapetus will need to review of "a decade" worth of accumulated documents in order to identify those that would fall within the relevant time frame. Lapetus maintains an undue burden and disproportionality objection to that extent that requests require it to cull through a decade's worth of documents in view of the availability of many documents from the parties themselves, the early stage of the case where a motion to dismiss is pending and the extraordinary cost required to search, review and produce the documents requested. Nonetheless, Lapetus will continue to work with Defendants in a good faith produce documents responsive to unobjectionable requests.

Lapetus exercised good faith effort to reasonably interpret the requests. Progress has been made on this front through the parties meet and confer efforts, as reflected by the narrowing and amending of the Initial Requests in the Second Letter. It appears that Defendants no longer contend that Lapetus has in appropriately "rewritten" requests as stated in the First Letter. Lapetus will continue to interpret Defendants' requests in good faith, reserving its right to object as to those that are vague overbroad, unduly burdensome or otherwise objectionable. That Lapetus confirmed in its Initial Objections a commitment to produce in conformity with any Court order overruling its objections

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801

 

Case 3:25-mc-00169     Document 1-6     Filed 12/18/25     Page 5 of 16

Michael McGinley, Esq.
December 3, 2025
Page 5 of 15



was not an invitation to litigation. It was simply to make clear that Lapetus will stand on its appropriate objections and that Defendants should be reconfigure objectionable requests accordingly.

### *Cost of Production*

Lapetus has advised Defendants of the extraordinary cost of compliance with the Initial Requests. Lapetus received an estimated a cost from its account representative at Consilio, the firm which hosts Lapetus' archived data, of between $114,000 to $574,000, depending on the number of agreed search terms and volume of "hits" for each.

This estimated cost include storage fees, charges for, running search terms over the data in the staging environment, promoting documents hitting on search terms from the staging environment for review to an active workspace, performing a review for relevant documents and screening for proprietary or otherwise privileged information, and producing responsive documents. The estimated cost did not include the estimated legal cost for facilitating compliance and production.

Lapetus continues to maintain that it is entitled to cost-shifting for the costs of responding to the Subpoena. In order to determine whether a nonparty to litigation should bear the costs of gathering and copying documents, courts should consider whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance. *See In re Seroquel Rods. Liabl. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2007 LX 17507, at * (M.D. Fla. Dec. 6, 2007).

Lapetus is a classical disinterested third party with respect to the Litigation. Indeed, it stands to gain nothing of from the claims asserted by Abacus against Defendants and has no interest or care as to its outcome. Coventry is the largest life settlements provider in the industry and purchased over $1.4 billion in life settlement contracts in 2024. Lapetus, on the other hand, is a micro-enterprise with a single remaining employee and no revenues. The initial cost estimate by Lapetus is of such magnitude that it is literally impossible for it to comply.

Lapetus has mitigated this extreme cost burden and conducted expended a reasonable effort to determine whether it possesses documents responsive to Defendants' unobjectionable requests by contacting its former employee Dr. Jay Olshanksy, who would have been the person at Lapetus most likely to have prepared or been aware of such documents or communications.

Should Defendants desire Lapetus to additionally a physical search of its archives for documents responsive to Defendants' unobjectionable requests, it will need to advance the estimated cost prior to Lapetus undertaking it. However, the cost may be less than the original estimate due to the



Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801



Michael McGinley, Esq.
December 3, 2025
Page 6 of 15



narrowed requests contained in the Second Letter.  Once the parties confirm on an agreed scope as to the terms and custodians for any request, Lapetus can seek a revised cost estimate.

### ***Responses to Revised and Narrowed Requests Contained in Second Letter***

Lapetus understands the Initial Requests set forth in the Subpoena to be narrowed and amended as set forth in the Second Letter.  Lapetus' responses to the Defendants' amended requests established by the Second Letter are set forth below.

Requests 1 and 2:

The Second Letter limits and amends the documents and communications sought pursuant to these requests, and provides in relevant part:

*Defendants are amenable to narrowing the scope of these Requests to* <u>*documents and communications concerning the extent and nature of the business and financial relationship between Abacus and Lapetus, including subparts (i), (ii) and (iii) of Request 2, as well as any agreements, contracts, or other documents or communications governing the provisions of LEs by Lapetus to Abacus*</u>*.  We agree to hold in abeyance (pending discovery discussions with Abacus) any communications directly between Abacus and Lapetus as well as documents concerning Abacus that do not relate to those underlined topics.*

### **Response:**

In conformity with the Initial Call and the Second Letter, Lapetus interprets the phrase "any other financial arrangements concerning Abacus", with is item (iii) described above, to mean "any financial arrayments other than Abacus' purchase of LEs from Lapetus in the ordinary course of Lapetus business."

Subject to and without waiving the foregoing, Lapetus maintains it relevance objections.  The requested documents are not relevant to the Defendants' statements upon which Abacus bases its defamation and FDUTPA claims.  The extent and nature of the business relationship between Abacus and Lapetus, including any investment in Lapetus by Abacus, the convertible note disclosed in Abacus' SEC public filings, or any other non-ordinary course "financial arrangements" do not go to the truth or falsity of any of the alleged defamatory statements, as evidenced by the Complaint and the MTD Response.  Further, any such documents (in addition to any communications) are readily available to Defendants through discovery requests directed to Abacus.



Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801

Michael McGinley, Esq.
December 3, 2025
Page 7 of 15



Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference, and will produce no documents responsive to this request.

Requests 3 and 4:

The Second Letter limits and amends the documents and communications sought pursuant to these requests, and provides in relevant part:

*… documents and communications concerning Coventry's statement or beliefs about Abacus, Lapetus, and the accuracy or inaccuracy of any LE or valuation, are relevant and must be produced. By way of obvious (and non-exhaustive) examples, if a Lapetus employee expressed a sympathetic (or unsympathetic) view of Defendants' statements, they would be relevant. Similarly, to the extent someone expressed their understanding that Defendants' statements were their true opinion about a particular matter, such expression would be relevant.*

**Response:**

As set forth above in this letter, Lapetus maintains its objection that Defendants' statements concerning the accuracy (or inaccuracy) of its LEs are not ones upon which Abacus bases its defamation and FDUTPA claims. It is Abacus' use of Lapetus' LEs in valuing its assets, and not their accuracy (or inaccuracy), that go to the truth or falsity of any of the alleged defamatory statements, as evidenced by the Complaint and the MTD Response.

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference.

Without waiving the foregoing objections, Lapetus has made a reasonable search for documents or communications that relate to Defendants statements concerning Abacus' alleged use of Lapetus' LEs in Abacus' valuation of its assets and preparation of its financial reports, and Defendants' other statements concerning Abacus' other business activity relevant to Abacus allegations in the Complaint by contacting its former employee Dr. Jay Olshanksy, who would have been the person at Lapetus most likely to have prepared or been aware of any such documents or communications. Dr. Olshansky has advised that he is not aware of the existence of any such documents or communications.

Based upon the foregoing reasonable investigation, Lapetus has no documents to produce. Should Defendants desire that Lapetus conduct a further inspection of Lapetus' archived documents and communications for any that are within the foregoing scope, Lapetus will do so after the parties

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801



Michael McGinley, Esq.
December 3, 2025
Page 8 of 15

establish agreed search terms so that Lapetus can obtain an estimate for the cost of production, within a reasonable time after the Defendants have advanced the estimated costs.

