UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NUMBER 6:25-cv-1401-RBD-RMN

ABACUS GLOBAL MANAGEMENT, INC., a corporation,

Plaintiff,

v.

COVENTRY FIRST LLC, a limited liability company, ET AL.,

Defendants.

Orlando, Florida
January 29, 2026
10:01 a.m.

TRANSCRIPT OF MOTION TO COMPEL HEARING (DOC 67)

BEFORE THE HONORABLE ROBERT M. NORWAY
UNITED STATES MAGISTRATE JUDGE

Court Reporter: Amie R. First, RDR, CRR, CRC, CPE
Federal Official Court Reporter
401 West Central Boulevard, Suite 4600
Orlando, Florida 32801
AmieFirst.CourtReporter@gmail.com

Proceedings recorded by Realtime Stenography.

Transcript produced by Computer-Aided Transcription.

APPEARANCES:

Counsel for Plaintiff: Alex Zuckerman, Esq.

Quinn Emanuel Urquhart &
Sullivan, LLP
295 5th Avenue, 9th Floor
New York, NY 10016

Kathleen S. Messinger, Esq.

Quinn Emanuel Urquhart &
Sullivan, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017

Jason D. Sternberg, Esq.

Quinn Emanuel Urquhart &
Sullivan, LLP
2601 South Bayshore Drive
Suite 1550
Miami, FL 33133

Counsel for Defendants: Michael H. McGinley, Esq.

Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Glennys Ortega Rubin, Esq.

Shutts & Bowen LLP
300 South Orange Avenue
Suite 1600
Orlando, FL 32801

**INDEX OF PROCEEDINGS**

Argument by Attorney Zuckerman ........... 6
Argument By Attorney McGinley ............ 15
Rebuttal by Attorney Zuckerman ........... 25

**P R O C E E D I N G S**

*****

(Court called to order.)

THE COURT: Thank you very much.

Good morning, gentlepeople. Please be seated.

All right. Mr. Jernigan, would you please call the case and have the parties make their appearances for the record.

THE DEPUTY CLERK: Case Number 6:25-cv-1401, Abacus Global Management, Inc. versus Coventry First LLC, et al.

Counsel, please state your appearances for the record.

ATTORNEY ZUCKERMAN: Good morning, Your Honor. For Abacus Global Management, Alex Zuckerman. I'm here with Kathleen Messinger and Jason Sternberg.

THE COURT: Good morning.

You may be seated. Thank you.

ATTORNEY McGINLEY: Good morning, Your Honor. Michael McGinley of Dechert LLP on behalf of the defendants. I'm joined by my colleague, Glennys Ortega Rubin.

THE COURT: And good morning to you both. Please be seated.

All right. So we are here today to hear argument

on a motion to compel documents that was filed by Abacus Global. It is at Docket Number -- you know, I got it mixed up, I think.

ATTORNEY ZUCKERMAN: 67, I think.

THE COURT: Yeah. No, no, that's right. 67 is the docket. And the response has been filed and it is at Docket Number 71.

Despite the fact that I can't identify the motion on the docket, I will assure everyone I have read the motion; I have read the response. And I have -- the response is printed out. And that is to the objections.

So, counsel, the proponent of the motion, who's going to argument?

ATTORNEY ZUCKERMAN: That would be me, Your Honor.

THE COURT: All right. Please approach.

ATTORNEY ZUCKERMAN: And just before we get started, I just wanted to note, mechanically, I think Docket 66 is also, I think, fully briefed. And we're prepared to argue it today. I know a hearing was set for next week.

THE COURT: So we're going to hear Docket Number 66 next week. The Court has limited bandwidth. And this is a good time to talk to you all about this.

I know you are in what I would call a proper scrum. And there are many disputes between you all. But

the Court -- you'll just have to bear with the Court. We're one of the busiest district courts in the nation, especially on the civil side. So the Court really just has a limited amount of bandwidth to deal with any particular case because we have -- I think at this time, I have about 600 other civil cases on my docket.

So if you all will bear with me, I will try to get to your case, your motions that you file as quickly as possible. But I'm not going to be able to do six or seven motions in the same sitting. So I can only set aside about an hour at a time, rough time.

So I will do my best. I will set them as I can set them. And we're going to hear them in the order that they're filed generally, although that was a little bit off.

So I do have the attachments to 66 printed out because they have the discovery disputes in them, just to let counsel know. So I have the two responses that I think are filed at Docket Number 66-1.

So go ahead. You may begin, sir.

ATTORNEY ZUCKERMAN: Sure.

