**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| ABACUS GLOBAL MANAGEMENT, INC., a corporation,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,<br>　　　　　　Defendants. | Case No. 6:25-cv-01401-RBD-RMN<br><br>**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S FIRST AMENDED COMPLAINT** |

Defendants Coventry First LLC ("Coventry") and Alan Buerger ("Mr. Buerger") (together, "Defendants") hereby submit their answer, affirmative defenses, and counterclaims to the First Amended Complaint ("FAC") filed by Abacus Global Management, Inc. ("Abacus" or "Plaintiff"). Defendants deny the allegations in Plaintiff's FAC unless expressly admitted in the following paragraphs. Defendants reserve all rights to amend their answer, affirmative defenses, and counterclaims, as necessary.

**ANSWER TO NATURE OF THE ACTION**

1. Defendants admit that Abacus is a publicly traded life settlement company and that Abacus uses a Life Settlements Calculator. But Defendants deny that Abacus is "transparen[t]" or forthright in its business dealings, much less a victim of any defamation. To the contrary, as detailed below, discovery thus far has confirmed that Abacus repeatedly misrepresented the truth in its pleadings—and has

continued to openly lie and mislead the public and the government—to cover up the serious problems with, and unlawful conduct in, its business.  Indeed, since the filing of the FAC, the truth has begun to emerge about Abacus, its fraudulent business practices and its improper relationship with now-defunct life expectancy provider Lapetus Solutions, Inc. ("Lapetus").  In the words of Lapetus's former CEO explaining his decision to resign, "I don't trust [Abacus]," and "can't in good faith continue to work with ABL."  Ex. 1, at 1.  Defendants deny the remainder of the allegations in paragraph 1.

2.    Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 2 and therefore deny the allegations.

3.    Defendants admit that Abacus and Coventry are competitors in the life settlement space.  Defendants further admit that Coventry has engaged in litigation with various parties, including AIG and the Office of the New York Attorney General, which were both settled without any findings or admissions of guilt or liability.  Defendants additionally admit that Coventry is not a publicly traded company.  Defendants deny the remaining allegations in paragraph 3.

4.    Defendants deny the allegations in paragraph 4 and note that discovery in this case has only confirmed that Abacus has done exactly what Mr. Buerger has said the company has done.

5.    Defendants deny the allegations in paragraph 5.

6.    Defendants admit that Lapetus was a life expectancy ("LE") provider.  Defendants also admit that they have, like others, raised concerns with Lapetus life

expectancies and that Mr. Buerger has, like others, expressed concern with Abacus's use of those life expectancies.  Defendants deny the remaining allegations in paragraph 6.

7.  Paragraph 7 states legal conclusions to which no response is required. To the extent a response is required, Defendants respond with the following:

a.  Defendants deny the statement that "Lapetus life expectancies are not less accurate than the estimates of any other provider."

b.  Defendants deny the statement that Abacus "does not solely or even primarily rely on Lapetus life expectancies," and instead point to both Abacus's public filings and discovery to date, which flatly contradict this allegation.

c.  Defendants deny the statement that "Abacus does not use a life-expectancy-based methodology to value the policies on its balance sheet; it instead uses a market-based valuation approach," because discovery to date flatly contradicts this assertion.

d.  Defendants deny the allegations in paragraph 7(d).

e.  Defendants deny the allegations in paragraph 7(e).

8.  Paragraph 8 states legal conclusions to which no response is required.  To the extent a response is required, Defendants admit that they commissioned a study that showed that Lapetus underestimates life expectancies.  Defendants further admit that Coventry filed a lawsuit against the Florida Office of Insurance Regulation ("OIR"), which included the representation that Abacus "is a publicly traded company

3

whose shareholders' investments are dependent on the accuracy of the Life Expectancy estimates used to value policies."  Coventry voluntarily dismissed that lawsuit after the relevant parties agreed that Coventry's claim could be pursued in a parallel litigation, which is what then occurred.  Defendants deny all other allegations in paragraph 8.

9.    Defendants lack sufficient knowledge to form a belief about the truth of the allegations regarding Abacus's actual financial performance and therefore deny them.  Defendants also deny the remaining allegations in paragraph 9.

10.    Defendants admit that Mr. Buerger was interviewed about Abacus on May 22, 2025, through Tegus, Inc.  Defendants further admit that the "five-page transcript" of the interview contains the words quoted in paragraph 10, even though Abacus strategically splinters phrases and largely takes those words out of context. Defendants deny the remaining allegations in paragraph 10.

11.    Defendants admit that Mr. Buerger has attended Abacus's earnings calls. Defendants disagree with Abacus's claim that it does not use Lapetus "to value the assets on its balance sheet," since discovery thus far has revealed that that is exactly what Abacus does.  Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations in paragraph 11 and therefore deny them, except to note that the transcript of the Tegus interview speaks for itself.

12.    Defendants admit that Mr. Buerger's Tegus Interview was published by Tegus on June 4, 2025, although Defendants had no knowledge that Tegus was

planning to publish the transcript of the interview on that day.  Defendants deny the remaining allegations in paragraph 12.

13.     Defendants admit that Morpheus Research LLC ("Morpheus") published a report on June 4, 2025, entitled "Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die." Particularly in light of the testimony in the recent deposition of Morpheus, Defendants deny the remaining allegations in paragraph 13.

14.     Defendants disagree with or otherwise lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 14 and therefore deny them.

15.     Defendants disagree with or otherwise lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 15 and therefore deny them.

16.     Defendants admit that an Abacus investor solicited Coventry's studies of Lapetus life expectancies.  Defendants disagree with the claim that Lapetus "thoroughly rebutted Coventry's one-sided study with its own independent report," and in so doing note that Lapetus and COIOS Ltd. ("COIOS") had a preexisting relationship prior to COIOS's release of the supposedly "independent report." Defendants further disagree with or lack sufficient knowledge to form a belief about the truth of the remaining allegations in paragraph 16 and therefore deny them.

17.     The allegations in paragraph 17 consist of arguments and legal conclusions which require no response.  To the extent that the allegations require a response, Defendants deny the allegations in paragraph 17.

18.    The allegations in paragraph 18 consist of arguments and legal conclusions which require no response.  To the extent that the allegations require a response, Defendants deny the allegations in paragraph 18.

## ANSWER TO PARTIES AND JURISDICTION

19.    Defendants admit the allegations in paragraph 19.

20.    Defendants admit the allegations in paragraph 20.

21.    Defendants admit the allegations in paragraph 21.

22.    The allegations of paragraph 22 consist of arguments and legal conclusions to which no response is required.  To the extent a response is required, Defendants admit that this Court has jurisdiction over the subject matter of this lawsuit.

23.    The allegations of paragraph 23 consist of arguments and legal conclusions to which no response is required.  To the extent a response is required, Defendants deny that Plaintiff was injured in Florida or anywhere else by Defendants.

24.    The allegations of paragraph 24 consist of arguments and legal conclusions to which no response is required.  To the extent a response is required, Defendants deny that Plaintiff suffered harm in this State, district, or anywhere else as a result of Defendants' conduct.

## ANSWER TO FACTUAL BACKGROUND

25.    Defendants admit that life insurance can provide "peace of mind" but deny the allegation in paragraph 25 that life insurance, in most cases, fails to provide a financial benefit.

26. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 26 and therefore deny them.

27. Defendants admit the allegations in paragraph 27.

28. Defendants admit that the life settlement industry allows policyholders the opportunity to monetize their policies. Defendants deny the remaining allegations in paragraph 28.

29. Defendants admit the allegations in paragraph 29.

30. Defendants do not entirely agree with the allegations in paragraph 30 and therefore deny them.

31. Defendants do not entirely agree with the allegations in paragraph 31 and therefore deny them.

32. Defendants agree and thus admit that the life settlement market offers significant growth opportunities. Defendants lack sufficient knowledge regarding Abacus's estimates and therefore deny the remaining allegations in paragraph 32.

33. Defendants admit the allegations in paragraph 33.

34. Defendants deny the allegations in paragraph 34.

35. Defendants admit the allegations in paragraph 35 as they pertain to Coventry. As to Abacus, Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 35 and therefore deny them.

36. Defendants deny the allegations in paragraph 36 and note that there are other alternatives to selling a policy besides making the premium payments or letting the policy lapse.

37. Defendants deny the allegations in paragraph 37.

38. Defendants deny the allegations in paragraph 38, since many of the variables that Abacus alleges operate independently of life expectancy are actually affected by the life expectancy for the insured.

39. Defendants lack sufficient knowledge to form a belief about the truth of whether "Abacus realizes significant value from optimizing the premium payment schedule of its policies," and therefore deny that allegation in paragraph 39. Defendants deny the remaining allegations in paragraph 39, and in so doing reiterate that life expectancies are the most important factor to secondary market purchasers and that life expectancies can influence the other factors described by Abacus.

40. Defendants admit the allegations in paragraph 40 as they pertain to Coventry, but lack sufficient knowledge to form a belief about the truth of the allegations as they pertain to Abacus and therefore deny them.

41. Defendants lack sufficient knowledge of the truth of the allegations in paragraph 41 and therefore deny them.

42. Defendants deny the allegations in paragraph 42.

43. Defendants deny the allegations in paragraph 43 and reiterate that the insured's life expectancy is "of paramount importance for valuing" a policy. *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 984 (11th Cir. 2022) (quotation marks omitted).

44. Defendants admit that Coventry competes with Abacus in at least some cases for particular policies. Defendants deny the remaining allegations in paragraph 44.

45. Defendants deny the allegations in paragraph 45.

46. Defendants deny the allegations in paragraph 46.

47. Defendants deny the allegations in paragraph 47.

48. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 48 and therefore deny the allegations.

49. Defendants admit that life settlement providers "undertake substantial costs related to licensing, origination, and marketing so that they may purchase policies directly from the insured persons," but deny all other allegations in paragraph 49.

50. Defendants deny the allegations in paragraph 50 because a sizable portion of Abacus's "historical success in realizing trade spreads" stems from Abacus's related-party transactions, wherein Abacus sells policies to entities affiliated with, and controlled by, Abacus. In fact, Abacus's latest quarterly financial disclosures demonstrate that 92% of the supposed market sales upon which Abacus purports to justify its valuations are actually related-party sales, in which Abacus controls both the seller and the buyer. Footnote 1 contains legal arguments for which no response is required. To the extent a response is required, Defendants deny the allegations in footnote 1.

51. Defendants deny the allegations in paragraph 51.

52. Defendants deny the allegations in paragraph 52.

53. Defendants admit that Coventry coined the term "life settlement" in 1998, but deny all other allegations in paragraph 53.

54.    Defendants deny the allegations in paragraph 54.

55.    Defendants deny the allegations in paragraph 55.

56.    Defendants admit that Coventry was engaged in litigation with the Office of the New York Attorney General many years ago, which was settled without any admission of guilt or liability.  Defendants deny all other allegations in paragraph 56.

57.    Defendants admit that Coventry entered into a consent order with the OIR but deny the remaining allegations.  Defendants further deny that the consent order was a "remedial business plan" and note that it contained no findings of guilt or liability.  Footnote 2 contains a citation to which no response is required.

58.    Defendants deny the allegations in paragraph 58.

59.    Defendants admit the SEC report contains the words quoted in paragraph 59.  Footnote 3 contains a citation for which no response is required.

60.    Defendants state that the Eleventh Circuit decision speaks for itself. Defendants deny the remaining allegations in paragraph 60 and note that the Eleventh Circuit decision is entirely irrelevant to this litigation and has no discernible connection to Abacus's claims.

61.    Defendants lack sufficient knowledge to form a belief about the truth of Abacus's development of a "comprehensive suite of products" and therefore deny the allegation.  Defendants deny the remaining allegations in paragraph 61, except to admit that Abacus is the only current publicly traded life settlement company. Additionally, Defendants note that two prior life settlement public companies, Life

Partners and GWG Holdings, eventually collapsed in the wake of federal regulatory investigations and severe financial scandals.

62. Defendants lack sufficient information as to the actual face value of policies that Abacus has purchased since 2004, but admit that Abacus represented in its 2024 Form 10-K that this value was at least $10 billion. Defendants lack sufficient knowledge to form a belief as to the percentage of face value of policies that Abacus purchased on the secondary market in 2024. Defendants admit the remaining allegations in paragraph 62.

63. Defendants admit that Abacus has offered an "Abacus Pays" portal. Defendants lack sufficient knowledge to form a belief about the truth of Abacus's supposed commitment to the "underlying premise of life settlements" and therefore deny the allegation. Defendants also deny the remaining allegations in paragraph 63.

64. Defendants lack sufficient knowledge to form a belief about the truth of the allegations contained in paragraph 64 and therefore deny them.

65. Defendants deny the allegations in paragraph 65 except to admit that, on October 16, 2024, ABL Longevity Growth and Income Fund filed Amendment 8 to its preliminary prospectus with the SEC, once again seeking approval to launch an interval fund. The initial preliminary prospectus was filed a year earlier on September 7, 2023, and to date, there have been 20 amendments to the initial filing. The SEC still has not approved the Fund. Footnote 4 requires no response, but to the extent that a response is required, Defendants deny the allegations in footnote 4.

66.     Defendants lack sufficient knowledge to form a belief about the truth of the allegations contained in paragraph 66 and therefore deny them.

67.     Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 67 and therefore deny them.

68.     Paragraph 68 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 68.

69.     Defendants deny the allegations in paragraph 69.

70.     Defendants deny the allegations in paragraph 70.

71.     Defendants deny the allegations in paragraph 71, except to admit that Abacus purports to realize at least some revenue from trading policies to investors.

72.     Defendants deny the allegations in paragraph 72.

73.     Defendants admit that Abacus's 2024 10-K contains the words quoted in paragraph 73 and footnote 5.  Defendants otherwise lack sufficient knowledge to form a belief about the truth of the allegations contained in paragraph 73 and footnote 5 and therefore deny them.

