# EXHIBIT 25

GT106895

811 Main Street, Suite 3700
Houston, TX  77002
Tel: +1.713.546.5400  Fax: +1.713.546.5401
www.lw.com

**LATHAM&WATKINS**LLP

| FIRM / AFFILIATE OFFICES | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

August 29, 2025

***VIA EDGAR***

United States Securities and Exchange Commission
Division of Corporation Finance
Office of Mergers & Acquisitions
100 F Street, N.E.
Washington, D.C. 20549-6010

Attention: John Spitz
Michael Volley
Madeleine Joy Mateo
Todd Schiffman

Re: **Abacus Global Management, Inc.**
**Form 10-K for Fiscal Year Ended December 31, 2024**
**Form 10-Q for Fiscal Quarter Ended June 30, 2025**
**File No. 001-39403**

Ladies and Gentlemen:

On behalf of Abacus Global Management, Inc. (the "***Company***" or "***us***"), set forth below are the Company's responses to the comments of the Staff (the "***Staff***") relating to the Form 10-K for Fiscal Year Ended December 31, 2024 (the "***2024 10-K***"), initially publicly filed with the Securities and Exchange Commission (the "***Commission***") on March 28, 2025, and the Form 10-Q for Fiscal Quarter Ended June 30, 2025 (the "***Q2 2025 10-Q***"), initially filed with the Commission on August 12, 2025.

For ease of review, we have set forth below each of the numbered comments from the Staff's comment letter to the 2024 10-K and the Q2 2025 10-Q, received on August 15, 2025, in bold type followed by the Company's responses thereto. Unless otherwise indicated, capitalized terms used herein have the meanings assigned to them in the 2024 10-K or Q2 2025 10-Q, as applicable. All references to page numbers and captions (other than those in the Staff's comments) correspond to the page numbers in the 2024 10-K or Q2 2025 10-Q, as applicable.

Form 10-K for Fiscal Year Ended December 31, 2024

Origination, page 3

1. **Tell us with a view toward disclosure whether you rely upon any key sources for 10% or more of your originations. Also tell us whether any of your officers or directors have an interest in any of these sources.**

   Response: The Company respectfully acknowledges the Staff's comment. The Company does not rely on any key sources for 10% or more of our originations, and the Company's officers and directors do not have any interest in the origination source firms.

Confidential

GT106895
GT106895

LATHAM·WATKINS⸺

Active Portfolio Management Strategy, page 7

2.  In the future, disclose whether you rely upon key customers for the sale of life insurance policies. We note the statement under "Concentrations" in Note 2 of the financial statements for 6/30/2025. Also tell us and disclose in the future how these entities are related and whether any of your officers or directors have any interest in these key customers.

Response: The Company respectfully acknowledges the Staff's comment and will disclose in future filings whether it relies on key customers for the sale of life insurance policies. The customers disclosed under "Concentrations" in Note 2 are the Abacus Premiere Income Fixed LP and Abacus Premiere Income Plus LP (collectively the "LP Funds") and were determined to be related parties pursuant to ASC 850, *Related Parties*, as disclosed on page 21 of the Q2 2025 10-Q. Officers and directors of the Company do not hold any economic interest in or influence over these key customers.

Risks Related to the Business and Regulatory Matters
The Company's valuation of life insurance policies.... page 14

3.  Reference is made to the second sentence. Please tell us what percentage of the expectancy reports are generated by this company. Name the company and the specific details of your ownership including whether you have any common directors or officers. Clarify whether these reports are the same as those received from medical underwriting firms referenced in the risk factor on page 15. Provide us with proposed disclosure that you will include in future 34 Act reports.

Response: The Company respectfully acknowledges the Staff's comment. The second sentence of the valuation risk describes the multitude of inputs used in the valuation of life insurance policies, including:

*   *Historical trade spread*: Each policy is fundamentally anchored by historical trade spreads for policies that the Company has transacted over recent years. The historical trade spread, which we will revise to call "historical realized gain on life insurance policies sold," is calculated for an individual policy as the actual sales price of a policy less its cost basis, and if expressed as a percentage further divided by its cost basis. The discount rates used in the discounted cash flow calculations are derived from these historical trade spreads, categorized by risk score.

*   *Quarterly Lookback Analysis*: The Company performs quarterly lookback analysis to validate current valuations against actual market transactions. The quarterly lookback reviews policies sold during the current quarter and compares sale prices to fair value measures as of the prior quarter.

*   *Risk Score*: Each policy is assigned a proprietary risk score from 1 to 5, with 5 being higher risk, based on multiple factors including insured age, life expectancy, life expectancy extension ratio, survival probability at breakeven, maturity probability, and risk-adjusted return on capital metrics.

*   *Risk-Based Discount Rate*: Each policy's discount rate is determined based on its proprietary risk score (1-5 scale), with discount rates directly calibrated to historical realized gains on life policies sold for policies within the same risk category. This transaction-based approach ensures that discount rates reflect actual transaction pricing rather than theoretical market rates.

*   *Life expectancy reports*: The Company obtains life expectancy reports to aid in both the origination of the policy as well as selling the policies. Out of the total life expectancy expenses incurred during the year ended December 31, 2024 and six months ended June 30, 2025, Lapetus Solutions, Inc. ("*Lapetus*") represented 60% and 34%, respectively, of expectancy reports purchased for the year ended December 31, 2024 and six months ended June 30, 2025.

