# Exhibit B

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Orlando Division**

| | |
|---|---|
| ABACUS GLOBAL MANAGEMENT, INC., a corporation,<br><br>Plaintiff,<br><br>v.<br><br>COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,<br><br>Defendants. | Case No.: 6:25-cv-01401-RBD-RMN<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Abacus Global Management, Inc. ("Abacus" or the "Company"), by and through its undersigned counsel, brings this Second Amended Complaint against Coventry First LLC ("Coventry") and its co-founder and Executive Chairman Alan Buerger ("Buerger") (collectively, "Defendants") and pleads as follows:

**NATURE OF THE ACTION**

1. Founded two decades ago, Abacus entered the life settlements business with a distinctive business model predicated on transparency and fair pricing. Unlike its competitors who operate through opaque valuation processes, Abacus built its reputation—and its status as the industry's only

publicly traded company—by providing policyholders with unprecedented access to policy valuations through its proprietary Life Settlement Calculator. This tool enables policyholders to understand the net present value ("NPV") of their policies, fundamentally altering the traditional information asymmetry that has long characterized this market. The result is that Abacus consistently pays higher prices as a percentage of each policy's face value than its competitors—a premium that reflects both its commitment to transparency and the competitive advantage such transparency creates.

2. This approach has proven commercially successful: After steadily growing for years, the Company's quarterly revenues have quadrupled since 2023. Today, Abacus acquires over 25% of all life insurance policies sold in first-time life settlement transactions, and its market share continues to increase.

3. Coventry is a direct competitor of Abacus in the life settlements space. Rather than embracing transparency as Abacus has done, Coventry has gone on a very different journey over the last twenty years. Coventry's pattern of misconduct is extensive and well-documented. Coventry faced bid-rigging charges from the Office of the New York Attorney General, and it settled a multi-billion-dollar fraud case brought by insurance giant AIG. A federal Court of Appeals characterized Coventry's policy origination practices

as "***illegal***." Unlike Abacus, Coventry operates without pricing transparency, concealing its valuation methodology from policyholders while simultaneously representing to investors that it achieves profit margins of 40–60% or more on individual policies—a spread made possible only by systematically underpaying policyholders. Coventry can afford to operate this way because it is not a publicly traded company like Abacus, and thus faces less regulatory scrutiny and fewer disclosure obligations. And despite generating profits by acquiring policies substantially below what Abacus deems to be a fair representation of NPV, Coventry is losing market share to Abacus every year.

4. Unable to match Abacus's transparent pricing model or market performance, Coventry's co-founder and Chairman, Alan Buerger devised a scheme to undermine Abacus through false and misleading statements: convince the market that Abacus pays policyholders ***too much*** for their policies—and that this alleged "overvaluation" (which amounts to paying a policyholder too large of a lump sum payment for their life insurance policy) is fraudulently reflected in Abacus's ***audited*** financial statements, thus artificially inflating the Company's stock price. In other words, according to Coventry, the very business model that Abacus uses to deliver greater value and higher monetary payments to policyholders is actually a massive fraud against its shareholders—a baseless and defamatory narrative.

5. In spreading these falsehoods, Coventry deliberately ignores Abacus's consistent and legally mandated disclosures that policies on its balance sheet are valued "under the fair value method"—that is, market price, which is fundamentally distinct from the NPV used in the Life Settlement Calculator for policyholder transactions. The statements by Coventry and Buerger, also ignore fundamental realities of the life settlements business and are designed to confuse the investing public.

6. Since Abacus went public in July 2023, Coventry and Buerger have routinely disseminated false and misleading statements about Abacus, in particular targeting Abacus's relationship with Lapetus Solutions, Inc. ("Lapetus"), a third-party life expectancy estimate ("LE" or collectively, "LEs") provider that recently dissolved because of Defendants' conduct. Defendants' core claim is that Lapetus—purportedly controlled by Abacus—was incentivized to—and ultimately did deliberately—underestimate life expectancies because of its so-called improper and conflicted relationship with Abacus, and that Abacus relied on and benefited from those manipulated estimates to intentionally overvalue the policies it buys and sells.

7. This is false, misleading, and defamatory for several reasons, including that:

a. There is no objective evidence that Lapetus life expectancies are less accurate than the estimates of any other life expectancy provider;

b. Abacus considers life expectancy estimates from at least half a dozen providers, frequently consulting multiple estimates for a single policy, and thus Abacus does not solely rely on Lapetus life expectancies;

c. Abacus does not use a valuation methodology grounded in a single life expectancy provider to value the policies on its balance sheet; it instead uses a market-based valuation approach that incorporates the life expectancy assumptions of a range of market participants;

d. Abacus's market-based valuation methodology consistently values the policies on its book within Abacus's stated margin of error of 2%; and

e. Neither Coventry nor Buerger have explained why, if they consider Lapetus estimates to be incorrect, ***Coventry has purchased Lapetus life expectancies <u>over 4,000 times</u>***, both before ***and after*** Lapetus rebuffed Buerger's attempts to interfere with Lapetus's life expectancy methodology. Indeed, as recently as February 2023—the same year Abacus went public—***Coventry purchased more life expectancy reports from Lapetus than Abacus.*** In fact, from 2019 to 2022, Coventry and its affiliates or subsidiaries consistently purchased more Lapetus LEs compared to Abacus.

8. Coventry, and in particular Buerger, have intentionally made false and misleading statements about Abacus and its use of Lapetus. They did this through self-proclaimed independent, but paid studies that purport to show that Lapetus underestimates life expectancy, causing Abacus to

overpay policyholders, and then overvalue the policies on its book. From at least August 2023 up to the present, Defendants spread these false claims across a wide range of audiences, each deliberately chosen to inflict maximum harm on Abacus. For example, Coventry presented its lies to Abacus's (now former) auditor, Grant Thornton; market analysts that track Abacus's stock, such as TD Securities; and government agencies, including the Securities and Exchange Commission ("SEC") and Florida Office Insurance Regulation ("FOIR"). Coventry then filed and voluntarily dismissed a meritless lawsuit, for which it had no standing, against FOIR, seeking Lapetus's audit records.

9. Despite Defendants' defamatory campaign, Abacus's financial performance has continued to demonstrate the falsity of Defendants' claims. This explosive growth is inconsistent with Defendants' implication that Abacus is ***overpaying*** for its core assets in economically inefficient transactions—because Defendants' claim is false.

10. Defendants needed to do more to stop Abacus's forward momentum. So Buerger—acting in his capacity as Coventry's chairman and founder—took these false claims to the next level in a May 22, 2025 interview facilitated by Tegus, Inc., a financial expert network (the "Tegus Interview"). In fact, Buerger was so committed to disparaging Abacus publicly that he [redacted]

[redacted] In a barely five-page transcript that Buerger knew would be posted to the Tegus platform, Buerger implied Abacus was "manufactur[ing] earnings," said that its "stockholders . . . will be subordinated to the asset-backed debt, which is to say they will all be wiped out when this thing goes upside down," and predicted that "it's just a matter of time before [Abacus] implode[s]."

11. A month later, Buerger even gave a second interview facilitated by Tegus in his capacity as Coventry's chairman and founder. There, the interviewer made clear that he believed—based in part on Buerger's public statements—that Buerger had "made credible allegations of potential foul play at Abacus." And Buerger only reinforced his conclusion by referring to Abacus as a "house of cards" that would result in billions of dollars' worth of losses to investors "when [it] caves in." A "house of cards" that according to Buerger was comprised of the "wrong people" who "duped" Lapetus. Realizing the legal ramifications for his defamatory statements, Buerger [redacted]

12. Buerger claims to speak with authority about Abacus, calling the Company his "***pet project***." An authority Buerger apparently also developed by attending all or virtually all of Abacus's earning calls since 2023, including on August 7, 2025, weeks after Abacus filed its initial complaint. Claiming to

"know every public document" Abacus has filed, Buerger apparently ignored that Abacus clearly and repeatedly disclosed that: (i) Abacus's financial statements and internal controls over its financial reporting have been found to be in compliance with Generally Accepted Accounting Principles ("GAAP") by respected public company auditors, first Grant Thornton and now KPMG, in every annual audit since the Company's inception; (ii) Abacus has zero "asset-backed debt"; and (iii) Abacus's valuation methodology depends on market conditions, not the life expectancy estimates of a single underwriter.

13. All of the false statements Buerger made from 2023 through 2025 were made with full knowledge of their inaccuracy in light of Buerger's claim that he has read each and every one of Abacus's SEC filings. On June 4, 2025—the same morning that Buerger's Tegus Interview was published and/or circulated to Tegus subscribers, including some of Abacus's largest stockholders—the other shoe dropped.

14. Coventry and Buerger finally inflicted a direct hit on Abacus by convincing a portion of the trading community, including predatory short sellers, that Abacus is a fraud. Short seller Morpheus Research L.L.C. ("Morpheus") released a report (the "Short Report") citing Coventry's "research" on Lapetus and repeating some of Defendants' most inflammatory accusations, under the title: "Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing

Fake Revenue By Systematically Underestimating When People Will Die." Morpheus had only begun investigating Abacus and writing its Short Report in April 2025, once they became aware of Defendants' public accusations, and those accusations formed the biggest headlines of the incendiary Short Report. On the day the Short Report was published, Abacus stock (NASDAQ: ABL) dropped over 20%, erasing around $157 million in market capitalization. Abacus's market capitalization would fall by roughly $287 million over the next four weeks.

