**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| ABACUS GLOBAL MANAGEMENT, INC., a corporation,<br>Plaintiff and Counterclaim Defendant,<br><br>JAY JACKSON,<br>Counterclaim Defendant,<br><br>v.<br><br>COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,<br>Defendants and Counterclaimants. | Case No. 6:25-cv-01401-RBD-RMN<br><br>**DEFENDANTS' FIRST AMENDED COUNTERCLAIMS** |

Pursuant to Rule 15(a)(1)(B), Defendants and Counterclaimants Coventry First LLC ("Coventry") and Alan Buerger ("Mr. Buerger") (together, "Counterclaimants") hereby assert the following Amended Counterclaims against Plaintiff and Counterclaim Defendant Abacus Global Management, Inc. ("Abacus"), as well as Abacus's Chairman and CEO Jay Jackson:

## INTRODUCTION

1. Abacus's lawsuit is a transparent attempt to obscure the truth, evade accountability, and punish protected speech. The truth Abacus seeks to suppress is straightforward. For years, Abacus has engaged in a disturbing—and unlawful—financial scheme. It has manipulated its books and records. It has deceived its

investors. And it has knowingly made false statements to its regulators. When Counterclaimants began exposing the facts underlying that scheme, Abacus doubled down by covering up its misconduct with still more falsehoods, weaponizing this lawsuit to broadcast false accusations against Counterclaimants and to divert scrutiny from its own misconduct. Its pleadings continue that effort, advancing innuendos, material misstatements, and outright falsehoods in service of a manufactured narrative. Outside the courtroom, Abacus and its Chairman and CEO, Jay Jackson, have pursued the same strategy, repeatedly making false statements to the press about Counterclaimants to damage their reputations and distract from Abacus and Jackson's own misconduct.

2. But "facts are stubborn things," as John Adams famously said. And the facts have finally caught up with Abacus. Since this lawsuit was filed, the Parties have engaged in nearly a year of discovery. That discovery has now put beyond dispute what Abacus and Jackson already knew when they brought this case: Abacus has perpetrated a fraud at the heart of its business, orchestrated by Jackson himself.

3. Abacus's scheme began in 2021, when it discovered that life expectancies ("LEs") from Lapetus Solutions, Inc. ("Lapetus"), a relatively new entrant to the LE provider market, were systematically shorter than those issued by established providers. As Abacus and Jackson were well aware, life expectancies are critical inputs in valuing life insurance policies, and shorter life expectancies increase the apparent value of the policies. With a potential public offering on the horizon, Jackson and Abacus saw an opportunity to partner with Lapetus and use its chronically short

LEs to inflate Abacus's balance sheet and earnings. Abacus invested $1 million in Lapetus, receiving a convertible note and the contractual right to [redacted]. Abacus exercised that right by placing Jackson himself on Lapetus's Board as a full voting member and the only director on Lapetus's Board with experience in the life settlement industry, making him uniquely positioned to influence Lapetus's business and strategic decisions. Jackson then sought to conceal his Board position while exploiting it to obtain and funnel information from Lapetus to Abacus in furtherance of the scheme.

4. Florida law prohibits precisely this kind of entanglement between life settlement companies and life expectancy providers—and for good reason. Before Abacus, two life settlement companies collapsed amid efforts to influence or control the life expectancies on which their businesses depended. Their collapses wiped out hundreds of millions of dollars in investor capital. And the consequences extended well beyond those companies and their investors. The resulting scandals tarred the life settlement industry, harmed consumers, and prompted regulators to impose safeguards designed to preserve the independence of LE providers.

5. But Abacus was undeterred. Indeed, Jackson viewed Abacus's relationship with and investment in Lapetus as a means to [redacted] ECF 121-1, at 1. The investment in Lapetus, Jackson explained, would enable Abacus [redacted] and thereby exert influence over the very life expectancies on which Abacus's policy valuations depended. *See id.* That mattered because Lapetus's LEs were systematically shorter than those issued by other

LE providers, and Abacus understood exactly what those shorter LEs would mean for its valuation. Before going public, Abacus calculated that valuing its portfolio using Lapetus LEs would [redacted] ECF 121-5, at 1. Abacus therefore "look[ed] forward to the time [it got] to mark a portfolio using [Lapetus] LE[s]." ECF 121-2, at 3.

6. And that is exactly what Abacus did when it went public. It put its plan into practice, using its illicit partnership with Lapetus to make Lapetus's chronically short LEs a critical input in valuing virtually its entire life insurance policy portfolio. As Abacus COO and CFO Bill McCauley explained, [redacted]. ECF 121-3, at 1. Abacus's policy valuation handbook, which Abacus provided to its former auditor, Grant Thornton, confirmed that practice in unmistakable terms. It stated that the [redacted] ECF 121-4, at 3 (emphasis added).

7. This use of Lapetus LEs to value Abacus's portfolio allowed Abacus to report higher earnings and maintain the illusion of strong financial performance. The magnitude of the resulting distortion was staggering. Abacus and Jackson knew—from Abacus's own analysis conducted before it filed suit—that the value of Abacus's portfolio would [redacted] if Abacus

simply replaced Lapetus's LEs with those of a reputable LE provider. *See* ECF 121-6, at 1.

8. Abacus has scrambled ever since. As investors began to recognize the problems with Lapetus LEs, Abacus found itself holding overvalued policies that it could not sell at their reported values. And as Abacus had to begin turning away from Lapetus and toward more reputable LE providers with longer LEs, those longer LEs threatened to expose the inflated values on Abacus's books. Abacus responded by manipulating another critical valuation input: its discount rate. It repeatedly lowered that rate, quarter after quarter, thereby propping up the reported value of the policies on its balance sheet. Specifically, when it went public in 2023 and was still using Lapetus to value its portfolio, Abacus used a 21% discount rate. Over the next two years, as it moved away from Lapetus, Abacus steadily lowered that rate to just 10%, with each reduction mechanically increasing its reported policy valuations. Yet Abacus has identified no bona fide economic justification for a reduction of that magnitude. And, as scrutiny has mounted, Abacus has now abandoned altogether the use of a discount rate in its valuation methodology.

9. When third parties would not purchase Abacus's policies at its inflated valuations, Abacus found buyers that would: its own fund clients. Abacus began offloading policies onto affiliated vehicles it controlled and managed, using its clients' capital to buy Abacus's own inventory at inflated prices the arm's-length market would not bear. These related-party transactions were no sideshow. In the last two quarters, they accounted for more than ***90%*** of Abacus's policy sales.

10. Meanwhile, Mr. Buerger and Coventry had substantial and well-founded concerns that Lapetus LEs were dangerously skewing the market. Like many others in the industry—including Abacus itself—they had come to understand that Lapetus LEs were consistently and materially short. Mr. Buerger and Coventry also understood the dangers posed when artificially short LEs distort policy valuations; they had seen similar practices wreak havoc on the life settlement industry before. And they worried that Abacus and Jackson were exploiting their relationship with Lapetus for improper purposes—which discovery has confirmed is exactly what was happening.

11. Mr. Buerger and Coventry believed that an issue with potentially significant consequences for investors, consumers, and the life settlement industry warranted public scrutiny. Coventry therefore conducted and published a study quantifying the extent to which Lapetus LEs were shorter than those of other LE providers. Two distinguished professors then verified Coventry's findings. Mr. Buerger also welcomed the opportunity to publicly debate Lapetus's Chief Scientist, Jay Olshansky, about the systemic problems with Lapetus LEs. And when Tegus invited Mr. Buerger to an interview, he accepted and openly discussed his concerns about Abacus's use of Lapetus LEs.

12. Then, on June 4, 2025, Morpheus Research ("Morpheus") published an independent report exposing Abacus's financial manipulation to the world. With its stock price collapsing, Abacus and Jackson knew that they were in trouble. But instead of confronting the substance of Morpheus's findings, Abacus issued a press release

built on fraudulent misrepresentations and then filed this baseless lawsuit to distract investors and shift blame for a crisis of its own making. Its complaint falsely attributed the Morpheus Report to Mr. Buerger and Coventry and accused them of defamation. But discovery has now revealed that Abacus's internal documents contradict the central allegations of its complaint. Worse, those same documents corroborate the very statements Abacus told this Court were defamatory.

13. In the end, Abacus did not bring this suit merely to distract from its own misconduct. It brought this action to silence public debate about its improper business practices and to warn others in the industry that exposing Abacus's misconduct would carry a cost. This lawsuit is the culmination of Abacus and Jackson's efforts to conceal a scheme that inflated the value of Abacus's portfolio using Lapetus's consistently and materially short life expectancies while hiding the consequences from investors and regulators alike. And through this lawsuit and their false statements to the press and the public, Abacus and Jackson seek not only to punish Mr. Buerger and Coventry for speaking out, but to send an unmistakable message to anyone else who might do the same—stay quiet, or pay the price.

14. Coventry and Mr. Buerger therefore bring these counterclaims under the Florida Anti-SLAPP Act, Fla. Stat. § 768.295, the Florida Viatical Settlements Act, Fla. Stat. §§ 626.991–993, and the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201–213. They also bring counterclaims for defamation *per se*. Counterclaimants seek damages related to reputational harms, lost profits stemming from Abacus's violations of the Florida Viatical Settlements Act, punitive damages for

Abacus's smear campaign and statutory violations, and court costs and reasonable attorneys' fees incurred by Counterclaimants in their defense against Abacus's meritless SLAPP suit.

## PARTIES

15. Counterclaimant Coventry First LLC is a limited liability company headquartered in Fort Washington, Pennsylvania. Coventry First LLC has a single member, Dash Investments LLC. Dash Investments LLC has two members: the Buerger 2003 Family Trust and the Alan H. Buerger 2003 Trust for Reid S. Buerger, both of which are citizens of Pennsylvania. Accordingly, Coventry is a citizen of Pennsylvania.

16. Counterclaimant Mr. Buerger is the Co-founder and Executive Chairman of Coventry. He, too, is a citizen of Pennsylvania.

17. Plaintiff and Counterclaim Defendant Abacus is a Delaware corporation with its principal place of business in Orlando, Florida.

