# EXHIBIT G

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

| | | |
|---|---|---|
| COVENTRY FIRST LLC,<br>Claimant | : | |
| v. | : | NO. 01-21-0017-1115 |
| TREYLED INSURANCE GROUP, INC. and DONALD ZEPLAIN,<br>Respondents | : | |
| v. | : | |
| LIFE EQUITY, LLC,<br>Additional Respondent on Counterclaim | : | |

## FINAL AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreements entered into between the above-named parties dated August 11, 2011 (JX-1), April 26, 2019 (JX-2), and December 12, 2018 (RX-16),[1] having been duly sworn, and having heard the proofs and allegations of the Parties, hereby AWARD as follows:

[1] "JX" refers to Joint Exhibits, "CX" to Claimant's Exhibits, and "RX" to Respondents' Exhibits.

**Introduction and Summary**

Coventry First LLC ("Coventry") commenced this arbitration against Treyled Insurance Group, Inc. ("TIG") and Donald Zeplain, and in its initial Demand, requested damages of "[greater than] $1,000,000 full damages to be determined at hearing" plus interest and attorneys' fees." TIG and Zeplain asserted a Counterclaim against Coventry and Coventry's affiliate Life Equity, LLC ("Life Equity"). Coventry and Life Equity are sometimes hereinafter referred to as the "Coventry parties," and TRG and Zeplain are sometimes hereinafter referred to as the "Treyled parties." JX-1 and JX-2 are sometimes hereinafter collectively referred to as the "Coventry contracts," and RX-16, which is a similar agreement between the Treyled parties and Life Equity, is sometimes hereinafter referred to as the Life Equity agreement. Generally, the claims and counterclaims relate to the business of purchasing and selling "viatical"[2] life insurance contracts owned by third-parties, a business which is also referred to as the "life settlement" business.[3]

[2] The Merriam-Webster dictionary defines a "viatical settlement" as "an agreement by which the owner of a life insurance policy . . . receives compensation for less than the expected death benefit of the policy in return for turning over (as by sale or bequest) of the death benefit or ownership of the policy to the other party (such as a company specializing in such transfers)." *See* https://www.merriam-webster.com/dictionary/viatical%20settlement.

[3] "[A] life settlement is the purchase of an existing policy for a discount of the death benefit." Tr. 122 (Reid Buerger, CEO of Coventry).

Coventry and other similar companies ("providers") purchase life insurance contracts from their owners (typically the named insureds, and sometimes referred to as "sellers"), sometimes directly (without any intermediary) and sometimes through brokers like the Treyled parties. Generally, the Coventry parties contend that the Coventry contracts required the Treyled parties to submit to Coventry any proposed life settlement contract for which the Treyled parties were acting as broker, to give Coventry an opportunity to make a counter-offer for any life settlement contract on which another provider was also bidding, to introduce to Coventry any "producers" of life settlement opportunities that were known to the Treyled parties,[4] and to refrain from any "interference" with Coventry's relationships with prospective sellers of life settlement contracts.

This arbitration is a dispute between a provider – Coventry and its affiliates – and two brokers – TIG and Zeplain. No "sellers" of life settlement contracts are parties to this case.

Coventry asserts that the Treyled parties breached the Coventry contracts, and also tortiously interfered with business relationships and prospective business

[4] Reid Buerger defined the term "producer" as including insurance agents, brokers and advisers. Tr. 128-29.

relationships between the Coventry parties and sellers and potential sellers of life settlement contracts. At the hearing, Coventry asserted that the Coventry parties suffered damages totaling $40,834,309, including alleged lost profits on life settlement contracts that Coventry was unable to purchase because of the Treyled parties' breaches, plus pre- and post-judgment interest and punitive damages. Generally, the Treyled parties deny that the Coventry contracts are valid and binding, deny that the Treyled parties breached the contracts or interfered with the Coventry parties' business relationships, and deny that the Coventry parties have proved their alleged damages. The Treyled parties counterclaim for $228,900 in commissions for life settlement contract sales which they brokered to the Coventry parties and which the Coventry parties withheld as a setoff to their claims against the Treyled parties.