Request 5:

The Second Letter provides in relevant part:

*We stand on the language of Request 5 and expect Lapetus to produce all responsive documents.*

**Response:**

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference, and will produce no documents responsive to this request.

Request 6:

The Second Letter limits and amends the documents and communications sought pursuant to this request, and provides in relevant part:

*We agree to limit Request 6 to documents and communications concerning the Fireside Chat portion of the LISA Conference, but we will otherwise seek all documents responsive to this Request.[1]*

**Response:**

As set forth above in this letter, Lapetus maintains its objection that Defendants' statements concerning the accuracy (or inaccuracy) of its LEs are not ones upon which Abacus bases its defamation and FDUTPA claims. It is Abacus' use of Lapetus' LEs in valuing its assets, and not their accuracy (or inaccuracy), that go to the truth or falsity of any of the alleged defamatory statements, as evidenced by the Complaint and the MTD Response.

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference.

---

[1] The Second Letter states that the Lapetus agreed during the Initial Call that "documents communications concerning the debate between Mr. Olshansky and Mr. Brueger, which took place at the 2024 LISA Conference (the "Fireside Chat") are relevant [to the Litigation]." There appears to have been a miscommunication. To clarify, Lapetus agrees only that any communications concerning the truth or falsity of Defendants' allegedly defamatory statements about Abacus' ***use*** of Lapetus LEs (as opposed to their accuracy) are relevant.

135 W Central Boulevard
Suite 300
Orlando, FL 32801

Paul N. Mascia
Shareholder



Michael McGinley, Esq.
December 3, 2025
Page 9 of 15



Without waiving the foregoing objections, Lapetus has made a reasonable search for documents or communications that relate to any of Mr. Brueger's statements at the "Fireside Chat" portion of the LISA Conference concerning Abacus' alleged use of Lapetus' LEs in Abacus' valuation of its assets or preparation of its financial reports, or Abacus' other business activity relevant to Abacus allegations in the Complaint, by contacting its former employee Dr. Jay Olshanksy, who would have been the person at Lapetus most likely to have prepared or been aware of any such documents or communications. Dr. Olshansky has advised that he is not aware of the existence of any such documents or communications.

Based upon the foregoing reasonable investigation, Lapetus has no documents to produce. Should Defendants desire that Lapetus conduct a further inspection of Lapetus' archived documents and communications for any that are within the foregoing scope, Lapetus will do so after the parties establish agreed search terms so that Lapetus can obtain an estimate for the cost of production, within a reasonable time after the Defendants have advanced the estimated costs.

<u>Request 7:</u>

The Second Letter limits and amends the documents and communications sought pursuant to this request, and provides in relevant part:

*<u>With respect to Requests 7, you represented that Lapetus does not believe that it has any responsive documents. However, you explained the difficulty of searching for communications between Abacus and any investor in Abacus, which is a publicly traded company. We agree to narrow Request 7 to documents and communications concerning or with any fund or other entity managed or controlled by Abacus, or entities that have purchased insurance policies from Abacus, including Transamerica Corp. (often referred to as "Trans" or "Transamerica"), Kohlberg Kravis Roberts & Co. L.P (often referred to as "KKR"), Nova Trading, LLC (often referred to as "Nova"), Reinsurance Group of America (often referred to as "RGA"), and any other insurers, reinsurers, credit unions, or investment banks or their affiliates.</u>*

**<u>Response:</u>**

While Lapetus appreciates the Defendants' effort to narrow this Request, it remains objectionable as vague, overbroad and unduly burdensome because Defendants' place Lapetus in the position of speculating as to information that Lapetus does not and cannot know, i.e. (i) what fund or other entity may be managed or controlled by Abacus, and (ii) what entities may have purchased insurance policies from Abacus. The Request is further objectionable as overbroad in that it requests documents concerning these foregoing entities without any link to any claim asserted by Abacus in the Litigation and could encompass documents that have nothing to do with Abacus or their purchase of life insurance policies from Abacus.

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801



Michael McGinley, Esq.
December 3, 2025
Page 10 of 15



Lapetus therefore interprets the Request to require the production of (i) communications with any the four (4) named entities set forth above, and (ii) any documents concerning any of the four (4) named entities above that relate to Abacus or the purchase of life insurance policies.

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference.

Without waiving the foregoing objections, Lapetus has made a reasonable search for the foregoing documents or communications by contacting its former employee Dr. Jay Olshanksy, who would have been the person at Lapetus most likely to have prepared or been aware of any such documents or communications. Dr. Olshansky has advised that (i) he is not aware of any documents concerning any of the four named entities, (ii) he is not aware of the existence of any communications with Transamerica, Nova or RGA, but is aware of communications with KKR, (iii) is not aware of any commutations with or documents concerning any other entity which to his knowledge was owned or controlled by Abacus, or purchased life insurance policies from Abacus.

Based upon the foregoing reasonable investigation, Lapetus will produce the communications of Lapetus with KKR on a rolling basis, and in conformity with the terms of this letter.

Should Defendants desire to identify any other entity that is under the control or management of Abacus or is a purchaser of life insurance policies from Abacus, then Lapetus will undertake further reasonable search by contacting Dr. Olshansky to determine whether it possesses any responsive documents. Should Defendants desire that Lapetus conduct a further inspection of Lapetus' archived documents and communications for any that are within the foregoing scope, Lapetus will do so after the parties establish agreed search terms so that Lapetus can obtain an estimate for the cost of production, within a reasonable time after the Defendants have advanced the estimated costs.

<u>Request 8:</u>

The Second Letter provides in relevant part:

*<u>We stand on the language of these requests.</u>*

**Response:**

While the Second Letter appears to limit and amend the scope of documents and communications sought pursuant in the original Request 8—it also contains the statement "[w]e stand on the language of these requests." Defendants offer "context" for the original request in the Second

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801



Michael McGinley, Esq.
December 3, 2025
Page 11 of 15



Letter, but Lapetus does not understand this context to alter the original request.  Lapetus therefore interprets the Second Letter as not amending the original request 8.

As set forth above in this letter, Lapetus maintains its objection that Defendants' statements concerning the accuracy (or inaccuracy) of its LEs are not ones upon which Abacus bases its defamation and FDUTPA claims.  Likewise, the various "analyses, studies and reviews" prepared or initiated by Coventry that compare Lapetus' LEs with LEs produced by other firms are not statements upon which Abacus bases its defamation and FDUTPA claims.  Rather, it is Abacus' use of Lapetus' LEs in valuing its assets, and not their accuracy (or inaccuracy) or how they compare with other LEs, that go to the truth or falsity of any of the alleged defamatory statements, as evidenced by the Complaint and the MTD Response.

Further, to the extent that Defendants seek any of Lapetus' communications or documents concerning Lapetus' position on any "analyses, studies and reviews" prepared or initiated by Coventry comparing Lapetus' LEs with LEs produced by other firms (which again, is entirely irrelevant to the Litigation)—documents sufficient to show Lapetus' position are set forth in the transcript to the Fireside Chat at the 2024 LISA Conference and the study offered in rebuttal to Coventry's studies, and are publicly accessible.