So appreciating that you've read the papers behind this, I think really the further color we want to add on this motion, which is seeking, you know, Coventry's financial information, its valuations, and information

regarding its market transactions, why we think those are relevant to Abacus' defamation claims here.

And so we know that, you know, for defamation, we have to show publication of a statement that was false; and that if we have to show actual malice, we're going to have to show that the speaker of the statement knew that it was false for whatever reason or that they acted with reckless disregard.

So I just want to focus on a couple of the statements that we allege in our Complaint, you know, that Mr. Buerger said that Abacus is manufacturing earnings with its valuation model, said that the discount rate in Abacus' valuation model was not realistic.

THE COURT: And that was from the event in Miami? Or maybe I'm getting --

ATTORNEY ZUCKERMAN: Yes, that's correct, that second statement was.

And then he said that, you know, in a later interview that we're using very short life expectancies to create this valuation. He also said at the conference that the valuation was grossly overstated.

So those are some of the statements that we think are false. And we're going to show that they're true. So this requires a little bit of discussion of what is Abacus actually doing in its valuation model.

As they describe in their 10-K, they're doing a market-based valuation that's based on transactions they execute when they're selling insurance policies. They reflect assumptions about market dynamics. That's what Abacus' position is.

THE COURT: Are we only talking about those -- and I'm going to call them contracts because I don't know what you all call them.

ATTORNEY ZUCKERMAN: Yes.

THE COURT: So are you talking about contracts that are being bought on the secondary market or contracts that are being bought on the tertiary market? Because both seem to be part of this lawsuit.

ATTORNEY ZUCKERMAN: That's a great question.

So the way Abacus' valuation works is they take the price that they're buying on the secondary market and the cost that they have to put into the contract after buying on the secondary market. They compare that with what they sell it for on the tertiary market. And then doing the subtraction is basically how they get their valuation.

THE COURT: That's the spread. And then -- you use another term for it in your contracts.

ATTORNEY ZUCKERMAN: Yes, the trade spread.

THE COURT: That's what you call it.

ATTORNEY ZUCKERMAN: That's right.

So why we think that Coventry's activities are relevant is that in the secondary market, Abacus is frequently competing against Coventry to win cases or contracts. In the tertiary market, they're frequently marketing similar bundles of products to similar investors that are interested in investing in this asset.

And they are number one and two in the secondary market and the tertiary market. So they are directly competing in like transactions.

And so why we would like information about those different transactions from Coventry's side of the house is because Buerger and Coventry have referenced things like, if you look at Exhibit 5 to defendant's motion to dismiss, Alan Buerger said we've looked at our portfolio and our valuation as support for some of his claims about Abacus. He said that Abacus' valuation is grossly overstated because, in his words, of his rough calculation and his knowledge of the market.

That's in paragraph 106 of our Complaint. And it's also in that same exhibit to their motion to dismiss.

And he also said that from the marketplace, Coventry is well positioned to know what the part is that Abacus has overvalued its policies.

And then in their brief opposing this motion,

defendants wrote that those comments weren't based on Coventry's own practices.

So we're a little befuddled about how Coventry knows about this market other than through the fact that it does the largest volume of business in this market of any company. You know, they're not general statements about the market. They're Alan Buerger's perspective based on his market experience, as he said in his own words.

And so, I guess, we're not convinced that their statement -- that these statements are just reflecting general market considerations and valuation principles sort of in the abstract, we don't think that's what the defendants were speaking about. We think they were looking at something that they deal with every day and then making a judgment based on that about what Abacus is doing.

So if --

THE COURT: Well, to other players in the market and to investors, which is the crux of your lawsuit, I think, they're making these statements to investors and those investors listen to them because they're a big player in the market.

ATTORNEY ZUCKERMAN: Yes.

And so I just wanted to go through sort of the necessity of this discovery, of why we need this in order to put on the case that we want to put on, is that part of

our case is going to be showing that the valuation disclosed in the 10-K that the defendants have said that they've read and are aware of, that valuation is true. That's actually a proper and defensible valuation based on market transactions.

They're going to stand up and say that, no, it's not. And then we want to be able to explore what's your basis for saying no, it's not. And we think from these statements in the Complaint, their basis must be their market transactions, their valuations.

And so they've offered as a compromised position to produce the life expectancy providers they use and the discount rates they use in their valuations.

But what the parties fundamentally are on disconnect on is what a proper discount rate is. We know that their discount rate will be different than ours. Our approach and our accountant's conclusion is that the valuation methodology we're using, the discount rate we're coming to is valid given market dynamics.