74.     Defendants admit that the annual report contains the words quoted in paragraph 74, except insofar as Abacus omitted the word "our" from the following phrase: "reflect our assumptions about what factors market participants would use in pricing life settlement policies."

75.     Defendants lack sufficient knowledge to form a belief about the truth of the allegations contained in paragraph 75 and therefore deny them.

76. Defendants lack sufficient knowledge to form a belief about the truth of the allegations contained in paragraph 76 and therefore deny them.

77. Defendants admit that the April 14 Form N-2 contains the words quoted in paragraph 77. Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations contained in paragraph 77 and therefore deny them.

78. Defendants admit that the April 14 Form N-2 contains the words quoted in paragraph 78. Defendants deny the remaining allegations in paragraph 78.

79. Defendants admit that the April 14 Form N-2 contains the words quoted in paragraph 79 and that the six firms listed have provided life expectancy estimates. Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations contained in paragraph 79 and therefore deny them.

80. Defendants lack sufficient knowledge to form a belief about the truth of the allegations contained in paragraph 80 and therefore deny them, except to admit that the April 14 Form N-2 suggests that the Fund was set up to rely on a single life expectancy provider: Lapetus. As that public filing states, "the Manager expects to use a single life expectancy provider"—specifically, "Lapetus"—"as its primary life expectancy provider."

81. Defendants admit that the April Form N-2 contains the words quoted in Paragraph 81 and that the Fund identified Lapetus as its anticipated primary life expectancy provider. Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations contained in paragraph 81 and therefore deny them.

82.   Defendants admit that the Fund's August Form N-2 contains the words quoted in Paragraph 82.  Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations contained in paragraph 82 and therefore deny them.

83.   Defendants admit that the April Form N-2 contains the words quoted in paragraph 83 but otherwise deny the allegations in paragraph 83.

84.   Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 84 and therefore deny them.

85.   Defendants admit that the Fund "chose Lapetus as the primary LE provider."  Defendants deny the remaining allegations in paragraph 85.

86.   Defendants lack sufficient knowledge to form a belief about the truth of whether Coventry made up over a quarter of Lapetus's business prior to 2024 and therefore deny the allegation.  Defendants admit that Coventry has purchased Lapetus life expectancies but deny the remaining allegations in paragraph 86.

87.   Defendants admit that the Fund disclosed its selection of Lapetus as its preferred life expectancy provider.  Defendants deny the remaining allegations in paragraph 87.  They also note that Florida law requires life settlement providers to "monitor" and "report[]" evidence of companies "routinely and consistently issuing estimates of life expectancy which are substantially and consistently below" those of others.  Info. Bulletin No. 2003-003, 2003 WL 25159993, at *2 (Fla. Ins. Bul. Aug. 12, 2003).

88. The allegations in paragraph 88 consist of legal arguments and conclusions that do not require a response. To the extent the allegations require a response, Defendants deny the allegations in paragraph 88.

89. Defendants deny the allegations in paragraph 89.

90. Defendants deny the allegations in paragraph 90, except to admit that Abacus, in correspondence to the SEC in August 2025, noted that (1) it holds a convertible note issued by Lapetus which can be converted to an ownership interest in Lapetus, and (2) Abacus's CEO, Jay Jackson, held a position as a Director of Lapetus, a fact that Lapetus sought to hide from the public.

91. Defendants lack sufficient knowledge to form a belief about the truth of the allegations regarding purported comments made by unnamed "industry insiders" and therefore deny the allegation. Defendants deny all remaining allegations in paragraph 91, and in so doing note that Abacus's own public disclosures state that it holds an "ownership interest" in Lapetus. Abacus 2024 Form 10-K, at 15.

92. Defendants deny the allegations in paragraph 92.

93. Defendants admit the allegations in paragraph 93.

94. Defendants admit that Mr. Buerger, among many others in the industry, expressed his concern with Lapetus's life expectancies being shorter than those of other LE providers. Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations in paragraph 94, including those regarding what Dr. Olshansky supposedly reported to Lapetus's CEO about his conversation with Mr. Buerger. Defendants therefore deny the remaining allegations.

95.    Defendants deny the allegations in paragraph 95.  Defendants add that Dr. Olshansky told Mr. Buerger that he was aware his life expectancies were shorter than the rest of the industry.

96.    Defendants deny the allegations in paragraph 96.

97.    Defendants deny the allegations in paragraph 97.

98.    Defendants deny the allegation that "Buerger did not get what he wanted from Lapetus or Dr. Olshansky," and further state that the study referenced in paragraph 98 and its accompanying press release speak for themselves.  Footnote 6 contains a citation for which no response is required.

99.    Defendants state that the independent peer review study conducted by Professors Bauer and Zhu in July 2024 and the accompanying press release speak for themselves.  Footnote 7 contains a citation for which no response is required.

100.    Defendants deny the allegations in paragraph 100, except to admit that they continued to purchase a small number of LEs from Lapetus, mainly for the purpose of evaluating Lapetus LEs against other LE providers.

101.    Defendants admit the allegations in paragraph 101.

102.    Defendants state that the video of the Fireside Chat speaks for itself. Defendants deny the remaining allegations in paragraph 102.  Footnote 8 contains a citation for which no response is required, but Defendants admit that the link contains a video of the Fireside Chat.

103.   Defendants admit that the YouTube video of the Fireside Chat cited in footnote 8 (and the transcript of that video) speak for themselves.   Defendants otherwise deny the allegations in paragraph 103.

104.   Defendants deny the allegations in paragraph 104, except to admit that Mr. Buerger stated that exceptionally short life expectancies represent an "existential threat" to the life settlement industry.  Defendants further state that the YouTube video of the Fireside Chat cited in footnote 8 (and the transcript of that video) speak for themselves.

105.   Defendants deny the allegation that Mr. Buerger "could not help himself" from talking about Abacus.  Defendants admit that Mr. Buerger discussed "using Lapetus at a discount rate of 21%" and described such a discount rate as "[n]ot realistic," but he did so in the context of a hypothetical $100 million fund, and did not mention any particular life settlement company.  Defendants deny all other allegations in paragraph 105.

106.   Defendants deny the allegations in paragraph 106, except to admit that Mr. Buerger stated that the "fair market value" of the hypothetical $100 million fund he was discussing would, in his opinion, be "grossly overstated" based on his belief and "knowledge of the market."  The YouTube video of the Fireside Chat cited in footnote 8 (and the transcript of that video) speak for themselves.

107.   Defendants deny the allegations in paragraph 107 and reiterate that the YouTube video of the Fireside Chat cited in footnote 8 (and the transcript of that video)—which contains no mention of Abacus or any other life settlement company

17

in Mr. Buerger's discussion of the hypothetical $100 million fund—speak for themselves.

108. Defendants admit that Abacus's August 12, 2024 Form 10-Q contains the words quoted in paragraph 108. Defendants deny the remaining allegations in paragraph 108.

109. Paragraph 109 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 109.

110. Paragraph 110 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 110, except that Defendants admit that Abacus's August 12, 2024 Form 10-Q contains the words quoted in paragraph 110.

111. Paragraph 111 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 111.

112. Paragraph 112 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 112, though in doing so state that the YouTube video of the Fireside Chat cited in footnote 8 (and the transcript of that video) speak for themselves.

113. Defendants admit that the former CEO of Mutual Benefits Corporation was sentenced to 20 years in prison. Defendants deny the remaining allegations in paragraph 113, though in doing so state that the YouTube video of the Fireside Chat cited in footnote 8 (and the transcript of that video) speak for themselves.

18

114.    Paragraph 114 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 114 except to admit that Defendants corresponded with Grant Thornton, whom Abacus fired without public explanation.

115.    Defendants admit that the SEC issued a comment letter on Abacus's Form S-1/S-3 filing and that Abacus's response to that letter contains the words quoted in paragraph 115.   Defendants otherwise deny the allegations in paragraph 115. Footnote 10 contains a citation for which no response is required.

116.    Defendants lack sufficient knowledge to form a belief about the truth of why the SEC issued its November 1 comment letter and therefore deny the allegations in paragraph 116.

117.    Defendants deny the allegations in paragraph 117, except to admit that Abacus's response to the SEC's comment letter contains the words quoted in paragraph 117.  Footnote 11 contains a citation for which no response is required.

118.    Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 118 and therefore deny them, other than to admit that Abacus's SEC response letter contains the quoted words.  Defendants add, however, that under Florida law, "[n]o viatical settlement broker, viatical settlement provider, or insurance agent in the business of viatical settlements in this state shall directly or indirectly own or be an officer, director, or employee of a life expectancy provider." Fla. Stat. § 626.99175(6).  And life expectancies, again, are the key factor for valuing life insurance policies.  "The actuarial estimate of the insured's lifespan . . . dictates

19

the purchase value of a life settlement.  And the return on investment depends on the accuracy of that estimate." *In re Living Benefits Asset Mgmt., L.L.C.*, 916 F.3d 528, 531 (5th Cir. 2019).

119.    Defendants deny the allegations in paragraph 119.

120.    Defendants deny the allegations in paragraph 120.

121.    Defendants deny the allegations in paragraph 121, except to admit that Coventry paid Professors Bauer and Zhu a total of approximately $15,000 to conduct this study.  Footnotes 13 and 14 contain citations for which no response is required.

122.    Defendants deny the allegations in paragraph 122, except to admit that COIOS published a document that contains the words quoted in paragraph 122. Footnote 15 contains citations and legal arguments for which no response is required. To the extent a response is required, Defendants deny that Lapetus maintained a "license" to operate in Florida.  Florida does not license life expectancy providers; it merely registers them.

123.    Defendants admit that Coventry published a press release, which speaks for itself.  Defendants deny the remaining allegations in paragraph 123, except to admit that accessing additional details from Coventry's follow-up study requires filling out a form.  Footnotes 16, 17, and 18 contain citations for which no response is required.

124.    Defendants deny the allegations in paragraph 124.

125.    Defendants admit that Abacus's 2024 Form 10-K contains the words quoted in paragraph 125.  Defendants deny the remaining allegations in paragraph 125.

126.   Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 126 and therefore deny the allegations.

127.   Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 127 and therefore deny the allegations.

128.   Defendants disagree with or lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 128 and therefore deny them. Specifically, Defendants deny Abacus's assertion that "Lapetus LEs are not used *at all* in the fair value analysis," a claim directly contradicted by many documents produced in discovery.

129.   Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 129 and therefore deny them.

130.   Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 130 and therefore deny them.

131.   Paragraph 131 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 131, except to admit that Coventry filed a petition for a writ of mandamus in Florida state court.

132.   Defendants lack sufficient knowledge to form a belief about the truth of the allegations regarding Jay Jackson's conversations with TD Securities and therefore deny the allegations.  Defendants state that the Coventry Writ speaks for itself. Defendants add that the quoted language in paragraph 132 is a reference to the work of an unaffiliated third-party, AA-Partners Ltd., which concluded that its "observed

increase" in industrywide life expectancies fell "significantly short of expectations," because of the entrance into the life expectancy market of "one LE provider," Lapetus, whose life expectancies "are substantially shorter on average" compared to its peers. AAP Life Settlement Market Update, Volume 13, Issue 10 (Nov. 2024).

133. Defendants deny the allegations in paragraph 133.

134. Defendants deny the allegations in paragraph 134, except to state that the Coventry Writ speaks for itself.

135. Defendants deny the allegations in paragraph 135, except to admit that Abacus CEO Jay Jackson held a seat on Lapetus's Board of Directors and to admit that Abacus held a $1 million convertible note in Lapetus. Footnotes 19 and 20 contain citations to which no response is required.

136. Paragraph 136 contains legal conclusions to which no response is required. To the extent that a response is required, Defendants state that the Coventry Writ speaks for itself. Defendants deny the remaining allegations in paragraph 136, except to admit that Abacus did claim to the SEC that Lapetus provided the "longest" life expectancy predictions, which is false.

137. Paragraph 137 contains legal conclusions to which no response is required. To the extent a response is required, Defendants admit that the Coventry Writ contains the words quoted in paragraph 137 and that Abacus was previously named Abacus Life Inc., as stated in footnote 21. Defendants otherwise deny the allegations in paragraph 137.

22

138. Defendants admit that the Abacus 2024 Form 10-K contains the words quoted in paragraph 138. Defendants otherwise deny the allegations in paragraph 138.

139. Defendants admit that the April Form N-2 contains the words quoted in paragraph 139. Defendants otherwise lack sufficient knowledge as to the truth of the allegations in paragraph 139 and therefore deny them.

140. Defendants disagree with or lack sufficient knowledge as to the truth of the allegations in paragraph 140 and footnote 22 and therefore deny them.

141. Paragraph 141 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 141.

142. Paragraph 142 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 142, except to admit that the petition for a writ of mandamus was voluntarily dismissed, and that Coventry successfully moved to intervene in *Lapetus Sols., Inc. v. Fla. Off. of Ins. Regul.*, Case No. 2025 CA 000516 (Fla. 2d Cir. Ct.).

143. Paragraph 143 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 143, except to admit that Tegus is a subsidiary of AlphaSense, and that Mr. Buerger was interviewed through the Tegus platform on May 22, 2025. Footnote 23 contains a citation for which no response is required.

144. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 144 and therefore deny them.

145.    Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 145 and therefore deny them.

146.    Paragraph 146 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants admit that the transcript of the Tegus Interview contains the words quoted in paragraph 146.  Defendants otherwise deny the allegations in paragraph 146.  Defendants further note that the statements listed in this paragraph are not "false and misleading."

147.    Paragraph 147 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants state that the transcript of the Tegus interview speaks for itself.  Defendants otherwise deny the allegations in paragraph 147.

148.    Paragraph 148 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants state that the transcript of the Tegus interview speaks for itself.  Defendants otherwise deny the allegations in paragraph 148.

149.    Paragraph 149 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 149, and in so doing deny that Mr. Buerger had any knowledge that his interview was going to be published to others not in the interview.