The Company holds a convertible promissory note in the amount of $1,000,000 (the "*LSI Note*") issued by Lapetus, which has accrued approximately $287,000 in accumulated interest. If the LSI Note were to convert into shares of Lapetus Series A-2 Preferred Stock in accordance with its terms, the Company's resulting ownership interest in Lapetus would represent less than a 5% equity stake in Lapetus on a fully diluted basis.

Confidential

LATHAM&WATKINS℠

The Company's Chief Executive Officer, Jay J. Jackson, previously held a "Director" title at Lapetus, where his role was strictly limited to an uncompensated advisory position rather than a contracted director role or service on the board of directors of Lapetus. Mr. Jackson resigned from his advisory board position with Lapetus effective on May 16, 2024.

The Company also used reports from five other life expectancy entities for the year ended December 31, 2024 and the six months ended June 30, 2025. Further, the Company understands that Lapetus has been subjected to routine reviews by the Florida Department of Insurance, Lapetus' primary regulator, which has found that the life expectancy estimates provided by Lapetus are within the accepted range of life expectancy accuracy.

In addition, Lapetus announced shutdown on August 31, 2025 and will no longer be providing life expectancy reports, and therefore the Company will not be buying any new life expectancy reports provided by Lapetus in the future.

Given the historical relationship, the Company proposes to include the following disclosure in the risk factor section regarding the valuation of life insurance policies in future periodic filings:

"The Company utilizes a multitude of inputs including historical realized gains on life insurance policies sold, quarterly lookback analysis, risk score, risk-based discount rate and life expectancies to determine the fair value of the policies it holds. The Company uses life expectancy reports from six different life expectancy entities including life expectancy reports generated by Lapetus Solutions, Inc. ("Lapetus"), in which the Company holds a minority ownership interest representing less than a 5% equity stake on a fully diluted basis. The Company's Chief Executive Officer previously held an advisory board position at Lapetus, where his role was strictly limited to an uncompensated advisory position rather than a contractor role or service on the board of directors of Lapetus. The Company's Chief Executive Officer resigned from his advisory board position with Lapetus effective on May 16, 2024. For the six months ended June 30, 2025, Lapetus represented 34% of expectancy reports purchased. The Company will not be purchasing any additional expense reports from Lapetus going forward as Lapetus announced shutdown on August 31, 2025."

The Company could fail to accurately forecast life expectancies. , page 15

4.    **Tell us whether any of your directors or officers have any interest in any of the medical underwriting firms.**

Response: The Company respectfully acknowledges the Staff's comment. The Company does not have any relationships with other medical underwriting firms or life expectancy providers other than Lapetus, as disclosed above and in the Company's periodic reports filed with the Commission.

The Company could fail to accurately forecast life expectancies. There may also be changes…., page 15

5.    **We note you disclose here that you purchase annuities but do not discuss purchases of annuities in any other parts of your filing. Please revise future filings to clarify this aspect of your business and include any related material financial information.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company has not purchased any annuities during 2024 and 2025. The Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the Company's purchase of annuities and will clarify this aspect of its business, including any related material financial information.

Risks Related to the Business and Regulatory Matters
There have been lawsuits in various states…, page 21

GT106897
GT106895

LATHAM&WATKINS&LLP

6. **Please ensure you provide updated information in your future filings related to challenges, by any party, related to the legality of purchases of life insurance policies that are reasonably likely to have a material impact on your business model, strategy and revenue-generating activities.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure including any challenges by any party related to the legality of purchases of life insurance policies that are reasonably likely to have a material impact on the Company's business model, strategy and revenue-generating activities. Further, the Company advises the Staff that there are no such known challenges as of this date.

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, page 37

7. **Please revise your future filings to discuss which consolidated entities are partially owned by third parties and result in net income being allocated to these noncontrolling interests. Also disclose the segments that include any material amount of noncontrolling interests.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to which consolidated entities are partially owned by third parties that result in net income being allocated to noncontrolling interests, as well as the segments that include any material amount of noncontrolling interests.

Active Management Revenue, page 40

8. **We note that realized and unrealized gains from life insurance policies held using the fair value method totaled $85 million and $43 million during the fiscal years ended December 31, 2024 and 2023 and represented 76% and 65% of total revenues during these periods, respectively. Please revise your future filings to provide the following:**

   - **Disclose in your table on page 41 the unrealized gains/losses recognized during each period presented and the cumulative amount recognized at each period end for policies that are held at each period end.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the unrealized gains or losses recognized during each period presented and the cumulative amount recognized at each period end for policies that are held during such applicable periods.

   - **Include a discussion of the reason(s) for the amount of and changes in realized gains recognized in each period presented, including trends in the average realized gain per policy sold and any other related KPI's used by management.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the amount of and changes in realized gains recognized in each period presented, including trends in the average realized gain per policy sold and any other related KPI's used by management.