15. Defendants' relentless campaign against Abacus has caused substantial harm to the Company and its stockholders. Defendants' false narrative attempts to project Coventry's own financial vulnerabilities onto Abacus, but the facts demonstrate otherwise. The market analysts who came to Abacus's defense after the Short Report recognize the truth: Abacus's transparent approach is a ray of sunshine in an otherwise beleaguered industry, and that explains its rapid rise.

16. Yet many Abacus investors have raised concerns in the wake of the Tegus Interview and the Short Report that parrot the same false statements Defendants have been making for over a year. Critically, these investors have focused on the parts of the Short Report that simply repeat Defendants' prior defamatory remarks: that "[Abacus's] fair market value is grossly overstated" and that "[f]unds and companies like Abacus that rely on

Lapetus . . . could soon face growing challenges with serious consequences for investors."

17. In fact, ***Buerger is communicating directly with Abacus investors and disseminating Coventry's misleading "studies" of Lapetus***. Of course, Buerger's communications omit that Lapetus had thoroughly rebutted Coventry's one-sided studies with its own independent report, which has caused market analysts to conclude that "there is no evidence that [Lapetus] under-estimates [life expectancy]."

18. To be clear, this case is not about legitimate competitive practices or good-faith criticism of a competitor's business model. Competition through superior products, services, or pricing benefits consumers and strengthens markets. Defendants' conduct, however, crosses the line from lawful competition into tortious interference and defamation. Rather than competing on the merits by offering policyholders better terms or more transparent pricing, Defendants have chosen to attack Abacus through a systematic campaign of false and misleading statements designed to damage Abacus's reputation, confuse its customers, and undermine investor confidence. This calculated campaign to harm a competitor through deception and falsehood rather than through a legitimate business strategy has no place in a properly functioning marketplace.

19. On June 30, 2025, Abacus therefore brought this action to put an end to Defendants' unjust and anticompetitive scheme of spreading false and misleading statements about Abacus's business, and to restore its reputation.

20. But Defendants have thus far remained undeterred. Instead, Coventry has weaponized the discovery exchanged in this litigation—which Defendants are contractually required to keep confidential—to make further false claims about Abacus. Enough is enough. Abacus seeks compensation for the substantial economic and reputational harm Defendants' falsehoods have caused.

## PARTIES AND JURISDICTION

21. Abacus is a corporation organized under the laws of the state of Delaware with its principal place of business in Orlando, Florida.

22. Coventry is a limited liability company organized under the laws of Delaware, with its principal place of business in Fort Washington, Pennsylvania. ECF No. 1 (Defendants' Notice of Removal) ¶ 20. According to Coventry, it has one member—Dash Investments LLC ("Dash")—which has its principal place of business in Fort Washington, Pennsylvania. *Id.* ¶ 22. Dash in turn has two members—the Buerger 2003 Family Trust and Alan H. Buerger 2003 Trust for Reid S. Buerger—that Coventry contends are citizens of Pennsylvania. *Id.* ¶¶ 23–24. In short, Coventry contends it is a citizen of

Pennsylvania. *Id.* ¶ 31. Coventry is also registered and licensed to do business in Florida.

23. Alan Buerger, the co-founder and Executive Chairman of Coventry, is a citizen of the state of Pennsylvania.

24. The Court has subject matter jurisdiction over this case pursuant to Section 1332(a)(3) of Title 28 of the U.S. Code because the suit is between citizens of different States and the amount in controversy is in excess of $75,000, exclusive of interest, costs, and attorneys' fees.

25. This Court has personal jurisdiction over Defendants, pursuant to Federal Rule of Civil Procedure 4(k)(1)(A). Defendants engage in substantial and not isolated activity within the state of Florida. This Court also has personal jurisdiction over Defendants because the causes of action in this Second Amended Complaint arising from Defendants acts were committed within this state and caused injury to a citizen of this state.

26. Venue is proper in the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District, and Abacus has suffered significant reputational and economic harm within this District as a direct result of Defendants' conduct.

## FACTUAL BACKGROUND

### I. ABACUS AND COVENTRY COMPETE IN A GROWING MARKET.

#### A. A New Asset Class For An Uncertain Time

27. The life settlements industry allows policyholders the opportunity to monetize their life insurance policies. A "life settlement" transaction allows the original policyholder to sell their life insurance policy to a licensed third party at the policy's then-NPV, where NPV equals the face value of the policy upon maturity and any future premium payments discounted to the present, with the total forecasted discounting period being based on the policyholder's life expectancy at the time of the settlement.

28. In a typical life settlement transaction, the original policyholder receives a lump-sum cash payment, which can be quite meaningful because life insurance is often a senior citizen's largest asset (including their home). On average, life settlements companies pay sellers nearly eight times more than the current cash surrender value the seller could get from their insurance carrier. Sellers are freed from paying premiums, and are able to use the proceeds to support their retirement, transfer wealth, and pay medical bills.

29. In exchange, the purchaser in a life settlement transaction receives the right to collect the face value of the policy at maturity, provided

that the purchaser maintains the premiums as required under the original insurance contract.

30. For the same reasons that life insurance offers peace of mind to the original policyholder, life settlements are a very stable investment. The payouts under life insurance policies are cash reserved by highly rated insurance companies and not correlated to market trends.

31. Abacus estimates that the scale of the life settlements market opportunity is $233 billion each year, yet only 2% of those policies are captured in life settlement transactions, which means this market offers significant growth opportunities.

**B. The Life Settlements Value Proposition**

32. After the initial issuance of a life insurance policy, life insurance policies are sometimes bought and sold in two distinct markets. Transactions in which the policy passes from the policyholder to a licensed life settlements provider occur in what is known as the "secondary market." Transactions in which the policy passes from one investor (including life settlements providers like Abacus and Coventry) to another investor interested in this new alternative investment opportunity occur in the "tertiary market."

33. As life settlements providers, Abacus and Coventry can operate in both markets, and realize their profits by optimizing policy value in between the purchase from the policyholder and the sale to the investor.

34. Neither Abacus nor Coventry are insurance providers.

### 1. The Secondary Market And The Role Of Life Expectancy Estimates

35. The price paid in a secondary transaction takes into account the value of the policy to the original policyholder, meaning that it assumes the only alternatives to selling the policy are making premium payments to keep the policy in force, or allowing the policy to lapse—which would result in a loss of the death benefit.

36. Defendants, having operated in the secondary market for life settlements for over four decades, know that the NPV of a particular policy generally depends on the characteristics of the policy—such as the amount of remaining premiums to be paid and the face value of the policy—as much as, if not more, than the policyholder's life expectancy. While buyers in the secondary market look to LEs (both from third-party providers and the buyers' own internal estimates) as one data point when pricing a transaction, the potential to generate positive cash flows from a life settlement transaction depends on, among other things:

a. The age of the insured (irrespective of life expectancy or present health conditions);

b. The carrier underwriting the policy;

c. The annual premiums relative to the size of the death benefit;

d. Risk of loss, which includes (i) the probability that the owner of the policy will have to pay more in premiums than the face value of the death benefit before the insured passes away; and (ii) the probability that the insured will outlive the coverage of the policy;

e. The desired internal rate of return of the potential investment in the underlying life insurance policy; and

f. The purchaser's cost of capital.

37. Some of the relevant pricing factors are immutable, like the insured person's age; other pricing factors are creatures of contract and may be reduced, like the monthly premiums.

38. When a life settlements provider like Abacus considers whether to buy a policy, and how much to pay, it considers the totality of these factors, not just LEs.

39. Companies like Abacus and Coventry use an array of LE providers in addition to their internal estimates: they buy policies that have more than one LE from different providers; they also buy policies without the aid of any LE. In at least a quarter of its secondary market purchases, Abacus has zero control over what LE is used.

40. It is even common in secondary market transactions for a life settlements provider like Abacus or Coventry to obtain an LE, disagree with the result, and ignore it based on their own internal analysis. That is because it is well-known in the industry that certain LE providers have

different strengths (*e.g.*, when assessing a particular health condition, or when assessing a relatively young insured's life).

41. Therefore, neither the identity of the LE provider, nor the methodology that provider uses, is the sole factor that dictates the price that Abacus or any other buyer will ultimately pay for an individual's insurance policy.

**2. The Tertiary Market**

42. Tertiary sales of policies—*e.g.*, from one investment fund to another investment fund—operate like sales of other fixed-income assets that trade over the counter, such as mortgages or collateralized loan obligations. The buyers in the tertiary market are not licensed intermediaries and do not interact with the insured. The buyers in the tertiary market are investors, and the discount rate they apply to policies they purchase is primarily driven by the investor's costs of capital, and the current supply and demand of policies; thus, individual life expectancy estimates are far less important than in secondary market transactions.

43. The buyers in the tertiary markets have their own internal pricing models, LEs, and diligence processes to arrive at the ideal price for their investments in life settlements. Because many tertiary market buyers are general partners of investment funds, it is not unusual for those buyers to rely primarily on a single life expectancy provider to ensure consistent daily

and weekly marking of the fund units backed by their array of policy acquisitions.

44. Abacus has realized trade spreads (gains-on-sale for policies sold) in excess of 20% for each of the last six fiscal quarters. These gains do not reflect a particular method for calculating life expectancy; rather, they reflect Abacus's competitive edge and ability to optimize premium schedules by identifying the true cost of insurance for a particular policy, thereby reducing cash outflows and maximizing upside.