18. Counterclaim Defendant Jay Jackson—the Chairman and CEO of Abacus—is also a Florida citizen.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over these counterclaims pursuant to Rule 13 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1367(a), since these counterclaims share a common nucleus of operative facts with the original claims asserted by Abacus and form part of the same case or controversy.

20. This Court has personal jurisdiction over Abacus because Abacus is a citizen of Florida, with its principal place of business in Orlando, Florida. Abacus has also submitted to the jurisdiction of this Court by prosecuting its case in this Court.

21. This Court has personal jurisdiction over Jackson because he is likewise a citizen of Florida. Jackson also serves as the Chairman and CEO of Abacus and works at its principal place of business in Orlando, Florida.

22. Venue is proper under 28 U.S.C. § 1391 because Abacus maintains its principal place of business in Orlando, Florida, which is within this District. Jackson, for his part, resides in this District and works at Abacus's Orlando headquarters.

## FACTUAL BACKGROUND

### A. Coventry, Abacus, and the Life Settlement Industry

23. Coventry, led by its Co-founder and Executive Chairman Alan Buerger, pioneered the life settlement market, turning life insurance policies into valuable assets that provide immediate value to everyday consumers. To date, Coventry has delivered over $6 billion to policyholders, and it stands as the largest life settlement provider in the industry.

24. Given their instrumental role in creating and growing the life settlement industry, Coventry and Mr. Buerger have always been concerned about its health and reputation. To this end, Coventry has been actively involved in advocating for necessary regulation of both life settlement and life expectancy providers. These stewardship efforts have garnered recognition and attention, including from the

American Council of Life Insurers, which has recognized Coventry's work to advance necessary regulation of the industry.

25. Coventry and Mr. Buerger's desire for regulation of the life settlement industry is born from experience. In 2012, the Securities and Exchange Commission ("SEC") brought charges against a major, publicly traded life settlement provider, Life Partners Holdings Inc. ("Life Partners"), and three of Life Partners' executives for disclosure and accounting fraud. According to the SEC, "the company was systematically and materially underestimating the life expectancy estimates it used to price transactions. Life expectancy estimates are a critical factor impacting the company's revenues and profit margins as well as the company's ability to generate profits for its shareholders." Press Release, Sec. & Exch. Comm'n, SEC Charges Life Settlements Firm and Three Executives with Disclosure and Accounting Fraud (Jan. 3, 2012), bit.ly/4xSkOwM.

26. The Life Partners case came less than a decade after federal authorities first brought charges against Mutual Benefits Corp., another life settlement company, which had defrauded tens of thousands of investors out of over $1.25 billion. *See* Press Release, Dep't of Justice, Former Mutual Benefits Corporation Head Sentenced To 20 Years In Prison For His Role In $1 Billion MBC Scheme (Aug. 29, 2014), bit.ly/4f5C9ut. These scandals led to widespread investor losses and long-term reputational harms to the entire industry.

27. Scandals like Life Partners and Mutual Benefits are why states, including Florida, have taken a harder look at life settlement providers. In 2016, that scrutiny landed on Abacus.

28. In that year, Abacus applied for a viatical settlements license from the Florida Office of Insurance Regulation ("OIR"), one of the most important regulatory bodies in the life settlement industry. But Abacus was rejected—for the second time.[1] At the outset, OIR had difficulty even examining Abacus's license application, because Abacus had "the most 'extreme' record keeping issues" that the OIR examiner had "ever seen." Donna Horowitz, *Florida Denies Provider's License to Abacus Settlements, Abacus Appeals*, The Deal (June 30, 2016), bit.ly/4vnkjcr. Indeed, a "significant portion" of Abacus's files "had been destroyed." *Id.*

29. After examining what they could, OIR determined that Abacus was "not worthy of a license" because of the "lack of trustworthiness of [the] principals/owners of [Abacus] which cannot be cured." *Id.* These concerns stemmed from, among other things, transactions involving Abacus that "violated state law because the policies had been obtained through misrepresentations." *Id.*

**B. Abacus and Jackson's Relationship with Lapetus**

30. Abacus's troubles in following Florida state law did not stop in 2016. In 2021, Abacus began contemplating its investment in Lapetus. Florida law prohibits

---

[1] Abacus had applied for a license with OIR in 2012 and was also denied then.

life settlement companies from holding ownership in or serving as a director for life expectancy providers. *See* Fla. Stat. § 626.99175(6). Yet that was no obstacle to the Abacus executive team.

31. Perhaps for the very same reason that Florida bars life settlement providers from having ownership in life expectancy providers, in August 2021, Jackson wrote to Abacus Co-founders Sean McNealy, Scott Kirby, and Matt Ganovsky that [redacted] ECF 121-1, at 1 (emphasis added). Jackson went on to argue that a partnership with Lapetus would allow Abacus to [redacted] *Id.*

32. Sean McNealy pointed out that he was [redacted] ECF 121-7, at 1 (emphasis added). But Jackson implored his team that [redacted] *Id.* (emphasis added). And not mincing words, Jackson admitted that investment in Lapetus could make all the difference for Abacus: "[redacted] ECF 121-1, at 1 (emphasis added).

33. Just a few months later, in November 2021, Abacus finalized its first investment in Lapetus and was granted a Board seat on Lapetus's Board of Directors, which was filled by Jackson. Notably, Jackson was not disclosed as a director on Lapetus's website, in contrast to all of Lapetus's other directors. The companies and

Jackson knew the legal problems created by that arrangement, so they buried the truth.[2]

34. Abacus then got to work using Lapetus to value its policy holdings. In January 2023, as Abacus was preparing to go public, an Abacus employee estimated that using Lapetus LEs to value Abacus's policy holdings would [redacted] ECF 121-5, at 1. Soon after this realization, Abacus took its [redacted] to develop the [redacted] ECF 121-8, at 5.

35. Abacus's in-house valuation methodology is impossible to square with the allegations in Abacus's operative First Amended Complaint.[3] As Abacus's valuation memorandum explains—in unambiguous [redacted] ECF 121-4, at 3 (emphasis added). The memorandum goes on to state that the valuation

---

[2] Jackson resigned from Lapetus's Board mere days after his Board seat was publicly disclosed by The Deal.

[3] Abacus's proposed Second Amended Complaint continues to peddle many of the same falsehoods, as shown by the redline submitted therewith. *See generally* ECF 126-1. Notably, however, Abacus seeks to quietly walk away from its most egregious misrepresentations, including that Abacus did not "primarily rely on Lapetus life expectancies," that "Abacus has ***never said that it uses Lapetus to value the assets on its balance sheet, nor has it ever done so***," that Abacus did not "use[] Lapetus LEs to inflate the fair value of policies on its balance sheet," and that "Lapetus LEs are not used *at all* in the fair value analysis." *See id.* ¶¶ 7(b), 11, 87(b), 128, 146(a), 199(a) (emphases in original) (paragraph numbering to original FAC). Abacus's contention that it did not use Lapetus LEs for its balance sheet was the central premise of its defamation lawsuit. Its attempt to quietly abandon this false central premise in the face of the unambiguous evidence submitted with the Counterclaims is therefore as clear an admission as any that Abacus was indeed using Lapetus to mark its portfolio—and was misrepresenting the truth to the public, regulators, and this Court by filing this lawsuit and alleging otherwise.

for Abacus's individual policies is [redacted] *Id.* at 6 (emphasis added). And [redacted] *Id.* (emphasis added). As Abacus CFO and COO Bill McCauley rationalized this questionable business practice, [redacted] ECF 121-3, at 1 (emphasis added). And it was no coincidence that Abacus chose the shortest vendor.

36. These documents are hardly the only evidence that Abacus used a valuation methodology that incorporated Lapetus LEs. Documents produced by Grant Thornton, Abacus's former auditor, confirm the same thing. Consistent with McCauley's admission, Grant Thornton noted that in "substantially all cases, [Abacus] management used one LE report per policy as they determine their valuation." ECF 121-16, at 1. And Abacus "[m]anagement ***typically utilizes Lapetus*** as their LE provider." *Id.* (emphasis added). These Lapetus LEs were used "[i]n order to calculate the fair value of the polic[ies]." *Id.* In other words, Lapetus LEs were a critical input that Abacus used in [redacted] of the policies reported on its [redacted] ECF 121-15, at 1.

37. Grant Thornton and its valuation consultant at Actuarial Risk Management ("ARM") quickly recognized that this heavy reliance on Lapetus to value Abacus's portfolio was a serious concern. As the ARM consultant explained,

Abacus's portfolio values would be [redacted] from Lapetus, because [redacted] ECF 121-8, at 3. Grant Thornton, which recently was terminated by Abacus as its auditor, similarly criticized Abacus's [redacted] which generates numbers that they [redacted] to a [redacted] ECF 121-9, at 1–2.

38. But that was the whole point. Abacus and Jackson already knew that Lapetus LEs were shorter than other LEs and thus were likely to result in overvalued policies. The same month Abacus made its first investment in Lapetus, November 2021, an Abacus employee prepared an analysis for Jackson which found that the "Lapetus Mean is significantly lower on average compared to the Fasano," an established LE provider, and "lower on average compared to the short[est LE]." ECF 120-11, at 1. Others knew this too. In March of 2022, when Abacus tried to sell a policy with a Lapetus LE, the potential buyer responded that it "can't currently use Lapetus LEs as they usually seem significantly shorter than the other more established LE providers (as I'm sure you're well aware!)." ECF 120-12, at 1. Abacus was indeed "well aware."

39. Abacus was also informed that Lapetus's actual-to-expected ratio—the number of deaths that ***actually*** occurred compared to those ***expected*** using Lapetus LEs—was "~24% to ~72%" depending on the demographic. ECF 120-18, at 1. By comparison, published analyses from other LE providers have reported A/E ratios near 100%. *See, e.g.*, Predictive Resources, LLC, *Home Page*, bit.ly/4fU6L3P (last

visited Aug. 20, 2026) (99%); Gary D. Lake & Jon R. Jennings, *Actual to Expected Analyses: Ten Years Ending 12/31/2019*, Fasano Associates (Mar. 17, 2020), bit.ly/4wNmFD2 (101%).