The Panel conducted evidentiary hearings on ten days: August 1 through 4, 2023, October 30 through November 3, 2023, and December 12, 2023. At the hearing, Coventry and Life Equity were represented by their attorneys Kenneth Brown, Amanda MacDonald, David Riskin and others from their law firm Williams & Connolly, LLP; and TIG and Zeplain were represented by their attorneys Neil Lapinski, Madeline Silverman, Phillip Giordano and others from

their law firm Gordon, Fournaris & Mammarella, P.A. Mr. Reid Buerger, the Chief Executive Officer of Coventry, and Mr. Zeplain were also present through the hearings. The Panel has also received and reviewed hundreds of exhibits as well as a Stipulation which identifies specific life settlement contracts or policies that are at issue; and has received and reviewed post-hearing briefs which the parties submitted on January 31 and March 15, 2024.

The Coventry parties bear the burden of proof or risk of non-persuasion as to every element of their claims. For the reasons discussed below, the Panel concludes that the Coventry parties have failed to carry this burden for the alleged breaches and interference. Even if we concluded that the Coventry parties proved a breach of contract or interference, we also conclude that the Coventry parties have failed to prove their alleged damages, and therefore, we do not award any damages on Coventry's claims against the Treyled parties. Since Coventry's only defense to the Counterclaim was as a setoff to Coventry's claim against the Treyled parties, we award $228,900 to the Treyled parties on the Counterclaim.

## Discussion

The subject of this arbitration is the life settlement business, which is the business of buying and selling individual life insurance contracts which are

generally owned by the named insureds: "sellers."[5] None of the parties dispute that sellers have the right to sell their contracts directly to a life settlement "provider" like Coventry (or one of its competitors), or through a broker like one of the Treyled parties (or one of their competitors), or to not sell their contracts at all, *i.e.,* to retain the contracts to maturity (the death of the named insured), or to surrender the contracts to the life insurance company.

None of the parties contend that the Coventry contracts (JX-1 and JX-2) or the Life Equity contract (RX-16) are "exclusives." If one of the Coventry parties purchases a life settlement contract, it is not required to do so through one of the Treyled parties.[6] If a seller represented by TIG or Zeplain chooses not to sell a life settlement contract to one of the Coventry parties, TIG and Zeplain are not prohibited from representing that seller.

The first Coventry contract with one of the Treyled parties, JX-1 between Coventry and TIG, is dated August 11, 2011; the second contract, JX-2, is between

[5] Sometimes, individual life insurance policies are owned by the beneficiary or by a Trust established to hold the policy, but this difference is not material here, and we will refer to all owners of individual life insurance policies as "sellers."

[6] *See* JX-1, JX-2 and RX-16, §§1.3 and 3.4, and *see also* Tr. 169 (Reid Buerger). Coventry contends that all three contracts permit it to decide whether to bid for or purchase any life settlement contract directly – without any broker involvement – or through one of the Treyled parties.

Coventry and Zeplain individually, and is dated April 26, 2019. The Life Equity contract, RX-16, is between TIG or Zeplain and Life Equity, and is dated December 12, 2018. Zeplain testified that it was explained to him that he "needed to sign" these contracts so that he and TIG could receive broker compensation for life settlement contract transactions where one of the Coventry parties was the successful bidder and where one of the Treyled parties had acted as broker. Tr. 873-74. Coventry does not dispute Zeplain's testimony about what Coventry told him about the contracts. Coventry did purchase 5 life settlement contracts through the Treyled parties during the relevant time period.[7]

Zeplain testified that he did not review the contracts that he signed – JX-1, JX-2, and RX-16 – and that he was not aware of what they provided until much later when Coventry claimed that the Treyled parties were not complying with the contracts.[8] Coventry does not dispute Zeplain's claim of ignorance, and indeed

---

[7] The relevant time period is the four-year period (corresponding to the applicable limitations period) preceding October 22, 2021 when the Treyled parties terminated the Coventry contracts. *See* CX-26, 43, 76, 134, 293 and 299 which are the "Individual Application Fee Schedules" for these 5 purchases. (CX-17 is for a purchase by Life Equity.) CX-293 and 299 are duplicates. All of these transactions are during the relevant period. *See also* Tr. 1891 (Richmond) and CX-362 (Richmond report), Exhibit 1. Presumably, Coventry also purchased one or more life settlement contracts through the Treyled parties prior to the relevant time period, since the contract with TIG was signed in August 2011.