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference, and will produce no documents responsive to this request.

<u>Requests 9 and 10:</u>

The Second Letter provides in relevant part:

> *<u>These Requests do not seek information concerning Lapetus' specific methodologies beyond what is included in the above referenced… complaints, criticism and comparisons. We stand on the language of these requests.</u>*

**Response:**

While the Second Letter appears to limit and amend the scope of documents and communications sought pursuant in the original Requests 9 and 10—it also contains the statement "[w]e stand on the language of these requests." However, as a result of the Initial Call, Lapetus understands Defendants to amend the documents and communications sought pursuant to this requests to require only the production of (i) communications or documents that evidence a criticism or complaint from a Lapetus customer that was received by Lapetus from the customer concerning a LE prepared for the customer, or (ii) communications with Abacus concerning Coventry's criticism of Lapetus' LEs.

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801



Michael McGinley, Esq.
December 3, 2025
Page 12 of 15



Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference.

Without waiving the foregoing objections, Lapetus has made a reasonable search for (i) communications or documents that evidence a criticism or complaint from a Lapetus customer that was received by Lapetus from the customer concerning a LE prepared for the customer, or (ii) communications with Abacus concerning Coventry's criticism of Lapetus' LEs, by contacting its former employee Dr. Jay Olshanksy, who would have been the person at Lapetus most likely to have prepared or been aware of any such documents or communications.

Dr. Olshansky has advised that he is aware of the existence of some such documents or communications, and Lapetus will produce them on a rolling basis and in conformity with the terms of this letter.

Should Defendants desire that Lapetus conduct a further inspection of Lapetus' archived documents and communications for any that are within the foregoing scope, Lapetus will do so after the parties establish agreed search terms so that Lapetus can obtain an estimate for the cost of production, within a reasonable time after the Defendants have advanced the estimated costs.

Request 11:

Defendants do not make any amendments to this request in the Second Letter.[2]

**Response:**

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference, and will produce no documents responsive to this request.

Request 12:

The Second Letter limits and amends the documents and communications sought pursuant to this request, and provides in relevant part:

*… we are willing to narrow this Request to include only documents and communications concerning those press releases, website postings, conference presentations, and public remarks by Coventry, Abacus, Lapetus or Morpheus Research that relate to the above referenced topics.*

---

[2] Defendants appear to acknowledge in the Second letter that if any production ordered by the Court, it must be subject to "attorneys eyes only" treatment.

135 W Central Boulevard
Suite 300
Orlando, FL 32801

Paul N. Mascia
Shareholder



Michael McGinley, Esq.
December 3, 2025
Page 13 of 15



Defendants then propose the search terms "press", "release", "statement", "remarks", "debate", "conference", "post*", "short-seller", "Morpheus" or "website", when combined with "Abacus" or "Coventry"— without agreeing to limit Lapetus' search to these terms.

**Response:**

Subject to the terms of this letter response, Lapetus maintains its objections stated in its Initial Objections, all of which are incorporated herein by this reference.

Without waiving the foregoing objections, Lapetus will conduct an inspection of Lapetus' archived communications using Defendants' proposed search terms and such other search terms as that parties may propose, when combined with "Abacus" or "Coventry", so that Lapetus can obtain an estimate for the cost of production, within a reasonable time after the Defendants have advanced the estimated costs.

Request 13:

Defendants do not make any amendments to this request in the Second Letter.

**Response:**

As a result of the Initial Call, Lapetus better understands that Defendants seek by this request documents and communications concerning Lapetus' decision to discontinue its historical business of providing LEs to customers in the ordinary course.

Subject to the terms of this letter response, Lapetus maintains its objections stated in its Initial Objections, all of which are incorporated herein by this reference.

Without waiving the foregoing objections, Lapetus will documents sufficient to show the basis for Lapetus' decision to discontinue its historical business of providing LEs to customers in the ordinary course on a rolling basis and in conformity with the terms of this letter.

Request 14:

Defendants do not make any amendments to this request in the Second Letter.

**Response:**

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801





Michael McGinley, Esq.
December 3, 2025
Page 14 of 15

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference.

Without waiving the foregoing objections, Lapetus has made a reasonable search for communications or documents responsive to this request by contacting its former employee Dr. Jay Olshanksy, who would have been the person at Lapetus most likely to have prepared or been aware of any such documents or communications.

Dr. Olshansky has advised that he is aware of the existence of some such documents or communications, and Lapetus will produce them on a rolling basis and in conformity with the terms of this letter.

Should Defendants desire that Lapetus conduct a further inspection of Lapetus' archived documents and communications for any that are within the foregoing scope, Lapetus will do so after the parties establish agreed search terms so that Lapetus can obtain an estimate for the cost of production, within a reasonable time after the Defendants have advanced the estimated costs.

Request 15:

Defendants do not make any amendments to this request in the Second Letter. [3]

**Response:**

Subject to the terms of this letter response, Lapetus otherwise maintains the balance of its objections stated in its Initial Objections, all of which are incorporated herein by this reference, and will produce no documents responsive to this request.

\*     \*     \*

---

[3] Defendants appear to acknowledge in the Second letter that if any production ordered by the Court, it must be subject to "attorneys eyes only" treatment.

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801





Michael McGinley, Esq.
December 3, 2025
Page 15 of 15

Lapetus is hopeful that its responses above and forthcoming production will adequately resolve all matters concerning the Subpoena and alleviate the need for any motion practice.  In the event that Defendants determine otherwise, please contact me so that we may further confer if desirable, or alternatively discuss how to move forward in the most efficient manner possible.

Very truly yours,

Paul N. Mascia, Esq.

Paul N. Mascia
Shareholder

135 W Central Boulevard
Suite 300
Orlando, FL 32801



# EXHIBIT G



November 4, 2024

*VIA EDGAR*

United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Division of Corporation Finance

Attention:    Madeleine Joy Mateo
              Christian Windsor

**Re:      Abacus Life, Inc.**
           **Registration Statement on Form S-3**
           **Filed October 21, 2024**
           **File No. 333-282747**

To the addressees set forth above:

      This letter respectfully sets forth the response of Abacus Life, Inc. (the "***Company***" or "***Abacus***") to the comments provided by the staff (the "***Staff***") of the Division of Corporation Finance of the Securities and Exchange Commission (the "***Commission***") in its letter dated November 1, 2024 (the "***Comment Letter***") with respect to the Company's Registration Statement on Form S-3 filed with the Commission on October 21, 2024 (the "***S-3***").

      For ease of review, we have set forth below each numbered comment from the Comment Letter in bold type, followed by the Company's response.

* * *

---

Registration Statement on Form S-3 filed October 21, 2024

General

1.  **We note the risk factors on pages 11, 13, and 20 of your annual report on Form 10-K/A for the fiscal year ended December 31, 2023 ("Annual Report"), which you incorporate by reference, implying that valuations of life insurance policies are key to your business. We also note your disclosure on page 7 of your Annual Report describing your partnership with Lapetus Solutions, Inc. ("Lapetus"). Please tell us whether Abacus or any of its officers, directors or other affiliates, have an ownership interest or credit relationship in Lapetus or its subsidiaries or other affiliates. Please provide a detailed explanation of any relationship and disclose the extent to which you have relied upon Lapetus or any of its co-owned entities for valuation of life insurance policies that you have purchased for your own account or which you have facilitated the purchase by other entities or investors. Consider revising your risk factor disclosure based on your response.**

    Response: The Company respectfully acknowledges the Staff's comment and confirms that its investment interest in Lapetus Solutions, Inc. ("Lapetus") is minor, as further described below, and also is immaterial to the Company's valuation processes for life insurance policies. Additionally, the Company's relationship with Lapetus does not materially affect any aspect of its business operations.