And so if we just present our side of our market dynamics and they simply say no, we can't really test whether they're aware of the actual prices of these policy sets on the tertiary market.

THE COURT: Right. What you are trying to do in this lawsuit is trying to test the veracity of their

statements.

ATTORNEY ZUCKERMAN: Exactly.

THE COURT: And that you can only do that if you know how they're operating and whether or not the statements they are making are consistent with the actions that they are taking as a business.

ATTORNEY ZUCKERMAN: Right.

THE COURT: That's essentially what you're trying to argue.

ATTORNEY ZUCKERMAN: Yes.

What they know about the market comes from their market activities. They're not sort of in the position of a journalist writing an article about this. They're actually in the trenches doing these sales.

THE COURT: Where are we in discovery on this case? I'm interested in the greater context. Are we early on still? Are we still in the written discovery phase where everyone is just going through, pawing through everyone's documents?

ATTORNEY ZUCKERMAN: So there's been exchanges of third-party discovery. There's not yet been exchanges of party discovery. We were going to raise that here. We waited about seven weeks to get a response on our search term protocol. We just got one yesterday.

We've been trying to move party discovery forward.

We've made a proposal. They've made a proposal. We are reviewing documents on our side. We have not received any documents from Coventry yet. And this is a concern that's not before the Court today, but we would like document discovery to get moving.

But this is a large gating issue. I mean, we've brought a few gating issues here among these motions that have been briefed that we think can be decided before any documents have exchanged hands.

THE COURT: All right. I think I get the basis of your motion and why you're seeking this discovery and why your client believes that it is relevant to your cases.

So anything else to add?

ATTORNEY ZUCKERMAN: Yeah. I guess just two other points, is that we are seeking transaction data. We're not seeking proprietary formulas. We're not seeking client lists. We're not seeking lead lists like policies Coventry is considering.

We're just really looking for -- so I don't see this as necessarily adding thousands of documents to discovery. It's specific pieces of information to show basically the profits they're making and how they valued their policies.

This is a request that can be satisfied with a document sufficient to show type production. It's not

necessarily multiplying email review.

THE COURT: So that they have some sort of like -- for instance, I think one of your requests is for the policies, practices, and techniques they use to value policies on the market.

ATTORNEY ZUCKERMAN: Yes.

THE COURT: And I'm blanking on the actual number right now, but they're parallel.

ATTORNEY ZUCKERMAN: That's 44.

THE COURT: So, for instance, if they had training slides that showed how their -- for purposes of how to actually conduct that analysis using particular information, that would be sufficient to satisfy your needs.

ATTORNEY ZUCKERMAN: For 44, yes.

THE COURT: Yes. Okay.

ATTORNEY ZUCKERMAN: And I think that a point on that is that we're going to produce things like that on our side. We've agreed to do that. So there's a lot of -- there's a lack of reciprocity and a lot of obstacles we're running into.

I think one other thing to just say, that we've narrowed these requests from how they're written in the RFPs a few different ways. And we just haven't had any -- there's been no budging on the other side.

THE COURT: Okay.

ATTORNEY ZUCKERMAN: But we're trying to make it less burdensome.

THE COURT: Okay.

All right. You may begin whenever you're ready, sir.

ATTORNEY McGINLEY: Good morning, Your Honor.

I sort of want to start with two key points why we don't think that these particular categories of documents should be compelled.

The first one I think goes to really the crux of what my friend said both in the papers and today which is that all of the statements that they say that they're trying to test are about Abacus' business practices. This is not a case about Coventry's business practices.

And so the question is, is there sufficient --

THE COURT: But is that entirely true? I mean, their point is that your client's business practices are relevant because it's going to show, or at least have an impact on, their ability to show whether or not the statements they are making publicly and to other -- I'm going to call them market players are, in fact, true or are believed by your clients.

So, again, doesn't that squarely put your client's business practices at issue?

ATTORNEY McGINLEY: It puts certain of our client's business practices at issue. And those are the categories of documents that we have unambiguously agreed to produce.

So, for example, all of the documents -- these are just a few examples of many business records that we have agreed to produce.

Records concerning Coventry's proprietary information forming the basis of the Coventry Studies, which were the Coventry commissioned research studies evaluating the length of Lapetus life expectancies. That is the key issue in many ways in this case, whether or not --

THE COURT: All of the other life expectancy providers, too, are at issue here, right?