150.    Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 150 and therefore deny them.  Defendants add that Mr.

24

Buerger had no knowledge that a transcript of the interview was going to be "circulated" on June 4, 2025.

151. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 151 and therefore deny them.

152. Defendants admit that Morpheus published a report on June 4, 2025, entitled "Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die."  Defendants disagree with or lack sufficient knowledge to form a belief about the truth of the remaining allegations in paragraph 152 and therefore deny them.  Footnotes 24 and 25 contain citations for which no response is required.

153. Defendants deny the allegations in paragraph 153.

154. Defendants deny the allegations in paragraph 154.

155. Defendants disagree with or lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 155 and therefore deny them.

156. Defendants deny or lack sufficient knowledge about the truth of the allegations in paragraph 156 and therefore deny them.

157. Paragraph 157 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants admit that the Morpheus Report contains some quotes from Mr. Buerger's Fireside Chat at the LISA Conference and that it says Morpheus interviewed unidentified "Abacus competitors,"

but deny that those competitors were Coventry or Mr. Buerger. Defendants deny the remaining allegations in paragraph 157.

158. Paragraph 158 contains legal conclusions to which no response is required. To the extent a response is required, Defendants disagree with or lack sufficient knowledge about the truth of the allegations in paragraph 158 and therefore deny them.

159. Defendants deny the allegations in paragraph 159 that imply Defendants knowingly took part in or worked with Morpheus to develop the June 4, 2025 Morpheus Report. Defendants deny the remaining allegations in paragraph 159 and footnote 26, except to state that the Morpheus Report speaks for itself.

160. Defendants lack sufficient knowledge to form a belief about the truth of the allegations regarding market analysts and therefore deny them. Defendants deny the remaining allegations in paragraph 160, except to state that the Morpheus Report speaks for itself. Footnote 27 contains a citation for which no response is required.

161. Defendants deny the allegations in paragraph 161.

162. Paragraph 162 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 162. Abacus advertises extensively to the public and has significant relationships with and access to the media. And, as a large publicly traded company, it has significant means to, and does in fact, engage in public relations, including making numerous claims and exaggerations about this litigation.

26

163. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 163 and therefore deny the allegations.

164. Defendants deny the allegations in paragraph 164.

165. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 165 and therefore deny the allegations.

166. Paragraph 166 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 166.

167. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 167 and therefore deny the allegations.

168. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 168 and therefore deny the allegations.

169. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 169 and therefore deny the allegations.

170. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 170 and therefore deny the allegations.

171. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 171 and therefore deny the allegations.

172. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 172 and therefore deny the allegations.

173. Paragraph 173 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 173.

174. Defendants admit the allegations in paragraph 174.

175. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 175 and therefore deny the allegations.

176. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 176 and therefore deny the allegations.

177. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 177 and therefore deny the allegations.

178. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 178 and therefore deny the allegations.

179. Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 179 and therefore deny the allegations.

180. Paragraph 180 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 180.

181. Defendants deny the allegations in paragraph 181.

182. Paragraph 182 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 182.

183.    Defendants deny the allegations in paragraph 183, except to note that an Abacus investor reached out to Coventry and solicited the Coventry studies from Defendants.

184.    Defendants deny the allegations in paragraph 184, except to reiterate that an Abacus investor reached out to Coventry and solicited the Coventry studies, not the other way around.

185.    Paragraph 185 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 185, except to note that Defendants agree that Abacus's reliance on Lapetus is evidence of fraud.

186.    Paragraph 186 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 186 and therefore deny the allegations.

187.    Defendants deny the allegations in paragraph 187.

188.    Defendants admit that Lapetus announced that it would wind down and cease all operations on August 18, 2025.  Defendants lack sufficient knowledge to form a belief as to the truth of the allegation that Lapetus actually ceased operations on September 1, 2025, and therefore deny the allegation.  Defendants otherwise deny the allegations in paragraph 188.

189.    Defendants disagree with or lack sufficient knowledge to form a belief about the truth of the allegations in paragraph 189 and therefore deny them.

29

190.   Defendants deny the allegations in paragraph 190, except to admit that Lapetus did issue a public statement.

191.   Defendants deny the allegations in paragraph 191, except to admit that the Fund's August 15, 2025 N-2 says "the Fund expected to rely on the life expectancy provider that has produced the most current life expectancy report with respect to a given Mortality Contract."

192.   Paragraph 192 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 192.

**ANSWER TO THE COUNTS**

**COUNT I**

193.   Defendants incorporate by reference their responses to Paragraphs 1 through 192 of the FAC as though fully set forth herein.

194.   Paragraph 194 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 194.

195.   Paragraph 195 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 195.

196.   Paragraph 196 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 196.

197. Paragraph 197 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 197.

198. Paragraph 198 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 198.

199. Paragraph 199 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 199, except to note that the documents and videos containing the alleged statements speak for themselves.

200. Paragraph 200 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 200.

201. Paragraph 201 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 201.

202. Paragraph 202 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 202.

203. Paragraph 203 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 203.

204. Paragraph 204 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 204.

205. Paragraph 205 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 205.

206. Paragraph 206 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 206.

207. Paragraph 207 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 207.

## COUNT II

208. Defendants incorporate by reference their responses to Paragraphs 1 through 192 of the FAC as though fully set forth herein.

209. Paragraph 209 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 209.

210. Paragraph 210 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 210.

211.    Paragraph 211 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 211.

212.    Paragraph 212 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 212.

213.    Paragraph 213 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 213.

214.    Paragraph 214 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 214, except to note that the documents and videos containing the alleged statements speak for themselves.  Defendants also note that one of these statements was dismissed with prejudice.

215.    Paragraph 215 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 215.

216.    Paragraph 216 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 216.

217. Paragraph 217 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 217.

218. Paragraph 218 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 218.

219. Paragraph 219 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 219.

220. Paragraph 220 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 220.

221. Paragraph 221 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 221.

222. Paragraph 222 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 222.

223. Paragraph 223 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 223.

**COUNT III**

34

224.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 224.

225.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 225.

226.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 226.

227.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 227.

228.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 228.

229.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 229.

230.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 230.

231. This allegation, along with the others in Count III, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 231.

232. This allegation, along with the others in Count III, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 232.

233. This allegation, along with the others in Count III, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 233.

234. This allegation, along with the others in Count III, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 234.

235. This allegation, along with the others in Count III, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 235.

236. This allegation, along with the others in Count III, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 236.

237. This allegation, along with the others in Count III, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 237.

238.    This allegation, along with the others in Count III, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 238.

**COUNT IV**

239.    Defendants incorporate by reference their responses to Paragraphs 1 through 192 of the FAC as though fully set forth herein.

240.    Paragraph 240 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 240.

241.    Paragraph 241 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 241.

242.    Paragraph 242 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 242.

243.    Paragraph 243 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 243.

244.    Paragraph 244 contains legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 244.

245. Paragraph 245 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 245.

## COUNT V

246. This allegation, along with the others in Count V, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 246.

247. This allegation, along with the others in Count V, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 247.

248. This allegation, along with the others in Count V, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 248.

249. This allegation, along with the others in Count V, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 249.

250. This allegation, along with the others in Count V, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 250.

251. This allegation, along with the others in Count V, was dismissed by the Court. No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 251.

252.   This allegation, along with the others in Count V, was dismissed by the Court.  No response is therefore required, but to the extent one is, Defendants deny the allegations in paragraph 252.

## ANSWER TO PRAYER FOR RELIEF

To the extent that Defendants are required to respond to the allegations contained within Plaintiff's "Prayer for Relief" (located on page 79 of the FAC), Defendants deny those allegations and request judgment in their favor.  Defendants further deny that Plaintiff is entitled to any of the relief requested in the FAC.  To the extent not otherwise expressly admitted, Defendants deny any remaining allegations in the FAC.

## ANSWER TO DEMAND FOR JURY TRIAL

Plaintiff's jury demand requires no response.

## AFFIRMATIVE AND OTHER DEFENSES

1.   The FAC, in whole or in part, fails to state a claim upon which relief can be granted, for the reasons explained in Defendants' Motion to Dismiss.  *See* ECF 47.

2.   The FAC is an improper shotgun pleading which fails to put Defendants on sufficient notice of the claims against them, as explained in Defendants' Motion to Dismiss.  *See id*. at 7–9.  Defendants understand this Court's ruling on the motion to dismiss as limiting the challenged conduct at issue to those statements listed in paragraphs 199 and 214 of the FAC.

3.   In addition, Defendants raise the following defenses for each of the three remaining counts.  Defendants reserve the right to raise additional defenses during the

course of these proceedings. That includes any additional defenses that Defendants

may have to Plaintiff's defamation per se and tortious interference claims (Counts III

and V), both of which the Court has dismissed.

### Count I – Defamation

4.     The challenged publications and statements by Defendants (listed in

paragraph 199 of the FAC) are protected by the First Amendment to the United States

Constitution. That is because all of the challenged publications and statements are

either true, substantially true, rhetorical hyperbole, or matters of opinion that are not

capable of being proved true or false. In particular:

   a.  Mr. Buerger's remark that public companies "try[] to generate steady

       progress in [their] quarterly earnings," which creates a "temptation"

       to "manufacture earnings," FAC ¶ 199(a), is true—or at a minimum,

       not readily capable of being proven false. The statement that Abacus

       used Lapetus as its "medical underwriting company, not exclusively,

       but primarily," FAC ¶ 199(a), is likewise true.

   b.  Mr. Buerger's prediction that shareholders could be subordinated to

       "asset-backed debt," FAC ¶ 199(b), is a constitutionally protected

       opinion. Mr. Buerger did not state that Abacus has asset-backed debt,

       as shown by the Tegus Interview transcript. And to the extent Abacus

       does have or might obtain asset-backed debt, it is true that

       shareholders and others would be subordinated to such debt.

40

c. Mr. Buerger's remark that "nobody's using Lapetus anymore" other than "small, unsophisticated, frankly stupid investors," FAC ¶ 199(c), is rhetorical hyperbole and/or true. Those adjectives connote inherently subjective perceptions.

d. Mr. Buerger's statement that "[y]ou have to choose which accounting method you'll use for [a] policy and you can never change it," FAC ¶ 199(d), is true. Abacus has admitted as much in SEC filings.

e. Mr. Buerger's belief that "[i]t's just a matter of time before [Abacus] implode[s]," FAC ¶ 199(e), is a constitutionally protected opinion, rhetorical hyperbole, and prediction of future events.

f. Mr. Buerger's "belie[f]" that policy valuations premised on Lapetus life expectancies are "grossly overstated," FAC ¶ 199(f), is a constitutionally protected opinion. That is true even if one could construe this statement about a hypothetical fund as referring to Abacus.

g. Coventry's statement that Lapetus's life expectancy estimates are "consistently and materially shorter than those issued by other life expectancy providers, potentially leadings to the overvaluation of life insurance policies and investor losses," FAC ¶ 199(g), is true. Abacus itself has recognized that Lapetus's estimates were consistently and materially shorter. The cautionary language in this statement also

41

shows that Coventry was relaying the findings of its study and its interpretation of the data that it had.

h. The same goes for Coventry's statement that its "internal review" results "cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies." FAC ¶ 199(h). That is exactly what the results show. The statement is true—or at the very least a protected opinion, given the hedging language used.

i. So too for the statement that "valuations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses." FAC ¶ 199(i). That statement is true—or at the very least a protected opinion, given the hedging language used.

j. Abacus's challenge to the assertion that it does not hold policies for more than a "short period of time," FAC ¶ 199(j), is an opinion that is incapable of being proven true or false.

5. The challenged publications and statements by Defendants are further protected by Article I, Section 4 of the Florida Constitution. As described above, those publications and statements are all either opinions or true. They were also all made to protect investors, the public, and the life settlement industry.

6. To the extent Abacus challenges any statements made to government officials—which do not appear in the list of challenged statements in Count I—those statements are specifically protected by the *Noerr-Pennington* doctrine.

42

7.      To the extent Abacus challenges any statements made to government officials—which do not appear in the list of challenged statements in Count I—those statements are specifically protected by Article I, Section 5 of the Florida Constitution.

8.      To the extent the FAC challenges statements in the Morpheus Report, those statements were not published by Defendants.

9.      Some of the challenged statements were not about, or "of and concerning," the Plaintiff.  The statements in paragraphs 199(g), 199(h), and 199(i) were about Lapetus.  The statements in paragraph 199(c) are about other unidentified investors.  These statements thus cannot be defamatory as to Abacus.

10.     The statement that Abacus must "choose which accounting method" it will use for policies likewise could not possibly injure the company's reputation.  FAC ¶¶ 199(d).  It is therefore not defamatory either.

11.     Abacus is a public figure, and the challenged statements made by Defendants were not published with actual malice—that is, with knowledge of falsity or reckless disregard for the truth.

    a.  Abacus is a general public figure for many reasons, including that it is a publicly held company that touts its transparency, that it advertises heavily, and that it operates in a field subject to close state regulation.

    b.  Abacus is at the very least a limited public figure for purposes of this action.  This dispute concerns an ongoing debate about Lapetus life expectancies and how Abacus's use of those estimates—along with other questionable practices—threatens the investments of

43

shareholders across the country. These sorts of issues have plagued the industry before, and they continue to draw the attention of the life settlement industry, the public, investors, and government regulators. Moreover, Abacus invited public scrutiny by voluntarily entering a strictly regulated, high-profile industry and becoming its only publicly traded participant. It has also advertised heavily, and it has taken advantage of its extensive resources and ready access to the media to commission a response to allegations about the company's overvaluation.

c. The statements at issue are either true or protected opinions. But even if they were somehow false, Defendants did not actually entertain serious doubts as to the veracity of their statements; nor were they aware that their statements were probably false. To the contrary, their statements were corroborated by Abacus's public filings and by an extensive internal review of Lapetus life expectancies, among other sources. Abacus has not alleged facts sufficient to establish actual malice as to any statement. Nor has discovery revealed any such evidence—because none exists.