Confidential

GT106898
GT106895

LATHAM&WATKINS

- Include a discussion of the reason(s) for the amount of and changes in unrealized gains/losses recognized in each period presented. For example, we note disclosure that you utilized a blended average discount rate of 18%, 20% and 21% for policy valuations at March 31, 2025, December 31, 2024 and December 31, 2023. We also note that this change in discount rate was "based on economic and company-specific factors." Specifically, tell us and revise your future filings to identify the specific economic and company-specific factors which resulted in the change to the discount rate used each period and quantify the impact on the unrealized gains recognized each period. Include additional discussion of other key inputs that changed, the underlying reasons why, and quantify the impact, if material.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the amount of, and changes in, unrealized gains or losses recognized in each period presented. Also, in future filings commencing with the Quarterly Report on Form 10-Q for the period ending September 30, 2025, the Company will identify the specific economic and company-related factors that result in the change to the discount rate used each period, quantify the impact on the unrealized gains recognized each period and include additional discussion of other key inputs that changed, the underlying reasons for those changes and a quantification of the impact of those changes, if material.

**Please provide us with your proposed disclosures as of the most recent interim period for which financial information is available.**

Response: The Company respectfully acknowledges the Staff's comment and has included below the unrealized gains or losses recognized during the recent interim period and the cumulative amount recognized for each period end for policies in Footnote 4 of its interim financial statements for the second quarter ended June 30, 2025. The Company will also include a discussion on the reason for changes and trends in realized gains recognized in each period and average realized gain percentage.

The change to our discount rate is driven by historical and current realized gains on policies sold, risk scores and life expectancy, which was expanded upon in our Q2 2025 10-Q.

Our proposed disclosure is as follows:

"Realized gains increased significantly from $18.0 million in the six months ended June 30, 2024 to $72.2 million in the six months ended June 30, 2025. This growth was fueled by the Company's expanded capital base and deployment capacity following two major financing events: a $90.0 million equity raise in November 2024 and a $100.0 million debt facility acquired in December 2024. The additional capital enabled the Company to acquire a larger portfolio of life insurance policies, with a substantial portion sold during the first half of 2025 to investors seeking uncorrelated assets to invest in.

"The average realized gain per policy sold also improved markedly, rising from 19.4% for the six months ended June 30, 2024 to 34.1% for the six months ended June 30, 2025. This improvement reflects increased institutional demand for life settlement policies as uncorrelated assets, creating more favorable pricing conditions for the Company's portfolio trades.

"The changes in unrealized gains or losses recognized in a given period are primarily driven by the amount of policies sold and purchased in such period. In the quarter ended June 30, 2025, the Company sold almost 50% of the policies that were on the balance sheet as of March 31, 2025 and redeployed a majority of that capital to purchase additional policies. In the quarter ended June 30, 2025, the Company's discount rate changed to 16%, which is based on the historical and current realized gains on policies sold, risk score, duration, and current demand for uncorrelated assets. The weighted average discount rate as of June 30, 2025 was 16%, which decreased from 18% as of March 31, 2025. Although the discount rate changed in the most recent interim period, the valuation of policies as of March 31, 2025 and June 30, 2025 were both 22% above acquisition costs plus premiums paid, which is supported by our historical realized gains on policies sold."

Confidential

LATHAM•WATKINS⊔⊔

9.  Please revise the fair value method table at the bottom of page 41 in your future filings to separately present the number of policies bought and sold with related parties, if material. Also, please separately disclose the average realized gain/loss on policies sold with related parties, if materially different. To the extent other disclosed KPI's have material differences between related party transactions and external transactions, please disclose them separately. Please provide us with your proposed disclosures as of the most recent interim period for which financial information is available.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested separate disclosure relating to (i) the number of policies bought and sold with related parties, if material, (ii) the average realized gain or loss on policies sold with related parties, if materially different, and (iii) other KPIs that have material differences between related party transactions and external transactions.

Further, please see below for our proposed disclosures in future filings based on the most recent period ended June 30, 2025:

For the six months ended June 30, 2025, we sold 354 policies to related parties. Realized and unrealized gains for policies sold to related parties of $17,076,617, which is made up of $56,153,818 of realized gains, less $1,606,164 of premiums paid and the reversal of $37,471,037 of unrealized gains from the prior quarter ended March 31, 2025 related to life insurance policies held using the fair value method, for the six months ended June 30, 2025, which we will include in the fair value table. The Company will assess the materiality of these disclosures on a quarter-by-quarter basis and provide separate breakout information in future filings if such differences become material.

## Asset Management Revenue, page 40

10.  Please revise your future filings to provide a breakdown of AUM by product type at each period end.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested breakdown of AUM by product type at each period end, namely alternative investment funds ("Longevity Funds") and exchange-traded funds ("ETF").

11.  Please revise your future filings to include a roll forward, for all periods presented, of AUM showing the beginning balance, gross inflows, gross outflows, market appreciation/deprecation, new funds established, etc., to arrive at an ending balance. Please disaggregate the roll forwards by the fund categories, strategy, type, products, etc., if meaningful to understand your business or financial results. Please also identify significant trends or concentrations in your AUM and discuss the causal factors for the trends. Refer to Item 303(a)(3) of Regulation S-K.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested roll forward, for all periods presented, of AUM disaggregated by fund category, including Longevity Funds and ETF Funds, strategy, type and products, in each case to the extent meaningful to an understanding of our business or financial results. We will also identify significant trends or concentrations in AUM and discuss the causal factors for the trends.