45. Abacus's trade spreads also reflect the high demand for policies in the tertiary market by investors who are unable or unwilling to overcome the high barriers to entry in the secondary market. Life settlements providers like Abacus undertake substantial costs related to licensing, origination, and marketing so that they may purchase policies directly from the insured persons. The trade spreads reflect the premium investors are willing to pay for Abacus's access to this market.

46. As discussed in further detail below (*infra* ¶¶ 60–67), Abacus's valuation of policies it holds on its balance sheet reflects its historical success in realizing these trade spreads in the tertiary market. Just like Abacus, the sophisticated institutional investors that buy policies from Abacus use an array of LE providers and take LEs into account in their own way. The prices reached between the willing seller (Abacus) and each willing buyer are

the product of all of the factors discussed above (*supra* ¶ 36), from the perspective of both sides of the deal.[1]

47. Again, Defendants are keenly aware of these market dynamics, and the unimportance of individual LE providers with respect to those dynamics, because they are Abacus's largest competitor in the tertiary market.

## II. ABACUS AND COVENTRY DO BUSINESS IN VERY DIFFERENT WAYS.

48. Coventry and Abacus both fill the intermediary role of buying policies on the secondary market and trading them on the tertiary market. But each company's practices shed light on the current state of the life settlements space and expose Defendants' motives for attacking Abacus.

### A. Coventry's Checkered History

49. Coventry claims on its website to have coined the term "life settlement" in 1998. It has also garnered more than its fair share of negative attention for how it has sourced the life insurance policies it purchases.

50. Coventry generates profits well above industry standards in many cases by paying policyholders less than a fair price for their policies.

[1] If, as Coventry has suggested: (i) the LE was a determining factor in price; (ii) one LE provider was consistently wrong in one direction (say, if their LEs were too short); and (iii) Abacus relied on that LE provider to value either the policies on its book or a large portion of the policies it sought to trade, then Abacus would be systematically overpricing its policies relative to fair market value; it would not be able to find sophisticated repeat trading partners, and its business would be shrinking. But because none of the preceding conditions is true, Abacus is only getting larger and gaining more market share.

Coventry has bragged to investors that it can realize 40–60% profits on a given policy, up to three times the average Abacus realizes.

51. Relying on these high profit margins, Coventry grew to dominate the secondary market. In 2022, Coventry and its wholly-owned affiliate Life Equity LLC bought 52.1% of the life insurance policies sold by policyholders in the United States.

52. This growth did not come without criticism, or, indeed, legal exposure. In 2006, the Office of the New York Attorney General accused Coventry of bid-rigging and aiding and abetting breaches of fiduciary duty perpetrated by insurance brokers against their clients. *See* Complaint, *New York v. Coventry First LLC, et al.*, Index No. 0404620/2006, 2006 WL 6199670 (N.Y. Sup. Ct. Oct. 26, 2006).

53. Coventry has also been a leading player in the so-called "stranger-originated life insurance" ("STOLI") space, which refers to the practice of a lender providing up-front financing of life insurance policies for seniors who could not otherwise afford to obtain them, in exchange for the lender taking control of the policy after a reasonable interval. STOLI policies have been highly controversial.

54. As discussed in a 2010 report from the SEC's Life Settlements Task Force, STOLI policies are "inconsistent with the historical social policy of insurance, which is to protect families and businesses from potential

economic hardship caused by untimely death of the insured," "may encourage insurance fraud," and "could make life insurance more expensive."[2]

55. Moreover, several courts across the country have expressly held that STOLI policies, and particularly ***Coventry's STOLI policies***, are "***illegal***" insofar as they allow a third party to take out an insurance contract for a life in which they do not have an insurable interest. *Est. of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186, 1196–98 (11th Cir. 2021). In *Estate of Malkin v. Wells Fargo Bank,* the Eleventh Circuit explicitly upheld a lower court ruling invalidating an insurance policy, the circumstances of which "[did] not show [the insured], [the broker], and Coventry intended to purchase the Policy for lawful insurance purposes. . . . Rather, the arrangement appears to . . . create an illegal wagering contract by which Coventry gambled on [the insured's] life and from which Coventry and [the broker] profited." *Id.* at 1196–97.

**B. Abacus Empowers Its Clients And Its Investors.**

56. Abacus has built its business on a fundamentally different model than Coventry's. Rather than buying low from seniors and selling high to investors, Abacus is developing a comprehensive suite of products and solutions around the life settlement asset to serve a variety of stakeholders. As the only publicly-traded life settlements company, Abacus functions as

---

[2] Life Settlements Task Force, Staff Rep. to U.S. Sec. & Exch. Comm'n 12–13 (2010), https://www.sec.gov/news/studies/2010/lifesettlements-report.pdf.

both an originator and market maker of this asset; it also publicly discloses its valuation methodologies and financial statements.

57. Abacus has purchased $10 billion in face value of policies since 2004. Abacus Global Management, Inc., Annual Report (Form 10-K), at 2 (Mar. 28, 2025) ("Abacus 2024 Form 10-K"). In 2023, the Company went public through a de-SPAC transaction with East Resource Acquisition Company. The next year, Abacus purchased 22% of the face value of policies sold on the secondary market.

58. In addition, on September 7, 2023, a newly-organized Abacus affiliate, ABL Longevity Growth and Income Fund (the "Fund"), filed a preliminary prospectus with the SEC, seeking approval to launch an interval fund—a specialized type of investment company that continually offers shares for purchase, but only permits repurchase or sale of shares on a quarterly basis. The Fund launched on July 13, 2026 after filing its final approved prospectus and registration statement. ABX Longevity Growth & Income Fund, Notice of Effectiveness (July 13, 2026); ABX Longevity Growth and Income Fund, Prospectus (July 13, 2026); ABX Longevity Growth and Income Fund, Form N-2 (June 29, 2026).

59. The Fund is purpose-built to act as a buyer on the tertiary market. Unlike Abacus Life Solutions, the Fund does not intend to participate in secondary market purchases, and will not reach out to

policyholders directly, nor will the Fund buy any policies from any Abacus affiliate (which is expressly prohibited by the Investment Company Act of 1940).

## III. ABACUS AND ITS AFFILIATES MAKE CLEAR AND CONSISTENT DISCLOSURES REGARDING THEIR VALUATION METHODOLOGIES.

### A. Abacus Uses A Fair Value Approach.

60. Beginning in October 2024, Coventry launched a campaign falsely claiming that Abacus misrepresents the value of policies on its balance sheet. Coventry's central accusation—that Abacus uses Lapetus life expectancy estimates to fraudulently inflate the value of policies on Abacus's books—is demonstrably false, as Abacus's public disclosures make clear.

61. For one thing, Abacus has never stated that it relies on a single life expectancy provider. For another, ***as it has repeatedly disclosed, Abacus does not use a life expectancy valuation model to value the policies on its balance sheet*** **(instead, it uses tertiary market-based fair value accounting pursuant to GAAP)**.

62. The parties with whom Abacus trades do not price policies based on a single LE—they take into account the broader set of inputs set forth above (*supra* ¶ 36).

63. For the vast majority of its policies, Abacus realizes revenues from trading the policies to investors, not from claiming the death benefit.

The trade value of the policy is far more salient than the anticipated cash flows from holding a policy until maturity.

64. Therefore, the fair value calculation Abacus actually uses reflects the value it could reasonably expect to capture in a subsequent transaction, and the methodology does not presume that such transaction would be conducted using a Lapetus LE.

65. As of 2025, over 99% of the policies on the Company's balance sheet were valued using the fair value method, which dictates "fair value as ***an exit price*** representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date." Abacus 2024 Form 10-K at 80 (emphasis added).[3]

66. The annual report reminds investors (and competitors, should they be reviewing each and every filing, as Buerger claims he does) that "fair

[3] Abacus values the life insurance policies on its balance sheet in accordance with ASC 325-30, *Investments in Insurance Contracts*. As explained in the Company's most recent annual report, dated March 13, 2026:

> For all policies purchased after June 30, 2023, the Company accounts for owned life settlement policies using the fair value method. There have been no changes to the fair value methodology since June 30, 2023, but we have expanded our disclosures. Prior to June 30, 2023, the Company elected to use either the fair value method or the investment method (cost, plus premiums paid). The valuation method is chosen upon contract acquisition and is irrevocable.

Abacus 2025 Form 10-K at 92–93.

value is a market-based measurement," which "reflect[s] assumptions about what factors market participants would use in pricing life settlement policies." *Id.* Market participants use an array of internal and third party life expectancy estimates, and apply their own perspectives to each.

67. Since Abacus became a public company, Grant Thornton and KPMG, both reputable public accounting firms, have audited the Company's consolidated financial statements and have issued unqualified opinions, including as to Abacus's valuation methodology.

## IV. DEFENDANTS SPREAD FALSEHOODS ABOUT ABACUS.

68. The trigger for Defendants' defamation campaign occurred when Abacus went public on July 3, 2023. A publicly-traded life settlements company like Abacus, free of scandal, posed an existential threat to Coventry. Since that time, Coventry has pursued an array of strategies to convince the market of five lies:

a. Lapetus life expectancies are inaccurate;

b. Lapetus deliberately underestimates life expectancies;

c. Abacus has an improper relationship with Lapetus;

d. Abacus chose to use Lapetus LEs knowing that those LEs were inaccurate so that Abacus could misstate the fair value of policies on its balance sheet; and

e. Abacus's unrealized and realized gains are the product of fraud, and the Company's stock is overvalued because of its reliance on Lapetus.