40. In short, Abacus and Jackson knew that Lapetus LEs were consistently shorter than the other LE providers and chose to use them to value the company's portfolio anyway precisely ***because*** Lapetus was materially shorter. Abacus continuously employed this Lapetus-dependent valuation methodology for years. *See* Ex. 1, at 3 ([redacted]); Ex. 2, at 3 ([redacted]); Ex. 3, at 3 [redacted]); Ex. 4, at 3 ([redacted]); Ex. 5, at 3 ([redacted]); Ex. 6, at 3 ([redacted]); Ex. 7, at 3 ([redacted]). In fact, it continued to do so even ***after*** bringing this lawsuit—in which it claimed to not use Lapetus "*at all* in the fair value analysis." FAC ¶ 128 (emphasis in original); *see* Ex. 8, at 3 [redacted]).

41. All the while, Abacus Chairman and CEO Jay Jackson was a voting member of the Lapetus Board of Directors—giving him the [redacted] that was central to Abacus's scheme. *See* ECF 121-1, at 1.

42. Jackson's spot on the Lapetus Board also gave him access to competitively sensitive information. And he misappropriated and [redacted] including information about Coventry, [redacted] and others in the market. *See, e.g.*, ECF 120-13, at 1. This information gave Abacus insight into Coventry's confidential trading volume and patterns. Worse yet, Jackson wielded his insider position to funnel

information to Abacus personnel about [redacted] Lapetus-based valuations in the marketplace. Ex. 9, at 1. Abacus could thus perpetuate its scheme by targeting unwitting counterparties and investors, even as more sophisticated players in the market were [redacted] ECF 121-24, at 2. In that way, Abacus leveraged Jackson's unlawful board position to harm its competitors, including Coventry.

43. Given Abacus's entanglement with and influence over Lapetus, it is no wonder that when he resigned from Lapetus, former Lapetus CEO John Dippold told a Lapetus board member he could not "in good faith continue to work with ABL" after the "correct info" in the Morpheus Report came to light. ECF 120-1, at 1. Abacus was Lapetus's "primary and basically only client." *Id.* And Dippold just "d[id]n't trust them." *Id.*

**C. Coventry's Concerns About Abacus's Use of Lapetus**

44. For a time, Abacus was able to avoid scrutiny regarding its increasing reliance on Lapetus LEs to value its policies and the true nature of its relationship with Lapetus. That began to change when Abacus's ABL Longevity Growth and Income Fund (the "Fund")—an interval fund that Abacus took nearly three years to launch due to SEC scrutiny[4]—announced that Lapetus would be its preferred life expectancy provider in 2024.

[4] The Fund filed its preliminary prospectus with the SEC on September 7, 2023. That prospectus included a representation that "[t]he Fund expects to engage in transactions with certain affiliates of the Manager. In particular, the Fund expects to engage Abacus Settlements, LLC as its primary life settlement broker and Longevity Market Assets will engage in purchase and sale transactions with the

45. By that time, concerns were widespread throughout the life settlement industry, including at Coventry, about Lapetus LEs being systematically and materially shorter than those of other LE providers. As Morpheus's representative testified, [redacted] and had sparked a [redacted] Ex. 10, at 158:14–25.

46. But Abacus, through the Fund, had announced that Lapetus would be the Fund's "primary" life expectancy provider. ECF 47-4, at 3. It also bizarrely represented to the SEC—contrary to all evidence and Abacus's own documents—that Lapetus "provide[d] the most conservative life expectancy predictions." *Id.*

47. These statements, coupled with Abacus and Lapetus's previously announced partnerships, and Abacus's decision to go public and secure capital from the general public, fostered genuine concerns among those in the life settlement industry. Abacus's overvaluations based on short Lapetus LEs threatened to harm everyday investors and the reputation of the industry.

Fund." Abacus Equity Income Fund, Registration Statement (Form N-2), at 10 (filed Sept. 7, 2023), bit.ly/3SRxNQ6. It was not until Amendment 8 that the Fund represented that it "will not purchase any mortality contracts from Abacus Settlements or any other affiliate." ABL Longevity Growth and Income Fund, Pre-Effective Amendment No. 8 to Registration Statement (Form N-2/A), at 18 (filed Oct. 16, 2024), bit.ly/3RqvUcI. And it was not until Amendment 17, dated February 26, 2026, that the Fund stated clearly that "[t]he Manager will not allow the Fund to purchase, directly or indirectly, any Longevity Assets owned or brokered by the Manager or its affiliates." ABL Longevity Growth and Income Fund, Pre-Effective Amendment No. 17 to Registration Statement (Form N-2/A), at 45 (filed Feb. 26, 2026), bit.ly/4viGali. In other words, Abacus has finally backed down on its original intent to engage in conduct that it now admits is "expressly prohibited by the Investment Company Act of 1940." FAC ¶ 67.

48. Although nearly everyone knew Lapetus LEs were short, nobody had publicly studied precisely how short Lapetus LEs were compared to the rest of the market. So, Coventry conducted its own study.

49. On May 7, 2024, Coventry announced the results of its months-long study into the length of Lapetus's LEs. The results confirmed what all the sophisticated players in the industry, including Abacus, already knew: Lapetus LEs are systematically shorter than those of other LE providers. Specifically, Coventry found that Lapetus LEs were shorter than LEs from other leading LE providers in approximately 85% of cases when comparing the same individuals.

50. But Coventry knew that not everyone would take its word for it. So, Coventry commissioned a follow-up study led by Professors Daniel Bauer and Nan Zhu, both esteemed academics with substantial experience in this industry. On July 22, 2024, Coventry announced that the academics' study found similar results: Lapetus LEs were shorter than LEs from other LE providers in 83% of cases, by an average amount of approximately 29 months.

51. Coventry then asked Professors Bauer and Zhu to update and expand their review of Lapetus LEs, this time looking into the Actual/Expected Ratio for Lapetus LEs—the same metric that the OIR and industry professionals rely on to evaluate life expectancy provider accuracy. On February 5, 2025, Professors Bauer and Zhu found that Lapetus's Actual/Expected Ratio for the studied population was a catastrophically low 31%, confirming that Lapetus LEs are substantially shorter than

the actual lifespans of the individuals they are providing LEs for. Other, more well-regarded LE providers have Actual/Expected ratios that are much closer to 100%.

52. Abacus never produced an analysis that refuted the core empirical findings of these studies. To the contrary, Abacus and Lapetus's own documents—and even the independent consultant retained by Lapetus—corroborated the important aspects of Coventry's concerns. To take just a few examples:

a. An internal Abacus analysis from November 2021 found that the "Lapetus Mean is significantly lower on average compared to the Fasano [LE] (33 months) and lower on average compared to the short[est LE] (12 months)." ECF 120-11, at 1. Abacus thus knew that Lapetus was the shortest LE provider overall.

b. Life settlement brokers often rejected policies that Abacus offered based on Lapetus valuations because they were notoriously too short. In March 2022, when Abacus tried to sell a policy with a Lapetus LE to one life settlement investor, the investor responded that it "can't currently use Lapetus LEs as they usually seem significantly shorter than the other more established LE providers (as I'm sure you're well aware!)." ECF 121-10, at 1. The next month, that same investor turned Abacus away again: "[N]one of [the] clients [was] able to generate an offer" because the "[c]lients do not accept Lapetus LE reports in isolation." ECF 121-11, at 3. Everyone knew that Lapetus LEs "tend to be shorter than the mainstream LE providers." *Id.* at 1.

In April 2022, a different broker demurred on an Abacus-offered policy for the same reason: "[A]s you realize, [Lapetus's] LE projections are often much more aggressive"—that is, shorter—"than traditional widely accepted LE reports." ECF 121-12, at 1.

c. This was not a surprise to Abacus executives and employees. It is confirmed by one internal document after another. For instance, Jackson himself recognized that the valuation on a policy was "really high" because "we did Lapetus only." ECF 120-16, at 3. In that instance, the Lapetus LE was over ***ten years shorter*** than the next shortest LE. *See id.* at 1. In another case from March 2022, Abacus employees discussed that a buyer "won't bid off a Lapetus only," and they knew that "[i]t's doubtful we will be able to find another LE to match up with the Lapetus." ECF 121-13, at 3. The "other LE's [were] likely going to be" much longer—to the tune of several years. *Id.*

d. Lapetus's own evaluations of its Actual/Expected ratios—the actuarially sound metric that by law, the OIR requires LE providers to use to verify the accuracy of LE reports—were not far off from the 31% found by Professors Bauer and Zhu. Indeed, months before Abacus filed its initial complaint, Lapetus told Abacus that its A/E ratio was "~24% to ~72%" depending on the demographic. ECF 120-18, at 1. Lapetus then submitted to the OIR its required triennial

report showing its Actual/Expected ratio was a remarkably low 41.5%. ECF 120-19, at 2. Lapetus, and by extension Abacus, often attempted to distract from Lapetus's poor Actual/Expected ratio by pointing to Lapetus's own invented metric of "Distance to Death." *See* ECF 120-18, at 1. But Lapetus's hired actuarial firm, the Terry Group, disclaimed this made-up metric, noting in its 2022 Statement of Actuarial Opinion Pursuant to Florida Statute 626.99175(5) that Lapetus's analysis "is neither probabilistic nor actuarial in nature," and "is not based on the traditional actuarial construct commonly found in actuarial analyses that compare actual to expected deaths in reference to baseline mortality tables." ECF 120-20, at 2. It went on to state that "[w]e do not believe Florida's statutory actual-to-expected determination as prepared by Lapetus is covered by any current Actuarial Standard of Practice." *Id.* The Terry Group's 2025 Statement of Actuarial Opinion Pursuant to Florida Statute 626.99175(5) regarding Lapetus's calculations contains the same caveats. Lapetus's contrived metric is no substitute for the A/E ratio mandated by both the law and actuarial standards. *See* Fla. Stat. § 626.99175(5)(b); *Life Settlements Mortality*, Actuarial Standard of Practice No. 48 (2013).

e. Nor did the independent consultant retained by Lapetus itself undermine the core concerns identified by Coventry. COIOS Ltd.,

which Lapetus retained to independently assess its methodology, acknowledged that mortality-experience analyses of Lapetus showed [redacted] Ex. 11, at 7. COIOS also cautioned that Lapetus's own internal accuracy analysis considered [redacted]. *See id.* at 8. COIOS further found, using an example supplied by Lapetus, that a [redacted]. *See id.* at 12.