[8] Tr. 872-73.

cites it as proof of the Treyled parties' non-compliance.[9]

Section 3.1 of all of these three similar agreements provides for the parties to execute an "Individual Fee Application Schedule" for each viatical contract purchase for which one of the Coventry parties was the successful bidder and for which one of the Treyled parties was to receive compensation paid by Coventry (as Coventry would have it) or "facilitated" by Coventry as part of Coventry's purchase price for a viatical contract (as Treyled would have it).[10] There is no dispute about the life settlement transactions that the Coventry parties did purchase through TIG or Zeplain, except for the Counterclaim, *i.e.,* except for the fact that Coventry has withheld payment of the Treyled parties' commissions due on two such contracts, as a setoff against Coventry's claims against the Treyled parties.

Although the first contract between Coventry and the Treyled parties was signed in 2011, Coventry's Chief Executive Officer, Reid Buerger, testified that he was not aware of any issue concerning the Treyled parties' compliance for more

---

[9] *See* Coventry Opening Brief at 4-5.

[10] The parties' briefs debate whether the commissions were "consideration" for Treyled's alleged promises to submit to Coventry all life settlement contracts for which one of the Treyled parties was the broker, and to allow the Coventry parties to make counter-offers on all such contracts. As discussed below, we conclude that the Coventry and Life Equity contracts do not require the Treyled parties to submit all contracts to the Coventry parties, and our decision does not turn on whether Coventry paid or only facilitated payment by the sellers of the commissions that the Treyled parties earned.

than 9 years after the signing of the first contract, when he learned of an issue relating to the McIntosh case around October 2020.[11] No witness testified about the details of this discussion. Buerger testified only that he was assured that the Treyled parties "would make sure to comply with that contract."[12]

Buerger testified that he became aware of another problem at the time of the Cinader case in October 2021.[13] Coventry's General Counsel sent a letter to the Treyled parties on October 22, 2021 expressing concern "that Treyled continues to be in breach of the Agreement."[14] The same day, Zeplain sent letters terminating both of the Coventry contracts (JX-1 and JX-2).[15] All three contracts generally provide that any party may terminate on ten days written notice, and that the "non-interference" provision survives termination by one year.[16] Coventry commenced this arbitration on October 28, 2021.

Coventry claims three categories of damages caused by the Treyled parties: "lost profits arising from failure to submit and/or failure to give right of

---

[11] Tr. 199.

[12] Tr. 200.

[13] Tr. 200-01.

[14] CX-313 and CX-316.

[15] CX 321 and RX 18.

[16] JX-1 (§§2.8 and 4.2); JX-2 (§§2.7 and 4.2); RX-16 (§§2.7 and 4.2).

counteroffer" for 41 specific life settlement contracts that fall within the four year limitations period, totaling $33,280,254; "damages arising from" TIG's "failure to introduce producers," totaling $4,718,730; and "damages from" the Treyled parties' "interference with at-issue policies," totaling $3,064,225. We consider each of these categories in turn:

**"Lost profits arising from failure to submit and/or failure to give right of counteroffer."**

Coventry contends that, for any life settlement transaction brokered by the Treyled parties, the Treyled parties were obligated by the Coventry contracts to allow Coventry to bid for the contract and also to give Coventry an opportunity to make a counteroffer to any offer from a competing purchaser. Coventry has identified 41 contracts, which it refers to as the "at issue policies," and contends that it would have been the successful bidder for all of these 41 policies. Coventry's contention that it would have been the successful bidder on the 41 contracts is based solely on the testimony of Reid Buerger,[17] who testified about