    As outlined in the Company's quarterly report on Form 10-Q with respect to the quarter ended June 30, 2024, which was filed with the Commission on August 12, 2024, the Company holds a convertible promissory note in the amount of $1,000,000 (the "*LSI Note*") issued by Lapetus. If the LSI Note were to convert into shares of Lapetus Series A-2 Preferred Stock in accordance with its terms, Abacus's resulting ownership interest in Lapetus would represent less than a 5% equity stake in Lapetus on a fully diluted basis. Both the LSI Note and Abacus's potential ownership level in Lapetus are immaterial to Abacus and would not grant the Company any influence or control over Lapetus's governance or business decisions.

    With respect to the Company's valuation methodologies for life insurance policies, the Company's relationship with Lapetus is limited to underwriting services. Specifically, Lapetus's role involves generating life expectancy reports, which the Company incorporates as one of multiple inputs into its valuation process in determining the fair value of the policies the Company holds. In addition to life expectancy reports, the Company employs its own underwriting practices, origination protocols, and proprietary "heat-map" technology platform; it does not rely solely or even materially on Lapetus's life expectancy reports. Notably, Lapetus does not engage in the valuation of policies, and therefore the Company's use of Lapetus as an input into the Company's policy-valuation exercise is both limited and immaterial to the Company's overall valuation process.

---

2. **If Lapetus is a related party, discuss any limitations on your ability to rely on Lapetus to value life insurance policies under any relevant state laws governing the purchase or sale of life insurance policies of third parties, and state whether you are in compliance with any such laws.**

<u>Response</u>: The Company respectfully acknowledges the Staff's comment and confirms that Lapetus does not meet the criteria for a related party under Financial Accounting Standards Board Accounting Standards Codification 850, *Related Party Disclosures* ("**ASC 850**"). Specifically, under ASC 850-10-20:

- Lapetus and the Company are not affiliates in that neither company controls the other, nor are they under common control;
- The Company's investment in Lapetus would not be required, absent the election of the fair value option under the Fair Value Option Subsection of Accounting Standards Codification Section 825-10-15, to be accounted for by the equity method by Abacus;
- Lapetus is not a trust for the benefit of Abacus employees managed by or under the trusteeship of Abacus management;
- Neither the Company nor Lapetus is a principal owner of, or management of, the other entity;
- Abacus does not control or have the ability to significantly influence the management or operating policies of Lapetus to an extent that one of the parties might be prevented from fully pursuing its own separate interests, or vice versa; and
- Neither Abacus nor Lapetus can significantly influence the management or operating policies of the other, nor does either party have an ownership interest in the other that would allow it to significantly influence the other to an extent that one of the parties might be prevented from fully pursuing its own separate interests.

For example, although the Company's Chief Executive Officer, Jay J. Jackson, previously held a nominal "Director" title at Lapetus, his role, which the Company confirms complied with all relevant state laws, was strictly limited to an uncompensated advisory position rather than a contracted director role or service on the Lapetus board of directors. Neither Mr. Jackson nor Lapetus has held out Mr. Jackson in an authority capacity on behalf of Lapetus. This advisory role, characterized by minimal involvement with Lapetus's management or operations, supports the Company's assessment that Lapetus would not be classified as a related party under ASC 850, the relevant accounting standard.

In addition, Lapetus is not a "related person" within the meaning of Item 404 of the Commission's Regulation S-K. Under Instruction 6 to Item 404(a), a person holding a position as a director of another entity does not acquire an indirect material interest solely by virtue of that role. While Mr. Jackson's position with Lapetus, which ceased on May 16, 2024, was strictly advisory, even considering Mr. Jackson as a "director" of Lapetus would not give rise to a material interest in Lapetus's transactions with Abacus that would trigger related-party transaction disclosure under Item 404. Additionally, the Company's interest in a convertible loan issued by Lapetus does not establish Lapetus as a related person pursuant to Instruction 7 to Item 404 because the terms of the convertible loan were the result of competitive bids that Lapetus solicited from several potential lenders before determining to enter into the convertible loan with the Company.

Risk Factors, page 6

3. **We note your risk factor disclosure on page 20 of your Annual Report that you are reliant on your management and on page 24 of your Annual Report that your executive officers have limited experience in the management of a publicly traded company. We also note that National Insurance Brokerage operates at an address in the same office park as Abacus. We note that the Florida Secretary of State lists Scott Kirby, Matthew Ganovsky, and Sean McNealy as officers of National Insurance Brokerage. Please revise your disclosure to discuss the extent to which you purchase insurance contracts from National Insurance Brokerage. Also, consider appropriate revisions to your risk factors to discuss the risks that management's other business interests may interfere with their focus on managing your business.**

<u>Response</u>: The Company respectfully acknowledges the Staff's comment and advises that it has no significant contractual, transactional, or affiliate relationship with National Insurance Brokerage, LLC ("*NIB*"). While Scott Kirby, Matthew Ganovsky, and Sean McNealy serve as officers of NIB, NIB operates entirely independently of the Company. NIB is neither a consolidated subsidiary nor an affiliate of the Company.

Notwithstanding the ownership interests of certain executive officers and directors that may render NIB a related person under Item 404, the Company has not engaged in any transactions with NIB. Even if the Company had engaged in transactions with NIB, or if the ownership interest of the three individuals listed above were sufficient to render NIB a related party to the Company, Instruction 7(a) to Item 404(a) provides that transactions that involve rates or charges fixed in conformity with law or governmental authority do not require related-party disclosure. NIB operates as an independent licensed insurance brokerage that assists in the conversion of term life insurance policies to permanent life insurance policies. The Company has no contractual agreement with NIB, and customers have full discretion to select any agent for policy conversions, including NIB, when they do not have an existing insurance agent relationship. NIB's role is limited to facilitating these conversions as the required agent, with commissions paid directly by insurance carriers at pre-established rates. The Company exercises no influence over NIB's involvement or compensation in these conversions, and this involvement remains immaterial to Abacus's overall business operations.

* * *

Please direct any questions or comments regarding this correspondence to our counsel, Ryan J. Maierson of Latham & Watkins LLP, at (713) 546-7420.

Very truly yours,

/**s**/ Jay J. Jackson
_____

Jay J. Jackson
of ABACUS LIFE, INC.

cc:     (via email)
        Ryan J. Maierson, Latham & Watkins LLP
        William H. McCauley, Abacus Life, Inc.
        Chris Romaine, Abacus Life, Inc.