ATTORNEY McGINLEY: No, I don't believe so, Your Honor. The crux of this case --

THE COURT: There's a lot of allegations in the Complaint that your client was having communication with the other -- I'm going to call them providers -- other providers, and those providers were modifying their methods to accommodate your client.

I think that's relevant, too, to this scrum, at least based on the allegations in the Complaint.

ATTORNEY McGINLEY: I don't understand the case to

be pled that way, Your Honor. I don't mean to quibble with you. But I also don't think that's what's at issue. And the requests that we're talking about here are communications vis-a-vis other providers.

THE COURT: Your client's business practices and if your client's business practice was to bully other providers to give him favorable terms, isn't that relevant to whether or not what you're saying about the life expectancy data that was being sourced, whether it was, you know, unduly short?

I mean, if your client is telling other providers you must give me lengthier terms; and you're out there, your clients are out there saying the short life expectancy is the real problem with Abacus' business model, doesn't that seem to be very relevant?

ATTORNEY McGINLEY: I don't think so, Your Honor, because that doesn't go to whether or not statements about Lapetus or Abacus are defamatory in nature. I mean, that's -- I don't understand any of those statements in the Complaint to make up --

THE COURT: It's a valuation, right?

ATTORNEY McGINLEY: Sorry. What's a valuation, Your Honor?

THE COURT: What we're really talking about here are valuing these policies.

ATTORNEY McGINLEY: Well, what we're talking about here is valuing Abacus' portfolio. And the statements that are being challenged were made on the basis that Abacus does two primary things that --

THE COURT: And your clients were doing it based on their knowledge of the market.

ATTORNEY McGINLEY: Of the market and the --

THE COURT: Which they're getting from their own interactions with the market and their own business decisions about what the valuation should be.

ATTORNEY McGINLEY: Partly, Your Honor. But also --

THE COURT: So you agree they are relevant?

ATTORNEY McGINLEY: I'm not saying no. I'm saying the documents that we have agreed to produce are relevant.

THE COURT: I'm not interested in documents that you're agreeing to produce. We're arguing over what they've requested. And that is how do your client value those policies, how your clients -- the procedures they do, the communications that they had with other market actors, that's what we're arguing here today.

And you have to show to me -- because as I understand it, your argument is simply that it's not relevant. So if you're saying, well, they are relevant in some regard, then why are we here?

ATTORNEY McGINLEY: No. So, Your Honor -- and to the extent that there's relevance, we have offered the compromised position to say we will --

THE COURT: You are saying they're relevant.

ATTORNEY McGINLEY: We're saying they're --

THE COURT: I'm trying to get down to the brass tacks, sir. Is it relevant or isn't it relevant? Yes or no?

ATTORNEY McGINLEY: So our position is no, the internal business valuation practices of Coventry are not relevant for a number of reasons.

The first one being Coventry's business practices do not affect the truth or falsity of the statements about Abacus and Lapetus.

But the second one is that Coventry and Abacus operate in very different ways. And I can point you to paragraph 3 and paragraph 61 of the --

THE COURT: And that's because they're privately funded versus publicly funded, correct?

ATTORNEY McGINLEY: Well, publicly traded versus a private company that --

THE COURT: Well, I mean traded.

It's really the source of your income or the source of your resources.

ATTORNEY McGINLEY: If I understand you correctly,

I think that's right. But just to clarify, it's that we don't have outside public stockholders that we have duties and obligations to.

THE COURT: Right.

ATTORNEY McGINLEY: But also we, therefore, value our policies and portfolios in different ways.

THE COURT: But you have investors. Your client has investors.

ATTORNEY McGINLEY: So my understanding is that our client is owned entirely by the Buergers and their trust.

THE COURT: But the Buergers are their investors?

ATTORNEY McGINLEY: Yes. Yes. But not outside investors that they --

THE COURT: Correct. I see your point.

But I guess my point is, is that ultimately really what's happening here is just the source of funds that are being used to manage the business ventures. They're using outside capital to do it. And your clients are using inside capital.

Why is that really different?

ATTORNEY McGINLEY: Because they owe fiduciary duties to the people that --

THE COURT: Well, your clients are still valuing things. Your clients are still operating in the market.

And your clients presumably still want to produce a profit.

ATTORNEY McGINLEY: Yes, that's right.

But I guess our point is it's still an apples-to-oranges comparison because the way that we would go about conducting valuations would be different because we're not regulated by the SEC in the same way. We're not making representations --

THE COURT: Why isn't that relevant to the statements that your clients are making publicly and to other market participants?

ATTORNEY McGINLEY: Because I understand what they want to do is to say let's look at how you do it. And if it looks like how we do it, then the statements you made about us must be false.