12. Even if Abacus is not a public figure, and even if any statement were false, Defendants did not act negligently with respect to the statement's falsity. To the contrary, the statements were corroborated by Abacus's public filings and by an extensive internal review of Lapetus life expectancies, among other sources.

44

13. For similar reasons, the challenged statements of Defendants were made in good faith and are thus protected by a qualified privilege under Florida law. No statement was made with malice. Instead, Defendants made their statements based on an interest in protecting the life settlement industry and avoiding investor losses. The statements were also made on proper occasions in a proper manner. And the statements were received by those with corresponding interests in the subject matter (life settlement industry participants at the LISA Conference, investors reading the Tegus interview, and industry participants, regulators, and investors for statements regarding the Coventry Studies). In fact, Florida law requires that Defendants, as life settlement industry participants, disclose their beliefs about short life expectancies.

14. The challenged statements are further protected by Florida's fair comment privilege. No statement was made with malice. Instead, the statements are fair comments on matters of public interest to the extent they relate to Abacus, which has voluntarily made itself newsworthy as a publicly traded life settlement company. The comments are honest expressions of opinion on matters of legitimate public interest that are based upon true statements of fact.

15. Plaintiff failed to provide pre-suit notice to Defendants under Fla. Stat. § 770.01, thus failing to satisfy a condition precedent for this suit.

16. Plaintiff did not suffer damages as a result of Defendants' challenged conduct.

17. There is no causal connection between the injuries allegedly sustained by Plaintiff and Defendants' conduct. Defendants were neither the but-for nor the

45

proximate cause of Plaintiff's alleged injuries. Indeed, Abacus has made clear that it believes it was harmed by the Morpheus Report. But Defendants had not heard of Morpheus prior to the report's filing, they did not knowingly contribute to the report, and they did not know that the report would be published. Any damages that Plaintiff suffered were the result of an intervening cause.

18.    Plaintiff is precluded from recovering the damages it seeks from Defendants, in whole or in part, because any such damages were caused by the acts or omissions of third parties with whom Defendants had no contractual or other relationship, and over whom Defendants had no control or right of control.

19.    To the extent Plaintiff suffered any damages, Plaintiff failed to mitigate such damages.

### Count II – Defamation by Implication

20.    The challenged publications and statements by Defendants (listed in paragraph 214 of the FAC) are protected by the First Amendment to the United States Constitution. That is because all of the challenged publications and statements are either true, substantially true, rhetorical hyperbole, or matters of opinion that are not capable of being proved true or false, nor do they convey any false implications. In particular:

     a. Mr. Buerger's "belie[f]" that policy valuations premised on Lapetus life expectancies are "grossly overstated," FAC ¶ 214(a), is a constitutionally protected opinion. That is true even if one could construe the broader statement about a hypothetical fund as referring

to Abacus. Mr. Buerger's opinion is also well grounded in facts, as Abacus is well aware. Lapetus's life expectancies are chronically short, and Abacus's scheme to manipulate policy values has striking parallels to what happened with Mutual Benefits and Life Partners.

b. The court dismissed the statements in paragraph 214(b) with prejudice as privileged. There is also nothing false or misleading about what Coventry said. The statements that Abacus has a "close" relationship with Lapetus and was invested "heavily" in the company, FAC ¶ 214(b), are non-actionable opinions. Those opinions are also well supported. Jay Jackson held a position on Lapetus's board, which "may" have violated Florida's "Life Expectancy reform law." *Id.* Abacus admittedly invested in Lapetus. And Abacus did in fact bizarrely claim that Lapetus "provides the most conservative" life expectancy predictions—even though all evidence is to the contrary. *Id.*

c. Abacus cannot deny that other public companies focused on life settlements historically "have gone bankrupt." FAC ¶ 214(c). That statement is true. And to the extent Abacus believes that Mr. Buerger was implying that Abacus would go bankrupt too (the statement was not about Abacus) that would be a constitutionally protected opinion. There is nothing false or misleading about what Mr. Buerger said.

d.  Nor is there anything false or misleading about Mr. Buerger's assertion that Coventry "do[es] a fair value calculation" to see what its policies are worth. FAC ¶ 214(d). That statement is true. And to the extent Abacus believes that Mr. Buerger was implying that Abacus does not use the fair value method, that is directly refuted by what he said. He specifically acknowledged that Abacus "went to fair market value" when it went public.

e.  There is also nothing false or misleading about Mr. Buerger noting that the quarterly growth in Abacus's inventory and the amount of money that Abacus was investing was "quite substantial." FAC ¶ 214(e). The word "substantial" is inherently subjective. And Mr. Buerger's claims were directionally accurate. Abacus's SEC filings show that these figures were indeed increasing, and they also show that this led to "unrealized gains" on the books. *Id.* Mr. Buerger's statement was therefore true. He said exactly what Abacus was doing, and he never implied that Abacus "only generates revenue through unrealized gains." FAC ¶ 146(e).

f.  Finally, there is nothing false or misleading about Mr. Buerger observing that Abacus was "trying to get the stock price up" through a "stock repurchase plan." FAC ¶ 214(f). Abacus was pushing to get its stock price up through, *inter alia*, a stock repurchase plan.

48

21.    The challenged publications and statements by Defendants are further protected by Article I, Section 4 of the Florida Constitution.  As described above, those publications and statements are all either opinions or true.  They were also all made to protect investors, the public, and the life settlement industry.

22.    To the extent Abacus challenges any statements made to government officials—which do not appear in the list of challenged statements in Count II—those statements are specifically protected by the *Noerr-Pennington* doctrine.

23.    To the extent Abacus challenges any statements made to government officials—which do not appear in the list of challenged statements in Count II—those statements are specifically protected by Article I, Section 5 of the Florida Constitution.

24.    The challenged statements made in court filings (paragraph 214(b)) are further protected by an absolute privilege.  This Court recognized as much by dismissing that portion of the claim with prejudice.

25.    To the extent the FAC challenges statements in the Morpheus Report, those statements were not published by Defendants.

26.    Some of the challenged statements were not about, or "of and concerning," the Plaintiff.  The statement in paragraph 214(c) was about other historic companies.  And the statement in paragraph 214(d) was about Coventry.

27.    Moreover, claiming that Abacus is trying to "get [its] stock price up" could not possibly injure the company's reputation.  FAC ¶¶ 214(f).  That statement is not defamatory either.

28.     Abacus is a public figure, and the challenged statements made by Defendants were not published with actual malice—that is, with knowledge of falsity or reckless disregard for the truth.

   a.  Abacus is a general public figure for many reasons, including that it is a publicly held company that touts its transparency, that it advertises heavily, and that it operates in a field subject to close state regulation.

   b.  Abacus is at the very least a limited public figure for purposes of this action.  This dispute concerns an ongoing debate about Lapetus life expectancies and how Abacus's use of those estimates—along with other questionable practices—threatens the investments of shareholders across the country.  These sorts of issues have plagued the industry before, and they continue to draw the attention of the life settlement industry, the public, investors, and government regulators. Moreover, Abacus invited public scrutiny by voluntarily entering a strictly regulated, high-profile industry and becoming its only publicly traded participant.  It has also advertised heavily, and it has taken advantage of its extensive resources and ready access to the media to commission a response to allegations about the company's overvaluation.

   c.  The statements at issue are either true or protected opinions.  But even if they were somehow false, Defendants did not actually entertain serious doubts as to the veracity of their statements; nor were they

50

aware that their statements were probably false. To the contrary, their statements were corroborated by Abacus's public filings and by an extensive internal review of Lapetus life expectancies, among other sources. Abacus has not alleged facts sufficient to establish actual malice as to any statement. Nor has discovery revealed any such evidence—because none exists.

29. Even if Abacus is not a public figure, and even if any statement were false, Defendants did not act negligently with respect to the statement's falsity. To the contrary, the statements were corroborated by Abacus's public filings and by an extensive internal review of Lapetus life expectancies, among other sources.

30. For similar reasons, the challenged statements of Defendants were made in good faith and are thus protected by a qualified privilege under Florida law. No statement was made with malice. Instead, Defendants made their statements based on an interest in protecting the life settlement industry and avoiding investor losses. The statements were also made on proper occasions in a proper manner. And the statements were received by those with corresponding interests in the subject matter (life settlement industry participants at the LISA Conference, investors reading the Tegus interview, and industry participants, regulators, and investors for statements regarding the Coventry Studies). In fact, Florida law requires that Defendants, as life settlement industry participants, disclose their beliefs about short life expectancies.

31. The challenged statements are further protected by Florida's fair comment privilege. No statement was made with actual malice. Instead, the

51

statements are fair comments on matters of public interest to the extent they relate to Abacus, which has voluntarily made itself newsworthy as a publicly traded life settlement company with extensive public advertisement. The comments are honest expressions of opinion on matters of legitimate public interest that are based upon true statements of fact.

32.    Plaintiff failed to provide pre-suit notice to Defendants under Fla. Stat. § 770.01, thus failing to satisfy a condition precedent for this suit.

33.    Plaintiff did not suffer damages as a result of Defendants' challenged conduct.

34.    There is no causal connection between the injuries allegedly sustained by Plaintiff and Defendants' conduct. Defendants were neither the but-for nor the proximate cause of Plaintiff's alleged injuries. Indeed, Abacus has made clear that it believes it was harmed by the June 4, 2025 Morpheus Report. Defendants did not partner with Morpheus to prepare the report nor have any knowledge that the report was coming. They had not heard of Morpheus prior to the report's filing, they did not knowingly contribute to the report, and they did not know that the report would be published. Any damages that Plaintiff suffered were the result of an intervening cause.

35.    Plaintiff is precluded from recovering the damages it seeks from Defendants, in whole or in part, because any such damages were caused by the acts or omissions of third parties with whom Defendants had no contractual or other relationship, and over whom Defendants had no control or right of control.

36.     To the extent Plaintiff suffered any damages, Plaintiff failed to mitigate such damages.

### Count IV – FDUTPA

37.     Plaintiff's FDUTPA claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is premised on the allegedly defamatory statements above. Defendants therefore incorporate their defenses for the defamation claims as if fully set forth herein.

38.     As to Mr. Buerger's statement that he "believe[d]" Lapetus's chronically short life expectancies posed an "existential threat" to the industry, FAC ¶ 242, that opinion is similarly protected by the First Amendment and the Florida Constitution. The statement about Lapetus also did not cause Plaintiff any harm or damages.

39.     For similar reasons, Plaintiff has failed to allege any deceptive or unfair trade practice. Defendants' opinions and true statements are not deceptive or unfair. They are instead protected by the First Amendment and the Florida Constitution, as explained above.

40.     Defendants are persons regulated by the Florida Office of Insurance Regulation and therefore cannot be subject to a claim under FDUTPA because they fall within FDUTPA's safe harbor. *See* Fla. Stat. § 501.212(4).

41.     Plaintiff's FDUTPA claim fails because the challenged statements were not made in trade or commerce. The law does not apply to the Defendants' publication of information here.

53

42.    Plaintiff's FDUTPA claim fails because the complained-of conduct did not cause harm to consumers.

43.    Plaintiff's FDUTPA claim fails because the complained-of conduct did not cause actual damages, as that term is used in Florida law.  Plaintiff cannot recover consequential damages as a matter of law.

44.    Plaintiff's FDUTPA claim is barred by the single publication doctrine. Abacus cannot repackage its defamation claims as FDUTPA claims—regardless of whether the defamation claims fail or not.

45.    Plaintiff's FDUTPA claim fails to the extent the challenged statements are required or specifically permitted by law.  Florida law requires Defendants as life settlement industry participants to disclose their beliefs about short life expectancies.

## COUNTERCLAIMS

Defendants and Counterclaimants Coventry First LLC ("Coventry") and Alan Buerger ("Mr. Buerger") (together, "Counterclaimants") hereby assert the following Counterclaims against Plaintiff and Counterclaim Defendant Abacus Global Management, Inc. ("Abacus"):

## INTRODUCTION

1. Abacus's lawsuit is an exercise in misdirection, resting on allegations that are contradicted by Abacus's own documents as well as discovery from third parties. When it filed this suit, Abacus knew that life expectancies ("LEs") from Lapetus Solutions, Inc. ("Lapetus") were systematically shorter than those of other providers. Abacus knew that systematically short life expectancies produce inflated values for life insurance policies. Abacus knew that it valued the life insurance policies on its books using these systematically short Lapetus life expectancies as a predominant input. And Abacus knew—based on its own analysis before filing suit—that the value of its portfolio would ██████████████████████████ if it switched from using Lapetus to a reputable life expectancy provider without also ██████████████ ████████████████████. Abacus's fraudulent business practices, including its related-party sales and discount rate manipulation discussed below, allowed Abacus to report higher earnings and maintain the illusion of strong financial performance with no basis in reality.

2. Discovery in this case has confirmed that Abacus knew these facts long before either Defendants or Morpheus raised the same concerns. And following the

55

Morpheus Report on June 4, 2025, the public and Abacus's investors also became aware of the truth.

3. But instead of addressing these hard truths, Abacus filed this suit. The First Amended Complaint alleges that Alan Buerger and Coventry were to blame for Abacus's own failures—and falsely attributes the Morpheus Report to Coventry and Mr. Buerger. As set forth below, Abacus's First Amended Complaint is replete with innuendos, misstatements, and outright falsehoods all in service of Abacus's own false narrative. And Abacus used its filings in this Court, and its press releases outside of Court, to perpetuate its scheme.

4. Abacus did not bring this suit just to distract from its own misdeeds. It brought this suit as a warning shot—a transparent attempt to silence public debate about Abacus's practices as a public company and to signal that Abacus would impose significant costs on anyone who exposed its misconduct. As set forth in Count I below, this suit was filed to discourage public discussion of Abacus's practices as a public company.