12.  Please revise your future filings to provide and discuss KPIs used by management to manage this business such as average fees earned. Please provide us with your proposed disclosure as of the most recent interim period for which financial information is available.

Confidential

GT106900
GT106895

LATHAM*WATKINS

**Response:** The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to average asset management fees earned by fund category (Longevity Funds and ETF Funds).

For the six months ended June 30, 2025, the Company's average management fee earned was 1.5% and 0.5% for the Longevity Funds and ETF Funds, respectively.

Cost of Revenues (Including Stock-Based Compensation) and Gross Profit, page 42

13. **Please revise your future filings to quantify any significant components of cost of revenues and any other expenses for each period presented that are necessary to understand the results of operations and related financial trends.**

**Response:** The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the quantification of any significant components of cost of revenues and any other expenses for each period presented that are necessary to understand the results of operations and related financial trends.

Key Business Metrics and Non-GAAP Financial Measures, page 48

14. **We note your disclosure that Adjusted Net Income and Pro Forma Adjusted Net Income appear to include an adjustment to add back the permanent difference in tax expense related to the restricted stock awards granted to the CEO due to IRC 162(m) limitations. Please explain to us the basis for this adjustment considering that the Adjusted Net Income measures do not appear to include any stock compensation costs since the GAAP recognized amounts are added back. Additionally, it appears that the GAAP net income does not include a tax impact, due to the permanent difference, which could warrant an adjustment. Therefore, it appears the non-GAAP measures do not include current and deferred income tax expense commensurate with the non-GAAP measure of profitability. Please explain to us, or alternatively, remove this adjustment.**

**Response:** The Company respectfully acknowledges the Staff's comment and notes that the adjustment for the permanent difference in tax expense related to the restricted stock awards granted to the CEO was added back as it generated an extraordinary cash impact in connection with a non-cash stock-based compensation expense. The cash impact is recorded in the income tax expense line item of our financial statements, whereas the stock-based compensation appears in the stock-based compensation expense line item. Further, the Company respectfully advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will revise our disclosure to show the tax impact of the adjustments as shown in response to Comment 15 below.

15. **We note other costs (e.g., amortization expense, etc.) that you add back to reconcile to Adjusted Net Income and Pro Forma Adjustment Net Income appear to have a tax impact on GAAP net income. Please revise your reconciliation of non-GAAP measures to include current and deferred income tax expense related to these adjustments to ensure the tax impact is commensurate with the non-GAAP measure of profitability or tell us how your current measure includes the appropriate tax impact. Please refer to question 102.11 of the C&DIs on Non-GAAP Financial Measures for guidance. Please provide us with your proposed disclosures as of the most recent interim period for which financial information is available.**

**Response:** The Company respectfully acknowledges the Staff's comment and advises that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the reconciliation to include the appropriate tax impact by taking the total gross value of the adjustments and multiplying it by the Company's U.S. federal and state statutory tax rate. Please see below for our proposed disclosures in future filings based on the most recent six-month period ended June 30, 2025:

GT106901

GT106895

LATHAM&WATKINS LLP

|  | | Six months Ended June 30, 2025: | | | | |
|  | | Gross | | Tax Impact | | Net |
| --- | --- | --- | --- | --- | --- | --- |
| Net income (loss) attributable to Abacus Global Management, Inc. | S | 22,223,272 | S | — | S | 22,223,272 |
| Net income (loss) attributable to noncontrolling interests | | 786,683 | | | | 786,683 |
| Amortization expense | | 9,301,141 | | (2,357,839) | | 6,943,302 |
| Stock-based compensation | | 5,842,224 | | (1,481,004) | | 4,361,220 |
| Business acquisition costs | | 74,782 | | (18,957) | | 55,825 |
| (gain) loss on change in fair value of warrant liability | | 623,000 | | (157,931) | | 465,069 |
| Tax impact[1] | | 233,137 | | — | | 233,137 |
| ADJUSTED NET INCOME | S | 39,084,239 | S | (4,015,731) | | 35,068,508 |
| WEIGHTED-AVERAGE STOCK OUTSTANDING—BASIC | | 95,437,545 | | 95,437,545 | | 95,437,545 |
| WEIGHTED-AVERAGE STOCK OUTSTANDING—DILUTED | | 97,801,477 | | 97,801,477 | | 97,801,477 |
| ADJUSTED EPS - BASIC | S | 0.41 | S | (0.04) | S | 0.37 |
| ADJUSTED EPS - DILUTED | S | 0.40 | S | (0.4) | S | 0.36 |

[1]   Tax impact represents the permanent difference in tax expense related to the restricted stock awards granted to certain executives due to IRC 162(m) limitations.

Consolidated Statements of Operations and Comprehensive (Loss) Income, page 70

16.   **Please revise your future filings to separately present all material related party amounts on the face your income statement. Refer to Item 4-08(k) of Regulation S-X and ASC 235-10-S99-1(k) for guidance. Please provide us with your proposed disclosures as of the most recent interim period for which financial information is available.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested separate disclosure of all material related party amounts on the face of the Company's income statement.