69. As set forth below (*infra* ¶¶ 71–130), Defendants' efforts to discredit Lapetus, which are intended to harm Abacus, have been brazen, persistent, and defamatory.

70. ***First,*** Coventry executives approached Abacus's auditor, Grant Thornton. ***Second***, Coventry and Buerger made numerous statements discrediting Lapetus that were aimed at harming Abacus. ***Third***, both before and during the campaign against Abacus via Lapetus, Coventry intervened with state and federal regulators, calling those agencies' attention to Defendants' false claims. ***Fourth***, Coventry gave interviews to investors recycling the same claims that Abacus was overvaluing its policies intentionally, using life expectancies it knew to be incorrect.

### A. Coventry And Buerger Interfered With Abacus's Auditor, Grant Thornton.

71. Just a few weeks after Abacus went public and disclosed Grant Thornton as its auditor, Coventry's Chief Financial Officer Scott Cohen reached out to Grant Thornton to discuss [redacted]

72. Internal Grant Thornton communications show that Mr. Buerger "[redacted] in the late summer of 2023, at the same

time Grant Thornton was doing its initial analysis of Abacus's valuation methodology after the Company went public.

73. Unsatisfied by its efforts to bring down Abacus by bringing down Lapetus, Coventry took its defamation campaign a step further. On information and belief, a week after Abacus's Lapetus disclosure in the Fund's N-2 on February 2, 2024, Coventry approached a partner at Abacus's former auditor, Grant Thornton. Coventry again tried to influence Grant Thornton's audit of Abacus's audited financials by disseminating the same lies that were peddled to other third parties (discussed *infra* ¶¶ 74–130), including the false and misleading statements contained in Coventry's own study of Lapetus's LEs that Lapetus LEs are short—with the implication that they are inaccurate—and that those inaccurate LEs distort Abacus's valuations.

**B. Defendants Attack Lapetus to Harm Abacus.**

74. Since that first outreach to Grant Thornton, Defendants have been spreading false statements that Abacus owns Lapetus and that Abacus uses Lapetus to obtain "favorable" LEs, comparing Abacus to a Ponzi scheme.

75. Defendants have also been looking for a pseudo-scientific way to discredit Lapetus with academic-sounding "studies." But this was proving more difficult than they would have hoped; because Lapetus only began assessing cases in 2019, most of the LEs it had issued pointed to expected

death dates still in the future, and made predictions about people who were still alive in 2023.

76. Indeed, in October of 2023, Coventry's only actuary told Mr. Buerger and other Coventry executives that [redacted] in the pool of Lapetus LEs. He also said [redacted] of Lapetus's accuracy in predicting life expectancy.

77. Over the next six months, Coventry did not obtain any of the key data it needed to make conclusive statements about Lapetus's accuracy, nor did enough time pass to determine whether Lapetus had missed on a meaningful number of its predictions. Nonetheless, Buerger assured his team that [redacted] (emphasis added).

78. Working from incomplete data, and without insight into which of the measured lives had actually ended, Coventry developed an "internal review" of Lapetus's life expectancy estimates purporting to show that Lapetus's estimates were [redacted]

79. [redacted]

[redacted]

80. [redacted].

81. On May 7, 2024, Buerger called Dr. Jay Olshanksy, the Chief Scientist and co-founder of Lapetus.

82. Buerger expressed his view that Lapetus LEs were shorter than others in the industry, and specifically expressed his concern that [redacted]

83. Buerger asked Dr. Olshanksy [redacted]

84. Upon information and belief, Buerger contacted other LE providers with similar requests, and those other providers agreed to lengthen their estimates, which gave Coventry and Buerger an "independent" estimate to justify paying seniors lower prices for their policies.

85. But Lapetus was different. Dr. Olshansky, a university professor and nationally-recognized expert who has been publishing on the topics of longevity and aging for three decades, responded that Lapetus had to maintain its independence from its clients and its clients' investors.

86. Apparently, Buerger did not get what he wanted from Lapetus or Dr. Olshansky. So, on May 8, 2024, the same day that Buerger spoke to Dr. Olshansky, Coventry published an "internal review" of Lapetus's life expectancy estimates purporting to show that Lapetus's estimates were [redacted]

87. Again, Coventry's only actuary said it was not possible to do an independent analysis of Lapetus at the time Coventry dropped this bombshell, and years later he testified that the May 8, 2024 Coventry analysis "[redacted] K. Desisles Tr. at 78:5-7. Nonetheless, Coventry's May 8, 2024 study concluded that its "[redacted][4]

[4] *Coventry Study Finds Lapetus Life Expectancies are Shorter than Competitors in 85% of Cases Reviewed*, Coventry (May 7, 2024), https://www.coventry.com/coventry-study-finds-lapetus-life-expectancies-are-shorter-than-competitors-in-85-of-cases-reviewed/.

88. Then, in July 2024, Coventry commissioned an "independent study," performed by two professors to "replicat[e]" and "confirm[] the results of [Coventry's] internal analysis." Coventry's core claim is that Lapetus LEs are shorter for 85% of underwritten cases, and that the average difference is 31 months. Coventry went on to opine [redacted][5] [redacted]

89. Despite Coventry's harmful and untrue statements that using Lapetus LEs could lead to "investor losses," it continued purchasing LEs from Lapetus.

90. On October 24, 2024, Buerger spoke at the Life Insurance Settlement Association ("LISA") Life Settlement Conference, in Miami. The occasion for his remarks was discussion between Buerger and Dr. Olshanksy, CEO of Lapetus, held in front of an audience of life settlements industry professionals.

91. In a video of the presentation available on YouTube, Buerger doubled down on the claims in Coventry's "internal review," stating, among

[5] *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, Coventry (July 22, 2024), https://www.coventry.com/coventry-releases-peer-review-of-lapetus-life-expectancy-study/.

other things, that Lapetus systematically underestimated life expectancy. Buerger repeatedly challenged Lapetus's work, but when asked by Dr. Olshansky to review the underlying data together, refused that offer.[6]

92. Specifically, Dr. Olshansky presented data on the over 4,000 LEs Lapetus had generated for Coventry, and showed that for ***over*** 95% of the LEs Lapetus had provided to Coventry as of that date, Lapetus had ***overestimated, not underestimated***, life expectancy. In such cases, the individual insured passed away earlier, not later, than estimated, and Lapetus's LE estimate was ***too long***, rather than too short, as claimed by Buerger.

93. By way of response, Buerger claimed that he did not understand what Dr. Olshansky was telling him, but remained firm in his belief that Lapetus life expectancies were so incorrect that they posed an "existential threat" to the life settlements industry.

94. When asked about Abacus, Buerger said "I don't think it's appropriate . . . for me to comment on Abacus . . . ." But then he could not help himself; he began talking about a valuation "using Lapetus at a discount rate of **21%**." Buerger stated that Coventry does not "use a discount of **21%, because 21%, we all know** . . . **[is] not realistic**." (emphasis added).

---

[6] *See* Opening Keynote Fireside Chat Between Buerger and Dr. Olshansky at the 30th Annual Life Settlement Conference, YouTube (Oct. 25, 2025), https://youtu.be/-xwCWTM33VY?feature=shared&t=4482 (the "Fireside Chat").

95. Buerger then stated that "fair market value is grossly overstated, even if you use **21%**" based on his "knowledge of the market." (emphasis added).

96. Buerger did not pull 21% from thin air, and it was not meant to be understood in the room as a hypothetical. He was talking about Abacus.

97. As Buerger would later admit, he reads every Abacus SEC filing. Thus, he picked 21% during his diatribe because Abacus had disclosed a 21% discount rate in its fair value calculation in its last quarterly filing before the LISA conference:

> For policies carried at fair value, the valuation is based on Level 3 inputs that reflect our assumptions about what factors market participants would use in pricing the asset or liability, such as life expectancies and cash flow discount rates. The inputs are developed based on the best available information, including our own data. The valuation model is based on a discounted cash flow analysis and is sensitive to changes in the discount rate used. ***The Company utilized a blended average discount rate of 21% and 21% for policy valuations*** at June 30, 2024 and at December 31, 2023, respectively, which is based on economic and company-specific factors. The Company re-evaluates its discount rates at the end of every reporting period in order to reflect the estimated discount rates that could reasonably be used in a market transaction involving the Company's portfolio of life settlements.

Abacus Global Management, Inc., Quarterly Report (Form 10-Q) at 22 (Aug. 12, 2024) (emphasis added).

98. Because Buerger did not tell the audience at the LISA Conference that Abacus's August 12, 2024 disclosure regarding its methodology was grounded in market prices, his suggestion that Abacus was "using Lapetus at a discount rate of 21%" was false and misleading. Buerger knew that his

statements were incomplete, having read every one of Abacus's filings, and thus spoke with, at a minimum, reckless disregard for the truth of the metrics Abacus actually uses to generate its fair value calculation.

99. Buerger also failed to explain that the paragraph he pulled the 21% number from makes clear that Abacus does not "use Lapetus" to derive its discount rate; rather, the filing Buerger clearly read before the LISA conference states that the discount rate used by Abacus "reflect[s] the estimated discount rates that could reasonably be ***used in a market transaction*** involving the Company's portfolio of life settlements." *Id.* (emphasis added).