53. Following Coventry's thorough examination of Lapetus LEs, Mr. Buerger was invited to debate Lapetus's Chief Scientist, Jay Olshansky, at the 2024 Life Insurance Settlement Association ("LISA") Conference, about the accuracy of Lapetus LEs and the life expectancy industry more broadly. Mr. Buerger gladly accepted the chance to have this public debate about important public issues.

54. At this debate, Mr. Buerger reiterated the findings of the Coventry Studies. He explained that Lapetus LEs were systematically shorter than other LE

providers and that these short LEs could lead to overvalued assets. At the end of the debate, Mr. Buerger opined on the harm that these short LEs could cause to the general public—noting that previous overvaluations of life insurance policies have led to hundreds of millions in investor losses, and that those losses are catastrophic for the industry.

55. By contrast, Lapetus's Jay Olshansky closed by glibly noting that he thought Coventry was really worth double what Mr. Buerger thinks it is, implicitly recognizing that Lapetus's short life expectancies lead to inflated asset valuations.

**D. Others Harbored Concerns with Abacus's Business Model**

56. Coventry was not the only one concerned about the potential impact on the investing public from Abacus's relationship with Lapetus and its reliance on Lapetus LEs for valuation.

57. On November 1, 2024, the SEC wrote to Abacus to inquire about numerous aspects of its business, including its relationship with Lapetus, any ownership interests Abacus has in Lapetus, whether Abacus relies on Lapetus for its valuation of life insurance policies, and whether National Insurance Brokerage ("NIB") is an undisclosed related party.

58. Abacus wrote back on November 4, 2024. It first disclosed that it holds the $1 million note in Lapetus that is fully convertible into an ownership interest, but declared that this relationship would not grant Abacus "any influence or control over Lapetus's governance or business decisions." Of course, this representation to the SEC is flatly inconsistent with Abacus's contractual [redacted]

[redacted], *see* ECF 121-14, at 7, as well as Jay Jackson's initial assessment and plan that Abacus's investment into Lapetus would [redacted]" ECF 121-1, at 1.

59. Next, Abacus stated that Lapetus "generat[es] life expectancy reports, which the Company incorporates as one of multiple inputs into its valuation process in determining the fair value of the policies the Company holds." But Abacus told the SEC that it "does not rely solely or even materially on Lapetus's life expectancy reports."

60. That too was false. Abacus's own internal valuation methodology makes clear that the valuation of Abacus's individual policies is "[redacted]**.**" ECF 121-4, at 6 (emphasis added). Not only that, but [redacted]." *Id.* (emphasis added). Documents from Abacus's former auditor confirm that this is how Abacus "[redacted]" on its [redacted] ECF 121-15, at 1. In "substantially all cases, [Abacus] management used one LE report per policy as they determine their valuation." ECF 121-16, at 1. And Abacus "[m]anagement ***typically utilizes Lapetus*** as their LE provider." *Id.* (emphasis added). These life expectancies were then used "[i]n order to calculate the fair value of the polic[ies]." *Id.*

61. Finally, Abacus responded that it disagreed with the SEC's assessment that Abacus and NIB are related parties. It claimed that, merely because its founders

are owners and officers of NIB, and Abacus shares an address with NIB, that does not mean they are related parties, even if Abacus were to transact in life insurance policies with NIB. This is notable for many reasons, including that Abacus later effectively conceded the SEC's point by quietly acquiring NIB from Abacus's executives, including Jackson, for $3 million without issuing any press release; just a passing mention in its Q1 2025 10-Q filing.

62. Moreover, contrary to Abacus's representations in the FAC that "the SEC did not raise any concerns about Abacus's valuation methodology or the relationship between Lapetus and Abacus" after the November 1, 2024 Comment Letter, *see* FAC ¶¶ 115–19, this was ***not*** the last time the SEC asked about Abacus's relationship with Lapetus.

63. On August 15, 2025, the SEC again issued a comment letter to Abacus with over three dozen points of clarification, including specifically asking about Abacus's "relationship with Lapetus" in light of "recent public reports." *See* ECF 120-25, at 14. Abacus responded on August 29, 2025, where it told the SEC, among other things, that "Jay J. Jackson, previously held a 'Director' title at Lapetus, where his role was strictly limited to an uncompensated advisory position rather than . . . service on the board of directors of Lapetus." *Id.* at 3. That representation is directly contradicted by contemporaneous records identifying Jackson as "[redacted]" ECF 121-17, at 2; *see also* ECF 121-14, at 7 (granting Abacus the right to "[redacted]" and noting that the [redacted]

**E. Abacus's Actions Leading up to This Lawsuit**

64. On June 4, 2025, Morpheus Research published a scathing report showing that Abacus "Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die." Morpheus's core claim was that Abacus was using Lapetus to value its portfolio and was thus overvaluing its balance sheet due to Lapetus's systematically short LEs.

65. On June 10, 2025, Abacus responded. Abacus first proclaimed that the "$446 million in claimed life settlements" on Abacus's books from its Q1 2025 SEC disclosure "***does not*** 'rel[y]' on Lapetus." Abacus made this false representation to the market despite its own internal valuation memoranda—which it supplied to its auditors—confirming that [redacted].

66. Abacus then touted a so-called "Independent Third-Party Actuarial Validation" from the actuarial firm Lewis & Ellis. According to Abacus, the Lewis & Ellis report was purportedly done without reliance in any way on Lapetus LEs, as supposed "proof" that Abacus does not use Lapetus LEs to value its balance sheet. Abacus declared that Lewis & Ellis generated a "valuation of $449 million," while coyly noting that the report "aligned with a discount rate and range of ±2% as disclosed in the Q1 2025 10-Q filing."

67. Both of these assertions were knowingly false and misleading.

68. Internal documents from Abacus show that [redacted] in May 2025—a clear admission that [redacted] in its Q1

2025 SEC filing. ECF 121-6, at 1 (emphasis added); *see* Abacus Q1 2025 10-Q, at 2 (May 8, 2025) (listing $446 million for "Life settlement policies, at fair value"). And these internal documents from Abacus show that the company knew that the value would [redacted]. *See* ECF 121-6 at 1.

69. Abacus's reliance on the Lewis & Ellis report is similarly misleading. A draft of this Abacus press release shows that [redacted] *See* ECF 121-18, at 2; ECF 120-28, at 3. Had Abacus used the same discount rate, which was also expressly provided in the Lewis & Ellis report, the comparable valuation would have been millions of dollars less and would not have fallen "within [the] 1% margin of error" of the overall valuation that Abacus trumpeted to the public.

70. Worse yet, Abacus failed to disclose that for over a third of the policies that it asked Lewis & Ellis to review, Abacus provided only "internal" Abacus LEs, which are ***life expectancy estimates generated by the very company whose portfolio was being valued***, untested by any independent underwriter. *See* ECF 120-29. By substituting its own self-serving LE estimates—which were themselves likely based at least in part on Lapetus LEs—for those of qualified independent life expectancy providers, Abacus corrupted the inputs to the Lewis & Ellis analysis. *See* Abacus 2023 10-K, at 7 (Mar. 21, 2024) (describing the "partnership between Abacus and Lapetus"

to "build and develop current life expectancy tables"). Abacus also hid from the public that Lewis & Ellis's report expressly warned that these so-called internal LEs "***would not be as utilized within the industry***" and thus Lewis & Ellis would "offer no opinion as to their completeness or accuracy." ECF 120-28, at 6 (emphasis added).

71. Abacus's deceptive use of inconsistent discount rates and internal LEs was still not enough to ensure that Lewis & Ellis's valuation would match its own Lapetus-based inflated valuations. So, Abacus went even further in its deception.

72. In the days leading up to the June 10 press release, rather than providing Lewis & Ellis ***all*** LEs in its possession for the policies on its books, Abacus cherry-picked the LEs that it provided for analysis. Abacus chose to do this despite the fact that one of Lewis & Ellis's stated assumptions in the valuation report was that Abacus had provided it with "all relevant life expectancy information produced for an insured from various LE providers." *Id*. Not surprisingly, many of the LEs Abacus gave to Lewis & Ellis were older—and shorter—than the more recent LEs that Abacus had in its possession but failed to provide. By supplying older, shorter LEs to Lewis & Ellis on several of its largest policies, Abacus artificially inflated the values of those policies by millions of dollars. Abacus chose to do this despite language in the valuation report stating that Lewis & Ellis "is not responsible for the potential inaccuracy of the valuation results within this report for policies where all life expectancy information available for an insured was not provided." *Id*.

73. To provide just one illustration of this financial chicanery, for one insured, Abacus provided Lewis & Ellis with a single LE of 86 months, dated

December 31, 2018. *See* ECF 120-30, at 1 ([redacted]). But Abacus possessed at least ten ***newer***—and substantially ***longer***—non-Lapetus LEs for the same insured, ranging from 110 months to 202 months. *See* ECF 120-31. As a result, although Abacus internally valued this policy at [redacted] *see* ECF 121-20, at 7, Abacus caused Lewis & Ellis to value the same policy at an astonishing [redacted] for the same period, based on the single stale LE that Abacus provided. *Compare* ECF 121-20, at 7, *with* ECF 120-28, at 17. In other words, by relying on a single outdated LE while disregarding at least ten newer and longer LEs in its possession, Abacus created nearly [redacted] of value out of thin air on just this policy alone. In sum, Abacus's desperate press release to offset the Morpheus Report is replete with misrepresentations and falsehoods.