[17] Coventry's damages expert, Richmond, expressly disclaimed any opinion as to whether Coventry would have acquired the 41 contracts, and stated that he was relying on Buerger's testimony. Tr. 1875.

what Coventry would hypothetically have bid for each of the 41 contracts.[18] Coventry's damages calculation is based on Buerger's testimony about what Coventry would have bid for the 41 "at issue" contracts, the conclusion that Coventry asks us to draw (and that Coventry's expert assumed) that Coventry would have won all 41 contracts, and a calculation by Coventry's expert witness, Mr. Andrew Richmond, of Coventry's "average profit" on life settlement contracts that Coventry purchased through the "intermediary channel," *i.e.,* through a broker like the Treyled parties, and not directly.

Although Coventry now contends that the Treyled parties were required, by the Coventry contracts, to permit Coventry to make offers and counter-offers to any life settlement seller for whom the Treyled parties were acting as brokers, Coventry never complained to Treyled about this until 9 years after the first contract was signed in 2011. Although Coventry claims that the Treyled parties were required to provide Coventry with the opportunity to make offers and counter-offers for every life settlement transaction, Coventry also contends that in such a case, it had the right to bypass the auction conducted by the Treyled parties,

[18] Coventry repeatedly denied that Buerger was testifying as an expert. *See, e.g.,* Tr. 357 (Ms. McDonald: . . . . So the idea that Mr. Buerger is offering an expert opinion, that is just not true. He's a fact witness.")

purchase the life settlement contracts directly from their sellers, and pay the Treyled parties nothing. Considering both Coventry's interpretation of its own contracts, and Zeplain's testimony, we conclude that the contracts were merely conditional, *i.e.*, promises by Coventry to pay a commission to the Treyled parties, when a Treyled-conducted auction of a life settlement contract resulted in a successful bid by the Coventry parties.

Coventry was not obligated to deal with the Treyled parties on any other individual life settlement contract. The Treyled parties were not liable to the Coventry parties for "failure to submit" or "failure to give right of counteroffer" for other life settlement transactions. Coventry was not obligated to pay anything to the Treyled parties if it purchased a life settlement contract directly from the seller, even if Treyled also tried to act as a broker for the same contract.

We also find that, even if there were liability for "failure to submit" or "failure to give right of counteroffer" on the 41 "at issue" life settlement contracts, Coventry has not proved its damages. Coventry has identified 41 life settlement contracts for which it alleges that the Treyled parties acted as brokers during the

relevant four-year time period.[19] Coventry's CEO, Reid Buerger, testified for each such contract to an amount that he contends that Coventry would or could have bid, an amount that exceeds the amount that the sellers of the 41 individual contracts accepted from other providers. Based on this hypothetical bid amount, Mr. Buerger contends that but for the Treyled parties' alleged breach, Coventry would have purchased all 41 contracts, and is therefore entitled to damages, measured by its "average profit," calculated by Mr. Richmond. The contention that all 41 hypothetical bids would have been successful is implausible, and the contention that any of the 41 bids would have been successful on any one of the 41 contracts is speculative. Coventry has competitors. Even if Coventry made the bids that Mr. Buerger said that it would have made, one of its competitors might have bid more. Even if Coventry made the bids that Mr. Buerger said it would have made, the seller might have nevertheless chosen not to accept Coventry's offer, as all sellers have the right to do, and some did.[20] Even if Coventry did win the contracts, Mr. Richmond's calculation of alleged lost profits is unconvincing because it assumes that all successful bids were equally profitable, and because it

---

[19] *See* page 7 n. 7, *supra*, *i.e.,* the four-year period (corresponding to the applicable limitations period) preceding October 22, 2021

[20] *See* pages 15*ff*, *infra*.

is based on the unproved assumption that the Coventry parties would not have any additional variable or incremental costs if they acquired the 41 additional policies.[21]

**"Damages arising from failure to introduce producers."**

Coventry's claim for failure to introduce producers fails for the same reason as its claim for "failure to submit" and "failure to give right of counteroffer." The Coventry contracts and the Life Equity contract were conditional, requiring a commission to the Treyled parties only if they made an introduction to which Coventry responded with a bid that was accepted by the seller.