# EXHIBIT H



**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
+1 215 994 4000  Main
+1 215 994 2222  Fax

**Michael McGinley**
*Partner*

Michael.McGinley@dechert.com
+1 215 994 2463  Direct
+1 215 655 2131  Fax

November 19, 2025

**Via Email**

Paul N. Mascia, Esq. (FL Bar No. 0489670)
Michael A. Nardella, Esq. (FL Bar No. 051265)
NARDELLA & NARDELLA, PLLC
135 W. Central Boulevard, Suite 300
Orlando, Florida 32801
pmascia@nardellalaw.com
mnardella@nardellalaw.com

> **Re:**   *Abacus Global Management, Inc. v. Coventry First LLC et al.*, No. 25-cv-
> **01401 (M.D. Fla. 2025) ("Abacus Litigation") – Lapetus Solutions, Inc.**
> **Subpoena Response**

Counsel:

We write on behalf of Coventry First LLC and Alan Buerger (collectively, "Defendants") following our meet and confer on October 31, 2025.  Lapetus's production of a single presentation deck, which was produced prior to the meet and confer call, remains the only document produced by your client in response to Defendants' August 29, 2025 subpoena ("Subpoena").  We write to demand production of all other documents responsive to the Subpoena,[1] which we will accept on a rolling basis.  Without prejudice to the Subpoena's Document Requests as written, we write to clarify the key documents that you should prioritize for immediate production.

As an initial matter, you stated during our meet and confer call that your main concern was what you called the "relevance threshold" of Lapetus's documents in this action.  Specifically, you explained your belief that Abacus's claims were not that Defendants contended Lapetus's life expectancy ("LE") estimates were inaccurate. Rather, you believe that the claims concerned Defendants' alleged statements regarding Abacus's valuations and whether such valuations were dependent on Lapetus LEs.  Plaintiff's complaint directly refutes your understanding of Lapetus's relevance to the case.  As we described in our October 20, 2025 letter, among its 213 references to Lapetus, Plaintiff alleges:

---

[1] Any term used herein should be interpreted as it was defined in the Subpoena.

**DECHERT**

Since the beginning of 2024, Coventry and Buerger have routinely disseminated false and misleading statements about Abacus, in particular targeting Abacus's relationship with [Lapetus], a third-party life expectancy estimate provider that recently dissolved because of Defendants' conduct. *Defendants' core claim is that Lapetus life expectancies are too short, and that Abacus relies on those estimates to intentionally overvalue the policies it buys and sells. This is false, misleading, and defamatory for several reasons, including that:*

      a.  *Lapetus life expectancies are not less accurate than the estimates of any other life expectancy provider*[2]

While several allegations certainly concern the use of Lapetus's LEs in the context of Abacus's valuations, the accuracy of Lapetus LEs is the "core claim" Plaintiff has identified. Even adopting your incorrect understanding of Plaintiff's allegations, the documents Defendants request would be highly relevant and discoverable as they relate to Abacus's valuations.

Second, you raised concerns about the cost of complying with the Subpoena. Courts are clear that non-parties must comply with subpoenas that are properly tailored to the needs of the case. *E.g.*, *Smartmatic USA Corp. v. Montgomery*, 2023 WL 4662241, at *3 (M.D. Fla. July 20, 2023) (reminding a third party of "his duty to respond in full to each request"); *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, 2023 WL 9792570, at *1-2 (M.D. Fla. Nov. 13, 2023) (finding that "the Federal Rules of Civil Procedure strongly favor full discovery whenever possible" so a non-party "resisting discovery has a heavy burden of showing why the requested discovery should not be permitted"). Notwithstanding Lapetus's obligation, we have engaged with Abacus to obtain documents that may also be in your client's possession. While any such production from Abacus would not discharge Lapetus of its own obligation to produce documents, we ask that you prioritize documents for production that are unlikely to be in Abacus's possession (*e.g.*, any documents or communications other than communications between Lapetus and Abacus).

In addition, and with the above caveat about prioritizing certain documents, in an attempt to narrow the scope of Defendants' Requests, we ask that you prioritize the documents described below as they relate to each of the Requests listed in the Subpoena and copied below.

> **Request 1: All Documents and Communications Concerning or with Abacus, including any agreements, contracts, business relationships, or strategic partnerships with Abacus.**

---

[2] Abacus Litigation, Dkt. 38 ("Amended Complaint") ¶¶ 6-7 (emphasis added).



**Request 2: All Documents and Communications Concerning (i) investments, (ii) convertible notes, or (iii) any other financial arrangements involving Abacus.**

As we discussed during our meet and confer call, Defendants are amenable to narrowing the scope of these Requests to *documents and communications concerning the extent and nature of the business and financial relationship between Abacus and Lapetus, including subparts (i), (ii), and (iii) of Request 2, as well as any agreements, contracts, or other documents or communications governing the provision of LEs by Lapetus to Abacus.* We agree to hold in abeyance (pending discovery discussions with Abacus) any communications directly between Abacus and Lapetus as well as documents concerning Abacus that do not relate to these underlined topics.

**Request 3: All Documents and Communications Concerning or with Coventry, except Documents maintained pursuant to any professional services agreement between Lapetus and Coventry.**

**Request 4: All Documents and Communications Concerning or with Alan Buerger, except Documents maintained pursuant to any professional services agreement between Lapetus and Coventry.**

As we discussed with respect to Requests 3 and 4, and as reflected in the Subpoena and in our October 20 deficiency letter, Defendants do not seek documents or communications maintained pursuant to any professional services agreement between Lapetus and Coventry, including but not limited to data Coventry provided to Lapetus or work product Lapetus provided to Coventry. During our meet and confer call, you raised the issue of documents containing internal Lapetus work related to LEs provided to Coventry. While we believe Lapetus's internal methodologies are key to establishing the truth of Defendants' statements concerning the accuracy of LEs, we do not believe Coventry's own business practices are at issue, and we are not seeking such documents related to Coventry. We also agree that Lapetus need not produce any communications *with* Defendants because such communications would likely be in Defendants' possession.

However, *documents and communications concerning Coventry's statements or beliefs about Abacus, Lapetus, and the accuracy or inaccuracy of any LE or valuation, are relevant and must be produced.* For example, to the extent Lapetus has in its possession documents or communications evaluating, analyzing, or discussing any of Defendants' statements or beliefs, those documents go to the heart of the potential claims and defenses. By way of obvious (and non-exhaustive) examples, if a Lapetus employee expressed a sympathetic (or unsympathetic) view of Defendants' statements, they would be relevant. Similarly, to the extent someone expressed their understanding



that Defendants' statements were their true opinion about a particular matter, such expression would be relevant.

> **Request 6: All Documents and Communications Concerning the Life Insurance Settlement Association Conference, including presentations or statements made at the conference and any preparatory materials regarding the presentations or statements made at the conference.**

You agreed during our meet and confer that documents and communications concerning the debate between Mr. Buerger and Lapetus CEO Jay Olshansky, which took place at the 2024 Life Insurance Settlement Association ("LISA") Conference ("Fireside Chat"), are relevant. You expressed concern about the breadth of this Request and the difficulty in generating search terms. We agree to limit Request 6 to *documents and communications concerning the Fireside Chat portion of the LISA Conference*, but we otherwise seek all documents responsive to this Request.