And what we've said is that's an apples-to-oranges comparison. But what we are willing to do is to show you who are the LE providers that we use and what are the discount rates that we use.

Because we understand to be that -- that is what they're challenging about Mr. Buerger and Coventry's statements. And so our compromise offer was to say we will produce that to you sufficient to show those two things.

And the response that we got was, well, no, we want to be able to run our entire methodology over your entire portfolio.

And we don't think that that's relevant to the case. And we also think that it veers deeply into competitive intelligence that just seems inappropriate, particularly at this stage of the litigation and discovery.

THE COURT: I mean, we can deal with that and the parties can deal with that just by simply agreeing to a confidentiality agreement that appropriately segregates out the businesspeople.

ATTORNEY McGINLEY: We do have that, Your Honor. I am not sure how they could go about conducting a full scale --

THE COURT: They can hire experts. I mean, that's what parties do, especially in these large cases.

ATTORNEY McGINLEY: Okay. So the other thing that we would say, Your Honor, is it's not just about the communications with market participants or the particular policies, but they also ask for profit margin information, revenue information, things that to us seem to be completely far afield of what is at issue.

THE COURT: I mean, they want your balance sheet, right, the financials. I think that was the first request.

ATTORNEY McGINLEY: The financials -- here. I have them here, Your Honor.

THE COURT: The audited and unaudited consolidated financial statements. Yeah, that's 43.

ATTORNEY McGINLEY: Well, so there's some -- yeah. So 43 to Coventry is audited/unaudited consolidated financial statements. 43 to Buerger is communications related to valuation of life policies.

But then when you get to the Coventry 66 and 67, it's documents and communications related to your profit margins on life insurance policies, including offering memorandum marketing materials, documents sufficient to show your revenue --

THE COURT: Right. That's the spread. That's the trade spread that they're asking for, information that they can show the trade spread. Correct? That's what 67 is?

ATTORNEY McGINLEY: Well, I understand that to be much larger than that, Your Honor.

THE COURT: I mean, it is larger but I think that's what it's generally --

ATTORNEY McGINLEY: That may be what they're trying to get at, but it's asking for much more than that, Your Honor.

THE COURT: Well, documents sufficient to show.

Okay. Any other arguments, or is that the crux of your argument that they don't need your client's internal and external communications about their own business actions to prove their claims?

ATTORNEY McGINLEY: It's that, Your Honor, but

then also I'm just making a few quick points in response to what my friend said today.

He pointed out that it's really that they're looking at the discount rate issue. Again, we offered to give them that information.

And, you know, we do have a disagreement as to the nature of what Mr. Buerger's statements regarding marketplace knowledge was referring to. We have agreed to give them a number of things about the statements he made to others in the market and his own and Coventry's own evaluations of Abacus and Lapetus within the market.

And then the last point that I would make is that you asked the question about where are we in discovery. We've been negotiating both the contours of the RFPs -- I think that we've done -- both sides, I believe, have been very productive in trying to narrow down their disputes only to the last remaining items. We are actively negotiating on search terms. We fully are prepared to start producing documents soon.

THE COURT: Okay. I do have a question about the discount rate info. Well -- and maybe some of your other things.

I don't know what you mean about we've agreed to provide some of the information. What information have you provided? What information aren't you providing and why?

ATTORNEY McGINLEY: So what we've offered to them -- it's not completely concrete because we offered it as a compromise before this hearing and it was rejected.

But what we said is we would produce documents sufficient to show which LE providers we're using and what discount rates we're applying.

THE COURT: But not any of the backup information that your clients would have used to potentially get to that information?

ATTORNEY McGINLEY: Yeah. For example, they're asking for all the data tapes that were sent out for every single transaction that we engaged in over the last three years. And we think that that's just overbroad.

But we're willing to work with them to figure out if what they're really concerned with is whether or not Coventry's use of LE's or discount rates are vastly different from Abacus' or look like Abacus'.

We're willing to provide documents sufficient to show those things and we're willing to work with them to identify what those would be.

THE COURT: Okay. I think I understand your position. Thank you.

ATTORNEY McGINLEY: Thank you, Your Honor.

THE COURT: Do you have any rebuttal, sir?

ATTORNEY ZUCKERMAN: Two very quick points,

Your Honor. One is just on the discount rate point.

I think you understand this. But the discount rate is downstream in Abacus' valuation of the trade spread information. So we understand that Coventry may have a different way to get to their discount rate, but simply getting their discount rate is not going to give us the information we need to understand if someone in Alan Buerger's position reading Abacus' description of its valuation could think, well, there's no way they're getting that trade spread. I never get that kind of trade spread.