5. It is apparent why Abacus has engaged in this course of conduct. For years, Abacus built its business through an improper relationship with Lapetus, a life expectancy provider. Dating back to 2021, Abacus Chairman and Chief Executive Officer Jay Jackson saw a potential relationship with, and financial investment in, Lapetus as Abacus's way to "███████████████████████████████" Ex. 2, at 1. Jay Jackson touted that Abacus's investment in Lapetus would allow it "█████████████" which would in turn enable Abacus to ███████████████████

56

███████████████████████████████████████████████████

████████████████████. *See id*. Abacus thus "look[ed] forward to the time [it got] to mark a portfolio using [Lapetus] LE[s]." Ex. 3, at 3. And that is exactly what Abacus did when the company went public.

6.  Florida law prohibits this sort of intermingling between life settlement companies and life expectancy providers—and for good reason. Life settlement companies have imploded in the past following efforts to influence or control life expectancies, which are critical to valuing their portfolios. But Abacus was undeterred. Abacus invested $1 million in Lapetus, receiving both a convertible note and the right to appoint a representative to serve on Lapetus's Board of Directors, which resulted in Abacus placing Jay Jackson on the Lapetus Board as a full-fledged voting member. Then, for years, he participated in Lapetus Board meetings—even after he purported to resign from the Board after his board membership came to light.

7.  Abacus and Lapetus also formed a "partnership" to build life expectancy tables and became so intertwined that Abacus became Lapetus's "primary and basically only client." Ex. 1, at 1. Abacus consistently used Lapetus LEs to determine valuations for policies it purchased on the secondary market and sold on the tertiary market—and it continued to do so, even as some tertiary market purchasers concluded that Lapetus LEs were unreliably short.

8.  But even more importantly, Abacus used Lapetus's chronically short life expectancies as a critical input in the fair market valuations of its entire life insurance policy portfolio. As Abacus COO and CFO Bill McCauley stated, when "██████████

57



. Ex. 4, at 1. Abacus's policy valuation handbook, which was provided to Abacus's former auditor, Grant Thornton, confirmed that too. The "███████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████" Ex. 5, at 3 (emphasis added).

9.      This Lapetus-driven valuation methodology was developed because an Abacus employee recognized years ago that using Lapetus LEs to conduct Abacus's portfolio valuation would "██████████████████████████████████ ██████████████████████" Ex. 6, at 1. In fact, internal emails show that, by the time this lawsuit was filed, Abacus realized that switching from Lapetus to a more reputable LE provider to mark the policies on Abacus's books would cause the company's portfolio value to ████████████████████████████████. *See* Ex. 7, at 1.

10.     Mr. Buerger and Coventry harbored legitimate concerns that Abacus and Jay Jackson were using their financial and directorial relationship with Lapetus for improper purposes. Those were the very same purposes that led Florida to outlaw life settlement companies from owning, or serving as directors of, life expectancy providers. Mr. Buerger and Coventry had these concerns because they had seen it before. Before Abacus, two companies had gone public in the life settlement industry.

58

Both blew up.  And in their implosions, hundreds of millions of investor dollars were lost, including many millions from the general public.

11.     These scandals tarred the life settlement industry, harmed consumers, and led to important regulatory changes.  Counterclaimants believe that sunlight is the best disinfectant, and that potential issues which could cost the public millions and shake up government regulatory regimes should be discussed openly and publicly.

12.     Abacus's lawsuit is thus not a legitimate effort to remedy legitimate legal claims.  It is the culmination of Abacus's knowing scheme to use Lapetus's misleading and deceptively short life expectancies for its own financial gain.  Abacus's scheme depends on Coventry, and others in the industry, staying quiet.  And Abacus's lawsuit is its way of exacting costs upon those who may speak out about their concerns.

13.     Coventry and Mr. Buerger therefore bring these counterclaims under the Florida Anti-SLAPP Act, Fla. Stat. § 768.295, and Florida Viatical Settlements Act, Fla. Stat. §§ 626.991–993.  Counterclaimants seek damages related to reputational harms, lost profits stemming from Abacus's violations of the Florida Viatical Settlements Act, and court costs and reasonable attorneys' fees incurred by Counterclaimants in their defense against Abacus's SLAPP suit.

## PARTIES

14.     Counterclaimant Coventry First LLC is a limited liability company headquartered in Fort Washington, Pennsylvania.  Coventry First LLC has a single member, Dash Investments LLC.  Dash Investments LLC has two members: the Buerger 2003 Family Trust and the Alan H. Buerger 2003 Trust for Reid S. Buerger,

both of which are citizens of Pennsylvania. Accordingly, Coventry is a citizen of Pennsylvania.

15. Counterclaimant Mr. Buerger is the Co-founder and Executive Chairman of Coventry. He, too, is a citizen of Pennsylvania.

16. Plaintiff and Counterclaim Defendant Abacus Global Management, Inc. ("Abacus" or "Plaintiff") is a Delaware corporation with its principal place of business in Orlando, Florida.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over these counterclaims pursuant to Rule 13 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1367(a), since these counterclaims share a common nucleus of operative facts with the original claims asserted by Abacus and form part of the same case or controversy.

18. This Court has personal jurisdiction over Abacus because Abacus is a citizen of Florida, with its principal place of business in Orlando, Florida. Abacus has submitted to the jurisdiction of this Court by prosecuting its case in this Court.

19. Venue is proper under 28 U.S.C. § 1391 because Abacus maintains its principal place of business in Orlando, Florida, which is within this district.

## FACTUAL BACKGROUND

### A.    Coventry, Abacus, and the Life Settlement Industry

20. Coventry, led by its founder and Executive Chairman Alan Buerger, pioneered the life settlement market, turning life insurance policies into valuable assets that provide immediate value to everyday consumers. To date, Coventry has delivered

60

over $6 billion to policyholders, and it stands as the largest life settlement provider in the industry.

21.     Given their role in creating the life settlement industry, Coventry and Mr. Buerger have always been concerned about its health and reputation.  To this end, Coventry has been actively involved in advocating for necessary regulation of life settlement and life expectancy providers.  These stewardship efforts have garnered recognition and attention, including from the American Council of Life Insurers, which has recognized Coventry's work to advance necessary regulation of the industry.

22.     Coventry's and Mr. Buerger's desire for regulation of the life settlement industry is born from experience.  In 2012, the Securities and Exchange Commission ("SEC") brought charges against a major, publicly traded life settlement provider, Life Partners Holdings Inc. ("Life Partners"), and three of Life Partners' executives for disclosure and accounting fraud.  According to the SEC, "the company was systematically and materially underestimating the life expectancy estimates it used to price transactions.  Life expectancy estimates are a critical factor impacting the company's revenues and profit margins as well as the company's ability to generate profits for its shareholders."[1]

---

[1] Press Release, Sec. & Exch. Comm'n, SEC Charges Life Settlements Firm and Three Executives with Disclosure and Accounting Fraud (Jan. 3, 2012), https://bit.ly/4vog2Wd.

23.     The Life Partners case came less than a decade after the SEC first brought an action against Mutual Benefits Corp., another life settlement company, which had defrauded tens of thousands of investors of over $1.25 billion.[2]  These scandals led to widespread investor losses and long-term reputational harms to the entire industry.

24.     Scandals like Life Partners and Mutual Benefits are why States, including Florida, have taken a harder look at life settlement providers.  In 2016, that scrutiny landed on Abacus.

25.     In that year, Abacus applied for a viatical settlements license from the Florida Office of Insurance Regulation ("OIR"), one of the most important regulatory bodies in the life settlement industry.  But Abacus was rejected—for the second time.[3] At the outset, OIR had difficulty even examining Abacus's license application, because Abacus had "the most 'extreme' record keeping issues" that the OIR examiner had seen.  Indeed, a "significant portion" of Abacus's files "had been destroyed."

26.     After examining what they could, OIR determined that Abacus "was not worthy of a license" because of the "lack of trustworthiness of principals/owners of [Abacus] which cannot be cured."  These concerns stemmed from, among other things, transactions involving Abacus that "violated state law because the policies had been obtained through misrepresentations."[4]

---

[2] Press Release, Dep't of Justice, Former Mutual Benefits Corporation Head Sentenced To 20 Years In Prison For His Role In $1 Billion MBC Scheme (Aug. 29, 2014), http://bit.ly/4f5C9ut.

[3] Abacus had applied for a license with OIR in 2012 and was also denied then.

[4] Donna Horowitz, *Florida Denies Provider's License to Abacus Settlements, Abacus Appeals*, The Deal (June 30, 2016), https://bit.ly/4vnkjcr.

**B.      Abacus's Relationship with Lapetus**

27.      Abacus's troubles in following Florida state law did not stop in 2016.  In 2021, Abacus began contemplating its investment in Lapetus.  Florida law prohibits life settlement companies from holding ownership in or serving as a director for life expectancy providers.  *See* Fla. Stat. § 626.99175(6).  Yet that was no obstacle to the Abacus executive team.

28.      Perhaps for the very same reason that Florida bars life settlement providers from having ownership in life expectancy providers, in August 2021, Jay Jackson wrote to Sean McNealy, Scott Kirby, and Matt Ganovsky that "███████

████████████████████████████████████████████████████████████████"
Ex. 2, at 1 (emphasis added).   Jackson went on to argue that ownership in Lapetus would allow Abacus to "██████████████████████████████████████" *Id*. This was even after Sean McNealy pointed out that he was "████████████████████

████████████████████████████████████████████████" Ex. 8, at 1 (emphasis added).  But Jackson implored his team that "████████████████████

████████████████████████" *Id*. (emphasis added).  And not mincing words, Jackson admitted that investment in Lapetus could make all the difference for Abacus:  "██

██████████████████████████████" Ex. 2, at 1 (emphasis added).

29.      Less than two months later, in November 2021, Abacus finalized its first investment in Lapetus and was granted a Board seat on Lapetus's Board of Directors, which was filled by Jay Jackson.  Notably, Jackson was not disclosed as a director on

Lapetus's website, in contrast to all of Lapetus's other directors.

30.    Abacus got to work using Lapetus to value its policy holdings not long after.  In January 2023, as Abacus was preparing to go public, an Abacus employee estimated that using Lapetus LEs to value Abacus's policy holdings would "████ ████████████████████████████████████████████████████████████████████ " Ex. 6, at 1.  Soon after this realization, Abacus took its "valuation process in house" to develop the "████████████████████████████████████████ " Ex. 9, at 5.

31.    Abacus's in-house valuation methodology is impossible to square with the allegations in Abacus's complaint.  As Abacus's valuation memorandum explains, "████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ " Ex. 5, at 3 (emphasis added).  The memorandum goes on to state that the valuation for Abacus's individual policies is "████████████████████████ ████████████████ " and "████████████████████████████ ████████████████████████████████████████ " Id. at 6 (emphasis added).  As Abacus CFO and COO Bill McCauley rationalized this questionable business practice, "████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ " Ex. 4, at 1 (emphasis added).

32.    But Abacus's former auditor, Grant Thornton, and its valuation consultant at Actuarial Risk Management ("ARM"), quickly recognized that Abacus's

64

reliance on Lapetus to value its portfolio was a serious concern.

33.     As the ARM consultant explained, Abacus's portfolio values would be "███████████████████████████████" from Lapetus because "██████  ██████████████████████████████████████████████████████" Ex. 9, at 3.  Grant Thornton, which more recently was terminated by Abacus as its auditor, similarly criticized Abacus's "█████████████" which generates numbers that they "███████████████" to a "██████████████" Ex. 10, at 1–2.

34.     But that was the whole point.  Abacus already knew that Lapetus LEs were shorter than other LEs and thus were likely to result in overvalued policies.  The same month Abacus made its first investment in Lapetus, November 2021, an Abacus employee prepared an analysis for Jay Jackson which found that the "Lapetus Mean is significantly lower on average compared to the Fasano" and "lower on average compared to the short[est LE]."  Ex. 11, at 1.  And others knew this too.  In March of 2022, Abacus tried to sell a policy with a Lapetus LE through a life settlement broker, who responded that it "can't currently use Lapetus LEs as they usually seem significantly shorter than the other more established LE providers (as I'm sure you're well aware!)."  Ex. 12, at 1.

35.     Abacus knew that Lapetus LEs were consistently shorter than the other LE providers and chose to use them to value its portfolio precisely anyway *because* Lapetus was materially shorter.

36.     All the while, Abacus Chairman and CEO Jay Jackson was a voting member of the Lapetus Board of Directors—giving him the "███████████████" that

was central to Abacus's scheme.  *See* Ex. 2, at 1.

37.     Jackson's spot on the Lapetus Board of Directors also gave him access to confidential, competitively sensitive information.  And he routinely misappropriated and shared this information, including information about Coventry, with Abacus employees to give Abacus a competitive advantage over Coventry.  *See, e.g.*, Ex. 13, at 1.  Jackson's repeated disclosure of confidential business information gave Abacus access to valuable, competitively sensitive information it otherwise would not have possessed.  This information, among other things, gave Abacus insight into Coventry's confidential trading volume and patterns.

**C.      Coventry's Concerns About Abacus's Use of Lapetus**

38.     Abacus's switch to a valuation methodology based on Lapetus life expectancies, and the true nature of the relationship between Abacus and Lapetus, was largely happening behind closed doors.  That is, until Abacus's ABL Longevity Growth and Income Fund (the "Fund")—an interval fund Abacus has been trying, and failing, to launch for nearly three years now[5]—announced that Lapetus would be

---

[5] The Fund filed its preliminary prospectus with the SEC on September 7, 2023.  That prospectus included a representation that "[t]he Fund expects to engage in transactions with certain affiliates of the Manager.  In particular, the Fund expects to engage Abacus Settlements LLC as its primary life settlement broker and Longevity Market Assets will engage in purchase and sale transactions with the Fund."  Abacus Equity Income Fund, Registration Statement (Form N-2), at 10 (filed Sept. 7, 2023), https://bit.ly/3SRxNQ6.  It was not until Amendment 8 that the Fund represented that it "will not purchase any mortality contracts from Abacus Settlements or any other affiliate."  ABL Longevity Growth and Income Fund, Pre-Effective Amendment No. 8 to Registration Statement (Form N-2/A), at 18 (filed Oct. 16, 2024), https://bit.ly/3RqvUcI.  And it was not until Amendment 17, dated February 26, 2026, that the Fund stated clearly that "[t]he Manager will not allow the Fund to purchase, directly or indirectly, any Longevity Assets owned or brokered by the Manager or its affiliates."  ABL Longevity Growth and Income Fund, Pre-Effective Amendment No. 17 to Registration Statement (Form N-2/A), at 45 (filed Feb. 26, 2026), https://bit.ly/4viGali.  In other

66

its preferred life expectancy provider.