Further, please see below for our proposed disclosures in future filings based on the most recent period ended June 30, 2025:

GT106902
GT106895

LATHAM•WATKINS⊔⊔

| | Three months Ended June 30, | | Six months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Asset management | $ 1,606,827 | $ 84,218 | $ 2,355,216 | 116,968 |
| Asset management-related party | 7,155,049 | 120,670 | 14,179,737 | 305,855 |
| Life solutions | 31,125,573 | 28,871,214 | 66,522,884 | 50,140,463 |
| Life solutions-related party | 16,175,271 | – | 17,076,617 | – |
| Technology services | 161,900 | – | 229,512 | – |
| **TOTAL REVENUES** | **56,224,620** | **29,076,102** | **100,363,966** | **50,563,286** |

Asset Management fees are earned by providing asset management services primarily to institutional investors alongside private clients investing in uncorrelated, and longevity-based assets, fixed-income replacement strategies and free cash flow-based investment solutions and are not earned from sales of policies to the related funds.

Life Settlement Policies, page 80

17. **Please revise your future filings to disclose where premiums paid and life insurance proceeds received are presented in your income statement. If they are not included in "Active management" revenues, please tell us how your presentation is consistent with the guidance in ASC 325-30-45-4.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to where premiums paid and life insurance proceeds received are presented in the Company's income statement. Further, the Company respectfully confirms that active management revenues were included in Life Solutions revenue in our income statement; therefore, the presentation is consistent with the guidance in ASC 325-30-45-4.

Active Management Revenue, page 84

18. **Based on your disclosure here and on page 105, it appears that for policies accounted for under the fair value method, you initially measure the fair value of the policy at the transaction price and subsequently measure the fair value using a discounted cash flow model. It appears that measuring the fair value using the discounted cash flow model results in your recognition of unrealized gains and therefore, the fair value at initial recognition is greater than the transaction price. Please tell us in detail and revise your future filings to clarify why the fair value at initial recognition does not represent the transaction price (e.g., the market in which you purchase the policy is different from the principal or most advantageous market or other reasons detailed in ASC 820-10-30-3A). If you believe the fair value at initial recognition represents the transaction price and that no day one gain is recognized, please tell us how you calibrate the inputs to the discounted cash flow model to the purchase transaction price as required by ASC 820-10-35-24C. Please provide us with your proposed disclosure.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to why the market in which we purchase policies is different from the principal or most advantageous market and other reasons detailed in ASC 820-10-30-3A.

Our proposed disclosure is as follows:

"The Company purchases policies from individuals or institutions, bundles those policies into tranches and sells to institutions, insurance carriers or funds that are attracting new investors. These initial purchases happen in the secondary market and the tertiary market. The secondary market is different from the principal or most advantageous market for purchasing policies and has less competition due to state-by-state licensing requirements. The Company leverages its broad policy base and extensive network, to offer individual policies that provide enhanced standalone value. This is achieved by precisely matching each policy's risk profile to the specific needs of fund managers, institutions, insurance carriers, or funds as well as bundling secondary market originated policies with those originated in the tertiary market. This tailored approach attracts new investors by making it easier to identify and acquire policies that align with their investment objectives. This approach enhances realized gains because it increases market liquidity, broadens the investor base, and enables more efficient price discovery, which in turn supports higher policy values. Our historical realized gains on policies sold, are materially consistent regardless of where policies are originated."

Confidential

GT106903
GT106895

LATHAM&WATKINS LLP

Asset Management Revenue, page 85

19. **To the extent performance fees are material, please revise your future filings to more clearly disclose your related revenue recognition policies. Specifically, discuss if performance fees are variable consideration and how you considered if they are constrained. Refer to ASC 606-10-32-11 and Example 25 in ASC 606-10-55-221 for guidance.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will more clearly disclose our related revenue recognition policies. We will include separate disclosures with respect to performance fees when they become material. There have not been any performance fees recognized for the first six months of 2025. Performance fees are deemed variable consideration and are only recognized to the extent that there are no significant probable future revenue reversals.

20. **Please revise your future filings to disclose in what line-item retrocession fees are presented in the income statement.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to line-item retrocession fees presented in the income statement.

21. **Please revise your future filings to disclose the typical length of time you pay retrocession fees to introducers. Please provide us with your proposed disclosure.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the typical length of time the Company pays retrocession fees to introducers.

Further, please see below for our proposed disclosures in future filings:

Retrocession fees are paid out throughout the life of the fund. The current portion represents retrocession fees that are paid within a year and the non-current portion represents retrocession fees that are related to performance fees that are not expected to be paid and collected until the end of the fund's life.

Note 5. Life Settlement Policies, page 97

22. **Please revise your future filings to provide the disclosures required by ASC 325-30-50-9 for your policies accounting for under the fair value method.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure required by ASC 325-30-50-9 relating to the Company's policies accounted for under the fair value method.

Confidential

GT106904
GT106895

LATHAM&WATKINS⁴⁴ᵖ

Note 13. Fair Value Measurements, page 104

23. We note your disclosure that your life settlement policies, at fair value, are classified as Level 3 assets and that fair value is determined based on what factors market participants would use in pricing the assets or liability, such as life expectancies and cash flow discount rates. Please revise your future filings to:

- disclose the amount of total gains or losses for each period presented that is attributable to the change in unrealized gains/losses relating to those assets held at the end of the reporting period, and

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will disclose the amount of total gains or losses for each period presented that is attributable to the change in unrealized gains or losses relating to those assets held at the end of the reporting period.