100. No one with Alan Buerger's four decades of experience in the secondary and tertiary markets for life insurance policies would read Abacus's public filings and have any reasonable basis to say that Abacus (and every one of its trading partners) was "using Lapetus" to define its discount rate. Therefore, Buerger's claims that Abacus's audited discount rate is purely based on Lapetus LEs were objectively unreasonable under the circumstances.

101. Nonetheless, after saying that "fair market value is grossly overstated, even if you use **21%**"—clearly referring to Abacus—Buerger made another false claim: the "$250 million dollars out there that investors have put up" with Abacus "is dead."

102. He continued, "and I worry that it's going to be $300, $400, and $600, and $1 billion. With Mutual Benefits, it was $800 million. . . . It's gonna be awful for us, all of us. The longer it takes, and the bigger it gets, the worse it'll be."[7] By referring to Mutual Benefits Corporation ("MBC"), Buerger implied Abacus was similar to a company that conducted one of the largest Ponzi schemes in Florida's history, and whose CEO had been sentenced to 20 years in prison.

103. To add a veneer of legitimacy to its attacks on Lapetus and Abacus, in December 2024, Coventry commissioned a "comprehensive new study" purporting to show that Lapetus's life expectancy estimates were far shorter than other providers based on Lapetus's actual-to-expected deaths ratio (the "A-to-E Study").[8] Again, Coventry failed to disclose about this purportedly objective analysis is that *Coventry paid* the two professors to validate the conclusions in Coventry's predetermined narrative, which Coventry had already set out in its May 2024 "internal review" and paid the two professors to "confirm[]" in July 2024 in an "independent" review.[9]

---

[7] *See* Fireside Chat, *supra* note 6.

[8] *Flaws in Lapetus Life Expectancy Estimates Exposed in New Study Following Olshansky-Buerger Debate at LISA Conference*, Coventry (Feb. 10, 2025), https://www.coventry.com/flaws-in-lapetus-life-expectancy-estimates-exposed-in-new-study-following-olshansky-buerger-debate-at-lisa-conference; *see also* Daniel Bauer & Nan Zhu, *Lapetus Actual-to-Expected Deaths Study* (Dec. 2024), https://www.slideshare.net/secret/9fjnG9zXIx1jM8?ref=morpheus-research.com.

[9] *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, *supra* note 5.

104. The actual-to-expected ratio provides a snapshot of the actual deaths among a group of lives divided by the number of deaths predicted as of that date by a life expectancy provider. So, if Lapetus had predicted on January 1, 2024 that 100 people would be dead, and only 67 of them were verified to be dead, its A-to-E would be 67%. The A-to-E ratio, though widely accepted, must be treated with some caution; on a long enough timeline, every provider will have an A-to-E ratio of 100% (a perfect score), and if a sample size is too small—under 1,000 expected deaths, according to Coventry's own actuary— or not enough time has passed since the date of the estimate, then the A-to-E ratio cannot confidently measure accuracy of a life expectancy provider.

105. Coventry's A-to-E Study dispensed not only with caution but also with truth. [redacted]

106. Coventry published a press release stating only the high-level "conclusions" of its "new study," but did not make the details of the study public.[10] Coventry hides the details underlying its attacks on Lapetus behind a click-through agreement that requires anyone who wants to see the various Coventry studies to agree that they will only access it "for informational purposes."[11] And even if one fills out the form, it is only to "Submit [a] Request," which requires the interested party to provide its name, email address, phone number, company, publication, and which document the party is interested in.[12] There is no guarantee that, once the user forfeits the information, they will actually gain access to the various Coventry studies. This gatekeeping mechanism allowed Coventry to monitor who was interesting in the studies and to control who gained access to them.

107. [redacted]

---

[10] *Flaws in Lapetus Life Expectancy Estimates Exposed in New Study Following Olshansky-Buerger Debate at LISA Conference*, *supra* note 8.

[11] *Request Lapetus Life Expectancy Study Information*, Coventry, https://www.coventry.com/research/ (last visited September 17, 2025).

[12] *Id.*

[redacted]

108. Following Defendants' filing of a lawsuit against FOIR, which sought to force Lapetus to disclose its proprietary information, Buerger contacted [redacted]

### C. Coventry Makes False Statements to Regulators About Abacus.

109. In parallel to its attacks on Lapetus, Coventry was working to create regulatory headaches for Abacus with the same false claims.

110. [redacted]

[redacted] and, as Buerger would echo later, his lawyers expressly compared Abacus to the fraud perpetrated by MBC over twenty years ago.

111. [redacted].[13] Defendants have no reason to think anyone at Abacus (or Lapetus, for that matter) is arbitrarily assigning life expectancies.

112. The SEC took no action on the January 2024 letter.

113. On April 30, 2024, Coventry's General Counsel, Amy Welsh, wrote letters to the Florida Department of Financial Services and FOIR, claiming that Abacus "[redacted] Acting at Buerger's direction and on behalf of Coventry, [redacted]

---

[13] According to the SEC:

> At no time did either doctor ever review any of the viators' medical records to confirm their diagnosis or establish an independent estimated life expectancy, as was being represented to investors. Instead, Mitchell and Escobar merely issued fraudulent life expectancy letters and/or affidavits drafted by MBC's employees which contained life expectancy figures that had already been designated by J. Steinger. The life expectancy estimates ostensibly issued by Mitchell and Escobar account for about 65% of MBC's current active policies.

Complaint for Injunctive & Other Relief, *SEC v. Mutual Benefits Corp., et al.*, No. 04-cv-60573 (S.D. Fla. May 3, 2004), Dkt. No. 1 ¶ 38.

[redacted]

114. [redacted] And again, the regulator did not credit her baseless accusations that Abacus was engaged in a massive fraud.

115. On November 1, 2024, nine months after the Fund first mentioned Lapetus in its registration statement, but within days of Buerger's public comments at the LISA Conference (*see supra* ¶¶ 90–102), the SEC curiously and suddenly issued a Comment Letter on Abacus's Form S-1/S-3 filing, asking the Fund to "provide a detailed explanation of any relationship and disclose the extent to which you have relied upon Lapetus or any of its co-owned entities for valuation of life insurance policies."[14]

116. On information and belief, the SEC issued the November 1 comment letter because Coventry contacted the SEC in October of 2024 and urged the SEC to inquire further into Abacus's disclosures about Lapetus.

---

[14] *See* Abacus's Resp. to SEC Nov. 1, 2024 Comment Letter (Nov. 4, 2024), https://www.sec.gov/Archives/edgar/data/1814287/000162828024044861/filename1.htm.

117. In the November 1 comment letter, the SEC asked pointed questions about (1) whether Abacus or its officers and directors had an interest or relationship in Lapetus and (2) "[i]f Lapetus is a related party," what limitations that placed on Abacus's ability "to value life insurance policies under any relevant state laws."[15] These questions from the SEC largely mirror the biased conclusions contained in Coventry's internal study. *See supra* ¶¶ 86–88, 103–05.

118. In any event, Abacus disclosed the truth to the SEC, investors, and the public that Abacus and Lapetus are not related parties, and that Abacus complied "with all relevant state laws." Abacus also disclosed that with respect to Abacus's valuation process, "Lapetus's role involves generating life expectancy reports, which [Abacus] incorporates as one of multiple inputs into its valuation process." Indeed, Abacus further disclosed that "it does not rely solely . . . on Lapetus's life expectancy reports." And critically, "Lapetus does not engage in the valuation of policies" thus, Abacus's "use of Lapetus as an input" is "limited and immaterial to [Abacus's] overall valuation process."[16]

---

[15] *Id.*

[16] *Id.*

119. After reviewing these fulsome disclosures, the SEC did not raise any concerns about Abacus's valuation methodology or the relationship between Lapetus and Abacus again.

120. Long after this litigation commenced and Coventry was forced to halt its efforts against Abacus, the SEC approved the Longevity Fund, which launched on July 13, 2026, nearly three years after first filing its S-1. This delay is best explained by Coventry's improper and relentless intervention with the SEC.

### D. Coventry Broadcasts Its View Of Abacus To A Wider Audience, Telling Market Analysts And Institutional Investors That Flaws In The Lapetus LE Indicate That Abacus "Will Implode" "Soon."

121. Coventry continued its defamatory campaign when, on May 22, 2025, Buerger conducted an interview with Tegus, a subsidiary of AlphaSense, Inc. Tegus is a business intelligence and expert network firm that provides one-on-one interviews with industry experts to investors and subscribers.[17]

122. Tegus subscribers pay $20,000 or more annually to get access to interviews held with "industry experts" on various topics of interest. The interviews are requested by particular analysts or investors who may be interested in the sector or company discussed in the interview.

[17] *See Tegus Expert Insights*, AlphaSense, https://www.alpha-sense.com/platform/expert-insights/ (last visited Aug. 15, 2026).

123. Tegus's subscribers include Fortune 500 companies, world-renowned private equity firms, hedge funds, and other institutional investors. The client that requests the specific interview gets priority on the expert information, but then these interviews are transcribed and the transcripts are made available to Tegus's subscriber network after a waiting period.

124. Therefore, experts and industry insiders that sit down with Tegus or a Tegus client for an interview know that their words will be transmitted to market-movers, including the blue-chip financial institutions that have played a part in Abacus's success over the past 20 years.