74. The discount rate game that Abacus played with the Lewis & Ellis report is not Abacus's only misleading manipulation of discount rates. Abacus initially used an unusually high discount rate of 21% in its August 2024 10-Q in order to ***partially*** offset the material impact of using short Lapetus LEs. *See* Abacus Q2 2024 10-Q, at 22 (Aug. 12, 2024). However, as the market began to recognize the problems with Lapetus's life expectancy estimates, Abacus could no longer plausibly justify relying primarily on Lapetus LEs to support its valuations. Abacus therefore resorted to another means of concealing its true financial condition and meeting its earnings targets: systematically reducing the discount rates used in its valuations quarter after quarter. Because a lower discount rate produces a higher present value, each reduction artificially ratcheted up the reported value of its portfolio.

| Date | Abacus Discount Rate |
|---|---|
| August 2024 (Aug. 12, 2024 10-Q) | 21% |
| November 2024 (Nov. 7, 2024 10-Q) | 20% |
| May 2025 (May 8, 2025 10-Q) | 18% |
| August 2025 (August 12, 2025 10-Q) | 16% |
| November 2025 (Nov. 7, 2025 10-Q) | 15% |
| March 2026 (Mar. 13, 2026 10-K) | 13% |
| May 2026 (May 11, 2026 10-Q) | 10% |

75. Thus, from August 2024 to May 2026, Abacus slashed the discount rate used to value its policies from ***21% to 10%***, even though no external factors justified cutting discount rates ***by more than half in less than two years***. On the contrary, market interest rates were steadily high during that period.

76. The discount rate was also no trivial input for Abacus. Small manipulations of the discount rate can—and did—drastically affect the company's portfolio valuation by tens of millions of dollars. *See* ECF 47-7, at 106 (Abacus stating that a 4% difference in discount rate would lead to a 15% difference in fair value). Overall, therefore, the steady decrease in Abacus's discount rate manufactured more than $100 million in artificial financial growth—a massive financial manipulation.

77. This subterfuge ultimately did not go unnoticed by Abacus's external auditors at Grant Thornton, who identified the determination of the discount rates used in the model to estimate the fair value of life settlement policies as a "critical audit

matter." *See* Abacus 2025 Form 10-K, at 52 (Mar. 13, 2026). Just three days later, on March 16, 2026, Abacus dismissed Grant Thornton as its public accounting firm. *See* Abacus Form 8-K (Mar. 18, 2026) ("On March 16, 2026, the Audit Committee (the 'Audit Committee') of the Board of Directors of Abacus Global Management, Inc., (the 'Company') approved the dismissal of Grant Thornton, LLP ('GT') as the Company's independent registered public accounting firm, effective immediately.").

78. Most recently, Abacus scrapped its use of discount rates altogether. *See* Abacus 2Q 2026 10-Q, at 24–25 (Aug. 10, 2026) ("Prior to June 30, 2026, fair value was determined using a discounted cash flow ('DCF') with Monte Carlo simulation to determine the fair value of each policy. . . . Effective with the quarter ended June 30, 2026, fair value is determined using a market multiple approach based on historical market-observed returns on cost basis (the 'Historical Return Method').").

79. Abacus's sudden switch to the "Historical Return Method" is just the latest ruse in its relentless campaign to mislead the market. To drive its "historical returns," Abacus has increasingly relied on related-party sales—selling policies to affiliated funds under its control—to simultaneously inflate its reported earnings and shed overvalued policies from its balance sheet. In other words, rather than substantiating its valuations, Abacus has sought to justify them by causing affiliated funds—funds as to which Abacus acts as both the buyer and seller—to purchase policies at elevated prices, to the detriment of those funds and their investors.

80. Indeed, Abacus and Jackson know that the lifeblood of the company's success—and the ability for its co-founders and executives to sell their shares—

depends on raising money from investors into its related-party funds, which can then purchase the overvalued policies off its balance sheet. Jackson has said as much: [redacted]" ECF 121-21, at 1 (emphasis added). And if Abacus could not raise third-party funds to monetize its policies at inflated prices, [redacted] of his company. *Id.* That, in turn, posed a problem for Jackson and other Abacus executives, who were admittedly "[redacted] *Id.* at 3.

81. Abacus is now using this tactic to recognize most of its sales revenue. Public filings reveal that, in 2025, more than 78% of the policies Abacus sold were sold to related parties like the Abacus Enhanced Income Fixed LP, Abacus Enhanced Income Plus LP, Abacus Premier Income Fixed LP, and Abacus Premier Income Plus LP ("Abacus Private Funds"). That number has only grown since.

82. To date, the Abacus Private Funds have raised over $500 million primarily from credit unions, including several based in Florida, by touting stable, low-risk returns, like a bond. Through its distribution partner, Acumen, Abacus assured investors that the "[redacted]," Ex. 12, at 8; that they [redacted] and that [redacted] Ex. 13, at 5. But

those representations were false. If people lived significantly longer, the fund would have to pay additional premiums to maintain the policies, which would negatively impact fund returns and liquidity.

83. Credit unions were also enticed to invest through representations from Abacus that, with regard to the Abacus Premier Income Plus Fund, [redacted]." Ex. 14, at 6. The Abacus Enhanced Income Plus Fund was similarly structured, with a representation that [redacted]." Ex. 15, at 6. Recently, the National Credit Union Administration, an independent federal agency that regulates, charters, and supervises federal credit unions and manages the federal insurance fund that protects savings deposits in credit unions, [redacted].

84. What was also not flagged for credit union investors was that the vast majority of policies to be acquired by the Abacus Funds would be purchased from Abacus. In addition, the Limited Partnership Agreements contemplated the real possibility that "[redacted] Ex. 16, at 19. Abacus would then have the [redacted]

[redacted].” *Id.*

85. Simply put, Abacus enticed the credit unions to invest in the Abacus Private Funds and then used its own clients’ capital to monetize policies at prices no arm’s-length buyer would agree to. Indeed, in its most recent SEC filing[redacted] Abacus revealed that during this past quarter, nearly ***93%*** of the policies sold were transferred to related parties under Abacus’s control. *See* Abacus Q2 2026 10-Q, at 58 (Aug. 10, 2026).[5]

86. The consequences are exactly what one would expect when a seller controls the buyer. In the first quarter of this year, “[s]ales to related parties resulted in average realized gains of 26.4%” versus mere “average realized gains of 10% from sales to external parties.” Abacus Q1 2026 10-Q, at 51 (May 11, 2026).[6] And, of course, very few of the sales were to external parties.

87. This dramatic difference underscores the ongoing financial manipulation that continues to prop up Abacus’s reported financial performance. Abacus could only offload these policies through related-party transactions—where it sits on both sides of the deal—because it had purchased the policies and valued them at inflated prices based first on Lapetus’s systematically short LEs and later on artificially reduced

[5] Not surprisingly, given Abacus’s near-total reliance on related party sales, Abacus somehow treats “sales to related funds to be transacted at arms’ length terms” for purposes of determining fair value under its new “Historical Return Method.” *See* Abacus Q2 2026 10-Q, at 25.

[6] After Counterclaimants pointed this out in their initial Counterclaims, the “average realized gains” statistic was conspicuously dropped from Abacus’s most recent 10-Q filing and replaced with a “weighted average realized gain” statistic that Abacus claims resulted in “no significant differences.”

discount rates. Unlike the related parties that Abacus controls, third-party [redacted] ECF 121-11, at 3. The scheme then becomes circular. Abacus uses its controlled funds to purchase policies at prices the arm's-length market would not bear; those related-party transactions generate purported "historical market data"; and Abacus then feeds that manufactured data back into its valuation methodology to support the valuations of other policies on its books. In this closed loop, Abacus does not rely on real market benchmarks—it manufactures its own. And the consequences now extend beyond Abacus's shareholders. By using client capital—including capital invested by credit unions—to purchase its overvalued inventory, Abacus has shifted the consequences of its valuation practices to investors in the very funds it controls.

**F. Abacus's First Amended Complaint**

88. Abacus's leadership—particularly Jackson [redacted]—was furious when Counterclaimants and Morpheus exposed Abacus's scheme. So, in retaliation, Abacus filed this frivolous lawsuit as a contrivance designed to reassure its investors and deflect attention from the substance and truth of Counterclaimants' and Morpheus's statements.

89. What remains of Abacus's operative complaint is a trio of claims against Coventry and Alan Buerger. The FAC alleges that Coventry and Mr. Buerger made a series of purportedly untrue statements about Abacus's business. However, at no time prior to this lawsuit did Abacus send Coventry or Mr. Buerger a cease-and-desist

letter—or any other writing—claiming that Counterclaimants' public statements were false or misleading.

90. At bottom, Abacus's defamation and FDUTPA claims rely on the premise that it is "false, misleading, and defamatory" to suggest that "Lapetus life expectancies are too short" and that "Abacus relies on those estimates to intentionally overvalue" policies. FAC ¶¶ 6, 7.

91. The problem for Abacus is that the premises of its lawsuit are ***themselves*** deliberately false and misleading. It is, in fact, ***true*** that Lapetus life expectancies are materially shorter than those of other LE providers. And, it is, in fact, ***true*** that Abacus relied on those life expectancies to value its policies during the relevant period. Most importantly, Abacus knew all of this ***when it filed this lawsuit***. Indeed, the same month Abacus filed its complaint, Abacus's records show that [redacted] out of [redacted] policies on its books—almost [redacted] of them—had [redacted]." ECF 121-22, at 1.[7] Just months earlier, Abacus and Jackson had calculated that using a different LE provider would cause the company's portfolio valuation to [redacted] *See* ECF 121-6, at 1. And discovery has confirmed that Abacus knew for a fact that Lapetus LEs were materially shorter than those of other providers and that many market participants would not accept them.

[7] The 80% figure was no anomaly. Abacus's records show that it predominantly relied on Lapetus LEs from the time it went public in 2023 through the filing of this case. *See, e.g.*, Ex. 17, at 2-10 ([redacted]; Ex. 18, at 2-7 ([redacted]); Ex. 19, at 1-13 ([redacted]); *see also* Ex. 20, at 2–3 (noting use of [redacted]

92. But Abacus sued anyway. It did so not because Coventry's statements were false—Abacus's own records confirm they were true—but because Abacus wanted to silence public scrutiny of its scheme to use misleading Lapetus LEs, manipulated discount rates, and related-party transactions to inflate its reported results and enrich itself.