Coventry has also failed to prove its alleged damages for this category – $4,718,730. (This is the second component of Coventry's total damage figure of $40,834,309.) Here, the damage calculation is based on Reid Buerger's testimony: (a) that the Treyled parties "failed to introduce" 15 producers; (b) that on average, each producer yields two life settlement transactions for Coventry; and (c) that Buerger derived from Richmond's calculation of "average" profit that an average

[21] Mr. Richmond testified that he assumed on the basis of an interview with Reid Buerger in February 2023, and because of the "sheer size of Coventry," it would not incur any additional operating costs in order to acquire the 41 at issue policies. Tr. 1904-06. Treyled's expert, Frank Bernatowicz, testified that Coventry would have incurred additional operating costs. We do not believe that Mr. Richmond's interview with Mr. Buerger and his assumption about the effect of Coventry's size are sufficient to carry Coventry's burden of proof as to incremental costs.

hypothetical profit for each hypothetical transaction was about $157,000.[22]

Each of the 15 producers on Coventry's "failure to introduce" list was associated in some way with one or more of the 41 "at issue" contracts but there is no evidence supporting Mr. Buerger's assumption that a producer introduction would result in two additional life settlement transactions for Coventry. Buerger himself testified that this assumption was "speculative."[23] Even if we accepted this speculative assumption, and even though Richmond testified that he did not calculate "failure to introduce" damages, the "average hypothetical profit" figure utilized by Buerger is actually based on, and is subject to the same infirmities as Richmond's calculation generally.[24] Therefore, even if we found that the Treyled parties were liable for "failure to introduce," Coventry has failed to prove damages in the "failure to introduce" category.

---

[22] Tr. 481 ($153,000). Tr. 482 ($157,000), Coventry parties' opening Brief at App. B ($157,291). Richmond testified that he did not calculate damages for this claim (Tr. 1879, 1932-33). Nevertheless, and although this calculation was never clearly explained, it appears to be based on Richmond's calculation of total net death benefit on the 1,369 policies acquired through the intermediary channel ($1,824,854,003, *see* Ex. 1 to Richmond's report, CX-362), divided by 1,369 (Richmond's determination of the total number of policies acquired through the intermediary channel) and multiplied by 11.8 percent (Richmond's calculation of net profit on the 1,369 policies as a percentage of net death benefit). As such, it depends on Richmond's calculation of net profit percentage which is subject to the infirmities that we have previously described.

[23] Tr. 482.

[24] *See* page 13 and note 21, *supra*.

**"Interference with at-issue policies."**

Coventry's final category of alleged damages is for interference with potential business relationships between Coventry and the owners of 11 specific life settlement contracts. Mr. Richmond did not calculate damages for this claim.[25] The Coventry parties are claiming interference damages both under the Coventry contracts, and under common law tort principles. Coventry contends that it is entitled to receive damages equal to the commissions that the Treyled parties earned by brokering the sale of life settlement contracts where Coventry alleges interference. Treyled admits that on some occasions, Zeplain made negative comments about Coventry, but Coventry has not proved that these negative comments resulted in a loss of business. Treyled presented evidence from the owners of the 11 contracts, or their advisors, which was inconsistent with Coventry's interference claims.[26]

For example:

- Emily Scott, a Manager for the Investment Adviser for the Cinader

[25] Tr. 1879,

[26] Treyled sought to call the contract owners and advisors as live witnesses. We directed Treyled instead to submit written statements, and required that Coventry be provided with the opportunity to cross-examine those witnesses.

policies directed the Treyled parties to accept an offer from one of Coventry's competitors, for several policies, even though Mr. Zeplain informed the Adviser that Coventry was interested in making an offer.[27] *See also* Coventry cross-examination of Ms. Cook at p. 18 ("Mr. Zeplain . . . was professional . . . in every way"). The Cinader owners had the right to make this decision.