> **Request 12: All Documents and Communications Concerning press releases, website postings, conference presentations, and public remarks referencing or Concerning Abacus, Coventry, Lapetus's life expectancy estimates, or the valuation of life settlements.**

You expressed your belief that Request 12 is overbroad because it could encompass any public statement by anyone concerning the topics listed. Abacus has so far been unwilling to describe to Defendants which alleged statements in its Amended Complaint form the basis for their claims, and instead alleges a sweeping "campaign" by Defendants.[3] Therefore, we are unable to narrow the scope of public statements referenced in this Request. While we disagree that the Request is overbroad, we are willing to narrow this Request to include only documents and communications concerning those press releases, website postings, conference presentations, and public remarks *by Coventry, Abacus, Lapetus, or Morpheus Research* that relate to the above-referenced topics. You requested that we provide you with search terms for this Request. While we do not know the ways that Lapetus communicates, or any specific terms it may use, and we expect Lapetus to conduct its own reasonable review for all responsive documents, we would expect that terms like "press," "release," "statement," "remarks," "debate," "conference," "post*," "short seller," "Morpheus" or "website" may be useful when combined with references to "Abacus" or "Coventry" to refine the universe for review.

> **Request 5: All Documents and Communications Concerning Jay Jackson's role with Abacus or Lapetus, including as a director of Lapetus.**

---

[3] *E.g.*, Am. Compl. ¶¶ 9, 13, 14, 17, 68, 87, 114, 120, 142, 144, 189, 192, 241.



**DECHERT**

**Request 7: All Documents and Communications Concerning or with any investor or prospective investor in Abacus, including any fund or other entity managed or controlled by Abacus.**

As we explained in our October 20 letter, the Amended Complaint repeatedly puts at issue the role that Abacus CEO Jay Jackson played at Lapetus, as well as the nature of Lapetus's relationship with Abacus.[4] We stand on the language of Request 5 and expect Lapetus to produce all responsive documents.

With respect to Request 7, you represented that Lapetus does not believe it has any responsive documents. However, you explained the difficulty of searching for communications between Lapetus and any investor in Abacus, which is a publicly traded company. We agree to narrow Request 7 to *documents and communications concerning or with any fund or other entity managed or controlled by Abacus, or entities that have purchased insurance policies from Abacus, including Transamerica Corp. (often referred to as "Trans" or "Transamerica"), Kohlberg Kravis Roberts & Co. L.P. (often referred to as "KKR"), Nova Trading (US), LLC (often referred to as "Nova"), Reinsurance Group of America (often referred to as "RGA"), and any other insurers, reinsurers, credit unions, or investment banks or their affiliates.* Request 7 does not seek communications Lapetus had with Abacus's retail investors.

**Request 8: All Documents and Communications Concerning the accuracy of Lapetus's life expectancy estimates, including analyses, studies, and reviews comparing Lapetus's life expectancy estimates with estimates provided by other providers.**

**Request 9: All Documents and Communications Concerning any criticisms or questioning of Lapetus's life expectancy estimates.**

**Request 10: All Documents and Communications Concerning any complaints Lapetus received Concerning its life expectancy estimates.**

As we have explained, the accuracy of Lapetus's LEs is central to the litigation. For context, Requests 8, 9, and 10 seek any documents or communications concerning the accuracy or inaccuracy of Lapetus LEs, any criticisms or complaints about Lapetus LEs, or any comparisons with other LE providers' LEs. You expressed concern regarding the breadth of these requests, as they could be read to encompass any work done related to the accuracy of Lapetus's business.

---

[4] Am. Compl. ¶¶ 90-91, 126-129, 132, 135-136, 214.



These particular Requests do not seek information concerning Lapetus's specific methodologies beyond what is included in the above-referenced analyses, studies, reviews, complaints, criticisms and comparisons. But these Requests would include—but are not limited to—any work done to analyze the accuracy of LEs following the release of the Morpheus Research reports. We stand on the language of these Requests.

> **Request 11: All Documents and Communications Concerning Lapetus's life expectancy calculations, estimations, projections, medical underwriting, actual-to-expected analyses, reconciliation reports, or methodologies related to Abacus, including all data related thereto.**

Abacus's use of Lapetus's LEs, and the related accuracy or inaccuracy of those LEs, is central to proving the truth or falsity of certain alleged statements by Defendants. You expressed concern regarding proprietary information that would reveal the formulas Lapetus uses to calculate LEs. But at a minimum, LEs themselves, as well as actual-to-expected results, would not fall into that category. With respect to documents that are truly sensitive, we are willing to accept certain documents designated Highly Confidential – Attorneys' Eyes Only, where appropriate, while reserving our rights to challenge any improper designations. To the extent you would like to discuss further protections of confidential information as you stated during our meet and confer call, please provide a proposal to do so.

> **Request 15: All Documents and Communications Concerning audits of life expectancies required to be filed with the Office of Insurance Regulation pursuant to Section 626.99175(g)(5) of the Florida Statutes, including final submissions, drafts, and any Documents used to generate such audits.**

As we stated during our meet and confer, any audits that relate to the accuracy or inaccuracy of Lapetus's LEs, including those required to be filed with the Florida OIR are directly relevant to the claims and defenses and should be produced. As discussed above and in light of the ongoing litigation concerning this issue, we are willing to accept documents designated Highly Confidential – Attorneys' Eyes Only, where appropriate. However, Defendants should not be prejudiced in the Abacus Litigation on the basis of other ongoing litigation.

> **Request 13: All Documents and Communications Concerning Lapetus's decision to end operations on August 31, 2025.**

> **Request 14: All Documents and Communications Concerning any "pressure from some clients to raise or lower" life expectancies, including any such pressure from Abacus, and any resulting reassessments by Lapetus.**



November 19, 2025
Page 7

During our meet and confer call, we explained that the contention in Lapetus's responses and objections that no responsive documents exist was implausible. You appeared to draw a distinction between a decision concerning a "voluntary dissolution" of Lapetus (which you represented has not occurred), and a decision to end its LE business, which you conceded had occurred but challenged its relevance. Of course, Lapetus's own public statement concerning its decision to end operations contended that it received "pressure from some clients to raise or lower" life expectancies. That contention is directly related to the claims and defenses. In addition, the Amended Complaint itself purportedly quotes Lapetus as telling investors that "in May of 2024, one of [Lapetus's] clients, Coventry, began a major campaign to tarnish our reputation in the [life settlement] industry after we refused to fraudulently adjust our LEs for [Coventry's] financial benefit."[5] We stand on our original Request. Any documents or communications that concern this issue, or are responsive to Requests 13 and 14, must be produced.

*      *      *

Defendants are willing to meet and confer over the next week. However, given the significant length of time that has passed without anything more than a nominal document production, Lapetus should make a substantial, good faith production of the documents that are not subject to any further negotiation. If Lapetus is unwilling to make such a production by November 26, please notify me upon receipt of this letter. Defendants reserve all their rights.

Very truly yours,

Michael H. McGinley

---

[5] Am. Compl. ¶ 189 (emphasis removed).