THE COURT: So, I mean, what information do you need for that?

ATTORNEY ZUCKERMAN: We would need to understand their outflows when they buy policies, and we would take that away from their inflows when they sell policies.

That's why the profit margin and the revenues and the balance sheet are relevant, because we can look at that raw information, we can apply the methodology that we describe that Alan Buerger doesn't believe from our 10-K to that information, and we can see that, well, if he was actually putting all the information he has together, he would see that actually you can generate this kind of profit.

And probably Abacus is generating this kind of profit. They're not manufacturing earnings.

That's the key, is that we think all of those pieces of information are on his desk somewhere. So we need to put them together by getting to the actual sales data and the balance sheet, like you said. That's why the compromised position is not quite getting us there.

THE COURT: It's not just that you need -- so if I understand your argument correctly, is that in order to test the veracity of those statements, you really do need to have a rather granular look at how they're operating their business to get to the point where you can have an expert opine about whether or not those statements were maybe false.

ATTORNEY ZUCKERMAN: We needed --

THE COURT: Or anybody.

ATTORNEY ZUCKERMAN: It's not every single thing related to every transaction. But when I think about what our auditor looks at on our policies, which is not loads and loads of information, it's a data tape that summarizes the inflows and outflows on the policy. We need to understand that so we can see if Coventry is generating profits like or in excess of the profits that we're generating on the tertiary market.

Because our valuation methodology clearly says that's where our discount rate comes from. They're saying they're generating discount rates some other way. And

they're saying that there's no way that we're doing what we say we're doing under this GAAP-approved valuation methodology. But we need to understand.

If Coventry makes, you know, huge profits on the tertiary market, we don't think they have a basis to say what they're saying about our valuation methodology.

THE COURT: Right.

ATTORNEY ZUCKERMAN: The only other thing I would say -- and I think Your Honor understands this.

On the competitive concerns, you'll see we filed another motion on Monday. Coventry has sent out a dozen very invasive subpoenas seeking all documents related to Abacus to several of our financial partners. And they don't seem to be shy about seeking potentially sensitive commercial information about potential investors or customers.

But I totally agree that we have a confidentiality order in place. It has two tiers and attorneys' eyes only provisions. So we don't see that as a concern going in either direction.

THE COURT: And does that confidentiality agreement also, does it have an umbrella for third-party disclosures as well?

ATTORNEY ZUCKERMAN: Yes. Third parties are -- well, we are providing all the parties we've subpoenaed

with that agreement. I cannot speak for everything that's being done over here. But we are informing everybody that they have the right to stamp their documents highly confidential.

THE COURT: All right. Thank you very much.

So like I said in the beginning, I do think that you all seem to be in a proper full-on knockdown drag out discovery fight here and that it seems to be very important to both of your clients. I understand that.

I am going to grant the motion, and I am going to compel the production of the documents and overrule the relevancy objections.

I do think it is highly relevant how Coventry operates its business down to the very valuations of the policies that its buying on the secondary and tertiary markets and how they're selling them because those are going to form the basis of the knowledge that was used.

And, quite frankly, it is part of -- as I think I mentioned earlier here today, part of your client's positions and the reason why people listen to them is because of the role they play in this market and their significant experience in it.

And that experience, as far as I can tell based on the allegations in the Complaint and what's been said here today, are based on their operating Coventry as a business.

So the veracity of the statements that were made and the real proof that the Abacus plaintiff here need are going to be tied up somewhat with how your clients are running their business. So I think that's just an unfortunate aspect of this type of defamation claim.

I also don't think very much of this distinguishing, trying to say that it's apples and oranges. Money is money. Your clients get money from a different source than they do.

And, quite frankly, the way I see it is that it is harder for Abacus to convince your clients not to put money into the market, but it is easier for your clients to convince market actors not to invest in Abacus. I think that's the whole basis of this lawsuit.

So I do think all of the requests are relevant, and I'm going to grant that. I'm also going to grant costs for this.

A couple of ground rules going forward. I routinely award costs. So when you all come before me, unless you give me a very good reason not to, the loser will pay costs. Costs include attorneys' fees, attorneys' fees for preparing the motion, for the conferrals, and for arguing and appearing here today. So that's costs.

How I'm going to handle the costs, I'll allow the parties after the hearing to confer, make an agreement, pay

the costs. If there is a disagreement between discovery costs at the end of the discovery period, the party who has been awarded costs but who has not yet been paid costs may file one motion for the Court to determine how much it should be awarded in costs cumulatively for the entire discovery period.