39.    Prior to 2024, the life settlement industry, including Coventry and Mr. Buerger, had been aware that Lapetus LEs were systemically short.  And nobody in the life settlement industry who was actually trying to use accurate life expectancies employed Lapetus as their preferred life expectancy provider.

40.    But Abacus, through the Fund, had announced that Lapetus would be the Fund's preferred life expectancy provider.  This, coupled with Abacus and Lapetus's previously announced partnerships, and Abacus's decision to go public and secure capital from the general public, fostered genuine concerns among those in the life settlement industry.  Abacus's overvaluations based on short Lapetus LEs threatened to harm everyday investors and the reputation of the industry.

41.    Although everyone knew Lapetus LEs were short, nobody had publicly studied precisely how short Lapetus LEs were compared to the rest of the market.  So, Coventry conducted its own study.

42.    On May 7, 2024, Coventry announced the results of its months-long study into the length of Lapetus's LEs.  The results confirmed what everyone in the industry, including Abacus, already knew:  Lapetus LEs are systematically shorter than those of other LE providers.  Specifically, Coventry found that Lapetus LEs were shorter than LEs from other leading life expectancy providers in approximately 85% of cases when comparing the same individuals.

---

words, Abacus has finally backed down on its original intent to engage in conduct that it now admits is "expressly prohibited by the Investment Company Act of 1940."  FAC ¶ 67.

43. But Coventry knew that not everyone would take their word for it. So, Coventry commissioned a follow-up study led by Professors Daniel Bauer and Nan Zhu, both esteemed academics with substantial experience in this industry. On July 22, 2024, Coventry announced that the academics' study found similar results: Lapetus LEs were shorter than LEs from other LE providers in 83% of cases, by an average amount of approximately 29 months.

44. Coventry then asked Professors Bauer and Zhu to update and expand their review of Lapetus LEs, this time looking into the Actual/Expected Ratio for Lapetus LEs—the same metric that the OIR and industry professionals rely on to evaluate life expectancy provider accuracy. On February 5, 2025, Professors Bauer and Zhu found that Lapetus's Actual/Expected Ratio for the studied population was a catastrophically low 31%—confirming that Lapetus LEs are well shorter than the actual lifespans of the individuals they are providing LEs for. In fact, other, more well-regarded LE providers have Actual/Expected ratios that exceed 90%.

45. Notably, Abacus never refuted these studies with their own analyses or evaluations, even while Abacus was publicly attacking them. That is because Abacus's and Lapetus's own documents and data confirm their validity. To take just a few examples:

      a. An internal analysis undertaken around the time of Abacus's initial investment in Lapetus found that the "Lapetus Mean is significantly lower on average compared to the Fasano [LE] (33 months) and lower

on average compared to the short[est LE] (12 months)." Ex. 11, at 1.

b. Life settlement brokers repeatedly rejected policies Abacus offered based on Lapetus valuations. One life settlement broker impressed upon Abacus that it "can't currently use Lapetus LEs as they usually seem significantly shorter than the other more established LE providers (as I'm sure you're well aware!)." Ex. 12, at 1. The next month, that same broker turned Abacus away again: "[N]one of [the] clients [were] able to generate an offer" because the "[c]lients do not accept Lapetus LE reports in isolation." Ex. 14, at 3. Everyone knew that Lapetus LEs "tend to be shorter than the mainstream LE providers." *Id.* at 1. And a different broker demurred on an Abacus-offered policy for the same reason: "[A]s you realize, [Lapetus's] LE projections are often much more aggressive"—that is, shorter—"than traditional widely accepted LE reports." Ex. 15, at 1.

c. This was not a surprise to Abacus executives and employees. It is confirmed by one internal document after another. For instance, Jay Jackson himself recognized that the valuation on a policy was "really high" because "we did Lapetus only." Ex. 16, at 2. In that instance, the Lapetus LE was over ***ten years shorter*** than the next shortest LE. *See id.* at 1. In another case, Abacus employees discussed that a buyer "won't bid off a Lapetus only," and they knew that "[i]t's doubtful we will be able to find another LE to match up with the Lapetus." Ex.

69

17, at 3. The "other LE's are likely going to be" much longer—to the tune of several years. *Id.*

d. And Lapetus's own evaluations of its Actual/Expected ratios—the actuarily sound metric that the OIR uses to verify the accuracy of life expectancy providers—were not far off from the 31% found by Professors Bauer and Zhu. Indeed, months before Abacus filed its initial complaint, Lapetus told Abacus that its A/E ratio was "~24% to ~72%" depending on the demographic. Ex. 18, at 1. Lapetus then submitted to the OIR its required tri-annual report showing its Actual/Expected ratio using Lapetus LEs was a remarkably low 41.5%. Ex. 19, at 2.[6]

46. Following Coventry's thorough examination of Lapetus LEs, Mr. Buerger was invited to debate Lapetus's Chief Scientist, Jay Olshansky, at the 2024 Life Insurance Settlement Association ("LISA") Conference, about the accuracy of Lapetus LEs and the life expectancy industry more broadly. Mr. Buerger gladly accepted the chance to have this public debate about important public issues.

47. At this debate, Mr. Buerger reiterated the findings of the Coventry Studies. He explained that Lapetus LEs were systematically shorter than other LE

---

[6] Lapetus, and by extension Abacus, often attempted to distract from Lapetus's poor Actual/Expected ratio by pointing to Lapetus's own invented metric of "distance to death." *See* Ex. 18, at 1. But Lapetus's hired actuarial firm disclaimed this made-up metric, noting that it "is not based on the traditional actuarial construct commonly found in actuarial analyses that compare actual to expected deaths in reference to baseline mortality tables." Ex. 20, at 2. This report was sent to Jay Jackson as part of his service on the Lapetus Board of Directors. *See* Ex. 21, at 1.

providers and that these short LEs could lead to overvalued assets. At the end of the debate, Mr. Buerger opined on the harm that these short LEs could cause to the general public—noting that previous overvaluations of life insurance policies have led to hundreds of millions in investor losses, and that those losses are catastrophic for the industry.

48. By contrast, Lapetus's Jay Olshansky closed by glibly noting that he thought Coventry was really worth double what Mr. Buerger thinks it is, implicitly recognizing that Lapetus's short life expectancies lead to inflated asset valuations.

**D.        Others Harbored Concerns with Abacus's Business Model**

49. Coventry was not the only one concerned about the potential impact on the public from Abacus's relationship with Lapetus and its reliance on Lapetus LEs for valuation.

50. On November 1, 2024, the SEC wrote to Abacus to inquire about numerous aspects of its business, including its relationship with Lapetus, any ownership interests Abacus has in Lapetus, whether Abacus relies on Lapetus for its valuation of life insurance policies, and whether National Insurance Brokerage ("NIB") is an undisclosed related party.

51. Abacus wrote back on November 4, 2024. It first disclosed that it holds the $1 million note in Lapetus that is fully convertible into an ownership interest, but declared that this relationship would not grant Abacus "any influence or control over Lapetus's governance or business decisions." Of course, this representation to the SEC is flatly inconsistent with Abacus's ████████████████████

71

███████████████, *see* Ex. 22, at 7, as well as Jay Jackson's initial assessment and plan that Abacus's investment into Lapetus would allow Abacus to "████████████" Ex. 2, at 1.

52.     Next, Abacus stated that Lapetus "generat[es] life expectancy reports, which the Company incorporates as one of multiple inputs into its valuation process in determining the fair value of the policies the Company holds." But Abacus told the SEC that it "does not rely solely or even materially on Lapetus's life expectancy reports."

53.     That too was false. Abacus's own internal valuation memoranda makes crystal clear that the valuation of Abacus's individual policies is "█████████████████████████████████████████████" Ex. 5, at 6 (emphasis added). Not only that, but "██████████████████████████████████████████████████████████████████████" *Id*. (emphasis added). Documents from Abacus's former auditor confirm that this is how Abacus "████████████████████" on its "█████████" Ex. 23, at 1. In "substantially all cases, [Abacus] management used one LE report per policy as they determine their valuation." Ex. 24, at 1. And Abacus "[m]anagement *typically utilizes Lapetus* as their LE provider." *Id.* (emphasis added). These life expectancies were then used "[i]n order to calculate the fair value of the polic[ies]." *Id.*

54.     Finally, Abacus responded that it disagreed with the SEC's assessment that Abacus and NIB are related parties. It claimed that, merely because its founders

are owners and officers of NIB, and Abacus shares an address with NIB, that does not mean they are related parties, even if Abacus were to transact in life insurance policies with NIB. This is notable for many reasons, including that Abacus later effectively conceded the SEC's point by quietly acquiring NIB from Abacus's executives, including Jay Jackson, for $3 million without issuing any press release; just a footnote mention in its Q1 2025 10-Q filing.

55. Moreover, contrary to Abacus's representations in the FAC that "the SEC did not raise any concerns about Abacus's valuation methodology or the relationship between Lapetus and Abacus" after the November 1, 2024 Comment Letter, *see* FAC ¶ 115-19, this was *not* the last time the SEC asked about Abacus's relationship with Lapetus.

56. On August 15, 2025, the SEC again issued a comment letter to Abacus with over three dozen points of clarification, including specifically asking about Abacus's "relationship with Lapetus Solutions" in light of "recent public reports." *See* Ex. 25, at 14. Abacus responded on August 29, 2025, where it told the SEC, among other things, that "Jay J. Jackson, previously held a 'Director' title at Lapetus, where his role was strictly limited to an uncompensated advisory position rather than . . . service on the board of directors of Lapetus." *Id.* at 3. *But see* Ex. 26, at 2 ██████████

████████████████████████████████████████████); Ex. 22, at 7

(████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████).

73

**E.    Abacus's Actions Leading up to This Lawsuit**

57.    On June 4, 2025, Morpheus Research published a scathing report showing that Abacus "Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die." Morpheus's core claim was that Abacus was using Lapetus to value its portfolio and was thus overvaluing its balance sheet due to Lapetus's systematically short LEs.

58.    On June 10, 2025, Abacus responded. Abacus first proclaimed that the "$446 million in claimed life settlements" on Abacus's books from its Q1 2025 SEC disclosure "does not 'rel[y]' on Lapetus." Abacus made this false representation to the market despite its own internal valuation memoranda—which it supplied to its auditors—confirming that ██████████████████████████████.

59.    Abacus then touted a so-called "Independent Third-Party Actuarial Validation" from the actuarial firm Lewis & Ellis. According to Abacus, the Lewis & Ellis report was purportedly done without reliance in any way on Lapetus LEs, as supposed "proof" that Abacus does not use Lapetus LEs to value its balance sheet. Abacus declared that Lewis & Ellis generated a "valuation of $449 million," while coyly noting that the report "aligned with a discount rate and range of ±2% as disclosed in the Q1 2025 10-Q filing."

60.    Both of these assertions were knowingly false and misleading.

61.    Internal documents from Abacus show that "████████████████ ████████████████████████████████" in May 2025—a clear admission that Abacus ████████████████████████████

74

███████████. Ex. 7, at 1 (emphasis added); *see* Abacus 10-Q at 2 (May 8, 2025) (listing $446 million for "Life settlement policies, at fair value"). And other internal documents from Abacus show that the company knew that the value would ████ ██████████████████████████████████████████████████████.

62.    Abacus's reliance on the Lewis & Ellis report is similarly misleading. A draft of this Abacus press release shows that ████████████████████████ ████████████████████████████████████████ ████████████████████████████. *See* Ex. 27, at 2; Ex. 28, at 3. Had Abacus used the same discount rate, which was also expressly provided in the Lewis & Ellis report, the comparable valuation would have been millions of dollars less and would not have fallen "within [the] 1% margin of error" of the overall valuation that Abacus trumpeted to the public.

63.    Worse yet, Abacus failed to disclose that for over a third of the policies that it asked Lewis & Ellis to review, Abacus provided only "internal" Abacus LEs, which are *life expectancy estimates generated by the very company whose portfolio was being valued*, untested by any independent underwriter. *See* Ex. 29, at 2. By substituting its own self-serving LE estimates—which were themselves likely based in part on Lapetus LEs—for those of qualified independent life expectancy providers, Abacus corrupted the inputs to the Lewis & Ellis analysis. Abacus also did not disclose to the public that Lewis & Ellis's report expressly warned that these so-called internal LEs "*would not be as utilized within the industry*" and thus Lewis & Ellis would "offer

75

no opinion as to their completeness or accuracy." Ex. 28, at 6 (emphasis added).

64.    But Abacus's deceptive use of inconsistent discount rates and internal LEs was not enough to ensure that Lewis & Ellis's valuation would match its own Lapetus-based inflated valuations.  So, Abacus went even further in its deception.

65.    In the days leading up to the June 10 press release, rather than providing Lewis & Ellis *all* LEs in its possession for the policies on its books, Abacus cherry-picked the LEs that it provided for analysis.  Abacus chose to do this despite the fact that one of Lewis & Ellis's stated assumptions in the valuation report was that Abacus had provided it with "all relevant life expectancy information produced for an insured from various LE providers."  *Id*.  Not surprisingly, many of the LEs Abacus gave to Lewis & Ellis were older—and shorter—than the more recent LEs that Abacus had in its possession but failed to provide.  By supplying older, shorter LEs to Lewis & Ellis on several of its largest policies, Abacus artificially inflated the values of those policies. Abacus chose to do this despite language in the valuation report stating that Lewis & Ellis "is not responsible for the potential inaccuracy of the valuation results within this report for policies where all life expectancy information available for an insured was not provided."  *Id*.