- disclose a narrative description of the uncertainty of the fair value measurement from the use of each significant unobservable input if those inputs reasonably could have been different at the reporting date.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the uncertainty of the fair value measurement from the use of each significant unobservable input if those inputs reasonably could have been different at the reporting date.

Refer to ASC 820-10-50-2 for guidance. Please provide us with your proposed disclosures for the most recent interim period for which financial information is available.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that this disclosure has been provided in our disaggregated revenue Note 4 in the interim financials included in the Q2 2025 10-Q.

For the narrative description of the uncertainty of the fair value measurement from the use of each significant unobservable input, we have included an additional sensitivity analysis in our disclosures in the Q2 2025 10-Q to evidence the relationship between the changes in significant inputs and the impact on the valuation.

24. Please revise your future filings to more clearly provide the disclosures required by ASC 325-30-50-10.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the disclosures required by ASC 325-30-50-10.

25. Please tell us in detail and revise your future filings to clarify how you measure the realized gain/loss and the realized gain percentage on sold and matured policies. Specifically, tell us how premiums paid impact the measurement and provide us an example measurement including a typical fact pattern. If premiums paid are not included in the measurement, please tell us why.

GT106905
GT106895

LATHAM&WATKINS LLP

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the gain on sold and matured policies presented in our Q2 2025 10-Q starting on page 58 represents the actual gain, net of related life policy premiums paid since the Company's acquisition of the sold or matured life policy. The premiums paid presented in Note 13 pages 28 and 106 in the Q2 2025 10-Q and 2024 10-K, respectively, includes all premiums paid during the respective reporting period for policies sold and matured during the reporting period and for life insurance policies held at the end of the respective reporting period. The change in estimated fair value presented in Note 13 is included in earnings and reconciles to the amounts presented in Note 4 of the referenced reports.

Premiums paid during the holding period are added to the original purchase price of an insurance policy to determine the total cost basis. This cost basis is then used to measure the realized gain or loss upon the sale of the policy. Premium payments are recorded as reductions to Active Management Revenue in our financial statements.

To illustrate our policy valuation process, consider the purchase of an insurance policy with a $1 million face value in January for $250,000. Monthly premiums are $1,500 per month and we sell the policy after holding for six months in June for $323,750.

**Initial Purchase in January:**

| | | |
|---|---|---|
| Dr. Insurance Policies at Fair Value | $ | 250,000 |
| Cr. Cash | $ | 250,000 |

**Premium Payments:** For ongoing premiums paid during the holding period, the entries to record the premiums paid are:

| | | |
|---|---|---|
| Dr. Premiums* | $ | 1,500 |
| Cr. Cash | $ | 1,500 |

*Note: Premium expenses are reported as a reduction to Active Management Revenue in the financial statements.*

**Calculation of realized gain percentage:**

| | | |
|---|---|---|
| Original Purchase Price: | $ | 250,000 |
| Premiums Paid during the holding period: | $ | 9,000 ($1,500 per month * 6 months) |
| Total cost basis: | $ | 259,000 |
| Sales Price: | $ | 323,750 |
| Realized Gain %: | | **25%** (($323,750-$259,000)/$259,000) |

The Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the measurement of the realized gain or loss and the realized gain percentage on sold and matured policies.

26. **Please tell us in detail why you include "premiums paid" and "realized gain on matured/sold policies" in two separate line items with offsetting amounts in the fair value roll forward on page 106. Please provide us simplified examples to demonstrate how your presentation is appropriate relating to these items. Please revise your disclosure in future filings, as needed, to clarify how these items impact the fair value of your life insurance policies and are incorporated in the roll forward.**

Response: The Company respectfully acknowledges the Staff's comment. The Company originally included the premiums paid to respond the Staff's comment letter received on January 6, 2023, in connection with our registration statement (Question 17, Fair Value measurements), requesting that the Company's roll forward more clearly present the impact of paying a premium on the fair value of the life insurance policies.

Confidential

GT106906
GT106895

LATHAM&WATKINS LLP

Further, please see below for our proposed revised disclosure for fair value roll forward in future filings:

| | |
|---|---:|
| Fair value at December 31, 2024  $ | 370,398,447 |
| Policies purchased | 205,307,659 |
| Matured/sold policies | (207,427,913) |
| Unrealized gain | 17,866,505 |
| Fair value at June 30, 2025 | 386,144,698 |

The Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to how "premiums paid" and "realized gain on matured/sold policies" impact the fair value of the Company's life insurance policies and are incorporated in the roll forward.

Note 14. Long-Term Debt, page 109

27. **Noting that your senior unsecured notes (FRSUN) have a fixed interest rate and a portion of the debt has been outstanding since November 2023, please tell us how you determined that the fair value was equal to the cost.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company erroneously disclosed the fair of the debt as equal to cost in the Long-Term Debt footnote and will correct this error in future filings.

Note 16. Stock-Based Compensation, page 116

28. **We note you disclose total stock-based compensation of $29.6 million related to RSUs and Options ($6.7 million) and CEO restricted stock ($22.9 million). Please reconcile this amount for us to the $43.4 million of stock-based compensation presented in the statement of cash flows on page 73.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the stock-based compensation amount of $43.4 million presented in the statement of cash flows and statement of equity is correct. However, the stock-based compensation for the CEO restricted stock was erroneously disclosed in Note 16 as $22.9 million and should have been reported as $36.7 million. In future filings the Company will properly disclose the restricted stock amount as it pertains to the historical comparative period and ensure additional internal controls are implemented to prevent this erroneous disclosure.