125. In the May 22 Tegus Interview, Buerger spoke almost exclusively about Abacus. After bragging that he had made Abacus his "***pet project***" and "know[s] every public document" Abacus has filed, Buerger doubled-down on his and Coventry's defamatory remarks about Abacus, Abacus's use of Lapetus, Abacus's valuation process, and even the financial health of Abacus as a company. Indeed, Buerger's false and misleading statements in the Tegus Interview include:

a. "***If you're a public company***, you're trying to generate steady progress in your quarterly earnings like any public company. ***The temptation that creates is to manufacture earnings***, which with a Level three asset is an easy temptation to fulfill."

b. "[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore." This is contradicted

by the fact that Coventry itselfwas trying to sell policies purchased on the secondary market with the Lapetus LE, less than a year before Abacus brought its initial complaint in June 2025.

c. "As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q." Buerger's suggestion is that Abacus is engaged in dishonest accounting, and that it ***only*** generates revenue through unrealized gains.

d. "There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements. There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and all of them have gone bankrupt." Buerger is clearly implying that Abacus, the only publicly-traded life settlements company, will go bankrupt, notwithstanding the Company's record financial success in the year leading up to his interview.

e. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "[n]otwithstanding that they do say that, it is just not accurate." His implication was that Abacus lied in its 2024 Annual Report, where it discussed the ongoing growth of its "hold" portfolio made possible by increased access to capital. Abacus 2024 Form 10-K at 7–8.

126. And perhaps one of Buerger's most brazen lies and statements to sow doubt about Abacus: "[I]t's just a matter of time before [Abacus] implode[s]."

127. Buerger knew these assertions were wrong, or at the very least, recklessly failed to apprise himself of the truth. Indeed, Buerger even conceded that the fair value approach Abacus actually uses to value its policies is the correct one: "[W]e"—referring to Coventry—"do a fair value

calculation because ***I want to know what my policies are worth.***" The implication that Abacus does anything else is patently false, as anyone familiar with Abacus's disclosures would know.

128. While it is not yet known why Buerger was selected as a so-called industry "expert" on Abacus, it is clear that Buerger's sole purpose in giving the interview was to sow doubt about Abacus to industry leaders, experts, and investors, including Abacus's own investors. Indeed, Buerger knew or should have known the content of his interview with Tegus would be published and broadcasted to all of Tegus's subscribers.

129. The investor whom Buerger spoke with directly during his May 22 interview told Tegus immediately following his talk with Buerger that he was no longer interested in investing in Abacus.

130. On June 4, 2025, at 8:00 a.m. ET, 90 minutes before the market opened, a transcript of the May 22 Tegus Interview was made available to all of Tegus's subscribers. Indeed, on the evening of June 4, Jay Jackson (the CEO of Abacus) received an unsolicited email from a third party attaching the Tegus Interview transcript and informing Mr. Jackson that Buerger's interview about Abacus was "getting circulated" among key investors, including investors with large stakes in Abacus.

## V. MORPHEUS PUTS OUT THE SHORT REPORT BASED ON DEFENDANTS' LIES.

131. Three hours after institutional investors, including some with large positions in Abacus stock, received access to the Tegus Interview, Morpheus, a "research" group that appears to be a spin-off of the now-defunct Hindenburg Research group led by Nathan Anderson,[18] published the Short Report, a false, scathing, and lengthy exposé purporting to reveal Abacus's accounting fraud and "fake revenue" by undervaluing life expectancy estimates.[19]

132. While purporting on June 4, 2025 to base its Short Report on "extensive research," Morpheus now admits that "[redacted]

133. In particular, Morpheus, an outsider to the life settlements industry and a good proxy for the trading public, understood that Coventry's [redacted] Morpheus published the Short Report in direct response to a shift

[18] *See* Nate Anderson (@NateHindenburg), X (Mar. 14, 2025, at 1:13 P.M. ET), https://tinyurl.com/dravzjzv ("This is a great team that I have known for a long time and includes some Hindenburg alumni.").

[19] *See Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die*, Morpheus Research (June 4, 2025), https://www.morpheus-research.com/abacus/.

in the public conversation about Abacus, which was brought about by Alan Buerger, [redacted] The research Morpheus did beyond those statements, the short-seller now admits, simply [redacted]

134. In polluting the public square enough to convince Morpheus of their false narrative, Defendants finally found an amplifier for the lies that had failed to convince the markets for nearly two years. In fact, the Short Report includes several direct quotes from Buerger, and one of its "sources" for the Short Report includes "Abacus competitors," a.k.a. Coventry.

135. Repeating the claims from Coventry and Buerger, the Short Report attacks Abacus's purported relationship with Lapetus; falsely claims that Abacus uses Lapetus to distort the value of its balance sheet; and falsely claims that Abacus will implode just the way MBC did.

136. Notably, none of the market analysts familiar with Abacus—and whom Coventry was unable to persuade—believed the falsehoods in the Short Report. In an extraordinary series of third-party rebuttals, Bernstein Research called the Morpheus claims "misleading"; TD Securities stated that "ABL's model . . . would seem to argue against overvaluation of policies"; and Piper Sandler called the reaction to the Short Report "overdone."[20] These

[20] *Abacus Refutes Misleading Balance Sheet Claims With Independent Third-Party Actuarial Valuation*, Abacus Global Management, Inc. (June 10, 2025),

rapid reactions—*i.e.*, the truth—help explain why Coventry has had to be so underhanded in its effort to slow Abacus's rise in the life settlements world.

137. Despite the claims in the Short Report, Abacus received strong support from market analysts that have paid close attention to the Company's increasing success in recent years.

138. But many investors and traders are less familiar with Abacus, since Abacus does not have a regular media presence or a way to control the perception of its company in the public. Those investors reacted negatively to the false and misleading statements contained in the Short Report, as well as Buerger's comments in the Tegus Interview released on the same day.

139. Abacus's stock dropped over 20% on June 4, 2025, causing the Company to lose around $157 million in market capitalization in a single trading session. By June 27, Abacus's market capitalization had fallen by approximately $287 million, for a total loss of roughly 39%.

## VI. DEFENDANTS' FALSE CLAIMS CAUSE ABACUS IMMEDIATE REPUTATIONAL AND FINANCIAL HARM.

140. After half a dozen attempts to find an effective attack on Abacus, it appears Coventry has finally dealt Abacus substantial reputational harm through the Tegus Interview and the Short Report.

---

https://ir.abacusgm.com/news-events/press-releases/detail/163/abacus-refutes-misleading-balance-sheet-claims-with-independent-third-party-actuarial-valuation.

141. Indeed, since Defendants' statements were published, dozens of shareholders have contacted Abacus about the false and misleading accusations. And, although the Short Report contains numerous claims that are not obvious repetitions of Defendants' other attacks, the incoming calls are only concerned with Lapetus and valuation issues, and specifically based on the premises that (i) Abacus uses Lapetus to value insurance policies; and (ii) valuations based on Lapetus LEs should be discounted.

142. In other words, it is the false claims by Buerger and Coventry, and nothing else in the Short Report, that has materially altered the market's view of Abacus as a company.

### A. Defendants' False Claims Taint Abacus In The Eyes Of Servicing Providers And Investors.

143. Abacus has lost client and customer relationships as a result of the Short Report. For example, a distributor network from whom Abacus originates policies through broker and agent network paused its listing of Abacus as a life settlement provider for several weeks following the change in market perception.

144. Institutional investors have also paused or broken off their interest in Abacus funds. For example, the day before the Short Report issued, Abacus was in discussions with an intermediary representing a multi-trillion-dollar investment company to form a fund-of-one with a minimum

duration of five years and a minimum investment of $100 million. Abacus Asset Group, a subsidiary of Abacus, would have managed the fund for a flat 1.5% annual management fee, and the fund's assets would be policies purchased in tertiary market transactions from Abacus Life Solutions (d/b/a Longevity Market Assets). The day after the Short Report was issued, the investment company broke off the talks, causing Abacus to lose out on (i) at least $7.5 million in management fees; and (ii) at least $18 million in gain-on-sale on the tertiary transactions, based on the Company's historical trade spreads.

145. Likewise, Abacus saw a decline in fundraising from one of its main sources, a distributor that routes credit union interest to Abacus-managed funds. As recently as July 2026, this distributor continues to have to answer questions from potential investors in Abacus-managed funds due to the Defendants' statements being widely available online.

146. More generally, the Short Report has been discussed at recent investor conferences, and Abacus and its subsidiaries and affiliates are losing leads as a result.

147. For example, in the week after the Short Report was published, a portfolio manager at a major asset management firm told the head of Abacus investor relations that the Company would "never recover" from the stock drop following the Report.

148. Defendants' false and defamatory statements caused significant damage to Abacus's reputation and stock price and caused it to suffer financial harm by being forced to incur expenses to respond to the statements, including professional fees such as legal and accounting costs.

### B. The Defamation And Accompanying Stock Drop Interrupt Abacus's Deal Flow And Impede Its Ability To Use Its Stock To Fund Its Operations.

149. As Abacus grows, it always looks for potentially accretive strategic transactions to diversify its revenue streams and expand its reach into new, but complementary, markets and verticals. And, like any public company, Abacus also has the option of authorizing a supply of stock (its "shelf") and then issuing it to raise funds to power its operations.

150. To negotiate and close these types of transaction, Abacus relies on its available balance sheet cash, its borrowing capacity, and its shelf as forms of consideration. Deals that use stock as some or all of the consideration depend upon the company's reputation in public markets.