93. Specifically, Abacus's FAC alleges that the following statements made by Counterclaimants, *inter alia*, are false and defamatory:

a. That Abacus "not exclusively but primarily" uses Lapetus as its "medical underwriting company." FAC ¶ 199(a).

b. That public companies are "trying to generate steady progress in [their] quarterly earnings," which creates a temptation to manufacture earnings. *Id.*

c. That only "small," "stupid," or "unsophisticated" investors use Lapetus. FAC ¶ 199(c).

d. That "fair market value [based on Lapetus] is grossly overstated," and that "[v]aluations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses." FAC ¶¶ 199(f), 199(i), 214(a).

e. That "Lapetus's life expectancy estimates are 'consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies.'" FAC ¶ 199(g).

f. And that Abacus has a "close" relationship with Lapetus. FAC ¶ 214(b).[8]

94. But Abacus indisputably knew that each of these statements was true when it filed this lawsuit.

a. Abacus knew that it primarily used Lapetus as its LE provider. As Grant Thornton remarked based on conversations with Abacus management, in "substantially all cases, [Abacus] management used ***one LE report per policy as they determine their valuation***." ECF 121-16, at 1 (emphasis added). And Abacus "[m]anagement ***typically utilizes Lapetus as their LE provider***." *Id.* (emphasis added). Abacus's policy holdings back this up. *See, e.g.*, ECF 121-23, at 3 ([redacted]

b. Abacus knew that it felt tempted to increase its earnings with the goal of driving the stock price up. Jackson pushed back on Scott Kirby wanting to [redacted] ECF 121-21, at 3. Jackson then doubled down, saying that Abacus is "[redacted]" because he was "[redacted]." *Id.* (emphasis added).

[8] Abacus continues to insist that many of these statements are false in its proposed Second Amended Complaint.

c. Abacus knew that sophisticated tertiary market investors had stopped using Lapetus LEs to buy policies. In Abacus's words, "[redacted]" ECF 121-24, at 2; *see also, e.g.*, ECF 121-25, at 3 [redacted] Ex. 21, at 2 [redacted]). In any event, whether an investor is "small," "stupid," or "unsophisticated" is quintessentially a matter of subjective judgment, not an objectively verifiable fact.

d. Abacus knew that fair market values based on short Lapetus LEs would be overstated. Shortly before it filed this lawsuit, Abacus conducted an analysis showing that if it were to [redacted] its portfolio value [redacted] *See* ECF 121-6, at 1. But Abacus's analysis identified another way to "[redacted] *See id.* And that is exactly what Abacus did. Earlier this year, after repeatedly lowering its discount rate each quarter, [redacted] This chart from Abacus's own analysis, which was sent to Jackson, says it all:

[redacted]

e. Abacus knew that Lapetus LEs were consistently and materially shorter than those of other LE providers. Abacus's own internal analysis of Lapetus's LEs found they were "significantly lower on average" than Fasano, "and lower on average compared to the short[est]" life expectancy on hand from any other provider. ECF 120-11, at 1. Abacus also knew that Lapetus's LEs were not merely shorter at the margins. As Abacus's Co-founder, Scott Kirby, acknowledged, [redacted]" ECF 121-26, at 2. And Jackson himself acknowledged that valuations could be "really high" because "we did Lapetus only." ECF 120-16, at 3. In addition, six days after the Morpheus Report—and less than three weeks before Abacus filed its first complaint—Abacus's Chief Investment Officer, Elena Plesco, received an LE analysis which expressly found [redacted] ECF 121-27, at 6.

f. And Abacus knew that it had—and continues to have—a close relationship with Lapetus. From the beginning, Abacus invested in Lapetus and Jackson unlawfully sat on the Lapetus Board so that Abacus could "[redacted] ECF 121-7, at 1. Subsequently, just six days before Abacus filed the FAC, Abacus's Revised Letter of Intent [redacted] ECF 121-28, at 1–2. Removing any doubt of Abacus's intention to continue its unlawful entanglement with Lapetus, Abacus also [redacted] and in fact hired Olshansky, a co-founder of Lapetus, following his company's demise. *Id.* at 2.

95. Other statements that Abacus challenges are likewise true—and Abacus knows it.[9] For instance:

a. Abacus says it is false that it has "to choose which accounting method [it'll] use for [a] policy and can never change it." FAC ¶ 199(d). But Abacus itself concedes this is true in its SEC filings. *See* Abacus 2024

[9] Abacus knowingly rips other statements out of context. It claims that it is misleading to suggest that Abacus does not use the "fair value" method. FAC ¶ 214(d). But Mr. Buerger never suggested otherwise—and in fact specifically acknowledged that Abacus "went to fair market value" when it went public. ECF 47-6, at 4. Nor did Mr. Buerger ever claim that Abacus had "asset-backed debt." FAC ¶ 199(b). This was merely one of "three things" that Mr. Buerger "believe[d] will likely happen" in the future to raise the capital that Abacus needs to perpetuate its financial scheme. ECF 47-6, at 3.

10-K at 80 (Mar. 28, 2025) ("The valuation method is chosen upon contract acquisition and is irrevocable.").

b. Abacus says it is false that the Coventry Study "cast[s] doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies." FAC ¶ 199(h). Yet that is exactly what the Study does. It reflects Coventry's observation—based on "all Lapetus life expectancy reports [Coventry] was aware of" for which another underwriter provided a report "within 3 months" of Lapetus's own—that Lapetus was "shorter in 85% of cases" by an average of 31 months. These results were then verified by academics. And they are consistent with Abacus's own internal analyses.

c. Abacus says it does not hold its policies for more than a "short period of time." FAC ¶ 214(j). But "a review of [Abacus's] SEC disclosures related to the buying and selling of policies show that its quarterly turnover ha[d] likely averaged 20.2%" during the year prior to this suit, which "impli[es] a holding period of over 1.3 years, double Abacus' target." Morpheus Research, *Abacus' Scattered Response Failed To Refute Any Of Our Allegations & Contradicted Its Own Statements To The SEC* (June 12, 2025), bit.ly/4eRw2L. This shows "that Abacus [was] becoming increasingly stuck with hard-to-sell, overvalued policies." *Id.* And that is why Abacus has since turned to offloading those policies to related parties. Nobody else will buy those policies

at the volumes and prices that Abacus needs to manufacture earnings growth.

d. Abacus says it is misleading to suggest that other public companies in the life settlement industry have gone bankrupt. FAC ¶ 214(c). But that is exactly what happened with Life Partners and GWG Holdings.

e. Abacus also says it is misleading to note that the company's "inventory" and "amount of money [it is] investing each quarter" is producing increasing "unrealized gains." FAC ¶ 214(e). But that, again, is exactly what the company's SEC filings showed.

96. Indeed, the FAC is rife with other misrepresentations that are flatly contradicted by Abacus's—and its business partners'—own documents. Other examples include:

a. "Abacus has ***never said that it uses Lapetus to value the assets on its balance sheet, nor has it ever done so***." FAC ¶ 11 (emphasis in original); *see also* FAC ¶¶ 69, 127 (same). That assertion turns reality on its head. In May 2025, Abacus's Director of Engineering, Armando Cabrera, told Jackson that [redacted] the same month Abacus's stated balance sheet valuation on its SEC filing was $446 million. ECF 121-6, at 1 (emphasis added); *see* Abacus Q1 2025 10-Q, at 2 (May 8, 2025) (listing $446 million for "Life settlement policies, at fair value").

b. "After reviewing [Abacus's] fulsome disclosures [in Abacus's November 4, 2024 response to the SEC's November 1, 2024 Comment Letter], the SEC did not raise any concerns about Abacus's valuation methodology or the relationship between Lapetus and Abacus again." FAC ¶ 119. This is a lie, too. On August 15, 2025—one month prior to the FAC being filed—the SEC penned another comment letter to Abacus specifically asking about Abacus's "relationship with Lapetus" as well as "whether any of your directors or officers have any interest in any of the medical underwriting firms." *See* ECF 120-25, at 3, 14.

c. Abacus characterizes Jackson's Lapetus directorship as "[a] prior unpaid nominal board position held by Mr. Jackson in which Mr. Jackson was in an advisory position, he did not have authority or capacity to act on Lapetus's behalf, and he was only minimally involved with Lapetus's operations." FAC ¶ 135. But Abacus's characterization bears little resemblance to the documentary record. Jackson was not merely an "advisory" or "nominal" board member. Contemporaneous documents identify him as "[redacted] ECF 121-17, at 2; *accord* ECF 121-29, at 3. Nor was Jackson "only minimally involved." The records show that he participated extensively at board meetings, *see, e.g.*, ECF

120-43, at 2, and continued participating in those meetings [redacted], *see* ECF 121-31, at 1–25.

d. Abacus describes its investment in Lapetus as a "$1 million convertible note, that may result in at most 5% ownership upon conversion," which "would not grant [Abacus] any influence or control over Lapetus." FAC ¶ 135. But Abacus's own documents tell a very different story. They state expressly that Abacus invested in Lapetus to "[redacted]" the notoriously short LE provider. ECF 121-7, at 1. Jackson was explicit, describing Abacus's investment as "[redacted]" and a means to [redacted] ECF 121-1, at 1. The investment also gave Abacus precisely the kind of influence its Complaint now disclaims: a contractual right to [redacted] which Abacus exercised by appointing Jackson himself as a voting member of Lapetus's Board. ECF 121-14, at 7.

97. Abacus knew its claims were based on false premises and nevertheless pushed ahead with this baseless lawsuit. Worse still, some of those same premises formed part of the factual allegations that this Court was required to accept as true at the pleading stage and considered in denying Defendants' motion to dismiss in part. Discovery has now revealed what the Court could not have known at the pleading

stage: Abacus's own contemporaneous documents directly contradict those allegations.