- The Trustee for the Elmer Cook policy decided to stand by his decision to accept an offer from one of Coventry's competitors, even after Zeplain informed the Trustee that Coventry had made a higher offer, and that he could rescind his prior acceptance of the rival offer.[28]
- W. McComb Dunwoody, one of the owners of the Dunwoody policies, directed Zeplain "not to go back to Coventry First."[29] Mr. Dunwoody concluded that "Coventry First had attempted to low-ball me by attempting to purchase the Policies for less than their

[27] Exhibit RX-232 at ¶10. *See also* Exhibit RX-257 (cross-examination of Ms. Scott) at 18.

[28] Exhibit RX-233, ¶¶7-9.

[29] Exhibit RX-237 (written testimony) at ¶¶4, 11; cross-examination (RX-256) at p. 42.

market value. I was upset and had no interest in offering Coventry First another opportunity to purchase the Policies. And so, I instructed Mr. Zeplain to stop the auction and not go back to Coventry First"; *see also* Coventry cross-examination of Dunwoody, RX 256, at pp. 17, 42).

- Mark Leyden (adviser to the owner of the Elliott Nelson policy), RX-238 at ¶¶6-7 ("After seeing the results of Mr. Zeplain and TIG's auction, which resulted in the Nelson Policy selling for almost double the value that Coventry First had offered, I determined that it was in Mr. Nelson's best interest to sell the Nelson Policy for $620,000. I instructed Mr. Zeplain and TIG to close the auction and accept the $620,000 gross offer without going back to Coventry First"); *see also* RX 252 (Leyden deposition) at 38 ("I wouldn't use Coventry for just this, you know, just the reason that happened in this case, that they're, they're not competitive and, you know, we had a dramatically better offer").

No contract seller testified that its decision was affected by derogatory statements by the Treyled parties, and several submitted written statements that

they declined to sell their contracts to Coventry even though the Treyled parties made no such derogatory statements and encouraged them to solicit offers from Coventry. In short, the Coventry parties have not carried their burden of proof as to any damages caused by alleged interference.

**Counterclaim.**

Coventry admits that "it set off amounts it determined were related to the commissions of TIG and a TIG affiliate arising from transactions involving a policy insuring Malcolm McQueen (Policy No. 8243885) and a policy insuring Don Aron (Policy No. 1A23128560)."[30] As we conclude that Coventry is not entitled to damages, and as Coventry has not asserted any other defense to the Counterclaim except for *pro forma* defenses of "unclean hands" and "*in pari delicto*," which we conclude are not applicable, we will therefore require the Coventry parties to pay the $228,900 in commissions that are due to the Treyled parties.

## Award

For the reasons discussed above, we award nothing to the Coventry parties on their claims, and we award $228,900 to Respondent Treyled Insurance Group,

[30] Coventry and Life Equity Answer to Counterclaim, ¶4.

Inc. on its Counterclaim.

The above sums are to be paid on or before THIRTY days from the date of this Award.

The administrative fees and expenses of the American Arbitration Association totaling $24,325.00 shall be borne as incurred, and the compensation and expenses of the arbitrators totaling $165,728.00 shall be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Date: 5/16/2024 — Lawrence D. Berger, Arbitrator

/s/ Bernard Chanin

Date: 5/16/2024 — Bernard Chanin, Arbitrator

Date: 5/16/2024 — Hon. Barbara Byrd Wecker, Arbitrator

I, Lawrence D Berger, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Date 5/16/2024: Lawrence D. Berger, Arbitrator

I, Bernard Chanin, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

/s/ Bernard Chanin

Date: 5/16/2024 Bernard Chanin, Arbitrator

I, Hon. Barbara Byrd Wecker, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Date: 5/16/2024 Hon. Barbara Byrd Wecker, Arbitrator