# EXHIBIT I



**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
+1 215 994 4000  Main
+1 215 994 2222  Fax



**Michael McGinley**
*Partner*

Michael.McGinley@dechert.com
+1 215 994 2463  Direct
+1 215 655 2131  Fax

October 20, 2025

**Via Email**

Paul N. Mascia, Esq. (FL Bar No. 0489670)
Michael A. Nardella, Esq. (FL Bar No. 051265)
NARDELLA & NARDELLA, PLLC
135 W. Central Boulevard, Suite 300
Orlando, Florida 32801
pmascia@nardellalaw.com
mnardella@nardellalaw.com

> **Re:**    ***Abacus Global Management, Inc. v. Coventry First LLC et al.*, No. 25-cv-01401 (M.D. Fla. 2025) ("Abacus Litigation") – Lapetus Solutions, Inc. Subpoena Response Deficiencies**

Counsel:

We write on behalf of Coventry First LLC and Alan Buerger (collectively, "Defendants") concerning numerous deficiencies in Lapetus Solutions, Inc.'s ("Lapetus") September 26, 2025 Responses and Objections to Defendants' Subpoena Duces Tecum (the "Subpoena" and "Responses"). Lapetus's virtually blanket refusal to produce relevant documents violates the Federal Rules and is sanctionable. And Lapetus's unreasonable stance is all the more troubling given that your client has taken actions suggesting that it is coordinating with Abacus with regard to this action. Defendants demand that Lapetus immediately correct the fundamental deficiencies outlined below. Defendants request a call to meet and confer this week to discuss the deficiencies.

Defendants are willing to discuss narrowing the scope of certain requests to ensure timely production of the documents that are most relevant to the claims and defenses in the Abacus Litigation. However, should Lapetus fail to amend and supplement its Responses and produce relevant documents, Defendants will have no choice but to seek court intervention. Defendants expressly reserve, and do not waive, their right to identify additional deficiencies or to seek further answers from Lapetus in the future.

<u>**Material Deficiencies in Lapetus's Responses**</u>

Lapetus's complete refusal to produce documents in response to the Subpoena is improper. Abacus has made Lapetus a central figure in this litigation. Thus, Lapetus's documents are critical to



October 20, 2025
Page 2

substantially all claims and defenses.  Among its 213 references to Lapetus, Abacus's Amended Complaint pointedly alleges:

> Since the beginning of 2024, Coventry and Buerger have routinely disseminated false and misleading statements about Abacus, in particular targeting Abacus's relationship with Lapetus Solutions, Inc. ("Lapetus"), a third-party life expectancy estimate provider that recently dissolved because of Defendants' conduct. *Defendants' core claim is that Lapetus life expectancies are too short*, and that Abacus relies on those estimates to intentionally overvalue the policies it buys and sells.[1]

Lapetus's General and Specific Objections repeatedly assert that Defendants' requests are irrelevant and disproportionate to the needs of the case.  But, given Lapetus's undeniable relevance to the claims and defenses in this litigation, it must, at a minimum, make a substantial, good faith effort to actually comply with the Subpoena.  For example, in General Objection 8, Lapetus asserts that it "has made and is making reasonable efforts to locate and produce all documents in its possession" for unobjectionable requests.  While the statement properly states Lapetus's obligations under federal law, the rest of Lapetus's Responses suggest that Lapetus is making no such "reasonable efforts."  Lapetus produced a single document and its Specific Objections indicate that it does not intend to produce anything more.

Similarly, General Objection 3 states that Lapetus will only produce documents in its possession, custody, or control, but not any within its "constructive possession."  That is inconsistent with Lapetus' obligations under the Federal Rules.  Instead, Lapetus must search for and produce documents that are reasonably accessible to it, including those in its possession, custody, or control, or to which it has access, of its current and former agents, employees, representatives, affiliates, officers, directors, partners, managers, predecessors in interest, and subsidiaries, and anyone acting or purporting to act on its behalf.  This includes, and is not limited to, Lapetus Life Event Solutions.[2]

With respect to the relevant time period, Lapetus contends in General Objection 12 that the temporal scope of the Subpoena is unduly burdensome and overbroad, but it does not provide a date range for which it will search and produce documents.  Lapetus states only that the Subpoena's timeframe of January 1, 2022 through the present "far exceeds the timeframe applicable to Defendants' March 2025 statements that are at issue in the Amended Complaint."  As noted above,

---

[1] Abacus Litigation, Dkt. 38 ("Amended Complaint") ¶ 6 (emphasis added).
[2] Abacus Global Management, Inc., Annual Report (Form 10-K) at 7 ("Lapetus Life Event Solutions—partnership between Abacus and Lapetus Solutions, Inc. to build and develop current life expectancy tables based on our 18 years of data.").



however, Abacus's complaint covers a multi-year period involving Lapetus. Hence, Lapetus, which is Abacus's admitted partner and the subject of many of the statements that Abacus has put at issue in the suit, is subject to discovery over a multi-year period and not some short unidentified period of Lapetus's choosing.

Separately, over a dozen times in its Specific Objections, Lapetus states that it would be too burdensome to produce documents spanning a "decade." Defendants only seek documents starting in 2022. The Amended Complaint alleges at a minimum that "as early as October of 2023, Defendants have been spreading false statements that Abacus owns Lapetus and that Abacus uses Lapetus to obtain 'favorable' LEs."[3] Defendants are willing to agree to a start date based on the beginning of Lapetus's relationship with Abacus, to the extent the relationship is shorter than the time frame in the Subpoena.

### Additional Deficiencies in Specific Responses

In its Specific Responses, Lapetus fails to provide responsive information even accounting for its own overly broad and boilerplate objections. In many cases, Lapetus improperly attempts to reframe the Requests by providing alternative language that the Subpoena does not use. Defendants reject Lapetus's purported rewriting of the Subpoena. Lapetus also makes repeated references to its failure to produce responsive documents unless the "Court requires any production." In doing so Lapetus ignores its own obligation to respond completely to each request.[4] Forcing court intervention before Lapetus will produce relevant information is abusive and contrary to the Federal Rules.

Defendants demand that Lapetus meet those obligations now, and resolve the deficiencies in its Specific Responses, which include without limitation, the following:

*Request Nos. 1, 3, and 4*

Defendants request Lapetus's Documents and Communications concerning the parties in this action. Lapetus categorically refuses to produce any documents in response to these Requests. Defendants reject Lapetus's assertion that these requests have "no bearing" on the claims or defenses in this case. There is no dispute that Lapetus, its life expectancy business, its relationship with Abacus, and its interactions concerning Coventry, are at the very core of the dispute. As

---

[3] Am. Compl. ¶ 90.

[4] *See e.g.*, *Smartmatic USA Corp. v. Montgomery*, No. 2:23-MC-5-JLB-KCD, 2023 WL 4662241, at *3 (M.D. Fla. July 20, 2023) (reminding a third party of "his duty to respond in full to each request"); *V5 Techs. v. Switch, Ltd.*, 332 F.R.D. 356, 366 (D. Nev. 2019) (describing "an affirmative duty to seek … information reasonably available").



October 20, 2025
Page 4

Request No. 3 makes clear, Coventry does not seek documents or communications maintained pursuant to any professional services agreement between Lapetus and Coventry, including but not limited to data Coventry provided to Lapetus or work product Lapetus provided to Coventry. Defendants are willing to meet and confer regarding what Defendants believe would be a reasonable search for documents in response to these Requests, but Lapetus's blanket refusal to produce any documents is sanctionable given its clear obligation under the Federal Rules to search for and produce documents responsive to a subpoena.