And this is just an example. For instance, if Abacus has successfully brought and been granted four or five motions to compel and been awarded costs for those motions and they have not yet been paid by the end of the discovery period, then they may file a single motion asking for a determination of the award for all four costs.

Same things for Coventry. If Coventry does the same, it files four or five motions for protection and they're granted, the same thing. At the end of the discovery period, you can file a single motion for the Court to determine how much you can recover in costs.

That's how I'm going to handle costs.

Now, how I want to handle exhibits to the discovery motions, I do not want to see 150-page exhibits. It's impossible for the Court's computer system to keep up with the PDF files that are that large. One document in one exhibit.

So Coventry's responses to the interrogatories, that's all I want to see is Coventry's responses. And I

don't want to see all of the responses. Only attach or only include in the attachment those pages that are relevant to the dispute. I don't want to scroll through a 50-page response just to find a single interrogatory that's at issue. So I only want to see attached excerpts from the exhibit that are relevant to the dispute.

And you should have plenty of space on ECF to make attachments. I think you can put 70 or 80 attachments to an ECF docket. So you should have plenty of room there for that.

And you all need to actually use pin cites in your motions. I don't want to see Exhibit A. I want to see Exhibit A at Page 12. If it's not Page 12, again, that really inhibits the Court's ability to actually figure out what's at issue.

If I have to scroll through a 150-page document just to find one page, it's a waste of my staff's time. And, quite frankly, if they printed it out, it's also a waste of a lot of paper.

So that's what I'm going to ask you all to do going forward with these disputes, try to limit those exhibits and only what is at issue and what the Court really needs to address.

You all are having, I think, really good and productive meet and conferrals. Usually that is a concern

with this Court. But I will say you guys seem to be doing a very good job at communicating.

I understand that you weren't coming to resolutions. That happens in litigation and discovery. I think it's more important to have the actual conversations. And I would like to give my encouragement and many thanks to both of your clients and you all for going through and doing that hard work.

Now, you all have until September of next year. Discovery has been going on for a little while now. The fact that you all haven't exchanged documents yet concerns me.

I understand that some of these requests were fairly big asks. But discovery needs to move forward. There's no guarantee that you all are going to get any extra time for discovery. So I'm going to strongly encourage you to start producing documents. Let's get this thing moving. Let's start producing documents and, to the extent necessary, start taking fact depositions.

I'm concerned that you all haven't begun to do this, haven't done this at this stage in the litigation. And I'm going to -- I'm going to caution you all that you may not get any additional time on the back end.

So don't -- neither party should believe that they're going to be able to file a motion to extend the

discovery deadline because that is not the practice in the Middle District of Florida, and particularly here in Orlando.

Because once again, we have a lot of cases. It's a fire hose. And we're going to be drinking from it. So we don't want your case to be lingering around. That's just sort of the nature of the beast.

Is there anything else that the Court can do for the parties if they -- oh, well, I'll also give you one other tidbit about my practice.

All my rulings are in person on discovery issues. You're going to get what I call a tombstone order probably immediately following this. A tombstone order is going to be just an order setting the -- memorializing the decision for the reason stated on the record. If you all wish to challenge those decisions, then you must order a transcript. And that is all.

So I'm going to grant the motion. I'm not going to impose a deadline to produce any of these documents because it looks like the parties are still negotiating other sides.

To the extent that -- and I don't know. I'm assuming that Coventry also has documents, requests for production outstanding. Is that correct, sir?

ATTORNEY McGINLEY: That is correct, except that

we had one other motion that we were going to argue today and the parties were able to reach a resolution on it.

So I think currently, as of right now, the only other motion to compel that's outstanding with Your Honor is the one scheduled for next week, which is Abacus' motion on communications with government agencies.

And obviously, Your Honor, I believe last week, ordered them to give notice to the agency. They did so. We're waiting to hear what the agencies have to say in response. And we will continue to confer with them in that.

THE COURT: Do the agencies know that we're holding a hearing next week?

ATTORNEY ZUCKERMAN: They do not know that yet.

THE COURT: So you all should probably let them know that.

ATTORNEY ZUCKERMAN: Yes, we will.

THE COURT: So thank you, sir.

ATTORNEY McGINLEY: Thank you, Your Honor.

ATTORNEY ZUCKERMAN: Your Honor, if I could just ask what your attitude is on the motion. We provided notice.

So the parties can meet and confer and potentially resolve, is your -- you want to hear from the government agencies; or if they don't say anything -- because we're a

little unsure on where you stand on that motion.

THE COURT: Well, I'm going to hear the motion next week. The government knows about the motion? The government agencies know about the motion, correct?

Is it only the SEC, or is it other government agencies?

ATTORNEY ZUCKERMAN: It's also the Florida Office of Insurance Regulation.

THE COURT: That is correct.

So long as they know about the motion and they're aware that we're going to have a hearing on the motion. I'll address it at the hearing.

ATTORNEY ZUCKERMAN: Okay. Thank you, Your Honor.

ATTORNEY McGINLEY: Thank you.

THE COURT: So, again, I'm not going to impose a deadline to produce. If the parties can't come -- because almost certainly this is going to be a rolling production, correct?

ATTORNEY McGINLEY: Correct.

THE COURT: So if the parties need court intervention on creating a rolling production schedule or final on deadline, I'm just going to ask you to file another motion to compel. And then the Court will address it at that time.

But I do think that is the type of thing that the

parties are in the best position to agree to because you all know the volume of work you need to do and when it can be done.

But I am going to caution you, like shepherd your resources appropriately because you're unlikely to get an extension of the discovery deadline.

ATTORNEY McGINLEY: Your Honor, just one thing that -- I just want to slightly correct one statement I made. There is also a pending motion to compel against Lapetus on a third-party subpoena that was transferred from the Western District of North Carolina where the subpoena was served to this district.

I don't know yet that it's been transferred to Your Honor. It was initially assigned to, I believe, Judge Middlebrooks. And I have to confess I don't know which magistrate it was assigned to. But I think the parties, meaning Lapetus and Coventry, will be moving to have it reassigned to Your Honor and Judge Dalton.

THE COURT: So it was assigned to the Tampa Division for some reason.

ATTORNEY McGINLEY: I'm not sure. I have to confess I have to double-check. It just happened earlier this week.

But there's been discussions between the parties to try to get it in front of Your Honor and Judge Dalton

given that it's related to this case.

THE COURT: Okay. So it was filed as a separate --

ATTORNEY McGINLEY: It was filed as a miscellaneous action in North Carolina where the subpoena was served. It sat there for a while. The parties agreed to transfer it to the Middle District of Florida.

And I think just by virtue of it being fed into the system, it just hasn't been reassigned. But that is a pending motion to compel by Coventry against Lapetus.

THE COURT: Well, thank you very much for bringing that to my attention because I wasn't aware of it.

Again, I don't want to stress this too much, but we're a very busy district. Unfortunately, we have fewer and fewer staff members in the Clerk's Office. And so if the parties aren't very proactive in identifying this and letting the Clerk's Office know that it's related to another case, it can get lost in the shuffle.

So do you know what the case number is for that miscellaneous case number?

ATTORNEY McGINLEY: If you allow me to look in my cell phone, I can tell you.

THE COURT: Please.

ATTORNEY McGINLEY: Okay.

THE COURT: You might need Mr. Jernigan's help.

ATTORNEY McGINLEY: Yes. Thanks.

(Brief pause.)

ATTORNEY McGINLEY: I apologize. I turned it off.

THE COURT: As you should have.

As a word of warning, I sanctioned a U.S. Attorney for using his cell phone in my courtroom. So it's probably the best idea to keep it.

ATTORNEY McGINLEY: Fair warning. Thank you.

(Brief pause.)

THE DEPUTY CLERK: 6:26-mc-4.

ATTORNEY McGINLEY: Yes. That's right.

THE COURT: Oh, okay. I have the case here, 6:26-mc-4. It's assigned to Judge Gaylord Moe and Judge Hill.

ATTORNEY McGINLEY: So I stand corrected on Middlebrooks, Your Honor.

THE COURT: That's totally understandable. Thank you very much for bringing that to our attention, counsel.

Is there anything else the Court can do for the parties here today?

For Abacus.

ATTORNEY ZUCKERMAN: No, Your Honor. Thank you.

THE COURT: Coventry.

ATTORNEY McGINLEY: No, Your Honor. Thank you very much.

THE COURT: Having nothing further, then, thank you very much. Thank you all. And very well done on the argument today, gentlemen.

ATTORNEY McGINLEY: Thank you.

(Proceedings adjourned at 10:46 a.m.)

*****

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

February 4, 2026

s\ Amie R. First

Amie R. First, RDR, CRR, CRC, CPE
Federal Official Court Reporter
United States District Court
Middle District of Florida