66.    To provide just one illustration of this financial chicanery, for one insured, Abacus provided Lewis & Ellis with a single LE of 86 months, dated December 31, 2018.  *See* Ex. 30 (██████████████████).  But Abacus possessed at least ten *newer*—and substantially *longer*—non-Lapetus LEs for the same insured, ranging from 110 months to 202 months.  *See* Ex. 31.  As a result, although Abacus

internally valued this policy at ███████████████████████████, *see* Ex. 32, Abacus caused Lewis & Ellis to value the same policy at an astonishing $13,389,680 for the same period, based on the single stale LE that Abacus provided. *Compare* Ex. 32 with Ex. 28. In other words, by relying on a single outdated LE while disregarding at least ten newer and longer LEs in its possession, Abacus created nearly ███████ in value out of thin air on just this policy alone.

67.     The discount rate game that Abacus played with the Lewis & Ellis report is not Abacus's only misleading manipulation of discount rates. In fact, Abacus initially used an especially high discount rate of 21% in its August 2024 10-Q in order to ***partially*** offset the material impact of using short Lapetus LEs. *See* Abacus 10-Q at 22 (Aug. 12, 2024). However, as the market began to recognize the significance of the Lapetus issue and Abacus could no longer rely on Lapetus to support its valuations, Abacus adopted another means of concealing its financial condition and meeting its earnings targets: systemically reducing the discount rates used in its valuations quarter over quarter. Because a lower discount rate produces a higher present value, each reduction artificially increased the reported value of its portfolio.

| Date | Abacus Discount Rate |
|---|---|
| August 2024 (Aug. 12, 2024 10-Q) | 21% |
| December 2024 (Dec. 31, 2024 10-K) | 20% |
| March 2025 (Mar. 31, 2025 10-Q) | 18% |
| June 2025 (June 30, 2025 10-Q) | 16% |
| September 2025 (September 30, 2025 10-Q) | 15% |
| December 2025 (Mar. 13, 2026 10-K) | 13% |
| May 2026 (May 11, 2026 10-Q) | 10% |

68.    Thus, from August 2024 to May 2026, Abacus slashed the discount rate

used to value its policies from 21% to *10%* even though no external factors justified

cutting discount rates *by more than half in less than two years*.  Not surprisingly, this

chicanery ultimately did not go unnoticed by Abacus's external auditors.  After the

auditors identified the determination of the discount rates used in the model to

estimate the fair value of life settlement policies as a "critical audit matter," *see* Abacus

Form 10-K at 52 (Mar. 13, 2026), they were dismissed by Abacus, *see* Abacus Form 8-

K (Mar. 12, 2026).

69.    In an effort to divert attention from this plethora of false and misleading

valuation games, Abacus has claimed that its valuations are supported by its actual

sales results. *See, e.g.*, FAC ¶ 50 ("Abacus's valuation of policies it holds on its balance

sheet reflects its historical success in realizing these trade spreads in the tertiary

market"). This claim, too, is false and misleading.

70. In reality, Abacus has increasingly relied on related-party sales—selling policies to affiliated funds under its control—to simultaneously inflate its reported earnings and shed overvalued policies from its balance sheet. In other words, rather than substantiating its valuations, Abacus has sought to justify them by causing affiliated funds—funds it controls—to purchase policies at elevated prices, to the detriment of those funds and their investors.

71. Public filings reveal that, in 2025, Abacus dumped more than 78% of the policies it sold to related parties like the Abacus Enhanced Income Fixed LP, Abacus Enhanced Income Plus LP, Abacus Premier Income Fixed LP, and Abacus Premier Income Plus LP ("Abacus Private Funds"). To date, the Abacus Private Funds have raised over $500 million primarily from credit unions, including several based in Florida.

72. Abacus enticed these credit unions to invest by promising stable, low-risk returns, like a bond. In reality, however, Abacus used its own clients' capital to monetize the policies at prices no arm's-length buyer would agree to.

73. This is why, in its most recent SEC filing, Abacus revealed that during this past quarter, *92%* of the policies sold were transferred to related parties under Abacus's control. *See* Abacus 10-Q at 50 (May 11, 2026).

74. The consequences are exactly what one would expect when a seller controls the buyer: "[s]ales to related parties resulted in average realized gains of 26.4%" versus mere "gains of 10% from sales to external parties." Abacus Q1 2025

10-Q at 51.[7]

75.    This dramatic difference underscores the fraudulent business practices that prop up Abacus's misleading financials.  Abacus could only offload these policies in related-party transactions—where it sits on both sides of the deal—because Abacus had purchased the policies and valued them at inflated prices based on short Lapetus LEs.  Unlike the related parties that Abacus controls, third-party "[c]lients do not accept Lapetus LE reports in isolation."  Ex. 14, at 3.  These massive related-party transactions then provide distorted "historical market data" that Abacus would feed back into the company's valuation method, further bolstering the illusion of growth— a closed loop in which Abacus manufactures its own self-serving benchmarks.  Now, not only is Abacus deceiving its shareholders, but it is also deceiving those, including credit unions, who are invested in its related-party funds.

76.    Indeed, Abacus knows that the lifeblood of its success—and the ability for its co-founders and executives to sell their shares—depends on raising money from these credit unions and other investors into its related-party funds, which can then purchase the overvalued policies off its balance sheet.  Jay Jackson has said as much:

"█████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████" Ex. 34, at 1 (emphasis added).  And if Abacus could

---

[7] Notably, Abacus's Partnership Agreement for one of its related-party funds—Abacus Premier Income Plus, LP—vests "the sole discretion" in "making investments" in the "General Partner" who is, of course, another Abacus related party, Abacus Premier Income Plus GP, LLC.  *See* Ex. 33, at 1, 13.

not raise third-party funds to monetize its policies at inflated prices, "████████ ██████████████" of his company. *Id.* That, in turn, posed a problem for Jay Jackson and other Abacus executives who were admittedly "████████████████ ██████████████████████████████████████████████" *Id.* at 3.

## F.    Abacus's First Amended Complaint

77.    What remains of Abacus's First Amended Complaint brings a trio of claims against Coventry and Alan Buerger. The FAC alleges that Coventry and Mr. Buerger made a series of purportedly untrue statements about Abacus's business. However, at no time prior to this lawsuit did Abacus send Coventry or Mr. Buerger a cease-and-desist letter—or any other writing—claiming that Defendants' public statements were false or misleading

78.    Abacus's defamation and FDUTPA claims rely on the premise that it is "false, misleading, and defamatory" to suggest that "Lapetus life expectancies are too short" and that "Abacus relies on those estimates to intentionally overvalue" policies. FAC ¶¶ 6, 7.

79.    The problem for Abacus is that the premises of its suit are *themselves* deliberately false and misleading. It is, in fact, *true* that Lapetus life expectancies are materially shorter than the rest of the market. And, it is, in fact, *true* that Abacus relies on those life expectancies to value policies. Abacus knew that the premises underlying its lawsuit were false *when it filed this lawsuit*. Indeed, the same month Abacus filed its complaint, ███ out of ███ policies on Abacus's books—almost ███ of them—had

███████████████████████ Ex. 35, at 1.  Just months earlier, Abacus recognized that using a different LE provider would cause its portfolio valuation to ███████████.  And the discovery to date shows that Abacus knew for a fact that Lapetus LEs were materially shorter and rejected by many in the industry.

80.    But Abacus went ahead with its lawless litigation strategy anyways because it wanted to shut down the public discussion about its scheme to use misleading Lapetus LEs, manipulated discount rates, and related-party transactions for its own pecuniary gain.

81.    Specifically, Abacus's FAC alleges that the following statements made by Counterclaimants, *inter alia*, are false and defamatory:

    a.  That Abacus "not exclusively but primarily" uses Lapetus as their "medical underwriting company."  FAC ¶ 199(a).

    b.  That public companies are "trying to generate steady progress in [their] quarterly earnings," which creates a temptation to manufacture earnings.  *Id*.

    c.  That only "small," "stupid," or "unsophisticated" investors use Lapetus.  FAC ¶ 199(c).

    d.  That "fair market value [based on Lapetus] is grossly overstated," and that "[v]aluations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses."  FAC ¶¶ 199(f), 199(i), 214(a).

    e.  That "Lapetus's life expectancy estimates are 'consistently and

82

materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies.'" FAC ¶ 199(g).

f. And that Abacus has a "close" relationship with Lapetus. FAC ¶ 214(b).

82. But Abacus indisputably knew that each of these statements was true when it filed this lawsuit.

a. Abacus knew that it primarily used Lapetus as its LE provider. As Grant Thornton remarked based on conversations with Abacus management, in "substantially all cases, [Abacus] management used *one LE report per policy as they determine their valuation*." Ex. 24, at 1 (emphasis added). And Abacus "[m]anagement *typically utilizes Lapetus as their LE provider*." *Id.* (emphasis added). Abacus's policy holdings back this up. *See, e.g.,* Ex. 36, at 3 (███████████ ████████████████████████████ ████ ).

b. Abacus knew that it felt tempted to increase its earnings with the goal of driving the stock price up. Abacus CEO Jay Jackson pushed back on Scott Kirby wanting to ████████████████ ████████████████ Ex. 34, at 3. Jackson then doubled down, saying that Abacus is "████████████ ████████" because he was "████████████

███████████████████████████████████████████ " *Id.* (emphasis added).

c. Abacus knew that sophisticated tertiary market investors had stopped using Lapetus LEs to buy policies. In Abacus's words, "██████████ ██████████████████████████████████████████████ ██████████ " Ex. 37, at 2; *see also, e.g.*, Ex. 38, at 3 ("I don't think Nova (or any other fund) is going to bid off of the Lapetus alone.").

d. Abacus knew that fair market values based on short Lapetus LEs would be overstated. Shortly before it filed this lawsuit, Abacus conducted an analysis that found that if it were to ████████████ ████████████████████████████████████████████, its portfolio value ████████████████████████████████ ██████. *See* Ex. 7, at 1. This chart from Abacus's own analysis says it all:



e. Abacus knew that Lapetus LEs were consistently and materially shorter than those of other LE providers. When Abacus tried to sell

84

a policy with a Lapetus LE in May 2022, a seasoned broker in the industry replied that it "can't currently use Lapetus LEs as they usually seem significantly shorter than the other more established LE providers (as I'm sure you're well aware!)." Ex. 12, at 1. Abacus's own internal analysis of Lapetus LE length found it was "significantly lower on average" than Fasano, "and lower on average compared to the short[est]" life expectancy on hand from any other provider. Ex. 11, at 1. Abacus also knew—like others throughout the industry— that " ███████████████████████████████████████████ ████████ " Ex. 39, at 2. And Jay Jackson himself acknowledged that valuations could be "really high" because "we did Lapetus only." Ex. 16, at 3. In fact, in the case he was then discussing, the Lapetus life expectancy was more than ***ten years*** shorter than the next shortest estimate. *See id.* at -625. In addition, six days after the Morpheus Report—and less than three weeks before Abacus filed its first complaint—Abacus's Chief Investment Officer, Elena Plesco, received a life expectancy analysis which expressly found ████████ ████████████████████████████████. Ex. 40, at 6.

f. And Abacus knew that it had—and continues to have—a close relationship with Lapetus. Indeed, from the beginning, Abacus invested in Lapetus and Jay Jackson sat on the Lapetus Board so that Abacus could ████████████████████████████████████.

85

Ex. 8, at 1. Subsequently, just six days before Abacus filed the FAC, Abacus's Revised Letter of Intent ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ Ex. 41, at 1–2. Removing any doubt of Abacus's intention to continue its unlawful entanglement with Lapetus, Abacus also represented that it ████████████████████████████████

██████████ and in fact hired Olshansky, a co-founder of Lapetus, following his company's demise. *Id.* at 2.

83. Other statements that Abacus challenges are likewise true—and Abacus knows it.[8] For instance:

    a. Abacus says it is false that it has "to choose which accounting method [it'll] use for [a] policy and can never change it." FAC ¶ 199(d). But Abacus itself concedes this is true in its SEC filings. *See* Abacus 2024 10-K at 80 ("The valuation method is chosen upon contract acquisition and is irrevocable.").

    b. Abacus says it is false that the Coventry Study "cast[s] doubt on the accuracy of asset valuations based primarily on Lapetus life

---

[8] Abacus knowingly rips other statements out of context. It claims that it is misleading to suggest that Abacus does not use the "fair value" method. FAC ¶ 214(d). But Mr. Buerger never suggested otherwise—and in fact specifically acknowledged that Abacus "went to fair market value" when it went public. ECF 47-6 at 4. Nor did Mr. Buerger ever claim that Abacus had "asset-backed debt." FAC ¶ 199(b). This was merely one of "three things" that Mr. Buerger "believe[d] will likely happen" in the future to raise the capital that Abacus needs to perpetuate its financial scheme. ECF 47-6 at 3.

expectancies." FAC ¶ 199(h). Yet that is exactly what the Study does. It reflects Coventry's observation—based on "all Lapetus life expectancy reports [Coventry] was aware of" for which another underwriter provided a report "within 3 months" of Lapetus's own— that Lapetus was "shorter in 85% of cases" by an average of 31 months. These results were then verified by academics. And they are consistent with Abacus's own internal analysis.

c. Abacus says it does not hold its policies for more than a "short period of time." FAC ¶ 214(j). But "a review of [Abacus's] SEC disclosures related to the buying and selling of policies show that its quarterly turnover has likely averaged 20.2%" during the year prior to this suit, which "impli[es] a holding period of over 1.3 years, double Abacus' target."[9] This shows "that Abacus [was] becoming increasingly stuck with hard-to-sell, overvalued policies."[10] And that is why Abacus has since turned to offloading those policies to related parties.

d. Abacus says it is misleading to suggest that other public companies in the life settlement industry have gone bankrupt. FAC ¶ 214(c). But that is exactly what happened with Life Partners and GWG Holdings. They filed for bankruptcy after understating life expectancies to

---

[9] Morpheus Research, *Abacus' Scattered Response Failed To Refute Any Of Our Allegations & Contradicted Its Own Statements To The SEC* (June 12, 2025), https://bit.ly/4eRw2L.

[10] *Id.*

overvalue their assets.  Abacus cannot avoid that uncomfortable truth.

e. Abacus also says it is misleading to note that the company's "inventory" and "amount of money [it is] investing each quarter" is producing increasing "unrealized gains."  FAC ¶ 214(e).  But that, again, is exactly what the company's SEC filings showed.

84.    Indeed, the FAC is rife with other misrepresentations that are flatly contradicted by Abacus's—and its business partners'—own documents.    Other examples include:

a. "Abacus has *never said that it uses Lapetus to value the assets on its balance sheet, nor has it ever done so*."  FAC ¶ 11 (emphasis in original); *see also* FAC ¶¶ 69, 127 (same).  Abacus's own documents show that this is a lie.  Abacus employee Armando Cabrera stated in May 2025 that ███████████████████████████████████████ ███████████████" the same month Abacus's stated balance sheet valuation on its SEC filing was $446 million.  Ex. 7, at 1 (emphasis added); *see* Abacus 10-Q at 2 (May 8, 2025) (listing $446 million for "Life settlement policies, at fair value").

b. "After reviewing [Abacus's] fulsome disclosures [in Abacus's November 4, 2024 response to the SEC's November 1, 2024 Comment Letter], the SEC did not raise any concerns about Abacus's valuation methodology or the relationship between Lapetus and Abacus again."  FAC ¶ 119.  This is a lie, too.  On August 15, 2025—

one month prior to the FAC being filed—the SEC penned another comment letter to Abacus specifically asking about Abacus's "relationship with Lapetus Solutions" as well as "whether any of your directors or officers have any interest in any of the medical underwriting firms." *See* Ex. 25 at 3, 14.

c. Abacus characterizes Jay Jackson's Lapetus directorship as "[a] prior unpaid nominal board position held by Mr. Jackson in which Mr. Jackson was in an advisory position, he did not have authority or capacity to act on Lapetus's behalf, and he was only minimally involved with Lapetus's operations." FAC ¶ 135. But this is also grossly misleading. Jay Jackson was, in fact, "███████████████ ██████████████████████" Ex. 26, at 2; *accord* Ex. 42 at 3. And he indisputably participated extensively at board meetings. *See, e.g.*, 43, at 2. In fact, he did so ██████████████. *See* Ex. 44, at 1–25.

d. Abacus describes its investment in Lapetus as a "$1 million convertible note, that may result in at most 5% ownership upon conversion," which "would not grant [Abacus] any influence or control over Lapetus." FAC ¶ 135. But Abacus's own documents confirm that the primary reason Abacus invested in Lapetus was so Abacus could "█████████████████" the notoriously short LE provider. Ex. 8, at 1. Abacus's investment was, in Jay Jackson's words, "████████████████████████████" and "██████████████

89


" Ex. 2, at 1.  And Abacus knew that its

note purchase agreement with Lapetus granted Abacus the right to

" Ex. 22, at 7.

85.    Abacus knew its claims were based on false premises and nevertheless

pushed ahead with this baseless lawsuit.  In fact, these false premises that Abacus

proffered were some of the very same premises that this Court relied on in not

dismissing Abacus's pleading—demonstrating that Abacus has even misled this Court.

*See, e.g.*, ECF No. 100, at 5 & n.2 ("each count explains how the factual allegations

support Abacus's claims" relating to "the specific statements Plaintiff alleges are

defamatory" which were found in "Defendants' appendix"); *id.* at 7 ("Defendants

never shared the factual basis for this implication" that "Lapetus (and by extension

Abacus) were deliberately underestimating life settlement values"); *id.* at 8–9 ("in the

context of Defendants' alleged broader scheme, [these statements] imply Abacus was

trying to dishonestly inflate its valuation").

86.    Lest there be any doubt, Abacus's press release announcing the lawsuit

demonstrates that its main goal in bringing this suit was to shut down public debate

regarding its business practices as a public company in a highly regulated industry.

Abacus used a judicial filing to create the narrative that it does "not" use Lapetus life

expectancies "to derive its balance sheet valuations."  Press Release, Abacus Global

Management Sues Coventry and its Chairman Alan Buerger for Defamation and

Anticompetitive Conduct (July 1, 2025), bit.ly/4vhXVm1.  But that assertion, as

already explained above, is patently false. One internal document after another, as well as documents from Abacus's auditor, business partners, and others, highlight Abacus's fraud on the public—and this Court.

87. Abacus's press release also peddles its false claim that Counterclaimants partnered with Morpheus in publishing Morpheus's June 4, 2025 Report, which Abacus alleges "eras[ed] more than $200 million in market capitalization" for Abacus's stock. *Id.* In fact, Abacus says that "Coventry will be responsible for hundreds of millions of dollars in damages ***should Abacus prove*** that Morpheus was acting as Coventry and Buerger's willing partner and megaphone." *Id.* (emphasis added).

88. But Counterclaimants did not talk with Morpheus, let alone "partner" with it, before the June 4, 2025 Morpheus Report. To the contrary, Morpheus's representative and co-author of the Morpheus Report denied under oath that Coventry and Mr. Buerger had any role in the Morpheus Report's publishing. Instead, Morpheus, having only seen Counterclaimants' public statements about Abacus, "immediately viewed all of Coventry's [public] claims with an immense amount of skepticism, as we do whenever we see a competitor criticizing another competitor." Ex. 45, 182:17-20. The witness testified that he "think[s] it's very possible that [Morpheus] would have written a report that was extremely similar . . . if Coventry had never put out a press release." Ex. 45, 115:7-10. And under oath, the witness confirmed that it is his "personal belief" that "Abacus is still committing a fraud." Ex. 45, 175:10-13 ("Q: So you said today that Abacus is still committing a fraud . . . A:

That's my personal belief").

89.    But Abacus went after Coventry and Mr. Buerger in this litigation, not Morpheus.  Instead, Abacus *released Morpheus from all claims* while pursuing these spurious claims against Coventry and Mr. Buerger.  *See generally* Ex. 46.  And Abacus released Morpheus from all claims even though Abacus's case is centered on a theory of harm stemming from an "eras[ure of] more than $157 million in market capitalization" and a 21% drop in Abacus stock *"[w]ithin minutes" of Morpheus's June 4 Report coming out*.  FAC ¶ 13 (emphasis added).  Nevertheless, Abacus pursued claims against Coventry and Mr. Buerger, and not Morpheus, even though Coventry and Mr. Buerger had no idea the Morpheus Report was in the works or being published.

90.    Abacus did this because its chief concern was not remuneration for supposed losses to its market capitalization; it was shutting down Counterclaimants' public discussion of Abacus's shady business practices.

91.    Coventry and Mr. Buerger now bring these counterclaims to seek redress for the harm Abacus has done to them, in the form of court costs, attorneys' fees, reputational harm, and lost profits.

## COUNT I

### (Florida Anti-SLAPP, Fla. Stat. § 768.295)

92.    Counterclaimants reallege and incorporate Paragraphs 1–91 as if fully set forth herein.

92

93.     Abacus brought this underlying lawsuit against Coventry and Mr. Buerger primarily because they exercised their rights of free speech in connection with a public issue.  Specifically, Coventry and Mr. Buerger made statements in interviews, public debates, and in protected conversations with government regulators, among other protected fora, regarding a public issue: the business practices and public disclosures of a publicly traded company, who receives public investment, who regularly publicly advertises on television and elsewhere, and who operates in a highly regulated industry.

94.     Abacus's underlying lawsuit is utterly baseless.  Abacus regularly uses Lapetus life expectancies to calculate the supposed "fair value" of the policies in its portfolio, and Lapetus life expectancies are systematically shorter than those of other life expectancy providers.  Abacus knew these facts prior to its filing of this lawsuit.  And every one of the statements that Abacus challenges is constitutionally protected.

95.     Furthermore, Counterclaimants were not the proximate cause of the June 4, 2025 Morpheus Report that allegedly harmed Abacus.  They took no knowing part in the development of the June 4, 2025 Morpheus Report, had no knowledge of Morpheus, nor any warning that Morpheus was going to release its report on June 4, 2025. *See supra* ¶¶ 77–85.

96.     Counterclaimants have incurred significant costs as a result of Abacus's tortious campaign; namely, the bringing and publicizing of this suit to stymie public debate.  Counterclaimants have incurred damages including court costs and attorneys'

93

fees in connection with Abacus's SLAPP suit.

## COUNT II

### (Florida Viatical Settlements Act, Fla. Stat. §§ 626.991–993)

97.     Counterclaimants reallege and reincorporate Paragraphs 1–91 as if fully set forth herein.

98.     At all relevant times, Abacus, and its employees and officers acting within the scope of their duties, were viatical settlement providers as defined in Fla. Stat. § 626.9911(14).

99.     At all relevant times, Lapetus was a life expectancy provider who issued life expectancy estimates that were routinely, consistently, and materially short, manifesting a pattern of false, misleading, or deceptive life expectancies.

100.    From 2023 onwards, Abacus used false, misleading, or deceptive life expectancies for its own financial gain, including but not limited to valuing its portfolio and selling policies to the funds it manages.

101.    Abacus knew at all relevant times that these Lapetus life expectancy estimates were false, misleading, or deceptive, and knowingly used these life expectancy estimates for its own financial gain.

102.    Abacus's scheme to use false, misleading, or deceptive life expectancies culminated in and was the proximate cause of their filing of this instant lawsuit.

103.    This lawsuit has produced significant actual damages to Counterclaimants, in the form of litigation costs, attorneys' fees, and reputational

94

harms.

104.    Abacus's scheme to use this pattern of false, misleading, or deceptive life expectancies also culminated in and was the proximate cause of the public documents surrounding this lawsuit like Abacus's press releases, which caused actual damages to Counterclaimants, including reputational harm to Coventry and its business.

## COUNT III

### (Florida Viatical Settlements Act, Fla. Stat. §§ 626.991–993)

105.    Counterclaimants reallege and incorporate Paragraphs 1–91 as if fully set forth herein.

106.    At all relevant times, Abacus, and its employees and officers acting within the scope of their duties, were viatical settlement providers as defined in Fla. Stat. § 626.9911(14).

107.    At all relevant times, Lapetus Solutions, Inc. was a registered life expectancy provider as defined in Fla. Stat. §§ 626.9911(5), 626.99175.

108.    From November 2021 through November 2024, Jay Jackson was a voting member of the Board of Directors of Lapetus Solutions, Inc., a registered life expectancy provider, while serving as an officer and director of a viatical settlement provider, Abacus, as well as its affiliates Abacus Settlements, LLC and Longevity Market Assets, LLC.

109.    Jay Jackson's service on the Lapetus Board of Directors violated the Florida Viatical Settlement Act's prohibition on viatical settlement providers serving

95

as directors of life expectancy providers.

110.   Jay Jackson's service on the Lapetus Board of Directors, which violated the Florida Viatical Settlement Act's prohibition on viatical settlement companies serving as directors of life expectancy providers, constitutes an unfair trade practice under Fla. Stat. § 626.9927.

111.   While serving as a director on the Lapetus Board of Directors, Jay Jackson distributed Coventry's, and other industry members', sensitive and confidential trade secret information to Abacus employees, misappropriating that information.

112.   Coventry discovered Jay Jackson's distribution of Coventry's protected, sensitive trade secret information during the pendency of this instant litigation and raised these claims as soon as practicable.

113.   As a result of Jay Jackson's unfair trade practices which resulted in the misappropriation of confidential, valuable, proprietary business information, Counterclaimants have suffered actual harm in the form of lost profits stemming from Abacus's improper consolidation of market share due to its unlawfully obtained trade secrets.

**RELIEF**

WHEREFORE, Counterclaimants respectfully requests judgment against Abacus as follows:

    a.  Judgment on all counts in favor of Counterclaimants;

    b.  Compensatory damages in an amount to be proven at trial, including but

not limited to damages stemming from reputational harms, lost profits, and misappropriation of trade secrets;

c.  Attorneys' fees and costs associated with Abacus's SLAPP suit;

d.  Punitive damages for Abacus's egregious pattern of knowing and intentional misconduct;

e.  Pre- and post-judgment interest, to the maximum extent provided by law; and

f.  Any and all other legal or equitable relief to which Counterclaimants are entitled

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Counterclaimants respectfully demand a jury trial on all issues.

Dated: July 9, 2026

Respectfully Submitted,

*/s/ Andrew J. Levander*

| | |
|---|---|
| MICHAEL H. MCGINLEY (*pro hac vice*) | ANDREW J. LEVANDER (*pro hac vice*) |
| BRIAN A. KULP (*pro hac vice*) | DECHERT LLP |
| DECHERT LLP | Three Bryant Park |
| Cira Centre | 1095 Avenue of the Americas |
| 2929 Arch Street | New York, NY 10036 |
| Philadelphia, PA 19104 | Telephone: (212) 698-3500 |
| | Facsimile: (212) 698-3599 |
| ALFRED J. BENNINGTON, JR. | andrew.levander@dechert.com |
| GLENNYS ORTEGA RUBIN | |
| BENJAMIN F. ELLIOTT | ERIC AUSLANDER (*pro hac vice*) |
| SHUTTS & BOWEN LLP | DECHERT LLP |
| 300 South Orange Ave. | 1900 K Street, NW |
| Suite 1600 | Washington, DC 20006 |
| Orlando, FL 32801 | |

*Counsel for Defendants Coventry First LLC and Alan Buerger*