Note 19. Related-Party Transactions, page 120

29. **Please revise your future filings to disclosure the nature of the relationship with Nova Trading.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the nature of the Company's relationship with Nova Trading.

We note that Nova Trading no longer owns policies and that we do not generate revenue from Nova Trading. The Company's most recent transactions with Nova Trading (US), LLC, a Delaware limited liability company and Nova Holding (US) LP, a Delaware limited partnership (these two entities collectively, the "*Nova Funds*"), occurred in the fourth quarter of 2024. The Company no longer transacts with the Nova Funds.

Confidential

LATHAM*WATKINS***

<u>General</u>

30. We note the recent public reports regarding your relationship with certain parties, including, for example purposes only, your relationship with Lapetus Solutions and Carlisle Asset Management. Please tell us how you considered including disclosure regarding your connection to key parties, any related party transactions arising from these connections, and the extent to which you have relied upon key third parties to conduct your business, including any related risks. By way of example only, we note your statement on page 16 of your Form 10-Q for the quarterly period ended June 30, 2024 that you hold a convertible promissory note in a separate unrelated insurance technology company that is a producer of life expectancy reports. Please tell us how you determined that this company is an unrelated insurance technology company. Finally, tell us whether any of your directors or officers are directors and officers with any other entity (including, but not limited to, those listed above) and if so, provide details relating to the business of such entities and any common business.

<u>Response</u>: The Company respectfully acknowledges the Staff's comment and has identified the transactions with the Carlisle Funds as related party transactions. Carlisle Asset Management is a consolidated entity that was acquired as part of the Carlisle Acquisition (as defined in the Q2 2025 10-Q). As it relates to Lapetus, we have provided the Company's ownership and nature of the relationship in response to Comment Number 3, as well as the proposed disclosure in future filings. As it relates to our evaluation of whether Lapetus represents a related party, we have considered the criteria for a related party under Financial Accounting Standards Board Accounting Standards Codification 850, *Related Party Disclosures* ("ASC 850"). Specifically, under ASC 850-10-20, which takes into consideration the following:

- o   Lapetus and the Company are not affiliates in that neither company controls the other, nor are they under common control;

- o   The Company's investment in Lapetus would not be required, absent the election of the value option under the Fair Value Option Subsection of Accounting Standards Codification Section 825-10-15, to be accounted for by the equity method by the Company;

- o   Lapetus is not a trust for the benefit of the Company's employees managed by or under the trusteeship of the Company's management;

- o   Neither the Company nor Lapetus is a principal owner of, or management of, the other entity;

- o   The Company does not control or have the ability to significantly influence the management or operating policies of Lapetus to an extent that one of the parties might be prevented from fully pursuing its own separate interests, or vice versa; and

- o   Neither the Company nor Lapetus can significantly influence the management or operating policies of the other, nor does either party have an ownership interest in the other that would allow it to significantly influence the other to an extent that one of the parties might be prevented from fully pursuing its own separate interests.

The Company concluded that Lapetus is not a related party within the meaning of Item 404 of the Commission's Regulation S-K. Under Instruction 6 to Item 404(a), a person holding a position as a director of another entity does give them significant influence over another entity solely by having that position. The CEO served on the board in an advisor capacity and did not vote on any decisions or actions taken by Lapetus; the Company therefore determined that he did not have significant influence over Lapetus. This relationship ceased on May 16, 2024 when the Company's CEO resigned from his advisory role with Lapetus.

Confidential

GT106908
GT106895

LATHAM&WATKINS LLP

In addition, if the convertible promissory note held by the Company were to convert into shares of Lapetus Series A-2 Preferred Stock in accordance with its terms, the Company's resulting ownership interest in Lapetus would represent less than a 5% equity stake in Lapetus on a fully diluted basis. Thus, the Company determined that Lapetus does not represent a related party pursuant to Instruction 7(c) to Item 404.

In addition, Lapetus announced shutdown on August 31, 2025 and will no longer be providing life expectancy reports; therefore, the Company will not be buying any new life expectancy reports provided by Lapetus in the future.

As documented in our response to Comment 3, the Company also used reports from five other life expectancy entities for the year ended December 31, 2024 and the six months ended June 30, 2025 and has not relied upon any key third parties to conduct our business. According to our most recent director and officer questionnaires, our directors and officers also serve as board members of the below entities, outside of their roles at the Company and its wholly owned subsidiaries:

Thomas W. Corbett, Board member:
- Variety Club of Pittsburgh (Board member)
- Animal Friends of Pittsburgh (Board member)

Sean McNealy, Managing Partner:
- PS Opportunities (Board member)

Karla Radka, Board member:
- HopeNow International - active (nonprofit) (Board member)
- Senior Resource Alliance (CEO)

Adam Gusky, Board member:
- RAND Corporation (Board member)
- ADPRO Sports (Board member)

Mary Beth Schulte, Board member:
- Richard A. Chaifetz School of Business – St. Louis University (Board member)
- Arch Grants (Board member)
- Attivo Partners (CEO)

Michiel van Katwijk, Board member:
- Vins vini (private partnership)

The Company does not engage in any common business with any of the entities listed above.

Form 10-Q for Fiscal Quarter Ended June 30, 2025
Life Settlement Policies, page 25

31. **Please tell us in detail what the nature of the historical trade spread represents and how it is measured. Specifically tell us the two values that serve as the inputs in measuring the spread. If the trade spread represents a bid/ask spread, please clarify where your policies are marked within this spread and explain why. Please revise your future filings as needed.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the historical trade spread represents the total actual sales price of policies less their total cost basis, and if expressed as a percentage further divided by their total cost basis, over a specified period of time (eight quarters). Historical trade spread is analogous to historical realized gains on life insurance policies sold.

The Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will update the disclosure to refer to the historical trade spread as the historical realized gains on life insurance policies sold.

Confidential

GT106909
GT106895

LATHAM·WATKINS<sup>LLP</sup>

32. We note your disclosure that trade spread represents the average trade spread on a quarterly basis over the last 8 quarters. Please revise your future filings to clarify how the quarters are weighted.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the weighting of quarters in the calculation of the average trade spread.

33. Noting your sensitivity disclosure on page 27, please explain to us in detail why the fair value of your policies would increase when trade spreads widen. Please revise your future filings as needed.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the historical trade spread represents the total actual sales price of policies less their total cost basis, and if expressed as a percentage further divided by their total cost basis, over a specified period of time (eight quarters). The sensitivity analysis is intended to illustrate the potential increase or decrease if policies sold for an average of 1% above or below their determined sale price.

The Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to why the fair market value of the Company's policies would increase when historical realized gains on life insurance policies sold changes. We will also update the disclosure to refer to the historical trade spread as the historical realized gains on life insurance policies sold.

34. To the extent quantitative information related to your significant unobservable inputs for prior periods was not previously disclosed in a prior period filing, please revise your future filings to disclosure the information for both periods presented.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested quantitative information related to the Company's significant unobservable inputs.

Asset Management, page 44

35. Please revise your future filings to separately disclose performance fees from regular management fees and provide appropriate information related to any material amounts or trends. Please provide us with your proposed disclosures as of the most recent interim period for which financial information is available.

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested separate disclosure of performance fees from regular management, along with the appropriate information related to any material amounts or trends.

There have not been any material performance fees recognized for the six months ended June 30, 2025, but will separately disclose these from asset management fees to the extent that performance fees become material in the future.

Life Solutions, page 45

36. We note your fee-based services revenue decreased from $6.9 million for the six months ended June 30, 2024 to $0.3 million for the six months ended June 30, 2025. Please revise your future filings to clarify why fee-based services did not recur and/or provide any other relevant information for why fee-based services revenue decreased so substantially.

Confidential

GT106910
GT106895

LATHAM & WATKINS LLP

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that this is due to one-time consulting fees that can vary widely on a quarterly basis. The Company at times provides fee-based services to (i) identify tranches of policies available for sale and held by institutional asset managers, (ii) value the policies and (iii) negotiate the terms with the institutional asset managers (sellers) and insurance carriers (buyers). The Company is paid a fee by the acquiring institutional asset manager or in this specific instance, an insurance carrier, upon the completion of a transaction, but this revenue does not occur on a frequent basis. Further, the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will revise to clarify why fee-based services decreased substantially.

(Gain) Loss on Change in Fair Value of Debt, page 49

37. **Noting your market-indexed notes are measured at fair value, please revise your future filings to clarify why the payoff of the market-indexed notes between July 2024 and January 2025 resulted in a decrease/gain related to the fair value of the debt. Please explain the underlying reasons the fair value of the debt decreased during the periods presented. For example, if true, clarify whether the settlement/payoff of the debt was at amounts lower than the carrying value which resulted in you revising the fair value of your remaining debt. Please provide us with your proposed disclosure.**

Response: The Company respectfully acknowledges the Staff's comment and advises the Staff that the Company, in future filings commencing with its Quarterly Report on Form 10-Q for the period ending September 30, 2025, will provide the requested disclosure relating to the fair value of the Company's debt.

The fair value of debt decreased during the period presented as a result of the Company's paying off two of the three structured notes in the second half of 2024 and the third note in January 2025. The Company's final paid amount to the debt holders was less than the fair value amount reported, resulting in the reported gain. The Company had the contractual right to pay off the debt at par value, and the fair value of the debt at retirement was different from its par value (due to the prevailing interest rate at the end of each reporting period, amongst other factors). Please refer to Note 14 on pages 31 and 32 of the Q2 2025 10-Q for the Company's disclosure of the amount paid in January 2025 compared to the fair value presented as of December 31, 2024. The Company respectfully advises the Staff that in future filings, it will point the reader to Note 14. The Company does not expect to issue similar debt in the future.

\* \* \*

We hope the foregoing answers are responsive to your comments. Please do not hesitate to contact me by telephone at (713) 546-7420 with any questions or comments regarding this correspondence.

Very truly yours,

/s/ Ryan J. Maierson
Ryan J. Maierson
of LATHAM & WATKINS LLP

cc: (via email)
Jay Jackson, Chief Executive Officer, Abacus Global Management, Inc.
William H. McCauley, Chief Financial Officer, Abacus Global Management, Inc.

Confidential