151. When the value of the traded stock drops, so does the value of the shelf stock. And the shelf stock is less useful as currency for capital raising and potential transactions when the market has diminshed faith in Abacus's reputation and business. An issuance off the shelf tends to trade at a discount for a smaller public company like Abacus, and an issuance in the midst of Coventry's defamatory campaign would have driven the price of the

stock even lower, such that any fundraising or acquisition Abacus might achieve through an issuance of stock or a stock-based acquisition would likely be dilutive of the value of the stock as a whole.

152. On the date of the Short Report, when Defendants' claims reached a wide audience—as they could have reasonably expected—Abacus had more than one deal in progress which was negotiated on the basis that Abacus's stock would constitute the majority of the purchase consideration. It also had plans to execute further issuances from its shelf. Abacus has not been able to engage in M&A activity or capital raises along the lines that it did in 2024, thanks to Defendants' defamatory statements.

153. While Abacus continues to explore strategic M&A transactions using its stock as consideration, the delay has resulted in lost revenue opportunities entitling Abacus to compensatory damages in an amount to be proven at trial. Abacus has also not been able to use its shelf as a fundraising tool. Those lost opportunities and the lost utility of the shelf are the direct result of Defendants poisoning the market.

## VII. COVENTRY AND BUERGER PUSH THEIR BIG LIE DIRECTLY TO ABACUS'S INVESTORS.

154. But reputational harm and lost opportunities are not enough for Coventry and Buerger. Since Defendants found an amplifier for their false and misleading statements (*i.e.*, when the Short Report was published),

***Buerger has been directly contacting Abacus's prospective and current investors***, recirculating the same misleading Coventry studies, and instructing them on what questions to ask Abacus to challenge Abacus's valuation practices.

155. For example, on June 17, 2025, Buerger [redacted] Buerger's intent was clear: sow doubt about Lapetus to sow doubt about Abacus. And his goal was clearer: convince the investor to either withdraw its investment or avoid investing further.

## VIII. DEFENDANTS TIGHTEN THEIR STRANGLEHOLD ON THE INDUSTRY BY DRIVING LAPETUS OUT OF BUSINESS.

156. Over the 18 months that Defendants were disparaging and undermining Lapetus and Dr. Olshansky, Lapetus's business dwindled.

157. Controlling 50% of the life settlements business, and demonstrating a newfound animosity toward Lapetus LEs, Coventry was

able to force brokers and tertiary market participants to seek LEs from one of the providers that had folded to its pressure.

158. Since the filing of the initial complaint, Defendants finally succeeded in destroying Lapetus and Dr. Olshansky's good name: On August 18, 2025, Lapetus announced that it would wind down and cease all operations. And, as of September 1, 2025, Lapetus did in fact cease all operations.

159. To be clear, Lapetus's financial ruin does not stem from its LE methodology, but rather, as Lapetus informed its investors, "in May of 2024, ***one of [Lapetus's] clients, Coventry***, began a major campaign to tarnish our reputation in the [life settlement] industry ***after we refused to fraudulently adjust our LEs for [Coventry's] financial benefit***." (emphasis added).

160. Lapetus also issued a public statement, noting one reason it had been forced to close was its integrity, referencing the pressure put on by Buerger and Coventry: "Lapetus did face pressure from some clients to raise or lower our LEs for certain cases or even entire books of lives. While we have agreed to reassess a case if it is documented that we missed something in the medical records, Lapetus never acquiesced to pressure to change our LEs to favor anyone."

## IX. DEFENDANTS MAKE ADDITIONAL FALSE CLAIMS ABOUT ABACUS "BASED" ON CONFIDENTIAL DISCOVERY MATERIAL.

161. On August 4, 2026, Coventry used selected documents exchanged in discovery in this litigation to bolster new defamatory statements in a press release that screamed "Abacus Misled Its Investors" and that "Abacus knowingly relied on unusually short life expectancy estimates."[21]

162. As it had in July 2024 and February 2025, Coventry again misstated Lapetus's actual-to-expected ratio to claim that Abacus had made false claims about LEs. Specifically, Coventry relied on Lapetus's April 2025 submission to FOIR for the proposition that "Lapetus reported an A/E ratio of just 41.5%," which a reader would understand that only 41.5% of the individuals Lapetus expected to die had actually died. The reader would also interpret this portion of the August 4 press release as confirming the Coventry A-to-E Study and its February 2025 press release to have been essentially correct.

---

[21] *Court Unseals Key Evidence in Coventry Filing Showing Abacus Global Management Relied on Short Lapetus Life Expectancy Estimates and Misled Investors*, Coventry (Aug. 4, 2026), https://www.coventry.com/court-unseals-key-evidence-supporting-coventrys-claims-about-abacus-reliance-on-lapetus/.

Notably, on August 3, Coventry had initially published a press release with a far less incendiary URL, "Coventry and Alan H. Buerger File Answer to Abacus Global Management First Amended Complaint." https://www.coventry.com/**coventry-and-alan-h-buerger-file-answer-to-abacus-global-management-first-amended-complaint/** (Aug. 3, 2026) (emphasis added).

163. However, Lapetus's submission said nothing of the sort. Instead, the FOIR submission showed that [redacted] This is the exact same misleading approach as Coventry's earlier studies.

164. The press release also rehashed Coventry's core claim that Abacus overvalued its assets because "Lapetus systematically underestimated life expectancies." But Coventry's own actuary had already admitted (and told Mr. Buerger in 2023) that [redacted] And none of the sealed or unsealed evidence shows that Lapetus deliberately attempted to systematically distort life expectancies, let alone that Abacus had some kind of undue influence or control over Lapetus to underestimate LEs.

165. The direct meaning and implication of Coventry's August 4, 2026 press release was that Abacus had engaged in fraud, and is still engaging in fraud. The statements in the press release were made outside of any formal proceeding and were directed to the general public. Abacus has no way to defend itself from the fabrications Coventry pumps out, and it did not bring

this litigation so it could be further harmed by Defendants in a forum bearing none of the safeguards that Abacus enjoys in a formalized judicial setting.

166. Coventry gratuitously attached those documents to its initial pleading, fought for them to be unsealed, and packaged the narrative around them for public consumption for the same reason they did everything else described above: Abacus's continued success and rise spells Coventry's decline and fall.

167. The August 4 press release further harmed Abacus and its business relationships by continuing to depress the value of Abacus's shelf and impeding its ability to use its stock as currency to fund its operations and grow its acquisition pipeline.

* * *

168. Abacus now seeks compensation for the great harm done to its reputation and the specific damages it has suffered as a result of Defendants' campaign of falsehoods. This harm is ongoing, because Defendants' campaign to ruin Abacus is ongoing.

**COUNT I**
**(Defamation against all Defendants)**

169. Abacus realleges and incorporates Paragraphs 1 through 168 as if fully set forth herein. Abacus further alleges:

170. Abacus is not a public figure or a limited public figure.

171. Coventry and Buerger are non-media defendants.

172. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

173. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

174. Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

175. Coventry's and Buerger's statements about Abacus are false, including but not limited to:

a. "***If you're a public company***, you're trying to generate steady progress in your quarterly earnings like any public company. ***The temptation that creates is to manufacture earnings***, which with a Level three asset is an easy temptation to fulfill."

b. "The problem with that is the stockholders, the baby bondholders, and even the [Sagard] loan ***will be subordinated to the asset-backed debt***, which is to say they will all be wiped out when this thing goes upside down."

c. "[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore."

d. "[Y]ou have to choose which accounting method you'll use for that policy and you can never change it."

e. "[I]t's just a matter of time before [Abacus] implode[s]."

f. Abacus's "fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up" with Abacus "is dead."

g. Lapetus's life expectancy estimates are "consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies and investor losses."

h. Coventry's own "internal review" "results cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies."

i. "[V]aluations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses."

j. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "***[n]otwithstanding that they do say that, it is just not accurate***."

k. "My view of Lapetus, of the motivations of Jay Olshansky and his partner has changed from where I believed, I think, I still believe that . . . they were duped by Abacus when they started." Indeed, Buerger told Dr. Olshansky that Lapetus "were dupe[d]" by Abacus.

l. Referring to Abacus, Buerger stated, "investors now have losses when you include Carlyle [sic]" and that "between [Abacus and Carlisle], investors and everyone who's at risk with Abacus is already approaching $1 billion" in losses. Buerger further states, "That's going to really hurt the life settlement industry. Not as much as it will if it's $2 billion when the house of cards" (referring to Abacus) "caves in."

176. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of

this Second Amended Complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization;

b. Abacus's authorized but unissued stock has dropped in value, curtailing merger and acquisition activity, and limiting Abacus's ability to fundraise through capital markets;

c. Abacus, its managed funds, and its direct subsidiaries have lost several prospective customers, representing investible funds in an amount to be proven at trial;

d. Abacus has lost several current customers;

e. Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million per year for five years, totaling $5.5 million, the profits of which would have been $2.5 million or more, and which would have given the company valuable data on approximately nine million individuals; and

f. Due to the drop in stock price caused by the Defendants, Abacus has suffered damages in an amount to be proven at trial flowing from the interruption to the Company's deal flow.

177. Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, interviews, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

178. Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

179. Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

180. Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

181. Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation, including with regard to Abacus's ability to use its shelf stock as operating capital and transaction consideration.

182. Convetry's and Buerger's statements were published with express malice, primarily motivated by an intent to injure Abacus, as demonstrated throughout this complaint including, without limitation, in Paragraph 91–102 and 125.

183. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

## COUNT II
## (Defamation by Implication against all Defendants)

184. Abacus realleges and incorporates Paragraphs 1 through 168 as if fully set forth herein. Abacus further alleges:

185. Abacus is not a public figure or a limited public figure.

186. Coventry and Buerger are non-media defendants.

187. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

188. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

189. Coventry and Buerger created a defamatory implication about Abacus by falsely comparing Abacus to past life settlements companies that failed, implying Abacus violated various state and federal laws, and suggesting Abacus improperly inflated its enterprise valuation. Coventry and Buerger did so by juxtaposing and/or omitting facts with the intention of creating a defamatory implication.

190. Coventry and Buerger created a defamatory implication about Abacus using intentionally misleading statements, including but are not limited to:

a. "[Abacus's] fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up . . . is dead. . . . I worry that it's going to be $300, $400, $600, and $1 billion. With Mutual Benefits, it was $800 million. . . . It's going to be awful for us."

b. "The unique relationship includes Abacus having held a seat on LAPETUS' board of directors through Abacus CEO Jay Jackson, and Abacus affiliates investing heavily in LAPETUS. . . . Both of these relationships may violate the Life Expectancy reform law passed by the legislature in the wake of the Mutual Benefits collapse. ***Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their***

***relationships***, the legislature now requires independence between settlement providers and Life Expectancy providers. . . . ***The relationship between Lapetus and Abacus is so close*** that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the market, bizarrely asserted that 'Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions.'"

c. "There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements. There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and ***all of them have gone bankrupt***."

d. "[W]e"—referring to Coventry—"do a fair value calculation because I want to know what my policies are worth."

e. "As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q."

f. "My view of Lapetus, of the motivations of Jay Olshansky and his partner has changed from where I believed, I think, I still believe that . . . they were duped by Abacus when they started." Indeed, Buerger told Dr. Olshansky that Lapetus "were dupe[d]" by Abacus.

g. Referring to Abacus, Buerger stated, "investors now have losses when you include Carlyle [sic]" and that "between [Abacus and Carlisle], investors and everyone who's at risk with Abacus is already approaching $1 billion" in losses. Buerger further states, "That's going to really hurt the life settlement industry. Not as much as it will if it's $2 billion when the house of cards" (referring to Abacus) "caves in."

h. Buerger said that his "concern" about Abacus stems from when Life Partners and Mutual Benefits "blew up," noting what would happen "in the hands of the wrong people." Based on context, Buerger was clearly insinuating that Abacus was going to "bl[o]w up" and was referring to Abacus as the "wrong people."

191. Upon information and belief, Defendants have made other defamatory implications about Abacus that will be revealed through discovery in this action.

192. Coventry's and Buerger's defamatory implications exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization;

b. Abacus's authorized but unissued stock has dropped in value, curtailing merger and acquisition activity, and limiting Abacus's ability to fundraise through capital markets;

c. Abacus, its managed funds, and its direct subsidiaries have lost several prospective customers, representing investible funds in an amount to be proven at trial;

d. Abacus has lost several current customers;

e. Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million per year for five years, totaling $5.5 million, the profits of which would have been $2.5 million or more, and which would have given the Company valuable data on approximately nine million individuals; and

f. Due to the drop in stock price caused by the Defendants, Abacus has suffered damages in an amount to be proven at trial flowing from the interruption to the Company's deal flow.

193. Coventry and Buerger published these defamatory implications about Abacus to numerous third parties on the internet through email, blog

posts, interviews, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

194. Coventry and Buerger knew the false and implications statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

195. Coventry's and Buerger's false and defamatory implications do not enjoy any absolute or qualified privilege.

196. Coventry and Buerger published these false and defamatory implications about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

197. Coventry's and Buerger's statements were published with express malice, primarily motivated by an intent to injure Abacus, as demonstrated throughout this complaint including, without limitation, in Paragraph 91–102 and 125.

198. Coventry's and Buerger's false and defamatory implications have adversely affected Abacus's otherwise good business reputation, including with regard to Abacus's ability to use its shelf stock as operating capital and transaction consideration.

199. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

## COUNT III
## (Defamation *Per Se* against all Defendants)

200. Abacus realleges and incorporates Paragraphs 1 through 168 as if fully set forth herein. Abacus further alleges:

201. Abacus is not a public figure or a limited public figure.

202. Coventry and Buerger are non-media defendants.

203. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

204. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

205. Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

206. Coventry's and Buerger's statements about Abacus are false, including but not limited to the following:

a. "It is the tip of a large iceberg that involves ***corrupt public company governance***, undisclosed related business entities, ***multiple SEC violations, multiple state regulatory violations***, investors and/or lenders who will lose 9 figures, growing to a billion plus, if left unchecked. Added color is ***the public company at the center of this massive fraud*** was merged into a SPAC last year."

b. "While Lapetus is the defendant, along with the Florida Office of Insurance (for legal purposes), it is really about Abacus Global (ABL). **The centerpiece of the story, is what I believe to be a *massive fraud*, *has to do with Abacus***' accounting for Level 3 assets."

c. "In this case, ABL purchased $1,000,000 of convertible debt from Lapetus, and Lapetus added Abacus's CEO to its board. All the while, Lapetus continues to supply short LEs, well below the normal range and based on indefensible methods, to Abacus, which uses those LEs to buy policies. Abacus's public parent company, ABL, then values its life settlement assets at substantially inflated valuations based on the too-short LEs supplied by Lapetus. **These are the same elements at the heart of the Mutual Benefits *Ponzi scheme*, playing out in real time today at the self-described 'only public life settlement company, trading . . . under the ticker symbol, ABL.'**"

207. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization;

b. Abacus's authorized but unissued stock has dropped in value, curtailing merger and acquisition activity, and limiting Abacus's ability to fundraise through capital markets;

c. Abacus, its managed funds, and its direct subsidiaries have lost several prospective customers, representing investible funds in an amount to be proven at trial;

d. Abacus has lost several current customers;

e. Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million per year for five years, totaling $5.5 million, the profits of which would have been $2.5 million or more, and which would have given the Company valuable data on approximately nine million individuals; and

f. Due to the drop in stock price caused by the Defendants, Abacus has suffered damages in an amount to be proven at trial flowing from the interruption to the Company's deal flow.

208. Coventry's and Buerger's false statements are defamatory *per se* because, when considered alone without innuendo, these statements subject Abacus to distrust, contempt, or disgrace and/or injure Abacus in its trade or profession by accusing Abacus of securities law violations as well improperly inflating its enterprise valuation.

209. Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email.

210. Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

211. Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

212. Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

213. Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation, including with regard to Abacus's ability to use its shelf stock as operating capital and transaction consideration.

214. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

**COUNT IV**
**(Deceptive and Unfair Trade Practices, Fla. Stat. § 501.204, against all Defendants)**

215. Abacus realleges and incorporates Paragraphs 1 through 168 as if fully set forth herein. Abacus further alleges:

216. At all relevant times, Coventry and Buerger were engaged in trade or commerce as defined in section 501.203(8) of the Florida Statutes.

217. Coventry and Buerger violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") by engaging in a deceptive and unfair smear campaign to damage Abacus's share price, reputation in the marketplace, and business relationships, as set forth above (*supra* ¶¶ 74–130), for Coventry's and Buerger's perceived gain.

218. Coventry and Buerger further violated FDUTPA in its statements directed at Lapetus, including, *inter alia*, claiming that Lapetus LEs posed an "existential threat" to the life settlements business. These statements were substantially the cause of Lapetus going out of business in August of 2025.

219. The Defendants' attacks on Lapetus misconstrued data, misrepresented facts, and misled Lapetus's customers, one of which was Abacus. The attacks were untrue, and thus their dissemination was immoral, unethical, oppressive, and unscrupulous.

220. Coventry's and Buerger's deceptive and unfair trade practices have caused Abacus actual harm, including but not limited to by causing Abacus's share price to drop, causing Abacus to lose revenue and profits, and causing Abacus to suffer other commercial injuries. Coventry's and Buerger's deceptive and unfair trade practices have also harmed consumers by misleading investors and artificially consolidating market share in Coventry.

221. Coventry and Buerger's deceptive and unfair trade practices have also harmed Abacus as a customer for LEs as it incurs professional fees and switching costs to recoup the unique medical underwriting information that it was only able to obtain from Lapetus, in an amount to be proven at trial.

## RELIEF

WHEREFORE, Abacus demands judgment against Defendants and requests relief as follows:

a. Compensatory damages in an amount to be proven at trial, including but not limited to for redress of reputational harms;

b. An award of punitive damages;

c. A judicial declaration that the statements listed in Paragraphs 175 and 206 are defamatory;

d. An order requiring Defendants to retract all previously published defamatory statements;

e. Attorneys' fees and costs;

f. Pre- and post-judgment interest, to the maximum extent provided by law; and

g. Any and all other legal or equitable relief to which Abacus is entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Abacus respectfully demands a trial by jury on all issues so triable.

DATED: August 18, 2026

*/s/ Alex Zuckerman*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Alex Zuckerman (*pro hac vice*)
alexzuckerman@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016

(212) 849-7000

Jason D. Sternberg (Fla. Bar No. 72887)
jasonsternberg@quinnemanuel.com
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
(305) 402-4880

Kathleen S. Messinger (*pro hac vice*)
kathleenmessinger@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Attorneys for Plaintiff Abacus Global Management, Inc.*