98. Lest there be any doubt, Abacus's press release announcing the lawsuit revealed a central purpose of the suit: to shut down public debate over its business practices as a public company in a regulated industry. Abacus used the filing of this suit to promote the narrative that it does "not" use Lapetus life expectancies "to derive its balance sheet valuations." Press Release, Abacus Global Management Sues Coventry and its Chairman Alan Buerger for Defamation and Anticompetitive Conduct (July 1, 2025), bit.ly/4vhXVm1. But Abacus knew that statement was patently false when it made it. One internal document after another—as well as documents from Abacus's auditor, business partners, and others—show that Abacus repeatedly relied on Lapetus LEs in valuing the policies reported on its balance sheet. Yet Abacus invoked this Court's process to tell the public precisely the opposite. Now, confronted with its own irrefutable evidence, even Abacus cannot maintain its misrepresentations any longer. *See supra* Note 3.

### G. Abacus and Jackson Launch a Public Smear Campaign Against Counterclaimants

99. While misleading this Court and bringing this frivolous lawsuit to try and cover up its tracks, Abacus and Jackson also attacked Counterclaimants through their own false and defamatory statements outside of this litigation.

100. Abacus issued its first press release attacking Mr. Buerger and Coventry just after filing this suit. That press release, which is not protected by the litigation

privilege, accused Mr. Buerger and Coventry of "engag[ing] in a concentrated effort to manipulate market sentiment" through "a systematic campaign to disseminate false and misleading statements about Abacus to regulators, auditors, market analysts, customers, investors and the public." July 1, 2025 Press Release, *supra*.

101. This public accusation was knowingly false. As explained above, Abacus was well aware when it filed this lawsuit that Counterclaimants' statements were, in fact, true. Abacus's own documents unambiguously corroborate those statements. Nevertheless, Abacus publicly accused Coventry and Buerger of having "devised a scheme to undermine Abacus through false and misleading statements" because Coventry was "[u]nable to compete." *Id.* Jackson then repeated that accusation, despite knowing that the statements Abacus branded "false" were true, claiming that Counterclaimants "tr[ied] to manipulate markets" with "false statements." *Id.* And Abacus lied once again that it "does not use Lapetus 'to value the assets on its balance sheet, nor has it ever done so.'" *Id.* Abacus's own contemporaneous records prove otherwise. These were not innocent mistakes. Abacus knew the truth, publicly said the opposite, and used the filing of this lawsuit to portray those who exposed its conduct as liars and market manipulators.

102. Abacus's press release also peddled the false claim that Counterclaimants partnered with Morpheus in publishing Morpheus's June 4, 2025 Report, which Abacus alleges "eras[ed] more than $200 million in market capitalization" for Abacus's stock. *Id.* Abacus subsequently entered into an agreement releasing Morpheus from all claims while continuing to pursue its claims against

Counterclaimants. *See generally* ECF 120-46. But Counterclaimants did not talk with Morpheus, let alone "partner" with it, before the June 4, 2025 Morpheus Report, as Morpheus's own representative and co-author of the Morpheus Report recently testified under oath. Ex. 10, at 96:12–18, 133:17–18.

103. Since that press release, Abacus and Jackson's public-facing lies have only increased. For instance, in response to Counterclaimants' Motion to Dismiss, an Abacus spokesperson accused Counterclaimants of "shed[ding] crocodile tears about the First Amendment" and falsely accused Coventry of being "a bully who was losing market share crossing the line." Donna Horowitz, *Coventry Says Abacus Can't Prove Malice in Defamation Suit*, The Deal (Oct. 16, 2025). Abacus knew that this characterization was grossly misleading, given that Coventry's statements were indeed true, as reflected in Abacus's own internal documents. So, unsurprisingly, "[a]n Abacus spokesperson didn't respond to questions" about "whether it had documents to back up [its] allegations"—because the documents directly refute them. Donna Horowitz, *Coventry Hounded Lapetus Out of Business, Abacus Alleges*, The Deal (Oct. 1, 2025). Instead, Abacus lied and misled the public to further its fraudulent scheme.

104. Now, with the evidence finally coming to light, Abacus has desperately tried to suppress the truth for as long as it can. To do that, it has sought to seal everything it can while falling back on its habit of lying to the public and others throughout the industry. Just this month—and even when faced with the undeniable evidence that exposes his company's fraud—Jackson falsely claimed to The Life Settlements Report that Coventry engaged in an "effort to mislead the public through

lies and malfeasance." Sarah Cohen, *Judge Unseals Some Documents in Abacus-Coventry Defamation Suit*, The Deal (Aug. 5, 2026). He also claimed that "[a]s this case advances, Coventry's lies and anti-competitive practices are being brought out into the open." Sarah Cohen, *Judge Allows Abacus to Proceed with Coventry Defamation Suit*, The Deal (July 14, 2026). But as the actual ***evidence*** shows—and as Jackson has known since the beginning—nothing about his statement could be further from the truth.

105. Meanwhile, Abacus issued another press release this month. In that press release, Jackson falsely claimed that "Coventry is backed into a corner, so it is doing anything it can to try to get off the hook for its defamatory and anti-competitive practices." Press Release, Abacus Global Management Provides Update on Defamation Lawsuit Against Coventry and its Chairman Alan Buerger, which is Advancing in U.S. District Court (Aug. 4, 2026), bit.ly/3SCW3FP. Jackson also falsely touted that "the underlying facts are going to prove a gross defamation scheme of monumental proportions enacted by Coventry." *Id.* At that point, we have passed through the looking glass. Abacus had in its possession the very evidence detailed above—evidence that corroborates Coventry's statements and contradicts Abacus's own allegations. Yet Abacus, while desperately seeking to seal the actual evidence in the record, publicly invoked the supposed undefined "evidence" as proof that Coventry was the one engaged in a "gross defamation scheme."

106. To be fair, Jackson did say one thing that is true: "Damning deposition testimony is pouring out weekly, including from Morpheus Research." *Id.* But Jackson neglected to inform the market that the testimony is damning ***for Abacus***.

Under oath, Morpheus's witness confirmed that after "[redacted]." Ex. 10, at 17:6–8, 28:10–13, 102:8–14. And Morpheus did not reach that conclusion because of what Counterclaimants said. Morpheus "immediately viewed all of Coventry's [public] claims with an immense amount of skepticism, as [it does] whenever [it] see[s] a competitor criticizing another competitor." ECF 120-45, at 182:17–20. Accordingly, Morpheus "[redacted]" what Counterclaimants had said. Ex. 10, at 198:18–21. And the mountain of evidence that Morpheus uncovered through a [redacted]" all [redacted] those statements. *Id.* at 132:3–21. That led Morpheus to conclude that Abacus "[redacted] *Id.* at 20:2–8, 159:24–160:2. Indeed, it was the witness's "personal belief" that "Abacus is still committing a fraud." ECF 120-45, at 175:10–13 ("Q: So you said today that Abacus is still committing a fraud . . . A: That's my personal belief.").

107. Morpheus's witness was right about that. And while Abacus and Jackson may be content to treat Counterclaimants as collateral damage in their ongoing scheme, the law does not tolerate such blatant disregard for the truth. Counterclaimants therefore assert the following counterclaims in order to hold Abacus and Jackson to account for their misconduct.

**COUNT I**

**(Violation of Florida Anti-SLAPP Act, Fla. Stat. § 768.295 by Abacus)**

108. Counterclaimants reallege and incorporate Paragraphs 1–107 as if fully set forth herein.

109. Florida's Anti-SLAPP Act provides that "[a] person . . . in this state may not file or cause to be filed, through its employees or agents, any lawsuit, cause of action, [or] claim . . . against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue." Fla. Stat. § 768.295(3).

110. The Anti-SLAPP Act further provides for a mandatory award of fees "incurred in connection with" a successful "claim that an action was filed in violation" of the law. *Id.* § 768.295(4).

111. Abacus brought this lawsuit against Coventry and Mr. Buerger primarily because they exercised their rights of free speech in connection with a public issue. Specifically, Coventry and Mr. Buerger made statements in interviews, public debates, and in protected conversations with government regulators, among other protected fora, regarding a public issue: the business practices and public disclosures of a publicly traded company, that receives public investment, that regularly publicly advertises on television and elsewhere, and that operates in a highly regulated industry.

112. Abacus's underlying lawsuit is utterly baseless and without merit. At all relevant times, Abacus regularly used Lapetus life expectancies to calculate the supposed "fair value" of the policies in its portfolio, and Lapetus life expectancies were

systematically shorter than those of other life expectancy providers. Abacus knew these facts prior to its filing of this lawsuit. And every one of the statements that Abacus challenges is constitutionally protected.

113. Furthermore, Counterclaimants were not the proximate cause of the June 4, 2025 Morpheus Report that allegedly harmed Abacus. They had no knowledge of Morpheus, nor any warning that Morpheus was going to release its report on June 4, 2025.

114. That some of Abacus's claims in its FAC recently survived Defendants' Motion to Dismiss, *see* Dkt. 100, is of no moment. In permitting certain claims in the FAC to proceed, this Court was required to "accept the factual allegations as true and construe them in the light most favorable to the plaintiff." *Id.* at 4 (quotation marks omitted). But the actual evidence shows that Abacus's claims are entirely frivolous—and that Abacus repeatedly lied to this Court both in its initial complaint and again in the FAC. *See supra* ¶¶ 90–98. Those lies do not insulate Abacus from liability. They are the very basis for these counterclaims.

115. Counterclaimants have incurred significant costs as a result of Abacus's tortious campaign; namely, the bringing and publicizing of this suit to stymie public debate. Counterclaimants have incurred damages including court costs and attorneys' fees in connection with Abacus's SLAPP suit. They are entitled to the recovery of those fees under the law.

**COUNT II**

**(Violation of Florida Viatical Settlements Act, Fla. Stat. §§ 626.991–993 by Abacus and Jackson; Fraudulent Viatical Settlement Act)**

116. Counterclaimants reallege and reincorporate Paragraphs 1–107 as if fully set forth herein.

117. At all relevant times, Abacus, and its employees and officers acting within the scope of their duties, including Jackson, were viatical settlement providers as defined in Fla. Stat. § 626.9911(14).

118. A "violation" of the Florida Viatical Settlements Act "is an unfair trade practice." Fla. Stat. § 626.9927(1); *see also id.* § 626.9521(1). And "[a]ny person damaged by the acts of a person in violation of th[e] act may bring a civil action against the person committing the violation." *Id.* § 626.9927(3).

119. It is "unlawful" to "[e]ngage in a fraudulent viatical settlement act." *Id.* § 626.99275(1)(f) (emphasis added). A "fraudulent viatical settlement act" includes knowingly or intentionally "[e]mploying a plan, financial structure, device, scheme, or artifice relating to viaticated policies for the purpose of perpetrating fraud." *Id.* § 626.9911(2)(b).

120. From 2023 onwards, Abacus and Jackson used false, misleading, or deceptive life expectancies for Abacus's own financial gain, including but not limited to valuing Abacus's portfolio and selling policies to the funds it manages based on Lapetus LEs.

121. At all relevant times, Lapetus was a life expectancy provider who issued life expectancy estimates that were routinely, consistently, and materially short, manifesting a pattern of false, misleading, or deceptive life expectancies.

122. Abacus and Jackson knew at all relevant times that these Lapetus life expectancy estimates were false, misleading, or deceptive, and still knowingly used these life expectancy estimates for the company and Jackson's own financial gain.

123. The instant lawsuit is part of Abacus and Jackson's "plan" or "scheme" to use false, misleading, or deceptive life expectancies for their own pecuniary gain. The success of that fraudulent scheme required Abacus and Jackson to suppress the truth and deceive the public. So, when Counterclaimants exposed the truth, Abacus filed this meritless lawsuit in retaliation to muzzle Counterclaimants, cover up Abacus's deception, and perpetuate Abacus's fraudulent scheme.

124. This lawsuit has produced significant actual damages to Counterclaimants, in the form of litigation costs, attorneys' fees, and reputational harms. It has also caused at least one bank to pause negotiations with Coventry on a loan facility, with the bank specifically citing Abacus's lawsuit and related public disclosures.

125. Abacus and Jackson's egregious misconduct has also harmed the reputation of the life settlement industry—and, in turn, Coventry's reputation and business within that industry. The industry has suffered this kind of damage before. Misconduct involving Mutual Benefits and Life Partners resulted in substantial investor losses and undermined public confidence in the life settlement market.

Abacus and Jackson have now inflicted similar harm by engaging in misconduct that once again threatens investor confidence in the integrity of life settlement valuations. As one of the industry's principal participants, Coventry has suffered resulting harm to its business and reputation, causing damages in an amount to be proved at trial.

126. Abacus and Jackson's scheme to use a pattern of false, misleading, or deceptive life expectancies also culminated in and was the proximate cause of the public documents surrounding this lawsuit, like Abacus's press releases and Jackson's other statements to the press, which caused actual damages to Counterclaimants, including reputational harm to Coventry and its business.

127. In addition to actual damages, Abacus and Jackson's pattern of blatant, intentional misconduct warrants the imposition of punitive damages.

**COUNT III**

**(Violation of Florida Viatical Settlements Act, Fla. Stat. §§ 626.991–993 by Abacus and Jackson; Prohibited Relationship with Life Expectancy Provider)**

128. Counterclaimants reallege and incorporate Paragraphs 1–107 as if fully set forth herein.

129. At all relevant times, Abacus, and its employees and officers acting within the scope of their duties, including Jackson, were viatical settlement providers as defined in Fla. Stat. § 626.9911(14).

130. At all relevant times, Lapetus was a registered life expectancy provider as defined in Fla. Stat. §§ 626.9911(5), 626.99175.

131. From November 2021 through November 2024, Jay Jackson was a voting member of the Board of Directors of Lapetus, a registered life expectancy provider, while simultaneously serving as an officer and director of a viatical settlement provider, Abacus, as well as its affiliates Abacus Settlements, LLC and Longevity Market Assets, LLC.

132. Jackson's service on the Lapetus Board of Directors violated the Florida Viatical Settlement Act's prohibition on viatical settlement providers serving as directors of life expectancy providers. *See* Fla. Stat. § 626.99175(6).

133. Jackson's service on the Lapetus Board of Directors, which violated the Florida Viatical Settlement Act, constitutes an "unfair trade practice" under Fla. Stat. § 626.9927.

134. "Any person damaged by the acts of a person in violation of th[e] act may bring a civil action against the person committing the violation." *Id.* § 626.9927(3).

135. While serving as a director on the Lapetus Board of Directors, Jackson repeatedly distributed information about Coventry and other industry members to Abacus in order to further the company's fraudulent scheme. This included, most notably, Jackson wielding his insider position to funnel information to Abacus personnel about "[redacted]" Lapetus's chronically low life expectancies in the marketplace. That abuse of power allowed Abacus to target unwitting counterparties and investors, even as sophisticated players in the market caught on to the problems with Lapetus. Abacus thereby leveraged Jackson's unlawful board position to increase its market share and harm its competitors, including Coventry.

136. Coventry discovered Jackson's abuse of his unlawful board position during the pendency of this litigation and raised these claims as soon as practicable.

137. As a result of Abacus and Jackson's unfair trade practices, Counterclaimants have suffered actual damages in the form of lost profits, in an amount to be proved at trial.

138. In addition to actual damages, Abacus and Jackson's intentional misconduct—which was a key part of their broader scheme—warrants the imposition of punitive damages.

**COUNT IV**

**(Defamation *Per Se* by Abacus and Jackson)**

139. Counterclaimants reallege and incorporate Paragraphs 1–107 as if fully set forth herein.

140. Neither Abacus nor Jackson is a media defendant.

141. Neither Abacus nor Jackson publishes disinterested and neutral commentary or editorializing regarding matters of public interest.

142. Abacus and Jackson made several false and defamatory statements as part of their malicious media campaign against Coventry and Mr. Buerger. Those false statements include:

a. Coventry is engaged in an effort to "mislead the public through lies and malfeasance."

b. Coventry and Mr. Buerger engaged in "a systematic campaign to disseminate false and misleading statements about Abacus to

regulators, auditors, market analysts, customers, investors and the public."

c. "[T]he underlying facts are going to prove a gross defamation scheme of monumental proportions enacted by Coventry."

d. "Coventry's lies and anti-competitive practices are being brought out into the open."

e. "Coventry is backed into a corner, so it is doing anything it can to try to get off the hook for its defamatory and anti-competitive practices."

f. "Unable to compete with Abacus' transparent pricing model and performance, Coventry and Buerger devised a scheme to undermine Abacus through false and misleading statements to convince the market that Abacus pays policyholders too much for their policies, causing an overvaluation of Abacus' assets."

g. "[T]hey chose to try to manipulate markets by damaging Abacus' reputation, confusing its customers, and undermining investor confidence with false statements."

143. Abacus and Jackson knew that these statements were all false, because they knew based on Abacus's own internal documents that Coventry and Mr. Buerger's statements were, in fact, true. At the very least, Abacus and Jackson acted with actual malice in making these defamatory statements about Coventry and Mr. Buerger.

144. Abacus and Jackson's specific intent in making these false and defamatory statements was to injure Coventry and Mr. Buerger and sully their reputation. The statements were made willfully and with malice; and the purpose, desire, and effect of these statements was to injure Coventry and Mr. Buerger.

145. Abacus and Jackson's false and defamatory statements, alone and without innuendo, tend to injure Counterclaimants in their trade or profession.

146. Abacus and Jackson's false and defamatory statements, alone and without innuendo, also naturally tend to subject Counterclaimants to distrust, ridicule, or contempt.

147. Abacus and Jackson published these false and defamatory statements to numerous third parties through press releases and by giving quotes to the media, intending that they would be disseminated broadly to injure Coventry and Mr. Buerger.

148. Abacus's false and defamatory statements do not enjoy any absolute or qualified privilege.

149. Abacus's intentional misconduct warrants punitive damages.

**COUNT V**

**(Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201–213 by Abacus and Jackson)**

150. Counterclaimants reallege and incorporate Paragraphs 1–107 as if fully set forth herein.

151. At all relevant times, Abacus was engaged in "trade or commerce" as defined in Fla. Stat. § 501.203(8).

152. Abacus violated FDUTPA by embarking on an unfair and deceptive smear campaign against Counterclaimants, as explained above. *See supra* ¶¶ 99–105, 142. These attacks were knowingly false. And they were made with the specific intent of deceiving the public and damaging Counterclaimants' reputation in order to cover up Abacus's fraud.

153. Abacus and Jackson's dissemination of their lies on top of lies was immoral, unethical, oppressive, and unscrupulous. It also offended public policy and was likely to mislead consumers.

154. While harming Counterclaimants' reputation in the marketplace, Abacus and Jackson's repeated FDUTPA violations simultaneously harmed consumers by misleading investors and consolidating market share. That market deception—and this lawsuit—is the direct result of Abacus and Jackson's defamation campaign and rampant, years-long scheme to defraud the public.

**RELIEF**

WHEREFORE, Counterclaimants respectfully request judgment against Abacus and Jay Jackson as follows:

a. Judgment on all counts in favor of Counterclaimants;

b. Compensatory damages in an amount to be proven at trial, including but not limited to damages stemming from reputational harms and lost profits;

c. Attorneys' fees and costs associated with Abacus's SLAPP suit;

d. Punitive damages for Abacus and Jackson's egregious pattern of knowing and intentional misconduct;

e. The imposition of sanctions against Abacus and its counsel for bringing this frivolous lawsuit;

f. An order requiring Abacus and Jackson to retract their false statements about Counterclaimants;

g. Pre- and post-judgment interest, to the maximum extent provided by law; and

h. Any and all other legal or equitable relief to which Counterclaimants are entitled.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Counterclaimants respectfully demand a jury trial on all issues.

Dated: August 20, 2026

Respectfully Submitted,

*/s/ Andrew J. Levander*

ANDREW J. LEVANDER (*pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
andrew.levander@dechert.com

MICHAEL H. MCGINLEY (*pro hac vice*)
BRIAN A. KULP (*pro hac vice*)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

ERIC AUSLANDER (*pro hac vice*)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006

ALFRED J. BENNINGTON, JR.
GLENNYS ORTEGA RUBIN
BENJAMIN F. ELLIOTT
SHUTTS & BOWEN LLP
300 South Orange Ave.
Suite 1600
Orlando, FL 32801

*Counsel for Defendants and Counterclaimants Coventry First LLC and Alan Buerger*