***Request Nos. 6 and 12***

Defendants requested Documents and Communications concerning public representations by or concerning the parties and Lapetus's own life expectancies and valuations. Documents reflecting Lapetus's views regarding the very statements that Abacus challenges as defamatory—as well as other, related public statements—are relevant to the claims and defenses, including ascertaining the truth of those statements. To take just one obvious example, a communication evidencing Lapetus's agreement that Coventry's statements had merit, or were true, would be material to Defendants' defenses.

Defendants also specifically requested Documents and Communications concerning the Life Insurance Settlement Associate ("LISA") Conference in 2024. Abacus repeatedly cites the LISA Conference in its Amended Complaint, noting, for example, that "Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024."[5] Lapetus objects to producing relevant documents, stating that it "imposes a burden upon a non-party that can easily be satisfied by obtaining the requested information from the public domain … Lapetus's presentation and statements at the 2024 LISA Conference are available on the internet." This is incorrect. Lapetus's objection ignores the existence, and relevance, of Lapetus's ***non-public*** communications and other documents concerning the LISA Conference, including any information concerning Defendants' allegedly defamatory statements at the conference.

***Request Nos. 2, 5 and 7***

Defendants requested Documents and Communications concerning the extent of Lapetus's business relationship with Abacus, including information on joint financial arrangements, shared directors, and interactions with Abacus investors. These Requests are directly relevant to the claims and defenses. Once again, Abacus put these topics squarely at issue.

---

[5] Am. Compl. ¶ 201; *see also* ¶¶ 217 & 233 (substantially similar).



The Amended Complaint states flatly that "Defendants have been spreading false statements that Abacus owns Lapetus" and that "[i]ndustry insiders told Abacus employees that Coventry was going to use Abacus's falsely-claimed 'ownership' of Lapetus to damage the image and stock price of Abacus, with one broker telling an Abacus employee that Coventry viewed Lapetus as the only thing Coventry had 'against' Abacus."[6]  The Amended Complaint also alleges that:

> A prior unpaid nominal board position held by [Jay] Jackson in which Mr. Jackson was in an advisory position, he did not have authority or capacity to act on Lapetus's behalf, and he was only minimally involved with Lapetus's operations.  And Abacus purportedly 'invest[ed] heavily in Lapetus.'  The heavy investment?  A $1 million convertible note, that may result in at most 5% ownership upon conversion, which 'would not grant [Abacus] any influence or control over Lapetus.'[7]

As the Amended Complaint suggests, Abacus's reliance on Lapetus, and the nature of their financial relationship and shared personnel, is directly relevant to the claims and defenses here.

Yet, Lapetus, as it has with every request, objects that production of documents responsive to these Requests would be burdensome.  There is no possible basis for that blanket objection.  For example, it is unclear why communications Lapetus had concerning Abacus investors or documents concerning Jay Jackson's purportedly "nominal board position" or communications regarding a mere "$1 million convertible note" would be unduly burdensome to collect and produce.  Nevertheless, Defendants would seek to meet and confer concerning these Requests.  Similarly, to the extent Lapetus objects as to what is meant by the words "investment" (Request No. 2) and "role" (Request No. 5), Defendants are available to meet and confer regarding that issue.

***Request Nos. 8, 9, 10, 11, and 15***

Defendants requested Documents and Communications concerning specific aspects of Lapetus's life expectancy estimates, including comparisons with other life expectancy providers, criticisms or complaints, regulatory audits, and calculations and methodologies related to Abacus.  The accuracy of Lapetus's life expectancy estimates is the basis for substantially all of the allegations in this action.  The Amended Complaint states that ***Abacus's*** own CEO "made clear that Lapetus's

---

[6] *Id.* ¶¶ 90 & 91.
[7] *Id.* ¶ 135 (emphasis removed).



estimates reported to the state of Florida are in line with other life expectancy providers."[8]  Abacus also alleges that "Coventry's true motivation for its [Petition for Writ of Mandamus with the Florida OIR] is laid bare in paragraph 18 of the Writ—yet another public vehicle to attack Abacus by way of attacking Lapetus."[9]  The documents and communications responsive to these requests will obviously be relevant to the claims and defenses.

Defendants are cognizant of the issues concerning personally identifiable and personal health information in this case. Defendants would like to meet and confer to ensure such personal data is properly protected.

***Request Nos. 13 and 14***

Defendants requested Documents and Communications related to Lapetus's decision to end operations earlier this year.  In response to Request No. 13, Lapetus inexplicably stated that "it has no documents" concerning its "decision to end operations."  It defies logic to believe that any company could shut down all of its operations and then, less than one month later, possess no document concerning the decision to do so.  Further, in response to Request No. 14, Lapetus stated that it is "unaware of responsive documents that are being withheld."  But that Request quotes directly from Lapetus's own statement asserting that it received "pressure from some clients to raise or lower" life expectancies.

The Amended Complaint devotes an entire section to asserting that "Defendants finally succeeded in destroying Lapetus."[10]  It even quotes directly from Lapetus's message to its investors, which alleged that "Coventry[] began a major campaign to tarnish our reputation in the [life settlement] industry after Defendants refused to fraudulently adjust our LEs for [Coventry's] financial benefit."[11]  Lapetus's assertion that producing documents on this issue that were created over the just the past few months is "overbroad" or "burdensome" or "irrelevant" is belied by Abacus's alleged facts and Lapetus's statements and actions.

\*          \*          \*

---

[8] *Id.* ¶ 127; *see also id.* ¶ "131 ("Coventry made defamatory statements about Abacus directly to regulators as part of a pleading seeking disclosure of information Lapetus provided to Florida OIR.").

[9] *Id.* ¶ 133.

[10] *Id.* ¶ 188.

[11] *Id.* ¶ 189 (emphasis removed); *see also* ¶ 190 ("Lapetus also issued a public statement, cited in Defendants' motion to dismiss … noting one reason it had been forced to close was its integrity, referencing the pressure put on by Buerger and Coventry.").



October 20, 2025
Page 7

Defendants propose to meet and confer this week, and in any event, no later than October 27, 2025 concerning the deficiencies in Lapetus's Responses. Please provide your availability to meet as soon as possible.

Very truly yours,

Michael H. McGinley

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Coventry First LLC and Alan Buerger

## DEFENDANTS
Lapetus Solutions Inc.

**(b)** County of Residence of First Listed Plaintiff    Montgomery, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Mecklenburg, NC
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Dechert LLP
300 S. Tryon Street, #800
Charlotte, NC 28202
(704) 339-3100

Attorneys *(If Known)*
Nardella & Nardella, PLLC
135 W Central Blvd., Suite 300
Orlando, FL 32801
407-966-268

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☐ 3   Federal Question *(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 2071-77 (Rules Enabling Act), which serves as the statutory basis for the Fed. R. Civ. P.
Brief description of cause:
Motion to compel third-party production related to underlying litigation in the Middle District of Florida

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE Hon. Roy Dalton    DOCKET NUMBER 25-cv-01401(M.D. Fla. 2025)

DATE   12/18/2025

SIGNATURE OF ATTORNEY OF RECORD   /s/ Eric Evans

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE